**IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON**
**IN AND FOR THE COUNTY OF WHITMAN**

PATRICK FLEETWOOD and MICHAEL
FLEETWOOD,

          Plaintiffs,

    vs.

WASHINGTON STATE UNIVERSITY,

          Defendant.

Case No.  20-2-00053-38

**AMENDED COMPLAINT**

The Plaintiffs, PATRICK FLEETWOOD and MICHAEL FLEETWOOD, by and through

MATTHEW Z. CROTTY, of CROTTY & SON LAW FIRM, PLLC complain of Defendant and

alleges as follows:

### I.  PARTIES, JURISDICTION, & VENUE

1.    Patrick Fleetwood was a student of Defendant Washington State University during

the time-frame relevant to this lawsuit.  Mr. Fleetwood has standing because he has been aggrieved

by the below-referenced Agency action as (a) that Agency action has prejudiced Mr. Fleetwood's

AMENDED COMPLAINT - 1

ability to complete his college education in a timely manner and his desire to serve as an officer in the U.S. Army (b) the Agency failed to consider Mr. Fleetwood's interests (described in more detail below), and (c) a judgment in Mr. Fleetwood's favor would substantially eliminate the prejudice to Mr. Fleetwood caused by the Agency's actions. Per RCW 34.05.546 Mr. Fleetwood's mailing address is 880 NE Providence Court, Apt P102 Pullman, WA 99163. For the purpose of this complaint Mr. Fleetwood is referred to as "Fleetwood."

2. Michael Fleetwood is Patrick Fleetwood's father. M. Fleetwood made a public record request to Defendant to which Defendant did not respond as provided by law. Unless otherwise noted, Michael Fleetwood will be referred to as "M. Fleetwood" in the Amended Complaint.

3. Defendant Washington State University ("WSU") is a state agency with a place of business in Pullman, Washington. Defendant is either referred to as "WSU" or "the Agency" in this complaint.

4. The Whitman County Superior Court has jurisdiction over this case.

5. Venue is proper in Whitman County pursuant to RCW 34.05.514(2).

6. The administrative pre-requisites to bringing this lawsuit are satisfied. Mr. Fleetwood timely appealed WSU's December 16, 2019, sanctions decision, to the WSU Appeals Board. On February 21, 2020 the WSU Appeals Board upheld WSU's December 16, 2019, decision. Mr. Fleetwood filed this instant action within 30 days of February 21, 2020.

7. The administrative pre-requisites to bringing the gender discrimination, tortious interference, First Amendment, Fourteenth Amendment, and Title IX claims have been satisfied. Mr. Fleetwood served Defendant with a Notice of Tort claim on May 19, 2020. Defendant received

AMENDED COMPLAINT - 2

said Tort Claim on May 22, 2020 and acknowledged receipt of said Tort Claim on May 28, 2020. Over sixty days have elapsed since May 22, 2020.

## II. FACTS

8.     Mr. Fleetwood incorporates the above allegations as if pled verbatim herein.

### Part 1: Timeline

9.     During late November and early December of 2018, Patrick Fleetwood, an ROTC MS-IV[1] at WSU, had a short-lived consensual sexual relationship with the C.P.[2], an ROTC MS-I. At least initially, there was no expectation for monogamy and no real "dating." This was a *hook-up*, no strings attached; and Fleetwood understood the C.P. understood that arrangement.

10.     Fleetwood recalls the pair hooked-up four times before he stopped initiating contacts in part due to cellular messages indicating the C.P.'s potential for jealous manipulation and indiscretion.

11.     The C.P. would later explain to the ROTC board (that was subsequently convened for the purpose of removing Fleetwood from ROTC) that she "broke it off in early to mid-December because she learned [Fleetwood] was sleeping with other women."

12.     Despite having allegedly "broken it off" in early December, on New Year's Eve, December 31, 2018 the C.P. texted Fleetwood, "Should I dump your ass in 2018?"

13.     On January 3, 2019, Fleetwood received a text from a friend in Anacortes sharing a profile photo of the C.P. (who appears to be partially naked behind a poster) promoting her dating

---

[1] MS IV means "Military Science" IV, a fourth year ROTC cadet. A MS I is a first year ROTC cadet. A MS II is a second year ROTC Cadet. A MS III is a third year ROTC cadet.
[2] C.P. = Complaining Party

AMENDED COMPLAINT - 3

1 availability on Tinder: The profile reads, "back on Tinder cause it's break and I'm bored as hell."



2

3

4

5

6

7

8

9

10     14.    On January 9, 2019, WSU was back in session, and Fleetwood invited the C.P. along

11 with two other students to a "coupon deal" group lunch at Pullman's Red Bento sushi restaurant.

12 Inviting fellow Cadets/students to "coupon lunch deals" was something Fleetwood did regularly. As

13 it turned out, that day just the C.P. was available to attend, and something about the pair's interaction

14 at the lunch did not sit well with the C.P., who later gossiped to ROTC peer Cadet M. that Fleetwood

15

16 had "become hostile towards her due to her refusal to provide ongoing sexual favors."

17     15.    Fleetwood has consistently denied attempting to re-initiate a sexual relationship at

18 the January 2019 Red Bento lunch or at any time after early December 2018.

19     16.    When asked under oath at Fleetwood's ROTC Disenrollment Hearing, the C.P.

20 *changed her earlier account* of the lunch: "He did not directly ask to resume a sexual relationship,"

21 but rather she perceived he "was flirty with her." Notes recorded at the ROTC Disenrollment Hearing

22 read as follows:

23

24

25 AMENDED COMPLAINT - 4

LTC Stafford then asked ___ why she went to the Red Bento sushi restaurant with Fleetwood on 09 JAN 2019. She said that she thought it was going to be a lunch in a group setting and that Cadet ___ and ___ would be there. However, when she got there it was just the two of them present. LTC Stafford then asked ___ if Fleetwood made any direct comments to resume a sexual relationship with her. She said that he did not directly ask to resume a sexual relationship, but was flirty with her during the lunch. She said she told Fleetwood during the lunch that she was not interested in continuing their prior sexual relationship.

17.     Nonetheless, by January 10, 2019, the ROTC rumor mill had been activated. And sometime after the Red Bento lunch, Cadet M. approached Fleetwood to ask why he had tried to "force the C.P. into a quid pro quo sexual relationship."

18.     Cadet M. was "just a friend" who had romantic interests in the C.P. and became her chief conspirator/advisor in the case against Fleetwood in the months to follow. The C.P. told the ROTC board, "Cadet M was the one informing her of things such as sexual comments that Fleetwood was saying about her." She added that, Cadet M. "did encourage her to make a complaint and helped her with it."

19.     Former Cadet C, who now serves as a Sergeant in 19th Special Forces Group, was Cadet M.'s roommate during the time of the complaint. He shared how C.P. began visiting their apartment to drink alcohol during Fall 2018 (Cadet M. was legal aged; C.P. was not). She visited up to twice per week in January 2019 when the complaint was filed. In early 2019, Cadet M told Cadet C about his complaint against Fleetwood, and Cadet C "did not believe the narrative put out to him. He believed they were conspiring against Fleetwood." After overhearing conversations in a small apartment, he concluded as summarized under oath to ROTC, "Cadet M was actively helping C.P. with how to respond to questions. He said that Cadet M had been subject to a prior disenrollment board and knew that may have made him jealous of Fleetwood."

AMENDED COMPLAINT - 5

20.    On January 10, 2019, WSU ROTC hosted a Sexual Harassment/Assault Response and Prevention Program training lab, and afterwards the C.P. sent a Snapchat telling Fleetwood to stop joking about them to other people. This was the first time that C.P. told Fleetwood to stop joking or otherwise discussing their relationship or her in general. Fleetwood responded with an OK emoji and proceeded to block her on Snapchat.   Later, when asked by ROTC why he blocked her, Fleetwood said, "he was irritated by the fact that C.P. told Cadet M. that Fleetwood had asked to start a sexual relationship again when it was not true."   He added that, "He did not want to play games with C.P. anymore." Blue is C.P.  Red is Fleetwood:



21.    On January 15, 2019, Cadet D told Fleetwood that he had heard from Cadet R that the C.P. and Cadet S were planning to file a Sexual Harassment/Assault Response and Prevention Program (SHARP) complaint against him.  Fleetwood called Cadet S to verify what he'd been told by Cadet D, but he did not pick up, so Fleetwood messaged him on Facebook. Finally, Fleetwood called the C.P. for a 60 second call, requesting her to stop talking about their relationship as if it had not been consensual because he had overwhelming evidence to show the relationship had been

AMENDED COMPLAINT - 6

consensual.  That was the last time Fleetwood spoke to the C.P.

22.    ROTC December 2019 Disenrollment hearing notes confirm, "Fleetwood was adamant that he was not trying to intimidate C.P. but was upset because he felt he was being falsely accused of sexual assault based on gossip he was told by other Cadets."

23.    That same day, January 15, 2019, Fleetwood also exchanged texts with his friend Cadet P. (ex-boyfriend of the C.P. who she had claimed via text message to be so angry with a few weeks earlier).

> Fleetwood: I don't need an investigation on my name is what I'm saying dude. I'm asking that if I need evidence or back up... if you'd be the guy to help me out.
> Cadet P: What evidence? Like I was not involved in what occurred between you guys.  Me and her dated and things ended like relationships do.
> Fleetwood: No, I mean, "Patrick wouldn't do that" type deal.
> Cadet P:  If you want to call me as a character witness then I'll answer whatever they ask me.  But I don't know what happened between you to. Like she's my Ex and I hold no hard feelings.  Like I'm friends to both of you."

24.    To be clear, *no investigation existed* at the point when Fleetwood texted Cadet P. Instead, there was an active rumor mill that the C.P. planned to accuse Fleetwood of sexual assault. Fleetwood heard the word "rapist" used by several other Cadets and a Cadre to describe him. Nevertheless, the WSU-OEO December 16, 2019 Finding #7 concluded, "You contacted another student via text message about providing evidence to 'help you out' with the  investigation," which then became evidence for a WAC 504-26-219 sanction of "attempting to discourage one's … participation in, or use of the conduct system."

AMENDED COMPLAINT - 7

25. On January 15, 2019, Cadet S. *approached Fleetwood*[3] explaining he wanted to discuss rumors he had heard through the C.P. after PT (Physical Training).

26. On January 16, 2019, Cadet S. and Fleetwood had a short, soon-to-be documented discussion about the rumors of sexual assault. This short discussion with a long time ROTC peer would later be used as a second "finding" to support Fleetwood's alleged interference with another's "Use of the student conduct system," and hence the early direct witness account is provided in full:

> harassment. I then advised CDT _____ that she should go to cadre and report CDT Fleetwood's actions. She stated that she did not want to be thought of as "The unit slut" or "The girl who kept someone from commissioning" (along those lines). I told CDT Fleetwood that I wanted to talk to him in person "tomorrow" which was 16Jan2019. After PT on 16Jan2019 I went up to CDT Fleetwood wanting to hear what he had to say. When I tried to talk to him he acted verbally aggressive towards me saying "you dont know anything"/"stay out of it" after that he said "You have a history of reporting this stuff to cadre." in reference to an incident last year when my now fiancé CDT _____ reported a nude photo that was posted on ROTC social media. I became angry and said "Stop talking" he said a few words which I cant remember and then said "now I'm mad" and left the building (to my knowledge) I had messaged CDT _____ about needing to talk to him.

27. On January 18, 2019, after ostensibly conspiring with Cadet M, the C.P. went with

---

[3] Again, timeline in this period is important because once allegations of sexual harassment were effectively disproven, WSU instead promoted an "interference retaliation" finding, relying on evidence and full disclosure of Fleetwood's three very brief attempts to clear his name of rape allegations, communications which all took place during this January 15-16, 2019 *before* any claims had been filed with ROTC or WSU-OEO.

AMENDED COMPLAINT - 8

Cadet S to file a complaint with WSU ROTC which proceeded to take a sworn statement dated 18 January 2019 11:29 am.

28.    Because it is revealing to read the early version of a report intended to end a man's military career; an excerpt from the C.P.'s sworn written statement record on January 18, 2019 at 11:29 am appears here:



29.    To summarize, the C.P. swore under oath that her November-December sexual relations with Fleetwood had been fully consensual, but described how she later heard *false rumors*

AMENDED COMPLAINT - 9

that Fleetwood had sexual relations with thirty women that semester.[4]  These rumors (perpetuated by Cadet M, a dubious witness with his own romantic interests in the C.P.) prompted the C.P. to express her *speculative concern* about Fleetwood's character and ability to serve as an officer in the Army due to "the way he treats women."[5]

30.    The sworn statement continued, explaining how rumors of Fleetwood's sexual promiscuity concerned her because it made her "realize why someone would take their own life due to another person destroying their reputation." To be clear, none of this "Fleetwood-destroyed-her-reputation" allegation was revealed to have basis in fact—not by the WSU OEO investigation, and not by the Army's own investigation; nonetheless, the early sworn statements do establish the C.P.'s motivations.

31.    Lest accusing Fleetwood of causing an entirely fictionalized future suicide might seem extreme, the C.P. did clarify to the ROTC: "I never personally had these thoughts, but to realize the severity of his gossip could potentially lead someone to do that was a crazy thought for me and for the people [i.e. unknown fictionalized future people] he could potentially effect."

---

[4] Fleetwood did <u>not</u> have anything close to thirty sexual interactions that semester.

[5] With regards to the C.P.'s motivation for filing, she was asked under oath at the ROTC disenrollment hearing why she chose not to testify against Fleetwood at the WSU Community Standards hearing, and she replied, "she did not want to prevent Fleetwood from receiving his degree from WSU.  She just does not want him to be an officer in the US Army because how he treats females."

AMENDED COMPLAINT - 10

*[handwritten text]* me deeply because it made me realize why someone would take their own life due to another person destroying their reputation. I never personally had these thoughts, but to realize the severity of his gossip could potentially lead someone to do that was a scary thought for me and for the people he could potentially effect. Furthermore, on January 9th, 2019,

32.     WSU ROTC then forwarded C.P.'s *speculative concern* to WSU OEO, and later that same day, on January 18, 2019, at 12:51pm, WSU OEO Investigative Assistant Cheryl Rose reached out to the C.P. about filing a Title IX complaint thru the Office of Community Standards.

33.     On Friday January 18, 2019, at 1:11pm, the C.P. replied to Ms. Rose, "Thank you for reaching out to me, and I would like to meet to pursue further action as soon as possible."

34.     **On January 22, 2019, ROTC LTC Brendan Hobbs counseled Cadet Fleetwood telling him for the first time to cease contact with the C.P. and alerting him he had requested a Title IX inquiry into his behavior between December 2018 and 18 January 2019.** Allegations presented to Fleetwood were, "statements contributing to a hostile environment and threat of professional retribution for reporting harassment to Cadre." The Summary of Counseling Key Points of Discussion reads, verbatim: "CDT Fleetwood -I have received a formal complaint against you from fellow cadets in reference to the Army SHARP program and the WSU Title IX Policy. I have directed a Commander Inquiry and requested a formal Title IX investigation from the Title IV coordinator on campus with regards to incidents between December 2019 and 18 January 2019.  2. You are to cease all verbal, digital and telephonic communication with [C.P.] effective immediately. 3. You are to cease discussing the incident or incidences relate to this complaint with any cadets or outside immediately. 4. You are welcome to provide a sworn statement on your own behalf 5. You

AMENDED COMPLAINT - 11

are to conduct yourself as a professional and a leader at all times."

35.    That same hour, January 22, 2019, LTC Hobbs told Fleetwood words to the effect that he had not wanted to open an Army SHARP investigation, and rather forwarded the complaint to the Office of Community Standards because, quite frankly, he did not think anything would come of it.  He also advised Fleetwood not to worry because he did not believe ROTC had any intention to kick him out.

36.    On January 23, 2019, Fleetwood submitted a personal written statement responding, to the best of his ability, to the broad allegations shared by LTC Hobbs in the January 22 Counseling. The statement clarified that he had not threatened retaliation; he had not harassed, taunted, nor threatened to blackmail the C.P. Instead he was concerned about false allegations of sexual assault; and that he felt personally threatened by the false allegations: "I expect to see individuals who knowingly make false allegations be held accountable for their actions."

37.    On January 24, 2019, the C.P. met with OEO Investigator Nikki Finnestead in her office. Finnestead emailed at 11:31 am requesting the C.P.'s permission to contact ROTC to gather information about their "reporting and response processes."

38.    On January 24, 2019, the C.P. returned Ms. Finnestead's email: "I know we talked about a lot both times we met, so if there's anything you need me to say or do, please let me know."

39.    A meeting between C.P. and Finnestead took place on January 24, 2019. Intake notes from that meeting (written by Finnestead) reveal that C.P. stated:

- "The reason I stopped having sex with is CFW is kind of a fuck boy and u shouldn't be getting them and *he needs to learn to not get with girls*.  He told his friends group from break, I'm going to be loyal to this one girl he was talking to not me.  …  He isn't a very loyal person"

AMENDED COMPLAINT - 12

- "*The spotlight gets off me and on his behavior in uniform…general character check on him*"
- "They [Cadet S, Cadet M, and Cadet HFT] wanted to meet me in the library. They said we should bring this case forward. At first, I was like I don't know"
- "People telling [me I'm an] ROTC slut.  Not to my face"
- "Cadet M said Patrick's not really a great guy.  I said, I'm not trying to date him."
- "It's really weird because most college students, drama is contained outside of classroom setting.  You're with a ton of strangers in class. But for me a lot of what I do revolves around ROTC. Around it all the time. With the people who *potentially think bad things about me*".

40.     On July 25, 2019, Ms. Finnestead and Ms. Brooks recorded notes from an interview with a unknown ROTC representative.

41.     On January 28, 2019, Rachel Brooks informed the C.P. by email that she would now be the contact person and primary investigator for the case, indicating Ms. Finnestead, who did the "intake interviews" was removed or removed herself from the case.

42.     On January 28, 2019, at 11:09 am, the newly assigned investigator Rachel Brooks emailed the C.P. with her interpretation of the "allegations" (presumably compiled by Ms. Finnestead).

43.     Because the allegations evolved, the initial text of C.P.'s "allegations" will be provided in full:

Brooks:  "I just wanted to follow up with you to let you know that moving forward I will be the primary investigator in your case … please review the following allegations that will go into the letter we send him, if there are parts you would like us to change, please do so and return them to me.
- On or around January 9, 2019, you subjected the C.P. to comments that were sexual explicit [sic] when you made comments such as "She squirted all over my sheets" and referring to another as an "Eskimo Bro" (Eskimo Bros is a reference to two people who have had sex with the same person at different

AMENDED COMPLAINT - 13

times). In addition on or around January 10, 2019 the C.P. walked into class, when you pulled lip gloss from your pocket and stated that you had found the lip-gloss by your bed and asked the C.P. if she left it there. Via snapchat the C.P. asked you to stop joking about you and her around people, and that she did not appreciate it.

• Additionally, the C.P. alleges that you engaged in retaliatory conduct against the C.P. to dissuade her from making a complaint or participating [sic] in an investigation under this policy; thus, engaged in retaliation. Specifically, she alleges that you told her she would have "no respect" in the program if she brought "this case forward," and that you "have a list of people backing" you.

• Also the C.P. alleges you contacted another in the program asking that if they are contacted by investigators to help you out and to tell them that "Patrick wouldn't do that, type deal."

44.    To be clear, neither the dates nor the details of allegations in this first communication bear notable resemblance to the alleged "facts" of the case presented in the January 18, 2019 sworn statements to ROTC, nor later, in the June 13, 2019 WSU Investigation Report produced by Investigator Brooks. Nevertheless, when explicitly asked by Brooks for corrections, emails from the C.P. did not contest <u>any</u> version of the ever changing allegations except as noted below.

45.    On January 28, 2019 11:21 am, the C.P. emailed Investigator Brooks a "Don't quote me on that" disclaimer: "Of course I am nervous about the investigation moving forward but know it's for the best. In regards to the letter I would appreciate it if the direct quotes weren't used, just because I stated them off memory and don't know if they were the exact phrasing he said to me- given, I know the general ideas were stated but I feel uncomfortable putting words into his mouth over a letter that may or may not be the exact way he phrased it."

46.    On January 28, 2019 11:23 am, Ms. Brooks emailed the C.P. she would make the correction requested above and resend it to her.

47.    On January 28, 2019 11:26 am, the C.P. replied, "Send it as soon as you see fit. But

AMENDED COMPLAINT - 14

again, the less quoting you can say in the letter the best, in my opinion." ... "If you want to use [the direct quotes] however that is fine."

48.    On January 30, 2019 8:31 am, after consulting with a "senior investigator," Ms. Brooks emailed the C.P. who then approved a significantly altered collection of allegations as follows:

**Brooks:** "Specifically, the C.P. alleged that you subjected her to harassment and bullying by explicitly talking about the sexual relationship to others or talking to her about the sexual relationship in the presence of others within the WSU classroom setting or on campus, which harmed and/or had the potential to harm her reputation amongst classmates in the WSU program. This included, but is not limited to, the following comments:

   a. During the week of January 9, 2019, you spread rumors about her sexual activities to other members of WSU such as telling others that she "squirted all over my sheets," and referring to another as an "Eskimo Bro" with the understanding that Eskimo Bros is a reference to two people who have had sex with the same person at different times.[6]

   b. On or around January 10, 2019, when the C.P. walked into class, you pulled lip gloss from your pocket and stated that you had found the lip gloss by your bed, asking the C.P. if she left there.

   c. Subjected her and other students to sexual comments by openly and explicitly talking about your sexual activities with other women;

   d. Persistently attempted to reinitiate a sexual and/or romantic relationship with the C.P., which was unwanted.

   e. Subjected her to negative and rude treatment and comments amongst other students, including those in the WSU program, when the C.P. was not amenable to reinitiating a sexual and/or romantic relationship with you.

   f. Engaged in retaliatory conduct against the C.P. to dissuade her from making a complaint or participating in an investigation under this policy which included, but is not limited to, on January 15, 2019, you told her she would have

AMENDED COMPLAINT - 15

no respect in the program if she brought this case forward, and that you have a lot of people backing you.

g. Engaged in interference when you contacted another in the program asking that if they are contacted by investigators to help you out and to tell them that "Patrick wouldn't do that, type deal."

49.    The C.P. replied a few minutes later that she was good with the new version of events and encouraged Ms. Brooks to begin the case.

50.    Neither of these he said/he said "Eskimo Bros" accounts survived investigation, and both were removed entirely from WSU's December 16, 2019 Findings. Nonetheless, WSU took no issue with C.P.'s willingness to accept either version as "truth," with emails to Brooks confirming she "okayed" both versions.

51.    As for the shifting hearsay that Fleetwood told someone that someone (Fleetwood/C.P./someone else?) "squirted the sheets," **and** the odd "chap stick" incident; both storylines also entirely disappeared during investigation; instead, the June 13 Investigation Report, line 17 shares that,  "Investigators learned that Student A [Cadet M.] had provided information that was later determined to be, more likely than not, untrue. … Investigators followed up with Student A about this inconsistency, he did not have a response for the inconsistency.  This inconsistency did affect Student A's credibility … his remaining statement were given limited weight as appropriate." In other words, Brooks figured out the main allegations were lies, but never fully dismissed Student A (Cadet M's) credibility. Nor did she dismiss a case based on verifiable lies.

52.    On January 31, 2019, Brooks hand-delivered a letter to Fleetwood clarifying that he was under investigation for the allegations above and that he should cease contact with the C.P.

AMENDED COMPLAINT - 16

53.     On February 5, 2019, Ms. Brooks had an email exchange (presumably with ROTC) indicating she **just then**, and not before received the sworn written testimony from the original January 18, 2019 written complaints to ROTC.

54.     On Sunday, February 10, 2019, Fleetwood emailed Ms. Brooks the written response to allegations he had provided ROTC in January and requested to meet with her in person as soon as the following day.

55.     From February thru May 2019, Investigator Brooks led a decidedly non-prompt investigation with her first interview of Fleetwood not taking place until March 29, 2019.

56.     Notes from the investigation are seemingly incomplete in many places; however, close reading reveals Brooks' (RMB's) bias against Fleetwood as compared to other note-takers present in the room during the same interviews.

57.     The spring interview also reveal that Brooks failed to pursue lines of questioning to elicit exculpatory evidence which could have proven Fleetwood's innocence and revealed the C.P.'s ulterior motivations.

58.     For example, on April 10, 2019, Brooks received exculpatory evidence via email from a former WSU student named by the C.P. as a possible "victim" of Fleetwood's allegedly inappropriate advances towards female MS-I Cadets:

AMENDED COMPLAINT - 17

yui

I'm sorry for the delay in my response as I have a busy schedule. I have heard about the case you are looking into. However, I never felt apprehensive or felt that ███ was unapproachable. I discussed that the case did not pertain to me with ███. I was never called in to speak to ███, otherwise I would have. I do not think I have any information that would be helpful to this case or I would have went to speak to him myself.
The individual who reported the ███ in question thought I had been involved with this ███ as well; however, this is not the case. I believe she named me because she knew I had been friends with the ███ in question and that I am not anymore. While I am no longer friends with the ███ in question it has nothing to do with anything pertaining to this case or his conduct. I explained to ███ that me leaving the ███ program had nothing to do with the alleged ███
Also, I believe the individual that reported this ███ confused me with another female ███ my friend ███ She has been given me permission to give you her email as she was more involved with the alleged ███ and might be able to help answer your questions about his conduct. Her email is ███

**Key quote:** "While I am no longer friends with the [Fleetwood] it has nothing to do with anything pertaining to this case or his conduct.  I explained to [presumably C.P.] that **me leaving the [ROTC] program nothing to with the alleged [Cadet].**"

59.     This witness testimony relates to the C.P.'s initial written based on Cadet M.'s rumors:  "Not only did I find out he had sex with well over 30 women that semester, he was also involved with two other MS I cadets: Ms. KS and Ms. GD. I do not know if they left the program because of him, but his [sic] predatorial behaviors of pursuing the newest/youngest freshmen in are [sic] program concerns me." Ms. Brooks' realization that this basis for complaint had been proven untrue, is not mentioned in the report.  Indeed, the witness above is not listed as a witness.

60.     During the prolonged investigation, the January 31 allegations of sexual harassment retaliation/interference proved un-true, introducing major credibility concerns with both the C.P. and her key witness Cadet M.

61.     When original harassment allegations proved false, the WSU OEO chose to solicit new witness testimony to pursue a new line of questioning related to Fleetwood's much earlier transmission of a Snapchat video consensually created in September 2017. The video played no role in the C.P.'s original complaint to ROTC or WSU OEO.

AMENDED COMPLAINT - 18

62.     During this phase, Brooks also led a witness to claim she had been previously "grossed out" by a shirtless "Army Strong" photo Fleetwood transmitted by phone at time period when he was dating one of her friends.

63.     These photos and videos did not involve the C.P.; and in fact, no individual had ever reported (or complained about) their existence prior to the investigation.

64.     No physical evidence of the photos nor video exists; nevertheless, Fleetwood answered truthfully under oath to confirm he did regret sending the consensually created Snapchat video in 2017.  He clarified that woman encouraged him to send the video because she apparently wanted to promote her reputation with other ROTC men. The video lasted 12 seconds and disappeared from his friends' phones immediately upon receipt.

65.     On June 13, 2019 WSU delivered an Investigation Report, drafted by Ms. Brooks who also completed the bulk of the interviews for the investigation [Read: Fleetwood's investigator was also his adjudicator].  The report found Fleetwood "Responsible" for Violating WSU Executive Policy 15 Prohibiting Discrimination, Sexual Harassment, and Sexual Misconduct based upon the seven Initial Allegations from the C.P. (none of which included mention of photos or videos).

66.     Ms. Brooks transmitted the June 13, 2019, report to Karen Metzner (more on her below) via email at 12:40 PM.

67.     At 3:04 PM on June 13, 2019, Ms. Brooks emailed Ms. Metzner in part "give me a call. I want to share some information with you that I learned from a meeting I had to day [sic] with the Respondent and [redacted]."

AMENDED COMPLAINT - 19

68.    No written record of what Ms. Metzner and Ms. Brooks discussed exists.

69.    On June 13, 2019, Ms. Brooks (cc'ing Ms. Metzner) emailed C.P. informing C.P. that her failure to participate in a conduct hearing could have consequences for the case.

70.    Issues with Ms. Brooks' June 13 Investigation Report are substantial and described more fully in Part III of this document; however; evidence of a biased investigation include:

- a verifiably inaccurate list of witnesses,
- a lack of effort to assess witness credibility,
- a failure to examine the C.P.'s motivation,
- a failure to summarize exculpatory evidence,
- a repeated reliance on hearsay as fact
- factual timeline issues, confusing chronology,
- failure to explain how/why initial allegations disappeared and instead, were replaced by unrelated allegations surrounding alleged cell phone misconduct from an entirely different standpoint.

71.    On June 14, 2019, and July 12, 2019, WSU Conduct Officer 1 "Holly Campbell" emailed Fleetwood, that WSU's Community Standards office received a complaint and the allegations against Fleetwood might be referred to a University Conduct Board. Both letters began, in part:

> As your WSU Center for Community Standards, we are here to protect the opportunities and success of all students. You are receiving this letter because we received a report you and subjected another student to unwelcome conduct on the basis of sex and/or gender on campus and within the WSU ▨38▨ program. The report also alleges that you engaged in harassment of a sexual nature towards her and others within the WSU ▨38▨ program, and that you engaged in retaliation and attempted to interfere with the investigative process. This may be violation(s) of:

72.    Ms. Campbell's letters invited Mr. Fleetwood to attend informational session later that summer; however, Mr. Fleetwood attend said informational session until October 24, 2019.

AMENDED COMPLAINT - 20

73.    On October 1, 2019, Karen Metzner (the person Brook's emailed on June 13th regarding Fleetwood) contacted C.P., referenced a prior phone call she (Metzner) had with C.P., and asked if C.P. would like to be involved in the Conduct Board formal hearing.

74.    On October 2, 2019, M. Fleetwood made an online public record request for "the complete investigative file concerning the Office of Equal Opportunity Complaint No. 2019-021 including all statement and records."

75.    On October 4, 2019, C.P. informed Ms. Metzner that she did not want to be involved in the Conduct Board formal hearing.

76.    On October 8, 2019, Ms. Meztner (a) *after* having an off the record call with Brooks about Fleetwood on June 13, 2019, (b) *after* having an off the record call with C.P. sometime in late-September/early-October 2019, and (c) *knowing* (from the June 13th email exchange) that C.P. had been warned of the consequences of not participating in the hearing process, emailed Mr. Fleetwood that she (Metzner) was Fleetwood's "designated Conduct Officer" and that Fleetwood was "assumed not responsible for the reported incident:"

> I am your designated Conduct Officer from the WSU Center for Community Standards. It is my role to help you throughout this process, evaluate all available information, and determine appropriate outcomes. Until a decision is made at your hearing, you are assumed not responsible for the reported incident.

77.    At or near this time Fleetwood also learned that ROTC had scheduled a proceeding called a Disenrollment Board to determine whether he should remain in ROTC. Fleetwood immediately requested a delay in his disenrollment hearing so he could obtain a copy of the June 13, 2019 investigation and related documents through a public record request.

AMENDED COMPLAINT - 21

78.     On October 18, 2019, M. Fleetwood made a second public record request for "[t]he complete file and all records concerning WSU Center for Community Standards Case No. 2018371301, including all emails and records of communications with the Office of Civil Rights Compliance and Investigation (formerly Office for Equal Opportunity) concerning this case and/or OEO Case No. 2019-021."

79.     On October 21, 2019, Fleetwood made an official record request for "any and all information" related to the OEO case.

80.     On October 23, 2019, Ms. Metzner let Fleetwood review some documents relating to the case but would not allow Fleetwood to copy or photograph said documents. Fleetwood was only able to review the documents for approximately 30 minutes. When Fleetwood got up to depart the office Ms. Metzner asked if he would like a copy of the redacted file, Fleetwood said "yes" and Metzner promised Fleetwood that he would get the file before Fleetwood's ROTC Disenrollment Board hearing.

81.     To that end, on October 23, 2019, Fleetwood made another record request for "all documents" relating to the case.

82.     On November 21, 2019, WSU informed M. Fleetwood that his October 2, 2019, and October 18, 2019, public record requests were denied because of the Family Educational Rights and Privacy Act (FERPA).

83.     On December 5, 2019, Fleetwood met with Ms. Metzner in her office. Nobody else was present. It would appear this would later be described as his "conduct hearing" by WSU. At the "hearing," Fleetwood provided Metzner with additional evidence he had compiled, but she

AMENDED COMPLAINT - 22

seemed to him to be impatient. It seemed clear to him she had already made her decision. The meeting was short. Fleetwood was not provided with the redacted file that Ms. Metzner promised and had no opportunity to cross examine witnesses.

84.    On December 9, 2019 an Army Disenrollment Board convened a 10+ hour hearing to review evidence, make credibility determination, question witnesses, and allow for cross-examination of witnesses including the C.P., Fleetwood, Cadet P, Cadet.S.  Cadet/Sergeant C and others.

85.    In addition, to the aforementioned testimony from the C.P. confirming that the noncredible witness Cadet M. had been her chief source of false information about Fleetwood, ***and*** that Fleetwood had never directly asked her to re-engage in a sexual relationship.  Other key elements of exculpatory evidence collected during the ROTC hearing included testimony from Cadet P., the C.P.'s ex-boyfriend, who claimed under oath that:

- It was not unusual for MS-IV and MS-I cadets to date.
- He'd heard rumors from Cadet M that Fleetwood "treats woman like crap" but with regards to actual negative comments about the C.P. the worst he ever heard Fleetwood say was that she was "annoying."
- He said Fleetwood had never bragged about his sexual exploits in uniform

86.  ROTC also interviewed Cadet L who confirmed:

- The C.P. had dated three MS-IV cadets before or during the investigations.
- When asked if it was normal to discuss sexual activities among Cadets, he said it was normal to talk about women they were hooking up with in private settings but not in the ROTC setting.  When asked if he ever heard Fleetwood bully or make inappropriate comments or spread rumors about the C.P.; he had not.
- Cadet L. claimed he had received one inappropriate Snapchat video from Fleetwood, but could not recall the time period.

87.  ROTC also interviewed Cadet S. further who clarified:

AMENDED COMPLAINT - 23

- he had not heard Fleetwood say anything inappropriate about the C.P.,
- he never heard Fleetwood use the term Eskimo Bros.
- Multiple times he heard Cadet M. slandering Fleetwood.
- Before going forward to ROTC on January 18, he only heard thru the C.P. that Fleetwood was trying to "ruin her reputation."
- He also confirmed that he and Cadet M. were fellow freemasons, and that Cadet M. had sponsored him.

88.    On December 16, 2019 WSU, by and through, Ms. Metzner found Fleetwood

"Responsible" for the violating the following community standards:

> **WAC 504-26-227 - Sexual harassment.** Sexual harassment includes behavior defined in Washington State University's Executive Policy 15, which prohibits discrimination, sexual harassment, and sexual misconduct.
> **WAC 504-26-209 - Violation of university policy, rule, or regulation.** Violation of any university policy, rule, or regulation published electronically on the university web site or in hard copy including, but not limited to Executive policy 15 (policy prohibiting discrimination, sexual harassment and sexual misconduct).
> **WAC 504-26-219 - Abuse of the student conduct system**. Abuse of the student conduct system including, but not limited to: (5) Attempting to discourage an individual's proper participation in, or use of, the student conduct system.

> Metzner's letter claimed, "After our discussion and reviewing all the information available to me, I have determined the following more likely than not occurred:
> 1.You and the C.P. had a consensual sexual relationship which ended in December 2018. After the relationship ended, you made sexual comments about your relationship and the C.P. to fellow students in the program. While you identified these people as your friends, they were also in some cases your subordinates within the program and also friends/acquaintances of the C.P..
> 2. You sent a photo to students in the program of you shirtless and in a towel via "ShapChat". You sent the photo because you were proud of your physique and the training program that you were currently completing in preparation for the Ranger Challenge.
> 3. You sent sexually inappropriate videos to several ROTC members. You sent these videos years ago, on your 21st birthday, and alcohol played a factor in the situation.
> 4. The students who received these photos/videos did not ask you to send them photos/videos and the photos/videos were unwanted.
> 5. You called the C.P. after you heard that she intended to file a report about her experiences.

AMENDED COMPLAINT - 24

6. You contacted another student via Facebook Messenger to discuss the reporting process with them.

7. You contacted another student via text message about providing evidence to "help you out" with the investigation."

89.    Ms. Metzner's December 16, 2019, finding (a) forbade Fleetwood from having "any contact with the C.P. or other parties involved [in the process] until December 16, 2021" (b) required Fleetwood to draft an action plan (c) required Fleetwood to write a reflection paper, (d) required Fleetwood to complete a state-approved alcohol and drug information program, and (e) placed Fleetwood on disciplinary probation. The December 16, 2019, finding also placed Fleetwood on "enrollment hold" pending completion of the above-referenced tasks.

90.    On December 19, 2019, WSU Army ROTC, obligated to honor the Community Standards sanction, informed Fleetwood that he had breached the terms of his ROTC contract due to his undesirable character demonstrated through his violation of WSU Executive Policy #15. And on August 13, 2020 the Army in fact disenrolled Fleetwood from ROTC and required he repay his $32,617.63 in debt from scholarships and based the disenrollment decision on Fleetwood's violation of EP 15.

91.    The Army's *only* listed reason for their recommendation for disenrollment was the broadly referenced WSU OEO sanction citing his violation of EP#15 and the following specific concern underlined to the initial complaint: "The sending out of explicit video and showing other Cadets naked and inappropriate photos of women is not something a Cadet of Character would do and is not in compliance with the Army Values."

92.    By listing the much earlier, unrelated incidents of video/photo transmission as *its only* corroborated evidence, the Army's Disenrollment Investigation **effectively discredited all**

AMENDED COMPLAINT - 25

**other allegations of sexual harassment and retaliation** nefariously propagated by the C.P.'s January 18, 2019 SHARP complaint which prompted the WSU Community Standards investigation.

93.    On January 5, 2020, Fleetwood appealed the December 16, 2019, finding to WSU's University Appeals Board.

94.    Fleetwood's January 5, 2020 appeal contained a signed statement from an admittedly disinterested third party witness that made clear that C.P. and CDT M conspired on *CDT M's* desire to get Fleetwood thrown out of ROTC.

95.    On February 21, 2020, WSU's Student Appeals Board via Olivia Shoesmith upheld, without explanation, Metzner's December 16, 2019, finding.

### Part II: Complainant Credibility: A "Don't Quote Me On That" Story Of Jealousy, Double Standards, and Malicious Intent

96.    Begin again, a bit earlier in the timeline.  September 2018 marked a new school year for WSU ROTC. Throughout September and October, Fleetwood and C.P. remained acquaintances; meanwhile, the C.P. became sexually involved with Cadet P, a different MS-IV in the program.  The sexual relationship between Cadet P and C.P. was effectively public knowledge within the program.

97.    Within two months, C.P.'s relationship with Cadet P ended. Later under oath before the Army Disenrollment board, Cadet P confirmed he had a "sexual relationship with the

AMENDED COMPLAINT - 26

C.P. between October and mid-November 2018. He said he ended things and that the C.P. was upset about it."[7]

98.      On or about November 20, 2018, the C.P. initiated new intimacy with Fleetwood by Snapchatting a meme comparing Father Christmas to Stalin.  Before engaging, **Fleetwood asked,** "Do you get offended or not like "upsetting and dirty memes?"" **C.P. replied,** "Bring it on, kid."  Blue is C.P. Red is Fleetwood.  C.P. initiated the dialogue.



99.      The light-hearted flirty, dialogue quickly transitioned to the C.P. accusing different male Cadets of spreading the same perceived insults she later accused Fleetwood. C.P. texted: "Like [Cadet X] said I didn't deserve my scholarship." …  Cadet Q said I have a tiny heart. …  Cadet Z should have been on the team instead of me." Fleetwood responded supportively,

---

[7] The C.P. claimed under oath at the Disenrollment Board hearing that "she broke up the relationship" with CDT P, which contradicts her own earlier texts and CDT P's account, one of numerous documented issues with her inconsistency and credibility under oath.

"What are you for real? To your face?"  Again below, Blue is C.P.  Red is Fleetwood. Pay attention to which gender uses sexually graphic or otherwise derogatory, inflammatory language.



100.    Next, the C.P. asked Fleetwood to tell her bad things about her earlier ROTC boyfriend (Cadet P) because, already, before anything happened with Fleetwood, she was "sick of being treated like shit."  and "loosing [sic] faith in men kind quick"

101.    The text flirtation continued with Fleetwood suggesting that perhaps the C.P. and her ex-ROTC boyfriend should have stayed FWB = Friends with Benefits.

AMENDED COMPLAINT - 28



102.   C.P. shared the sentiment, "Ayee todos chicos son pendejos" which in Spanish translation equals "All men are Assholes."   Or possibly "All men are bitches," either way indicating a powerfully anti-male bias.

103.   There is no evidence that Ms. Brooks (or any WSU investigator/adjudicator) took C.P.'s professed anti-male bias into account in determining C.P.'s motives.

104.   The text dialogue further revealed the C.P. was embarrassed to tell her family that the former ROTC ex-boyfriend CDT P had "gone behind [her] back."



105.    As a whole the November texts (all of which were in the possession of WSU during the course of its investigation of Fleetwood) provide compelling evidence to challenge the C.P.'s credibility and motivation due to her:

- Pre-existing concern about her growing reputation as the "ROTC slut"
- Confessed belief that all men were malicious

106.    Prior to engaging in a sexual relationship with Fleetwood, the C.P. also demonstrated her potential for:

- Seeking "dirt/revenge" against the men she felt rejected by
- Using sexually explicit language to describe ROTC peers
- Discussing her sexual relationships with ROTC peers, which is to say, the C.P.'s own tendency to gossip about her sex life appears to be a primary threat to her "reputation" within the program.

107.    The texting also led to Fleetwood and the C.P.'s own short-lived consensual sexual relationship, which fizzled out before the winter holiday.

108.    But first, on or about December 1, during a jealous moment in their non-monogamous sexual relationship, the C.P. demonstrated her potential for malicious prosecution by sending Fleetwood a threatening text along with a Snapchat image of the Army's Sexual Harassment/Assault Response and Prevention (SHARP) pamphlet. When questioned under oath in the December 9, 2019 ROTC Disenrollment Board Hearing, C.P. confirmed, "She did send [a picture of the SHARP pamphlet] over Snapchat *as a joke* because she was frustrated with Fleetwood sleeping with multiple women" (Disenrollment Proceedings (DP) 14:11).

109.    Here again, corroborated evidence suggests the C.P.'s main motive for filing a complaint against Fleetwood was his refusal to be monogamous with her, and she would soon describe in writing her concern about developing a reputation as the ROTC "program slut" due to her own non-monogamous sexual relationships.

110.    Then, on December 31, 2018, the C.P. texted Fleetwood the aggressive, "Should I dump your ass in 2018?" This was fine with Fleetwood who was never seeking a serious relationship. Nonetheless, the tone is aggressive, and the timing of the text is odd since C.P. later claimed they were done in early December.

### Part III: WSU OEO's Fails to Follow Policy & Procedure to Provide A Timely, Impartial Investigation Into a Nefarious, Complaint Which Itself Warranted Investigation as Fraud

111.    The Department of Education's Office of Civil Rights September 22, 2017 *Dear Colleague letter* and accompanying Q&A on Campus Sexual Misconduct, clarifies WSU's legal obligation to provide an "equitable" process for **adequate, reliable and impartial investigation** of Title IX complaints.  These guidelines call for an investigator who is  "free of actual or

AMENDED COMPLAINT - 31

reasonably perceived conflicts of interest and biases for or against any party" objectively **evaluates the credibility of parties and witnesses**, and synthesizes all available evidence—including both inculpatory and exculpatory evidence—and **takes into account the unique and complex circumstances of each case.**

112.    In 2017-18, WSU's own issues with equitable investigations led to a sizable Student Conduct Task Force, including several high-level administrators who were directed to "recommend any changes that will improve the quality, fairness, and educational values of the [student conduct adjudication] process." As part of that process, WSU conduced a major survey soliciting input from students, faculty and former or active conduct board members.  The survey released in 2018 revealed widespread concern surrounding bias and due process within the Office of Community Standards. To wit:

**Table 1: Description of Themes**

| Theme | Description |
| --- | --- |
| Composition of Conduct Board | • Diversity<br>• Question maturity of student members<br>• Members have too much power |
| Bias | • Race, Ethnic, Gender, and Class Bias<br>• Bias against certain student groups (e.g., Athletes and Greek Life)<br>• Bias against students with different cultures or where English is a second language<br>• Organizational Bias and Conflicts of Interest |
| Negative Experiences with Conduct Board | • Respondent was wrongfully accused, or personally knew someone who was<br>• Respondent was or personally knew someone who had a bad experience with the conduct board<br>• Students were punished for reporting crimes if they themselves committed crimes (e.g., getting a drink spiked while underage drinking)<br>• Respondent had a negative experience serving on the conduct board |
| Conduct Board Procedures | • Assumes guilt, rather than "innocent until proven guilty"<br>• Burden of proof for serious accusations is low<br>• Board acts as the "judge, jury, and executioner"<br>• Does not allow representation, even for serious accusations<br>• No Due Process<br>• Claims process is "educational," but is really out to punish<br>• Process is too confusing |

AMENDED COMPLAINT - 32

113.     Quotes from the documented survey which resonate with Fleetwood's own experience of implicit anti-male bias with the office include:

> *"I recall the process very confusing, multi-layered, and lacking clarity-- And I was on the Board.  I could only imagine what it was like for students who came before the board and our proceedings." (Student and Former Conduct Board Member)*

> *"Student conduct is broken, and eliminating the 'always guilty' presumption would help avoid attention like WSU is receiving currently." (Alumni)*

> *"I represented a few students in my former capacity as an attorney, in student conduct proceedings. I cannot comment on ethnic bias. I can say that in all occasions, it appeared that the outcome was pre-ordained. The sanctions were virtually identical, with little or no individualization." (Community Member)*

> *"I am concerned that the student conduct process at WSU may lack independence or the appearance of independence due to the fact that the Director of the Office of Student Conduct and the head of the Office for Equal Opportunity (who is also the Executive Director for Compliance Title IX Coordinator and ADA Coordinator) are long-term cohabiting romantic partners." (Unknown Respondent)*

114.     In addition to the documented concerns about ambiguity, bias, and internal conflicts of interest; during Fleetwood's Investigation, the Office of Community Standards was experiencing a period of personnel turnover and leadership upheaval after former Director Adam Jussell (who had been a romantic partner with the Title IX Coordinator) resigned on February 4, 2019.[8]

---

[8] https://dailyevergreen.com/47399/news/director-of-the-center-for-community-standards-resigns-after-six-years/

AMENDED COMPLAINT - 33



**Director of the Center for Community Standards resigns after six years**

*Jussel to act as new dean of students at University of Wisconsin-Milwaukee*

PAIGE CAMPBELL | DAILY EVERGREEN FILE

Adam Jussel, former director of the Center for Community Standards, discusses new changes to the student conduct process Friday in the French Administration building.

115.    On February 4, 2019, Mary Jo Gonzales, Vice President of Student Affairs, announced that Karen Metzner would serve as Interim Director of Community Standards until WSU could complete a national search to find a permanent Director.



AMENDED COMPLAINT - 34

116.    Prior to her career boost to Interim Director, Karen Metzner, BFA Fine Art, MA Higher Ed Administration, served as Assistant Director of Community Standards; and prior to that she worked as an Assistant Director of Resident Life (overseeing dormitories and conduct issues within the Greek system). One of her professional accomplishments was developing a Community Standards Volunteer Advisor program. The WSU website quoted her in December 2018: **"The community standards process can be overwhelming for students.** … Having [a volunteer] to talk with about the process gives a student an opportunity to be informed about how they play an active role in their community standards experience." As she promoted the program to the public, she claimed volunteers would not need previous experience in student conduct, but would be required to participate in online and in person training.

117.    Evidence of Ms. Metzner's bias and impartiality of includes, but is not limited to, **(a)** her notable impatience and refusal to seriously consider Fleetwood's new evidence during the December 5, 2019, hearing; **(b)** her oddly disjunct language in the December 16 letter (where sanctions do not match findings); **(c)** her proposed Action Plan for Fleetwood which included the unusual directive to "Read at least two articles about the #metoo movement and how it is linked to the communities in which you identify;" and **(d)** her apparent disregard for C.P.'s documented anti-male sentiments.

118.    The anti-male bias is not just limited to Ms. Metzner.

119.    WSU utilized Nikki Finnestead, to conduct C.P.'s intake interview on or about January 24, 2019. Ms. Finnestead hosted ***FEMpowerment*** luncheons on campus and previously

AMENDED COMPLAINT - 35

served as the trainer for the progressive Green Dot violence prevention program, which offered WSU a new perspective to power-violence prevention by focusing on bystander intervention.



*Spread the green dots. Nikki Finnestead, WSU's violence prevention coordinator. (Photo by Linda Weiford, WSU News)*

120.    In a *Daily Evergreen* campus news article "Fighting the Violence," Finnestead publicly expressed her disappointment, "that students entering college accept violence in our society as a norm. … We just expect [gender-based] violence is going to happen." She continued, describing how, "relationship abuse is not necessarily physical in nature; emotional, verbal and sexual abuse are more difficult for outsiders to recognize. 'I think we should be turning the focus away from 'Why doesn't she just leave?' to 'Why is this person doing that to their partner?'"[9]

121.    In a separate article Finnestead, expressly applauded the Obama era passage of the Campus Sexual Violence Elimination Act as an important win for students at WSU and college

---

[9] https://dailyevergreen.com/1081/news/wsu-pullman-campus/fighting-the-violence/.

AMENDED COMPLAINT - 36

campuses nationwide. "By providing prevention and awareness education to students, we're teaching the meaning of sexual consent and what constitutes dating violence and stalking. **We're also empowering students by showing them how to intervene as bystanders,**" said Finnestead, referring to a campus violence prevention program called Green Dot that capitalizes on **the power of peer influence and intervention.**" [10]

122.    This "intervene as a bystander" approach aligns with the C.P.'s original allegations against Fleetwood which were speculative in nature. I.e. that C.P. wanted to use the power of her peer influence to "intervene" in a nonexistent harassment scenario due to her "concerns for the females in his future platoon and the sexist culture he would create."

123.    After drafting allegations and convening with LTC Hobbs on January 28, 2019, Ms. Finnestead handed off Fleetwood's case to WSU's brand-new Investigator Rachel M. Brooks



---

[10] https://news.wsu.edu/2013/03/13/major-law-expands-protections-at-college-campuses/

AMENDED COMPLAINT - 37

124.    The newly hired Brooks' anti-male bias is shown in investigation interview notes collected from February thru April 2019.  Examples of her bias and/or incompetence appear below:

125.    **Issue 1:**  Brooks repeatedly failed to report the C.P.'s own credibility issues:

- The C.P.'s explicitly expressed potential for malicious prosecution provided by Fleetwood in December 2018 Snapchat messages was never mentioned in the June 13 Investigation Report
- The C.P.s "don't quote me on that" email along with her documented willingness to quickly endorse differing written accounts of allegations was similarly un-noted.
- To the contrary, Brooks' June 13 report instead claimed, pg.7 Par.14, "Her statements to investigators were generally consistent internally and consistent with the written statement she provided.  In addition, her statements were generally consistent with the statement of witnesses OEO found to be credible **including Student A (Cadet M)**" But close reading of the evidence reveals this is untrue; the content of her written statement to ROTC bears little resemblance to the content of the interviews.  Her accounting of what happened is not consistent presumably in part because she relied so heavily on hearsay from the highly non-reliable Student A/Cadet M. Furthermore, interview notes reveal little effort to test the internal consistency of her accounts by asking for the sorts of supporting details the ROTC asked for (and the C.P. was unable to provide).
- The C.P.'s willingness to rely upon and propagate "gossip as evidence" were not corrected nor effectively noted in the report.
- The C.P.'s written testimony to ROTC which presented her **speculative** concern about Fleetwood based on false statements about promiscuity (the 30 women in one semester lie) was never addressed. Brooks did nothing to test C.P.'s assertion that Fleetwood was a male slut; instead Brooks appeared to take that assertion at face value.
- No effort to measure an educational impact that Fleetwood's supposed "harassment" had on C.P. was included (which makes sense, since there was no real impact).  Instead, Brooks concludes, Pg. 14 Par. 40, "The Complainant told investigators that she has been impacted on a social and emotional level.  She expressed worry about gossip and rumors in the Program and being labeled a "Program slut." The Complainant told investigators she feels uncomfortable in the Program with everyone hearing these rumors from the Respondent about their sexual activities." This was

AMENDED COMPLAINT - 38

written on June 13; Brooks had access to texts which proved the C.P. was worried about her reputation *well before Fleetwood*. Brooks also knew there was no factual evidence to support the C.P.'s conclusion that people were "hearing these rumors from the Respondent" and disregarded the fact that any reputational ruin alleged by C.P. could have been C.P.'s own doing.

126.     **Issue 2:** Brooks' June 13 report failed to directly address blatant credibility issues surrounding Student A's/Cadet M.'s testimony which formed the foundation for the case from the beginning. An impartial investigator would likely have dismissed the case upon realizing how readily the C.P.'s conspirator could and did lie. But not Brooks.  Instead:

- The June 13 report at ¶16 concluded, **"The statements of Student A [Cadet M], Student B, and Student C were relied on as witnesses** to the interactions between the Complainant and Respondent after the relationship…"
- At this late date, on June 13, Cadet M's testimony was "relied on" even though at ¶17, we read, "During the investigation, **investigators learned that Student A [Cadet M.] had provided information that was later determined to be, more likely than not, untrue."** That one line, which conflicts with other credibility analysis within the report, is the only notation of Cadet M's verifiable lies, which effectively initiated the entire complaint, and should have been detailed, in full.  Instead, allegation after allegation ("he said she squirted the sheets", the chap stick incident, Fleetwood initiating the Eskimo Bros) disappear from the report without any correspondent condemnation of the cases' overall credibility.
- When confronted with additional proof about CDT M (student A's) motivation in the December 2019 – January 2020 timeframe Metzner still disregarded that information germane to disproving that any type of sexual harassment occurred.

AMENDED COMPLAINT - 39

- On this note a direct excerpt from one of Cadet M.'s interviews is worth reading:



**38**                        **RMB/KRH**                     4/17/19
OEO – In Person

RMB: Did ▮38▮ ever tell you how lunch at Red Bento went?

She did. Think I mentioned in first interview. It was some sushi place in Pullman. Patrick had coupon. She agreed to go as friends, talk. Some point, he propositioned her to sleep with him. Got more aggressive. She kept saying no. he realized she wasn't going to say yes, he started being mean. Berating her.

He knew me and her were friends. He asked what does ▮38▮ have that I don't. She said he's got a degree and published author. We're not together that way at all though.

HE wanted to know why she wouldn't sleep with him. That conversation went negatively. He began immediately insulting her about her intelligence, aspirations in ▮38▮ college. At some point, she left and walked home by herself.

RMB: Did she tell you after?

Almost immediately after, she called and asked to talk. Went to my apartment and talked. I was floored a friend of mine would act this way. Talked about maybe it's time for you to go forward and talk about this to somebody.

- Cadet M. shamelessly describes conversations <u>he was not present to witness</u>: this included details which by that point Brooks *knew* (or should have recalled) did not align with the C.P.'s own account. (See below). Fleetwood <u>did not proposition the C.P. to sleep</u> with her at Red Bento. The C.P.'s second interview on the topic effectively denied it happened. And C.P. would later deny any such proposition occurred to ROTC. And Nonetheless, Cadet M. speaks as if he witnessed not just one, but multiple aggressive propositions:  As Cadet M. relayed to Brooks: "She kept saying no, he realized she wasn't going to say yes, he started being mean. Berating her."
- This testimony was a bald-faced, easily verifiable **lie** which Brooks should have prosecuted as Prohibited Discriminatory Conduct under Executive Policy #15 Appendix 1 Paragraphs 9, 10



OFFICE OF PROCEDURES, RECORDS, AND FORMS
**Executive Policy Manual**

9. **Interference** may include:

  - Asking a witness, reporting party, or responding party to provide false information to an investigator or disciplinary body;
  - Unreasonably delaying participation in an investigation; or
  - Sharing false information to a witness, reporting party, or responding party in order to disrupt an investigation.

10. **Knowingly false allegations** may include:

  - Falsely filing a complaint of discrimination against another individual whom the reporting party dislikes or disagrees with;
  - Falsely filing a complaint of stalking against an individual in an attempt to improperly remove them from campus; or
  - Falsely filing a complaint of sexual harassment against an individual to harm their reputation.

AMENDED COMPLAINT - 40

- Nevertheless, there's no indication that Brooks stopped Cadet M to clarify how he knew what he claimed to know.  Nor does the Investigation Report ever fully discredit Cadet M or consider the consequences of his malicious jealousy which compromised the entire complaint.

127.    **Issue 3:**    Brooks' investigation report failed to acknowledge significant exculpatory evidence which arose during interviews, thereby ignoring opportunities to establish Fleetwood's innocence vise-vi multiple false allegations.

128.    **Blatant examples:** Brooks failed to highlight testimony from Cadet P. indicating that he, not Fleetwood, initiated the allegedly controversial "Eskimo Bros" comment. Indeed, it's clear here, that ***someone besides Fleetwood had told Cadet P about the C.P.'s sexual activity***, and Cadet P. was asking Fleetwood to confirm the rumor:

RMB: Ever heard Patrick refer to you and him as eskimo bros? Context?

Yeah. In context I found out he had sex in ▆▆ I asked him about he, is it true? He said yeah, we're eskimo bros now.

RMB: Where did that happen?

Had a class last semester. I asked him when I came in.

RMB: Know if anyone else heard?

No. We sat down, I asked like what's going on with you and ▆▆ That type of context.

129.    Cadet P's account here corroborates Fleetwood's consistent testimony that Cadet P "asked him" [asked Fleetwood] about his sexual encounter with the C.P.  Nevertheless, Brooks' June report along with Metzner's December sanctions both fail to acknowledge the way the original allegation was inaccurately presented.

130.    Contrary to Cadet M's maliciously exaggerated account, this one-time conversation initiated by Cadet P happened one-on-one.  The notes above, like many of RMB/Brooks' notes, include ambiguity:  Did he not ***know*** if anybody else heard?  Or did he

AMENDED COMPLAINT - 41

answer, **No,** nobody else heard. It would be nice to know for sure, but presumably Cadet P answered **"No."** Nobody else overheard.

131.    Finally, it's noteworthy but never noted that <u>this seemingly benign interaction involved a student who already possessed carnal knowledge of the C.P.'s sexuality within the program</u>; nevertheless, the conversation was construed as Fleetwood somehow "ruining her reputation" in the program.  Again, the double standard is ridiculous. The C.P. can and does talk about her own sexual relationships. The C.P.'s ex-boyfriend can and does ask questions about the C.P.'s later sexual relationships. Cadet M. can and clearly did talk about the C.P.'s sexual relationships, seemingly non-stop. Still, only Fleetwood, who did not talk, was accused of misconduct related to "talk of the C.P.'s sexual relationships" within the program.

132.    And, on December 16, 2019, when the Eskimo Bros conversation initiated by CDT P remained as the *only* evidence of such talk, Metzner concluded, "After the relationship ended, you made sexual comments about your relationship and the C.P. to fellow students in the program. While you identified these people as your friends, they were also in some cases your subordinates within the program and also friends/acquaintances of the C.P."

133.    **Issue 4:** In this situation, and throughout the investigation, Brooks and later Metzner, **failed to effectively distinguish behavior which was "severe and persistent" enough to qualify "sexual harassment."**  Which is to say, even *if* Fleetwood had initiated or repeated the "Eskimo bros" descriptor, the comment, while arguably in poor taste, **does not rise to the level of sexual harassment** as described by WSU's own definition. To be clear:

AMENDED COMPLAINT - 42

- Brooks and later Metzner, **failed to consider context**, situation wherein discussing prior sexual relationships is standard practice within shared housing scenarios of college campuses or within military programs.
- WSU's own EP #15's opening section expressly clarifies the policy's intent to eliminate legitimate sexual harassment without impeding freedom of expression.[11]
- Tangible evidence exists to show the C.P. herself readily and consistently described, to Fleetwood and others, details of her past sexual relationships within ROTC, but nobody policed her language; nobody accused her of sexual harassment. **On this point, the double standard/anti-male bias is overwhelmingly evident**.
- Nevertheless—regardless of gender—the conclusion that "who-hooked-up-with-who" gossip on a college campus is punishable as sexual harassment is absurd and compromises the legitimate purposes of Title IX legislation.

134.     **Issue 5:** Brooks' **investigation notes are a chaos of conflicting, incomplete documentation** which nonetheless reveal her consistent failure to follow thru on obvious lines of questioning to challenge witness credibility See, for example, the notes below describing C.P.'s recollection of the January 9, 2019 Red Bento lunch and alleged retaliation:

---

[11]     See     WSU     Executive     Policy     #15     *available     at* https://policies.wsu.edu/prf/index/manuals/executive-policy-manual-contents/ep15-discrimination-sexual-harassment-and-sexual-misconduct/

AMENDED COMPLAINT - 43

38 — Phone Call . 4·8·19

1. Invited other people: I don't know if he asked anyone else. I don't remember if it was over snapchat or the phone. I don't know if we had a group chat, but if so it was 38

2. No, I think he did. Oh yeah he, did. He had taken a picture. I said what are you doing, and he said im sending it to 38 I checked his phone and he didn't send it.

3. Did you share that information with one. I told 38 and said Patrick wants to get back together with me, I don't know how I feel about that. That's when I started being concerned.

4. First sharing information about PF. 38 said be careful he is kind of a womanizer. Just the fact that I was talking to him, and after I hooked up with him. I wish you would have told me sooner, like a be careful sort of thing.

5. Other people: when I first started getting with him, told me he had just said he was going to loyal to this one girl, and started hooking up with me. He just promised them that Im going to be loyal. OK lets see how long that last, and that was the first time we started hooking up. Heavily hitting that you wanted to get back with him. He does have a girlfriend. He thought she was cheating and so that's why I want to hook up. That was the birthday party, we were wrestling, accidently got chocked out, later that night. We were all hanging, I think we were still seeing each other and the likely hook of something happening, I was stilling him at the time.

135.    Reading the incomplete documentation, #3 shows RMB failed to ask C.P., as the ROTC Board asked, if Fleetwood *actually requested* C.P. to resume a sexual relationship. (She later said under oath he did not!).  See also, #4 & #5 which introduce issues of C.P. motivation *and* witness credibility.  CDT M told me, "Be careful, he is kind of a womanizer."  And again, the double-standard and the hearsay. Cadet M. is maliciously gossiping about Fleetwood's past sexual relationships in a way that damages his own reputation in the program.  However, since CDT M has aligned himself with the female accuser his (CDT M's) gossiping about Fleetwood's sex life is overlooked.

136.    Another example of Brooks' failure to track details is shown on pg. 4-5 of the June 13 Report, a section called "Summary of Investigation" which reads, "As part of the investigation, investigators interviewed the following people:"

AMENDED COMPLAINT - 44

11.                           , (Student J) a former female WSU undergraduate student, and former member of the Program."

But less than three lines later, the report continues:

"Investigators did not interview                           (Student J) … at the request of the Respondent."

137.    **Issue 6:** Additional evidence of Brooks' anti-male bias appears in the interview notes. For example, while Ms. A above apparently did not make the list of witnesses, she did speak with Brooks, in an interview that included witness leading, narrative leaps, and problematic omissions present in the RMB (Brooks) typed notes as compared to a second notetaker present at the same interview.

The bystander's notes reveal Brooks questioning the witness about Fleetwood's general demeanor:



138.    Ms Brooks' own notes meanwhile reduce the more nuanced exchange above as follows:



Its not what he says its more about how he says it, his tone of voice lets you know he doesn't care. then there are times he chooses to be disrespectful. Kind of how you go about, hurting someones. He did

AMENDED COMPLAINT - 45

139.    Ms. A established in the opening lines of the interview that she and Fleetwood had not engaged in sexual intercourse: "We never slept together, we just did stuff together."  Still, Ms. Brooks probed:

No RP never made me feel uncomfortable

Anything else?
I don't believe so, When he did do his thing
I didn't stop him.
WSU 000005  Penetration Vaginally? yes

I did not stop him doing that.

Prior to him doing that made it clear
not interested in having sex with him

When he did what he did, thinking
constitute sex?
no, I did not.

Intercourse not part of that in my mind

140.    Brooks' own notes **reduced the exchange by leaving out** the important segue, "No, Mr. RP never made me feel uncomfortable."

141.    Instead Brooks typed-up an encounter that could be construed as sexual assault, "He did vaginal penetrate, but I did not stop him. I made that clear that I wasn't wanting to have sex with him.  I did not consider that to be intercourse."

142.    This inconsistent transcription where Brooks (Lead Investigator **and** Adjudicator) depicts Fleetwood in the worst possible light, while never challenging Cadet M nor

AMENDED COMPLAINT - 46

the C.P. on their own inconsistencies recurs throughout the notes.  For example, Brooks again failed to follow up and/or record exculpatory evidence disproving the Retaliation/Interference claim against Fleetwood when interviewing female Cadet HFT who previously reported a different male Cadet for sexualized behavior but nonetheless refused to condemn Fleetwood.

> **RMB:** When did tell you?"
> **Cadet HFT:** In January? Something like that. <u>That's when she talked to me about going forward</u>. She was afraid of retaliation. Think she wanted another female to have her back."
> **RMB:** Did she say anything about being afraid of retaliation?
> **Cadet HFT:** I think reputation. Hard to have rep already established like when you've slept around in program, to have rep that's girl who slept around. <u>Didn't want to be girl who made rape case and have people think that. Don't think she was scared of Patrick, think he has fragile ego, but not aggressive. Think she was more afraid of reputation, don't want to be girl that made false rape case.</u>"[12]

143.    **And then the interview notes end abruptly.**  There is no evidence that Brooks asked whether a) C.P. <u>had indeed</u> coached the witness "when she talked to [her] about going forward?" or b) the witness had information to share about the C.P.'s real motivation for filing against Fleetwood. Instead, Brooks either ended the interview when it became clear the witness was not sympathetic to the C.P. or failed to type additional comments.

144.    Finally, **Issue 7,** Brooks herself, and later Metzner, failed to acknowledge the point at which the C.P. herself seemingly questioned the validity of her initial complaint when she refused to participate in the WSU conduct hearing.

---

[12] A C.P. with a "fear of being the girl who cried rape" motivation is not intuitively obvious; however, it stands up to various testimonies including Fleetwood's own.  During the January 14-19, 2019, time period, the ROTC rumor mill was admittedly on fire; and the main message was, "C.P. accused Fleetwood of rape."

**Part IV: Additional Issues Addressed by the US Department of Education Office for Civil Rights 2017 Guidelines for Sexual Misconduct Cases Appear Below[13]**

145.    "Restricting the ability of either party to discuss the investigation (e.g., through "gag orders") is likely to deprive the parties of the ability to obtain and present evidence or otherwise to defend their interests and therefore is likely inequitable." ***Beginning January 22, 2019, Fleetwood was effectively and thoroughly gagged by WSU and then WSU used Fleetwood's discussion of the allegation (before he knew an investigation had started) as evidence of Fleetwood's "retaliation/interference."***

146.    "Once it decides to open an investigation that may lead to disciplinary action against the responding party, a school should provide written notice to the responding including sufficient details, and <u>the precise conduct allegedly constituting the potential violation, and the date and location of the alleged incident.</u>" ***Fleetwood never received notice of the emerging allegations during the Investigation phase.  Nor was he ever provided clear dates, locations, or details surrounding the various allegations which proved to be lies perpetrated by Cadet M.***

147.    "Any rights or opportunities that a school makes available to one party during the investigation should be made available to the other party on equal terms." ***The C.P. certainly participated in multiple early interviews with the Office of Community Standards whereas Fleetwood's first in-person interview did not take place until March 29, 2019.***

---

[13]    Full text of September 2017 Q&A on Campus Sexual Misconduct available at: https://www2.ed.gov/about/offices/list/ocr/docs/qa-title-ix-201709.pdf

AMENDED COMPLAINT - 48

148.    WSU's website also describes the following expectation regarding Investigation Timeline and the Respondent's rights to a prompt investigation: "CRCI seeks to balance the need to promptly complete investigations after receipt of a complaint with the need to conduct a thorough investigation. Generally, CRCI will **complete the information gathering portion of an investigation within 60 days, and will issue relevant reports to the parties involved in an investigation within 30 days of completing the information gathering portion**. The length of an individual investigation varies depending on, but not limited to, the number of witnesses to be interviewed, the extent of documentation to be reviewed, the type of alleged conduct, and length of time over which the alleged conduct has occurred."

149.    In Fleetwood's case, the severity/risk factor of alleged conduct [verbal incidents] and length of time over which the conduct occurred [at most several weeks] provided no rationale for extending this investigation.    Nevertheless, Fleetwood's complaint was processed by Finnestead on January 19, 2019, and interviews continued through April, with the first in-person interview of Fleetwood delayed until March 29, 2019 (70 days after filing).  The final interviews took place in mid-April, but the initial Investigation Report was not released until June 13, 2019 (140 days after filing), and the conduct hearing did not take place until December 5, 2019 (315 days after filing), at which point the Respondent, Fleetwood, had still not been issued full information related to the allegations against him.

150.    On the topic of timeline, WSU OEO's official cover sheet noted a January 19, 2019 incident "on campus" when Fleetwood allegedly "Intimidated, Threatened and made Comments about the C.P."  This Cover Sheet has no basis in cell phone-based evidence nor the

AMENDED COMPLAINT - 49

C.P.'s own timeline of alleged concern. January 19, 2019 was a Saturday.  No witnesses ever suggested anything out of the ordinary happened on that Saturday. This cover sheet also chose to elevate the Incident as "Clery" indicating Clery Act level criminal behavior was involved, again calling the basic effectiveness of the investigation/investigators into question.



151.    In short, Fleetwood was never presumed innocent. Instead, it appears WSU's biased Office of Community Standards was bound and determined to charge Fleetwood guilty because he had been accused, even if that required ignoring issues of witness credibility, failing to address exculpatory testimony, and rather calling new witnesses to explore entirely unrelated evidence, thereby broadening the scope of investigation to include a much earlier consensual sex video Fleetwood created and  shared with two male acquaintances using a private Snapchat setting at the woman's request. Which is to say, once it became clear in spring of 2019, that Fleetwood was *not guilty as charged* by the C.P., WSU instead felt inclined to pursue new charges to justify

AMENDED COMPLAINT - 50

continuing an investigation rather than pursuing their viable options to seek "Alternative Resolution."[14]

152.    Brooks and Metzner chose not to pursue restorative justice within a system that encourages EP 15 Procedural Guidelines Part J Alternative Resolution Process: "At anytime after receipt of a complaint, and when appropriate, CRCI may assess whether an alternative resolution is appropriate. … Generally, alternative resolution may be appropriate in the following situations: i. *The alleged conduct is not sufficiently severe, persistent, or pervasive to constitute a violation*… ii. The Reporting Part and/or the Respondent prefer an alternative resolution process; or iii. There is *limited nexus between the alleged conduct and EP15.*

153.    Instead, WSU continued with a broadened scope of the video related harassment charge even after the C.P. had effectively distanced herself from the investigation, declining to appear at the WSU conduct hearing because, as she stated under oath to ROTC, "She did not want to prevent Fleetwood from receiving his degree at WSU.  She just does not want him to be an officer in the U.S. Army because of how he treats females."

154.    With regards to the broadened charges of cell phone misconduct, there is no physical evidence that the video Fleetwood created while intoxicated on his 21st birthday currently exists. In addition, there is no evidence that any of the video's recipients objected to Fleetwood's transmission or indicated that the video was in fact "unwanted" until years later and then only after being prompted by WSU's investigators.

155.     Indeed, the Finding related to the video exists largely because Fleetwood incriminated himself, confirming he had transmitting the video **only after** being confronted with the previously undisclosed allegation during an interview.  It was not until mid-way through the interview—an interview that WSU represented to Fleetwood pertained only to the C.P.'s January 31, 2019 allegations as opposed to non-Complainant related issues from year earlier—that the investigator confronted Fleetwood with the video allegation.

156.     At the time Fleetwood confessed to sending the video, he was not represented by an attorney and believed he was responding to an entirely different allegation.

157.     While in poor taste, creating the much earlier video was behavior protected under Fleetwood's First Amendment freedom of expression rights.

158.     Furthermore, while the transmission of a sexualized video may seem reprehensible to an older generation, an examination of context and circumstance is warranted. And Pew Research Center[15] reports 48% of all users—and 57% of women aged 18-34—report it is very common for online daters to be sent a sexually explicit message they didn't ask for.

159.     Which is to say, the advent of Snapchat, an app whose principal feature "is that pictures and messages are usually only available for a short time before they become inaccessible to their recipients" contributed to widespread changes in community standards of privacy related to cell phone transmissions.[16] And Fleetwood's use of the app which "allows users to keep photos

---

[15]     https://www.pewresearch.org/fact-tank/2020/02/06/10-facts-about-americans-and-online-dating/

[16]     https://en.wikipedia.org/wiki/Snapchat

AMENDED COMPLAINT - 52

in the 'my eyes only' … password-protected space" took place in September 2017, when the cultural impacts of cell phone privacy standards were just beginning to be examined.

160.    Nonetheless, on December 16, 2019, Karen Metzner issued her Findings, including the video.

161.    Fleetwood exercised his right to appeal, and on February 12, 2020, the WSU Appeals Board, chaired by Olivia Shoesmith, an incoming undergraduate transfer student from Cascadia College with no legal background, convened to consider if justice was truly served to Fleetwood.



162.    On February 21, 2020, Mr. Fleetwood received a letter signed by Ms. Shoesmith upholding the December 16, 2019 sanctions and claiming the Appeals Board had "carefully considered the information and rationale" as stated below:

AMENDED COMPLAINT - 53

(a) Whether the University Conduct Officer's hearing was conducted fairly in light of the charges and information presented, and in conformity with prescribed procedures. Deviations from designated procedures are not a basis for sustaining an appeal unless significant prejudice results.

(b) Whether the decision reached regarding the accused student was based on substantial information, that is, whether there were facts in the case that, if believed by the fact finder, were sufficient to establish that a violation of the standards of conduct for students occurred.

(c) Whether the sanction(s) imposed were appropriate for the violation of the Standards that the respondent student was found to have committed.

(d) New information, sufficient to alter a decision, or other relevant facts not brought out in the original hearing, because such information and/or facts were not known to the person appealing at the time of the original Conduct Officer hearing.

163.    The Appeals Board process wherein students with zero legal experience determine the financial, professional fate of their peers as an act of resume-building student governance is described on WSU's website as follows:

### About the Appeals Board:

- Your Appeals Board will consist of three members, with the majority of members being your WSU student peers. One member will be appointed as the Chair who takes on responsibility for ensuring you receive a fair and impartial process and is also a voting member. WAC 504-26-115
- Your Appeals Board members have been through a selection process and trained on topics such as due process, burden of proof, cultural competency and implicit bias. WAC 504-26-120
- Prior to your Appeals Board review, your board member names will be provided to you.
- You can also request to have a board member removed with good cause.
- Appeals Board reviews are not held in person.
- The Appeals Board must respond to your Conduct Officer hearing appeal within 20 calendar days or within 30 days if it was a Conduct Board hearing.
- The Appeals Board can uphold the initial decision, reverse it, modify it, or send it back to the Conduct Officer or Conduct Board for additional review. WAC 504-26-420

**Part V: WSU EP #15's Definition of Actionable Sexual Harassment**
**Which "creates a hostile environment" is Overbroad or Vague**
**Under the 1st Amendment of the US Constitution.**

164.    To pass muster, a regulation must "allow persons of 'ordinary intelligence a reasonable opportunity to know what is prohibited.'" Instead Fleetwood's freedom of expression was unduly limited with innocent verbal interactions illegally construed first as sexual harassment and secondly as interference/witness intimidation. WSU's definition of sexual harassment states:

AMENDED COMPLAINT - 54

"Sexual harassment encompasses unwelcome verbal or physical conduct *of a sexual nature*. … Sexual harassment creates a hostile environment when behavior *is sufficiently severe, persistent, or pervasive to interfere with an individual's work* or educational performance or creates an intimidating, hostile, or offensive work or educational environment."

165.    There is **zero evidence** that Fleetwood ever engaged in unwelcome "verbal or physical conduct of *a sexual nature*" towards the C.P.

166.    There is **zero evidence** that Fleetwood's behavior was *sufficiently severe, persistent, or pervasive*[17] to interfere with another's work.  Instead, the C.P. herself from Day one indicated that "she never had [negative] thoughts herself" but rather acted upon a rumor-fueled speculative concern for future female Army cadets who might feel mistreated by Fleetwood should he become an officer.  Moreover, this Investigation failed to assess "the effect of" alleged harassment which was never established as fact.  Or, to quote again, an anonymous critic surveyed by the Task Force charged to address bias in the WSU student conduct system: ***"I can say that in all occasions, it appeared the outcome was pre-ordained."***

167.    There is no evidence that Fleetwood's case ever went thru EP Policy #15 E Conflict Review which checks for a conflict of interest defined as a "personal interest, financial, familial, professional, or otherwise, that might impair or reasonably appear to an objective outside observer

---

[17] OCR Guidelines are established in V.1, clarifying that "OCR considers the conduct from both a subjective and objective perspective. In evaluating the severity and pervasiveness of the conduct, OCR considers all relevant circumstances, ie: 'The constellation of surrounding circumstances, expectations, and relationships' … To draw commonsense distinctions between conduct that constitutes sexual harassment and conduct that does not rise to that level."

AMENDED COMPLAINT - 55

to impair an investigator independent, unbiased judgment " documentation of the Review has not been provided. https://studentaffairs.wsu.edu/media/256672/conduct-board-survey-report.pdf

168.    And here, in this case the preferential treatment/pro-female bias provided to the female C.P. was evident as follows:

- The C.P. was never reprimanded for her equal and often more extreme incidences of "discussing prior sexual relationships" within the program.
- The C.P. was never reprimanded for her own explicitly sexual depiction of other members of the ROTC program.
- The C.P. was never reprimanded for her own witness coaching and refusal to respect confidentiality during the Investigation. (i.e: Fleetwood was gagged; the C.P. was not)
- The C.P. did not honor the no contact order
- The underlying basis of this claim—speculative concern about the reputation consequences of sexual promiscuity within the ROTC program—was never applied to the Complainant's other sexualized behavior within the program

169.    Mr. Fleetwood timely appealed the December 16, 2019, finding to WSU's University Appeals Board who, on February 21, 2020, upheld Ms. Metzner's December 16, 2019, decision.

### III. CAUSE OF ACTION

170.    Mr. Fleetwood incorporates the above paragraphs as if pled verbatim herein.

**(Count One – Violation of the Washington Administrative Procedure Act)**

171.    A final agency decision, such as the February 21, 2020, Appeals Board decision and the December 16, 2019, are properly appealable when (a) the Agency erroneously interprets or applies the law (b) issues an order not supported by the evidence or (c) issues an order that is arbitrary or capricious. RCW 34.05.570(3)(d)(e)&(i).

172.    For the following reasons, the Agency's determination that Mr. Fleetwood's actions violated WAC 504-26-227 & WAC 504-26-209 (i.e. sexually harassed complainant in violation of

AMENDED COMPLAINT - 56

WSU Executive Policy 15) constitutes a misapplication of the law and is not supported by substantial evidence.

173.    WSU Executive Policy 15 defines "sexual harassment" as "a form of discrimination based on sex and/or gender and is prohibited by this policy. Sexual harassment encompasses **_unwelcome_** verbal or physical conduct **_of a sexual nature_**."  (Emphasis added)

174.    As it relates to *finding number 1,* the "joke" centers around a "Eskimo bro" comment that Mr. Fleetwood vehemently disputes even making, and that rather, Cadet D[18], another MS-IV[19] who previously dated the Complainant, used the term.  Nevertheless, assuming Mr. Fleetwood did initiate or repeat that comment, the comment in and of itself, while arguably in poor taste, does not rise to the level of harassment. Here context (and freedom of speech) matter as discussing prior sexual relationships, including frustrations with prior sexual relationships, is standard on within the shared housing scenarios of college campuses and within military programs. Indeed, the Complainant herself described, to Mr. Fleetwood, her frustrations about her past sexual relationship with Cadet D.  Both testimonies confirm that is how their more intimate relationship began.

175.    As it relates to *finding number 3 and 4* of Ms. Metzler's December 16, 2019, letter: there is no evidence that the recipients of those videos objected to the receipt of those videos at (or near) the time they were transmitted. Accordingly, Mr. Fleetwood was not on notice that the transmission of those videos was unwanted. Further, Mr. Fleetwood testified that he had permission

---

[18] The Agency's June 13, 2019, report 2019-021 references Students A through J. In this complaint Students A through J are referred to as Cadets to the extent they were part of WSU Army ROTC. And it was WSU's June 13, 2019, report from which the Agency utilized in issuing the orders at issue in this complaint.
[19] MS IV means "Military Science" IV, a fourth year ROTC cadet. A MS I is a first year ROTC cadet. A MS II is a second year ROTC Cadet. A MS III is a third year ROTC cadet.

from the person in the video to transmit those videos.

176.     As it relates to *finding number 2* of Ms. Metzler's December 16, 2019 letter and *finding 28* of the June 13, 2019, WSU Investigative Report, both cite Student E's report of feeling "grossed out" after receiving a photo Mr. Fleetwood sent of himself shirtless in a towel after a Ranger Challenge workout.  In addressing this issue Mr. Fleetwood stated, in a proceeding that WSU Army ROTC initiated against Mr. Fleetwood, that, "Many of his guy friends also received this message. No rule states that I cannot be shirtless. I was purely showing how proud I was of my physical achievements and that I was proud to have become Army Strong.  I send these to guys and gals with no sexual intent." Indeed, the conclusion that exposure to an image of a shirtless male could somehow qualify as harassment and create hostile environment is highly problematic. Consider the *Men's Health* magazine cover below. One can easily imagine encountering it in a doctor's office. Is that doctor guilty of sexual harassment?  Consider the college boys pictured below, or countless other photos found during a simple Google image search of the terms "towels" "college" "muscles"? Are these "shirtless male hunks" creating a hostile environment on Ebay?  Most would conclude not. Indeed, EP 15 itself states that it is "committed to the principles of free inquiry and free expression"[20] and sending a shirtless photo to some friends falls squarely into that category.

[20] *See infra* n. 20.

AMENDED COMPLAINT - 58



177.    As it relates to *findings number 2, 3, and 4*, WSU's own Purposes section, the opening section of Executive Policy #15, expressly clarifies the policy's intent to eliminate legitimate sexual harassment *without* impeding freedom of expression.[21] Mr. Fleetwood's sharing of consensually created videos should be protected under his first amendment freedom of expression rights.

178.    The Agency also misapplied the law and had no factual basis for its determination that Mr. Fleetwood violated WAC 504-26-219 (abuse of the student conduct system) because the Agency did not establish that any of Mr. Fleetwood's conduct was directed at any of the potential

---

[21] "WSU is committed to the principles of free inquiry and *free expression;* vigorous discussion and debate are fundamental to the University. This policy is not intended to stifle teaching methods or *freedom of expression*. Discrimination, as prohibited in this policy, is conduct that is neither *legally protected as an expression of free speech*, nor the proper exercise of academic freedom.; vigorous discussion and debate are fundamental to the University." *See* EP 15 *available at* https://policies.wsu.edu/prf/index/manuals/executive-policy-manual-contents/ep15-discrimination-sexual-harassment-sexual-misconduct/ (*last visited* March 10, 2020).

AMENDED COMPLAINT - 59

witnesses *before* Mr. Fleetwood was told that he could not have contact with any witnesses.

179.    As it relates to *finding numbers 5, 6, and 7* of Ms. Metzler's December 16, 2019, letter: there is no evidence that any of Mr. Fleetwood's contact with the individuals identified in findings 5, 6,  or 7 happened *after* Mr. Fleetwood was told not to have contact with potential witnesses. But more to the point, there is no evidence that Mr. Fleetwood's communications with any of the potential witnesses (or Complainant) rose to the level of "attempting to discourage an individual's proper participation in, or use of, the student conduct system."

180.    As it relates to *finding numbers 5, 6, and 7* of Ms. Metzler's December 16, 2019 letter: the only evidence of contact with other Cadets related to the case occurred during the time period when Mr. Fleetwood misunderstood—through an active ROTC rumor mill quite probably perpetrated by the Complainant's conspirators—that he had been accused of rape.  And while keeping EP's protection of "speech" in mind, it logically follows that a person falsely accused of rape would naturally reach out to colleagues of his to defend his reputation or at least tell his side of the story.

181.    The Agency's December 16, 2019, order and February 21, 2020, Appeals Board decision (all of which stem from the June 13, 2019, investigation) is also arbitrary and capricious as the Agency credited the testimony of witnesses who were found to have misled the investigator and credited the testimony of Complainant while ignoring false (and sexually motivated) written statements made by Complainant regarding Mr. Fleetwood, specifically a statement that Complainant made (under oath) that she found out that  "[Mr. Fleetwood] had slept with well over 30 women during that semester" when that statement was false.

AMENDED COMPLAINT - 60

182. Establishing the arbitrary and capricious nature of the Agency's investigation and subsequent determination requires comparing WSU's conclusions vis-à-vis Mr. Fleetwood with the seemingly more thorough and transparently documented findings of the Army ROTC disciplinary board which also investigated Complainant's allegations against Mr. Fleetwood but reached a different conclusion.

183. By way of example, WSU's June 13, 2019 report ¶ 24 states ***in finding 24***, "Student A, Student C, Student F, and Student I stated "the Respondent had made inappropriate sexual comments while in uniform," but the Army investigation's reached a conflicting conclusion after interviewing the same witnesses on the same topic. To be clear, the notes from the Army Disenrollment Board on December 9, 2019 at (20:15) state: "CDT Doe [Student F] was first reminded that he still was under oath… CDT Doe [Student F] was then asked if Fleetwood ever made sexual comments to him in uniform." He said that Fleetwood ***never*** made sexual comments to him in uniform." Either the witness was not credible in front of the WSU OEO. Or the investigation was not credible, and if the first is true, then the second must hold true as well.

184. Equally problematic is unusual disappearance of WSU's initial evidence[22] that Mr. Fleetwood had been "telling others that "[the Complainant] 'squirted all over my sheets'" from the Army ROTC Disenrollment Board findings. Why did the Army reject that evidence but not WSU? What happened to this evidence? Who reported it initially? Why was it not discussed in the report? Were there issues with the consistency of the report? Was that witness deemed "not credible"; if so, why did the report not state so much transparently?

---

[22] *See* WSU Investigation Report, 1.a, authored, June 13, 2019,

AMENDED COMPLAINT - 61

185.    Continuing with credibility issues, the WSU Investigative Report *finding 20* mentions one aggressive, and sexually explicit "should I leave your ass in 2018" message the Complainant sent on December 31, 2018, but fails to address corroborated evidence of a more troubling interaction which impacts the Complainant's credibility.  Specifically, in late November or early December while still dating Mr. Fleetwood, the Complainant effectively confessed her potential for both jealousy and malicious prosecution by sending Mr. Fleetwood a threatening text along with a Snapchat image of the Army's Sexual Harassment/Assault Response and Prevention (SHARP) pamphlet.  The December 9, 2019 Disenrollment Board Officially notes the Complainant's response: "She did send it over Snapchat as a joke because she was frustrated with Fleetwood sleeping with multiple women" (Disenroll Proceedings (DP) 14:11[23]). This corroborated evidence suggests that the Complainant's earliest motive for filing against Mr. Fleetwood was his refusal to be monogamous, which, sad as it might be, does not qualify as sexual harassment.[24]

186.    Equally concerning is the Complainant's refusal to testify during the WSU OEO hearing, but later to testify in the Army disciplinary hearing.  When the Complainant declined to testify, WSU should have discounted her complaint or certainly questioned her credibility.  Instead, *finding 14* of the June 13, 2019, report confidently concluded "the Complainant's statement to be credible."  And to be clear, there is no evidence that Complainant's refusal to testify as part of the

[23]  The Army Disenrollment Board hearing was partially transcribed. The 14:11 entry refers to the time stamp on an Army document titled "Cadet Fleetwood Disenrollment Board Sequence of Events."

[24] The Complainant's presumed motive (jealousy and/or concern about Mr. Fleetwood's alleged promiscuity) is reasserted in her false testimony in the complaint later in the December 9, 2019 Disenrollment Proceedings when sometime after 15:50 she explains why she did not in the end testify during the university harassment hearing on his case: "[Complainant] just does not want him to be an officer in the US Army because of how he treats females."

AMENDED COMPLAINT - 62

WSU OEO investigation was in related to fear that her testimony might exacerbate PTSD or impact her own reputation because she, in fact, testified twice before the Army disciplinary hearing. When asked at the Army disciplinary hearing why Complainant did not testify as part of the WSU OEO investigation Complainant stated, as recorded: "She did not want to prevent Fleetwood from receiving his degree at WSU. She just does not want him to be an officer in the U.S. Army because of how he treats females." *See supra.*

187.    WSU OEO Investigative Report *finding 40* states that "the Complainant told investigators she has been impacted on a social and emotional level.  She expressed worry about gossip and rumors in the Program and being labeled a '[Program] slut'" is evidence of motive that the Agency disregarded in arbitrarily determining that Mr. Fleetwood violated the above-referenced regulations. Worry and rumors are another phrase for "speculation" and the Agency arbitrarily and capriciously credited Complainant's speculative fear about rumors and gossip while rejecting the unrebutted evidence that when it came to Mr. Fleetwood, this Complainant never experienced anything akin to sexual assault. Indeed, during the ROTC Disenrollment Proceeding Complaint provided no evidence of Mr. Fleetwood doing or saying anything of a harassing nature. The only comment Complainant could recall was Mr. Fleetwood stating something to the effect that Complainant "won't be able to get in a sorority." (15:50) That is not harassment and there is no evidence that the WSU OEO investigation considered any other comment than the one Complainant made during the Disenrollment Proceeding.

188.    Instead, the Agency arbitrarily bases its hostile environment finding on rumor/reality-based stigmatization experienced by the Complainant, but not caused by Mr. Fleetwood, or certainly

AMENDED COMPLAINT - 63

not solely by Mr. Fleetwood.  Specifically, the Complainant admits to multiple short-term sexual romances with MS-IVs during her first year as a Cadet: at least one before, and a different one during the months after her brief interlude with Mr. Fleetwood (a romance which began, as text evidence reveals, in part because Mr. Fleetwood was consoling the Complainant about her outrage surrounding the first MS-IV Cadet's treatment).

189.    Complainant's own words (presumably words Complainant also told WSU's OEO investigators) make clear Complainant had real reason to fear her ROTC environment could become awkward/hostile due to her growing reputation as a "[Program] slut" however, WSU's arbitrary blaming of just Mr. Fleetwood for the actions of Complainant and the actions of various Cadets involved in this consensual situation is an abuse of the intention of Title IX.  To be clear, during the investigation, Mr. Fleetwood faced repeated false accusations of "being a rapist"; however, at no time does the Complainant suggest her sexual relations with Fleetwood were anything but consensual.

190.    Further, the Army's Disenrollment Proceeding makes clear that Complainant was not harmed, at all, by any of Mr. Fleetwood's alleged statements; in fact, she could not recall much that Mr. Fleetwood said to her after his last in private encounter with her (a group invitation *she accepted* to attend a public lunch spot in broad daylight). Indeed, the US Army intake paperwork (dated January 18, 2019) associated with Complainant's allegations against Mr. Fleetwood included specific opportunity for Complainant to report on her disposition. In response to that query: "N/A" was reported.  Hence, contrary to WSU OEO's reporting, the Army intake paperwork concluded the Complainant was not visibly impacted by the accusations at the time she first filed the complaint.

AMENDED COMPLAINT - 64

191.    Although the WSU OEO investigation report claims the investigators "assessed credibility" of witnesses, including, but not limited to "internal consistency of statements… consistency of their statements with those of other witnesses or documentary evidence, plausibility, and motivation," the conclusions rely heavily upon Student A, who provided information that was later determined to be, more likely than not, untrue.  This is especially concerning since Student A had pre-existing credibility issues due to a) his own earlier ROTC disenrollment proceedings related to a racism charge and b) his noted romantic interest in the Complainant.

192.    The one piece of evidence that WSU OEO and the Army generally agree upon relates to a video Mr. Fleetwood sent to two friends and with the consent/encouragement of a woman he was having sex with after his twenty-first birthday party. This event took place two years prior to Complainant's allegations, did not involve the Complainant, and was only corroborated fact because Mr. Fleetwood confessed, due to his own honest nature, to making the video and distributing it to a pair of presumably willing male recipients.

193.    There is no physical evidence that the video currently exists. There is no evidence that any of the video's recipients objected to Mr. Fleetwood's transmission of that video or indicated that the video was in fact "unwanted" until years later, and then only after being contacted by WSU's investigators.

194.    Mr. Fleetwood confirmed transmitting the videos only after being confronted with that allegation by the WSU investigator during an interview. It was not until mid-way through the interview—an interview that WSU represented to Mr. Fleetwood pertained *only* to Complainant's allegations as opposed to non-Complainant related issues that happened years earlier—that the

AMENDED COMPLAINT - 65

investigator confronted Mr. Fleetwood with the video allegations.

195.    At the time Mr. Fleetwood confessed to sending the videos Mr. Fleetwood was not represented by an attorney

196.    In short, Mr. Fleetwood ended his military career and accrued considerable financial debt, by his own conscientious admission to a behavior he clearly regretted/regrets.  And he did this in a proceeding where he had no legal counsel and believed he was responding to an entirely different allegation. Before he walked into that room he had no idea he would be asked that question. Mr. Fleetwood condemned himself in a "trial by ambush" aided and abetted by the Agency's refusal to provide required documentation throughout the investigation process.

197.    Furthermore, while the transmission of the Snapchat video may seem reprehensible to an older generation, the behavior has become seemingly normal within Mr. Fleetwood's age group. Current statistics related to online dating are relevant in assessing whether Mr. Fleetwood's short-lived Snapchat behavior was aberrant enough to justify such harsh persecution. For example, 60% of female users ages 18 to 34 say someone on a dating site or app continued to contact them after they said they were not interested, while a similar share--57% of women aged 18 to 34--and 48% of all users, report being sent a sexually explicit message or image they didn't ask for.[25]  And this is during an age when 48% of Americans aged 18-29 report using dating sites or online apps. In short, if Mr. Fleetwood's bad night truly violated community standards, it did so in a way which has become "standard" for the subset of our population who engage with Snapchat: an app whose

---

[25]    *See*    Pew    Research    Center    Report    *available    at* https://www.pewresearch.org/internet/2020/02/06/the-virtues-and-downsides-of-online-dating/ (*last visited* March 11, 2020)

AMENDED COMPLAINT - 66

principal feature "is that pictures and messages are usually only available for a short time before they become inaccessible to their recipients."[26]

198.    The bullet points provided in Ms Karen Metzger, Director of the Office of Community Standards' 16 December 2019 letter suggest the Agency itself discredited the bulk of the Complainant's harassment accusations, concluding in its own for Mr. Fleetwood's essential innocence: "Based on our conversations, you did not intend to create a hostile environment for the students around you, however, that does not change the impact of your actions."  The understated language of the final findings versus the original accusations warrants a second read:

After our discussion and after reviewing all of the information available to me, I have determined the following more likely than not occurred:

1. You and the Complainant had a consensual sexual relationship which ended in December 2018. After the relationship ended, you made sexual comments about your relationship and the Complainant to fellow students in the program. While you identified these people as your friends, they were also in some cases your subordinates within the program and also friends/acquaintances of the Complainant.
2. You sent a photo to students in the program of you shirtless and in a towel via "ShapChat". You sent the photo because you were proud of your physique and the training program that you were currently completing in preparation for the Ranger Challenge.
3. You sent sexually inappropriate videos to several ROTC members. You sent these videos years ago, on your 21st birthday, and alcohol played a factor in the situation.
4. The students who received these photos/videos did not ask you to send them photos/videos and the photos/videos were unwanted.
5. You called the Complainant after you heard that she intended to file a report about her experiences.
6. You contacted another student via Facebook Messenger to discuss the reporting process with them.
7. You contacted another student via text message about providing evidence to "help you out" with the investigation.

199.    Mr. Fleetwood has requested (but has not been given – more on that below) copies of the documents/interview notes the Agency considered in reaching its decision/investigating Complainant's allegations.

200.    Accordingly, Mr. Fleetwood reserves the right to amend his complaint once he

---

[26] See Wikipedia "Snapchat" available at https://en.wikipedia.org/wiki/Snapchat (last visited March 11, 2020)

AMENDED COMPLAINT - 67

receives the underlying documents that the Agency used in reaching its investigatory conclusions and administrative findings.

**(Counts Two and Three – Violation of the Washington Public Record Act – P. Fleetwood & M. Fleetwood)**

201.    Plaintiffs incorporate the above facts as if pled verbatim herein.

202.    Washington's Public Record Act (PRA) "provides a cause of action for two types of violations: (1) when an agency wrongfully denies an opportunity to inspect or copy a public record, or (2) when an agency has not made a reasonable estimate of the time required to respond to the request." *Andrews v. Washington State Patrol*, 183 Wn. App. 644, 651 (2014).

203.    On October 2, 2019 and October 18, 2019, M. Fleetwood made two public record requests to WSU as set out above. Those record requests were numbered 19-520 (October 2, 2019 request) and 19-549 (October 18, 2019 request).

204.    On November 21, 2019, WSU denied both of M. Fleetwood's public record requests.

205.    On November 23, 2019, Fleetwood made a public record request to WSU seeking:

#1: The complete investigative file concerning the Office of Equal Opportunity Complaint No. 2019-021, Including all statements, emails and records.
#2: The complete file and all records concerning WSU Center for Community Standards Case No. 2018371301, including emails and records of communication with the Office of Civil Rights Compliance and Investigation (formerly Office for Equal Opportunity) concerning this case and/or OEO Case No. 2019-021.

206.    WSU designated Fleetwood's November 23, 2019, request as Request No. 19-616.

207.    WSU closed the request on November 27, 2019 claiming that "Community Standards case number 2018371301 is still an active investigation."

208.    WSU made no such objection to Mr. Fleetwood's request for the "complete investigative file concerning the Office of Equal Opportunity Complaint No. 2019-021, Including

AMENDED COMPLAINT - 68

all statements, emails and records" as that investigation, undisputedly completed on June 13, 2019.

209.    Accordingly, WSU's failure to provide Fleetwood documents responsive to item number one of Request No. 19-616 violated Washington's Public Record Act as did WSU's failure to provide M. Fleetwood documents responsive to Request Nos. 19-520 and 19-549.

210.    Furthermore, WSU's failure to provide Fleetwood and M. Fleetwood those documents materially prejudiced Fleetwood by depriving him of the information he needed to both defend himself from the above-referenced Agency procedures as well as a concurrently occurring administrative procedure by WSU's Army Reserve Officer Training Corps (ROTC) arising out of Complainant's allegations.

211.    On November 28, 2019, Fleetwood made a public record request to the Agency seeking "The complete investigative file concerning the Office of Equal Opportunity Complaint No. 2019-021, Including all statements, emails and records."

212.    WSU labeled this November 28, 2019, request as Request No. 19-630.

213.    WSU closed the request on December 2, 2019, claiming that Fleetwood could access the information through WSU's Civil Rights & Compliance Investigation office.

214.    Fleetwood then requested the documents from Civil Rights & Compliance Investigation; however, the Civil Rights & Compliance Investigation did not provide Fleetwood any responsive documents other than the redacted investigation report that Fleetwood received months earlier.

215.    Additionally, at least twice, Ms. Metzler promised to Fleetwood that he (Fleetwood) would receive copies of all the above-referenced documents; however, as of the date of this lawsuit

AMENDED COMPLAINT - 69

WSU has not produced any documents in response to Request No. 19-630.

216.    The Agency's violation of the Public Record Act has caused Mr. Fleetwood damage in an amount to be proven at trial.

**(Count 4 – Gender Discrimination – RCW 49.60.400 – P.  Fleetwood)**

217.    Plaintiffs incorporate the above facts as if pled verbatim herein.

218.    The Washington Law Against Discrimination defines "any place of public resort" to include "any public library or educational institution." RCW 49.60.040(2). The Washington State Supreme Court supports this extended protection: "[u]nlike our state law against discrimination, Title VII does not contain a broad statement of the right to be free of discrimination in other areas. Our state law does [and] [w]hile Title VII of the Civil Rights Act of 1964 is similar to RCW 49.60.180, the provision delineating unfair practices in employment, there is no provision in the federal law which sets forth the equivalent of the broad language of RCW 49.60.030(1) and there is no statutory provision requiring liberal construction in order to accomplish the purposes of the act." *Marquis v. City of Spokane*, 130 Wn.2d 97, 110–11 (1996). What this means is that the WLAD's anti-gender discrimination provisions apply in the educational context.

219.    Indeed, the WLAD also makes clear:

> The state shall not discriminate against, or grant preferential treatment to, **any individual** or group on the basis of race, **sex**, color, ethnicity, or national origin in the operation of public employment, **public education**, or public contracting. RCW 49.60.400(1)(emphasis added).

220.    Here WSU discriminated against Fleetwood on account of Fleetwood's gender by (a) ignoring C.P.'s documented anti-male bias including, *without limitation*, C.P.'s statements that "all men are assholes," (b) assigning investigators to investigate C.P.'s complaint who were biased

AMENDED COMPLAINT - 70

against men, (c) refusing to consider Fleetwood's new evidence during the December 5, 2019, hearing, (d) disregarding C.P.'s stated motive for bringing her complaint against Fleetwood, i.e. not a compliant for sexual harassment but "character check on him," (e) ignoring C.P.'s repeated "don't quote me on that" explanations about what happened, (f) ignoring C.P.'s unsubstantiated (but under oath) submission that Fleetwood had slept with 30 women in the past semester, and (g) ignoring exculpatory evidence.

221.    WSU's violation of the WLAD has caused Fleetwood damages in an amount to be proven at trial.

**(Count 5 – Tortious Interference With Contractual Expectancy – P.  Fleetwood)**

222.    Plaintiff incorporates the above facts as if pled verbatim herein.

223.    In order to prove a tortious interference claim the plaintiff must show "(1) the existence of a valid contractual relationship or business expectancy; (2) that defendants had knowledge of that relationship; (3) an intentional interference inducing or causing a breach or termination of the relationship or expectancy; (4) that defendants interfered for an improper purpose or used <u>improper means</u>; and (5) resultant damage." *Leingang v. Pierce Cty. Med. Bureau, Inc.*, 131 Wn.2d 133, 157 (1997).

224.    "Improper means" includes a government entity's <u>arbitrary and capricious</u> actions as evidence of improper means and a "court need not find that a defendant acted with ill will, spite, defamation, fraud, force, or coercion in order to find improper purpose or means."  *Greensun Grp., LLC v. City of Bellevue*, 436 P.3d 397, 408 (Wash. Ct. App. 2019).

225.    Fleetwood had a Reserve Officer Training Corps (ROTC) contractual relationship

AMENDED COMPLAINT - 71

with the U.S. Army.

226. WSU knew of Fleetwood's contract with the U.S. Army.

227. WSU intentionally interfered with Fleetwood's contract with the U.S. Army by, *inter alia*, without notice to Fleetwood, broadening the scope of its investigation to encompass consensual activity that occurred between Fleetwood and others years before and did not involve C.P.

228. WSU's interference with the contractual relationship was by improper means because, *without limitation*, it was arbitrary and capricious (as alleged above), biased in favor of the female accuser, ignored exculpatory evidence from Fleetwood, ignored C.P.'s own contradictory statements about Fleetwood's alleged harassment, ignored C.P.'s professed reason for bringing the complaint, i.e. her speculative belief that Fleetwood might prey on unsuspecting female Soldiers should Fleetwood become an officer, and broadened the scope of its investigation to include consensual videotaped (but no longer existing) encounters Fleetwood had with female partners years earlier.

229. WSU's actions caused Fleetwood harm. ROTC ended its contract with Fleetwood and required Fleetwood to re-pay ROTC in excess of $32,000.00. More importantly, this action has destroyed any change of Fleetwood embarking on a military career thus causing him substantial damages. The sole reason ROTC gave for ending its contract was the consensual videotapes Fleetwood made years earlier. And had WSU not impermissibly extended the scope of its investigation to encompass the consensual videos ROTC would not have been able to use that event to justify the ending of Fleetwood's military career.

**(Count 6 & 7 - Violation of 1st and 14th Amendments of the U.S. Constitution – P. Fleetwood)**

AMENDED COMPLAINT - 72

230.    Plaintiff incorporates the above facts as if pled verbatim herein.

231.    The First Amendment of the U.S. Constitution forbids regulations that are overbroad and/or vague.

232.    "Statutes that are insufficiently clear are void for three reasons:    (1) to avoid punishing people for behavior that they could not have known was illegal;    (2) to avoid subjective enforcement of   the laws based on   'arbitrary and discriminatory enforcement' by government officers; and (3)    to avoid any chilling effect on the exercise of First Amendment freedoms ... when First Amendment freedoms are at stake, an even greater degree of specificity and clarity of laws is required." *Italian Colors Rest. v. Harris*, 99 F. Supp. 3d 1199, 1210 (E.D. Cal. 2015).

233.    Conversely,  "[t]he overbreadth doctrine derives   from  the   recognition  that unconstitutional restriction of expression may deter protected speech by parties not before the court and thereby escape judicial review." *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*, 447 U.S. 557, 566 (1980).

234.    WSU found Fleetwood violated EP 15, specifically that Fleetwood's conduct met EP 15's definition of "sexual harassment."  As examples of this sexual harassment WSU found that (a) Fleetwood "made sexual comments about your relationship and the C.P. to fellow student," and (b) posed shirtless in a towel.

235.    EP 15's definition of sexual harassment is both vague and overbroad as it does not put students on notice that discussing sexual relationships with other students (which is something that happens on college campuses in America numerous times each day) or posing shirtless places

AMENDED COMPLAINT - 73

them in violation of EP 15's prohibition against sexual harassment. Nor, for that matter, does EP 15 put students on notice that temporary SnapChat videos of consensual sexual activity that are transmitted to others with the consent of both parties is illegal.

236.    Additionally, WSU policy, which is memorialized in WAC 504-26-219, is vague and overbroad because it has a chilling effect on the accused which, in this instance, was Fleetwood. Before Fleetwood was told that any complaint of any type had been filed against him, he heard that he had been accused of rape. Wanting to defend himself from such criminal allegations, Fleetwood contacted both the C.P. and other students to both inquire into the bases of the claim and defend his reputation. At no time did WSU put Fleetwood on notice that any communication he had with any potential witness in the case would result in a violation of WSU regulations.

237.    WSU's policies and regulations are void and overbroad and this Court should exercise its powers to declare the same.

238.    State actors that adjudicate important rights are constitutionally required to protect parties' due process rights. *Goldberg v. Kelley*, 397 U.S. 254, 262 (1970). These due process protections apply to students at public educational institutions. *Goss v. Lopez*, 419 U.S. 565 (1975). Neither the Supreme Court nor the Ninth Circuit have defined the precise process due to accused students. *See Wynar v. Douglas County Sch. Dist.*, 728 F.3d 1062, 1073 (9th Cir. 2013); *see also Lucy v. Nevada ex rel. Board of Regents of the Nevada System of Higher Education*, 380 F. App'x 608, 610 (9th Cir. 2010) (unpublished opinion applying the Goss framework to higher education disciplinary process).

239.    The factors considered in determining whether a person has received sufficient due

AMENDED COMPLAINT - 74

process protections are (1) the private rights affected by the official action, (2) the risk of an erroneous depravation of the private right because of procedural flaws, (3) any probable value of additional or substitute procedural safeguards, and (4) any governmental interests that would be affected by additional safeguards, such as fiscal and administrative burdens. *Matthews v. Eldridge*, 424 U.S. 319, 335 (1976).

240.    The process by which WSU used in finding Fleetwood at fault for violating EP 15 fails for lack of Constitutionally required due process.

241.    Fleetwood was not allowed to cross-examine C.P. as part of WSU's adjudication. Without that cross-examination WSU found Fleetwood in violation of EP 15. Conversely, the ROTC Board hearing process (described more fully above) allowed Mr. Fleetwood opportunity to cross examine C.P. and this ability to cross examine C.P. led to the ROTC board finding in Fleetwood's favor on all EP-15 related allegations except the allegation regarding the consensual transmission of the video images that did not involve C.P. and occurred years earlier.

242.    Additionally, WSU utilized the single investigator model that allowed Brooks to not only investigate C.P.'s claims against Fleetwood but to then determine, as Brooks did in the June 2019 investigation report, deem Fleetwood liable for violating, *inter alia,* EP 15. This single investigator model allowed Brooks (and others) to eviscerate any due process afforded Fleetwood as shown by the above examples of WSU disregarding C.P.'s written anti-male bias, disregarding C.P.'s ulterior motive that had nothing to do with sexual harassment but everything to do with protecting her own reputation, and disregarding any exculpatory evidence brought in Fleetwood's favor.

AMENDED COMPLAINT - 75

243.    Additionally, WSU failed to put Fleetwood on notice that its investigation had expanded to consensual events that took place years before Fleetwood began his consensual relationship with C.P.

244.    WSU's unconstitutional polices and failure to provide Fleetwood due process have caused Fleetwood harm.

### (Count 8 – Violation of Title IX – 20 U.S.C. §1681 - P.  Fleetwood)

245.    Plaintiff incorporates the above facts as if pled verbatim herein.

246.    WSU is a recipient of federal funds and, as such, is subject to Title IX.

247.    Title IX bars gender discrimination and further bars gender discrimination in the context of a university disciplining a student based on improper assumptions about gender roles.

248.    A plaintiff can bring a Title IX claim by showing an erroneous outcome where the plaintiff is innocent and was wrongly found to have committed an offense. *Yusuf v. Vassar College*, 35 F.3d 709, 715 (2d Cir. 1994).  A Title IX plaintiff can also proceed under a selective enforcement theory. Fleetwood proceeds under both theories.

249.    Here WSU brought actions against Fleetwood in the context of WSU's process for handling harassment complaints being called into question as stated above. With that background, WSU treated C.P. and Fleetwood differently by, *inter alia,* ignoring C.P.'s stated anti-male bias and her defamatory statements about Fleetwood (that he had sex with 30 women in a semester) but taking C.P.'s word for it that Fleetwood harassed her at the Red Bento lunch when C.P. herself repeatedly said to WSU's investigators "don't quote me on that" and then later reversed course and admitted that Fleetwood did not engage in any sexual harassment whatsoever at the lunch or anytime after

AMENDED COMPLAINT - 76

their consensual relationship ended.

250.    WSU's anti-male bias is further set out in the above paragraphs of the complaint.

251.    Due to his gender Fleetwood was subject to numerous sanctions by WSU (set out above) and his ROTC contract cancelled.

## IV. PRAYER FOR RELIEF

Plaintiffs respectfully seek:

A.  An order pursuant to RCW 34.05.574 setting aside all agency action.

B.  An order compelling WSU to produce the above-requested documents per the Public Record Act.

C.  Attorneys' fees, costs, and expenses as allowed under the Public Record Act.

D.  All damages allowed under the law including injunctive relief, equitable relief, as well as general and economic damages as allowed under the WLAD and/or Title IX.

E.  All other relief that is just and equitable.

DATED this September 2, 2020.


CROTTY & SON LAW FIRM, PLLC

By: _____
Matthew Z. Crotty, WSBA No. 39284
905 West Riverside Ave. Ste. 404
Spokane, Washington 99201
Telephone No. 509.850.7011

Attorneys for Plaintiff

AMENDED COMPLAINT - 77

**CERTIFICATE OF SERVICE**

Pursuant to RCW 9A.72.085 the undersigned hereby certifies under penalty of perjury under the laws of the State of Washington, that on the 9th day of September 2020, the foregoing was delivered to the following persons in the manner indicated:

| | |
|---|---|
| Nathan E. Deen<br>Attorney General of Washington<br>332 French Administration Building<br>Pullman, WA 99164 | VIA REGULAR MAIL ___<br>VIA FACSIMILE ___<br>HAND DELIVERED ___<br>VIA EMAIL ___ |

CROTTY & SON LAW FIRM, PLLC

By: _____

Matthew Z. Crotty, WSBA No. 39284
905 West Riverside Ave. Ste. 404
Spokane, Washington 99201
Telephone No. 509.850.7011

Attorneys for Plaintiff

AMENDED COMPLAINT - 78