1

2    Brian J. Baker
     Assistant Attorney General
3    7141 Cleanwater Drive SW
     PO Box 40126
4    Olympia, WA 98504-0126
     (360) 586-6351
5

6

7

8

9                                        The Honorable Stanley A. Bastian

10              **UNITED STATES DISTRICT COURT**
               **EASTERN DISTRICT OF WASHINGTON**
11                        **AT SPOKANE**

12   PATRICK FLEETWOOD and          NO. 2:20-cv-00355-SAB
     MICHAEL FLEETWOOD,
13                                  NOTICE OF STATE FILED
                   Plaintiffs,      COURT DOCUMENTS
14

15        vs.

16   WASHINGTON STATE
     UNIVERSITY,
17
                   Defendant.
18

19

20        Attached to this Notice, filed herewith, are true and correct copies of the

21   documents filed in the Whitman County Superior Court Cause No. 20-2-00053-

22   38.

23

24        I declare under penalty of perjury under the laws of the United States that

25   the foregoing statements are true and correct to the best of my knowledge.

26

NOTICE OF STATE FILED COURT            1         ATTORNEY GENERAL OF WASHINGTON
DOCUMENTS                                                    Torts Division
                                                        7141 Cleanwater Drive SW
                                                            PO Box 40126
                                                        Olympia, WA  98504-0126
                                                            (360) 586-6300

1    DATED this 15th day of October, 2020.

2
                                    ROBERT W. FERGUSON
3                                    Attorney General

4                                    s/ Brian J. Baker

5                                    _____
                                    BRIAN J. BAKER, WSBA No. 54491
6                                    OID #91023
                                    Assistant Attorneys General
7                                    Attorneys for Defendant
                                    WASHINGTON STATE UNIVERSITY
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

NOTICE OF STATE FILED COURT              2          ATTORNEY GENERAL OF WASHINGTON
DOCUMENTS                                                      Torts Division
                                                        7141 Cleanwater Drive SW
                                                              PO Box 40126
                                                        Olympia, WA 98504-0126
                                                            (360) 586-6300

**CERTIFICATE OF SERVICE**

I hereby certify that on this 15th day of October, 2020, I caused to be electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Matthew Z. Crotty
Crotty & Son Law Firm, PLLC
905 West Riverside Avenue, Suite 404
Spokane, WA  99201
matt@crottyandson.com

DATED this 15th day of October, 2020.

ROBERT W. FERGUSON
Attorney General

s/ Brian J. Baker

BRIAN J. BAKER, WSBA No. 54491
Assistant Attorney General
Attorneys for Defendant
WASHINGTON STATE UNIVERSITY

NOTICE OF STATE FILED COURT
DOCUMENTS

3

ATTORNEY GENERAL OF WASHINGTON
Torts Division
7141 Cleanwater Drive SW
PO Box 40126
Olympia, WA  98504-0126
(360) 586-6300

FILED

MAR 1 3 2020

JILL E. WHELCHEL
WHITMAN COUNTY CLERK

20 – 2 – 00053 – 38
CICS           1
Case Information Cover Sheet
7906250



**CIVIL**

Whitman _____ COUNTY SUPERIOR COURT

Case Information Cover Sheet (CICS)

**20 2 00053 38**

Case Number _____  **Case Title** Fleetwood v. Washington State University

**Attorney Name** Matthew Crotty                          **Bar Membership Number** 39284

Please check one category that best describes this case for indexing purposes.  Accurate case indexing not only saves time in docketing new cases, but helps in forecasting needed judicial resources.  Cause of action definitions are listed on the back of this form.  Thank you for your cooperation.                          *Form updated: 8/19/2019*

| | | | | | | |
|---|---|---|---|---|---|---|
| ☐ | ABJ | Abstract of Judgment | | ☐ | PRG | Property Damage – Gangs |
| ☒ | ALR | Administrative Law Review | | ☐ | PRP | Property Damages |
| ☐ | ALRJT | Administrative Law Review-Jury Trial  (L&I) | | ☐ | QTI | Quiet Title |
| ☐ | BAT | Ballot Title | | ☐ | RDR | Relief from Duty to Register |
| ☐ | CHN | Non-Confidential Change of Name | | ☐ | RFR | Restoration of Firearm Rights |
| ☐ | CBC | Contractor Bond Complaint | | ☐ | SDR | School District-Required Action Plan |
| ☐ | COL | Collection | | ☐ | SER | Subdivision Election Process Law Review |
| ☐ | CON | Condemnation | | ☐ | SPC | Seizure of Property-Commission of Crime |
| ☐ | COM | Commercial | | ☐ | SPR | Seizure of Property-Resulting from Crime |
| ☐ | CRP | Pet. for Cert. of Restoration of Opportunity | | ☐ | STK | Stalking Petition |
| ☐ | DOL | Appeal Licensing Revocation | | ☐ | SXP | Sexual Assault Protection |
| ☐ | DVP | Domestic Violence | | ☐ | TAX | Employment Security Tax Warrant |
| ☐ | EOM | Emancipation of Minor | | ☐ | TAX | L & I Tax Warrant |
| ☐ | FJU | Foreign Judgment | | ☐ | TAX | Licensing Tax Warrant |
| ☐ | FOR | Foreclosure | | ☐ | TAX | Revenue Tax Warrant |
| ☐ | FPO | Foreign Protection Order | | ☐ | TMV | Tort – Motor Vehicle |
| ☐ | HAR | Unlawful Harassment | | ☐ | TRJ | Transcript of Judgment |
| ☐ | INJ | Injunction | | ☐ | TTO | Tort – Other |
| ☐ | INT | Interpleader | | ☐ | TXF | Tax Foreclosure |
| ☐ | LCA | Lower Court Appeal – Civil | | ☐ | UND | Unlawful Detainer – Commercial |
| ☐ | LCI | Lower Court Appeal – Infractions | | ☐ | UND | Unlawful Detainer – Residential |
| ☐ | LUPA | Land Use Petition Act | | ☐ | VAP | Vulnerable Adult Protection Order |
| ☐ | MAL | Other Malpractice | | ☐ | VEP | Voter Election Process Law Review |
| ☐ | MED | Medical Malpractice | | ☐ | VVT | Victims of Motor Vehicle Theft-Civil Action |
| ☐ | MHA | Malicious Harassment | | ☐ | WDE | Wrongful Death |
| ☐ | MSC2 | Miscellaneous – Civil | | ☐ | WHC | Writ of Habeas Corpus |
| ☐ | MST2 | Minor Settlement – Civil  (No Guardianship) | | ☐ | WMW | Miscellaneous Writs |
| ☐ | PCC | Petition for Civil Commitment (Sexual Predator) | | ☐ | WRM | Writ of Mandamus |
| ☐ | PFA | Property Fairness Act | | ☐ | WRR | Writ of Restitution |
| ☐ | PIN | Personal Injury | | ☐ | WRV | Writ of Review |
| ☐ | PRA | Public Records Act | | ☐ | XRP | Extreme Risk Protection Order |
| | | | | ☐ | XRU | Extreme Risk Protection Order Under 18 |

**IF YOU CANNOT DETERMINE THE APPROPRIATE CATEGORY, PLEASE DESCRIBE THE CAUSE OF ACTION BELOW**

.

***Please Note:  Public information in court files and pleadings may be posted on a public Web site.***

FILED

MAR 13 2020

JILL E. WHELCHEL
WHITMAN COUNTY CLERK

```
20 - 2 - 00053 - 38
SM              3
Summons
7906268
```

**SUPERIOR COURT, STATE OF WASHINGTON, COUNTY OF WHITMAN**

PATRICK FLEETWOOD,

                    Plaintiff,

    vs.

WASHINGTON STATE UNIVERSITY,

                  Defendant.

NO. **20 2 00053 38**

**SUMMONS**

ORIGINAL

TO THE STATE OF WASHINGTON:

    A lawsuit has been started against you in the above entitled court by plaintiff Patrick Fleetwood.

    Plaintiff's claims are stated in the written complaint, a copy of which is served upon you with this summons.

    In order to defend against this lawsuit, you must respond to the complaint by stating your defense in writing, and by serving a copy upon the person signing this summons within 20 days after the service of this summons, excluding the day of service, or a default judgment may be entered against you without notice. A default judgment is one where plaintiff is

SUMMONS - PAGE 1

1  entitled to what he asks for because you have not responded. If you serve a notice of

2  appearance on the undersigned person, you are entitled to notice before a default judgment

3  may be entered.

4      You may demand that the plaintiff file this lawsuit with the court. If you do so, the

5  demand must be in writing and must be served upon the person signing this summons.

6

7  Within 14 days after you serve the demand, the plaintiff must file this lawsuit with the court,

8  or the service on you of this summons and complaint will be void.

9      If you wish to seek the advice of an attorney in this matter, you should do so

10  promptly so that your written response, if any, may be served on time.

11      This summons is issued pursuant to rule 4 of the Superior Court Civil Rules of the

12  State of Washington.

13      DATED this 13th day of March 2020.

14

15      CROTTY & SON LAW FIRM, PLLC

16

17  By: _____
      MATTHEW Z. CROTTY, WSBA #39284

18

19      905 W. Riverside Ave. Ste. 404
      Spokane, WA 99201
20      (509) 850 7011
      matt@crottyandson.com

21      Attorneys for Plaintiff

22

23

24

25

26

SUMMONS - PAGE 2      _____

FILED

MAR 1 3 2020

JILL E. WHELCHEL
WHITMAN COUNTY CLERK

20 – 2 – 00053 – 38
CMP        2
Complaint
7906259

# IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
# IN AND FOR THE COUNTY OF WHITMAN

PATRICK FLEETWOOD,

       Plaintiff,

vs.

WASHINGTON STATE UNIVERSITY,

       Defendant.

Case No. **20  2   00053  38**

**COMPLAINT**

ORIGINAL

The Plaintiff, PATRICK FLEETWOOD, by and through MATTHEW Z. CROTTY, of

CROTTY & SON LAW FIRM, PLLC complains of Defendant and alleges as follows:

## I. PARTIES, JURISDICTION, & VENUE

1.    Patrick Fleetwood was a student of Defendant Washington State University during

the time-frame relevant to this lawsuit.  Mr. Fleetwood has standing because he has been aggrieved

by the below-referenced Agency action as (a) that Agency action has prejudiced Mr. Fleetwood's

ability to complete his college education in a timely manner and his desire to serve as an officer in

the U.S. Army (b) the Agency failed to consider Mr. Fleetwood's interests (described in more detail

COMPLAINT - 1

below), and (c) a judgment in Mr. Fleetwood's favor would substantially eliminate the prejudice to Mr. Fleetwood caused by the Agency's actions. Per RCW 34.05.546 Mr. Fleetwood's mailing address is 1153 NE Lake St., Apt #6 Pullman, WA 99163.

2.    Defendant Washington State University ("WSU") is a state agency with a place of business in Pullman, Washington.  Defendant is either referred to as "WSU" or "the Agency" in this complaint.

3.    The Whitman County Superior Court has jurisdiction over this case.

4.    Venue is proper in Whitman County pursuant to RCW 34.05.514(2).

5.    The administrative pre-requisites to bringing this lawsuit are satisfied. Mr. Fleetwood timely appealed WSU's December 16, 2019, sanctions decision, to the WSU Appeals Board. On February 21, 2020 the WSU Appeals Board upheld WSU's December 16, 2019, decision. Mr. Fleetwood filed this instant action within 30 days of February 21, 2020.

## II. FACTS

6.    Mr. Fleetwood incorporates the above facts as if pled verbatim herein.

7.    On or about January 18, 2019, Mr. Fleetwood's ex-girlfriend (Complainant) made a report to WSU's Office for Civil Rights Compliance and Investigation in which Complainant accused Mr. Fleetwood of sexual harassment.

8.    On or about January 31, 2019, WSU's Office for Civil Rights Compliance and Investigation f/k/a Office of Equal Opportunity commenced an investigation into Mr. Fleetwood.

9.    On or about June 13, 2019, WSU's OEO completed its investigation and labeled that investigation Complaint No. 2019-021.

10.    On or about December 5, 2019, Mr. Fleetwood participated in a community

COMPLAINT - 2

standards hearing regarding the events alleged by Complainant on or about January 18, 2019.

11.     On or about December 16, 2019, WSU's Center for Community Standards found that Mr. Fleetwood violated the following regulations:

> WAC 504-26-227 - Sexual harassment. Sexual harassment includes behavior defined in Washington State University's Executive Policy 15, which prohibits discrimination, sexual harassment, and sexual misconduct.
>
> WAC 504-26-209 - Violation of university policy, rule, or regulation. Violation of any university policy, rule, or regulation published electronically on the university web site or in hard copy including, but not limited to Executive policy 15 (policy prohibiting discrimination, sexual harassment and sexual misconduct).
>
> WAC 504-26-219 - Abuse of the student conduct system. Abuse of the student conduct system including, but not limited to: (5) Attempting to discourage an individual's proper participation in, or use of, the student conduct system.

12.     Karen Metzner, WSU's Center for Community Standards Director, authored the December 16, 2019, letter and made the above-referenced findings contained therein.

13.     Ms. Metzner based the above referenced findings on the following facts:

> 1.     You and the Complainant had a consensual sexual relationship which ended in December 2018. After the relationship ended, you made sexual comments about your relationship and the Complainant to fellow students in the program. While you identified these people as your friends, they were also in some cases your subordinates within the program and also friends/acquaintances of the Complainant.
> 2.     You sent a photo to students in the program of you shirtless and in a towel via "ShapChat". You sent the photo because you were proud of your physique and the training program that you were currently completing in preparation for the Ranger Challenge.
> 3.     You sent sexually inappropriate videos to several ROTC members. You sent these videos years ago, on your 21st birthday, and alcohol played a factor in the situation.
> 4.     The students who received these photos/videos did not ask you to send them photos/videos and the photos/videos were unwanted.
> 5.     You called the Complainant after you heard that she intended to file a report about her experiences.

COMPLAINT - 3

6.    You contacted another student via Facebook Messenger to discuss the reporting process with them.

7.    You contacted another student via text message about providing evidence to "help you out" with the investigation.

14.    Ms. Metzner's December 16, 2019, finding (a) forbade Mr. Fleetwood from having "any contact with the Complainant or other parties involved [in the process] until December 16, 2021" (b) required Mr. Fleetwood to draft an action plan (c) required Mr. Fleetwood to write a reflection paper, (d) required Mr. Fleetwood to complete a state-approved alcohol and drug information program and (e) placed Mr. Fleetwood on disciplinary probation. The December 16, 2019, finding also placed Mr. Fleetwood on "enrollment hold" pending completing of the above-referenced tasks.

15.    Mr. Fleetwood timely appealed the December 16, 2019, finding to WSU's University Appeals Board who, on February 21, 2020, upheld Ms. Metzner's December 16, 2019, decision.

## III. CAUSE OF ACTION

16.    Mr. Fleetwood incorporates the above paragraphs as if pled verbatim herein.

### (Count One – Violation of the Washington Administrative Procedure Act)

17.    A final agency decision, such as the February 21, 2020, Appeals Board decision and the December 16, 2019, are properly appealable when (a) the Agency erroneously interprets or applies the law (b) issues an order not supported by the evidence or (c) issues an order that is arbitrary or capricious. RCW 34.05.570(3)(d)(e)&(i).

18.    For the following reasons, the Agency's determination that Mr. Fleetwood's actions violated WAC 504-26-227 & WAC 504-26-209 (i.e. sexually harassed complainant in violation of WSU Executive Policy 15) constitutes a misapplication of the law and is not supported by substantial evidence.

COMPLAINT - 4

19.     WSU Executive Policy 15 defines "sexual harassment" as "a form of discrimination based on sex and/or gender and is prohibited by this policy. Sexual harassment encompasses *unwelcome* verbal or physical conduct *of a sexual nature*." (Emphasis added)

20.     As it relates to *finding number 1*, the "joke" centers around a "Eskimo bro" comment that Mr. Fleetwood vehemently disputes even making, and that rather, Cadet D[1], another MS-IV[2] who previously dated the Complainant, used the term. Nevertheless, assuming Mr. Fleetwood did initiate or repeat that comment, the comment in and of itself, while arguably in poor taste, does not rise to the level of harassment. Here context (and freedom of speech) matter as discussing prior sexual relationships, including frustrations with prior sexual relationships, is standard on within the shared housing scenarios of college campuses and within military programs. Indeed, the Complainant herself described, to Mr. Fleetwood, her frustrations about her past sexual relationship with Cadet D. Both testimonies confirm that is how their more intimate relationship began.

21.     As it relates to *finding number 3 and 4* of Ms. Metzler's December 16, 2019, letter: there is no evidence that the recipients of those videos objected to the receipt of those videos at (or near) the time they were transmitted. Accordingly, Mr. Fleetwood was not on notice that the transmission of those videos was unwanted. Further, Mr. Fleetwood testified that he had permission from the person in the video to transmit those videos.

22.     As it relates to *finding number 2* of Ms. Metzler's December 16, 2019 letter and

---

[1] The Agency's June 13, 2019, report 2019-021 references Students A through J. In this complaint Students A through J are referred to as Cadets to the extent they were part of WSU Army ROTC. And it was WSU's June 13, 2019, report from which the Agency utilized in issuing the orders at issue in this complaint.

[2] MS IV means "Military Science" IV, a fourth year ROTC cadet. A MS I is a first year ROTC cadet. A MS II is a second year ROTC Cadet. A MS III is a third year ROTC cadet.

COMPLAINT - 5

*finding 28* of the June 13, 2019, WSU Investigative Report, both cite Student E's report of feeling "grossed out" after receiving a photo Mr. Fleetwood sent of himself shirtless in a towel after a Ranger Challenge workout. In addressing this issue Mr. Fleetwood stated, in a proceeding that WSU Army ROTC initiated against Mr. Fleetwood, that, "Many of his guy friends also received this message. No rule states that I cannot be shirtless. I was purely showing how proud I was of my physical achievements and that I was proud to have become Army Strong. I send these to guys and gals with no sexual intent." Indeed, the conclusion that exposure to an image of a shirtless male could somehow qualify as harassment and create hostile environment is highly problematic. Consider the *Men's Health* magazine cover below. One can easily imagine encountering it in a doctor's office. Is that doctor guilty of sexual harassment? Consider the college boys pictured below, or countless other photos found during a simple Google image search of the terms "towels" "college" "muscles"? Are these "shirtless male hunks" creating a hostile environment on Ebay? Most would conclude not. Indeed, EP 15 itself states that it is "committed to the principles of free inquiry and free expression"[3] and sending a shirtless photo to some friends falls squarely into that category.

[3] *See infra* ¶23.

COMPLAINT - 6



23.    As it relates to *findings number 2, 3, and 4*, WSU's own Purposes section, the opening section of Executive Policy #15, expressly clarifies the policy's intent to eliminate legitimate sexual harassment *without* impeding freedom of expression.[4] Mr. Fleetwood's sharing of consensually created videos should be protected under his first amendment freedom of expression rights.

24.    The Agency also misapplied the law and had no factual basis for its determination that Mr. Fleetwood violated WAC 504-26-219 (abuse of the student conduct system) because the Agency did not establish that any of Mr. Fleetwood's conduct was directed at any of the potential witnesses *before* Mr. Fleetwood was told that he could not have contact with any witnesses.

---

[4] "WSU is committed to the principles of free inquiry and *free expression;* vigorous discussion and debate are fundamental to the University. This policy is not intended to stifle teaching methods or *freedom of expression*. Discrimination, as prohibited in this policy, is conduct that is neither *legally protected as an expression of free speech*, nor the proper exercise of academic freedom.; vigorous discussion and debate are fundamental to the University." *See* EP 15 *available at* https://policies.wsu.edu/prf/index/manuals/executive-policy-manual-contents/ep15-discrimination-sexual-harassment-sexual-misconduct/ (*last visited* March 10, 2020).

COMPLAINT - 7

25.     As it relates to *finding numbers 5, 6, and 7* of Ms. Metzler's December 16, 2019, letter: there is no evidence that any of Mr. Fleetwood's contact with the individuals identified in findings 5, 6,  or 7 happened *after* Mr. Fleetwood was told not to have contact with potential witnesses. But more to the point, there is no evidence that Mr. Fleetwood's communications with any of the potential witnesses (or Complainant) rose to the level of "attempting to discourage an individual's proper participation in, or use of, the student conduct system."

26.     As it relates to *finding numbers 5, 6, and 7* of Ms. Metzler's December 16, 2019 letter: the only evidence of contact with other Cadets related to the case occurred during the time period when Mr. Fleetwood misunderstood—through an active ROTC rumor mill quite probably perpetrated by the Complainant's conspirators—that he had been accused of rape.  And while keeping EP's protection of "speech" in mind, it logically follows that a person falsely accused of rape would naturally reach out to colleagues of his to defend his reputation or at least tell his side of the story.

27.     The Agency's December 16, 2019, order and February 21, 2020, Appeals Board decision (all of which stem from the June 13, 2019, investigation) is also arbitrary and capricious as the Agency credited the testimony of witnesses who were found to have misled the investigator and credited the testimony of Complainant while ignoring false (and sexually motivated) written statements made by Complainant regarding Mr. Fleetwood, specifically a statement that Complainant made (under oath) that she found out that  "[Mr. Fleetwood] had slept with well over 30 women during that semester" when that statement was false.

28.     Establishing the arbitrary and capricious nature of the Agency's investigation and subsequent determination requires comparing WSU's conclusions vis-à-vis Mr. Fleetwood with the

COMPLAINT - 8

seemingly more thorough and transparently documented findings of the Army ROTC disciplinary board which also investigated Complainant's allegations against Mr. Fleetwood but reached a different conclusion.

29.    By way of example, WSU's June 13, 2019 report ¶ 24 states *in finding 24*, "Student A, Student C, Student F, and Student I stated "the Respondent had made inappropriate sexual comments while in uniform," but the Army investigation's reached a conflicting conclusion after interviewing the same witnesses on the same topic.   To be clear, the notes from the Army Disenrollment Board on December 9, 2019 at (20:05) state: "CDT [Student F] was first reminded that he still was under oath… CDT [Student F] was then asked if Fleetwood ever made sexual comments to him in uniform." He said that Fleetwood *never* made sexual comments to him in uniform." Either the witness was not credible in front of the WSU OEO *or* the investigation was not credible, and if the first is true, then the second must hold true as well.

30.    Equally problematic is unusual disappearance of WSU's initial evidence[5] that Mr. Fleetwood had been "telling others that "[the Complainant] 'squirted all over my sheets'" from the Army ROTC Disenrollment Board findings. Why did the Army reject that evidence but not WSU? What happened to this evidence? Who reported it initially?  Why was it not discussed in the report? Were there issues with the consistency of the report? Was that witness deemed "not credible"; if so, why did the report not state so much transparently?

31.    Continuing with credibility issues, the WSU Investigative Report *finding 20* mentions one aggressive, and sexually explicit "should I leave your ass in 2018" message the Complainant

---

[5] *See* WSU Investigation Report, 1.a, authored, June 13, 2019,

sent on December 31, 2018, but fails to address corroborated evidence of a more troubling interaction which impacts the Complainant's credibility.    Specifically, in late November or early December while still dating Mr. Fleetwood, the Complainant effectively confessed her potential for both jealousy and malicious prosecution by sending Mr. Fleetwood a threatening text along with a Snapchat image of the Army's Sexual Harassment/Assault Response and Prevention (SHARP) pamphlet. The December 9, 2019 Disenrollment Board Officially notes the Complainant's response: "She did send it over Snapchat as a joke because she was frustrated with Fleetwood sleeping with multiple women" (Disenroll Proceedings (DP) 14:11[6]). This corroborated evidence suggests that the Complainant's earliest motive for filing against Mr. Fleetwood was his refusal to be monogamous, which, sad as it might be, does not qualify as sexual harassment.[7]

32.    Equally concerning is the Complainant's apparent refusal to testify during the WSU Community Standards hearing, but later to testify in the Army's December 9, 2019, Disenrollment Board hearing.    Complainant declining to testify in one proceeding while deciding to testify in another certainly calls her credibility into question as if Complainant is truly interested in stopping harassment it follows she would participate in the Community Standards haring as well.    Instead, *finding 14* of the June 13, 2019, report confidently concluded "the Complainant's statement to be credible."    And to be clear, there is no evidence that Complainant's refusal to testify as part of the

---

[6]  The Army Disenrollment Board hearing was partially transcribed. The 14:11 entry refers to the time stamp on an Army document titled "Cadet Fleetwood Disenrollment Board Sequence of Events."

[7]  The Complainant's presumed motive (jealousy and/or concern about Mr. Fleetwood's alleged promiscuity) is reasserted in her false testimony in the complaint later in the December 9, 2019 Disenrollment Proceedings when sometime after 15:50 she explains why she did not in the end testify during the university harassment hearing on his case: "[Complainant] just does not want him to be an officer in the US Army because of how he treats females."

COMPLAINT - 10

WSU Community Standards hearing was related to fear that her testimony might exacerbate PTSD or impact her own reputation because she, in fact, testified twice before the Army disciplinary hearing. When asked at the Army disciplinary hearing why Complainant did not testify as part of the WSU Community Standards hearing, Complainant stated, as recorded: "She did not want to prevent Fleetwood from receiving his degree at WSU. She just does not want him to be an officer in the U.S. Army because of how he treats females." *See supra.*

33.    WSU OEO Investigative Report *finding 40* states that "the Complainant told investigators she has been impacted on a social and emotional level.  She expressed worry about gossip and rumors in the Program and being labeled a '[Program] slut'" is evidence of motive that the Agency disregarded in arbitrarily determining that Mr. Fleetwood violated the above-referenced regulations. Worry and rumors are another phrase for "speculation" and the Agency arbitrarily and capriciously credited Complainant's speculative fear about rumors and gossip while rejecting the unrebutted evidence that when it came to Mr. Fleetwood, this Complainant never experienced anything akin to sexual assault. Indeed, during the ROTC Disenrollment Proceeding Complaint provided no evidence of Mr. Fleetwood doing or saying anything of a harassing nature. The only comment Complainant could recall was Mr. Fleetwood stating something to the effect that Complainant "won't be able to get in a sorority." (15:50) That is not harassment and there is no evidence that the WSU OEO investigation considered any other comment than the one Complainant made during the Disenrollment Proceeding.

34.    Instead, the Agency arbitrarily bases its hostile environment finding on rumor/reality-based stigmatization experienced by the Complainant, but not caused by Mr. Fleetwood, or certainly not solely by Mr. Fleetwood.  Specifically, the Complainant admits to multiple short-term sexual

COMPLAINT - 11

romances with MS-IVs during her first year as a Cadet: at least one before, and a different one during the months after her brief interlude with Mr. Fleetwood (a romance which began, as text evidence reveals, in part because Mr. Fleetwood was consoling the Complainant about her outrage surrounding the first MS-IV Cadet's treatment).

35.    Complainant's own words (presumably words Complainant also told WSU's OEO investigators) make clear Complainant had real reason to fear her ROTC environment could become awkward/hostile due to her growing reputation as a "[Program] slut" however, WSU's arbitrary blaming of just Mr. Fleetwood for the actions of Complainant and the actions of various Cadets involved in this consensual situation is an abuse of the intention of Title IX.  To be clear, during the investigation, Mr. Fleetwood faced repeated false accusations of "being a rapist"; however, at no time does the Complainant suggest her sexual relations with Fleetwood were anything but consensual.

36.    Further, the Army's Disenrollment Proceeding makes clear that Complainant was not harmed, at all, by any of Mr. Fleetwood's alleged statements; in fact, she could not recall much that Mr. Fleetwood said to her after his last in private encounter with her (a group invitation *she accepted* to attend a public lunch spot in broad daylight). Indeed, the US Army intake paperwork (dated January 18, 2019) associated with Complainant's allegations against Mr. Fleetwood included specific opportunity for Complainant to report on her disposition. In response to that query: "N/A" was reported.  Hence, contrary to WSU OEO's reporting, the Army intake paperwork concluded the Complainant was not visibly impacted by the accusations at the time she first filed the complaint.

37.    Although the WSU OEO investigation report claims the investigators "assessed credibility" of witnesses, including, but not limited to "internal consistency of statements…

COMPLAINT - 12

consistency of their statements with those of other witnesses or documentary evidence, plausibility, and motivation," the conclusions rely heavily upon Student A, who provided information that was later determined to be, more likely than not, untrue. This is especially concerning since Student A had pre-existing credibility issues due to a) his own earlier ROTC disenrollment proceedings related to a racism charge and b) his noted romantic interest in the Complainant.

38.     The one piece of evidence that WSU OEO and the Army generally agree upon relates to a video Mr. Fleetwood sent to two friends and with the consent/encouragement of a woman he was having sex with after his twenty-first birthday party. This event took place two years prior to Complainant's allegations, did not involve the Complainant, and was only corroborated fact because Mr. Fleetwood confessed, due to his own honest nature, to making the video and distributing it to a pair of presumably willing male recipients.

39.     There is no physical evidence that the video currently exists. There is no evidence that any of the video's recipients objected to Mr. Fleetwood's transmission of that video or indicated that the video was in fact "unwanted" until years later, and then only after being contacted by WSU's investigators.

40.     Mr. Fleetwood confirmed transmitting the videos only after being confronted with that allegation by the WSU investigator during an interview. It was not until mid-way through the interview—an interview that WSU represented to Mr. Fleetwood pertained *only* to Complainant's allegations as opposed to non-Complainant related issues that happened years earlier—that the investigator confronted Mr. Fleetwood with the video allegations.

41.     At the time Mr. Fleetwood confessed to sending the videos Mr. Fleetwood was not represented by an attorney

COMPLAINT - 13

42.    In short, Mr. Fleetwood potentially ended his military career, accruing considerable financial debt, by his own conscientious admission to a behavior he clearly regretted/regrets.  And he did this in a proceeding where he had no legal counsel and believed he was responding to an entirely different allegation. Before he walked into that room he had no idea he would be asked that question. Mr. Fleetwood condemned himself in a "trial by ambush" aided and abetted by the Agency's refusal to provide required documentation throughout the investigation process.

43.    Furthermore, while the transmission of the Snapchat video may seem reprehensible to an older generation, the behavior has become seemingly normal within Mr. Fleetwood's age group. Current statistics related to online dating are relevant in assessing whether Mr. Fleetwood's short-lived Snapchat behavior was aberrant enough to justify such harsh persecution. For example, 60% of female users ages 18 to 34 say someone on a dating site or app continued to contact them after they said they were not interested, while a similar share--57% of women aged 18 to 34--and 48% of all users, report being sent a sexually explicit message or image they didn't ask for.[8]  And this is during an age when 48% of Americans aged 18-29 report using dating sites or online apps. In short, if Mr. Fleetwood's bad night truly violated community standards, it did so in a way which has become "standard" for the subset of our population who engage with Snapchat: an app whose principal feature "is that pictures and messages are usually only available for a short time before they become inaccessible to their recipients."[9]

---

[8]    *See*    Pew    Research    Center    Report    *available    at* https://www.pewresearch.org/internet/2020/02/06/the-virtues-and-downsides-of-online-dating/ (*last visited* March 11, 2020)
[9]    *See* Wikipedia "Snapchat" *available at* https://en.wikipedia.org/wiki/Snapchat (*last visited* March 11, 2020)

COMPLAINT - 14

44.    The bullet points provided in Ms Karen Metzger, Director of the Office of Community Standards' 16 December 2019 letter suggest the Agency itself discredited the bulk of the Complainant's harassment accusations, concluding in its own for Mr. Fleetwood's essential innocence: "Based on our conversations, you did not intend to create a hostile environment for the students around you, however, that does not change the impact of your actions."  The understated language of the final findings versus the original accusations warrants a second read:

After our discussion and after reviewing all of the information available to me, I have determined the following more likely than not occurred:

1. You and the Complainant had a consensual sexual relationship which ended in December 2018. After the relationship ended, you made sexual comments about your relationship and the Complainant to fellow students in the program. While you identified these people as your friends, they were also in some cases your subordinates within the program and also friends/acquaintances of the Complainant.
2. You sent a photo to students in the program of you shirtless and in a towel via "ShapChat". You sent the photo because you were proud of your physique and the training program that you were currently completing in preparation for the Ranger Challenge.
3. You sent sexually inappropriate videos to several ROTC members. You sent these videos years ago, on your 21st birthday, and alcohol played a factor in the situation.
4. The students who received these photos/videos did not ask you to send them photos/videos and the photos/videos were unwanted.
5. You called the Complainant after you heard that she intended to file a report about her experiences.
6. You contacted another student via Facebook Messenger to discuss the reporting process with them.
7. You contacted another student via text message about providing evidence to "help you out" with the investigation.

45.    Mr. Fleetwood has requested (but has not been given – more on that below) copies of the documents/interview notes the Agency considered in reaching its decision/investigating Complainant's allegations.

46.    Accordingly, Mr. Fleetwood reserves the right to amend his complaint once he receives the underlying documents that the Agency used in reaching its investigatory conclusions and administrative findings.

### (Count Two – Violation of the Washington Public Record Act)

47.    Washington's Public Record Act (PRA) "provides a cause of action for two types of

COMPLAINT - 15

violations: (1) when an agency wrongfully denies an opportunity to inspect or copy a public record, or (2) when an agency has not made a reasonable estimate of the time required to respond to the request." *Andrews v. Washington State Patrol*, 183 Wn. App. 644, 651 (2014).

48.     On November 23, 2019, Mr. Fleetwood made a public record request to the Agency seeking:

> #1: The complete investigative file concerning the Office of Equal Opportunity Complaint No. 2019-021, Including all statements, emails and records.
> #2: The complete file and all records concerning WSU Center for Community Standards Case No. 2018371301, including emails and records of communication with the Office of Civil Rights Compliance and Investigation (formerly Office for Equal Opportunity) concerning this case and/or OEO Case No. 2019-021.

49.     WSU designated Mr. Fleetwood's November 23, 2019, request as Request No. 19-616.

50.     WSU closed the request on November 27, 2019 claiming that "Community Standards case number 2018371301 is still an active investigation."

51.     WSU made no such objection to Mr. Fleetwood's request for the "complete investigative file concerning the Office of Equal Opportunity Complaint No. 2019-021, Including all statements, emails and records" as that investigation, undisputedly completed on June 13, 2019.

52.     Accordingly, WSU's failure to provide Mr. Fleetwood documents responsive to item number one of Request No. 19-616 violated Washington's Public Record Act.

53.     Furthermore, WSU's failure to provide Mr. Fleetwood those documents materially prejudiced him by depriving him of the information he needed to both defend himself from the above-referenced Agency procedures as well as a concurrently occurring administrative procedure by WSU's Army Reserve Officer Training Corps (ROTC) arising out of Complainant's allegations.

COMPLAINT - 16

54.     On November 28, 2019, Mr. Fleetwood made a public record request to the Agency seeking "The complete investigative file concerning the Office of Equal Opportunity Complaint No. 2019-021, Including all statements, emails and records."

55.     WSU labeled this November 28, 2019, request as Request No. 19-630.

56.     WSU closed the request on December 2, 2019, claiming that Mr. Fleetwood could access the information through WSU's Civil Rights & Compliance Investigation office.

57.     Mr. Fleetwood then requested the documents from the Center for Community Standards as the WSU Records Office directed; however, the Community Standards Office did not provide Mr. Fleetwood the opportunity to make copies of the responsive documents or to meaningfully inspect them.

58.     Additionally, at least twice, Ms. Metzler promised to Mr. Fleetwood that he (Fleetwood) would receive copies of all the above-referenced documents; however, as of the date of this lawsuit WSU has not provided Mr. Fleetwood copies of documents (or the opportunity to make copies of those documents) in response to Request No. 19-630.

59.     The Agency's violation of the Public Record Act has caused Mr. Fleetwood damage in an amount to be proven at trial.

## IV. PRAYER FOR RELIEF

Mr. Fleetwood respectfully seeks:

A.  An order pursuant to RCW 34.05.574 setting aside all agency action.

B.  An order compelling WSU to produce the above-requested documents per the Public Record Act and provide Mr. Fleetwood copies of said records or allow Mr. Fleetwood to make copies of those records.

COMPLAINT - 17

C. Attorneys' fees, costs, and expenses as allowed under the Public Record Act.

D. All damages allowed under the law.

E. All other relief that is just and equitable.

DATED this _March 13_, 2020.


CROTTY & SON LAW FIRM, PLLC

By: _____

Matthew Z. Crotty, WSBA No. 39284
905 West Riverside Ave. Ste. 404
Spokane, Washington 99201
Telephone No. 509.850.7011

Attorneys for Plaintiff

COMPLAINT - 18

20-2-00053-38
NTAPR        5
Notice of Appearance
7965417

FILED

MAR 23 2020

JILL E. WHELCHEL
WHITMAN COUNTY CLERK

1
2
3
4
5
6
7

## STATE OF WASHINGTON
## WHITMAN COUNTY SUPERIOR COURT

8
9

PATRICK FLEETWOOD,

             Plaintiff,

v.

WASHINGTON STATE
UNIVERSITY,

             Defendant.

NO. 20-2-00053-38

NOTICE OF APPEARANCE

**(Clerk's Action Requested
CORRECTED NOTICE)**

16    TO:    Patrick Fleetwood, Plaintiff, by and through his attorney, Matthew Z.
17             Crotty of Crotty & Son Law Firm, PLLC

18    TO:    CLERK OF THE COURT

19          YOU WILL PLEASE TAKE NOTICE that Defendant Washington State

20    University by and through its attorneys, Robert W. Ferguson, Attorney General, and

21    Nathan E. Deen, Assistant Attorney General, without waiving objections as to

22    improper service, jurisdiction or venue, hereby enters their appearance in the above-

23    entitled action and requests that notice of any and all further proceedings in said

24    action be served upon the undersigned attorney at the address stated below.

NOTICE OF APPEARANCE                                1                    ATTORNEY GENERAL OF WASHINGTON
                                                                          332 French Administration Building
                                                                          PO Box 641031
                                                                          Pullman, WA 99164-1031
                                                                          (509) 335-2636

1  **TRANSMISSION BY FAX OR BY ELECTRONIC MAIL DOES NOT**

2  **CONSTITUTE SERVICE, UNLESS AGREED IN WRITING OR UNLESS**

3  **OTHERWISE REQUIRED BY COURT RULE.**

4      DATED this 19th day of March, 2020.

5

6                           ROBERT W. FERGUSON
                            Attorney General

7

8

9                           NATHAN E. DEEN, WSBA #39673
                            Assistant Attorney General
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1

## PROOF OF SERVICE

2    I certify that I served a copy of this document on all parties or their counsel

3    of record on the date below as follows:

4

**To Plaintiff:**

5    ☑    Matthew Z. Crotty, attorney for Plaintiff

6         via email to –matt@crottyandson.com

7    ☑    Via standard U.S.P.S. mail to:

8         MATTHEW Z. CROTTY
         CROTTY & SON, PLLC

9         905 WEST RIVERSIDE AVENUE, SUITE 404
         SPOKANE, WA  99201

10

11    I certify under penalty of perjury under the laws of the state of Washington

12    that the foregoing is true and correct.

13    DATED this _9th_ day of March, 2020, at Pullman, Washington.

14

15

16    _Rita Haas_
      Rita Haas

17    Assistant Director of Legal Services

18

19

20

21

22

23

24

ATTORNEY GENERAL OF WASHINGTON
332 French Administration Building
PO Box 641031
Pullman, WA  99164-1031
(509) 335-2636

20 - 2 - 00053 - 38
NTAPR        4
Notice of Appearance
7965425



FILED

MAR 23 2020

JILL E. WHELCHEL
WHITMAN COUNTY CLERK

1

2

3

4

5

6

7

8

## STATE OF WASHINGTON
## WHITMAN COUNTY SUPERIOR COURT

9

PATRICK FLEETWOOD,                    NO. 20-2-00053-38

10                      Plaintiff,        NOTICE OF APPEARANCE

11

12        v.                            **(Clerk's Action Requested)**

13    WASHINGTON STATE
    UNIVERSITY,

14                      Defendant.

15

16    TO:    Patrick Fleetwood, Plaintiff, by and through his attorney, Matthew Z.
17           Crotty of Crotty & Son Law Firm, PLLC

18    TO:    CLERK OF THE COURT

19        YOU WILL PLEASE TAKE NOTICE that Defendant Washington State

20    University by and through its attorneys, Robert W. Ferguson, Attorney General, and

21    Nathan E. Deen, Assistant Attorney General, without waiving objections as to

22    improper service, jurisdiction or venue, hereby enters their appearance in the above-

23    entitled action and requests that notice of any and all further proceedings in said

24    action be served upon the undersigned attorney at the address stated below.

**TRANSMISSION BY FAX OR BY ELECTRONIC MAIL DOES NOT CONSTITUTE SERVICE, UNLESS AGREED IN WRITING OR UNLESS OTHERWISE REQUIRED BY COURT RULE.**

DATED this 19th day of March, 2020.

ROBERT W. FERGUSON
Attorney General

NATHAN E. DEEN, WSBA #39673
Assistant Attorney General

1

## PROOF OF SERVICE

2       I certify that I served a copy of this document on all parties or their counsel

3  of record on the date below as follows:

4

**To Plaintiff:**

5     ☑   Matthew Z. Crotty, attorney for Plaintiff

6           via email to –matt@crottyandson.com

7     ☑   Via standard U.S.P.S. mail to:

8           Matthew Z. Crotty

             Crotty & Son, PLLC

9           905 West Riverside Avenue, Suite 404

10         Spokane, WA  99201

11      I certify under penalty of perjury under the laws of the state of Washington

12  that the foregoing is true and correct.

13      DATED this _9th_ day of March, 2020, at Pullman, Washington.

14

15

16                    Rita Haas

17                    Assistant Director of Legal Services

18

19

20

21

22

23

24

20 – 2 – 00053 – 38
AFSR          6
Affidavit Declaration Certificate Confirmation of
8006566



FILED

APR 01 2020

JILL E. WHELCHEL
WHITMAN COUNTY CLERK

# SUPERIOR COURT, STATE OF WASHINGTON, COUNTY OF WHITMAN

PATRICK FLEETWOOD,

                              Plaintiff,          NO. 20-2-00053-38

vs.

                                                  **CERTIFICATE OF SERVICE**

WASHINGTON STATE UNIVERSITY,

                              Defendant.

    I, Nancy Cook, hereby certify under penalty of perjury under the laws of the State of Washington as follows:

    1.    I am over the age of 18 and am competent to testify as a witness.

    2.    On March 13, 2020, I personally served Adam Malcolm, an attorney for the Washington State Attorney General's office with a copy of the Complaint and Summons in the above captioned matter. The location of the service was the Washington State Attorney General's office located on the WSU campus in Pullman, Washington

    3.    On March 13, 2020, I personally served Ginger Druffel, the Executive Assistant to the President of Washington State University with the Complaint and Summons

CERTIFICATE OF SERVICE - PAGE 1

in the above captioned action. The location of the service was the WSU Office of the President. Ms. Druffel confirmed to me that she was the chief administrative officer who was authorized to accept legal process on behalf of WSU's director, here its President.

DATED this _29_ day of March 2020.

By: _____
Nancy Cook

CERTIFICATE OF SERVICE - PAGE 2

1
2
3
4
5
6
7
8

FILED
APR 0 2 2020
WHITMAN COUNTY CLERK

**STATE OF WASHINGTON
WHITMAN COUNTY SUPERIOR COURT**

9    PATRICK FLEETWOOD,                    NO. 20-2-00053-38

10                        Plaintiff,       DEFENDANT WASHINGTON
11                                         STATE UNIVERSITY'S
         v.                                ANSWER TO PLAINTIFF'S
12                                         COMPLAINT
     WASHINGTON STATE
13   UNIVERSITY,
14
                         Defendant.
15

16        Defendant Washington State University, in answer to Plaintiff's complaint,

17   admits, denies and alleges as follows:

18                    **I. PARTIES, JURISDICTION, AND VENUE**

19        1.      Defendant admits Plaintiff was a student of Defendant during the time-

20   frame relevant to this lawsuit.    Defendant is without knowledge or information

21   sufficient to form a belief as to the truth of the allegation regarding Plaintiff's mailing

22   address and, therefore, denies the same.    Defendant denies all other allegations

23   contained in paragraph 1.

24        2.      Defendant admits the allegations contained in paragraph 2.

25

1       3.     The allegations contained in paragraph 3 constitute legal conclusions to

2   which no answer is required.  To the extent an answer is required, Defendant denies

3   the same.

4       4.     Defendant admits the allegations contained in paragraph 4.

5       5.     The allegations contained in paragraph 5 constitute legal conclusions to

6   which no answer is required.  To the extent an answer is required, Defendant denies

7   the same.

## II.  FACTS

9       6.     Defendant reasserts and incorporates by reference each and every

10  answer set forth in paragraphs 1-5 with the same force and effect as though fully set

11  forth herein, and applies those answers to its response to the facts.

12      7.     Defendant admits that on January 18, 2019, Senior Military Instructor

13  MSG Jeremy Keller contacted Defendant's Office of Civil Rights Compliance and

14  Investigation (CRCI) regarding possible sexual harassment by Plaintiff.  Defendant

15  further admits that on that day, CRCI contacted a potential target of Plaintiff's

16  harassment, who agreed to meet with CRCI to discuss her knowledge at a future date.

17  The remainder of the allegation and any inference from the allegations not

18  specifically admitted is denied.

19      8.     Defendant admits the allegations contained in paragraph 8.

20      9.     Defendant admits the allegations contained in paragraph 9.

21      10.    Defendant admits that on or about December 5, 2019, Plaintiff

22  participated in a community standards hearing; the remainder of the allegation

23  contained in paragraph 10 and any inference from the allegation not specifically

24  admitted is denied.

25      11.    Defendant admits the allegations contained in paragraph 11.

DEFENDANT WSU'S ANSWER TO
PLAINTIFF'S COMPLAINT

2

1     12.    Defendant admits the allegations contained in paragraph 12.

2     13.    Defendant admits the allegations contained in paragraph 13.

3     14.    Defendant admits that the Director of the Center for Community

4   Standards Karen Metzner's December 16, 2019, initial order (a) forbade Plaintiff

5   from having "any contact with the Complainant or other parties involved [in the

6   process] until December 16, 2021;" (b) required Plaintiff to draft an action plan;

7   (c) required Plaintiff to write a reflection paper; (d) required Plaintiff to complete a

8   state-approved alcohol and drug information program; and (e) placed Plaintiff on

9   disciplinary probation.  Defendant further admits that it placed a hold on Plaintiff's

10  account precluding graduation until Plaintiff completes the sanctions outlined in (b),

11  (c), and (d) of this paragraph.  The remainder of the allegation contained in paragraph

12  14 and any inference from the allegation not specifically admitted is denied.

13    15.    Defendant admits the allegations contained in paragraph 15.

14                        **III.  CAUSE OF ACTION**

15    16.    Defendant reasserts and incorporates by reference each and every

16  answer set forth in paragraphs 1-15 with the same force and effect as though fully set

17  forth herein, and applies those answers to its response to each cause of action.

18    17.    The allegations contained in paragraph 17 constitute legal conclusions

19  to which no answer is required.  To the extent an answer is required, Defendant denies

20  the same.

21    18.    Defendant denies the allegations contained in paragraph 18.

22    19.    Defendant admits that its Executive Policy 15 (EP 15) defines "sexual

23  harassment" in part as "a form of discrimination based on sex and/or gender and is

24  prohibited by this policy.  Sexual harassment encompasses unwelcome verbal or

25  physical conduct of a sexual nature."  However, EP 15 contains additional,

alternative means for committing sexual harassment and, therefore, an inference from the allegation that the quoted definition is EP 15's sole definition for sexual harassment is denied.

20.    Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 20 and, therefore, denies the same.

21.    Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 21 and, therefore, denies the same.

22.    Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 22 and, therefore, denies the same.

23.    The allegations contained in paragraph 23 constitute legal conclusions to which no answer is required.  To the extent an answer is required, Defendant denies the same.

24.    The allegations contained in paragraph 24 constitute legal conclusions to which no answer is required.  To the extent an answer is required, Defendant denies the same.

25.    Defendant admits that at this time it is not aware of any evidence that Plaintiff contacted the individuals identified in findings 5, 6, and 7 of Ms. Metzner's initial order after he was notified of CRCI's investigation; the remainder of the allegation contained in paragraph 25 and any inference from the allegation not specifically admitted is denied.

1    26.    Defendant is without knowledge or information sufficient to form a
2  belief as to the truth of the allegations contained in paragraph 26 and, therefore,
3  denies the same.

4    27.    The allegations contained in paragraph 27 are not a short and plain
5  statement of the claim showing that the pleader is entitled to relief, therefore no
6  answer is required.  To the extent an answer is required, Defendant denies the same.

7    28.    Defendant denies the allegations contained in paragraph 28.

8    29.    The allegations contained in paragraph 29 are not a short and plain
9  statement of the claim showing that the pleader is entitled to relief, therefore no
10  answer is required.  To the extent an answer is required, Defendant denies the same.

11    30.    Defendant is without knowledge or information sufficient to form a
12  belief as to the truth of the allegations contained in paragraph 30 and, therefore,
13  denies the same.

14    31.    Defendant is without knowledge or information sufficient to form a
15  belief as to the truth of the allegations contained in paragraph 31 and, therefore,
16  denies the same.

17    32.    Defendant is without knowledge or information sufficient to form a
18  belief as to the truth of the allegations contained in paragraph 32 and, therefore,
19  denies the same.

20    33.    Defendant denies the allegations contained in paragraph 33.

21    34.    Defendant denies the allegations contained in paragraph 34.

22    35.    Defendant admits that at no time did the Complainant suggest her
23  sexual relations with Plaintiff were anything but consensual and denies all other
24  allegations contained in paragraph 35.

25

1    36.    Defendant is without knowledge or information sufficient to form a

2    belief as to the truth of the allegations contained in paragraph 32 and, therefore,

3    denies the same.

4    37.    The allegations contained in paragraph 37 are not a short and plain

5    statement of the claim showing that the pleader is entitled to relief, therefore no

6    answer is required.  To the extent an answer is required, Defendant denies the same.

7    38.    Defendant is without knowledge or information sufficient to form a

8    belief as to the truth of the allegations contained in paragraph 38 and, therefore,

9    denies the same.

10    39.    Defendant is without knowledge or information sufficient to form a

11    belief as to the truth of the allegations contained in paragraph 39 and, therefore,

12    denies the same.

13    40.    Defendant admits that Plaintiff admitted to a CRCI investigator that he

14    sent a video of himself having sex with a female to other ROTC members; the

15    remainder of the allegation contained in paragraph 40 and any inference from the

16    allegation not specifically admitted is denied.

17    41.    Defendant admits the allegations contained in paragraph 41.

18    42.    Defendant is without knowledge or information sufficient to form a

19    belief as to the truth of the allegations contained in paragraph 42 and, therefore,

20    denies the same.

21    43.    Defendant is without knowledge or information sufficient to form a

22    belief as to the truth of the allegations contained in paragraph 43 and, therefore,

23    denies the same.

24    44.    Defendant denies the allegations contained in paragraph 44.

25

45.    Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 45 and, therefore, denies the same.

46.    Paragraph 46 contains a reservation of rights, therefore no answer is required.

47.    The allegations contained in paragraph 47 constitute legal conclusions to which no answer is required. To the extent an answer is required, Defendant denies the same.

48.    Defendant admits the allegations contained in paragraph 48.

49.    Defendant admits the allegations contained in paragraph 49.

50.    Defendant admits the allegations contained in paragraph 50.

51.    Defendant admits the allegations contained in paragraph 51.

52.    Defendant denies the allegations contained in paragraph 52.

53.    Defendant denies the allegations contained in paragraph 53.

54.    Defendant admits the allegations contained in paragraph 54.

55.    Defendant admits the allegations contained in paragraph 55.

56.    Defendant admits the allegations contained in paragraph 56.

57.    Defendant denies the allegations contained in paragraph 57.

58.    Defendant denies the allegations contained in paragraph 58.

59.    Defendant denies the allegations contained in paragraph 59.

## IV.  AFFIRMATIVE DEFENSES

By way of FURTHER ANSWER and FIRST AFFIRMATIVE DEFENSE, Defendant alleges:

1.    That the court lacks jurisdiction over the subject matter of Count One; and

DEFENDANT WSU'S ANSWER TO
PLAINTIFF'S COMPLAINT

7

ATTORNEY GENERAL OF WASHINGTON
332 French Administration Building
PO Box 641031
Pullman, WA 99164-1031
(509) 335-2636

1    2.    That the Plaintiff has failed to state a claim for Count One upon which

2    relief may be granted.

3    WHEREFORE, Defendant prays that Count One of Plaintiff's complaint be

4    dismissed with prejudice, that Plaintiff take nothing by Count One of his complaint

5    and that Defendant be allowed its costs and reasonable attorney fees herein.

6    DATED this 2nd day of April, 2020.

7

8    ROBERT W. FERGUSON
     Attorney General

9

10

11    NATHAN E. DEEN, WSBA #39673
      Assistant Attorney General

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DEFENDANT WSU'S ANSWER TO
PLAINTIFF'S COMPLAINT                8                ATTORNEY GENERAL OF WASHINGTON
                                                      332 French Administration Building
                                                      PO Box 641031
                                                      Pullman, WA 99164-1031
                                                      (509) 335-2636

## PROOF OF SERVICE

I certify that I served a copy of this document on all parties or their counsel of record on the date below as follows:

**To Plaintiff:**

☑    Matthew Z. Crotty, attorney for Plaintiff
    via email to:  matt@crottyandson.com

I certify under penalty of perjury under the laws of the state of Washington that the foregoing is true and correct.

DATED this 2nd day of April, 2020, at Pullman, Washington.

_____
Rita Haas
Assistant Director of Legal Services

DEFENDANT WSU'S ANSWER TO
PLAINTIFF'S COMPLAINT

9

ATTORNEY GENERAL OF WASHINGTON
332 French Administration Building
PO Box 641031
Pullman, WA 99164-1031
(509) 335-2636

1
2
3
4
5
6
7
8

FILED

APR 0 2 2020

WHITMAN COUNTY CLERK

**STATE OF WASHINGTON**
**WHITMAN COUNTY SUPERIOR COURT**

9

PATRICK FLEETWOOD,

NO. 20-2-00053-38

10

Plaintiff,

11

v.

12

WASHINGTON STATE
UNIVERSITY,

13

14

Defendant.

15

**DEFENDANT WASHINGTON STATE UNIVERSITY'S MOTION TO DISMISS COUNT ONE OF PLAINTIFF'S COMPLAINT**

16    Comes now the Defendant, Washington State University (WSU or

17  University) appearing by Robert W. Ferguson, Attorney General, and Nathan

18  Deen, Assistant Attorney General, and moves the Court for an order dismissing

19  Count One of Plaintiff Patrick Fleetwood's complaint pursuant to CR 12(c).

20                    **I.  RELIEF REQUESTED**

21    The Defendant respectfully requests that this Court dismiss Count One of

22  Plaintiff's Compliant under CR 12(c) for failure to state a claim upon which relief

23  can be granted.

24

25

DEFENDANT WSU'S MOTION TO
DISMISS COUNT ONE OF PLAINTIFF'S
COMPLAINT

1

## II.  FACTUAL AND PROCEDURAL HISTORY

Plaintiff Patrick Fleetwood is, and at all times relevant to this matter was, a student of the University.  Complaint ¶ 1.  In January of 2019, the University launched an investigation into whether Plaintiff violated WSU's Policy Prohibiting Discrimination, Sexual Harassment, and Sexual Misconduct.  Complaint ¶¶ 8, 9. The outcome of the investigation lead to the University initiating student conduct proceedings against Mr. Fleetwood.  Complaint ¶¶ 10-14.  Mr. Fleetwood's student conduct case was initially heard by Karen Metzner, who found him responsible for three violations of the University's Standards of Conduct:  Sexual harassment, Violation of University policy, and Abuse of the conduct system.  Complaint ¶¶ 11-12.  Ms. Metzner's decision represented the University's initial order. Mr. Fleetwood appealed Ms. Metzner's decision to the University Appeals Board, which upheld her decision on February 21, 2020.  Complaint ¶ 15.  The University Appeals Board decision represented the University's final order on the matter. On March 13, 2020, Mr. Fleetwood filed his complaint in this matter alleging two causes of action:  Count One, Violation of the Washington Administrative Procedure Act; and Count Two, Violation of the Washington Public Records Act. Complaint at 1, 4, 15.  Mr. Fleetwood requests, among other things, that the University's order be set aside.  Complaint at 17.

### III.  PLEADINGS RELIED UPON

Plaintiff's Complaint.

### IV.  ARGUMENT

Washington's Administrative Procedure Act does not provide for a private right of action.  The sole remedy for parties seeking to set aside an agency's action is to seek judicial review.  Failure to properly invoke the Court's appellate

DEFENDANT WSU'S MOTION TO DISMISS COUNT ONE OF PLAINTIFF'S COMPLAINT

2

ATTORNEY GENERAL OF WASHINGTON
332 French Administration Building
PO Box 641031
Pullman, WA 99164-1031
(509) 335-2636

1  jurisdiction divests the court with jurisdiction to hear the matter.    Here,
2  Mr. Fleetwood failed to properly invoke judicial review; therefore, this Court must
3  dismiss Count One of Plaintiff's Complaint.

4  **A.    Standard for granting CR 12(c) motion for judgment on the pleadings**

5      Motions for judgment on the pleadings under CR 12(c) employ the same
6  standards of review used for motions brought under CR 12(b)(6), and the Court
7  may grant the motion if it is clear that no relief could be granted under any set of
8  facts that could be proven consistent with the allegations. *P.E. Syss., LLC v. CPI*
9  *Corp.*, 176 Wn.2d 198, 203 (2012) (citations omitted).    After the pleadings are
10 closed, any party may move for judgment on the pleadings.    CR 12(c).    A motion
11 under CR 12(c) is properly granted when "it appears beyond doubt that the plaintiff
12 can prove no set of facts, consistent with the complaint, which would entitle the
13 plaintiff to relief." *Haberman v. Wash. Pub. Power Supply Sys.*, 109 Wn.2d 107,
14 120 (1987) (internal quotation marks omitted) (quoting *Bowman v. John Doe Two*,
15 104 Wn.2d 181, 183 (1985)).

16 **B.    Mr. Fleetwood failed to state a claim in Count One**

17     Judicial review is the exclusive means for reviewing agency action unless
18 the sole issue is a claim for money damages, it is an ancillary procedural matter
19 before the reviewing court, or *de novo* review or jury trial review of agency action
20 is expressly authorized by provision of law.    RCW 34.05.510.    Unless an exception
21 applies, a plaintiff cannot challenge an agency action through a lawsuit, but rather
22 must properly file for judicial review.    *See Wells Fargo Bank, N.A. v. Dep't. of*
23 *Revenue*, 166 Wn. App. 342, 351-54 (2012) (dismissing plaintiff's lawsuit for
24 failure to seek judicial review).

25

DEFENDANT WSU'S MOTION TO
DISMISS COUNT ONE OF PLAINTIFF'S
COMPLAINT

3

ATTORNEY GENERAL OF WASHINGTON
332 French Administration Building
PO Box 641031
Pullman, WA 99164-1031
(509) 335-2636

1   Here, Mr. Fleetwood seeks an order setting aside the University's action and no

2   provision of law establishes *de novo* review or a jury trial, thus judicial review is

3   his sole remedy. Therefore Mr. Fleetwood fails to state a claim under which relief

4   can be granted. *See also, Judd v. Am. Tel. & Tel. Co.*, 152 Wn.2d 195, 204 (2004)

5   (dismissing lawsuit where plaintiff sought to change agency action).

6   **C.   This Court lacks subject matter jurisdiction over Count One**

7   A petition for judicial review invokes the limited appellate jurisdiction of

8   the superior court. *Cheek v. Emp't Sec. Dep't*, 107 Wn. App. 79, 83 (2001).

9   A party seeking to invoke the jurisdiction of the superior court in its appellate

10  capacity must meet all statutory procedural requirements. *Cheek*, 107 Wn. App. at

11  83. In the context of a judicial review of agency action, the superior court does not

12  acquire subject matter jurisdiction over the appeal unless the petitioner, within

13  thirty (30) days of being served with the agency's final order, files a petition for

14  review in superior court and serves the petition on the agency.

15  *Id.*; RCW 34.05.534(2). Because Mr. Fleetwood failed to file a petition for judicial

16  review within thirty (30) days of the University's final order, this Court does not

17  have jurisdiction over the subject matter of Count One.

18  ## V.   CONCLUSION

19  For the foregoing reasons, Defendant respectfully requests that Count One of

20  Plaintiff's complaint be dismissed with prejudice and without leave to amend.

21  DATED this 2nd day of April, 2020.

22

23  ROBERT W. FERGUSON
    Attorney General

24

25

    NATHAN E. DEEN, WSBA #39673
    Assistant Attorney General

DEFENDANT WSU'S MOTION TO
DISMISS COUNT ONE OF PLAINTIFF'S
COMPLAINT

4

ATTORNEY GENERAL OF WASHINGTON
332 French Administration Building
PO Box 641031
Pullman, WA 99164-1031
(509) 335-2636

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**PROOF OF SERVICE**

I certify that I served a copy of this document on all parties or their counsel of record on the date below as follows:

**To Plaintiff:**
☑    Matthew Z. Crotty, attorney for Plaintiff
via email to:  matt@crottyandson.com

I certify under penalty of perjury under the laws of the state of Washington that the foregoing is true and correct.

DATED this 2nd day of April, 2020, at Pullman, Washington.

Rita Haas
Assistant Director of Legal Services

DEFENDANT WSU'S MOTION TO
DISMISS COUNT ONE OF PLAINTIFF'S
COMPLAINT

5

ATTORNEY GENERAL OF WASHINGTON
332 French Administration Building
PO Box 641031
Pullman, WA 99164-1031
(509) 335-2636

1
2
3
4
5
6
7
8

FILED
APR 0 2 2020
WHITMAN COUNTY CLERK

**STATE OF WASHINGTON**
**WHITMAN COUNTY SUPERIOR COURT**

9
10
11
12
13
14
15

PATRICK FLEETWOOD,

                Plaintiff,

    v.

WASHINGTON STATE
UNIVERSITY,

                Defendant.

NO. 20-2-00053-38

NOTICE OF HEARING

**(Clerk's Action Requested)**

16
17
18
19
20

TO:   CLERK OF THE ABOVE-ENTITLED COURT

TO:   Patrick Fleetwood, Plaintiff, by and through his attorney, Matthew Z. Crotty of Crotty & Son Law Firm, PLLC

      The clerk is requested to place the following motion on the docket for the day indicated:

21
22
23
24
25

      MOTION:           Defendant WSU's Motion to Dismiss Count One of Plaintiff's Complaint

      HEARING DATE:    April 29, 2020, at 10:00 a.m.

ATTORNEY GENERAL OF WASHINGTON
332 French Administration Building
PO Box 641031
Pullman, WA 99164-1031
(509) 335-2636

1    DATED this 2nd day of April, 2020.

2

3                           ROBERT W. FERGUSON
                            Attorney General

4

5                           _____
                            NATHAN E. DEEN, WSBA #39673

6                           Assistant Attorney General

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

ATTORNEY GENERAL OF WASHINGTON
332 French Administration Building
PO Box 641031
Pullman, WA 99164-1031
(509) 335-2636

1

## PROOF OF SERVICE

2      I certify that I served a copy of this document on all parties or their counsel

3  of record on the date below as follows:

4
       **To Plaintiff:**
5      ☑    Matthew Z. Crotty, attorney for Plaintiff
6           via email to:  matt@crottyandson.com
            via email to:  matthew.z.crotty@msn.com
7
       I certify under penalty of perjury under the laws of the state of Washington
8
   that the foregoing is true and correct.
9
       DATED this 2nd day of April, 2020, at Pullman, Washington.
10

11

12      _____
        Rita Haas
13      Assistant Director of Legal Services

14

15

16

17

18

19

20

21

22

23

24

25

ATTORNEY GENERAL OF WASHINGTON
332 French Administration Building
PO Box 641031
Pullman, WA 99164-1031
(509) 335-2636

1
2
3
4
5
6
7
8

**STATE OF WASHINGTON**
**WHITMAN COUNTY SUPERIOR COURT**

FILED
APR 03 2020
WHITMAN COUNTY CLERK

9

PATRICK FLEETWOOD,

NO. 20-2-00053-38

10

Plaintiff,

NOTICE OF CHANGE OF
HEARING

11

v.

12

**(Clerk's Action Requested)**

13

WASHINGTON STATE
UNIVERSITY,

14

Defendant.

15

16

TO:    CLERK OF THE ABOVE-ENTITLED COURT

17

18

TO:    Patrick Fleetwood, Plaintiff, by and through his attorney, Matthew Z. Crotty
of Crotty & Son Law Firm, PLLC

19

The clerk is requested to place the following motion on the docket for the day

20

indicated:

21

22

MOTION:              Defendant WSU's Motion to Dismiss Count One of
Plaintiff's Complaint

23

HEARING DATE:        May 6, 2020, at 10:00 AM
(previously requested for April 29, 2020)

24

25

CORRECTED NOTICE OF HEARING                1                ATTORNEY GENERAL OF WASHINGTON
332 French Administration Building
PO Box 641031
Pullman, WA 99164-1031
(509) 335-2636

DATED this 3rd day of April, 2020.

ROBERT W. FERGUSON
Attorney General

NATHAN E. DEEN, WSBA #39673
Assistant Attorney General

ATTORNEY GENERAL OF WASHINGTON
332 French Administration Building
PO Box 641031
Pullman, WA 99164-1031
(509) 335-2636

# PROOF OF SERVICE

I certify that I served a copy of this document on all parties or their counsel of record on the date below as follows:

**To Plaintiff:**
☑    Matthew Z. Crotty, attorney for Plaintiff
    via email to:  matt@crottyandson.com
    via email to:  matthew.z.crotty@msn.com

I certify under penalty of perjury under the laws of the state of Washington that the foregoing is true and correct.

DATED this 3rd day of April, 2020, at Pullman, Washington.

_____
Rita Haas
Assistant Director of Legal Services

CORRECTED NOTICE OF HEARING                    3                    ATTORNEY GENERAL OF WASHINGTON
                                                                    332 French Administration Building
                                                                    PO Box 641031
                                                                    Pullman, WA 99164-1031
                                                                    (509) 335-2636

FILED

APR 28 2020

WHITMAN COUNTY CLERK

**IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
IN AND FOR THE COUNTY OF WHITMAN**

PATRICK FLEETWOOD,

        Plaintiff,

    vs.

WASHINGTON STATE UNIVERSITY,

        Defendant.

Case No.  20-2-00053-38

**DECLARATION OF PATRICK
FLEETWOOD**

I, Patrick Fleetwood, declare:

1.     I am competent to testify and have personal knowledge of what is written in this declaration.

2.     Attached hereto as Exhibit A is a true and correct copy of the February 21, 2020, letter that I received from Washington State University.

I declare under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct.

DECLARATION - 1

DATED this _April 8_ , 2020.

By: _____
Patrick Fleetwood

DECLARATION - 2

1

## **CERTIFICATE OF SERVICE**

2

     Pursuant to RCW 9A.72.085 the undersigned hereby certifies under penalty of perjury under the laws of the State of Washington, that on the 28th day of April 2020, the foregoing was

3

delivered to the following persons in the manner indicated:

4

| Nathan E. Deen | VIA REGULAR MAIL | __ |
| Attorney General of Washington | VIA FACSIMILE | __ |
| 332 French Administration Building | HAND DELIVERED | __ |
| Pullman, WA 99164 | VIA EMAIL | X |

5

6

7

8

9

10

11

CROTTY & SON LAW FIRM, PLLC

12

Matthew Crotty

13

14

15

16

17

18

19

20

21

22

23

24

25

DECLARATION - 3

# EXHIBIT A

 WASHINGTON STATE UNIVERSITY

University Appeals Board

February 21, 2020

Patrick Fleetwood
Sent electronically to patrick.fleetwood@wsu.edu

**PERSONAL AND CONFIDENTIAL**

Regarding Case Number: 2018371301

The University Appeals Board has made a decision regarding the enclosed community standards matter pertaining to Patrick Fleetwood. Please see the attached document for additional information.

Now is a good time to reach out for support from friends, family, or campus resources.

Please contact our office at 509-335-4532 or community.standards@wsu.edu if you have any questions.

Regards,

Kyle Cance
Student Hearing Boards Manager

CC:     Karen Metzner, Director, Center for Community Standards



WASHINGTON STATE UNIVERSITY

University Appeals Board

February 21, 2020

Sent via email (patrick.fleetwood@wsu.edu)

Dear Patrick,

On 2/12/2020, the University Appeals Board met to consider your appeal of the Conduct Officer's decision issued on 12/16/2019. The Conduct Officer found you responsible for violating Washington State University Standards of Conduct (*Standards*), including WAC 504-26-227: Sexual harassment; WAC 504-26-209: Violation of university policy, rule, or regulation; and WAC 504-26-219: Abuse of student conduct system.

The appeal is a review of the record and the decision; it is not a new hearing. As outlined in WAC 504-26-420(3), the Appeals Board considers:

(a) Whether the University Conduct Officer's hearing was conducted fairly in light of the charges and information presented, and in conformity with prescribed procedures. Deviations from designated procedures are not a basis for sustaining an appeal unless significant prejudice results.

(b) Whether the decision reached regarding the accused student was based on substantial information, that is, whether there were facts in the case that, if believed by the fact finder, were sufficient to establish that a violation of the standards of conduct for students occurred.

(c) Whether the sanction(s) imposed were appropriate for the violation of the Standards that the respondent student was found to have committed.

(d) New information, sufficient to alter a decision, or other relevant facts not brought out in the original hearing, because such information and/or facts were not known to the person appealing at the time of the original Conduct Officer hearing.

Your appeal was based on WAC 504-26-420(3)(a)(b)(c).

The Appeals Board carefully considered the information and rationale provided in your appeal. We find that there is substantial information to establish violations of the *Standards* and the sanctions assigned to you by the Conduct Officer are appropriate for the violations. Consequently, the Appeals Board affirms the Conduct Officer's decision and sanctions.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

This is the final order of the University. Judicial review of this final order may be available under RCW 34.05 by filing a petition for review with Whitman County Superior Court within thirty (30) days from the date that this order was placed in the mail. This order will be placed in the mail on the date listed above.

Sincerely,

Olivia Shoesmith
Chair, University Appeals Board

cc:
Karen Metzner, Director, Center for Community Standards
Kyle Cance, Student Hearing Board Manager

1
2
3
4
5
6
7
8
9

FILED

APR 28 2020

WHITMAN COUNTY CLERK

10

**SUPERIOR COURT, STATE OF WASHINGTON, COUNTY OF WHITMAN**

11

PATRICK FLEETWOOD,

12

                    Plaintiff,

NO. 20-2-00053-38

13

14

    vs.

15

WASHINGTON STATE UNIVERSITY,

**MOTION TO DIMSISS RESPONSE BRIEF**

16

                    Defendant.

17

18

I.    **INTRODUCTION & SUMMARY OF ARGUMENT**

19

        Washington State University (WSU's) motion to dismiss count one of Patrick

20

Fleetwood's complaint (violation of Washington's Administrative Procedures Act (APA)) is a

21

classic example of a litigant elevating form over substance.  WSU claims that Mr. Fleetwood's

22

APA claim should be dismissed because "judicial review is [Fleetwood's] sole remedy" and

23

that somehow (in WSU's eyes) Mr. Fleetwood didn't "properly file for judicial review." (Mot.

24

to Dismiss pg. 3-4) But Mr. Fleetwood's Complaint seeks judicial review by, *inter alia,* citing

25

RCW 34.05.570(3)(d)(e)&(i) as three separate bases for which the Court can review (and then

26

reverse) WSU's actions. The title to RCW 34.05.570 - - - the statute cited in the Complaint - - -

MOTION TO DISMISS RESPONSE BRIEF -
 PAGE 1

- *is* **Judicial Review**. (Complaint ¶17) Since Mr. Fleetwood's complaint seeks judicial review WSU's motion should be denied.

## II.    ARGUMENT

**A.    Motions to dismiss are disfavored and rarely granted and CR 8 states that pleadings should be construed liberally.**

As a starting point, CR 12 "dismissals are disfavored and are warranted only if the trial court concludes, beyond a reasonable doubt, that the plaintiff cannot prove any set of facts justifying recovery." *West v. State, Washington Ass'n of Cty. Officials*, 162 Wn. App. 120, 128 (2011). And Division III of the Court of Appeals has long held that "[a]ll pleadings shall be so construed as to do substantial justice." *Shinn Irr. Equip., Inc. v. Marchand*, 1 Wn. App. 428, 430 (1969).  More recently, Division I held that "even if a claim is not a vision of precise pleading or is mislabeled, it may still give the notice CR 8 requires" and that "[p]arties may clarify initial pleadings in the course of summary judgment proceedings." *Puget Sound Sec. Patrol, Inc. v. Bates*, 197 Wn. App. 461, 474 (2017). The authorities WSU cites in support of its motion are consistent with the above-authorities. For example, *Haberman v. Washington Pub. Power Supply Sys.*, 109 Wn. 2d 107, 120 (1987) stands for the proposition that "[a] trial court may grant dismissal for failure to state a claim under CR 12(b)(6) only if it appears beyond doubt that the plaintiff can prove no set of facts, consistent with the complaint, which would entitle the plaintiff to relief" and here Mr. Fleetwood's complaint alleges that he properly sought judicial review under the APA and is entitled to relief.

**B.    Count One of Mr. Fleetwood's case seeks judicial review.**

As a starting point, Washington's APA "does not explicitly define 'judicial review' but states that '[t]his chapter establishes the exclusive means of judicial review of agency action.'" *Cobra Roofing Servs., Inc. v. State Dep't of Labor & Indus.*, 157 Wn.2d 90, 99 (2006).  An

"agency action" means, in part, "the imposition of sanctions, or the granting or withholding of benefits." RCW 34.05.010(3). A person appealing an "agency action" must, within 30 days after the agency action petition for review of the "agency action" and, during that same timeframe, serve the Agency and the Washington State Attorney General. RCW 34.05.542(3). The petition for review must then contain the information set out in RCW 34.05.546(1)-(8).

The record before the court makes clear that within 30 days of WSU's February 21, 2020 agency action[1], Mr. Fleetwood filed the lawsuit, served WSU[2], served the Washington State Attorney General's Office,[3] and that Mr. Fleetwood's petition (which he called a complaint because the lawsuit, Count Two, contains a violation of the Washington State Public Record Act), sets out Mr. Fleetwood's name and address[4], Mr. Fleetwood's attorney's address,[5] makes clear that WSU's Pullman, Washington branch is subject to the complaint[6], identifies the agency action at issue,[7] identifies (consistent with federal and state privacy laws) the parties to the adjudicative proceedings[8], and sets out the facts and reasons[9] supporting Mr. Fleetwood's requested relief.[10]   Clearly, under *Haberman* and CR 8 Mr. Fleetwood plead numerous facts upon which he asserted judicial review of WSU's decision.

Mr. Fleetwood timely filed his complaint, and that complaint clearly seeks judicial review under the APA.

---

[1] Complaint ¶5. (Fleetwood Decl. at Ex. A)
[2] N. Cook certificate of service.
[3] N. Cook certificate of service.
[4] Complaint ¶1.
[5] Complaint, pg. 18.
[6] Complaint ¶2.
[7] Complaint ¶ 11, 15.
[8] *See e.g.* Complaint ¶14, 20 n.2
[9] Complaint ¶17-46 & Count 1 *citing* RCW 34.05.570 **Judicial Review**.
[10] Prayer for Relief, ¶A.

MOTION TO DISMISS RESPONSE BRIEF -
PAGE 3

**C.        None of WSU's authorities mandate dismissal of Count One.**

WSU cites *Wells Fargo Bank, N.A. v. Dep't of Revenue*, 166 Wn. App. 342, 354 (2012), for the proposition that "a plaintiff cannot challenge an agency action through a lawsuit, but rather must properly file for judicial review." (Mot. To Dismiss, p. 3) *Wells Fargo* involved the bank failing to challenge an Agency's actions within 30 days of the final agency action. *Wells Fargo,* 166 Wn. App. at 354. That rule, while true, doesn't apply here because Mr. Fleetwood timely filed his APA claim within 30 days of WSU's February 21, 2020 final agency action. (Complaint ¶5; Fleetwood Decl. Ex. A)

WSU cites *Judd v. Am. Tel. & Tel. Co.*, 152 Wn.2d 195, 204 (2004) in support of its argument that "Mr. Fleetwood fails to state a claim under which relief can be granted" because "Mr. Fleetwood seeks an order setting aside the University's action and no provision of law establishes *de novo* review or a jury trial…" (Mot Dismiss. P. 4) *Judd* involved the dismissal of a claim because a party failed to timely bring an APA action. *Judd,* at 204. That is not the case here because Mr. Fleetwood's petition for agency review under the APA *was* filed within 30 days of the final agency action of February 21, 2020. But more to the point, WSU's citation to *Judd* for the proposition that Mr. Fleetwood fails to state a claim because he "seeks an order setting aside the University's action" is nonsensical because relief under RCW 34.05 includes allowing the reviewing court to "set aside agency action." RCW 34.05.574(1).

Lastly, *Cheek v. Employment Sec. Dep't of State of Washington*, 107 Wn. App. 79, 83 (2001) stands for the proposition that a party seeking judicial review "was required to serve her petition for review on the Department *and* the attorney general *and* all parties of record" which is precisely what Mr. Fleetwood did in this instance. (*See* N. Cook Certificate of Service)

### III.    CONCLUSION

WSU's motion should be denied. Mr. Fleetwood's complaint – count one - properly seeks judicial review of WSU's final and appealable February 21, 2020 agency action.

DATED this 28th day of April 2020.

**CROTTY & SON LAW FIRM, PLLC**

By:    _____
MATTHEW Z. CROTTY, WSBA #39284

905 W. Riverside Ave. Ste. 404
Spokane, WA 99201
(509) 850 7011
matt@crottyandson.com

Attorneys for Plaintiff

MOTION TO DISMISS RESPONSE BRIEF - _____
PAGE 5

1

## CERTIFICATE OF SERVICE

2

3        Pursuant to RCW 9A.72.085 the undersigned hereby certifies under penalty of perjury under the laws of the State of Washington, that on the 28th day of April 2020, the foregoing was delivered to the following persons in the manner indicated:

4

| Nathan E. Deen | VIA REGULAR MAIL | __ |
| Attorney General of Washington | VIA FACSIMILE | __ |
| 332 French Administration Building | HAND DELIVERED | |
| Pullman, WA 99164 | VIA EMAIL | ☒ |

5

6

7

8

9

10

11

12                                   CROTTY & SON LAW FIRM, PLLC

13                                   Matthew Crotty

14

15

16

17

18

19

20

21

22

23

24

25

26

MOTION TO DISMISS RESPONSE BRIEF -
PAGE 6

1
2
3
4
5
6
7
8
9
10

FILED

APR 28 2020

WHITMAN COUNTY CLERK

**SUPERIOR COURT, STATE OF WASHINGTON, COUNTY OF WHITMAN**

11

12   PATRICK FLEETWOOD,

13                        Plaintiff,         NO. 20-2-00053-38

14   vs.

15   WASHINGTON STATE UNIVERSITY,            **CERTIFICATE OF SERVICE**

16                        Defendant.

17

18        I, Nancy Cook, hereby certify under penalty of perjury under the laws of the State of

19   Washington as follows:

20        1.      I am over the age of 18 and am competent to testify as a witness.

21        2.      On March 13, 2020, I personally served Adam Malcolm, an attorney for the

22   Washington State Attorney General's office with a copy of the Complaint and Summons in

23   the above captioned matter. The location of the service was the Washington State Attorney

24   General's office located on the WSU campus in Pullman, Washington

25        3.      On March 13, 2020, I personally served Ginger Druffel, the Executive

26   Assistant to the President of Washington State University with the Complaint and Summons

CERTIFICATE OF SERVICE - PAGE 1

1  in the above captioned action. The location of the service was the WSU Office of the

2  President. Ms. Druffel confirmed to me that she was the chief administrative officer who was

3  authorized to accept legal process on behalf of WSU's director, here its President.

4      DATED this _29_ day of March 2020.

5

6                By:

7                       Nancy Cook

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

CERTIFICATE OF SERVICE - PAGE 2

**CERTIFICATE OF SERVICE**

Pursuant to RCW 9A.72.085 the undersigned hereby certifies under penalty of perjury under the laws of the State of Washington, that on the 30th day of March 2020, the foregoing was delivered to the following persons in the manner indicated:

| | |
|---|---|
| Nathan E. Deen<br>Attorney General of Washington<br>332 French Administration Building<br>Pullman, WA 99164 | VIA REGULAR MAIL ___<br>VIA FACSIMILE ___<br>HAND DELIVERED ___<br>VIA EMAIL ✗ |

CROTTY & SON LAW FIRM, PLLC

_____
Matthew Crotty

**Stephen Hervin**

| | |
|---|---|
| **From:** | Matthew Crotty <matt@crottyandson.com> |
| **Sent:** | Tuesday, April 28, 2020 10:03 AM |
| **To:** | Clerk |
| **Cc:** | Haas, Rita; Deen, Nathan; wsu.atg@wsu.edu |
| **Subject:** | Case No. 20-2-0053-38 Please File |
| **Attachments:** | 2020 04 08 Fleetwood Decl Signed.pdf; 2020 04 28 Plaintiff Motion to Dismiss Response Brief.pdf; 2020 03 29 Cert of Service.pdf |
| **Categories:** | Stephen |

FILED
APR 28 2020
WHITMAN COUNTY CLERK

Hello,

Please file the documents that are attached to this email in the above-referenced action: Fleetwood v. WSU 20-2-0053-38.

As to proof of service, I have copied WSU's attorney, Nathan Deen, and his assistant, Rita Haas.

Thanks,

Matt Crotty

Matthew Z. Crotty
Crotty & Son Law Firm, PLLC
905 W. Riverside Ave.
Ste. 404
Spokane, Washington 99201
+1.509.850.7011
http://www.crottyandson.com/

1
2
3
4
5
6
7
8

```
            FILED
         APR 30 2020
       WHITMAN COUNTY CLERK
```

**STATE OF WASHINGTON**
**WHITMAN COUNTY SUPERIOR COURT**

9   PATRICK FLEETWOOD,                    NO. 20-2-00053-38

10                       Plaintiff,       DEFENDANT WASHINGTON
11                                         STATE UNIVERSITY'S
          v.                               RESPONSE TO PLAINTIFF'S
12                                         RESPONSE BRIEF
     WASHINGTON STATE
13   UNIVERSITY,
14
                          Defendant.
15

16                  **I. INTRODUCTION**

17         Mr. Fleetwood claims that Washington State University's (WSU) Motion to

18   Dismiss Count One elevates form over substance.  Plaintiff Brief 1.  However, in

19   this instance, form does matter.  Due to the form of Mr. Fleetwood's action,

20   Mr. Fleetwood has already needlessly forced WSU to spend resources providing

21   an answer to Mr. Fleetwood's lengthy complaint, a procedure not authorized by

22   the Administrative Procedure Act (APA) in judicial reviews.   Furthermore,

23   Mr. Fleetwood has already begun to marshal the tools of discovery seeking to

24   engage in a time-consuming and unnecessary quest for information.  Exhibit 1,

25   First Set of Interrogatories and Requests for Production.  This common tool of civil

DEFENDANT WSU'S RESPONSE TO                    1

1    litigation is also unavailable to Mr. Fleetwood in a judicial review proceeding

2    under the APA—where this Court sits as an appellate body—and further highlights

3    the fact that the form of Mr. Fleetwood's litigation matters a great deal indeed.

## II. ARGUMENT

5         In judicial review proceedings, the Superior Court sits in its appellate

6    capacity and reviews an agency's action by applying the standards in the APA to

7    the agency record. *See, e.g., Eidson v. Dep't of Licensing*, 108 Wn. App. 712, 718

8    (2001), as modified on denial of reconsideration (Nov. 21, 2001) (citations

9    omitted) ("We sit in the same position as the superior court and review the agency's

10   decision by applying the standards in the APA directly to the agency record.").

11   The issues on review are, with narrow exceptions, confined to those raised before

12   the agency.  RCW 34.05.554.  Furthermore, the Court's review is limited to the

13   agency record and conducted without a jury.  RCW 34.05.558.  Statute defines the

14   agency record and the agency supplies it to the Court.    RCW 34.05.494;

15   RCW 34.05.566.  Discovery, as contemplated in civil suits, is not allowed.  Rather,

16   RCW 34.05.562 controls any addition to the agency record and any addition must

17   be approved by the Court.  RCW 34.05.566(6); *Wash. Indep. Tel. Ass'n v. Wash.*

18   *Utils. & Transp. Comm'n*, 110 Wn. App. 498, 518 (2002), aff'd, 149 Wn. 2d 17,

19   65 P.3d 319 (2003).

20        Here, in Mr. Fleetwood's lengthy complaint, he seeks to litigate issues not

21   brought before the agency based almost completely on alleged facts outside of the

22   agency record.  Furthermore, he seeks to utilize tools of discovery reserved for

23   civil suits outside of the APA established parameters for judicial review.  In form

24   and action, Mr. Fleetwood is operating as though he has commenced a civil suit.

25

DEFENDANT WSU'S RESPONSE TO
PLAINTIFF'S RESPONSE BRIEF

2

ATTORNEY GENERAL OF WASHINGTON
332 French Administration Building
PO Box 641031
Pullman, WA 99164-1031
(509) 335-2636

1 │ For this reason, the Court must dismiss the first count of his complaint, as it is not

2 │ a properly and timely filed petition for judicial review.

3 │ ### III. CONCLUSION

4 │     For the foregoing reasons, Defendant respectfully requests that Count One of

5 │ Plaintiff's complaint be dismissed with prejudice and without leave to amend.

6 │     DATED this 30th day of April, 2020.

7

8 │             ROBERT W. FERGUSON
            Attorney General

9

10 │             _____

11 │             NATHAN E. DEEN, WSBA #39673
            Assistant Attorney General

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DEFENDANT WSU'S RESPONSE TO
PLAINTIFF'S RESPONSE BRIEF

3

ATTORNEY GENERAL OF WASHINGTON
332 French Administration Building
PO Box 641031
Pullman, WA 99164-1031
(509) 335-2636

1

## PROOF OF SERVICE

2      I certify that I served a copy of this document on all parties or their counsel

3  of record on the date below as follows:

4

**To Plaintiff:**

5      ☑   Matthew Z. Crotty, attorney for Plaintiff

6          via email to:  matt@crottyandson.com; matthew.z.crotty@msn.com

7      I certify under penalty of perjury under the laws of the state of Washington

8  that the foregoing is true and correct.

9      DATED this 30th day of April, 2020, at Pullman, Washington.

10

11      _____

12      Rita Haas
        Assistant Director of Legal Services

13

14

15

16

17

18

19

20

21

22

23

24

25

1
2
3
4
5
6
7
8

FILED

MAY 04 2020

JILL E. WHELCHEL
WHITMAN COUNTY CLERK

**STATE OF WASHINGTON
WHITMAN COUNTY SUPERIOR COURT**

9   PATRICK FLEETWOOD,                    NO. 20-2-00053-38

10                         Plaintiff,     DEFENDANT WASHINGTON
                                          STATE UNIVERSITY'S
11      v.                                RESPONSE TO PLAINTIFF'S
                                          RESPONSE BRIEF
12
    WASHINGTON STATE
13  UNIVERSITY,

14                         Defendant.

15

16                  **I.  INTRODUCTION**

17        Mr. Fleetwood claims that Washington State University's (WSU) Motion to

18  Dismiss Count One elevates form over substance.  Plaintiff Brief 1.  However, in

19  this instance, form does matter.  Due to the form of Mr. Fleetwood's action,

20  Mr. Fleetwood has already needlessly forced WSU to spend resources providing

21  an answer to Mr. Fleetwood's lengthy complaint, a procedure not authorized by

22  the Administrative Procedure Act (APA) in judicial reviews.  Furthermore,

23  Mr. Fleetwood has already begun to marshal the tools of discovery seeking to

24  engage in a time-consuming and unnecessary quest for information.  Exhibit 1,

25  First Set of Interrogatories and Requests for Production.  This common tool of civil

1  litigation is also unavailable to Mr. Fleetwood in a judicial review proceeding

2  under the APA—where this Court sits as an appellate body—and further highlights

3  the fact that the form of Mr. Fleetwood's litigation matters a great deal indeed.

## II. ARGUMENT

5     In judicial review proceedings, the Superior Court sits in its appellate

6  capacity and reviews an agency's action by applying the standards in the APA to

7  the agency record.  *See, e.g., Eidson v. Dep't of Licensing*, 108 Wn. App. 712, 718

8  (2001), as modified on denial of reconsideration (Nov. 21, 2001) (citations

9  omitted) ("We sit in the same position as the superior court and review the agency's

10 decision by applying the standards in the APA directly to the agency record.").

11 The issues on review are, with narrow exceptions, confined to those raised before

12 the agency.  RCW 34.05.554.  Furthermore, the Court's review is limited to the

13 agency record and conducted without a jury.  RCW 34.05.558.  Statute defines the

14 agency record and the agency supplies it to the Court.   RCW 34.05.494;

15 RCW 34.05.566.  Discovery, as contemplated in civil suits, is not allowed.  Rather,

16 RCW 34.05.562 controls any addition to the agency record and any addition must

17 be approved by the Court.  RCW 34.05.566(6); *Wash. Indep. Tel. Ass'n v. Wash.*

18 *Utils. & Transp. Comm'n*, 110 Wn. App. 498, 518 (2002), aff'd, 149 Wn. 2d 17,

19 65 P.3d 319 (2003).

20    Here, in Mr. Fleetwood's lengthy complaint, he seeks to litigate issues not

21 brought before the agency based almost completely on alleged facts outside of the

22 agency record.  Furthermore, he seeks to utilize tools of discovery reserved for

23 civil suits outside of the APA established parameters for judicial review.  In form

24 and action, Mr. Fleetwood is operating as though he has commenced a civil suit.

25

1  For this reason, the Court must dismiss the first count of his complaint, as it is not

2  a properly and timely filed petition for judicial review.

3  ### III.  CONCLUSION

4  For the foregoing reasons, Defendant respectfully requests that Count One of

5  Plaintiff's complaint be dismissed with prejudice and without leave to amend.

6  DATED this 30th day of April, 2020.

7

8  ROBERT W. FERGUSON
   Attorney General

9

10  _____
    NATHAN E. DEEN, WSBA #39673

11  Assistant Attorney General

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**PROOF OF SERVICE**

I certify that I served a copy of this document on all parties or their counsel of record on the date below as follows:

**To Plaintiff:**
☑    Matthew Z. Crotty, attorney for Plaintiff
        via email to:  matt@crottyandson.com; matthew.z.crotty@msn.com

I certify under penalty of perjury under the laws of the state of Washington that the foregoing is true and correct.

DATED this 30th day of April, 2020, at Pullman, Washington.

Rita Haas
Assistant Director of Legal Services

DEFENDANT WSU'S RESPONSE TO
PLAINTIFF'S RESPONSE BRIEF

4

ATTORNEY GENERAL OF WASHINGTON
332 French Administration Building
PO Box 641031
Pullman, WA 99164-1031
(509) 335-2636

1
2
3
4
5
6                 **SUPERIOR COURT, STATE OF WASHINGTON, COUNTY OF WHITMAN**
7
8      PATRICK FLEETWOOD,                       NO.  20-2-00053-38
9                            Plaintiff,         **PLAINTIFF'S FIRST SET OF**
10                                              **INTERROGATORIES AND REQUESTS**
        vs.                                     **FOR PRODUCTION OF DOCUMENTS**
11                                              **PROPOUNDED TO DEFENDANT**
       WASHINGTON STATE UNIVERSITY,
12
                             Defendant.
13
       TO:          WASHINGTON STATE UNIVERSITY
14
       AND TO:      ROBERT W. FERGUSON and NATHEN DEEN, its attorneys of record.
15
16                              <u>INTERROGATORIES</u>
17         Pursuant to Civil Rule 33, the undersigned herewith submits the following
       interrogatories to be answered separately and fully under oath within thirty (30) days from
18     the day of service of said interrogatories upon you.  In answering these interrogatories, you
       are required to furnish such information as is available to you and not merely the information
19     which you know of your personal knowledge.  This is intended to include any information in
       the possession of the agent, or attorney, or any investigator for the answering party.
20
21         COURT RULES REQUIRE THE ANSWERS BE PRECEDED BY THE
       QUESTIONS, AND THUS EXTRA COPIES OF THESE INTERROGATORIES ARE
22     BEING SERVED UPON YOU IN ORDER TO EXPEDITE THE ANSWER THEREOF.
       YOU MAY TYPE OR WRITE YOUR ANSWERS IMMEDIATELY AFTER THE
23     QUESTION AND THUS AVOID RETYPING THE QUESTION.
24         THESE INTERROGATORIES ARE CONTINUING IN NATURE, AND THE
       UNDERSIGNED HEREBY DEMAND THAT ANY INFORMATION COMING INTO
25     YOUR POSSESSION OR THAT OF YOUR COUNSEL THAT WOULD CHANGE THE

ANSWER IN ANY WAY BE FURNISHED TO THE UNDERSIGNED NO LATER THAN TWENTY (20) DAYS AFTER RECEIVING SUCH INFORMATION.

<u>REQUEST FOR PRODUCTION AND INSPECTION OF DOCUMENTS</u>

Pursuant to Civil Rule 34, the undersigned herewith submits the following requests to produce the documents set forth for inspection and copying within thirty (30) days of the date of service of said request for production and inspection upon you, or upon receipt if within thirty (30) days of trial.

Moreover, these requests for production are continuing in nature, and it is expressly requested that any relevant correspondence, information, documents, or writings coming into your possession be promptly furnished to the undersigned attorney of record.

These requests for production may be satisfied by attaching copies of the requested documents to your answers to the interrogatories set forth herein.

## **PRELIMINARY STATEMENT**

The following questions and requests are to be answered fully and separately as to the defendant, Washington State University.  In answering these interrogatories and requests for production of documents, "fully" means that the defendant are required to set out each responsive fact, circumstances, act, omission or matter of course of conduct whether or not admissible in evidence at the trial, known to the defendant, defendant's officers, employees, agents, representatives or attorneys, or about which any of them have information.

If these interrogatories and requests for production of documents cannot be answered or responded to in full, the defendant shall answer to the extent now possible, and specify the reasons for defendant's inability to answer the remainder.  In answering these interrogatories and requests for production of documents, the defendant shall furnish such information as is available to defendant, regardless of whether this information is obtained directly by defendant through defendant's agent or other representatives or by defendant's attorney.

In answering these requests for production of documents, you shall identify each document on its face with the number of the request.  With respect to the things requested to be produced, you shall transmit such things to plaintiffs, along with your answer to these interrogatories and requests, stating in your answer that such things have been transmitted along with your answer and further stating the particular of transmittal or shipment.

## **DEFINITIONS, TERMS AND INSTRUCTIONS**

As used in these interrogatories and requests for production of documents:

1.      As used herein, "plaintiff" shall mean Patrick Fleetwood.

PLAINTIFF'S FIRST SET OF INTERROGATORIES
AND REQUESTS FOR PRODUCTION OF
DOCUMENTS TO DEFENDANT - PAGE 2

2.     "Defendant" shall mean WASHINGTON STATE UNIVERSITY, and any persons associated with or acting on its behalf, including all attorneys, representatives and/or agents.

3.     Whenever the pronoun "you" is used in these interrogatories, it is to be understood as reference to WASHINGTON STATE UNIVERSITY, as well as its representatives, attorneys, agents, or consultants.

4.     "Documents" includes, irrespective of its medium and whether stored in tangible, electronic, mechanical, or electric form or representation of any kind (including materials on or in computer tapes, disks and memory, and backup copies and "deleted" files on a computer or computer storage device or media, including any mainframe PCs, iPads, iPhones, Palm Pilots, Blackberries, e-mails and the like) whether located on-site or off-site, without limiting their generality, all manner of written, typed, printed, reproduced, tapes or recorded matter including rough or preliminary drafts pertinent to or describing, referring to, directly or indirectly, or in whole or in part, the matter requested in the interrogatories or requests.   The term includes, without limitations, each chart, record, billing invoice, letter, note, correspondence, summary, brochure, price catalog, agenda, minutes, study, analysis, manual, diary, photograph, drawing, audiotape, videotape, audiotape and videotape transcription, agreement, contract, checks, work orders, memoranda, conversation summary, work log, map, survey, plan and all notations on the foregoing and all copies thereof and each summary or report by whomever prepared, regarding the act, event or matter which is the subject of the interrogatory or request.

5.     In each interrogatory where the defendant is asked to "identify" a person, or the answer to an interrogatory refers to a person, state with respect to each such person:

     a.     Their name and telephone number;
     b.     Their last known residence address;
     c.     Their company affiliation and job title at the date of the transaction to;
     d.     A summary description of the person's duties and each job title identified; and
     e.     Their present employer and his business address.

6.     In each interrogatory where the defendants are asked to identify a document, or documents, with respect to each document, state:

     a.     A full description of the document;
     b.     The names and job titles of all persons who have possession or custody of such documents;
     c.     The telephone number and address of all such persons having such possession or custody; and
     d.     The precise location of each such document.

PLAINTIFF'S FIRST SET OF INTERROGATORIES
AND REQUESTS FOR PRODUCTION OF
DOCUMENTS TO DEFENDANT - PAGE 3

## **PRIVILEGED INFORMATION**

As to any information withheld because of a claim of privilege or work product:

1.      State the reason for withholding it and the nature of the privilege or work product asserted; and

2.      Identify each person who has received such information or who has had possession of any documents relating to or containing such information.

Dated this 8th day of April 2020.

CROTTY & SON LAW FIRM, PLLC

By: _____
MATTHEW Z. CROTTY, WSBA #39284
Attorney for Plaintiff

## INTERROGATORIES AND REQUESTS FOR PRODUCTION

**INTERROGATORY NO 1**:  State the (a) name (b) hire date (c) job title and (d) annual salary for each employee of Defendant who investigated the complaint against Mr. Fleetwood that is the subject of Mr. Fleetwood's lawsuit.

**ANSWER**:


**REQUEST FOR PRODUCTION NO. 1:** Please produce each document that the above referenced individual(s) relied on, took into account, and/or considered in investigating the complaint against Mr. Fleetwood that is the subject of Mr. Fleetwood's lawsuit.

**RESPONSE:**


**REQUEST FOR PRODUCTION NO. 2:** Please produce all investigative files related Defendant's investigation into the complaint against Mr. Fleetwood that is the subject of this lawsuit.  Please produce the files in the manner in which they are customarily kept. Include copies of the folders, binders, expandos, or other things in which Plaintiff's files were/are maintained. Please produce these files in unredacted form.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 3:** Please produce each policy, practice, and/or procedure that Defendant used to investigate student complaints of sexual harassment and/or retaliation during calendar year 2019.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 4:** Please produce the documents (e.g. resume, job application) that set out the investigatory qualifications of Rachel Brooks and Karen Metzner and any other employee of Defendant who investigated the complaint that is at issue in Mr. Fleetwood's lawsuit.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 5:** Please produce each formal or informal complaint from January 1, 2014 to the present-day, that relates to or is associated with a person claiming that the Defendant's Office of Equal Opportunity and/or Center for Community Standards failed to properly investigate a claim of sexual harassment and/or retaliation. Without limitation this request seeks company-internal complaints as well as complaints made to any government agency as well as any lawsuits against Defendant regarding the above-referenced claims.

**RESPONSE:**

**INTERROGATORY NO 2:** Please identify any individual(s) that Defendant contends has knowledge of the facts asserted in Plaintiff's lawsuit and/or Defendant's

PLAINTIFF'S FIRST SET OF INTERROGATORIES
AND REQUESTS FOR PRODUCTION OF
DOCUMENTS TO DEFENDANT - PAGE 6

defenses to Plaintiff's lawsuit, the phone number and mailing address of said individual(s), and a description of said individual(s) knowledge.

**ANSWER:**


**INTERROGATORY NO 3:**  Please identify, by name and job title, the individuals who Defendant contends to be "constituents" for the purpose of the above-captioned action. The word "constituents" means the individuals, who, as set out in Washington Rule of Professional Conduct 4.2 (Comment 7), regularly supervise, direct or consult with Defendant's attorneys concerning the above-captioned action or who has the authority to obligate Defendant with regard to the above-captioned action or whose actions/omissions regarding the above-captioned action can be imputed on the Defendant.

**ANSWER:**


**REQUEST FOR PRODUCTION NO. 6:** Please produce each communication (email, text message, etc.) between Rachel Brooks and Karen Metzner regarding Patrick Fleetwood.

**RESPONSE:**


**REQUEST FOR PRODUCTION NO. 7:** Produce the document (e.g. a line and block chart) that sets out the Office of Equal Opportunity and/or Center for Community Standards chain of command, reporting structure, and/or membership during 2018 and 2019. Put differently, this request seeks a visual depiction of who worked in those departments during the above-referenced timeframes.   Without limitation and for explanatory purposes

only, certain companies maintain PowerPoint slides that contain line-and-block charts that set out where certain employees work, who certain employees report to, and the identity/work location of certain employee co-workers. This request seeks those charts.

**RESPONSE:**


**REQUEST FOR PRODUCTION NO. 8:**  Please produce each employee handbook or other policy maintained by Defendant during the 2018-2019 timeframe that relate to or are associated with the rights of students who have been accused of sexual harassment and/or retaliation.

**RESPONSE:**


**REQUEST FOR PRODUCTION NO. 9:** Please produce any document that Ms. Metzler used in the process of applying for any promotion and/or job opening at WSU from January 1, 2018 to the present day.

**RESPONSE:**


**REQUEST FOR PRODUCTION NO. 10:**  Please produce the document that sets out the training that the volunteers referenced in Defendant's December 7, 2018, article received during calendar year 2019.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 11:** Please produce document that relates to any type of complaint that any person has made against Ms. Metzler and/or Ms. Brooks regarding their failure to conduct an impartial investigation of any type.

**RESPONSE:**

**INTERROGATORY NO. 4:**   Identify the name of each person Defendant interviewed regarding the complaint against Mr. Fleetwood that is the subject of this lawsuit.

**ANSWER:**

**REQUEST FOR PRODUCTION NO. 12:** Please produce each document upon which Defendant bases its defenses in this case.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 13:** Produce the all documents that Defendant provided any expert witness in this case.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 14:** Produce the all documents that Defendant has obtained from any third party that relate to or are associated with Plaintiff's lawsuit. Put differently, if Defendant has issued a subpoena or any public record/FOIA request to any entity/person regarding Plaintiff then this request seeks production of any documents received in response to such a request.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 15:**   Produce a copy of the document that sets out the duties, responsibilities, and job title of the position(s) that Ms. Metzner and Ms. Brooks held during calendar years 2018 and 2019.

**RESPONSE:**


**INTERROGATORY NO. 5**:   Identify each student complaint of sexual harassment and/or retaliation made to Defendant's Office of Equal Opportunity and/or Center for Community standards since January 1, 2017. In answering this Interrogatory please provide the following information:

(a)      Gender of complaining party.

(b)      Date the complained of harassment/retaliation occurred.

(c)      Nature of the allegation (e.g. sexual harassment/retaliation)

(d)      Identity of the gender of the person was accused of the harassment and/or retaliation.

(e)      Name of the employee of the Defendant, if any, who investigated the complaint.

(f)      Whether the person(s) identified in sub-paragraph (e)found that the complaint had merit.

(g)      The current status of the complaint (e.g. lawsuit has been filed in court, complaint still being investigated, complaint settled, etc.)

**ANSWER:**

**INTERROGATORY NO. 6:**        Identify each person whom you expect to call as an expert witness at trial or to testify in support of any motion.  As to each person identified, state or identify the following:

a)  the subject matter on which the expert is expected to testify;

b)  the substance of the facts and opinions to which the expert is expected to testify;

c)  a summary of the grounds of each opinion to which the expert is expected to testify;

d)  the sources of information the expert considered in forming his or her opinions;

e)  any exhibits to be used as a summary of, or support for, the expert's opinions; the qualifications of the expert;

f)  all published books, papers or articles the expert has written, alone or jointly, within the preceding ten years;

g)  the compensation to be paid to the expert; and

h)  any other cases in which the expert has testified as an expert within the preceding four years.

**ANSWER:**

**REQUEST FOR PRODUCTION NO. 16:**        Produce:

(a) all curriculum vitae or resumes of any expert who may offer evidence at trial or with respect to any other motion in this lawsuit.

(b) all documents reviewed or considered by any expert witness who may offer evidence at trial or with respect to any other motion in this lawsuit.

(c) all documents, including without limitation correspondence, memoranda, books, treatises, periodicals, articles and pamphlets, on which any expert witness who may offer

1    evidence at trial or with respect to any other motion in this lawsuit relied in forming his or

2    her opinions in connection with this lawsuit.

3        **RESPONSE:**

4

5

6        **INTERROGATORY NO. 7:**  Please identify the name and job title of each person

7    who assisted in responding to these discovery requests.

8        **ANSWER:**

## **ATTORNEY'S CERTIFICATION**

The undersigned attorney certifies that he or she has read the foregoing Interrogatories and Requests for Production and answers and responses thereto and they are in compliance with Civil Rule 26(g).

_____

PLAINTIFF'S FIRST SET OF INTERROGATORIES
AND REQUESTS FOR PRODUCTION OF
DOCUMENTS TO DEFENDANT - PAGE 13

STATE OF WASHINGTON )
                                    : ss.
County of _____ )

_____, being first duly sworn, on oath, deposes and says:
That I am one of the defendants in the above-referenced matter.  I have read the foregoing
Answers and Responses to Plaintiff's First Set of Interrogatories and Requests for Production
of Documents Propounded to Defendant Washington State University, know the contents
thereof and believe the same to be true, and have made a complete production of documents
to the best of my knowledge and ability.


                                    _____
                                    NAME:
                                    TITLE:
                                    STATE OF WASHINGTON


        SUBSCRIBED AND SWORN to before me this _____ day of_____ 2020.


                                    _____
                                    NOTARY PUBLIC in and for the State
                                    of Washington, residing at _____.
                                    My commission expires: _____

## CERTIFICATE OF SERVICE

The undersigned certifies under penalty of perjury under the laws of the State of Washington that on the April 8, 2020, I caused to be served a true and correct copy of *Plaintiff's First Set of Interrogatories and Requests for Production of Document to Defendant,* addressed to the following in the manner described below:

Nathen Deen                          [ ]    VIA HAND DELIVERY
                                     [ ]    VIA U.S. MAIL
                                     [ ]    VIA FACSIMILE
                                     [ ]    VIA CERTFIED MAIL
Attorney for Defendant               [ ]    VIA OVERNIGHT MAIL
                                     [X]    VIA E-MAIL


_____
MATTHEW CROTTY

PLAINTIFF'S FIRST SET OF INTERROGATORIES
AND REQUESTS FOR PRODUCTION OF
DOCUMENTS TO DEFENDANT - PAGE 15

WHITMAN SUPERIOR COURT
Clerk's Minutes
Judicial Officer: Libey, Gary
Court Reporter: FTR Gold Recorder
Clerk: BRENDA CLONINGER

Date:  05/06/2020
Start:  10:22 AM      End:  10:45 AM

20-2-00053-38
PATRICK FLEETWOOD
VS
WASHINGTON STATE UNIVERSITY

Matter set for: Motion Hearing

Case Parties Present/Not Present:

PATRICK FLEETWOOD, Petitioner, not present

MATTHEW CROTTY, Attorney, present

WASHINGTON STATE UNIVERSITY, Respondent, not present

Nathan E Deen, Assistant Attorney General, present

Comments:
PARTIES APPEARED BY TELEPHONE

Events:

- Motion Hearing

Hearings Scheduled:

1

2

3

4

5

6

7

8

9

10

FILED

MAY 07 2020

JILL E. WHELCHEL
WHITMAN COUNTY CLERK

## SUPERIOR COURT, STATE OF WASHINGTON, COUNTY OF WHITMAN

11

12 PATRICK FLEETWOOD,

13                                   Plaintiff,          NO. 20-2-00053-38

14     vs.

15 WASHINGTON STATE UNIVERSITY,

16                                   Defendant.

**ORDER DENYING MOTION TO DISMISS COUNT ONE OF PLAINTIFF'S COMPLAINT**

17

18     Defendant Washington State University (WSU) moved for an order dismissing Count

19 One of Plaintiff, Patrick Fleetwood's, complaint. The Court heard oral argument of Matt

20 Crotty, attorney for Plaintiff, and Nathan Deen, attorney for Defendant, and considered:

21     1.          Plaintiff's Complaint.

22     2.          WSU's Motion and Memorandum to Dismiss Count One.

23     3.          Mr. Fleetwood's Brief in Response to Motion to Dismiss.

24     4.          The Declaration of Patrick Fleetwood.

25     5.          The Certificate of Service signed by Nancy Cook re service of process.

26     6.          WSU's Motion to Dismiss Reply Brief.

ORDER - PAGE 1

1   7.          Exhibit 1 to WSU's Motion to Dismiss Reply Brief.

2   THEREFORE, after hearing the arguments of counsel and having reviewed the

3   above-referenced documents the Court finds that:

4   IT IS HEREBY ORDERED THAT:

5   WSU's Motion to Dismiss is DENIED.

6   Dated this _5/7/2020_

7

8   _____
    Honorable Gary Libey

9

10   Presented by:

11   CROTTY & SON LAW FIRM, PLLC

12   By: _____
    Matthew Crotty, WSBA 39284
13   Attorney for Plaintiff

14   Copy Received; Approved as to Form;
    Notice of Presentation Waived:
15

16   Robert Ferguson, Washington State Attorney General

17   By: _Electronically approved_
    Nathan Deen, WSBA 39673
18   Attorney for Defendant

19

20

21

22

23

24

25

26

ORDER - PAGE 2

1

2

3

4

5

6



FILED

MAY 1 2 2020

JILL E. WHELCHEL
WHITMAN COUNTY CLERK

7

**IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON**
**IN AND FOR THE COUNTY OF WHITMAN**

8

9   PATRICK FLEETWOOD,

10                                    Petitioner,          No.  20-2-00053-38

            vs.

11   WASHINGTON STATE UNIVERSITY,

                                                           **ADMINISTRATIVE SCHEDULING**
12                                    Respondent.          **ORDER**

13

14        The Petitioner has filed a Petition for Review of an administrative decision.  In

15   conjunction with this appeal, it is ORDERED as follows:

16

17        The parties shall comply with the following schedule:

| Action | Deadline |
|---|---|
| 1.  **Filing of Agency Record** | June 30, 2020 |
| 2.  **Opening Brief of Petitioner** | July 31, 2020 |

21

22

23

24   ADMINISTRATIVE SCHEDULING ORDER—PAGE 1

**WHITMAN COUNTY SUPERIOR COURT**
N. 404 MAIN STREET ♦ P.O. BOX 679
COLFAX, WA 99111
(509) 397-6244

| 3. **Response Brief of Respondent** | August 31, 2020 |
| 4. **Petitioner's Reply Brief, if any** | September 30, 2020 |
| 5. **Oral Argument** | October 26, at 1:30 p.m. |

DATED: May 12, 2020

_____
J U D G E

ADMINISTRATIVE SCHEDULING ORDER—PAGE 2

20 – 2 – 00053 – 38
AFSR          19
Affidavit Declaration Certificate Confirmation of
8170563

**FILED**

**MAY 1 2 2020**

WHITMAN COUNTY CLERK

**SUPERIOR COURT OF WASHINGTON**
**COUNTY OF WHITMAN**

**PATRICK FLEETWOOD** ,

No.20-2-00053-38

**PLAINTIFF,**

**CLERK'S AFFIDAVIT OF** *service*

**VS.**

**WASHINGTON STATE UNIVERSITY** ,

**DEFENDANT.**

I, Brenda Cloninger, state under penalty of perjury that on this day I caused a true and correct copy of ADMINISTRATIVE SCHEDULING ORDER, to be served by E-MAIL to:

MATTHEW CROTTY                    matt@crottyandson.com

NATHAN DEAN                        Nathan_dean@wsu.edu

ROBERT FERGUSON                   judyg@atg.wa.gov

DATED: _5_ / _12_ /20 _20_.

_Brenda Cloninger_
Deputy Clerk

CLERK'S AFFIDAVIT OF MAILING

**WHITMAN COUNTY CLERK**

Page 1

N. 400 MAIN STREET ♦ P.O. BOX 390
COLFAX, WA 99111
(509) 397-6240

1
2
3
4
5
6

FILED

JUN 1 0 2020

WHITMAN COUNTY CLERK

7

**STATE OF WASHINGTON**
**WHITMAN COUNTY SUPERIOR COURT**

8

PATRICK FLEETWOOD,

9                            Petitioner,

NO. 20-2-00053-38

10        v.

MOTION FOR PROTECTIVE ORDER
TO SEAL COURT RECORDS

11   WASHINGTON STATE UNIVERSITY,

12                            Respondent.

13

14

15                **I. RELIEF REQUESTED**

16         Washington State University (WSU) respectfully moves this Court for entry of a

17   Protective Order to Seal Court Records (Protective Order) to protect the privacy interests of

18   students who are not parties to this case but whose identifying information will appear in

19   documents filed by the parties or issued by the Court.

20                **II. LEGAL AUTHORITY**

21         All "documents filed with the court will presumptively be open to the public unless

22   compelling reasons for closure exist consistent with the *Seattle Times Co. v. Ishikawa*, 97 Wn.2d

23   30, 640 P.2d 716 (1982), standards." *Rufer v. Abbott Labs.*, 154 Wn.2d 530, 535, 549, 114 P.3d

24   1182 (2005). The Washington State Supreme Court has stated five factors to be applied in

25   considering whether to seal judicial proceedings or documents from public view:

26

MOTION FOR PROTECTIVE ORDER TO
SEAL COURT RECORDS

1

ATTORNEY GENERAL OF WASHINGTON
332 French Administration Building
PO Box 641031
Pullman, WA 99164-1031
(509) 335-2636

1   1. The proponent of closure or sealing must make some showing of the need for doing so, and where that need is based on a right other than an accused's right to a fair trial, the proponent must show a "serious and imminent threat" to that right.

2   2. Anyone present when the closure motion is made must be given an opportunity to object to the closure.

3   3. The proposed method for curtailing open access must be the least restrictive means available for protecting the threatened interests.

4   4. The court must weigh the competing interests of the proponent of closure and the public.

5   5. The order must be no broader in its application or duration than necessary to serve its purpose.

*See Allied Daily Newspapers of Wash. v. Eikenberry*, 121 Wn.2d 205, 210-11, 848 P.2d 1258 (1993) (summarizing *Ishikawa* standards); *see also* General Rule (GR) 15(c), Sealing or Redacting Court Records (setting forth procedures, basis for, and limitations upon, orders to seal or redact court records).

## III. ANALYSIS

WSU will submit to the Court documents in this case that contain student education records protected under the Family Educational Rights and Privacy Act of 1974 (FERPA), 34 C.F.R. § 99. FERPA requires, with limited exception, that WSU keep education records confidential absent prior written consent of the student to whom the records pertain. 34 C.F.R. § 99.30(a). If WSU discloses protected information to a third party, either by consent, subpoena, or some other exception provided in FERPA, the disclosure must be on the condition that the third party will not allow access or disclosure to any other parties without the student's permission. 34 C.F.R. § 99.33(a).

FERPA broadly defines the term "education record" to encompass all records directly related to an identified student. 34 C.F.R. § 99.3. Student disciplinary records that contain names of student witnesses/complainants are education records of students named; therefore, their identifying information must be redacted before records are disclosed. (October 31, 2003,

2

U.S. Department of Education letter to attorney for School District, located at http://www2.ed.gov/policy/gen/guid/fpco/ferpa/library/1031.html).

Students' concern for privacy is a compelling reason under FERPA and GR 15, which outweighs the public's right to full access and warrants sealing those portions of the court record that contain identifying information of students not parties to this matter. WSU plans to submit the agency record in this case, which contains records that include student information protected under FERPA. The parties' briefing also may include protected student information. To the extent these documents and records contain identifying information of students not parties to this matter, they must be filed under seal. Whenever possible, any document or record provided under seal will be accompanied by a redacted version that will be publicly available.

## IV. CONCLUSION

Based on the foregoing, WSU respectfully requests this Court grant the Protective Order as specified above, to the extent the records contain identifying information of students who are not parties to this case.

RESPECTFULLY SUBMITTED this 10th day of June, 2020.

ROBERT W. FERGUSON
Attorney General


NATHAN E. DEEN, WSBA #39673
Assistant Attorney General
Attorneys for Respondent Washington State University

MOTION FOR PROTECTIVE ORDER TO
SEAL COURT RECORDS

3

ATTORNEY GENERAL OF WASHINGTON
332 French Administration Building
PO Box 641031
Pullman, WA 99164-1031
(509) 335-2636

**PROOF OF SERVICE**

I certify that I served a copy of this document on all parties or their counsel of record on the date below as follows:

**To Plaintiff:**
☑    Matthew Z. Crotty, attorney for Plaintiff
via email to: matt@crottyandson.com
via email to: matthew.z.crotty@msn.com

I certify under penalty of perjury under the laws of the state of Washington that the foregoing is true and correct.

DATED this 10th day of June, 2020, at Pullman, Washington.

Rita Haas
Assistant Director of Legal Services

MOTION FOR PROTECTIVE ORDER TO
SEAL COURT RECORDS

4

ATTORNEY GENERAL OF WASHINGTON
332 French Administration Building
PO Box 641031
Pullman, WA  99164-1031
(509) 335-2636

1
2
3
4
5
6
7

FILED

JUN 1 0 2020

WHITMAN COUNTY CLERK

**STATE OF WASHINGTON
WHITMAN COUNTY SUPERIOR COURT**

| | |
|---|---|
| PATRICK FLEETWOOD, | NO. 20-2-00053-38 |
| Plaintiff, | NOTICE OF HEARING |
| v. | **(Clerk's Action Requested)** |
| WASHINGTON STATE UNIVERSITY, | |
| Defendant. | |

TO:    CLERK OF THE ABOVE-ENTITLED COURT

TO:    Patrick Fleetwood, Plaintiff, by and through his attorney, Matthew Z. Crotty of Crotty & Son Law Firm, PLLC

The clerk is requested to place the following motion on the docket for the day indicated:

MOTION:                    Defendant WSU's Motion for Protective Order to Seal Court Records

HEARING DATE:         June 24, 2020, at 10:00 a.m.

DATED this 10th day of June, 2020.

ROBERT W. FERGUSON
Attorney General

NATHAN E. DEEN, WSBA #39673
Assistant Attorney General

ATTORNEY GENERAL OF WASHINGTON
332 French Administration Building
PO Box 641031
Pullman, WA 99164-1031
(509) 335-2636

**PROOF OF SERVICE**

I certify that I served a copy of this document on all parties or their counsel of record on the date below as follows:

**To Plaintiff:**
☑    Matthew Z. Crotty, attorney for Plaintiff
via email to: matt@crottyandson.com
via email to: matthew.z.crotty@msn.com

I certify under penalty of perjury under the laws of the state of Washington that the foregoing is true and correct.

DATED this 10th day of June, 2020, at Pullman, Washington.

_____
Rita Haas
Assistant Director of Legal Services

NOTICE OF HEARING                    2

20 – 2 – 00053 – 38
PORD              22
Protective Order
8393473

FILED

JUN 24 2020

JILL E. WHELCHEL
WHITMAN COUNTY CLERK

**STATE OF WASHINGTON
WHITMAN COUNTY SUPERIOR COURT**

PATRICK FLEETWOOD,

     Petitioner,

v.

WASHINGTON STATE UNIVERSITY,

     Respondent.

NO. 20-2-00053-38

STIPULATED PROTECTIVE ORDER
TO SEAL COURT RECORDS

  THIS MATTER came before this Court at the request of Washington State University (WSU) to consider and determine its Motion for Protective Order and to Seal the Court Records (Motion). Under General Rule 15, the parties to this action stipulate to the following protective order to seal the court records, subject to approval and entry by this Court.

**I. FINDINGS**

  1.  A hearing was held on June 24, 2020, in open court on WSU's Motion for Protective Order to Seal Court Records.

  2.  Mr. Fleetwood does not object to WSU's motion. Mr. Fleetwood's non-objection to this motion is solely for the purpose of avoiding motion practice and limiting related fees, expenses, and the Court's time. Mr. Fleetwood's non-objection to this motion will not be considered as a waiver of any of Mr. Fleetwood's arguments in any other aspect of any claim that Mr. Fleetwood or any other person may have against WSU. This includes, without

1

1   limitation, any argument WSU may make that the Family Educational Rights and Privacy Act

2   of 1974 (FERPA) justified WSU's non-disclosure of certain documents relating to WSU's

3   investigation of Mr. Fleetwood. Accordingly, WSU cannot use this Order as a defense to any

4   claim that Mr. Fleetwood has brought or that someone else may bring as it relates to WSU's

5   obligations under the Washington State Public Record Act regarding requests made by Mr.

6   Fleetwood or Mr. Fleetwood's father, Michael Fleetwood, regarding documents relating to the

7   investigation of Mr. Fleetwood; provided, however, that WSU does not waive any defense

8   based upon the legal authorities contained in this Order, including any defenses based in whole

9   or in part on FERPA.

10        3.    The Court allowed anyone present at the hearing to object to the closure; no

11   objection was made.

12        4.    FERPA establishes a privacy interest for students' personally identifiable

13   information contained in the agency record. As evidenced by the United States Congress's

14   enacting FERPA, this constitutes a compelling privacy interest.

15        5.    Mr. Fleetwood's personally identifiable information is not protected by FERPA

16   in this matter under 34 C.F.R. § 99.31(9)(iii)(B).

17        6.    WSU requests the sealing of the record be limited to the redaction of students'

18   personally identifiable information where practical and that where redaction is impractical (e.g.,

19   police body camera video footage), that specific record be sealed. This is the least restrictive

20   means of protecting students' FERPA privacy interests.

21        7.    The public has an interest in the open administration of justice. Withholding

22   personally identifiable information protected by FERPA has a negligible impact on the public's

23   interest in the open administration of justice. Furthermore, the specific interest for individuals

24   not associated with this case in knowing the personal identifiable information of students other

25   than Mr. Fleetwood in this matter is minimal. *See West v. The Evergreen State Coll. Bd. of*

26

STIPULATED PROTECTIVE
ODER TO SEAL COURT
RECORDS

2

ATTORNEY GENERAL OF WASHINGTON
332 French Administration Building
PO Box 641031
Pullman, WA 99164-1031
(509) 335-2636

1  *Trustees*, No. 49120-6-II, 2018 WL 1100977 (FERPA protected information exempt from the
2  Public Records Act) (nonbinding unpublished opinion).

## II. CONCLUSIONS

4      The specific sealing or redaction requested by WSU is justified by the compelling
5  privacy rights established in FERPA and such rights outweigh the public interest in access to
6  the portions of the court record WSU seeks to seal.

STIPULATED PROTECTIVE
ODER TO SEAL COURT
RECORDS

3

## III. ORDER

Therefore, it is hereby ORDERED as follows:

The entire court record, including, but not limited to, the agency record, report of proceedings, briefs, motions, or other documents filed with this Court in the current action will be sealed to the extent the records contain identifying information of students other than Mr. Fleetwood.

Where practicable, the parties will file with this Court unsealed copies of these documents from which personally identifiable student information has been redacted.

DATED this 24 day of June, 2020.

Superior Court Judge Libey

Presented by:

_____
Nathan E. Deen, WSBA #39673
Assistant Attorney General
Attorney for Respondent
Date:   6/24/2020

Agreed by attorney for Petitioner
and notice of presentation waived by:

_____
Matthew Z. Crotty, WSBA #39284
Attorney for Petitioner
Date:   June 11, 2020

STIPULATED PROTECTIVE
ODER TO SEAL COURT
RECORDS

4

WHITMAN SUPERIOR COURT
Clerk's Minutes
Judicial Officer: Libey, Gary
Court Reporter: FTR Gold Recorder
Clerk: BRENDA CLONINGER

Date: 06/24/2020
Start: 10:16 AM      End: 10:18 AM

20-2-00053-38
PATRICK FLEETWOOD
VS
WASHINGTON STATE UNIVERSITY

<u>Matter set for:</u> Motion Hearing

<u>Case Parties Present/Not Present:</u>

PATRICK FLEETWOOD, Petitioner, not present

MATTHEW CROTTY, Attorney, present

WASHINGTON STATE UNIVERSITY, Respondent, not present

Nathan E Deen, Assistant Attorney General, present

<u>Comments:</u>
PARTIES APPEARED BY TELEPHONE

<u>Events:</u>

- Motion Hearing
- Protective Order; TO SEAL COURT RECORDS

<u>Hearings Scheduled:</u>

FILED

JUN 2 4 2020

WHITMAN COUNTY CLERK

20-2-00053-38
AFML          23
Affidavit of Mailing
8397270

**SUPERIOR COURT OF WASHINGTON
COUNTY OF WHITMAN**

**PATRICK FLEETWOOD      ,**                    No.20-2-00053-38

                              **PLAINTIFF,**    **CLERK'S AFFIDAVIT OF MAILING**

  vs.

**WASHINGTON STATE UNIVERSITY   ,**

                              **DEFENDANT.**

I, Brenda Cloninger, state under penalty of perjury that on this day I caused a true and correct copy of STIPULATED PROTECTIVE ORDER TO SEAL COUR RECORDS, to be served by FIRST CLASS MAIL to:   and  emailed to:                                      BU

NATHAN E. DEEN                          nathan_deen@wsu.edu

ATTORNEY AT LAW

PO BOX 641031

PULLMAN WA  99164

                                                    BU

MATTHEW CROTTY                          matt@crottyandson.com

ATTORNEY AT LAW

905 W RIVERSIDE AVE STE 404

SPOKANE WA  99201-1099

DATED:  6 / 24/20 20   Jill Whelchel   JWhlcho

CLERK'S AFFIDAVIT OF MAILING             **WHITMAN COUNTY CLERK**

Page 1                                   N. 400 MAIN STREET ♦ P.O. BOX 390
                                         COLFAX, WA  99111
                                         (509) 397-6240

FILED

JUN 3 0 2020

WHITMAN COUNTY CLERK

**STATE OF WASHINGTON**
**WHITMAN COUNTY SUPERIOR COURT**

PATRICK FLEETWOOD,

                         Petitioner,

    v.

WASHINGTON STATE UNIVERSITY,

                         Respondent.

NO. 20-2-00053-38

CERTIFICATION OF AGENCY RECORD

STATE OF WASHINGTON  )
                       ) ss.
County of Whitman        )

    I, Karen Metzner, state that:

    1.    I am the Director of the Center for Community Standards at Washington State University (WSU). I have held this position since May 2019. I also serve as one of WSU's University Conduct Officers.

    2.    My duties include collecting documents and maintaining the agency record of student conduct matters. As Director of the Center for Community Standards, I can certify the content of the agency record.

    3.    A true and correct copy of the agency record in the student conduct proceedings involving Patrick Fleetwood is attached hereto.

    I certify under penalty of perjury under the laws of the state of Washington that the foregoing is true and correct.

CERTIFICATION OF AGENCY
RECORD

1

1    DATED this 30th day of June, 2020, at Pullman, Washington.

2

3

4                          Karen Metzner

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

CERTIFICATION OF AGENCY
RECORD

2

1

**PROOF OF SERVICE**

2      I certify that I served a copy of this document on all parties or their counsel of record on

3   the date below as follows:

4      **To Plaintiff:**

5      ☑   Matthew Z. Crotty, attorney for Plaintiff
          via email to:  matt@crottyandson.com

6          via email to:  matthew.z.crotty@msn.com

7      I certify under penalty of perjury under the laws of the state of Washington that the

8   foregoing is true and correct.

9      DATED this 30th day of June, 2020, at Pullman, Washington.

10

11   _____
     Rita Haas

12   Assistant Director of Legal Services

13

14

15

16

17

18

19

20

21

22

23

24

25

26

CERTIFICATION OF AGENCY
RECORD

3

1
2
3
4
5
6

FILED

JUL 21 2020

JILL E. WHELCHEL
WHITMAN COUNTY CLERK

7  **STATE OF WASHINGTON**
   **WHITMAN COUNTY SUPERIOR COURT**

8

PATRICK FLEETWOOD,

9                          Petitioner,            NO. 20-2-00053-38

10    v.                                          INDEX OF AGENCY RECORD

11  WASHINGTON STATE UNIVERSITY,

12                          Respondent.

13

14         Washington State University (WSU) transmits the following documents as the Certified

15  Agency Record in the above-captioned matter, with page numbers stamped in the lower-right

16  corner of the document (AGENCY RECORD ###).

17

18

| Page Numbers | Date | Description of Document(s) |
|---|---|---|
| 001-002 | undated | Cover sheet of Petitioner's student conduct file |
| 003-006 | 1/31/2019 | Notice of Office for Equal Opportunity (OEO) investigation |
| 007 | 4/8/2019 | Notice of hold on Petitioner's account |
| 008-011 | 6/14/2019 | Notice of informational meeting |
| 012-024 | 6/13/2019 | OEO Investigation Report |
| 025-168 | various | OEO investigation file |
| 169-170 | 7/12/2019 | Notice of informational meeting |
| 171-172 | 10/4/2019 | Emails between the Center for Community Standards (CCS) and Complainant |
| 173-176 | 10/8/2019 | Notice of Conduct Officer hearing |
| 177-179 | 10/18/2019 | Notice of rescheduled Conduct Officer hearing |
| 180-197 | 10/2019 | Emails between CCS, Petitioner, and Petitioner's father |
| 198 | 10/23/2019 | Conduct Advisor Registration |

INDEX OF AGENCY RECORD                    1

| Page Numbers | Date | Description of Document(s) |
|---|---|---|
| 199-204 | 10/29/2019 | Notes from Conduct Officer hearing |
| 205-209 | various | Letters of support for Petitioner |
| 210 | 11/15/2019 | Notice of continuation of Conduct Officer hearing |
| 211-213 | 11/21/2019 | Email from CCS to Petitioner |
| 214-215 | undated | CCS Case Resolution Form |
| 216-219 | 12/16/2019 | Conduct Officer decision letter (Initial Order) |
| 220-223 | 1/5/2020 | Petitioner's appeal of Conduct Officer decision |
| 224 | 1/8/2020 | Letter from University Appeals Board to Petitioner |
| 225-231 | undated | CCS conduct file notes |
| 232-233 | undated | University Appeals Board Checklist |
| 234-235 | 6/29/2019 | Email from Complainant to WSU's attorney |
| 236-239 | 2/21/2020 | University Appeals Board decision letter (Final Order) |

DATED this 21st day of July, 2020.

ROBERT W. FERGUSON
Attorney General

NATHAN E. DEEN, WSBA #39673
Assistant Attorney General

INDEX OF AGENCY RECORD        2

**PROOF OF SERVICE**

I certify that I served a copy of this document on all parties or their counsel of record on the date below as follows:

**To Plaintiff:**
☑    Matthew Z. Crotty, attorney for Plaintiff
via email to: matt@crottyandson.com
via email to: matthew.z.crotty@msn.com

I certify under penalty of perjury under the laws of the state of Washington that the foregoing is true and correct.

DATED this 21st day of July, 2020, at Pullman, Washington.

_____
Rita Haas
Assistant Director of Legal Services

INDEX OF AGENCY RECORD                3                ATTORNEY GENERAL OF WASHINGTON
332 French Administration Building
PO Box 641031
Pullman, WA 99164-1031
(509) 335-2636

# *Patrick Fleetwood v.*

# *Washington State University*

State of Washington

Whitman County Superior Court No. 20-2-00053-38



## AGENCY RECORD
## REDACTED COPY

THIS DOCUMENT IS **NOT UNDER SEAL**.

IT IS AVAILABLE  TO THE PUBLIC.

**2018371301**          OEO Student

# Patrick Michael Fleetwood  (011464891)

## DEMOGRAPHIC INFORMATION

DOB
1996-09-07

Classification
Junior

Athletics
Not Athlete

Gender
Male

Major
Social Sciences BA

Greek
Not Greek

Ethnicity

Academic Advisor
Rocha Alma 509/432-1820

Honors
N/A

GPA Last Term      Cume
3.130              2.880

ROTC/Veteran
N/A

Visa Status/Country of Citizenship
USA

Student Campus
PULLM

## CONTACT INFORMATION

Housing Address
Off Campus

Local Address
13522 129th St E
Puyallup WA 98374
(local)
(cell)

Permanent Address
13522 129th St E
Puyallup WA 98374

253/268-2437

Email Address
patrick.fleetwood@wsu.edu

Emergency Contact

## INCIDENT AND CASE INFORMATION

Role
Respondent

Incident Date
2019-01-18

Incident Time

Incident Location

Reported Date
2019-01-18

Referral Source
Student

Reported By

Charges/Issues
   1.
   2.
   3.
   4.
   5.
   6.

Clery Reportability

Tags

Case Status
Open

Access Restriction
OEO - Student

Case Created Date
2019-04-08

Case Created By
Karen Metzner

Assigned To
Karen Metzner (OSC - Assistant Director)

Next Deadline Date
2019-04-15

Reason
Unspecified at case creation

The information contained on these pages is privileged and confidential information intended solely for the individual or entity who has accessed it for official purposes and by lawful means.  Any dissemination, distribution, or copy of this communication is strictly prohibited.  If you have received this communication in error, please immediately notify us by telephone at 509-335-4532, and return the original message to us via the U.S. Postal Service to the Center for Community Standards, Washington State University, PO Box 641050, Pullman, WA 99164-1050, without retaining a copy.

**INCIDENT DESCRIPTION**

The Complainant has alleged that after you and she had a consensual
sexual relationship which ended in December 2018, you subjected her to
unwelcome conduct on the basis of sex and/or gender on campus and within
the WSU ROTC program. She also alleged that you engaged in harassment of a
sexual nature towards her and others within the WSU ROTC program, and that
you engaged in retaliation and interference.

AGENCY RECORD
002


Office for Equal Opportunity

January 31, 2019

*via electronic mail and hand delivery*

Patrick Fleetwood
Washington State University

RE:  **Office for Equal Opportunity, Complaint No. 2019–021**

Dear Patrick:

This message is official notice to you that the Washington State University (WSU) Office for Equal Opportunity (OEO) has opened an investigation in response to information received on January 18, 2019, provided to this office by ▮▮▮▮▮▮ (the Complainant), a female WSU undergraduate student, regarding your alleged conduct.  The Complainant has alleged that after you and she had a consensual sexual relationship which ended in December 2018, you subjected her to unwelcome conduct on the basis of sex and/or gender on campus and within the WSU ROTC program.  She also alleged that you engaged in harassment of a sexual nature towards her and others within the WSU ROTC program, and that you engaged in retaliation and interference.  Specifically, the Complainant alleged that you;

1.  Subjected her to harassment and bullying by explicitly talking about the sexual relationship to others or talking to her about the sexual relationship in the presence of others within the WSU ROTC classroom setting or on campus, which harmed and/or had the potential to harm her reputation amongst classmates in the WSU ROTC program.  This included, but is not limited to, the following comments:
    a.  During the week of January 9, 2019, you spread rumors about her sexual activities to other members of WSU ROTC, such as telling

French Administration 225, PO Box 641022, Pullman, WA 99164-1022
509-335-8288 • Fax: 509-335-5483 • oeo@wsu.edu • www.oeo.wsu.edu

AGENCY RECORD
003

others that she "squirted all over my sheets," and referring to another cadet as an "Eskimo Bro" with the understanding that Eskimo Bros is a reference to two people who have had sex with the same person at different times.

    b. On or around January 10, 2019, when the Complainant walked into class, you pulled lip gloss from your pocket and stated that you had found the lip–gloss by your bed, asking the Complainant if she left it there.

2. Subjected her and other students to sexual comments by openly and explicitly talking about your sexual activities with other women;

3. Persistently attempted to reinitiate a sexual and/or romantic relationship with the Complainant, which was unwanted.

4. Subjected her to negative and rude treatment and comments amongst other students, including those in the WSU ROTC program, when the Complainant was not amenable to reinitiating a sexual and/or romantic relationship with you.

5. Engaged in retaliatory conduct against the Complainant to dissuade her from making a complaint or participating in an investigation under this policy which included, but is not limited to, on January 15, 2019, you told her she would have no respect in the ROTC program if she brought this case forward, and that you have a lot of people backing you.

6. Engaged in interference when you contacted another cadet in the program asking that if they are contacted by investigators to help you out and to tell them that "Patrick wouldn't do that, type deal."

7. Engaged in retaliatory and/or interfering behavior when you sent a statement about the Complainant to multiple other individuals.

It is my understanding that the Complainant does not want you to contact her further.  **Do not attempt to contact the Complainant directly, through a third party, or through any other means.**

University Policy and Process

These allegations implicate the WSU Policy Prohibiting Discrimination and Sexual Harassment, Executive Policy #15 (EP 15, see attached copy), and warrant this investigation.  OEO's role in this matter is solely that of

French Administration 225, PO Box 641022, Pullman, WA 99164-1022
509-335-8288 • Fax: 509-335-5483 • oeo@wsu.edu • www.oeo.wsu.edu

2

AGENCY RECORD
004

neutral finder of fact.  We intend to interview you and other relevant individuals.  OEO will gather and consider relevant information, which may include statements and documents.

OEO will make every effort to carry out a prompt and effective investigation.  If you know of any witnesses you believe OEO should interview, please provide us with a list as soon as possible.  Also, include a brief description of the information you believe each witness can provide.  OEO investigators will interview those witnesses OEO determines may have relevant information.  Also, please provide this office <u>all</u> records and documents in your possession or control that are relevant to this matter.

We are aware that you may need to interact with some potential witnesses in the performance of your educational and other activities at WSU. <u>However, you should not attempt to influence potential witnesses or alter or destroy any records related to the events being investigated</u>.

WSU expects you to cooperate in all phases of the investigation and ensuing actions.  <u>You are prohibited from engaging in any form of retaliation against the Complainant or any other person participating in, or whom you believe will participate in the investigation.</u>  Any adverse action against the interests of any such individuals, which is found to be retaliatory, will comprise a separate and distinct violation of EP 15, as well as other WSU policies, including the Standards of Conduct for Students.  You should regard the "interests" of anyone participating in OEO's process as broadly defined and inclusive of that person's personal and professional reputations.

After the investigation is complete, OEO will issue an investigative memorandum to the Center for Community Standards (CCS) with factual findings, a conclusion with respect to whether EP 15 was violated, and a recommendation to OSC as to whether further proceedings are warranted.  CCS will determine whether further proceedings are

French Administration 225, PO Box 641022, Pullman, WA 99164-1022
509-335-8288 • Fax: 509-335-5483 • oeo@wsu.edu • www.oeo.wsu.edu

3

AGENCY RECORD
005

warranted.  A copy of this memorandum will also be provided to you and the Complainant with student names redacted to protect student privacy.

I would like to schedule a time for you to speak with my office, as soon as possible; I will contact you soon to schedule a time.  I encourage you to provide a written response to these allegations; however, a written response is not mandatory.  Please see the attached list of resources that may be available to you.  Please contact me if you have any questions.

Sincerely,

Rachel M. Brooks
Investigator


Enc:   List of Resources
       EP 15

French Administration 225, PO Box 641022, Pullman, WA 99164-1022
509-335-8288 • Fax: 509-335-5483 • oeo@wsu.edu • www.oeo.wsu.edu

4

AGENCY RECORD
006



WASHINGTON STATE UNIVERSITY

*Center for*
Community Standards

April 8, 2019

Patrick Fleetwood
Sent electronically to patrick.fleetwood@wsu.edu

**PERSONAL AND CONFIDENTIAL**

Regarding Case Number: 2018371301

Dear Patrick,

As your WSU Center for Community Standards, we are here to protect the opportunities and success of all students. You are receiving this letter because we received a report that on January 31, 2019, you were notified by the Office of Equal Opportunity at Washington State University that they had opened an investigation in response to information provided to their office by another student. A hold has been placed on your WSU account that may restrict the release of your transcripts, degree, diplomas, or allow you to register for classes. If you disagree with the application of the community standards hold, you can submit your reasoning here. For more information about the application of holds and good standing with the university, please visit https://apps.leg.wa.gov/wac/default.aspx?cite=504-26-525.

This is a good time to reach out for support from friends, family, or campus resources. More information about campus resources can be found here: https://handbook.wsu.edu/resources/campus-resources-and-support/.

More information can be found at https://handbook.wsu.edu. Please feel free to email us at community.standards@wsu.edu, call us at 509-335-4532, or visit https://communitystandards.wsu.edu if you have any questions or concerns.

Sincerely,

Karen Metzner
Interim Director, Center for Community Standards

AGENCY RECORD
007



Center for
Community Standards

June 14, 2019

Patrick Fleetwood
Sent electronically to patrick.fleetwood@wsu.edu

**PERSONAL AND CONFIDENTIAL**

Regarding Case Number: 2018371301

Dear Patrick,

As your WSU Center for Community Standards, we are here to protect the opportunities and success of all students. You are receiving this letter because we received a report you and subjected another student to unwelcome conduct on the basis of sex and/or gender on campus and within the WSU ROTC program. The report also alleges that you engaged in harassment of a sexual nature towards her and others within the WSU ROTC program, and that you engaged in retaliation and attempted to interfere with the investigative process. This may be violation(s) of:

> WAC 504-26-227 - Sexual harassment. Sexual harassment includes behavior defined in Washington State University's Executive Policy 15, which prohibits discrimination, sexual harassment, and sexual misconduct.
> WAC 504-26-209 - Violation of university policy, rule, or regulation. Violation of any university policy, rule, or regulation published electronically on the university web site or in hard copy including, but not limited to, Washington State University's alcohol and drug policy, executive policy 15 (policy prohibiting discrimination, sexual harassment and sexual misconduct), and housing and residence life policy.
> WAC 504-26-219 - Abuse of the student conduct system. Abuse of the student conduct system including, but not limited to: (1) Failure to obey any notice from a university conduct board or other university official to appear for a meeting or hearing as part of the student conduct system. (2) Willful falsification, distortion, or misrepresentation of information before a university conduct proceeding. (3) Disruption or interference with the orderly conduct of a university conduct board proceeding. (4) Filing fraudulent charges or initiating a university conduct proceeding in bad faith. (5) Attempting to discourage an individual's proper participation in, or use of, the student conduct system. (6) Attempting to influence the impartiality of a member of the university conduct system prior to, and/or during the course of, any university conduct board proceeding. (7) Harassment (verbal, written, or physical) and/or intimidation of a member of a university conduct board, any individual involved in the conduct process, or any conduct officer before, during, and/or after any university conduct proceeding. (8) Failure to comply with or failure to complete any term or condition of any disciplinary sanction(s) imposed under the standards of conduct for students. (9) Influencing or attempting to influence another person to commit an abuse of the university conduct system. (10) Violation of probation or any probationary conditions.

**Based on the information known, and considering your previous contacts with the Center for Community Standards, you may be referred to the University Conduct Board for a formal hearing. The University Conduct Board has the authority to suspend or dismiss you from the University.**

The first step in this process would be for you to attend an informational session regarding the University Conduct Board and the community standards process. I have scheduled that session for:

**Informational Session Date: Friday, June 28, 2019**
**Time: 9:00 a.m.**
**Meeting with: Holly Campbell**
**Location: French 130 or via telephone (call 509-335-7231 to connect)**

PO Box 641012, Pullman, WA 99164-1012
509-335-4532 | Fax: 509-335-4814
community.standards@wsu.edu | communitystandards.wsu.edu

AGENCY RECORD
008

After the information session, the second step in the process is for us to refer the matter to the Conduct Board. Throughout that formal process, the University Conduct Board will determine whether or not the your behavior violated the WSU Standards of Conduct for Students, and impose sanctions. If you are found responsible, the Conduct Board has the authority to suspend or expel you. Nathan Deen, an Assistant Attorney General with the Washington State University Division of the Attorney Generals Office, represents the University in the formal hearings.

**Additional information to help you prepare for the community standards process include:**

    **1. Access an advisor.**
    There are specially trained advisors available to guide you through this process. <u>More information about how to access an advisor, and the options that you have is available here.</u> Your community standards advisor is different from your academic or career advisor.
    **2. Use your resources and seek support.**
    This is a good time to reach out for support from friends, family, or campus resources. Language interpreters are also available upon request.
    **3. Check your email.**
    You will receive another letter (via email) within the next couple of weeks with information specific to your hearing. Until a decision is made at your hearing, you are assumed not responsible for the reported incident.

More information can be found at <u>https://handbook.wsu.edu</u>. Please feel free to email us at <u>community.standards@wsu.edu</u>, call us at 509-335-4532, or visit <u>https://communitystandards.wsu.edu.</u> if you have any questions or concerns.

Sincerely,

Holly Campbell
Conduct Officer 1

# YOUR QUICK GUIDE TO OUR
# COMMUNITY STANDARDS PROCESS

Go to HANDBOOK.WSU.EDU for more complete information about your rights and responsibilities, timelines, available resources, and possible sanctions.

## 1 AN INCIDENT HAS BEEN REPORTED AND YOU ARE LISTED AS POTENTIALLY VIOLATING OUR COMMUNITY STANDARDS.

We will send an email (to your WSU address) with the next steps, including your information session. Remember that until a decision is made at your hearing, you are assumed **not responsible** for the reported incident.

## 2 YOUR COMMUNITY STANDARDS PROCESS BEGINS.

These next steps may help you throughout the process:
- ❑ Attend an information session.
- ❑ Review your rights and responsibilities.
- ❑ Select an advisor. (*This is different from your academic or career advisor*)
- ❑ Request disability or medically related accommodations.
- ❑ Request a language interpreter.

## 3 PREPARING FOR AND ATTENDING YOUR HEARING.

You will get another email with your hearing date, time, and location.
Your hearing will be with a **Conduct Officer** or the **Conduct Board.**

**BEFORE YOUR HEARING**
- ❑ Provide, gather, and review all of the information relevant to the reported incident.
- ❑ Request any changes that need to be submitted prior to your hearing. For example:
  - Requesting a new hearing date and time.
  - Requesting a different Conduct Officer or Conduct Board Member.
  - Challenging the jurisdiction of off-campus behavior.
- ❑ Invite your advisor to attend your hearing.

## 4 A DECISION IS MADE.

You will be notified of the decision at the end of the hearing or by email, within 10 calendar days of your hearing.

## 5 YOUR OPTION TO APPEAL.

You have 21 calendar days after receiving the decision to submit an appeal.

SC19-003 Jan

## LET US HELP.

Find Community Standards support on your campus at communitystandards.wsu.edu



Center for
**Community Standards**
WASHINGTON STATE UNIVERSITY

AGENCY RECORD
010

# Your rights and responsibilities in the community standards process.

## SHARING YOUR EXPERIENCE

**You are assumed not responsible**
You are assumed not responsible for any reported incident unless it is determined that you were "more likely than not" responsible within the Conduct Officer hearing or Conduct Board hearing. WAC 504-26-040

**You do not have to self-incriminate**
You get to choose what information you want to share. You do not have to share any information which may incriminate you. You will not be viewed negatively if you choose not to share specific information. WAC 504-26-045

**You have access to your information**
At any point throughout the process, even before you meet with your Conduct Officer, you can request to view your file with details and information related to the incident.

**You can provide documentation**
Sharing your information ensures that your experience is part of the conversation and is added to your file. You can provide a written statement, submit additional documentation (such as text messages, emails, phone logs, etc.), provide witnesses, and/or ask witnesses to contact your conduct officer.

**You have a responsibility to participate**
You will benefit by actively engaging in the process and we want you to be involved. If you choose not to show up or participate, the community standards process will continue in your absence.

## YOUR AVAILABLE RESOURCES

**Information sessions**
Information sessions are led by WSU students who are trained to clarify the community standards process from a student perspective and answer any questions you may have. These sessions help you understand your rights and responsibilities and what you can expect moving forward. WAC 504-26-401

**Trained advisors**
You may choose to have an advisor during all stages of the conduct process. Advisors are volunteers, serving for the benefit of students. WAC 504-26-020

**Disability or medically related accommodations**
You can request accommodations to assist you throughout the community standards process.

**Language interpreters**
You may request a language interpreter at no cost, at any time.

## YOUR RIGHT TO A FAIR AND EQUITABLE PROCESS

**Understand when community standards apply**
Community standards apply to individuals from the time of application until awarding of a degree. The standards apply on university premises, during university sponsored activities (including transit), to online behavior, and to off-campus behavior when it negatively affects the university community. WAC 504-26-015

**Confidentiality**
Conduct meetings and hearings are closed to public observation. If there is a concern for your personal safety, wellbeing, or fears of confrontation, accommodations for participation can be made. WAC 504-26-025

**Legal representation**
A licensed attorney or a legally licensed intern may act and speak on your behalf during Conduct Board hearings. During a Conduct Officer hearing, they can only serve as an advisor. If you choose to have legal representation, it is at your own expense. WAC 504-26-020

**Request individuals to be removed from the process**
If you believe your assigned Conduct Officer or a Board Member may have a conflict of interest, you may request to have them removed (recused) from your conduct review. WAC 504-26-125

**Appeal decisions**
You can make an appeal if you believe a hearing was conducted unfairly, if you think the information was insufficient for the outcome, if you think the assigned sanction was inappropriate, or if new and sufficient information becomes available. WAC 504-26-420

**Your conduct file and record**
WSU is not permitted to share your information without your written consent, except:
- when a student under the age of 21 violates alcohol or drug standards, their parents/guardian will be notified, and
- when required by law. The community standards process is unique from the legal system and WSU generally does not share information with law enforcement unless required to do so,
- or when authorized by the Family Educational Rights and Privacy Act of 1974 (FERPA).

You may also request to remove a single alcohol, drug or marijuana-related incident from your conduct record. WAC 504-26-530

Find more information about the community standards process at handbook.wsu.edu



Center for
Community Standards
WASHINGTON STATE UNIVERSITY

SC19-003 Jan



Office for Equal Opportunity

**Investigation Report**
**Office for Equal Opportunity**
**Complaint No. 2019-021**
**June 13, 2019**

## Executive Summary

The Washington State University (WSU) Office for Equal Opportunity (OEO), commenced an investigation into the alleged conduct of Patrick Fleetwood (the Respondent), a male WSU undergraduate student and member of the WSU ROTC program (the Program), on January 31, 2019, in response to information received from ███████████ (the Complainant), a female WSU undergraduate student and member of the Program. The Complainant alleged that after a consensual sexual relationship ended in December 2018, the Respondent subjected her to discrimination on the basis of her sex and/or gender, retaliation, and interference in this investigation. Specifically, the Complainant alleged that he;

1. Subjected her to harassment and bullying by explicitly talking about their sexual relationship to others or talking to her about the sexual relationship in the presence of others within the Program classroom setting or on campus, which harmed and/or had the potential to harm her reputation amongst classmates in the Program. This included, but is not limited to, the following comments;

    a. During the week of January 9, 2019, he spread rumors about her sexual activities to other members of the Program, such as telling others that she "squirted all over my sheets," and referred

    to another cadet as an "Eskimo Bro" with the understanding that Eskimo Bro is a reference to two people who have had sex with the same person at different times;

    b. On or around January 10, 2019, when the Complainant walked into class, he pulled lip gloss from his pocket and stated that he found the lip-gloss by his bed, asking the Complainant if she left it there;

2. Subjected her and other students to unwanted sexual comments by openly and explicitly talking about his sexual activities with other women;

AGENCY RECORD
012

3.  Persistently attempted to reinitiate a sexual and/or romantic relationship with the Complainant, which was unwanted;

4.  Subjected her to negative and rude treatment and comments in front of other students, including those in the Program, when the Complainant was not interested in reinitiating a sexual and/or romantic relationship with him;

5.  Engaged in retaliatory conduct against the Complainant including, but not limited to, on January 15, 2019, telling her she would have no respect in ROTC if she brought this case forward, and that he has a lot of people backing him;

6.  Engaged in interference when he contacted another cadet in the program asking that if they are contacted by investigators to help him out and to tell them that "[the Respondent] wouldn't do that, type deal;" and

7.  Engaged in retaliatory and/or interfering behavior when he sent a statement about the Complainant to multiple other individuals after he was sent notice of this investigation.

After conducting an investigation, as described below, OEO found that the Respondent violated EP 15.


**University Policy at Issue**

These allegations implicated the WSU Policy Prohibiting Discrimination, Sexual Harassment, and Sexual Misconduct, Executive Policy #15 (EP 15), and relevant provisions of the WSU Standards of Conduct for Students (Standards of Conduct), and warranted this investigation. This report summarizes OEO's investigation, provides findings of fact, states a conclusion as to whether or not EP 15 was violated, and makes a recommendation to the WSU Center for Community Standards (CCS) regarding further proceedings. The provisions of EP 15 and the Standards of Conduct which are relevant to these allegations include:

1.  Sexual Harassment: EP 15 states that sexual harassment is a form of discrimination based on sex and/or gender and is prohibited by this policy. Sexual harassment encompasses unwelcome verbal or physical conduct of a sexual nature. Sexual misconduct, which includes sexual assault and other sexual violence, is a form of sexual harassment and is also prohibited by this policy. Sexual harassment creates a hostile environment when behavior is sufficiently severe, persistent, or pervasive to interfere with an individual's work or educational performance, or creates an intimidating, hostile, or offensive work or educational environment.

2.  Jurisdiction: EP 15 applies to all students, faculty, staff, and others having an association with WSU, and applies whether the conduct occurs on or off the WSU campus, if the

AGENCY RECORD
013

continuing effects of the conduct have the potential to unreasonably interfere with or limit an individual's work, academic performance, living environment, personal security, or participation in any WSU activity.  Additionally, WAC 504-26-015 states the university has sole discretion to determine what conduct occurring off-campus adversely impacts the health and/or safety of the university community or the pursuit of the university's vision, mission, or values.  To make this determination, the conduct officer considers whether the alleged conduct: (1) requires the university to exercise jurisdiction under law or as required by federal or state agencies; (2) negatively impacted the reputation of the university or its students; (3) occurred on the property of recognized or registered student organizations; (4) caused physical, mental, or emotional harm to another; or (5) was recognized by onlookers, complainants, or witnesses as being carried out by a student or recognized or registered student organization.

**Summary of Investigation**

Upon receiving the allegations in this matter, investigators reviewed the information to determine an appropriate investigation plan.  As part of the investigation, investigators interviewed the following people:

1.  The Complainant;

2.  ███████████ (Student A), a male WSU undergraduate student, member of the Program, and friend of the Complainant.

3.  ███████████████ (Student B), a female WSU undergraduate student, and member of the Program;

4.  ███████████████ (Student C), a male WSU undergraduate student, member of the program, and friend of the Complainant;

5.  ███████████ (Student D), a male WSU undergraduate student, member of the Program, and ex-boyfriend of the Complainant;

6.  ███████████ (Student E), a female WSU undergraduate student, and member of the Program;

7.  ███████████ (Student F), a male WSU undergraduate student, and member of the Program;

8.  █████████ (Student G), a male WSU undergraduate student, and member of the Program;

9.  ███████████ (Student H), a male WSU undergraduate student, and member of the Program;

10.  ██████████ (Student I), a male WSU undergraduate student, and member of the Program;

11.    ████████████ (Student J), a former female WSU undergraduate student, and former member of the Program;

12.    SFC. Brian Streigle, MS 1 Instructor, and Operations NCO;

13.    The Respondent.

Investigators did not interview ████████████ (Student J), a former female WSU undergraduate student, and former member of the Program, at the request of the Respondent. The Respondent told investigators that he did speak to Student J a few days prior to his interview with investigators and she told him (the Respondent) she did not want to be contacted or involved in regards to this investigation. Investigators learned of Student J from the Complainant, as another female within the Program who was alleged to have been in a sexual relationship with the Respondent. The Respondent initially told investigators, the Complainant was the only female within the Program that he had a sexual relationship with. However the Respondent later admitted that he and Student J had engaged in a sexual relationship. Investigators did not have any information that would suggest Student J may have knowledge related to any of the remaining allegations involved in this case, therefore, investigators determined that Student J was not a necessary witness.

The Respondent did not recommend any witnesses for OEO to interview.  Investigators asked the Respondent several times if he would like to recommend witnesses and he did not.  One reason the Respondent gave for not providing witnesses was that, "it would be hard to find an unbiased person" within the Program.

For the witnesses interviewed, investigators assessed credibility.  Factors considered when assessing credibility included, but are not limited to, internal consistency of their statements, consistency of their statements with those of other witnesses or documentary evidence, plausibility, motivation to make statements, demeanor during their interview, and witnesses' overall memory.

Investigators also reviewed:

1.    Screenshots of the Complainant's phone-log, dated January 15, 2019. Submitted by the Complainant (Submission A);

2.    Screenshots of the Respondent's SnapChat "Story," submitted by the Complainant (Submission B);

3.    Screenshots of a forwarded text message conversation between the Respondent and Student A, submitted by the Complainant (Submission C);

4.    Screenshots of a SnapChat conversation between the Complainant and the Respondent, submitted by the Complainant (Submission D);

5.    Screenshots of a conversation between the Respondent and Student D, submitted by the Complainant (Submission E);

AGENCY RECORD
015

6. Sworn statements by the Complainant and Student C were given Lt. Col. Hobbs with the Program. Lt. Col. Hobbs provided those statements to OEO dated February 18,2019 (Submission F);

7. The Respondent's written statement in response to the allegations, submitted to OEO February 10, 2019 (Submission G).

**Findings of Fact**

Based on the totality of the evidence gathered in the investigation, including witness statements and documentary evidence as documented in OEO Investigative File for Matter No. 2019-021, and using a standard of more likely than not, the Washington State University (WSU) Office for Equal Opportunity (OEO) finds:

1. ████████████ (the Complainant), was a female WSU undergraduate student and member of the Program during relevant events. The Complainant's first semester at WSU was Fall 2018.

2. Patrick Fleetwood (the Respondent), was a male WSU undergraduate student and member of the Program during relevant events. The Respondent's first semester at WSU was Fall 2015.

3. ████████ (Student A), a male WSU undergraduate student, member                    of the Program, and friend of the Complainant.

4. ████████████ (Student B), a female WSU undergraduate student, and member of the Program;

5. ████████████ (Student C), a male WSU undergraduate student, member of the program, and friend of the Complainant;

6. ██████████ (Student D), a male WSU undergraduate student, member of the Program, and ex-boyfriend of the Complainant;

7. ██████████ (Student E), a female WSU undergraduate student, and member of the Program;

8. ██████████ (Student F), a male WSU undergraduate student, and member of the Program;

9. ████████ (Student G), a male WSU undergraduate student, and member of the Program;

10. ██████████ (Student H), a male WSU undergraduate student, and member of the Program;

11. ██████████ (Student I), a male WSU undergraduate student, and member of the Program;

AGENCY RECORD
016

12.    ████████████ (Student J), a former female WSU undergraduate student, and former member of the Program;

13.    SFC. Brian Streigle, MS 1 Instructor, and Operations NCO;

14.    The Complainant appeared genuinely upset when providing her statements to investigators. Her statements to investigators were generally consistent internally and consistent with the written statement she provided. In addition her statements were generally consistent with the statements of witnesses OEO found to be credible, including Student A, Student B, Student C, and Student D, as well as the documentary evidence she provided. For these reasons, investigators found the Complainant's statements to be credible.

15.    The Respondent provided a written statement and participated in follow up interviews with investigators. The Respondent's statements were internally consistent from interview to interview. However there was an inconsistency, when the Respondent shared that the Complainant had been his only sexual relationship within the Program. Which later was found to not be accurate. As the Respondent had engaged in a previous sexual relationship with another female from the Program. Also the Respondent told investigators that he also had his concerns about the impact this investigation may have on his future career prospects, his continued participation in the Program, and with his family.  Investigators considered this as a potential motivation to be untruthful and weighted the assessment of the Respondent's credibility appropriately.

16.    The statements of Student A, Student B, and Student C were relied on as witnesses to the interactions between the Complainant and Respondent after the relationship as well as witnesses of the impact on the Complainant.  The statements of Student D, Student E, and Student F were relied upon only as witnesses to a contemporaneous account of the events told to them by the Complainant and therefore, their statements were used to determine the credibility of the Complainant's statements but were given limited weight as appropriate.

17.    During the investigation, investigators learned that Student A had provided information that was later determined to be, more likely than not, untrue. Student A told investigators that the Respondent had made an inappropriate sexual remark about SFC Brian Streigle's wife. Student A said that several other Program members were present in the office and heard the Respondent make this comment. Investigators asked the Respondent if he made that comment; he stated, "No, that is not something I would do."  Investigators followed up with SFC Brian Streigle and he did not recall such comment being made by the Respondent about his wife. Investigators followed up with Student A about this inconsistency, he did not have a response for the inconsistency. This inconsistency did affect Student A's credibility and his statements were found credible where they were consistent and

corroborated by the statements of other witnesses, however, his remaining statements were given limited weight as appropriate.

18.    The statements of Student G, Student H, Student I, and Student J did not appear rehearsed and were generally consistent with the statements made by the Complainant. Witnesses clearly identified where they had direct knowledge versus second-hand knowledge.  For these reasons, investigators found Student G, Student H, Student I and Student J to be credible and relied upon their statements as witnesses to images or videos they received from the Respondent.

19.    During December 2018 the Complainant and Respondent engaged in a consensual sexual relationship that ended in late December 2018.

20.    On December 31, 2018, the Complainant sent the Respondent a "SnapChat" message stating "should I leave your ass in 2018."

21.    On January 9, 2019, the Respondent sent the Complainant an invite for lunch at a restaurant in Pullman, Washington.  The Complainant told investigators the only reason she agreed to go to lunch with the Respondent was because she was under the impression the Respondent had a girlfriend and was no longer interested in a relationship with the Complainant.  The Respondent told investigators he had invited several other individuals as well, however the Complainant was the only who was free during that time and agreed to showed up.  During lunch, the Respondent propositioned the Complainant to reengage in a consensual sexual relationship.  The Complainant did not want to reengage the sexual relationship with the Respondent. Following this, the Complainant said the Respondent's behavior towards her "switch[ed] from nice to hostile."  The Complainant told Student A about the Respondent propositioning her for a sexual relationship at lunch, shortly after leaving Red Bento.  Student A confronted the Respondent about him propositioning the Complainant for a sexual relationship, in which the Respondent denied asking the Complainant to reengage in a sexual relationship.

22.    A few days after the Complainant and the Respondent had lunch the Complainant texted the Respondent;

>    The Complainant:            Random but can you please stop joking about us around people? I know it's funny to you but I don't appreciate it.

>    The Respondent:            (OK) emoji

The Respondent blocked the Complainant immediately following this "SnapChat" message.

23.    Following being blocked on social media, the Respondent started becoming verbally hostile towards the Complainant to the point where several other students in the

Program asked the Complainant what was going on due to how the Respondent was treating her.  Student D inquired from the Complainant why the Respondent was "being a jerk" towards her in front of fellow Program members.

24.  Student A, Student C, Student E, Student F, and Student I stated the Respondent had made inappropriate sexual comments while in uniform and in settings where these comments would be considered inappropriate. Student I told investigators, he has heard the Respondent say comments such as; "she has a nice ass," or comments about the Respondent's sexual encounters with females in the Program or other female WSU students.  The Respondent denied making such comments both in general and while involved in Program activities.

25.  The Respondent told Student D he was having a sexual relationship with the Complainant and referred to himself and Student D as "Eskimo bro's" which investigators understood as a reference meaning that the Respondent and Student D had both had a sexual relationship with the same person.  During a Program training exercise event the Respondent called Student D an "Eskimo bro" again, this was said close to other members of the Program.  The Respondent told investigators he only said that while in class one on one with Student D, where no one else could hear them.  Student A recalled hearing the comment while other members of the Program were close by.  OEO found that the Respondent did make this comment which was a reference to the sexual relationship he had with the Complainant where others could hear and, at least one person did hear the comment.

26.  Prior to arriving to class, the Respondent found a tube of "chapstick" in Student A's car and thought it belonged to the Complainant. The Respondent had a class with the Complainant and would ask her about the "chaptstick" during that class. While in class later that day the Respondent asked the Complainant "is this yours" (referring to the "chapstick").  The Complainant told the Respondent "no", but the Respondent was sure it did belong to her. OEO found that the Respondent made this comment in class, where other members of the program could hear, with the intention of implying that the Complainant had sex with Student A.

27.  The Respondent sent sexually inappropriate videos to several Program members. Student C provided the names of Student E, Student F, and Student G as individuals who he knew had received photos and videos.

28.  Student E, received a picture via "SnapChat" in which the Respondent was shirtless and wearing a towel. Student did not ask the Respondent to send her that picture, she noted that it made her feel "grossed out", due to the Respondent dating her friend.  Student E could not recall names of others who received photos and videos from the Respondent, but recalled that other females in the Program received them.

AGENCY RECORD
019

29.  Student F received a picture via "SnapChat" of the Respondent and an unknown female sleeping on the Respondent. Student F told investigators that people within the Program have talked to the Respondent before about his comments, referring to him (the Respondent) talking openly about his romantic life, and to watch what he is sending people over social media.

30.  The witnesses interviewed stated the pictures and videos were unwanted and they did not ask the Respondent to send them those pictures.

31.  Student G received two videos from the Respondent via "SnapChat" showing the Respondent engaging in sexual intercourse with an unknown female.  Student G confronted the Respondent about sending them and told him to stop and do not send him anymore. The videos made Student G feel uncomfortable.

32.  Student I received a photo from the Respondent via "SnapChat" showing the Respondent shirtless and a video of the Respondent engaging in sexual intercourse with an unknown female. Student I stated "you could see, girls back, genitals, moaning".

33.  Investigators asked the Respondent if he sent shirtless "SnapChat's" and/or videos of him engaging in sexual intercourse to member of the Program. The Respondent told investigators he was possibly intoxicated and didn't recall sending them.

34.  The Respondent called the Complainant on January 15, 2019 after learning the Complainant was talking about filing a "SHARP" (Sexual Harassment and Assault Prevention Program, which is a complaint process within the Program separate from OEO complaint process) complaint against him (the Respondent). The Respondent told the Complainant on the phone, that if she (the Complainant) brought a "SHARP" case against him, he has evidence to show that he did not sexually assault her, that everything between them was consensual and that he would come out on top. Based on this information investigators found the Respondent was attempting to intimidate the Complainant into not filing a complaint.

35.  The Respondent told investigators he also called Student C after calling the Complainant to inquire if Student C was helping the Complainant file a "SHARP" complainant.

36.  The Respondent sent Student C a "Facebook" message about Student C and their involvement in helping the Complainant bring a complaint forward;

| | |
|---|---|
| The Respondent: | Call me when you get this |
| Student C: | I got class until 9. Have time to talk in person tomorrow? |

AGENCY RECORD
020

| The Respondent: | I need to talk to you today, head some stuff and need to address this issue before anything irrational is done |
| Student C: | Relax its not my decision and she's over it. I'm just a little surprised; But if you still want to talk I can call you back after my lab |
| The Respondent: | Call me regardless, it's very unbrotherly to take one persons word over another before even fully getting the whole scope of said issue; |

Based on this information investigators found the Respondent was attempting to intimidate Student C into not supporting the Complainant in the reporting process.

37. On January 18, 2019, the Complainant, accompanied by Student C, went to file a sexual harassment complaint against the Respondent with the Program.

38. After learning of the Complainant filing a complaint against him, the Respondent sent Student D the following text messages:

| The Respondent: | But I don't need an investigation on my name is what im saying dude; Im asking that if I need evidence or back up if you'd be the guy to help me out |
| Student D: | What evidence? Like I was not involved in what occurred between you guys. Me and her dated and things ended like relationship do |
| The Respondent: | No I mean "[the Respondent] wouldn't do that" type deal |
| Student D: | If you want to call me as a character witness then I'll answer whatever they ask me. But I don't know what happened between you two. Like she's my ex and I hold no hard feelings. Like I'm friend to both of you |

OEO found that the Respondent attempted to influence a witness, when he contacted Student D.

39. The Respondent also sent Student A, a Facebook message about the Complainant and how her (the Complainant) bringing allegations against him was "reprisal" for him pushing the Complainant away romantically. OEO found that the Respondent attempted to damage the Complainant's reputation because she engaged in OEO's process by filing a complaint.

AGENCY RECORD
021

40.   The Complainant told investigators that she has been impacted on a social and emotional level.  She expressed worry about gossip and rumors in the Program, and being labeled a "[Program] slut."  The Complainant told investigators she feels like this situation has been "eating away at my mental health."  The Complainant told investigators she feels uncomfortable in the Program with everyone hearing these rumors from the Respondent about their sexual activities.

41.   The Respondent's conduct, as found to have occurred in Findings 21, 23, 26, 34, and 40 above intimidating, hostile, and offensive educational environment for the Complainant, limited her ability to feel safe on and off campus, and emotionally impacted her.

42.   The Respondent's conduct, as found to have occurred in Findings 24, 25, and 27-32 above, created a hostile and offensive educational environment for his fellow Program members.

43.   Based on findings 34-36, 38, and 39 above, investigators determined that the Respondent attempted to interfere with the investigation on three separate occasions.  Investigators also determined that the Respondent attempted to intimidate the Complaint into not filing a complaint and threatened to damage her reputation within the Program. Investigators found that the Respondent's attempts to interfere in the investigation did not ultimately impact the outcome of the investigation as each of the individuals that the Respondent attempted to influence cooperated with the investigation and provided credible, truthful information, despite the Respondent's efforts.  OEO finds that the Respondent did interfere with the investigation and his interference could have had impacted the witnesses willingness to provide truthful information.

Conclusion

The following is OEO's conclusion regarding the above findings and their applicability to the WSU Policy Prohibiting Discrimination, Sexual Harassment, and Sexual Misconduct, Executive Policy 15 (EP 15).

OEO has jurisdiction to investigate matters in which EP 15 is implicated by students, faculty, staff, or others having an association with WSU.  EP 15 applies whether the conduct occurs on or off the WSU campus, if the continuing effects of the conduct have the potential to unreasonably interfere with or limit an individual's work, academic performance, living environment, personal security, or participation in any WSU activity.  OEO has jurisdiction to investigate the alleged conduct because, per Findings 1 and 2 above, the Respondent and the Complainant were WSU undergraduate students, and the conduct had the potential to interfere with the Complainant's academic performance, personal security, and participation in WSU activities.

AGENCY RECORD
022

This investigation was initiated to determine whether or not the Respondent violated EP 15. Per EP 15, sexual harassment is a form of discrimination based on sex and/or gender and is prohibited by this policy.  Sexual misconduct, which includes sexual assault and other sexual violence, is a form of sexual harassment and is also prohibited by this policy. Additionally, EP 15 states sexual misconduct is an egregious form of sexual discrimination/sexual harassment that includes nonconsensual sexual contact, including sexual intercourse and sexual assault.  Sexual harassment creates a hostile environment when behavior is sufficiently severe, persistent, or pervasive to interfere with an individual's work or educational performance, or creates an intimidating, hostile, or offensive work or educational environment.

The conduct described in Finding 21 and 22 above meets the definition of prohibited sexual harassment because the Respondent subjected the Complainant to unwanted request to reengage in a sexual relationship with the Respondent, and when the Complainant did not want to, the Respondent began subjecting the Complainant to negative treatment causing increased anxiety in the Complainant. Which made her limit her participation in the Program, and impacted her friendships with fellow program members, and personal life. OEO concludes that the Respondent's conduct toward the Complainant did violate the WSU Policy Prohibiting Discrimination, Sexual Harassment, and Sexual Misconduct, Executive Policy #15 (EP 15).

The conduct described in Finding 24, 25, and 27-32 above meets the definition of prohibited discriminatory harassment because the Respondent subjected fellow program members Student E, Student F, Student G, Student I, and Student K to uninvited pictures and/or videos depicting sexual activities of the Respondent with unknown females. Student E-Student I, stated they do not ask the Respondent to send them any pictures or videos of a sexual nature, the pictures and videos were unwanted and made them feel uncomfortable and created a hostile environment for other Program members. OEO concluded that the Respondent's conduct towards other members of the Program did violate the WSU Policy Prohibiting Discrimination, Sexual Harassment, and Sexual Misconduct, Executive Policy #15 (EP 15) by creating a hostile environment that interfered with their education environment.

The conduct described in Finding 34-36 and 38-39 above meets the definition of prohibited interference because the Respondent subjected the Complainant and Student C to conduct in which he (the Respondent) attempted to dissuade the Complainant and Student C from reporting and filing a complaint with the Program and with OEO. The Complainant told investigators following her phone call from the Respondent, she was very scared about coming forward and how it would impact her reputation within the Program. OEO determined that the Respondent did engage in interference and as result, OEO concluded the Respondent did violate the WSU Policy Prohibiting Discrimination, Sexual Harassment, and Sexual Misconduct, Executive Policy #15 (EP 15).

**Thus, based on the foregoing findings and the totality of the investigation OEO concludes that the Respondent's conduct toward the Complainant did violate the**

AGENCY RECORD
023

**WSU Policy Prohibiting Discrimination, Sexual Harassment, and Sexual Misconduct, Executive Policy #15 (EP 15).**  Therefore, OEO refers this matter to the Center for Community Standards (CCS) pursuant to OEO's Procedural Guidelines.

### Recommendations

1. The Center for Community Standards should review this report for possible violations of WSU Policies other than EP 15.

### Report Disclaimer

OEO's findings, conclusion, and recommendation in this matter are based on EP 15, and interpretations of EP 15, and represent a final conclusion as to whether EP 15 was implicated. Nothing in this report is based upon, or intended to be understood as a statement or interpretation of law, or any other WSU policy.

| | |
|---|---|
| **From:** | Brooks, Rachel M |
| **To:** | ██████████  ██████████ |
| **Cc:** | Metzner, Karen |
| **Subject:** | WSU Office for Equal Opportunity Matter No. |
| **Date:** | Thursday, June 13, 2019 12:37:47 PM |
| **Attachments:** | Investigati██ ████████ ███6-021.pdf |

Dear ██████

Attached is a copy of this office's investigative report in the matter involving you. All student names, including your own, were redacted to protect student privacy. The Respondent and the Center for Community Standards will also receive a copy of this memorandum. Participants are reminded of the policies prohibiting retaliation, which apply to all individuals involved in this process. The Respondent will be reminded that you do not wish for any future contact from him/her/them.

The Center for Community Standards may reach out to you for additional proceedings. Please know, should this matter proceed to a formal administrative hearing, your participation is important to that process. Lack of participation may have an impact on the outcome. If you have any questions about those hearings, please contact the Center for Community Standards at 509-335-4532. I have also copied the Director of the Center for Community Standards, Karen Metzner, on this email.

Please also find the attached list of resources that may be available to you. Please feel free to contact me if you have any questions.

Regards,


Rachel M. Brooks
EEO Coordinator & Investigator
Office for Equal Opportunity
Washington State University
509-335-8288 / Rachel.M.Brooks@wsu.edu / oeo.wsu.edu


*This communication, including any attachment, is intended solely for the entity or individual(s) to whom it is addressed and may contain confidential information. If you have received this message in error, please notify me immediately and delete this message. Any disclosure, copying, distribution, or other use of the contents of this message is prohibited.

| From: | Brooks, Rachel M |
|---|---|
| To: | Fleetwood, Patrick Michael |
| Cc: | Metzner, Karen |
| Subject: | WSU Office for Equal Opportunity Matter No. 2019-021 |
| Date: | Thursday, June 13, 2019 12:37:36 PM |
| Attachments: | image .png Investigation Report 2019-021.pdf |

Dear Patrick,

Attached is a copy of this office's investigative report in the matter involving you. Names, including your own, were redacted to protect privacy. The Complainant and the Center for Community Standards will also receive a copy of this memorandum. The Center for Community Standards may reach out to you for additional proceedings. Please know, should this matter proceed to a formal administrative hearing, your participation is important to that process. Lack of participation may have an impact on the outcome. If you have any questions about those hearings, please contact the Center for Community Standards at 509-335-4532. I have also copied the Director of the Center for Community Standards, Karen Metzner, on this email.

Please know that the provisions, of which you were informed in the notification letter from this office dated January 31, 2019, remain effective. It is my understanding that the Complainant does not want you to contact her further. Do not attempt to contact the Complainant or anyone involved in the alleged incident directly, through a third party, or through any other means. Participants are also reminded that retaliation against investigation participants, or those who are believed to have participated in this investigation, is prohibited.

Please also find the attached list of resources that may be available to you.
Please make sure to reach out to CougHealth Services, specially CAPS (Counseling and Psychological Services)

Regards,

Rachel M. Brooks
EEO Coordinator & Investigator
Office for Equal Opportunity
Washington State University
509-335-8288 / Rachel.M.Brooks@wsu.edu / oeo.wsu.edu

*This communication, including any attachment, is intended solely for the entity or individual(s) to whom it is addressed and may contain confidential information. If you have received this message in error, please notify me immediately and delete this message. Any disclosure, copying, distribution, or other use of the contents of this message is prohibited.

**The following resources may be available on campus and in the local community:**

In most instances, care providers from the following resources can talk with you confidentially:

**WSU Cougar Health Services:** 509-335-3575
WSU Cougar Health Services offers a range of health services for students on campus, including confidential and private Counseling and Psychological Services, Health Promotion, Medical Clinic, Pharmacy, and Vision Clinic.
https://cougarhealth.wsu.edu

**Community Health Services:**
For information about free and low-cost health care options visit:
http://freeclinicdirectory.org/washington_care/whitman_wa_county.html

The following WSU offices will share information about your situation with others only on a need-to-know basis, but cannot guarantee confidentiality, as a matter of law:

**Office for Equal Opportunity (OEO):** 509-335-8288
This office works closely with the WSU Office of Student Conduct (OSC) on student conduct cases involving discrimination, sexual harassment, and sexual misconduct. OEO conducts preliminary investigations, makes findings of fact, determines whether WSU Policy Prohibiting Discrimination, Sexual Harassment, and Sexual Misconduct (Executive Policy 15) was violated, and makes recommendations to OSC about further disciplinary actions. OEO also can provide you contact information to file a complaint with state and/or federal agencies. For information about OEO's processes, visit oeo.wsu.edu.

**Center for Community Standards (CCS):** 509-335-4532
CCS works closely with OEO on student conduct cases involving discrimination, sexual harassment, and sexual misconduct. CCS participates in preliminary investigative meetings and addresses any disciplinary action, as appropriate, after the preliminary investigation is complete. CCS administers the student conduct system, and addresses potential violations of WSU's Standards of Conduct for Students. You may contact CCS at 509-335-4532. For information about CCS's processes and the Standards of Conduct, visit: communitystandards.wsu.edu and handbook.wsu.edu.

**Dean of Students:** 509-335-5757
The Dean of Students' Office can assist you in coordinating resources and support, such as making changes in classes or your schedule. This office also can help you resolve housing issues, notify faculty if you will be leaving campus for a short time, and assist you with other challenges you may encounter. This office also has Student Conduct Advisors available to help students understand the conduct process, resources, and their options. For additional information, visit: deanofstudents.wsu.edu.

Please be advised that WSU's processes under Executive Policy 15 and the Standards of Conduct for Students are separate from any criminal process and can be pursued simultaneously.

· **WSU Police Department** 509-335-8549

· **City of Pullman Police Department** 509-334-0802

Additionally, please be advised that WSU's student conduct process includes support and protection for students, including, but not limited to, the option to consult an advisor during the process.

Also, WSU policy prohibits retaliation against anyone who participates in the investigative and disciplinary processes mentioned above. Retaliation will be regarded as independent grounds for investigation, separate from any allegations of discrimination, sexual harassment, or sexual misconduct.

**Additional Resources:**

**Northwest Justice Project Free Legal Hotline (CLEAR):** CLEAR is Washington state's publicly funded legal aid program. CLEAR provides free legal assistance and representation to those who qualify on the basis of income. To access CLEAR call 1-888-201-1014 or apply on-line at http://nwjustice.org/.

028

| | |
|---|---|
| **From:** | Brooks, Rachel M |
| **To:** | Metzner, Karen |
| **Cc:** | Ashkannejhad, Holly C |
| **Subject:** | WSU Office for Equal Opportunity Matter No. 2019-021 |
| **Date:** | Thursday, June 13, 2019 12:39:48 PM |
| **Attachments:** | 2019-021 � � report.pdf<br>image �__.png |

Dear Karen,

Attached is an unredacted copy of OEO's investigative report in which Patrick Fleetwood was the respondent.  The Complainant and Respondent will receive a copy with student names redacted.

Please feel free to contact me if you have any questions or concerns.

Regards,



Rachel M. Brooks
EEO Coordinator & Investigator
Office for Equal Opportunity
Washington State University
509-335-8288 / Rachel.M.Brooks@wsu.edu / oeo.wsu.edu

**This communication, including any attachment, is intended solely for the entity or individual(s) to whom it is addressed and may contain confidential information.  If you have received this message in error, please notify me immediately and delete this message.  Any disclosure, copying, distribution, or other use of the contents of this message is prohibited.

# Submission to the
# Office for Equal Opportunity

---

**Submission: G**

**Description: Respondent's written statement and SnapChat messages between him (the Respondent) and Complainant.**

**Submitted by: Respondent**

**Date Submitted: February 10, 2019**

**Date of Document: January 23, 2019**

**Notes (if applicable):**

Patrick Fleetwood
Title IX investigation
Personal Statement
January 23, 2019

     I would like to first start by starting I am extremely embarrassed that of all people I am the one in this situation having to defend myself against a SHARP allegation. I have been raised with five sisters and show respect for the women in my life.

     Here is to the best of my recollection of the events regarding the relationship between ████ and myself.

     During the fall break, around November 16th, communication started between ████ and I, initially through Instagram. This quickly went to Snapchat for the majority of the time that she and I kept in touch. A lot of her messages directly showed her hatred of ████ her most recent partner to that of my knowledge (See image 1).

     After Fall break ████ came over to my place on many occasions. Sometimes ████ would be present and egg her to come with him so they could discuss topics back at his place across the street. She often would sleep over at ████ or my place if she found herself in the ████ area after dark.

     She eventually became more comfortable around me and would crack off-color jokes. She introduced me to her favorite shows and music. As she became closer to me, she found out about some of the other women I was involved with. This upset her, but I didn't realize she was looking at our status as "relationship worthy". Quickly her mood changed and she became hostile.

     This is where she began to send me threatening Snapchat photos. She also went to great extents to make me feel uncomfortable around my other friends. She sent me a snapchat of a picture that she took of an SHARP pamphlet back in late November after the Apple Cup. I believe she was trying to taunt me and make me feel uneasy as she jokingly replied "just thought you'd like to see that." She may have sent this to control me or force me to contort to her liking. I did not bend but rather limited my communication with her. ████ can prove that this happened as this pamphlet was at his apartment where ████ sent me this Snapchat photo. The only thing I can remotely link her taunt to my past actions were that she realized that there were many more women involved in my life, meaning that she wasn't getting my full attention (see image 2).

     She also began to create discomfort between myself and ████ going out of her way to tell ████ that she was seeing me: to antagonize him (either to pit him against me or to get back at him for supposedly mistreating her (see image 3). I quickly became upset and went to ████ to clear the air. He said "I already know man, she told me. Don't worry man we are cool." This was during our history class we had together during the Fall semester of 2018.

     I then confronted her at ████ to find out why she was doing this. She was very hesitant discussing this issue with me, but with ██ by her side, they both explained to me that she supposedly wanted to come clean with ████ To which ████ stated she had coffee with him and he left her abruptly. "He left like a bitch" she said. When I look back at this particular incident I think to myself "if ████ has no problems creating strife between myself and

██████ would she have any issues trying to produce legal problems for me today." Many of the cadets I have talk to have repeatedly told me that ██████ is irrational and immature.

On a few occasions ██████ made me feel uncomfortable as she would say sexual things that I would just ignore, hoping she would get the notion I was not interested at the time (see image 4). I also would make excuses so she would not to come over as I was quickly becoming less and less interested in her (see image 5).

Contact between myself and ██████ after this point was minimal due to all the drama that she created. She snapchatted me a video on New Year's Day and wrote "should I leave your ass in 2018?" I did not respond as I didn't know why she would abruptly try to talk to me and continue to antagonize me after it was clear I didn't want to talk to her while I was spending my holiday in Seattle.

On January 9th, I invited ████████████, ███████████, ███████████ and ████████ for sushi. Everyone but ██████ was busy, and she agreed to join me. As we had lunch together, I took a snapchat picture of her while she was eating sushi and jokingly said "it's going to ██████ My intent was to patch-up our previously tense relationship with a little humor. However she quickly responded with "Oh my god why did you send that to him? Did you really send that to ██████ I didn't send it to ██████ only to her while we were eating our sushi and she understood this. I paid for both of our lunches but she paid her half electronically and sent me $10 through Venmo (see images 6 and 7). ██ later claimed that ██████ told him she had denied me sex during this lunch, but that is not true, as I had not requested sex with her. She messaged me shortly after the SHARP lab. Her message was along the lines that I had made her feel uncomfortable and that she wanted to stop making jokes/talking to people. I didn't know what kind of jokes she was talking about so I replied with "ok" and then blocked her on Snapchat. It was apparent that after a second reference to SHARP I did not want to have any more drama with ██████ ██ confronted me about why I had blocked her. At this point it was clear that everything I did was being shared. (see Image 8)

The last communication we had was a phone call on January 15th. I first tried to call ██████ as from what I understood he was the proponent to some of the gossip that I had heard. He did not answer the phone but did respond on Facebook. I told him to call me as it was highly unbrotherly to take another's word without consulting the accused. This was something ██ advised me to do, in order to straighten things out. Later the following morning ██████ and I had a talk after PT. I was abrasive but didn't threaten him in anyway, I just tried to make him understand that he didn't even come to me before assuming I was a crook. He tried to shush me down but I talked over him saying "You have an apparent track record of telling on people without even going to them to figure out what the whole problem was. You got ██████ kicked out and ██████ in trouble." I believe that this confrontation is the reason he decided to retaliate against me.

On Tuesday 15, at around 5:10 pm the same day I tried to call ██████ but she did not answer at first. Minutes later she called me back and I relayed to her "there's been some word out that you and who ever are trying to say that I committed assault on you. I just want you to know that if you bring your argument up that it will not last against the overwhelming evidence I have. Do what you want, but I'm advising you that it won't turn out great for you and I will come out on top." She replied with "I'm not going to report you. I wouldn't do that." I quickly

AGENCY RECORD
032

interjected "well you don't have anything to report me on." - my intent for this phone call was to show ███████ that if she was going to falsely accuse me of a SHARP violation that I was ready to defend myself (see images 9 and 10, 11). I personally felt threatened, as much of this information was being passed to me by others. My friends, ████████████, and ████ ███████, were telling me this gossip through 2nd and 3rd hand accounts. Nothing whatsoever came from the accusers themselves. So I tried to deal with the issue at the lowest level. I had the conversations with ████████ and ████████ because I thought that they were conspiring to create a false accusation that I had assaulted ████████ or forced her to do things that she didn't want to do. This upset me because I have never and would never push anyone to do things they don't want to do. While I had done nothing wrong, I remembered how much time, energy and stress was involved in defending oneself against false accusations as had happened with ████

I want to be clear that I did not tell ████████ or ████████ that I would retaliate in any way if they were to file something against me. I simply told them that I was upset that he did not come directly to me to figure out what the facts were and that it would not end in ████████ favor if she accused me of a SHARP violation as I had overwhelming evidence to contradict her accusation. I did not sexually abuse or assault ████████████ I did not harass, taunt, or blackmail her. Furthermore I expect to see individuals who knowingly make false allegations be held accountable for their actions.



Image 1:



**Brooks, Rachel M**

| | |
|---|---|
| **From:** | Patrick Fleetwood |
| **Sent:** | Thursday, April 4, 2019 12:13 PM |
| **To:** | Brooks, Rachel M |
| **Subject:** | Patrick Fleetwood |





ME

Do you get offended or not like "upsetting and dirty memes"



Bring it on kid

Send a chat

1



You watch parks and rec ?

ME

I watched it and then had no one to watch it with so kinda put it on pause

[gunshots]

Sorry, new ringtone

I watched the whole damn thing solo

Send a chat

2

AGENCY RECORD
035



The amount of patience I have with people lol

Like ███████ said I didn't deserve my scholarship
    ███████ said I was a tiny heart and
    ███████ should've been on the team instead of me

ME
Wait are you for real? To your face?

Yes.
Literally no filter

3

AGENCY RECORD
036



Big bet

Ooo you think I'm not coming thru ?

ME
I donno

Well I am so

W

ME
Yuuup what's up?

If you want haha
I was just wondering

ME
Ah okie

Haha
Okay
You don't have to go into detail or anything-
some things are better left unsaid.
I know all I need to know, I'll talk to him
when I'm back and do what I have to do
But fuuuuu Im sick of being treated like shit

Send a chat

4

AGENCY RECORD
037



W/ ███ ?

ME
Yuuup what's up?

██●
If you want haha
I was just wondering

ME
Ah okie

██●
Haha
Okay
You don't have to go into detail or anything-
some things are better left unsaid.
I know all I need to know, I'll talk to him
when I'm back and do what I have to do
But fuuuuu Im sick of being treated like shit

ME
Oh boy

██●
Lol
First the ranger challenge bs now this
I'm loosing faith in men*kind quick

Send a chat

5

AGENCY RECORD
038



You don't have to go into detail or anything- some things are better left unsaid.
I know all I need to know, I'll talk to him when I'm back and do what I have to do
But fuuuuu Im sick of being treated like shit

ME
Oh boy

Lol
First the ranger challenge bs now this
I'm loosing faith in men*kind quick

ME
Oh gosh... don't say that 😊 😊 😊

Give me one reason not to give up for forever haha
One just one
One reason why chivalry isn't dead

ME
I cook a good steak lol
And the notebook!

Send a chat

AGENCY RECORD
039



Give me one reason not to give up for forever haha
One just one
One reason why chivalry isn't dead

**ME**
I cook a good steak lol
And the notebook!

That's a fucking movie ▮
a real reason
Before I become a nun

**ME**
Oh fuck that
Don't do that
Life would not be fun

Fuck sex

**ME**
Oh..?

That sentence was ironically contradictory
But seriously-why is chivalry not dead?

Send a chat

7

AGENCY RECORD
040



Well guys in college are not of the quality you'll find in the outside world
Honestly.

Haha
Not from fucking DuPont
Or whatever that place is

ME
Oooooofff
Don't say that 😚 😚 😚 😚 😚

I never even heard of it before he told me he lived there
There's two qualities I value the most in life; honesty and hard work
But damn do people have a hard time with the first one

ME
Honestly is hard for many because they want to not hurt feelings but also don't want to loose things they like

Send a chat

8

AGENCY RECORD
041



I haven't even been able to tell my family the real reason I'm not going to be with him
It's embarrassing-this guy you talked up so much who you found out is going behind your back?

ME
It's not like he didn't think you weren't hot or anything....
Just he didn't know if he could make it work out
Ya know?

That's so consoling

ME
What's that..?

What do you mean left with nothing

ME
Like... "I can't see you no more."
And then has nothing to fall back on
Like for real single and alone

Send a chat

9

AGENCY RECORD
042



Yeah
Probably best for him

ME
Y'all shoulda just been FWB
TBH

EW.
No
I don't settle for that

ME
what's wrong with that?
Oh

What's wrong is you're fuck buddies

ME
What's wrong wit dat doe

I just am sick of empty promises and
vagueness and not feeling like you can relax
with someone who has your best interest in
mind and will truly care for you

ME

Send a chat

10

AGENCY RECORD
043



Fwb have that!

The reason I don't get friends with benefits is because a true friends has your best interest in mind
As nice as it might be, fucking just messes everything up
Tell me, did he ever mention intentions with me?

ME
Yes and no ish? It has its place to sho
I don't wanna ask:/
He'll catch on

Or was he just flexing his testosterone and talking about how many females he's gotten with and will get with
Don't answer lol
Ayee todos chicos son pendejos wey!!!

ME
Guys need physical stuff... I highly dought he used you for boasting...

Send a chat

11

AGENCY RECORD
044



Guys need physical stuff... I highly dought
he used you for boasting...
And what's that last thing say hahaha

I just think all men are pendejos

ME
Ahhhh nooooo pendejo

Do you even know what that means

ME
Bitch

And btw when I'm mad I cuss in Spanish
Dumbass, asshole, all of the above lol

ME
Need me to leave ya be
?

No it's good to talk
I will get over it

ME
I'd send memes

12

AGENCY RECORD
045



Tell me things about ▮▮▮▮ that will make me hate him! Not like relationship related things but just things in general
Like how he is as a leader, his persona etc

ME
Jesus that's so damn toxic

Fine I won't make you do that

ME
That's like some shit you don't need rn 😂 😂

Well I like it because it makes me feel like I dodged a bullet

ME
No need to worry
Also do you like Christmas stuff?

Like what kind

ME
Snow
Snowmen
Stockings
Sweaters

Send a chat

13

AGENCY RECORD
046



wut?

I'm a smart boi

I was just about to open my friends snap
and you snapped me right as I was so I
opened your snap and then didn't see it

ME

Lol I said

You just watched the best of ron Swanson
YouTube video.

Lol

Ohhhh didn't see your friends lol

Ron Swanson is everything

"Don't half ass two things. Whole as one"

I just downloaded tinder again

And after a solid 10 minutes of swiping left

Ive decided to delete it

ME

Yikes... tinder is a dangerous game lol

Loooot of bad shit

Little good shit

14

AGENCY RECORD
047



Yikes... tinder is a dangerous game lol
Loooot of bad shit
Little good shit

Everyone looks thirsty-and when someone is thirsty I'm automatically turned off

ME
Lmao for real? You're so strange honestly

Why is that

NOVEMBER 23RD, 2018

ME
I mean. I don't know just a little different I guess

Okay explain

ME
I don't wanna make you all red and blush haha

I don't blush I roll my eyes
Idk but you may proceed in explaining why I'm so called "different"

Send a chat

15

AGENCY RECORD
048



AGENCY RECORD
049



ME
Oooof
Um.
So

Kind of a slap in the face

ME
I know but ▮ don't freak out

Hard not to
You're right though
Wyaaa

ME
I'm at staircase one

Send a chat

17

AGENCY RECORD
050



18

AGENCY RECORD
051



19



AGENCY RECORD
053



AGENCY RECORD
054



22

AGENCY RECORD
055



AGENCY RECORD
056



AGENCY RECORD
057



25

AGENCY RECORD
058



Wha

ME

I just got in the shower



Haha

Lmk when you're done with

The sooner the better cause

ME

Ah ok

26



Wha

ME
I just got in the shower

Haha
Lmk when you're done with your female

The sooner the better cause I might dip

ME
Ah ok

Bueno
I'm dippin 👋

Image 2:

W

ME
Yuuup what's up?

If you want haha
I was just wondering

ME
Ah okie

Haha
Okay
You don't have to go into detail or anything-
some things are better left unsaid.
I know all I need to know, I'll talk to him
when I'm back and do what I have to do
But fuuuuu Im sick of being treated like shit

ME
Oh boy

Lol
First the ranger challenge bs now this
I'm loosing faith in men*kind quick

Image 3:

The amount of patience I have with people
lol

NOVEMBER 20TH, 2018

Like                said I didn't deserve my
scholarship
            said I was a tiny heart and
            should've been on the team
instead of me

ME
Wait are you for real? To your face?

Yes.
Literally no filter

Image 3 continued:



Image 4:

image 5:



Lol noooooo
I gotta finish this dang paper that's due at
12 😂😂😂😵😵

wait so yes or no

ME
Tomorrow maybe if I get all my work done B
But if you need your belt I can get it to you
tomorrow day:)

Deal

NOVEMBER 27TH, 2015

Oh btw what time should I come over

ME
Hmm I'll message you when I get a good
amount of my paper done😌

Aight
So what's the verdict

ME
I just got out of a writing assessment

JANUARY 9TH

Hell yea I love sushi

ME
Aight

What time ?
I have class 1-3

ME
Hmmm lemme think
Where u at

Cub

ME
Welp we can just walk there if you want
It's next to Taco Bell

I like walking sure
Bn ?

Image 5 continued

Image 6:

Image 7:



Image 9

Image 9

Image 10



Image 11

# Submission to the
# Office for Equal Opportunity

Submission: F

Description: Sworn statements by the Complainant and Student C, were given to LTC. Hobbs.

Submitted by: LTC Hobbs (WSU–ROTC)

Date Submitted: February 5, 2019

Date of Document: January 18, 2019

Notes (if applicable):

**SWORN STATEMENT**

For use of this form, see AR 190-45; the proponent agency is PMG.

**PRIVACY ACT STATEMENT**

**AUTHORITY:** Title 10, USC Section 301; Title 5, USC Section 2951; E.O. 9397 Social Security Number (SSN).

**PRINCIPAL PURPOSE:** To document potential criminal activity involving the U.S. Army, and to allow Army officials to maintain discipline, law and order through investigation of complaints and incidents.

**ROUTINE USES:** Information provided may be further disclosed to federal, state, local, and foreign government law enforcement agencies, prosecutors, courts, child protective services, victims, witnesses, the Department of Veterans Affairs, and the Office of Personnel Management. Information provided may be used for determinations regarding judicial or non-judicial punishment, other administrative disciplinary actions, security clearances, recruitment, retention, placement, and other personnel actions.

**DISCLOSURE:** Disclosure of your SSN and other information is voluntary.

| 1. LOCATION Washington State University | 2. DATE (YYYYMMDD) 20190118 | 3. TIME 10:40 | 4. FILE NUMBER |
|---|---|---|---|
| 5. LAST NAME, FIRST NAME, MIDDLE NAME ▓▓▓▓ | 6. SSN ▓▓▓▓ | | 7. GRADE/STATUS CDT |

8. ORGANIZATION OR ADDRESS  Washington State University Army ROTC

9. I, ▓▓▓▓ , WANT TO MAKE THE FOLLOWING STATEMENT UNDER OATH:

On ~~2018~~ 15Jan2019 CDT ▓▓▓▓ and I were in the CUB waiting for collar guard practice. We ~~it~~ were talking about frustrations we were having and she brought up CDT Fleetwood had asked her out and she had said no. She (CDT ▓▓▓▓) then told me that he had continued go after her even after she had made it known she had no intrest. later during practice Myself and CDT ▓▓▓▓ recieved multipul calls from CDT Fleetwood (as well as messages). When CDT ▓▓▓▓ was called, she answered and left practice. after returning to practice, she told me that he had threatened her with her reputation within the Cougar batallion if she chose to report him for his actions. when I checked my phone the messages from CDT Fleetwood seemed verry polite. He said he wanted to tell me his side of the story and ~~for practice there in cougar after our orientation after~~ CDT to call him after practice. After practice, CDT ▓▓▓▓ CDT ▓▓▓▓ and myself went ▓▓▓ to the CUB. Here, CDT ▓▓▓▓ told us that ~~after she and CDT~~ her and

| 10. EXHIBIT | 11. INITIALS OF PERSON MAKING STATEMENT ▓▓▓▓ | PAGE 1 OF 3 PAGES |
|---|---|---|

ADDITIONAL PAGES MUST CONTAIN THE HEADING "STATEMENT OF ___∅___ TAKEN AT ___∅___ DATED _____

THE BOTTOM OF EACH ADDITIONAL PAGE MUST BEAR THE INITIALS OF THE PERSON MAKING THE STATEMENT, AND PAGE NUMBER MUST BE INDICATED.

DA FORM 2823, NOV 2006     PREVIOUS EDITIONS ARE OBSOLETE     APD LC v1.01ES

AGENCY RECORD
066

**USE THIS PAGE IF NEEDED.  IF THIS PAGE IS NOT NEEDED, PLEASE PROCEED TO FINAL PAGE OF THIS FORM.**

STATEMENT OF ▮▮▮▮▮▮▮▮▮▮  TAKEN AT  WSU          DATED  19 Jan 2019

9. STATEMENT *(Continued)*

CDT Fleetwood had "hooked up" and that he had been "bullying" her because she had refused to re-enter/ [into a relationship] sleep with him again. ~~these~~ The incidents of bullying CDT ▮▮▮▮▮▮ Mentioned Included verbal things like, "you're never going to get Contracted" and "LtCol Hobbs was Lying to you about ~~your~~ wanting you to get an airborne slot." at this point I believed that CDT Fleetwoods actions qualified as Sexual harasment. I than advised CDT ▮▮▮▮▮▮▮ that she should go to cadre and report CDT Fleetwood's actions. She stated that she did not want to be thought of as "The unit slut" or "The Girl who kept Someone from Commisioning"(along those lines). I told CDT Fleetwood that I wanted to talk to him In person "tomorrow" which was 16 Jan 2019. After PT on 16 Jan 2019 I went up to CDT Fleetwood wanting to hear what he had to say. When I tried to talk to him he acted verbally aggressive twards me saying "you don't know anything/stay out of it." after that he said "You have a history of reporting this stuff to Cadre." in reference to an incident last year when my now fiancé CDT ▮▮▮▮▮▮ reported a ~~lewd~~ nude photo that was posted on ROTC Social media. I became angry and said "Stop talking" he said a few words which I cant remember and then said "now I'm mad" and left the building (to my knowledge) ✗ I had messaged CDT ▮▮▮▮▮▮ about needing to talk to him [confronting CDT] about ~~CDT~~ Fleetwood before ~~1600~~ Collar guard the day before (15 Jan 2019). at aproximatly 16 Jan 2019 myself and CDT ▮▮▮▮▮▮ discussed the Incident. I expressed that Something needed to be done and he agreed but was conflicted because CDT Fleetwood and himself had been friends for a long time. He also informed me that CDT Fleetwood had slept with multipul other MS 1s but CDT ▮▮▮▮▮▮ chose to keep their names Confidential. CDT ▮▮▮▮▮▮ also expressed that he has some serious issues with

INITIALS OF PERSON MAKING STATEMENT ▮▮▮▮▮▮

DA FORM 2823, NOV 2006                    PAGE  2  OF  3  PAGES

APD LC v1.01 ES

AGENCY RECORD
067

STATEMENT OF ▓▓▓▓▓▓▓▓▓ TAKEN AT WSC DATED 19 Jan 2019

9. STATEMENT *(Continued)*

CDT Fleetwoods Charicter and that he had talked to / tried to give CDT Fleetwood advise which he believes CDT Fleetwood Completely blew off. (This pertains to RDT Fleetwood past relationships and seeking relationship advice from CDT ▓▓▓▓. Later that night I expressed my frustration about CDT Fleetwood to CDT ▓▓▓▓. I expressed that someone needed to come forward. I decided to talk to CDT ▓▓▓▓ for advice. we met at the library at aproximatly 1800 16 Jan 2019. He told me that he thinks I should bring it to the attention of Cadre. He also expressed that he had heard CDT Fleetwood say Sexist things in the past that had continued but were spread out over time. The next night after Lab, CDT ▓▓▓▓, CDT ▓▓▓▓, CDT ▓▓▓▓, and myself met in the library at aproximatley 1700 17 Jan2019. we discussed what happened and agreed something had to be Said. CDT ▓▓▓▓ expressed her fear of retaliation to me over Messenger (App) and then said she was willing to come forward with me to cadre about the Issues at hand. As far as I know CDT Fleetwood thinks I am the only one coming forward. at aproximatly 0900 18 Jan 2019 I looked around the 4th floor of avery to make Sure CDT Fleetwood wasent present, messaged CDT ▓▓▓▓ that "it's clear" and we approached MSG ▓▓▓▓

nothing follows

**AFFIDAVIT**

I, ▓▓▓▓▓▓▓▓▓ , HAVE READ OR HAVE HAD READ TO ME THIS STATEMENT WHICH BEGINS ON PAGE 1, AND ENDS ON PAGE __3__. I FULLY UNDERSTAND THE CONTENTS OF THE ENTIRE STATEMENT MADE BY ME. THE STATEMENT IS TRUE. I HAVE INITIALED ALL CORRECTIONS AND HAVE INITIALED THE BOTTOM OF EACH PAGE CONTAINING THE STATEMENT. I HAVE MADE THIS STATEMENT FREELY WITHOUT HOPE OF BENEFIT OR REWARD, WITHOUT THREAT OF PUNISHMENT, AND WITHOUT COERCION, UNLAWFUL INFLUENCE, OR UNLAWFUL INDUCEMENT.

▓▓▓▓▓▓▓▓▓
(Signature of Person Making Statement)

WITNESSES:

▓▓▓▓
SFC Steigle Brian
WSU ROTC
ORGANIZATION OR ADDRESS

Subscribed and sworn to before me, a person authorized by law to administer oaths, this __18__ day of __Jan__, __19__ at WSU ROTC

▓▓▓▓
(Signature of Person Administering Oath)

Pauley, Bruce J.
(Typed Name of Person Administering Oath)

ORGANIZATION OR ADDRESS

(Authority To Administer Oaths)

INITIALS OF PERSON MAKING STATEMENT ▓▓▓▓

PAGE __3__ OF __3__ PAGES

DA FORM 2823, NOV 2006

APD LC v1.01ES

AGENCY RECORD
068

**SWORN STATEMENT**

For use of this form, see AR 190-45; the proponent agency is PMG.

**PRIVACY ACT STATEMENT**

| | |
|---|---|
| **AUTHORITY:** | Title 10, USC Section 301; Title 5, USC Section 2951; E.O. 9397 Social Security Number (SSN). |
| **PRINCIPAL PURPOSE:** | To document potential criminal activity involving the U.S. Army, and to allow Army officials to maintain discipline, law and order through investigation of complaints and incidents. |
| **ROUTINE USES:** | Information provided may be further disclosed to federal, state, local, and foreign government law enforcement agencies, prosecutors, courts, child protective services, victims, witnesses, the Department of Veterans Affairs, and the Office of Personnel Management. Information provided may be used for determinations regarding judicial or non-judicial punishment, other administrative disciplinary actions, security clearances, recruitment, retention, placement, and other personnel actions. |
| **DISCLOSURE:** | Disclosure of your SSN and other information is voluntary. |

| 1. LOCATION Washington State ~~University~~ University | 2. DATE (YYYYMMDD) 20190118 | 3. TIME 1129 | 4. FILE NUMBER |
|---|---|---|---|
| 5. LAST NAME, FIRST NAME, MIDDLE NAME ████████ | 6. SSN ████████ | | 7. GRADE/STATUS COT |

8. ORGANIZATION OR ADDRESS
WSU ROTC

9. I, _____████_____, WANT TO MAKE THE FOLLOWING STATEMENT UNDER OATH:

I have character concerns about Cadet Patrick Fleetwood, specifically regarding his sexist behavior towards women. From the 23rd of November (2018) to approximately the 7th of December (2018), I had (consensual) sexual relations with cadet Fleetwood. His actions towards me after I wanted to stop having sex concerned me however. Not only did I find out he had sex with well over 30 women that semester, he was also involved with two other MS1 cadets: ████████ and ████████ ████. I do not know if they left the program because of him, but his predatorial behavior of pursuing the newest/youngest freshman in our program concerns me about his professionalism as an officer and whether or not he will know his limits and potentially prey on some private right out of basic training whose new to the program, have sex with her, leave her, then ruin her reputation. That leads me to my next point — after Cadet Fleetwood was denied sexual favors

| 10. EXHIBIT | 11. INITIALS OF PERSON MAKING STATEMENT ████ | PAGE 1 OF 3 PAGES |
|---|---|---|

ADDITIONAL PAGES MUST CONTAIN THE HEADING "STATEMENT OF _____ TAKEN AT _____ DATED _____

THE BOTTOM OF EACH ADDITIONAL PAGE MUST BEAR THE INITIALS OF THE PERSON MAKING THE STATEMENT, AND PAGE NUMBER MUST BE INDICATED.

| DA FORM 2823, NOV 2006 | PREVIOUS EDITIONS ARE OBSOLETE | APD LC v1.01ES |
|---|---|---|

AGENCY RECORD
069

| USE THIS PAGE IF NEEDED. IF THIS PAGE IS NOT NEEDED, PLEASE PROCEED TO FINAL PAGE OF THIS FORM. |

STATEMENT OF ██████████    TAKEN AT __WSU__    DATED __20190118__

9. STATEMENT (Continued)

from me, he decided to share explicit content to other cadets in the program about what transpired between us. He would joke to other MS4's at PT about it, made sexual references and comments — in and out of uniform, and in general ripped apart my reputation by spreading these explicit details — some true and some not so true. This behavior concerned me deeply because it made me realize why someone would take their own life due to another person destroying their reputation. I never personally had these thoughts, but to realize the severity of his gossip could potentially lead someone to do that was a scary thought for me and for the people he could potentially effect. Furthermore, on January 9th, 2019, Cadet Fleetwood Fleetwood invited me to grab lunch. Seeing it as a friendly gesture, and since we were in the same friend group, I agreed to go to Red Bento's in Pullman, WA with him. I noticed that he was acting way more nice than usual and then he asked if I wanted to resume our sexual behavior. When I denied him he was persistent and kept asking and flirting until it finally sunk in. Not only that, I messaged him via snapchat the night of Thursday the 10th of January (2019) to tell him to stop talking about us sexually to others. He said okay but then immediately following that, he blocked me and started openly bullying me in front of other cadets, while still continuing the sexual related rumors. He would say things like "the cadre are lying to you about your scholarship being upgraded" or "the cadre are lying to you about an airborne slot for you" or "if you want

INITIALS OF PERSON MAKING STATEMENT ██████

PAGE __2__ OF __3__ PAGES

DA FORM 2823, NOV 2006

APD LC v1.01ES

AGENCY RECORD
070

STATEMENT OF ███████████    TAKEN AT WSU    DATED 20190118

9. STATEMENT *(Continued)*

to get into a sorority you can't be so self-centered" or "your professor is stupid and your stupid to take his class" and he generally would raise his voice at me while saying these things— I knew it was bad, but I realized it was a real problem when other cadets told me they noticed what was going on. The thing that concerns me about his behavior is the fact that when I denied him sex, he sought some sort of retribution for me saying no by running my name through the mud and bullying me any chance he got. I almost feel like it would have been easier if I would have agreed to have sex with him in the first place and none of this would've happened. I expressed my concerns to a fellow cadet (cadet ███████) who suggested I go to our cadre about this problem. Someone tipped off cadet Fleetwood that cadet ███████ suggested this and he immediately called at approximately 5pm, January 15th, 2019, and threatened that if I pursued this case that I would ruin my career and reputation and that I will lose. This blackmail-like behavior concerned me, and was ultimately what motivated me to come forward — my other motivation is my concerns for the females in his future platoon and the sexist culture he would create. I have stated everything here to the best of my memory and ability. Nothing Follows

AFFIDAVIT

I, ███████, HAVE READ OR HAVE HAD READ TO ME THIS STATEMENT WHICH BEGINS ON PAGE 1, AND ENDS ON PAGE 3. I FULLY UNDERSTAND THE CONTENTS OF THE ENTIRE STATEMENT MADE BY ME. THE STATEMENT IS TRUE. I HAVE INITIALED ALL CORRECTIONS AND HAVE INITIALED THE BOTTOM OF EACH PAGE CONTAINING THE STATEMENT. I HAVE MADE THIS STATEMENT FREELY WITHOUT HOPE OF BENEFIT OR REWARD, WITHOUT THREAT OF PUNISHMENT, AND WITHOUT COERCION, UNLAWFUL INFLUENCE, OR UNLAWFUL INDUCEMENT.

*(Signature of Person Making Statement)*

WITNESSES:

SFC Streigle, Brian
WSU ROTC
ORGANIZATION OR ADDRESS

Subscribed and sworn to before me, a person authorized by law to administer oaths, this 18 day of Jan , 2019
at WSU ROTC

*(Signature of Person Administering Oath)*

Pauley, Brian J.
*(Typed Name of Person Administering Oath)*

ORGANIZATION OR ADDRESS

*(Authority To Administer Oaths)*

INITIALS OF PERSON MAKING STATEMENT    ███████

PAGE 3 OF 3 PAGES

DA FORM 2823, NOV 2006    APD LC v1.01ES

# Submission to the
# Office for Equal Opportunity

Submission: E

Description: Screenshots of a conversation between the Respondent and Student D.

Submitted by: Complainant

Date Submitted: January 24, 2019

Date of Document: January 2019

Notes (if applicable):







AGENCY RECORD
073

# Submission to the
# Office for Equal Opportunity

Submission: D

Description: Screenshots of a Snapchat conversation between the Complainant and the Respondent.

Submitted by: Complainant

Date Submitted: January 24, 2019

Date of Document: January 2019

Notes (if applicable):

AGENCY RECORD
074





# Submission to the
# Office for Equal Opportunity

---

Submission: C

Description: Screenshots of a forwarded text message conversation between the Respondent and Student A.

Submitted by: Complainant

Date Submitted: January 24, 2019

Date of Document: January 24, 2019

Notes (if applicable):





AGENCY RECORD
077





# Submission to the
# Office for Equal Opportunity

Submission: B

Description: SnapChat "Story"

Submitted by: Complainant

Date Submitted: January 24, 2019

Date of Document: January 2019

Notes (if applicable):

AGENCY RECORD
079







# Submission to the
# Office for Equal Opportunity

---

Submission: A

Description: Complainant's phone-log of missed calls from Respondent.

Submitted by: Complainant

Date Submitted: January 24, 2019

Date of Document: January 15, 2019

Notes (if applicable):







███████████████

4/19/19

RMB/CMR

Phone Call

Witness

I know both of them through ROTC,

OEO: known him

Since the start of this school year

OEO: Other female cadets in the program

yes, me. This was last semester around , maybe before October. We never slept together, we just did "stuff" together. from my understanding I was new and he became the first person I meet in the program. We hung out a few times, something happened, I tried to keep my distance at that. He then turned disrespectful. OEO: How; he was kind of off putting, sometimes it comes off as disrespective. I have heard that had sent pictures. I know that he sent me pictures of himself, but I have gotten any videos. OEO, sexual jokes or comments? Off the top of my brain, I don't remember exact moments, no one has told me that. He makes a lot of jokes in general, in particular moments I don't recall. OEO What happened: I went over to his apt, we were watching a movie and he had started kissing me, I was unset about that, but I had told him, that I was a virgin and that I wasn't going to have sex with him. Basically what happened. He went to go put his hands in my pants, that I wasn't ready for him to do that over my underwear. I told him several times that I didn't want him to do that. But I haven't done a lot of sexual things, and tried to distance myself. I would say a problem I did have, something we went through together was he was going towards me and also trying to have a sexual relationship with███████ as well, and that's why we both stopped talking to him. I don't think he said anything personal, but it was implied that███████and I both had slept with him. Patrick blocked me and unfollowed me, two and half weeks ago, when I stopped talking to him, and then all of sudden he just blocked me. The other cadet was███████

learned about investigation through other people. ███████ she did not tell me anything, but one time I saw her texting him.

Its not what he says its more about how he says it, his tone of voice lets you know he doesn't care. then there are times he chooses to be disrespectful. Kind of how you go about, hurting someones. He did vaginal penetrate, but I did not stop him. I made that clear that I was not wanting to have sex with him. I did not consider that to be intercourse.

RMB/CMR          4/19/19
                 Phone

RMB - OEO process overview; Non-Confidential; PRR
         Retaliation/Interference

Know Pat Fleetwood?
  yes
  ████████

  yes
I am in ROTC program as well
Quit b/c other interests but finishing year

known RP how long
  - beginning of this school year
During time, ever dated/sex relationship w/ female
  Cadet?
yes, he has, me
Nature of relationship
 - last semester around maybe before October
 - never actually slept together. Just did stuff
 - how looked to me, I was new he was 1st person I
had in prog. hung out quite a few times
kept distance - turned disrespectful in how he
talked to me.
 - off putting. His opinion is his & doesn't
care what anyone else thinks
    Comes off as disrespectful

Photos of him / others nude?
- heard he has done that. Sent me pics of
himself. Got no videos but heard other
cadets had.

Known RP while in uniform / events made
Sexual comments / jokes
- umm, off top of my brain - I don't rem.
exact moments

Anyone tell you?
- no, makes jokes in general, can't think of
specific moment in uniform made sexual jokes

Something happened off putting & then you
distanced self, why?
I went to his apt. watch movie he started
kissing me, not upset, perfectly fine
told him I was virgin & not going to have sex
with him. Basically, he went to put hand
in my pants - not ready I told him
but okay over my pants. He did it under
my pants eventually. I didn't tell him to not
while doing it.

Persistent any other way?
no, I think he knew I wouldn't have sex

Something ▮▮▮▮ & me talked about
he was going for me & still trying to
have sexual relationship w/ her. We're
best friends - not okay. Why we both
stopped talking to him.

After distancing, ever bad mouth you?
I don't think personally, but implied
▮▮▮▮ & I slept w/ him. We spent
the night but slept on floor - Implied
I think other cadets

He unfriended & blocked me on everything.
A few months ago
2½ wks ago added me back Snapchat

fine for a while after distancing & then
all of a sudden he blocked me from all.

I believe me, Sexual w/ ▮▮▮▮ & one
other female quit program.
Name ▮▮▮▮?
yes it was. Idk for sure, but what was said.
I haven't talked to her.

Any Idea invest going on?
yes I did

AGENCY RECORD
086

When something in ROTC happens though grapevine everyone knows about it.

███████ talk w/ you?
- no she did not. Once I was @ RP she was messaging him. Idk how he replied. Seemed like she wanted to have sex w/ him, from what I saw.

Off putting things he says?
- not what says, how he says it. Tone of voice very disrespectful & doesn't care. Are times he's very nice - very confusing he can do that & chooses to do that.

Disrespectful?
- for me say something & wouldn't care what other person thinks ~ comment just said.

No RP never made me feel uncomfortable

Anything else?
I don't believe so, When he did do his thing I didn't stop him.
Penetration vaginally? yes

I did not stop him doing that.

Prior to him doing that made it clear
not interested in having sex with him.

When he did what he did, thinking
constitute sex?
no, I did not.

Intercourse not part of that in my mind

████████                           RMB/KRH                           4/17/19
OEO – In Person

RMB: Did ████ ever tell you how lunch at Red Bento went?

She did. Think I mentioned in first interview. It was some sushi place in Pullman. Patrick had coupon. She agreed to go as friends, talk. Some point, he propositioned her to sleep with him. Got more aggressive. She kept saying no. he realized she wasn't going to say yes, he started being mean. Berating her.

He knew me and her were friends. He asked what does ██ have that I don't. She said he's got a degree and published author. We're not together that way at all though.

HE wanted to know why she wouldn't sleep with him. That conversation went negatively. He began immediately insulting her about her intelligence, aspirations in army, college. At some point, she left and walked home by herself.

RMB: Did she tell you after?

Almost immediately after, she called and asked to talk. Went to my apartment and talked. I was floored a friend of mine would act this way. Talked about maybe it's time for you to go forward and talk about this to somebody.

RMB: Did you talk to Patrick about it?

I did. Talked several times. When case dropped, he was asked to draft statement to cadre. He read it to me. He played down a lot what happened in letter. I'm inclined to believe her more than him. I've seen him act this way, seems like him.

Me and his roommate,████, we all talked. Don't care if you played it down like this, but we know what actually happened. Your lying is not going to help it.

RMB: When you picked ████ up, how did she seem?

Quiet. Normally she's happy, bubbly. Think at this point she felt box closing in. She asked what ot do. I said here's my opinion, if you're going to do anything, talk to him first person to person. Say I want this to stop. If it doesn't stop, go to cadre. Can at least say you did your due diligence to try to resolve at lowest level.

Weeks or days later, she tried to talk to him and he blew her off. Bragged about having sex with her, making up lies about what happened between them, doing this around other cadets. She went to the cadre to talk about incidents.

RMB: Recall RP finding tube of chapstick in your car?

Yes. Forgot that happened. It was sitting in my cup holder. He asked who it belonged to. It was snowy at time, she didn't want to drive. She crashed at my house, gave her a ride. She always forgets something. After I took her to class, I picked up Patrick. He asked whose chapstick it was. Think he recognized it.

RMB: Your response?

Didn't want to drive in snow, she crashed on my couch, I slept in bed. Took her home following day. Pretty sure it was hers.

RMB: Where you were when you heard RP use eskimo bro?

Page **1** of **2**

AGENCY RECORD
089

OEO – In Person

I was right next to him. Most brazen things I've heard Patrick say. It was with 120 of our peers. Battalion staff, we stand behind them. Patrick, me, and ███████ were in line. When ██████ walked by, said it loud, others turned their heads. Patrick said it and he was talking to ████████

RMB: Did ████████ stop after hearing that?

Don't think she did. Know she heard it. It was loud enough that someone further away than us could hear, I'm sure she heard it. Actually, she did. We spent more time together, she said she heard what he said but didn't react to it when it happened.

RMB: Ask respondent to share details about his sexual experienced with ████████

No. He'll volunteer information nobody wants to hear. He'll show tests, photos, talk about what happened. A lot pretty dramatic. Not the only time that's happened.

RMB: Witnessed Patrick showing people inappropriate content?

Yes.

RMB: IN places it would be considered inappropriate?

Yes. I've seen it personally in uniform on campus.

RMB: Nature of photos?

Nude photos of people he had slept with or conversations or texts with girls he was sleeping with about coming over. It was usually nude photographs.

RMB: Comment about cabin. Were you present when that was said?

I was right next to him. That's exactly. That did happen.

RMB: Spoke with Brian, did not recall instance. Know why that might be?

Know that it happened. I wasn't the only one that heard it. ████████ was there when he said it. Don't know when you ask him, but assuming it was a small incident at the time. Don't know why he wouldn't. Feel if he remembered he would have said something. Strigel takes sexual harassment thing seriously.

Page **2** of **2**

AGENCY RECORD
090

███████████

4.17.19

RMB/KRH

In person

Question:

1. Did the CP tell you about her lunch at Red Bento with the Respondent in January/what did she say? Yes, it was there, and Patrick had a coupon, went out as friends, proposition to sleep with him, getting more aggressive. Started being mean to her, he know me and her are friends. He is also not a dick to me, we aren't together at all. Why they were cool and they are not. That ended pretty negatively, started insulting her. So right after she left, I picked her up, im floored a friend would act that way, that's when we started talking about her coming forward. Yeah I talked to Patrick about, he was asked to write a statement. He played down what happened really happened at Red Bento. Us and ███████told him we know what happen, and you lying is not going to happen. When I picked her up, she was pretty quite, I think she was starting to worry. Do the right thing, talk to him first, and say hey I want this to stop, and a week or day or so later. He totally blew her off, it was about that time she went to the codre.

2. Do you recall the RP being in your car one day and finding a tube of chapstick and asking you if it belonged to the CP? Yes, it was sitting in my cup holder, he asked who it belonged to, she left stuff in my car, always forget to leave something. He asked who chapstick it was. I said well, yeah she passed out on my couch and I took her home, but im pretty sure it was hers.

3. Do you recall where you were when you heard the Respondent refer to Cadet ██████ as an "Eskimo Bro"? Yes, I was right next to them. In front of 120 peers, we stand behind. he said it loud enough for others to hear because they turned their heads. I don't think she stopped, im sure she heard it, it was that close. Later that day she told me she heard what he said. but didn't physically react when it happened.

4. Do you recall the alleged comments the RP made about Brian Streigle's wife in the woods/ RP said that never happened, as well as Brian? Any response to that? I was right next to him. Its exactly, what they said. No why, Brian, I wasn't the only present and probably, in his mind it might have been that big of deal, him and Patrick don't get along.

5. Did you ever ask the RP to share details about his sexual experiences with the CP? No, that was always on his accord, he will share information, he will share texts, photographs, show things on his phone. Yes, I have seen him. I've seen it personal in uniform on campus. They are nude photos of people he had slet with.

Patrick Fleetwood                          RMB/**KRH**                                    4/11/19
OEO – In Person

RMB: Last time you were here, brought up videos shared via snapchat. In videos, people we talked to said they were sexual in nature. Recall whether or not people in video knew you were recording?

Videos of me having sex? They were not of me having sex. Selfies of us laying together, stuff like that.

RMB: Never sent videos of yourself engaging in sexual activities?

Not intercourse. Like pillow talk, laying there, like that.

RMB: Know ▮▮▮▮▮▮▮▮▮

Yes.

RMB: How do you know her?

Assuming this is follow up from ▮▮▮▮▮ contacted ladies from my past. Assuming you figured out that's girl's name.

I know her because she was in program. She came over a couple times, did my eyebrows. I have videos. She came over for dinner and we had consensual relations. Have it saved in my snapchat.

This is an individual that was contacted by ▮▮▮▮▮ Worried ▮▮▮▮▮ was going to continue contacting people. She begged me not to disclose her name.

RMB: Have sexual relationship or just the one time? Ongoing?

Was flirting. She came over, had sex. Think she has a boyfriend. Didn't know she had boyfriend. Think she's in CO with him. After she had sex with me, she ghosted me. Think that was her way to say what I did was irresponsible, don't want to talk about it.

RMB: Had boyfriend?

Don't know if she had boyfriend. Maybe she was trying to kindle relationship, maybe bored and wanted to come over. All I know is after that incident, after sex stuff, things went cold. Don't know if it was because she didn't like me, another guy in picture.

[Showing RMB saved texts] After that she blocked me. Don't know if she had a boyfriend or what. Was abrupt. I was a little heartbroken.

RMB: Recall if any photos sent to female cadets, specifically you out of shower with just shower.

Can't remember.

RMB: anybody spoken to you about receiving photos?

Can't really remember. Wouldn't be without question that maybe was sent, but can't say who was sent to.

Mass snap. Example, remember for ranger challenge – think I have photo saves. [Shows photo of a red mark on his leg]. Gets sent to everyone. Would never take a picture of me in shower and put it on my story.

RMB: While in uniform, made sexual jokes/comments?

Not activities like in lab, or laying in point position talking to friends next to me. No.

Page **1** of **2**

Patrick Fleetwood                        **RMB/KRH**                        4/11/19
OEO – In Person

Let's say if ▮ and I are driving in his car by ourselves – I have video – let's say by ourselves. . .[showing video] That's kind of humor we'd have in private. Nothing like there's cadets around us doing that kind of stuff.

RMB: In snapchat messages you gave me, what does red dot next to her name mean?

Don't know. Lot of people when they make snapchat name. . .just an emoji.

RMB: Something she selected or you selected?

I would put it there. Reason I put palm tree next to ▮ name is because I remember living in Hawaii with ▮, ▮, we joked about Pengu, so penguin emoji. Think red dot for ▮ was like. . .I can't remember. Added later. Like don't message her anymore, then eventually blocked her.

RMB: Have system of tracking women you've been with using emojis?

No. I have a list of women I've had sex with, just name list, but not system. For example, not like ▮ and palm tree. Not like there's a peach emoji with girls who. . .

RMB: Received info about how you have system, advertise system because you have contacts in phone. How heart could mean big butt, purple means sleeps with him. Talked in public about it.

There are people that have emojis. Like blue heart, a flower. Don't put emoji's next to girl's names. Don't have a system.

RMB: Made comments about female cadet's body parts while in uniform?

Can't really see any of that in these uniforms.

RMB: Anything else?

About pictures with other girls. Think I sent like 2 or 3. Does anyone have one?

RMB: If deleted, gone forever?

Yes and no. If I send video, if you want to save, can save evidence of it. I have pictures of selfies with girls. [Shows RMB picture]. If people have these, I would ask show me this evidence otherwise just saying stuff. They could say Patrick sent videos of him saying he was going to attack major city. Just pulling stuff out because they're saying that.

I have a lot of stuff saved, but not everything. If people don't have anything, seems they can say whatever they want.

RMB: Last time anyone brought that up to you?

2 years, 1 year ago. Been a long time. ▮ pulled me aside. Reflected and said that's pretty screwed up I did that. Haven't done that for a long time. 1.5 years, last one I sent.

Seems unfair when someone says he does this all the time. Unless you have evidence.

Don't know if I'm the only one who gave evidence, screenshots, whatever. Feels I have to explain a lot of stuff because someone can blindside me and not show evidence.

Page **2** of 2

AGENCY RECORD
093

████████ in person

4.10.2019

RMB/DBR

Witness

OEO: Intro, rights, and options

Any idea as to why I've asked you to come in today?

The allegations against Fleetwood, and ████████ and other social media usage. ████████ report Fleetwood, for something like regards to sexual harassment. Fleetwood, I know he turned in a big packet, showing all the screen shots, of what she said to him. Saying graphic details. Can I have that dick, begging for sex. Patrick share that information with me.

How long have you known him? Since the start of freshman year, so like 4 years almost,

How would you describe your level of friendship with him i.e. aquiantices, close friends? █wouldn't say we are friends, but I know him well.

Do you recall hearing a conversation between ████████ and ████████ on Jan 15 at the CUB, and her sharing her concerns about Fleetwood's behavior towards her?

It was right after SHARP lab, like a week after. They were talking about Fleetwood, wasn't really paying attention. I heard some stuff about it, and then Patrick bought it how people kept looking at him during sharp lab, they were talking about going to Cadre about it, if she felt uncomfortable. I told ████████, that ████████ and ████████ were talking and Patrick called me after that, and asked what happened at the CUB, but I was paying attention. He said I have proof that she asked me for sex, and that I said no.

Have you ever witnessed Fleetwood make inappropriate sexual comments or jokes, during ROTC programming? Yes, in class, and muster. In uniform, he pointed out a couple of girls with nice ass, showing stuff on his phone. I don't think its appropriate in uniform, because you know never know who's listening. I mean it would say it fairly loudly in the CUB. To my knowledge he make these comments often.

To your knowledge has Fleetwood been with other female cadets in the program? ████████, she was in the program first year, then left due to grades. Patrick told me they had sex.

No comments that I can recall, the cabin in the wood situation.

Patrick has shared photos of videos with you, Yes. One time he sent me a snap chat video of him having sex. Then he sent a couple of pics of him out the shower, couldn't see anything. No, couldn't see the person who he was having sex with. In the video you could see, girls back, genitals, moaning. Could you tell if she was aware. The flash was, and it was dark so maybe. A lot of people in ROTC have gotten these videos. It was random, I didn't ask to see videos. Made me feel uncomfortable to get those from him, no I didn't talk to him about it. I asked him wtf he sent, me he said don't worry about and that was it.

He said he hooked up wth her, it was I cant recall. Either late last semester, or early this semester.

█████████████                                    DBOR   4-10-19
                                                 RMB    OEO

RMB discusses Role of OEO

Know why asked you in?
      Inv   re   Patrick   ██████████
            and his Social media message

What due you heard?
      ██████████ reported Fleet need for B2 or Sex Harss,
and Fleet med.  I know he turned in a big
packet of screenshots of what ██████████ said
to him w/ graphic stuff   I never
saw messages

What Graphic stuff?
            Can I have that dick
            Beggar for sex

Who Shared w/ you   since didn't see?
            Patrick

How long know Patrick?
      Freshmen   4 years almost

Level of friendship
        Friendship - I knew her well

Sexual comments/ Jokes?
        Yes

During ROTC events chooses?
        -Yes.

Recall jokes comments
        In uniform point at girls, - miscuss
        Showing me stuff on phone

If both parties are fine with it no one
        else can hear your thoughts fine

But other than that its not appropriate
        especially while in uniform

Where there times when it meant one on one like
        other people could hear?

Yeah like something in Cab said. L
        petty loud

To your knowledge does photos make those comments
        often?
                Yeah

Besides ▮▮▮ has he been Romantic w/ mother child

Yeah ▮▮▮▮▮?

Fall semester

Is she no longer in program

no she left WSU grades partly sem

How do you know they were associated?

Patrick W on they had sex

Jan 15 incident at Cub were ▮▮▮ talking w/ ▮▮▮

It was right after Sharp lol like week other

▮▮▮ and ▮▮▮ brought up Patrick

She was uncomfortable

I wasn't really listening

Patrick brought up why people kept looking

at him during Sharp he was confused

Something we defently about ▮▮▮ going

After that Conversation did you call Patrick?

I told ▮▮▮ my roommate that

▮▮▮ and ▮▮▮ thing

After that Patrick called me and asked me

what happened at Cub.

I tell him I want pay's withdrawn
He said I have proof she asked me
for sex.
I said No something like that

Have you ever known Patrick to make sexual
comments as to any of the

Do you recall being in meeting with

Strengell comment about nothing what really
Patrick comment about write sorry

No I do not recall

Have patrick shared photos or videos

are him sent me a snapchat photo of how body
sex
pictures of his dick just coming out of shower.

What could you see in the video?
her face, thrusting, grabbing.

Could you tell if she was aware of video?
Flash was on it was dark so I think so

Did you ask to see these videos.
No. Rainbow
Did it make you uncomfortable

Did you talk to him about it?
No, Oh I did
I asked him what the fuck he sent me
he said dont worry about it
that my pretty much it.

Have you withessed him make comments about Rochelle too?
Yeah when he told me she logged for sea

Also when he told me he hooked-up with her
Cant recall when.
late last semester or early this semester

Did he share any details?
And he said they hooked up
I didnt aste.

█████ █████                    RMB/**KRH**                            4/8/19
OEO – Phone

RMB: Who else di Patrick invite to Red Bento?

Just me and him.

RMB: Know if he asked anyone else?

I don't. Got a text from him, that's all I know.

RMB: Text through Snapchat?

I don't remember. Want to say Snapchat.

RMB: Ask you in friend group message?

Don't think it was friend group message.

RMB: Prior to that day, been in group chat?

Don't know. Maybe ROTC stuff. Don't know like a friend setting.

RMB: While at Red Bento, did Patrick joke about sending picture to ████

No. Don't think he did. What kind of picture?

Oh, yeah. He did.

RMB: Tell about that?

He had taken a picture. I was like what are you doing? He said going to send to ████ I said no, don't do that. I asked can I see if you sent it? I was scared, grabbed his phone. He didn't send it, said I was joking.

RMB: While at Red Bento, share conversation with anyone else?

Think with some friends like ██ Like I think Patrick wants to get back with me, don't know how I feel.

Some other people too. That's when I started having concerns about him and character. That was part of narrative when I was talking to other people.

RMB: Who told you about Patrick's reputation with women?

A lot of his close friends. ██ had said be careful with that one, he's kind of a womanizer. He was the main one who warned me against him.

RMB: What prompted ██ to tell you?

Just fact that I was talking to him, after I hooked up with him, that's when he was like you should have told me you were talking to him sooner, be careful with that one.

RMB: When did you become aware Patrick was seeing other people?

I remember when I first started getting with him, ██ and other friends told me he had just said he was going to be loyal to one girl. Turned around and started hooking up with me. He had just promised them he was going to be loyal. Like oh yeah, see how long that lasts. A day later, he hooked up with me for first time. That was in November, early Dec.

Page **1** of **3**

AGENCY RECORD
100


OEO – Phone                                     RMB/**KRH**                                     4/8/19

In Jan, around Red Bento, he was heavily hinting he wanted to get back with me, hook up. I said don't you have a girlfriend? He had girlfriend. Reason he was asking was because he thought she was going to cheat on him, like if she's doing it he can do it. That's not ok.

Remember one time after hooking up with him, went to friend's apartment. I had hooked up with him, sort of seeing each other, but he had a girl over and they were. . .he's definitely ok with being with multiple women at once.

RMB: Did you stay over that night?

Might have been a different night. There was one I didn't stay over, was him and girl. One was a birthday, big group of friends and he brought a Tinder girl over. Don't know if they hooked up, but I did crash there. I didn't do anything with Patrick that night.

RMB: Night there was wrestling going on, you had been choked out?

I remember that. That was birthday party. Do remember we were having wrestling match. One of our friends accidently put me in choke hold, I passed out. Then, later that night when we were hanging out, I remember crashing. We were still seeing each other, but don't remember pushing anything on him, but likelihood something happened could have, but it didn't that night. I was still seeing him at the time.

RMB: Did Patrick ever tell you he did not want to engage in sexual relations with you anymore?

No. Not really. I mean, yeah. We stopped seeing each other, but don't remember him saying I don't want to have sex with you. I could be mistaken, but I don't remember him saying no more sex.

RMB: During last Nov, Did you send photo or Sharp booklet to RP?

I believe so. At that time, wasn't like a threat. We were joking around. We all knew Patrick had reputation. Sent picture to him jokingly. Late Nov sounds about right.

RMB: Send Snapchat video around new years talking about leaving Patrick in 2018?

If I did, think it was just to close friends. At that point, I knew he was no good, was like going to leave him behind, big mistake.

RMB: Don't recall sending it to him?

I could have jokingly done that. Wasn't a threat or anything, just like I'm done seeing you. Over break, he kept sending me snapchats, trying to talk to me. I probably sent something like me and you are not seeing each other, leaving you in 2018.

RMB: how did you learn about Patrick making eskimo bro statement?

Remember there was comment about him talking to ▮▮▮▮ saying like what's up eskimo bro because ▮▮▮▮ was ex. Whole eskimo bros thing was they both had sex with the same girl. Heard about that from ▮ Few others from class confirmed that. I didn't hear it directly, just heard he said that and other sexual comments.

RMB: Class they were in?

This wasn't class. It was practice. We have PT in mornings. He said it in formation in morning before we started. Before we formed up or during it.

Page **2** of **3**

AGENCY RECORD
101

 — Phone Call . 4·8·19

1. Invited other people: I don't know if he asked anyone else. I don't remember if it was over snapchat or the phone. I don't know if we had a group chat, but if so it was ROTC.

2. No, I think he did. Oh yeah he, did. He had taken a picture. I said what are you doing, and he said im sending it to ███ I checked his phone and he didn't send it.

3. Did you share that information with one. I told ██ and said Patrick wants to get back together with me, I don't know how I feel about that. That's when I started being concerned.

4. First sharing information about PF. ██ said be careful he is kind of a womanizer. Just the fact that I was talking to him, and after I hooked up with him. I wish you would have told me sooner, like a be careful sort of thing.

5. Other people: when I first started getting with him, told me he had just said he was going to loyal to this one girl, and started hooking up with me. He just promised them that Im going to be loyal. OK lets see how long that last, and that was the first time we started hooking up. Heavily hitting that you wanted to get back with him. He does have a girlfriend. He thought she was cheating and so that's why I want to hook up. That was the birthday party, we were wrestling, accidently got chocked out, later that night. We were all hanging, I think we were still seeing each other and the likely hook of something happening, I was stilling him at the time.

6. No more sex? No not really, we stopped seeing each other. I could be mistaken, though.

7. Sent photo: Yeah, we were joking around, and I sent the picture jokingly.

8. NYE snapchat, if I did I sent it to close friends, I knew he wasn't any good. I could have jokingly done that. Over that whole break, keep sending snap chats, and yeah I probably sent something. Like we aren't seeing each other anyone more in a sexual way.

9. Eskimo bro: from ██ this was at practice (PT) he had said in formation in the morning. It was like around that time. ██ for sure, maybe ████████

10. ██ told me about the incident "cabin in the woods" I know for sure ██ told me this. I don't know who else was in the room, that could confirm. Heard the story from ██

11. I did send messages about asking for bad stuff about ██████

███ ███
OEO – Phone                              RMB/**KRH**                              4/8/19

RMB: Who were other people who told you?

███ for sure. Maybe ███. Not sure. Just remember, seemed like they were like he said this. For sure ███ though.

RMB: Recall hearing comment about Cadre's wife?

Yes, I did hear about that. ██ was first one to tell me about that. Something about the woods or something, don't know comment, but he did say something. I wasn't in room for conversation, but ██ ███ Know for sure ██ told me this, don't know who else was in room, can confirm that conversation went down. I wasn't there.

RMB: Send messages to Patrick asking for negative information about ████

Yes. We had just broke up, me and ████ in Nov. I found out he cheated on me. That's when Patrick was first talking to me. Think it was something like tell me something bad about him. Wasn't very good to me, just tell me bad stuff so I don't feel heartbroken.

Page **3** of **3**

███████████                    RMB/NAF                         4/8/19

NAF – in person

OEO: EP 15; OEO process; notes; confidentiality, PRR; retaliation/interference. Any Qs?

Not really at this time.

OEO: How long have you known RP?

Since beginning of freshman year.

OEO: Do you have general idea of why I asked you to speak with me?

I do have an idea. Probably something along lines of him being a womanizer.

OEO: Why pick that word for him?

He's on Tinder a lot

OEO: In ROTC program, known him to make sexual jokes comments?

Sometimes

OEO: During ROTC activities?

More like during private times.

OEO: Describe?

Like with friends, basically.

OEO: Ever make comments where other people could hear?

No.

OEO: Regarding incident that took place involving RP and Brian Streegle – comment about cabin in the woods. Recall?

No. I've never set foot in Streegle's office for a good while, at least a year.

OEO: Recall ever hearing comment in regards to Brian's wife?

No

OEO: Members of ROTC command tell RP he's towing line of SHARP with his comments?

No

OEO: Recall ROTC trip up north, staying in cabin?

Yes.

OEO: Recall RP making sexual comment re ███████████?

No

OEO: Comments such as planning to rape, touch inappro?

No. I was kind of sleeping away from everybody else.

Page **1** of **2**

███████████                          RMB/NAF                          4/8/19

NAF – in person

OEO: When RP has conversations with friends, been around?

Probably in past

OEO: Recall those comments?

Not really, no.

OEO: RP date people within ROTC program?

Like friends?

OEO: Relationship, dating

I don't think so, no.

OEO: Ever have cadets come to you about concerns about RP?

No.

OEO: Ever hear RP make comments/jokes about CP?

No.

OEO: RP reputation about first-year female cadets?

I don't think so, no

OEO: Concerns about how he engages with them? Ex: the way he Talks to them, training

I don't really interact with him that often, I guess.

OEO: Anyone told you about jokes/comments made by RP?

Not that I remember.

OEO: How well do you know RP?

Above acquaintance, somewhat friends, I guess.

OEO: Tinder – how do you know?

It's just a running gag in the senior class, I guess.

AGENCY RECORD
105

Brian Streigle        4.8.19      Phone Call
MS Instructor.

☐ No recall of "Cabin in the woods" comment

☐ No recall of meeting in his office w/ Seniors

☐ Has not heard reports of RP's Behavior prior
to this investigation.

☐ Never had to speak to RP about language while
in uniform.

Patrick Fleetwood                    RMB/**KRH**                    4/4/19
OEO – In Person

RMB: Describe off color jokes you referred to between you and CP?

Jokes you wouldn't normally say in front of friends. Have dark humor in military. Like Vietnam reference jokes. Any sort of joke you wouldn't say in public. Kind of closed door humor that military share. Some of the people share. We cope with horrors with humor.

Some of the jokes would be light hearted like references to her favorite show: Parks and Rec. She'd always talk about that.

RMB: Example of jokes?

Have screenshot [searching phone – showing RMB] Making a joke like this is the army way, because we always mess things up. Nothing like dying people, just jokes you wouldn't make in public.

I have everything, think she tried to delete everything on Snapchat. I contacted Snapchat, they gave me everything.

[RMB taking pictures]

RMB: Make comments, pit you and ▮▮▮▮ against each other?

She would often ask things like tell me things about ▮▮▮▮ how bad of a leader he was. Very toxic responses from me. Continued to escalate like I was the person she was recovering from her prior relationship.

RMB: How long between dating ▮▮▮▮ and you?

Don't know. Know they were seeing each other during Ranger Challenge. Beginning of school year. October I think.

RMB: Ended or started around Ranger Challenge?

Don't know. Just know they were seeing each other.

Uncomfortability also. She would sometimes just say I'm coming over, or this is what I want. To me, made me feel like obligation. I felt bad for her. Knew she was in tight spot in program. Apparently she made it out like a lot of cadets were against her. They put her as outcast because she was above everyone else. I empathize with her, felt bad. Always be something like I'm coming over. I would say I'm busy with paper, she would say tell me when paper is over. Don't know if she saw, but I was losing interest.

RMB: How long engage in relationship?

Would say for half a month, I was enjoying hanging out with her, but morphed into something I didn't want to deal with. Was feeling effects of this is not right in program, shouldn't be doing that. Held standard to not have relations with anyone in program. This was not a thing I would do.

RMB: Is she first person you've had sexual relationship with in ROTC?

Yes.

RMB: Other cadets think she's immature and irrational. How discussed?

For example, ▮▮▮▮ in spite of me told ▮▮▮▮ we were seeing each other. Think she was trying to get us upset at each other. Don't know why she did that. I realized I could talk to ▮▮▮▮ or not. Talked to

Page **1** of **6**

Patrick Fleetwood                          RMB/**KRH**                                    4/4/19
OEO – In Person

him, said you found out. He said I understand, she's kind of crazy. Other cadets came to me said feel bad for you, she's kind of cuckoo. Fellow cadet who has had multiple encounters with ██████████

RMB: Multiple interactions

ROTC cadets, like family setting. Going to see each other, talk to each other, multiple pass bys.

RMB: What prompted you to call her that day?

Can't remember who told me, but gossip spreads like wildfire. Think █████████ told roommate ████ ████ Don't think ████ was going to tell me. ████ came to me, said something's up, figure out what's happening. Trying to figure out what they meant. Apparently, ████ told someone. . . ████ was sitting on couch with ████ complaining about me. ████ was urging ████ to make complaint.

I thought they were trying to figure out how to say Patrick was a rapist. My mind was at peak, like these people think I'm murderer. I called ████████ Wanted to know why he was telling her to make investigation. I didn't understand what kind of information he had to offer.

Called him, said what's problem. Talked to me if there's problem. He told me to chill out, not to worry. He wasn't going to report me, nothing to report. I said conversation, and I don't appreciate that. Don't need people thinking about me like that. I was pretty angry.

I was pursuing going into Freemasonry. He's a free mason. I thought against freemason code. From what I gathered, he was clueless to what was happening.

Briefly, conversation I had with ████████ maybe 5 minutes after. Said don't know what's happening, but if you're going to try to report me for whatever, you're not going to come out on top. I have overwhelming evidence, snapchat history, that I was not forceful. Everything consensual. No record I would rape her She said not going to report you. I said good, no reason to report me.

Reason I did this was to show her I was going to defend myself. Not going to roll over, let her attack me. I had all information she thought I wouldn't have.

RMB: Recall conversation with ████████ referring as Eskimo bro?

Yes.

Can't remember how conversation went. Running joke in ROTC is that everyone is Eskimo bro, every girl is Eskimo sister. I didn't come up with term. Just appeared.

RMB: When did you tell him that?

I didn't tell him that.

He made that comment. I agreed. I wasn't going to say no we're not. I understand concept of what Eskimo bro is.

RMB: Where did he make comment?

Want to say this was when ████ told him. When I came to ████ said this is what happened. This was during US History class, 349, last year in CUE 351. Took place before class, sitting in class before class started. He said it's fine. Later, it was we're Eskimo bros now. I guess we are.

RMB: Not around ROTC people?

Page **2** of **6**

Patrick Fleetwood                    RMB/**KRH**                                    4/4/19
OEO – In Person

Don't think so. That particular instance was in classroom. Think there were 2 individuals in back I don't know names of.

RMB: Make comment referring to lipstick/chapstick you found?

Misconstrued story. I was in ███ car. Know ██████ hangs out with ██ all the time. Found tube of chapstick in car. Said this is ████████. Going to see her later, will give it to her. Told ██ is it yours? He said no. I thought must be ████████ put 2 and 2 together.

This was during friend Rummage and ███████ class. I saw in there. Pulled out of my pocket, said this is yours. She said no. I was almost certain it was, in ████ car, only girl ██ hangs out with. I left it in classroom. Left it next to windowsill radiator. That was never in my room.

Only thing in my room was her belt and maybe a scarf and hat. I've never taken chapstick from my room and said it was hers.

RMB: Ever made sexual jokes or comments in ROTC program?

One classic one everyone will say I've said: we're going to flank them, take them from rear. Guess that could be considered sexual in a lighter sense. I would never in uniform say to another person, especially a female like this is whatever, highly sexual joke.

Maybe at PT when me and buddies are talking like my girlfriend's so pretty. Not a joke though, just talking about girlfriends. I don't joke about sex at all. Maybe if you really look at what I'm saying. . .flank them, take from rear. That's probably most sexual joke I'd make.

RMB: Ever make comment in regards to one of officer's wives?

Don't know what cadre's wives look like. Can remember from our dining out, but I was intoxicated at dining out. Cadre's wives, don't joke about that. Like joking about Cadre.

RMB: In regards to Striegal?

Don't even know what she looks like.

RMB: Story told to us, said you along with 3-4 cadets were around person talking about moving to woods, can't hear screaming about cadets. Witness said you made comment so people can't hear your wife scream. Recall conversation?

No way I said that. He would kill me. Only jokes I've joked about Sgt Striegal about is like soldier readiness.

He's cadre. I can get in trouble for joking around with him. He's my superior, determines what happens to me. Like making jokes with boss.

RMB: Anyone talked about your conduct in program?

Yes. Know large proponent to this. ██ had investigation. He thought he was in bad spot. He lectured me. Before his case, before he went to basic camp, I had conversation with him when we were sophomores. I called him on phone, said I think you're funny, would hang out at bar, trying to look out for you. Some things cadets talk about behind your back. Want to tell you this is what's happening, people are saying. Want to help you become better, correct yourself. He took that wholeheartedly. Now he's been extremely cautious.

Page **3** of **6**

Patrick Fleetwood                    RMB/**KRH**                              4/4/19
OEO – In Person

From that investigation, he took away that he was going to correct me because I corrected him. In program, I'm known as pretty boy. That's joke he has for me. I find it funny, go along with it. I don't consider myself a ladies man. It's a funny identity to have in program. Often, would say calm yourself down, not talk, joke like that. This is when me and him are talking.

Just thought that was him trying to give. . .do what I did for him. Trying to help me.

RMB: In program, have you sent photos or videos to other individuals?

Been told multiple times by ██████ that I do that all the time. I can count twice I've done that. It's probably due to me being intoxicated. Don't know rules about being drunk, but he didn't want to see that, he could have blocked me. He joked about it, thought it was hilarious. Made me embarrassed he knew what was going on.

RMB: Share any photos with yourself with another individual to other cadets?

Just ████ Maybe Cadet ██████ once.

I went through breakup. Reason I'm sober now because I was drinking way too much, doing stupid things. After new years, decided to do away with alcohol for whole year. Was ruining what I wanted to be. ████ said I sent him funny video. I assume nudity slash I'm with this girl type of deal.

RMB: Did they ever tell you not to send them/?

No. they joked about it. Thought it was funny. Talking now, I'm extremely embarrassed. Very unfair to have done that. I never would have sent that to anyone other than those individuals.

RMB: Make threats against reputation?

No.

Counter example. She would all the time bug me bout ruin your life with this SHARP stuff. This is right when I decide I can't deal with this, deal with her. Indirectly, could consider a threat. Just her saying this is available.

RMB: What made her do that?

Don't know. Assume she was jealous I was seeing multiple other girls. Don't know.

Being in positon I was, seeing what she was trying to do towards ██████ it wouldn't be something that she'd do to make me fall, taint me in program. Feel that's kind of person she is.

Sent something around new years, like it's new years, should I leave you back in 2017? Taunting me. Trying to get reaction.

Original question was did I threaten. No.

RMB: In ROTC, ever brag about sexual exploits with individuals, make comments about ██████ like squirted on sheets?

She never did that.

RMB: Make those comments?

Page **4** of **6**

Patrick Fleetwood                                RMB/KRH                                4/4/19
OEO – In Person

Never about her. ▇ would ask me, think he has crush on her. He would be upset I'd be with her, try to lead her away. I never talked about her and my experience.

RMB: Talk about experience with other women?

I definitely have. With my friends, not in program. Would talk drinking gin and tonic, like here's my experience. That type of setting.

One thing comes to mind. Had party at my apartment, we were all wrestling each other. There was girl I was seeing, her brother was staying at my apartment. Another girl that was seeing her brother was there. ▇▇▇ there. ▇ was there. Roommates. All wrestling each other. Don't want to say who, but one individual wrestled ▇▇▇ got chocked out. She was bragging about how she passed out. Everyone was joking about how she liked to be passed out. She was bragging about it the whole time.

Think that was same night. . .I was sleeping on floor, girl I was seeing's brother was in my bed. I was trying not to be around anyone. Was mad that day because girl I was seeing was difficult. ▇▇▇ was trying to sleep next to me. I didn't want her to be there, in my apartment. Awkward situation.

RMB; When was that?

2018. I haven't talked to her since day we had lunch together. Blocked her.

RMB; Directly tell her you were not interested in her?

Maybe. If I would, I wouldn't say in person. Have to say in text. I made it known I didn't have time for her, didn't want her to come over.  [Searching texts] just didn't want her to come, and she didn't understand I didn't want her to come. Didn't want her to think I hated her, was trying to softly let her down. Eventually, too much to be nice. Blocked her. Escalated things to all time high. Didn't think that would happen.

I have never had someone be persistent with me like ▇▇▇ has. Very strange for me.

RMB: Make attempts to talk to people, interfere, coach them?

Only people I've contacted were prior girls I've seen, ex girlfriends, boss at work. ▇ I called, we had rough relationship, but could attest that's not something I could do. She asked what was happening, I said someone said I was bad guy, said could you answer some questions. Said sure. Same with my boss.

RMB: Anyone from ROCT?

▇▇ First, I contacted ▇▇, boss, then ▇▇▇. Then ▇▇. Said somebody reported something, ▇▇▇ reported. Would you be able to tell story. She said I don't know. I understood. At that point, I thought ▇▇▇ was feeing information. With ▇▇ contacting girls, not out of question ▇▇▇ would do that.

I've never tried to coach them, know you can get in trouble. For me, lot of things come up because ▇▇▇ picked people she knows has information. That's what it looks like to me. Don't want to say ▇ helped, but that's what it looks like. Don't know if that's violation.

RMB: Ever contact people telling them to say Patrick is good guy, anything like that?

Not with people I was going to use as reference. People you receive as witnesses didn't receive any coaching at all.

AGENCY RECORD
111

Patrick Fleetwood                    RMB/**KRH**                              4/4/19
OEO – In Person

■ did come over one night, said I'm going to be honest about whether you're good guy. He said it's up to him.

Other than that, didn't talk to anyone in program. I don't want to talk to anyone about this at all. Don't want people to know there's investigation.

RMB: Did you do it when you first found ▬▬▬ was talking to ▬▬▬

No. At that time, just went straight to them, told them to knock it off.

A lot of this built around rumor. Word to mouth, things change. Telephone. Patrick is mean leads to Patrick is a rapist. That's what I got. Was not about to let everyone in program say I was rapist. Now I realize they were saying I was being. . .don't know complaints. Hostile or something?

RMB: Anything else we should know?

This has. . .revolved me and ▬▬▬ hanging out, liking each other, evolved to not liking, to don't know how to let you off, to now threatening me. I'm just a nice guy. I'm assuming ■ makes jokes, jokes about me. Hard for me to figure out how to remain professional yet friendly. Hard to be professional friendly without coming off as stern or mean. Ultimately blocked her because I couldn't explain myself. Always try to come over, always demand sex. I don't want to give it to you. My out was to block her and I think that hurt her feelings. Don't know if it has to do with insecurities, but she always tried to find ▬▬▬ was bad or ranger challenge people weren't nice to her. Lot of her trying to find validation and I couldn't give it to her. Blocked her and that escalated everything.

Now I'm here, alleged I harassed her. Think story is being turned. I was uncomfortable whole time and now she's victim. Not once did I pipe up, but I should have. That's what happens when you don't say anything. People with louder voice get to attack first.

RMB: In message you sent in regards to inappropriate jokes, you said ok and blocked. What was she referring to?

No. She could just be making open statements. She might have just heard, wanted to use knowledge. Don't know what jokes she was referring to. Jokes we had I showed you. Nothing terrible. Don't know of anything, I would have said something murder or sexual. Lot of he said, she said.

Evidence I have doesn't paint picture fully, but examples of this is what Patrick is about. Never black and hite, me saying things crazy mean. I had 5 sisters, my dad would have beat me if I ever did anything like that.

Biggest concern is my father will find out. I'm in Asian style family. Everything about family honor, face. Can't have this get to my family. If it got around ROTC program, can imagine what would happen if my grandparents, parents found out.

[Sends text screenshots]

RMB: Restaurant

■ confronted me, said she said this, why did you do this? Didn't ask for sex.

Page **6** of **6**

Patrick Fleetwood             **RMB/KRH**             3/29/19
OEO – In person

Questions. Gave statement, was that not enough?

RMB: Have clarifying questions regarding harassment after relationship in your statement.

Protections against slander. In PT, people are saying things. Worried about my reputation.

RMB: Spoken to supervisor? OEO can convey to supervisor, prohibition on retaliation.

Lt. Colonel Hobbs is not encouraging. Just certain friends, they like to talk. Interesting thing, they're going to talk about it.

Happened once, girls I have seen in past have been contacted by ██████ What point does this cross. Assume she's trying to gather dirt.

RMB: How did you become aware?

Individual said don't know what's happening. Said ██████ contacted me, asked a bunch of questions. Want you to know I'm not going to say anything. She wrote down that everything we did was consensual/

RMB: How long ago was conversation?

Very close to our meeting. I can take screenshots, but she asked me to unsave things.

My concern is I don't want these girls to be harassed, think have to be cautious. Mind game they don't need to deal with.

After I figured she was calling exes, thought that would be great thing for me to get list of people. All ex girlfriends to character check.

RMB: Relevance of character reference compared to allegations. Will address CP contacting exes. Ask follow up questions?

Can reschedule?

RMB: Rescheduled for 4/4 @ 11am.

Page 1 of 1

AGENCY RECORD
113

Witness Interview: ██████

2.22.2019

In person

RMB/KA

RMB: OEO process, purpose of today,

1. Purpose of today
Over here is a problem with one of our cadets a senior and a freshman. Patrick Fleetwood. No nothing specific just heard it was drama between them.

2. How do you know RP and how long? He was in my platoon freshman year, I've hung out with him a couple of time, helped with a few assignments. So about three years. ██████ ██████ know her through ROTC and working at the library with me.

3. Through our investigations several people have told us that Patrick makes sexual/inappropriate jokes, and langue, can you describe for me what you have witnessed Patrick say or do that would be considered inappropriate?

Not directly, I didn't notice, I just don't hang out with the upper class men really.

4. Have you ever received pictures or videos from Patrick that are of a sexual nature?

Freshman year there was a snap video that was unwanted. I talked to him about that it stopped for while, then he sent another. He didn't remember probably because he had alcohol in his system, and a few months later I got another one.

5. The content of those videos?
It was him having sex with someone. I didn't recognize who the female was in the video.

6. I just told him that I didn't need to get that, I didn't need to wake up to something like that, he sounded like he understood. He acknowledged that you didn't want to receive any more of those. Same as the first video in nature sexual content.

7. Ever hear talk about sharing with other people?

No.

8. Pictures,

No

9. Did he offer apology,
   a. I honestly can't remember

10. Timeline
    a. A couple months in between

11. Felt after second video?
    a. Irritated,

When ▮▮▮▮▮▮▮ reported it, he asked if there was anything else that Patrick had sent me.
12. Any questions about ▮▮▮▮
13. Have not heard him say anything inappropriate

I never saw them hanging out really, I never heard talk about her.
Did say videos were unwanted?
        Yes.

No and not even when I first received them.

Witness Interview: ▮▮▮▮    OEO    2/22/19    RMB/KDA    1

RMB:    Process

OEO/EP 15

File/Records/Redactions

CCS

RMB:    Why here?

Problem with one of our cadets; Senior w/freshman

Patrick

In my platoon Freshman year

Helped with a couple assignments & ROTC

He's one year ahead of me; both in program since freshman



- One of the Freshman this year
- Works in the same library as me

Heard concerns about P's behavior towards women

Haven't heard anything directly, barely pay attention to upperclassmen

Pictures/Videos?

- Freshman year; Snap video that was unwanted. Talked to him about got another one. Didn't remember. Think alcohol
- Talked to him – got another

Content? Him having sex with someone  - couldn't recognize the other person in the video

What did you tell him: Told him I didn't need to wake up to something like that. He sounded like he understood; he was understanding.

Acknowledged that you didn't want to receive more? Yea

Second time? Same as first convo – video was same as first in nature

Mention if he ever shared it with other people? No

Pictures?

Couple months in between him sending videos.

How did you feel after second video? Irritated

▮▮▮▮ – mentioned reporting, and asked if anything P had sent me

Witness Interview: ███████    OEO    2/22/19    RMB/KDA    1

Ever heard P make in appropriate comments or jokes about B? No

? I didn't really see them hanging out around each other

? Never heard him talk about her

Said overheard there was a problem? Nothing specific, just some drama between them.

AGENCY RECORD
117

██████ ███    RMB/**KRH**    2/20/19

OEO – In Person

RMB: OEO process overview.

Curious how I got brought up as witness?

RMB: Name provide by another person.

RMB: Why you think you're here?

Think it's because I'm close friend of the person being accused. Maybe I would have insights, anything I've heard or observed regarding matter being investigated.

RMB: Who is person?

Patrick Fleetwood.

RMB: How do you know Patrick?

Met in ROTC. Developed friendship.

RMB: How long in program together?

This is his senior year. He's been since freshman. I've been in since Aug 2017.

RMB: What has Patrick shared with you?

Told me there was accusation against him. That's really it. Of course, classic things you hear but don't know facts. He just shared there is accusation against him.

RMB: What did you hear?

Didn't hear of any rumblings until we got brought to light. Don't know. All came out of nowhere in my opinion. I like to stay disconnected from drama, don't know what was going on. Matter came up, heard so-and-so having relations. Pitter patter. Haven't heard much set in stone. I'm not well educated on matter.

RMB: Know who other person is?

Believe it is ██████ ███████

RMB: Know her.

Know her through ROTC.

RMB: Relations?

Believe something about fooling around together. Hung out a bit. Not 100%.

RMB: hang out with them together?

No.

RMB: Did Patrick talk to you about what to say? Prompts?

No.

RMB: What is Patrick's reputation in program re women?

Fooling around a bit, ladies man. That's it.

Page **1** of **3**

███████                    RMB/**KRH**                          2/20/19
OEO – In Person

RMB: Heard Patrick make sexual comments, jokes, around cadets?

Yes.

RMB: Recall anything in particular?

No. just in one ear, out the other. Loose conversation.

RMB: Heard him make sexual jokes/comments in regards to 

Nothing I can recall.

Before all this, I didn't know anything was going on. Their relationship, don't know what it was. All new to me. Before issue got brought up, nothing got discussed.

RMB: received or know anyone who has received videos from Patrick?

Yes.

RMB: Know who individuals are?

Don't know who, but I've received stuff.

RMB: What kind of stuff?

One with a girl in bed next to him. Stuff with chick in bed next to him. There were no sexual organs showing.

RMB: None contained Patrick engaging in sexual activities?

I did not receive any of those.

RMB: Last time you received video?

Do not recollect date. Only thing comes to mind was a girl sleeping on him, something like that. That's the one that comes to mind. Don't know date.

RMB: Before or after winter break?

Before.

RMB: Anyone shared concerns about Patrick with you?

People have commented he needs to tone down being open about his romantic life. Really watch what he's sending people over social media. Biggest concern people brought up. Needs to check himself, stop doing that stuff.

RMB: When Patrick would share videos, how sent them?

Over Snapchat.

RMB: Anything else to know?

No.

RMB: Ever ask Patrick to share videos with you?

No. Never.

Page **2** of **3**

████████████                    RMB/**KRH**                    2/20/19

OEO – In Person

RMB: Had conversation with Patrick about language?

No. I've never told him to tone it down personally.

AGENCY RECORD
120

Witness Interview: ███████████

2.20.19

RMB/KRH

1. Today's purpose?
   I think that Im close friends of the person being accused, anything I have observed or heard in the matter being investigated. Patrick Fleetwood. We meet in ROTC and then we just developed a friendship. He has been in since a freshman, I've been for two years.

2. What information had Patrick shared with you: He told me just that there was an accusation made against him and that's really it. There is the classic things you hear, and things that are facts.

3. I didn't really hear any rumblings, when things got brought to light. It all came out of know where. But all of a sudden, I heard so and so having relations and then there are just the casual conversation. ███████ ████████ and I know her through ROTC. I believe that they might have been fooling around together.                                                               .

4. Ever hangout with them?

   No, never.

5. Prior to coming in did Patrick talk to you about what to say to us?
   No.

6. In your opinion what is Patrick's reputation within ROTC when it comes to women?
   He kind of has a reputation of fooling around, kind of a ladies man.

7. Have you ever received or know of anyone who have received pictures or videos that would be consider sexual in nature?
   Yes, I have received stuff, one with a girl laying in bed next to him, chick in bed next to him. No body parts showing.

8. Last video sent?
   It was like a girl sleeping on him, sent before winter break.

9. Sex language/jokes

   Yes

10. What have you heard?
    Just kind of things, and lose conversation but nothing I can recall

11. Ever hear jokes or comments about ███████

No

Nothing that I can recollect, before all this I didn't know anything that was going on. It was all pretty new to me, nothing ever got really discussed.

Videos were sent over snap chat, never asked for him to send videos.

People have commented that he needs to really tone down the way he talks around people and to what he sends on social media.

Anything else that might be helpful?

No I have never talked to him personally about his language or behavior.

Witness interview: ██████ ██████

2.15.19 In-Person

RMB/KRH

Any idea why you are here today?

There is a guy in the program who is under investigation for sexual harassment.

Know the guy?

Yeah Patrick Fleetwood

First time hearing about this?

Within the last month

Anything specific?

Sexual relationship with out girl in the program, held something over her or against her. Know the girl,

Yes ██████ ██████ I think.

I know my freshman 2016-2017 he would send snap chats right out of the shower, yeah that was while he was dating someone I knew. It came from his phone. Like a lot of Mirrors have bands along the bottom, like a piece of metal, the band would perfectly cover his crouch. Maybe but nothing as memorable as that picture.

One time or multiple?

It wasn't a onetime thing, just one once and while.

I never asked for him to send me photos he was dating my friend at the time.

Caught off guard, kind of I mean probably mostly, grossed out because he was with my friend it was kind of random diffently caught off guard.

There have been other females, I can't remember specific names and dates but in my mind those weren't not only going to me.

I think it's been a general consensus that this investigation is overdue. The way he talks about women

You can't develop that kind of trust with the way he acts. Everyone kind of knows he is pushy in a sense.

There is one thing, he talks about his system. Because he has so many women contacts he has an emoji's system. If it has a red heart she has a big butt, certain emoji's mean certain things. Pretty much common knowledge that he has this system in place.

He would say don't shit where you work, we knew about that and it wasn't in the work place at the time.

No photos specifically

Aggressive towards I didn't know of any till now about those wanting to come forward with complainant.

██████████
OEO – In Person

**RMB/KRH**                                                                      2/15/19

RMB: OEO process overview.

RMB: Why you're here today?

Have a guess. I'm in ROTC. Guy in program under investigation for sexism or potentially holding inappropriate relationship over somebody. I've been trying not to snoop.

RMB: Know who it is?

Patrick Fleetwood.

RMB: When was first time you heard situation?

Within the month. Not sure, couple weeks ago.

RMB: Recall anything specific you heard?

I heard he had sexual relationship with another girl in program. Somehow held something over her or against her. Something along lines.

RMB: Female?

██████  ██████

RMB: Inappropriate photo?

2016-17, freshman year. He would send Snapchats right out of shower. It was cleverly placed objects. While he was dating somebody I knew.

RMB: Send directly to you?

I don't know if they were sent just to me, but from his phone. Of him.

RMB: Things were placed?

A lot of mirrors have bands along bottom, metal. Sometimes that band would just cover his crotch. Everything else was out. Something like that.

RMB: Send you anything else?

I've talked to him before.

RMB: Inappropriate?

Not anything as memorable.

RMB: How frequent were photos?

Definitely got a handful. Wasn't a one time thing, but wasn't daily. Every one in a while.

RMB: Ask to send him photos?

No. he was dating my friend. I wouldn't have done that.

RMB: How did photos make you feel?

Caught off guard. Mostly grossed out. He was with my friend and it was random. Caught off guard.

Page **1** of **2**

RMB/**KRH**                                                         2/15/19

OEO – In Person

RMB: Anyone else who has received photos?

Yes, but can't think of names.

RMB: Male or female?

Female. Can't think of specific name, but those were not just going to me.

RMB: Others who has made comments about his conduct?

Think it's been general consensus his investigation is overdue. Way he talks about women is not acceptable, especially for career path he's choosing.

Pushy in a sense, like he's looking for ladies.

RMB: Things he's said?

Talks about system he has, advertises it. Because he has so many contacts in his phone, he has an emoji system. Example, like a red heart, she has a big butt. A purple circle means she's down to sleep with him. He's talked about that on multiple occasions, publically.

RMB: Other female cadets in program who have had problems with him?

He has phase he would say, don't shit where you work. This was all we heard about it but it stayed out of program. For the most part. Exceptions like Snapchats.

RMB: Females who have left program because of him?

No. Don't think so. Not that I know of.

RMB: Know of anyone else who have received pictures?

Not specific names.

RMB: People in program have perception of him being aggressive towards females?

Think so.

RMB: Anyone talk to ROTC leadership about him?

I don't know of any until now.

RMB: Anything else to know?

No.

Page **2** of **2**

Witness Interview: ███████████
In person
2.14.19 RMB

Any idea why you are here today?

Between ██████ ██████ and Patrick Fleetwood and the fact that ██████ wanted to go and make some statement, she said he said that he would cause harm to her somehow.

How do you know ██████
Since start of September 2018, I'm currently a junior senior as of right now. Dated for about 2 and half months. The relationship ended because we wanted different things, maturity level and such. I got out a serious relationship and didn't want to get back in. I didn't know if I wanted to date her long term so trying to figure that out. Yeah we stayed in contact still somewhat friends on some level.

Do you know Patrick?
I've been friends/peers with since our freshman year in ROTC. We (██████ we tried to not let alof of people know.

What did she share with you?
She said she was having problems with Patrick, she said " like being a dick head'. No examples that I can recall.

Have you heard of others talking about Patrick's behavior towards women?

He treats women like shit, he uses girls for sex, he cheats on his girlfriend. Has a snap chat block of girls he has had sex with. Its like a "black" book but only on snap chat. Not a lot of girls from ROTC just a lot girls from all around. His best friend ██ other seniors in our program. It is pretty well known about his behavior towards women within the program.

Reference to Eskimo Bros?
Eskimo bros: I found out he had sex with ██████ he said yeah bro we are Eskimo bros now. We had a class together and I asked him when he came in. It wasn't in a space where a lot of people could hear.

Has Patrick made inappropriate comments aloud in your presence?

Nothing directly to me, I've heard second hand. I've heard he was upset that ██████ was discussing with other freshman about going to ROTC instructors that that was a possibility.

Any contact with Patrick prior to you meeting with us today?

Ok nothing directly about this,
He did send a message, when he found out this might be coming his way he said. (looking through phone for message): ██████ filed a sharp case against me. (Text messages provided).
More like locker room talk, he does say things to where others can hear and they tell him to shut up.

Peer wise, yes most of peers have said something ████████, Taken him to the side and talk to him. Not sure about the behavior part if other have said anything to ROTC leadership.

Inappropriate pictures from Patrick?
I know one individual who gets them regularly (████ Actually we are both in National Guard, He would get snap chat videos or something like that. Of Patrick and different females. He said a variety of things, but sexual in nature. I cant remember how we started talking about it.

I don't have anything else, that's all I know.

█████████                          RMB/KRH                          2/14/19
OEO – In Person

RMB: OEO process overview.

RMB: Why you're here today?

Yes. Between █████ and Patrick Fleetwood. Fact hat █████ wanted to go and make claim, statement that Fleetwood was. . something about violence. She was saying if she reported him, he would do something. She was my ex girlfriend, he was guy after me. They had falling out.

RMB: How long known █████

Beginning of September.

RMB: 2018?

Yeah.

RMB: New to program?

No.

RMB: How long did you date for?

Would say 2-2.5 months.

RMB: How know Patrick?

Have been friends, peers in ROTC, since freshman year.

RMB: Prior to you and █████ relationship, did you share that with Patrick?

We tried keeping it down low. Everyone figured out we had thing at one point or another.

RMB: You and █████

We tried keeping personal lives separate, but everyone found out.

RMB: How did relationship end?

We wanted different things. Different maturity levels.

RMB: Say more?

I just got out of serious relationship, she was person out of me. I didn't want another long term relationship. I didn't know what I wanted. Didn't know if she was person I wanted to date long term.

RMB: Stay in contact after breakup?

Yeah off and on. Nothing bad. We're still friends on some level.

RMB: Ever heard anyone talk about Patrick's behavior towards women? What heard?

Yeah. He treats women like shit. Uses girls for sex. Has sex with multiple females when he's seeing girl. Cheats on them. He has snapchat block of all girls he's had sex, flings with.

RMB: Snapchat block?

When he's chatting with them, he has them as friends. It's like his little black book on snapchat.

Page **1** of **4**

█████████                        RMB/**KRH**                                    2/14/19
OEO – In Person

RMB: Most girls from ROTC?

No, different years, sports, classes.

RMB: Patrick ever said anything inappropriate to you about █████

Nothing to me. I've heard second hand stuff.

RMB: Second hand?

Second hand, heard that he was upset that █████ was discussing with another freshman about going to instructors. He wanted to beat up the other individual pressuring her to talk.

RMB: Other individual.

Can't remember.

RMB: Talking about?

Going to ROTC instructors. He was upset that was a possibility.

RMB: Ever heard Patrick refer to you and him as eskimo bros? Context?

Yeah. In context I found out he had sex in █████ I asked him about he, is it true? He said yeah, we're eskimo bros now.

RMB: Where did that happen?

Had a class last semester. I asked him when I came in.

RMB: Know if anyone else heard?

No. We sat down, I asked like what's going on with you and █████ That type of context.

RMB: Who said Patrick treats women like shit?

I know his best friend, █████, talked about it. █████ Other kids, seniors in our program have said that. Pretty much consensus.

RMB: Females saying these things?

Only talked to █████

RMB: Well know of Patrick's behavior in program?

Yes.

RMB: Did Patrick make contact with you prior to being here?

We talk on regularly basis in ROTC, but nothing about this.

RMB: Patrick give you promises before coming in here?

He did send message. When he found out this might be coming his way, he sent a message saying [checking phone for message]

'in class what's up' he's like 'there's shit up. ..filed case against me.' Context was "Patrick wouldn't do that."

Page **2** of **4**

████████          RMB/**KRH**          2/14/19
OEO – In Person

[RMB taking pictures of phone messages]

RMB: When Patrick makes comments about women, normally in ROTC environment?

Think it's more locker room talk.

RMB: Says things where people can casually hear him?

Yeah. People tell him to shut up.

RMB: ████ talk to you prior to filing a report?

She said she was having issues with him. I told her, if you feel you need to report something, report.

RMB: When was conversation?

Beginning of January.

RMB: Did she say what problems she was having?

Just him being a dick-head.

RMB: Did she give example?

None I recall.

RMB: Anyone else talk about Patrick's behavior?

Peerwise, yes. Most of my peers have said something. Even his roommate ████ have taken him aside and talked to him.

RMB: Anyone said anything to ROTC program leaders?

Yeah.

I don't think about his behavior, but about the incident. She reported that to them.

RMB: Ever sent inappropriate images to you?

Not to me, but I know one person who gets them regularly. 

RMB: What did ████ tell you?

This weekend, he told me in instances last year, he would wake up to Patrick and female doing something.

RMB: HE would wake up to them?

It would be snapchat message or snapchat video. Something like that.

RMB: Tell you what videos are of?

He said variety of things. I just know they're sexual in nature.

RMB: Share with you how it made him feel?

No.

RMB: How that came up in conversation?

Page **3** of **4**

██████████
OEO – In Person

RMB/**KRH**

2/14/19

Can't remember.

RMB: Anything we should know?

No. Think you've hit all highlights.

Page **4** of **4**

████████████            RMB/NAF                    2/8/19

NAF – in person

**OEO** : EP 15; OEO process; notes; confidentiality, PRR overview; retaliation

Do you have my statement?

**OEO** : Yes

I want to make sure I'm able to remember order of events

**OEO** : Idea why you're here?

Fair idea. Because of incident with Fleetwood and ████

████ and Patrick. Work with her in library. In ROTC with him. She was recently hired at library. I knew her from ROTC before the library

I've known Patrick spring semester of last year is when I started having on and off conversations. Never actually friend level but friends with a lot of his friends.

**OEO** : Knowledge of incident?

She came to me told me they had physical relationship. More we talked she opened up and said after she decided to cut it off, he started to slander her in front of other cadets. Told her she wouldn't get her scholarship or airborne slot she was actively pursuing in ROTC.

Later than night, B attends color guard practice. I'm captain She stepped out because Patrick found out, called, threated her – if you tell anyone about this, ruin your reputation.

He sent me a text that was it was unbrotherly not to talk to me about this Confronted after PT session in the morning. Acted not aggressive but he was kind of posturing make himself seem menacing. Accused me of having a history of bringing thigs like this. Nude photo last year, reported it.

After that talked to couple older cadets. Eventually B decided to talk to one of the cadre about it.

**OEO** : Copy of text he sent?

I was really pissed off and deleted that. He probably kept it. Without context, it would look good for him. It was over Facebook Messenger. I have witnesses who saw him act in a more aggressive way towards me. ████████  ████ Wrote that on my statement.

Those text messages would have looked good on him. They were friendly in nature. Then came at me with completely diff demeanor the next day

**OEO** :

She kind of said she felt like her reputation was being ruined.

**OEO** : Examples of what he would do?

She told me He would tell people certain parts about their sex life. Can't remember specifics. There was another former cadet he said he had slept with, but they had no physical relationship. Rumors are crazy in ROTC.

**OEO** : How long in program?

AGENCY RECORD
133

███████████                    RMB/NAF                    2/8/19

NAF – in person

Since I transferred from WSU Vancouver. Whatever last fall was. 2017.

**OEO** : Heard other cadets talk about RP's behavior towards women?

Yes. Basically things like he's said some very sexist things. Never heard firsthand from him mouth but heard from people I trust a lot. I take that as fact. He did say something, can't remember specifics, in front of cadre. "You're towing the line of SHARP." I know it happened in my presence, but not sure what I said.

**OEO** : Present when ███████ was thinking about reporting?

The CUB is when I first found out I said this sounds like SH I think you should say something. I strongly felt she should talk to a female cadet.

**OEO** : When did you first learn about it?

I know it was right before a color guard practice. I was livid for the rest of the night.

**OEO** : Heard RP make negative comments about CP?

No. Tend to not interact with him. Heard rumors about him being sexist prior to this. Specific incident crossed the line about what he was doing. ███████ said after she wanted to cut off physical relationship he was picking on her telling her stupid at the ROTC table.

I do remember an exact quote. She had also dated cadet ██████ He made a comment to ██████ about being Eskimo Brothers. Close to battalion during physical training event. ███████ was there and heard it. ██ might be able to tell you when that happened. I don't know.

██ told me he had heard it. And I think ██████ had told ██████ what he said. I can't remember, but I do have some sort of recall telling me that he did.

**OEO** : How have you seen this impact ██████

I didn't know her before all this happened, so not sure. But I remember she went up to the cadre. She was talking to my fiancée We were trying to walk her to her apartment. We were pretty sure word was going to get around quick. We walked her and I remember her saying she was comfortable getting it out. She could talk to her mom about it.

**OEO** : Why walk her?

We know word travels quick and we were worried he would try to confront her based on the call he made to her the other day. Cadre called us back and made us write sworn statements.

**OEO** : Color guard contact?

She said he threatened to ruin her reputation if she went forward with it.

**OEO** : You had missed phone calls?

Yes he called me a bunch of times. I know that since I had had that, he called me after I made statement and I just ignored it and didn't pick up. Ignored it.

[RMB takes photo]

AGENCY RECORD
134

████████████████    RMB/NAF    2/8/19

NAF – in person

People had mentioned he had been saying some stuff. They basically came out and said we support ████ we've seen a trend, glad someone said something – ████████ ██████ 3rd year cadets.

**OEO** : Their concerns?

████ had received unwarranted shirtless pics in the past. ██████ said he sent him snapchats videos of him having sex with individuals. After ████ said to stop, he did for a little, but more came. I work with ████ at the library as well. He's a third year cadet.

**OEO** : When?

He told me this right after I gave the statement. Word got out. Friday after I gave the statement, I think.

**OEO** : ████ say if he knew any of the people in the video?

He did not. I don't know if girls knew they were being recorded.

This was after stuff had gotten out and ████ said, he'd done that in the past.

████████ said he received same types of snapchat.

His inner circle of friends he sends this stuff to? I don't know.

**OEO** : Know of Patrick reaching out to people?

I believe ████ said Patrick reached out... bro I'm not going to lie for you. This is hearsay from ██ but he talked to his roommate ████████ who said he wasn't going to perjure himself.

Other roommate is ████████ He found out and was kind of disgusted by it. He said, I think you're doing the right thing [reporting it].

First week, everyone knew. This is weird.

**OEO** : Fiancée expressed concerns?

She's said he's a dick. Pretty sure she thinks he looks down on a women in a way. She's a second year cadet. Pre-existing relationship. Normally dating cadets is no Bueno.

**OEO** : ████ receiving shirtless photos?

She told me herself. I think pictures were from shower. Unwarranted and made her feel uncomfortable.

**OEO** : Training on SH?

Yes, we do. Ironic that it was literally a week before█talked to me that we had that training. It was a week before we had the training last year that photos were sent in the group chat.

Person taking photos were disciplined. Can't remember names. Not even sure they go here anymore. Person in the photo who was passed out left and joining army. I think the other guy did the same.

Typical college party. Dude assed out. Ass was out, up in the air. Snapchat that was specifically labeled ROTC Class of XX. We'd been told, do not do that.

Page **3** of 4

███████████████     RMB/NAF                                    2/8/19

NAF – in person

Fiancée – █████████████

**OEO** : How did Patrick know B was planning to report?

I think it was ██ saying it's getting out, you're in trouble. ██ and I in fraternity together. ███████ had told ██ about it previously. He and Fleetwood were very close. ██ talked to dad. Dad said you can't defend this guy if he's doing this stuff. I know ██ wants this to move forward, too. Good friends with Fleetwood, but also kind of disgusted.

**OEO** : Heard from other female cadets?

I've heard just rumors that others have been talking and they came forward. There was a prior cadet he said he had sexual relationship with, don't remember name.

**OEO** : Rumors?

I asked ██ How many other freshman? ██ said, think of all the female 1's, how many are attractive, and how many are gone. Just by that statement, I think he said enough.

I do know he has tendencies with dating apps. Roommates said 9 girls came out of his room in one day. If it's consensual I don't have a problem with it but mixing it with this matter, that kind of adds some concern to my mind.

**OEO** : What kind of concerns?

If those rumors are true and he's been with so many women, I wonder how many have turned out the same way.

**OEO** : What did you interpret ███ statement to mean?

The way I took it initially was that they left because of him, but ██ said they just left for other majors or things like that. He has names. He didn't tell me, wanted to keep it confidential. But he'll probably tell you.

**OEO** : Anything else to share?

Not that I can recall. I'm sure I've talked to more people, but I don't think I have any more. If there is anything else I remember, I have your email.

AGENCY RECORD
136

███████████████ Witness interview

2.8.19 RMB/NAF

In-Person

RMB: OEO Overview and Process

Questions about what I just went over?

No.

Do you have any idea as to why you're here today?

Yeah, because of the incident █████ and Patrick. I know her because I work with her in the library, and know Patrick from ROTC. I've known Patrick since about spring semester last year. I'm friends with a lot of his friends. What I'm aware of is she came to me they had physical relationship, once she decided to cut it off he started to slander in front of other cadets. Saying things like she wants going to get her scholarship and other things she was going up for.

She attended color guard practice, Patrick called her and t her and that he would ruin her reputation, that's the extent she would tell me, then he sent me a text and saying like it would be unbrotherly. I talked to him the next morning, he kind of was acting aggressively, and then he accused me of bring things like this up, last year nude pic was sent. I told him to stop talking and after that I talked to some other cadets and █████ was encouraged to talk to the cadre about it. I deleted the message but he probably still has it. █████ ████ and ███████. Without the context of the interaction I had with him, those text messages would look better for him. They were friendly in nature.

What concerns did ██████ share with you?

Basically she kind of said she just felt like her reputation is being ruined by him

He would tell people about certain parts about their sex life.

I was at WSU Vancu last fall 2017, been at WSU Pullman since fall 2017.

Basically things like he has said very sexist things, ive heard from people saying things about him in the past. I know he has said things in my presence but I cant recall specifics.

Every hear about this before

I was at the CUB right before color guard practice. When I first heard about what had happen

But I had heard rumors about him being sexist and specifics

She said after she decided to cut off started picking on her in front of her at the table.

I do remember an exact quite, she dated another cadet and they ended their relationship on good terms, that they were Eskimo brothers, this was close to the battalion.

How have you seen this impact ▮▮▮▮

I didn't know her before all this happen, but I remember after she went to cadre she was talking to my fiancé, we were walking to I remember she said that she could get it out, and finally talk to her about what was going on.

Why walk her?

We were worried that he might try to confront her, based on the call she got.

He tried to specifically get her not to report it. He did call me also several times but I didn't pick up.

People had for sure mentioned it before, ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮ both 3year cadets. I know that ▮▮▮▮ had received shirtless pictures of him before in the past. ▮▮▮▮▮▮▮ (3rd year) had received vides of Patrick having sex with other people that were unwanted. He told me that after I gave the statement, I think it was the Friday after I gave the statement. He did not mention, idk if the girls knew they were being recorded. ▮▮▮▮▮▮▮ (2nd year), might be inner circle of friends.

I believe ▮▮ said that Patrick had reached out to him and told him to "help him out" ▮▮ said bro im not going to lie for you. ▮▮▮▮▮▮ (Roommate of Patrick). ▮▮ has said he agrees because he believes that Patrick would do the things he is being accused of.

Has fiancé said anything?

She thinks he's a "dick"

She thinks that he looks down on women in some regards.

████ told me herself that she received pictures from Patrick, just that she had received pics of him in the shower. They were unwanted and made her feel uncomfortable.

Training Provided?

Yes, the week before ████ had talked to me, a week before the training last year same thing happened.

Do you remember names of people from last year?

I'm not sure if they are still here, I think he left and joined the army out right I think but can't be too sure: dude was passed out on the floor with his butt in the air

 (Fiancé)

I've heard just rumors since this whole things has come out.

██ said this "how many other freshmen he has been with? Think of all the first year cadets, the ones active, then think of the ones that are gone" the way I took is that he had been doing the same thing, but they also left for other reasons.

The fact that if those rumors are true, I wonder how many of these turned out in the same way.

2.7.2019 RMB/KRH

Witness Interview- ███████████████

In-person

OEO process overview.

know ████████How?

Yes. Through ROTC. Known of her since beginning fall last year. Got to know her better this year, she's in one of my classes. Don't know anything other, don't know where she's from. More acquaintance than friend. Incident at CUB during lunch/dinner. I don't sit at that table, but know concern. She's talked about it before. Group of ROTC students at that table.

Did she express concerns about another member of ROTC?

Yes, Patrick Fleetwood

What she's told you about situation?

If I remember, don't know when it happened. Think incident started this, her and Patrick, I know they had sexual relationship in Nov. My understanding, sexual relationship in Nov. Don't know what happened after that. Think what happened at CUB table, she was talking about something not related to their relationship and he was being rude. Like a paper or assignment. Something that seemed not insignificant, but not related to sexual relationship. Another cadet said shouldn't be talking that way in uniform, but I wasn't there. Assume it was vulgar.

How long known Patrick?

I've known him since freshman year.

Describe his behavior/demeanor towards females?

Tough question. We used to be good friends. I changed a lot as a person in junior and senior year. Dynamic changed. When this case is developing, people saying Patrick is rude to women. I don't see it. I was involved in an investigation last year. If his demeanor towards women is negative, he's probably trying to keep it away from me. Don't know how I can describe his demeanor towards women other than neutral. To me. Tough question.

Heard many accusations. I don't know Patrick that well anymore, but I don't see it. They say well you're good, he doesn't show you.

Lot of people say that?

No, in light of case.

Don't know what ██████ has told you, but I'm only female she asked what to do about this. Context of other people having her back. Met with her and other cadets, and they said this is what he does. If this is what he does to you, report it, but I can't make any general comments about trends in his personality. Think he demeanor is neutral, I don't see it.

Anyone ever come to you and said Patrick did this or that?

Only ▮▮▮▮ as of recently. Think that was only because other cadets she told said you should talk to female about this. We don't know each other well at all, don't know why she would go to me. Confused when she emailed. Rumors were flying, I thought probably about this. Was confused about witness part because I didn't really witness anything.

She's only one that's ever came with specific 'Patrick did this to me.'

Has Patrick ever used his positon, standing in program, to manipulate cadets for dates?

Don't think so. He doesn't really have positon. He's not in positon of authority that could do that. Could say if he did, don't see how he would be in position to do that other than seniority thing. I haven't seen it. Don't think he's ever dated younger cadet other than ▮▮▮▮

Dated others?

Don't think he's dated another cadet at all. Was in long term relationship for a year, but it ended, she moved. Other than that I don't know. Used to know him well. He's never held commanding position to say like I'm battalion commander. Never in position like that.

Ever witnessed interactions between Patrick and ▮▮▮▮ other than CUB?

I didn't witness that, wasn't at table in CUB. I've never seen two interact. Last semester, she was in challenge, did things separate from battalion. Don't know when relationship started, think Nov. Don't know if they were officially dating. Ranger challenge probably ended sometime around then. I've never seen them interact at all.

▮▮▮▮ I've barely known. He's a senior, she's a freshman. We do different things in program.

Ever heard anyone else make other comments about Patrick?

Honestly, nothing specific. Just general, this is what he's always been, or because of family issues he's this way towards women. Haven't heard specific examples. Just like he talks about masculinity. Don't know if it's true or people are shielding it from me because I'm good Christian girl. Was in investigation last year, don't know if I'm seen as a snitch, narc.

Email for witness. Got phone call from Patrick too. Said this is going on, want you to know about it.

Details he shared?

There's an investigation between me and ▮▮▮▮ Said basically she had been saying he had been pressuring her for sex.

Patrick say anything about prompting you, telling you to lie or change story?

No. I don't think he knows I'm here. I don't know ▮▮▮▮ so I don't know why he'd think I'd be called in investigation. Me and 2 other cadets met in Library room. She was like what should I do, come forward with this? That was 2nd week of school.

When did ▮▮▮ tell you? In January?

Something like that. That's when she talked to me about going forward. She was afraid of retaliation. Think she wanted another female senior cadet to have her back.

Did she say anything about being afraid of retaliation?

I think reputation. Hard to have rep already established like when you've slept around in program, to have rep that's freshman girl who slept around. Didn't want to be girl who made rape case and have people think that. Don't think she was scared of Patrick, think he has fragile ego, but not aggressive. Think she was more afraid of reputation, don't want to be girl that made false rape case.

Other Cadets who were at the library?

Cadet ▮▮▮ ▮▮▮▮▮ and ▮▮▮▮▮▮.

████████████                          RMB/**KRH**                          2/7/19

OEO – In Person

RMB: OEO process overview.

RMB: know ████ How?

Yes. Through ROTC. Known of her since beginning fall last year. Got to know her better this year, she's in one of my classes. Don't know anything other, don't know where she's from. More acquaintance than friend.

RMB: Incident at CUB during lunch/dinner. Did she express concerns about another member of ROTC?

I don't sit at that table, but know concern. She's talked about it before. Group of ROTC students at that table.

RMB: What she's told you about situation?

If I remember, don't know when it happened. Think incident started this, her and Patrick, I know they had sexual relationship in Nov. My understanding, sexual relationship in Nov. Don't know what happened after that. Think what happened at CUB table, she was talking about something not related to their relationship and he was being rude. Like a paper or assignment. Something that seemed not insignificant, but not related to sexual relationship. Another cadet said shouldn't be talking that way in uniform, but I wasn't there. Assume it was vulgar.

RMB: How long known Patrick?

I've known him since freshman year.

RMB: Describe his behavior/demeanor towards females?

Tough question. We used to be good friends. I changed a lot as a person in junior and senior year. Dynamic changed. When this case is developing, people saying Patrick is rude to women. I don't see it. I was involved in an investigation last year. If his demeanor towards women is negative, he's probably trying to keep it away from me. Don't know how I can describe his demeanor towards women other than neutral. To me. Tough question.

Heard many accusations. I don't know Patrick that well anymore, but I don't see it. They say well you're good, he doesn't show you.

RMB: Lot of people say that?

No, in light of case.

Don't know what ████ has told you, but I'm only female she asked what to do about this. Context of other people having her back. Met with her and other cadets, and they said this is what he does. If this is what he does to you, report it, but I can't make any general comments about trends in his personality. Think he demeanor is neutral, I don't see it.

RMB: Anyone ever come to you and said Patrick did this or that?

Only ████ as of recently. Think that was only because other cadets she told said you should talk to female about this. We don't know each other well at all, don't know why she would go to me. Confused when she emailed. Rumors were flying, I thought probably about this. Was confused about witness part because I didn't really witness anything.

She's only one that's ever came with specific 'Patrick did this to me.'

Page **1** of **3**

████████████████          **RMB/KRH**                                    2/7/19

OEO – In Person

RMB: Has Patrick ever used his positon, standing in program, to manipulate cadets for dates?

Don't think so. He doesn't really have positon. He's not in positon of authority that could do that. Could say if he did, don't see how he would be in position to do that other than seniority thing. I haven't seen it. Don't think he's ever dated younger cadet other than ████████

RMB: Dated others?

Don't think he's dated another cadet at all. Was in long term relationship for a year, but it ended, she moved. Other than that I don't know. Used to know him well.

He's never held commanding position to say like I'm battalion commander. Never in position like that.

RMB: Ever witnessed interactions between Patrick and ████████ other than CUB?

I didn't witness that, wasn't at table in CUB. I've never seen two interact.

Last semester, she was in challenge, did things separate from battalion. Don't know when relationship started, think Nov. Don't know if they were officially dating. Ranger challenge probably ended sometime around then. I've never seen them interact at all.

████████ I've barely known. He's a senior, she's a freshman. We do different things in program.

RMB: Ever heard anyone else make other comments about Patrick?

Honestly, nothing specific. Just general, this is what he's always been, or because of family issues he's this way towards women. Haven't heard specific examples. Just like he talks about masculinity. Don't know if it's true or people are shielding it from me because I'm good Christian girl. Was in investigation last year, don't know if I'm seen as a snitch, narc.

Email for witness. Got phone call from Patrick too. Said this is going on, want you to know about it.

RMB: Details he shared?

There's an investigation between me and ████████ Said basically she had been saying he had been pressuring her for sex.

RMB: Patrick say anything about prompting you, telling you to lie or change story?

No. I don't think he knows I'm here. I don't know ████████ so I don't know why he'd think I'd be called in investigation.

RMB: When did ████████ tell you?

Me and 2 other cadets met in Library room. She was like what should I do, come forward with this? That was 2nd week of school.

RMB: Jan?

Something like that. That's when she talked to me about going forward. She was afraid of retaliation. Think she wanted another female senior cadet to have her back.

RMB: Did she say anything about being afraid of retaliation?

Page **2** of **3**

OEO – In Person

I think reputation. Hard to have rep already established like when you've slept around in program, to have rep that's freshman girl who slept around. Didn't want to be girl who made rape case and have people think that.

Don't think she was scared of Patrick, think he has fragile ego, but not aggressive. Think she was more afraid of reputation, don't want to be girl that made false rape case.

RMB: Other Cadets?

Cadet ███ ████████ and ████████.

Page **3** of **3**

██████████ Witness interview In person

RMB/DBR 2.6.19

So basically in ROTC I know Fleetwood and ████████, I consider him very good friends because friends with her and have hung out with everything. He has a dark sense of humor, he has said some things and made some jokes, he has expressed over time and shared how he sees women in his life. I told her not to get involved with him. They had sexual relationship, that ended in December, she deiced not to do that any more he began to think his gf was cheating on him so he started to look for someone else. He took her to lunch, started making advances he started being very abrasive. He just asked what does he have going for him. He blocked her on social media, and started telling people what had happened sexually between then. She started having a hard time in the program. She had more and more concerns and we talked about it for many hours. I have brushed these things off in the past, but I can no longer to do that. I don't want to see his life destroyed, but if that happens and that is a result. Our concern is for him as an officer would be that he would create an environment that would be hostile environment for females. He would make it that difficult for them.

Both you and Fleetwood have been

What kind of conversations?

So at first I can of brushed off his comments before, but as time went on he is actually treating people different. It isn't humor at this point, but its dismissal. They really started last semester, he wanted to be FM but I didn't want to take. I told him to improve himself morally, before you can join this group. The last time we talked about this, I will try and avoid cheating on my gf, I have serious doubts and later that following night was with ████████ And he knew what was required of him. Not that long ago we thought he had herpes. He had a relationship with a women who did have herps. My friends and I went over to his place to talk to him about is ST, that is serious problem. So then again, things in passing he is talking about things in uniforms, he would blow things off. We just started belittling his intelligence.

He asked for me to help him out in this matter. I'm trying to avoid him knowing which one im leaning. Im not going to lie for you, talk to your dad. He never asked me lie we haven't spoken in about to weeks.

First years?

One of the thing was to not sleep with anyone in the program. Basically he was just like she quitted everyone and that made us mad. One girl who he was seeing and he asked us what he thought IM not going to tell what you wanted to hear He braged about to people in the program, about photos. He is putting things out there that he cooks them dinner, he has a pattern or MO of how he gets women.

Several girls have left the program different reasons, she quit the program, another girl who he was sleeping with but it didn't happen. He was telling everyone ████████████. He lies about people he has been with. ████████, he treated them the same way. When he makes advances and they say no he flips the switch and starts treating them badly. I haven't heard about him treaing up peoples reps

This whole thing kind of kicked off, she was asking for advice. A cadet near buy heard SHARP, this one other cadet saw it has they are going to report this. I got a phone call from another cadet and then she called, then Pat I told her I was going to do this and this what do you think. She called and Pat called he came over and we talked about. Patrick found out lost his shit, he started calling and treating them. I have all these screen shots and your just a slut in the program. If it goes anywhere he was going to take them down with legal action.

It just doesn't happen with ████████ they broke up

Esikmo bros comment when she walked by.

Will spread rumors, STD, gave advice, and they had already been together, he isn't looking for friend he is looking for fling. She was thinking about going to basic training. Before she is gone for 6-8 months. Im just surprised she would go for someone from him. I need to see somethings change before we go forward. If you think he is a mason I think he is wrong.

He broke up with her, blocked her on facebook, and started bragging about his sexual behaviors. And I knew for a fact that she eventually she would want more than a fling.

I do know that he has asked people to lie for him. Its been more that

███████████

He showed me a text from Patrick

He was promoting a witness or statement. I saw the same message from two different peple. I encouraged her to go forward with it. Going around and doctoring messages and evidence. And our codrae is aware of that as well.

Havent heard anything about ruinning her reputation. He has made cras sexual jokes, and he can get really aggressive.

Did you observe him directly saying sexual jokes

We were at a training exsice and the dived the roomin two woen on the left guys on the right, ███was about 10 feet away, trying to make it sound like a joke "im going to rape her". He thought she was trying to get with her, but you have a girlfriend. He would try to play dumb saying what do you mean about dating. ███████████. We have all seen him say inapprotite things in and at ROTC events. ███ (is Pat's RM).

We told him to

Heard him making sexual jokes, in front of the LtCol. Patrick made the comment about

He had no memory of it. They had all been there.

They receive training, and that training was very deep and so that same week he made the comment about the wife in the woods.

His behavior has been a consistant over the time I've known him. I just try to walk away.

███████████████          DBR  2-6-19
                         RMB   in-person

Do you know why you're here today

    Yes   I know  both  Patrick and ████
    have  been  very good friends w/ Patrick
    Met  ████  last November  hung. out almost
    everyday

    Patrick  dark sense of humor
       said  some things made even joke
       then expressed  and then her
       he actually feels about more

    ████  and Patrick got involved
    I warned her

    They had sex and relation
    they end , 2 December Lends

    her reached out to her
    friend

    When he had done w/ ████
    he looked for someone to have Sex

    Went to Sechi  kept asking her to pursue
      Physical  she said no.

He asked what I have going for me
we're not dating

he then started social media
spreading private information
and rumors about him

They stopped talking
Still felt being judged
Concerns being viewed ██████████

We talked my rights my
power.

I heard another person indud
██████████ encouraged to
come by govern office

They came to me what do you think
don't want to ruin life but
right thing to report. Concerned
if he goes into military would
taint innocence similarly.

He joined 2015
I transferred in Jan 2016

Were told about his jokes, behavior
about women multiple times
they this is gonna bite you in the ass
he logically thought no thats
not gonna happen to me.
6 other people also talked to him
he blew it off

at first wrote off his jokes ordered sex
but then proclaimed his actual
views of women are abysmal

Patrick wanted to join organization I'm in
concern about moral character
he lied to me.

Concern about how truly hurtful
he my roommate other guy friends
talked to him about it no big deal
chill shlut, really putting w/ this
he wrote it off.

In uniform talking about some girl he
slept with...

AGENCY RECORD
151

try to talk about it w/ him
cool. People involved art
couldn't give names
he's like then it's not recall

Confront him about how it could hurt
his career. I said if I get asked
not going to lie for you.

Did he talk to you about coming here
We had conversation
he asked me to help him
I cannot let known what my
I am leaving I tell him going to
tell truth told him to talk to his
dad.

Consistent w/ Prof testimony w/ women celeb

He said he broke his own rule not to
fuck anyone in program
I chat group. Basically the squirrel
guy whin
One girl he was seeing broke up w/ him
talked to me and roommate
Night before he went out and slept w/
freshman
he had a bunch of photos he took of them
together.

They don't telling anyone about this
but then posting photos of having
dinner with them on snapchat

Pattern get steaks cook dinner,
have sex, then ghost them

Was any female cadet he dated left program
Yes several
███████ left for other reasons
███████ quit
another girl he told dated he talked about it
dont he slept w/ this freshman
She found out ~ really mad
~ upset
███████████████████ he hit on them even saw my
hit on them when they said no
Acted a switch negative
then still in program.

4/ ████ when turned negative did he communicate
w/ other cadet like disparage anything?
not that I knew
really just ██████████████████████

Did cadet Freshman call you when ████ would you come
Command?
Yes. ██████████████

John was talking to someone
options Title IX SHarp go to Command
O overheard by cadet ███████ it is
mean gossip to do this
Hey tell Patrick

███████████ called me said Patrick
threatened her had all this photos
going to ruin her

Patrick called me confused what she said
I'm not gonna ruin anyone
over her

I asked ████████ tend
Then Patrick called wanted to delete

He immediately called and ████████
When we talk about it he denies

Patrick said I ████████
I yelled at how far this and then
I have all of these screenshots in
case of you wanting it
Ruined just some shit

Sexual Commenting in public space    Yes not just ████████

Bk mum leadership we what in both
Xervice

As [redacted] mother key
my look its my ostrinro love
referring to how the two of them
had slept with her at different times

When you had known [redacted] had started to felt
w/ Patrick what manualy do her?

Basically & said I guess hes showy guy
if looking for flany other people
if not to keep professional dirt
think Patrick Can
Comment about him having STD
Told her a lot of comm w/ Rhots
not looking for bond hooking
for sleep w/ couple nights
then not hear from him
She was okay with ed Rhot nadal to
have fun because boiz

He did make her off, he blocked her on social media
he did spend negative times
He said men only attaby how w/ moral issues
because were jealous of all the girls he can get



Does he have a position of leadership?
    Company Commander
        Practicing role but no authority
    leadership duties

Use authority to
    As company Commander I can get you this
    than he does than

A lot of people think has a hard guy
    because my army skill.
    but that because people dont know
    how the system works

Comm sound like in Crush of hard catch?

Extremely and few
    Thinking in ████████
                ████████ with more
    ████████ lying down. behind him
    10 ft any
    He said that I'm going do report
        her making, i said like "just
    He was talking about how she spoke
        attractive.
    I said that but your have gf
        not really have GF
    Well how do you define dating

Shortly after I invited my own 2 weeks later they ended up being together

█████████████████

Pretty much never all seen him
do something █████████████████

█████████████ — Patricks roommate

Tell him how to take care of this
Don't lie
Tell them truth
Don't mess w/ people
Don't conduct her

2 examples of sexual jokes in front of
Community Holfes

Strogel said wants to retire to Colorado
Woods   never can hear me scream about
how much hate chiefs (joking)

█████  al present

Yeah kill of like how noene can hear you
wife screaming in Woods
Strogel said no dep to Tn like w/ Sharp

Training

Yes. That same week
he made that comment

Sgt 1st class ████ called him out on it
I thanked him for doing it.

Anything else we haven't asked?

Consensus terms of cadets
are really strong enough

he's make off comments about wanting to
sleep w/ someone.

happens so often its hard to pinpoint
& specific
usually I just pause walk away
nice one, super tight

other people have problem
they do them it out or
they might all say theyre bad something

1/24/2019 RMB/NAF

Intake: ██████ ████████ In person

N: Intro OEO, Resources, next steps

B:LTC Hops put a no contact order in place already

B: Late nov earl dec two wk window, had sex with Fleetwood ms4 rank, I think its his actions that followed are my concerns. We talked after we had sex we continued to communicate. November 9th started saying things about our sex life. He was saying things like "she squirted all over my shit, Eskmio bro (if two people have had sex with the same person) he is saying this in our professional area. Saying a lot things that aren't true, he is runiing my rep. A few days later jan 9th 2019, he snapchat messaged me and aks me if I wanted to co to red bento, and get some food. Sure why I thought it was going to be chill, low key.  We went and did that, he started asking questions hinting at getting back together. I said no, thanks I don't want to do that anymore. Then he becamse prosistent about it. When it got that I didn't want to do that, he started kinda of bullying me. LT.col is lying about upgrading your status in the program. He was doing this in group settings, not one on one. I realizd it was bad when people started asking me why he is so rude to me.

Jan 10, SCM between CP-RP (pic taken). He knows about the case. In ROTC people know everything, I dated a guy back in sept thur nov and just by dating hi  people started asking how many cadets have B slept with. Cadet Fleetwood, he imbodies the sexist culture that ROTC has, he is will to saying explicit things. After he blocked is when he started becoming very harsh towards me. Jan 15th I was sitting at the Cub at an ROTC table, ROTC can be headaches at times with gossip right now, I told them about what was going on with CFW, ████████ He suggest you go talk to codrae, idk don't want to be snitch. At 5pm CFW called, if you bring this case forward, you going to have no respect in the program, he was like listen if your going to do anything I got people backing me. CFW called ██████ and CFW said yes I thrented these people. That freaked me out that it would be to much of a risk. The sex was consenal not the behavior (harassing) is the problem. ████████ and others wanted to meet in library. We want to bring this case forward, they think this is really serious. CFW has been targeting first years, we are easy targets. He is seen as the "fuck boy" of the program, his behavior is conserving.

Got with femal cadet ██████, and female cadet ██████ apparently that wasn't true but he was telling people that he had got with them. Last semester he slept with over 30 girls in and out of the program, and he is just ok with talking about it. Just using women for sex, he is very open, friends think he is sexist. His approach to sex is very open and wold cross line. Just exploit everything about their sexual behavior. There is power play there between his rank and the underclassmen. I realized after talking to friends I need to bring this forward. When he was spearding these rumors it was very damaning, the severity of gossip and bullying  made me realze why someone would take their own life. That is ok with doing something like that to another person. This started to eat away at my MH, being called an ROTC slut its a lot to process and go about your day at the same time. I have to show up and be professional stay on track and its hard when you know in the back of your mind what people are thinking about you. Most student go to class and drama is out of class, my drama is on going because im with these people who are saying all these bad things about me as well.

Questions:how long where you guys sexual active with each other?

About two weeks time. CFW told me that the guy I was dating at the time was cheating on me. I think he was like using that

The reason I stopped having sex with is CFW is kind of a fuck boy and u shouldn't be getting with him, and he needs to learn to not get with girls. He told his friends group from break, im going to be loyal to this one girl he was talking to, not me. When I found out about that I didn't want to anymore felt like I was stepping on toes. He isn't a very loyal person, started dating in 2wk window When he asked me to go to RedBento, he was still dating that girl. That's why I thought it was going to be fine because he was with that girl. I remember telling him that you have girlfriend. He said oh think she is going to cheat on me, even if you weren't with her I still would want to have sex with you.

After Red Bento behavior change?

When I sent that text that's when he started being more hostile.

Affect in the classroom?

Mil history together. The day after the 10th had class with him, lots of ROTC kids in class. POlSci 427. I walk in and pulls out this random lipgloss, and he said I found this by bed did you leave that there. I rolled my eyes sat down, said it in front of whole class. Im not going to let this affect me not going to class with him, he wrote up this statement that he would bring forward and he sent to their group message, when I read it, it was hard to read, hard to read because he made it seem like I would make this thing up. ████ forwarded to me. He overall has charcther issues he has sent me some weird snaps that make me think what are you doing. Sexual jokes that he just puts out there.

Are there any guidelines for relationships in ROTC

No, not in army yet, but its a lot of taboo assicotated with it. Highly recommended against it. Ms4 have a lot of leadership over us. They lead our labs, they make the schedule over the year. Lab from 3-5 next lab is weapons assb disassb. There are platoons and we work in teams, they lead much of that. They lead us. Another issue with CFW he was leading our platoon, the enviorment he creates is hostile. He is condescending.

How often does he lead

They rotation so idk for sure

They put cadets on probabtion, and no contact order in place. I will see him but not working with him.

How did you find out about NO contact order

Hops told him this is what is going on, someone brought forward a sharp complainant. CFW that night went to talked to his friends and cadet ████ was there when he was talking about all this.

When did he read you on snapchat

Yester, no contact Tuesday. After he was done taking screenshots he blocked me again.

Impact?

Gossip and rumors. Its big enough that it's the amont of people who know these things and they just keep haunting you in those professional settings.

Have people approached you?

Ex boy-friend asked if I was ok, saw how I was being treated byCFW, CFW has said things to cadet █████ He reached out to me about it, outside of that no one has come up to me. People have asked friends if things are going with me and CFW. Some folks are geninuely concerned.

Phone Call from CFW at cub?

Talking with friends, CFW was tipped off by █████ He called me and █████ and then called us to and said you better not make this case. Intimidation.

See happen?

I would just want to get other people to come in and speak about his behavior, and just who have encountered his bad character.

Feelings?

Its just scary, not knowing how he would react. One reason I didn't want to bring this forward, it would critically impact him, lose of scholarship, repay money. More of his imtimating behavior would be expected. It was a lot to handle the other day, but its just something I would have to work towards

Has this impacted your status in the program?

I thought so, but after speaking w them they reassured me that this would have no impact on your status or position in the program. To come forward and put this case forward. they hold me in high regard, it was hard thing to do, but they reassured me and I think at the end of the day I feel like im in good hands. They made that 100% clear. The way he treated when I stopped giving him sex, that's what this is about. The spotlight gets off me and on his behavior in uniform..general character check on him. I think there are other female ms4's could attest to his behavior. When asked folks would say he is rude and the fuck boy of the program

Other People?

Other cadets have a lot of problems with him, that he is sleeping around a lot and his friends don't like that. Ms4's they do these briefs with cadre the plans for labs and things, and he said a comment in uniform he said, im trying to remember said something about having sex in the woods in front of others.

Moving forward investigation?

Yes, but explain what that would look like again?

Investigation process explained

███████████                          NAF/RMB                          1./24/19
NAF in person

**OEO** : EP 15; OEO process; notes; confidentiality, PRR overview; retaliation

Lt no protection order. I didn't request. Hopps.

Late Nov/early Dec, two week window I had sex with Cadet Fleetwood. MS 4 in our program, a senior.

His actions that followed concerned me most.

We talked back and forth over break friendly banter. He hinted at continuing having sex. I wasn't going to continue that.

Jan 9 that whole week spreading rumors details about sex life in and out of uniform to whole battalion. Telling people, she squirted on my sheets. Telling people, friend I dated in program, Eskimo Bro – two people who have sex with same person. IN our professional settings. Explicit stuff. Some of it not true. Made me really uncomfortable. Everything knows everything about me. Ripping apart reputation.

Jan 9 Caught wind a few days later. He's part of my friend group. He had snapchatted me. Want to go to Red Bento? I was like sure why not. Low key. Nothing would happen. Grabbing sushi with a friend for lunch. He started asking me questions about us being together hinting about getting together having sex. No, no thanks. Why? IDW to do that anymore. He was kind of persistent about it. When he finally got hint, switched from nice to hostile. Bullying. Lt Cln Hobbs is lying to you about scholarship. Sorority, don't be so full of yourself. Not one on one, in group settings. Not okay. Realized it was pretty bad when other people were asking me, why is he being so mean to you?

Snapchat, he blocked me right after but added me yesterday to take screenshots. Got notifications he was taking screenshots. Then he blocked me again. He's on a no contact thing right now. Smart to block me.

**OEO** : How he found out?

People talk. Another thing that makes community hostile. I dated a guy back in Sept-Nov. Just by me dating that one person, people asking, how many people has ████ slept with now? It's really bad. Cadet Fleetwood embodies that sexist culture that ROTC can have. What concerns me the most about his character. Willing to say explicit things about who he has been with.

That's when he started becoming really harsh towards me.

Jan 15, I was sitting at unofficial ROTC table at the CUB. Talking with another cadet. Talking about how much gossip in ROTC. Said, I'm struggling with one person. Described what was going on. Cadet ████ he suggested, why don't you go talk to your cadre about this? I don't know, it's not my style. I don't like being a snitch. About an hour later, got call from Fleetwood, about 5 pm. He was like, if you bring this case forward, your reputation is going to be ruined. You career won't move forward. I have people backing me up you'll regret it.

Cadet ████████ received a similar call. Cadet ████ ████████, my friend also RP's friend. Patrick called ████████ and said kind of threatened people.

I have proof that he called me.

AGENCY RECORD
163

███████████                         NAF/RMB                              1./24/19

NAF in person

That freaked me out. I don't know if I should do this. Threatened he had screenshots of our conversations to prove something happened. Think he was worried rape. But the sex was consensual, it was the stuff that followed.

Next couple of days, ████ would talk to Fleetwood. Then Thursday, ████ and ████, ██████████wanted to meet me in the library. They said we want to bring this case forward. At first I was like I don't know. But thin is, Cadet █████ he went through case last year for racism. "I've been through this process before, someone went straight to the cadre to tattle before talking to me. With Fleeetwood, all of his friends know he's a womanizer. Targeting MS 1's, first years. That concerns me. We're new to the program, easy target to go to. He's known as "fuckboy" of the program.

The other two cadets he gotten with Cadet █████ and Cadet █████ Wrote in my statement on Friday. Apparently no with █████ but he said he did. Also last semester he slept with over 30 girls at least. In and out of program. He's okay with just talking about it, body count and stuff. Using women for sex. Very vocal about it with friends. His friends have said you're towing the line between being a sexist.

He's going to commission, be an officer. I can see him being okay with crossing the line. Create a hostile environment, exploit everything about her sexual behavior, ruin her career. I've seen that playout to some extent here. MS 1 and MS 4 are tech same as rank. But if you think about experience, they're in charge of us sometimes. Power play.

Cadet ████████████████████ – we started talking about his character and everything else. I think I need to do this.

Thing concerned me most, when he was spreading rumors it's really harsh. Very professional setting. We're all competing against each other – the classes compete each other to get top score. The severity of the gossip and bullying. I'm not the type of person to do this but it made me realize why people take their life over things like this. He's okay with taking advantage, spreading rumors, backed into a corner. Just personal thoughts. I have a hard shell. But this stuff is detrimental. Eating away at my mental health. People telling you you're an ROTC slut. Not to my face.

**OEO** : Mental health right now?

You're with these people a lot. Lab together, class together. Dealing with these people thinking all these things about me.  Be myself, answer questions in class, but in the back of your mind you know what people think about you. It's really weird because most college students, drama is contained outside of classroom setting. You're with a ton of strangers in class. But for me, a lot of what I do revolves around ROTC Around it all the time. With these people who potentially think bad things about me. Saying bad things about me.

**OEO** :Timeframe of consensual relationship?

About 2-3 weeks. November 23ish to December 7th.

**OEO** : why those dates come to mind?

Other person I was dating broke up with me. Broke up with him. Fleetwood is one who told me. Talking with me. Being that friend and shoulder to lean on. Goes to someone who is a fragile place, uses them for sex. I was in a fragile place. Broke up, got with him. I was doing it, I didn't care.

AGENCY RECORD
164

███████                               NAF/RMB                                    1./24/19
NAF in person

████████ said Patrick's not a really great guy. I said, I'm not trying to date him. ████████ said, Fleetwood is a fuckboy. You shouldn't be getting with him.' I didn't know this at the time, but he had told his friend group including ████████ that winter break… When I found out about that, I felt like I was stepping on toes. Funny story, that same girl, he started dating he was supposed to be loyal to. Name is ██ When he had asked me to go to sushi on January 9, he was still dating that girl. That was part of my reason why I thought it was going to be chill to go to lunch with him. I remember telling him, you have a girlfriend. His justification for wanting to get with me was, I think she is going to cheat on me. Even if you weren't' with her, I wouldn't want to have sex with you.

After Red Bento, it took about a day for it to sink in. Then he blocked me. Right around that time, that's when he started becoming more hostile towards me.

**OEO** : Affected you in classroom?

Yes. I have Mil History class with him.

I forgot about this one thing. January 10, I had a class with him. Lot of ROTC kids. PoliSci 427. He said he was just sitting in with a friend. I walk in. He pulls out random lip gloss thing. I found this by my bed. Did you leave it there? Like 5 other ROTC people around. Rolled my eyes, sat down. That really bothered me.

He's in my mil history 390 class. It's fine, I guess. Hasn't said anything to me there. After case broke yesterday, I didn't go to that class. Not going to let this affect me going forward, just hard yesterday.

He wrote up this draft of a statement that he would bring forward. He sent it to ████████ group message. When I read that, it was hard to read. Most of the stuff is true, but he's twisting it to make it sound like  I had a premediated plan. Like the kind of person who cries rape. That stuff happens, but he's painting a picture

Now that case has broke, he attacked me.

I have some other snapchats he sent to me. He has character issues I'm concerned with. Screenshotted at the time. Because it was almost perplexing how extreme it was. Wasn't think about reporting or anything. Just, wow. Like, what are you asking? I'm not one to screenshot, but thinking what are you saying. Not sure if just sent to me.

**OEO** : MS code of conduct about dating?

Because it's not technically not the 'army', you're not in a unit yet. We're all kind of the same rank, technically. But there's a lot of taboo. Highly recommended against.

MS 4's - They lead all our labs. They instruct us. Make the schedule for the entire semester. They mediate everything. MS 3's put on PT.

**OEO** : Labs?

Thursday, 3-5. This next lab is weapons assembly. They instruct like a classroom setting. Two platoons. Usually will go to Arboretum, formations, they lead. This brings me back to another character issue with RP Last week, leaving platoon. Environment he creates in position of leadership is hostile. Rude. He was leading a routine, yelling at us.

Page **3** of **5**

AGENCY RECORD
165

██████████████                    NAF/RMB                    1./24/19

NAF in person

**OEO** : How often does he lead labs?

They rotate.

What they usually do, the cadre, they put a certain cadet on probation where they can't attend anything. I think for now, no contact order. I think part of that is that he can't lead lab for my platoon. I'll see him, I won't be working with him.

**OEO** : How did you find out about NCO?

Hobbs had Counseling with him. Someone brought forward a SHARP complaint about you. Ordered NCO. That night, Fleetwood talked to all his friends, including ████████, mentioned NCO.

**OEO** : When did he add you snapchat?

Yesterday. NCO was on Tuesday. I don't know if that's contact, but getting notifications about screenshots. Then he blocked me again.

**OEO** : Most difficult?

Gossip and rumors. It's big enough, things get around. You work with these people all the time. You can't shake these personal things that haunt you in these personal settings. I had to deal with sexism a lot last semester.

**OEO** : People spoken to you about what RP said about you?

The ex-boyfriend I had. We were at ROTC table. He noticed RP was being a jerk. He texted me, are you okay? We hadn't talked a lot since we broke up. It was significant. I told him no. We talked about it. He said things to him (Cadet ████████ He reached out to me about it. Besides that, people usually ask people close to me, like ████████, is this true about ████████

**OEO** :

We were talking, ████████ and ████. He tipped off Fleetwood probably.

He just called me and ████████ Then he called ████████ and said he called ████████

**OEO** : What would you like to see happen?

If it were up to me, at this point, I would want people to come in to second things I said. Some of the MS 1 girls who have kind of been hit on by him.

**OEO** : Investigation process

[CP begins sighing after NAF discusses notice of investigation]

**OEO** : What does that mean?

It's scary. He's going to know there's a case. I don't know how he would react. Also why I didn't want to bring this forward, the potential for ruining someone's career. He would most likely be kicked out of the army. Scholarship repay. He'd lose his future job. That weight of that would be really hard to deal with. The more this case is in his face, the more he'll talk about it. I can take it. But Tuesday when I first heard about it, it was really hard. I didn't know he'd find out so quickly.

Page **4** of **5**

██████████            NAF/RMB            1./24/19
NAF in person

**OEO** : Impacted your status in the program?

They've been clear this has no affect. I have good relationship with cadre. To come forward, to bring this case forward I feel like I was putting an axe in that, in a way. They made it clear you're doing the right thing. It makes it a little awkward for me but I feel like I'm in good things.

My hope for the investigation if it proceeded forward, the spotlight would be on him, not me. Him being sexist to people in the program. He said comments all the time in uniform. Some other MS 1's can attest to what they have experienced. Other people in program who have seen their general behavior. They'd say he's rude and he's the fuckboy of the program.

**OEO** : People talked to you about problems?

Cadet ██, Cadet ████████. Within their friend group, problems with how he sleeps around and doesn't change. The MS 4's do these briefs with cadre about weekly plans. He had said a comment in uniform, in front of cadre, joke about girls screaming about during sex. Sergeant Stringer overheard that comment, said you're towing the lines of SHARP.

**OEO** : Our investigation would focus on the concerns you shared with us.

**OEO** : Investigation, you don't have to bring an answer today.

I would like that, if it is possible.

**OEO** : Investigation process, retaliation

[CP and RMB take photos from CP's phone]

**OEO** : I'd like to talk with you again before moving forward. Want to be sure I understand all of your concerns.

This is just another step in the process. Okay with things proceeding.

**OEO** : Will send email with overview of investigation process, and allegations for your review.

AGENCY RECORD
167

██████████████  NAF/RMB                    1/24/19
(in person)

██████████████ - texts

Lt. Hobbs

            ██████████ - MS 4  █████ not last name, starts w/ F

where did comments   - overheard RP trying to recruit ppl, asking help on case
occur?          - RP asking ppl to send texts I've sent them

            I do not - he knows about everything

        ✗ Courtesy notification to prof, missed class due to
            ⌣ OEO mtg this morning



University Conduct Board

July 12, 2019

Patrick Fleetwood
Sent electronically to patrick.fleetwood@wsu.edu

**PERSONAL AND CONFIDENTIAL**

Regarding Case Number: 2018371301

Dear Patrick,

As your WSU Center for Community Standards, we are here to protect the opportunities and success of all students. You are receiving this letter because we received a report you and subjected another student to unwelcome conduct on the basis of sex and/or gender on campus and within the WSU ROTC program. The report also alleges that you engaged in harassment of a sexual nature towards her and others within the WSU ROTC program, and that you engaged in retaliation and attempted to interfere with the investigative process. This may be violation(s) of

> WAC 504-26-227 - Sexual harassment. Sexual harassment includes behavior defined in Washington State University's Executive Policy 15, which prohibits discrimination, sexual harassment, and sexual misconduct.
> WAC 504-26-209 - Violation of university policy, rule, or regulation. Violation of any university policy, rule, or regulation published electronically on the university web site or in hard copy including, but not limited to, Washington State University's alcohol and drug policy, executive policy 15 (policy prohibiting discrimination, sexual harassment and sexual misconduct), and housing and residence life policy.
> WAC 504-26-219 - Abuse of the student conduct system. Abuse of the student conduct system including, but not limited to: (1) Failure to obey any notice from a university conduct board or other university official to appear for a meeting or hearing as part of the student conduct system. (2) Willful falsification, distortion, or misrepresentation of information before a university conduct proceeding. (3) Disruption or interference with the orderly conduct of a university conduct board proceeding. (4) Filing fraudulent charges or initiating a university conduct proceeding in bad faith. (5) Attempting to discourage an individual's proper participation in, or use of, the student conduct system. (6) Attempting to influence the impartiality of a member of the university conduct system prior to, and/or during the course of, any university conduct board proceeding. (7) Harassment (verbal, written, or physical) and/or intimidation of a member of a university conduct board, any individual involved in the conduct process, or any conduct officer before, during, and/or after any university conduct proceeding. (8) Failure to comply with or failure to complete any term or condition of any disciplinary sanction(s) imposed under the standards of conduct for students. (9) Influencing or attempting to influence another person to commit an abuse of the university conduct system. (10) Violation of probation or any probationary conditions.
> WAC 504-26-219 - Abuse of the student conduct system. Abuse of the student conduct system including, but not limited to: (1) Failure to obey any notice from a university conduct board or other university official to appear for a meeting or hearing as part of the student conduct system. (2) Willful falsification, distortion, or misrepresentation of information before a university conduct proceeding. (3) Disruption or interference with the orderly conduct of a university conduct board proceeding. (4) Filing fraudulent charges or initiating a university conduct proceeding in bad faith. (5) Attempting to discourage an individual's proper participation in, or use of, the student conduct system. (6) Attempting to influence the impartiality of a member of the university conduct system prior to, and/or during the course of, any university conduct board proceeding. (7) Harassment (verbal, written, or physical) and/or intimidation of a member of a university conduct board, any individual involved in the conduct process, or any conduct officer before, during, and/or after any university conduct proceeding. (8) Failure to comply with or failure to complete any term or condition of any disciplinary sanction(s) imposed under the standards of conduct

for students. (9) Influencing or attempting to influence another person to commit an abuse of the university conduct system. (10) Violation of probation or any probationary conditions.

**Based on the information known, and considering your previous contacts with the Center for Community Standards, you are being referred to the University Conduct Board for a formal hearing. The University Conduct Board has the authority to suspend or dismiss you from the University.**

The first step in this process is for you to attend an informational session regarding the University Conduct Board and the community standards process. I have scheduled that session for:

**Informational Session Date: Monday, July 22, 2019**
**Time: 10:00 a.m.**
**Meeting with: Holly Campbell**
**Location: French 130 or via telephone (call 509-335-7231 to connect)**

After the information session, the second step in the process is to schedule a University Conduct Board hearing. Through that formal process, the University Conduct Board will determine whether or not your behavior violated the WSU Standards of Conduct. If you are found responsible, the University Conduct Board has the authority to sanction you, including suspending or expelling you.

**Additional information to help you prepare for the community standards process include:**

    **1. Access an advisor.**
    There are specially trained advisors available to guide you through this process. More information about how to access an advisor, and the options that you have is available here. Your community standards advisor is different from your academic or career advisor.
    **2. Use your resources and seek support.**
    This is a good time to reach out for support from friends, family, or campus resources. Language interpreters are also available upon request.
    **3. Check your email.**
    Following your informational meeting, you will receive another letter (via email) with information specific to your hearing. Until a decision is made at your hearing, you are assumed not responsible for the reported incident.

More information can be found at https://handbook.wsu.edu. Please feel free to email us at standards.boards@wsu.edu, call us at 509-335-4532, or visit https://communitystandards.wsu.edu, if you have any questions or concerns.

Sincerely,

Holly Campbell
Conduct Officer 1

| | |
|---|---|
| **From:** | "Metzner, Karen" <kmetzner@wsu.edu> |
| **Sent:** | Friday, October 4, 2019 12:46 PM |
| **To:** | ███████████████████████████ |
| **Subject:** | RE: WSU Community Standards |

Hi ███████

Thanks for following up. Please let me know if there are any additional questions that I can answer for you.
Karen

--
**Karen Metzner [she/her/hers]**
*Director, Center for Community Standards*
Washington State University | French Administration 130
Main: 509-335-4532 | Direct: 509-335-2295
https://www.handbook.wsu.edu/
https://communitystandards.wsu.edu/
kmetzner@wsu.edu

---

**From:** ████████████████
**Sent:** Friday, October 4, 2019 12:11 PM
**To:** Metzner, Karen <kmetzner@wsu.edu>
**Subject:** Re: WSU Community Standards

Mrs. Metzner,

I have decided not to be involved in the hearing.

V/R,

█████████████

**From:** Metzner, Karen <kmetzner@wsu.edu>
**Sent:** Tuesday, October 1, 2019 1:13 PM
**To:** █████████████████████████████████
**Cc:** 2018371302+wsu@efc.maxient.com <2018371302+wsu@efc.maxient.com>
**Subject:** WSU Community Standards

Hi ███████

Thanks for speaking with me on the phone about participating in a community standards conduct officer hearing in the next couple of weeks. I am happy to answer any additional questions that may come up for you. If you could let me know your decision by Friday, October 4th at noon, I would greatly appreciate it.
Thanks for your time.
Karen

--
**Karen Metzner [she/her/hers]**
*Director, Center for Community Standards*
Washington State University | French Administration 130
Main: 509-335-4532 | Direct: 509-335-2295
https://www.handbook.wsu.edu/
https://communitystandards.wsu.edu/
kmetzner@wsu.edu



Center for
Community Standards

October 8, 2019

Patrick Fleetwood
Sent electronically to patrick.fleetwood@wsu.edu

**PERSONAL AND CONFIDENTIAL**

Regarding Case Number: 2018371301

Dear Patrick,

I am your designated Conduct Officer from the WSU Center for Community Standards. It is my role to help you throughout this process, evaluate all available information, and determine appropriate outcomes. Until a decision is made at your hearing, you are assumed not responsible for the reported incident.

On June 13, 2019, the WSU Office for Civil Rights Compliance and Investigation released a report outlining their investigation into your reported behavior. The Complainant has alleged that after you and she had a consensual sexual relationship which ended in December 2018, you subjected them to unwelcome conduct on the basis of sex and/or gender on campus and within the WSU ROTC program. They also alleged that you engaged in harassment of a sexual nature towards them and others within the WSU ROTC program, and that you engaged in retaliation and interference.

If this information is true, you may have violated:

> WAC 504-26-227 - Sexual harassment. Sexual harassment includes behavior defined in Washington State University's Executive Policy 15, which prohibits discrimination, sexual harassment, and sexual misconduct.
> WAC 504-26-209 - Violation of university policy, rule, or regulation. Violation of any university policy, rule, or regulation published electronically on the university web site or in hard copy including, but not limited to, Washington State University's alcohol and drug policy, executive policy 15 (policy prohibiting discrimination, sexual harassment and sexual misconduct), and housing and residence life policy.
> WAC 504-26-219 - Abuse of the student conduct system. Abuse of the student conduct system including, but not limited to: (1) Failure to obey any notice from a university conduct board or other university official to appear for a meeting or hearing as part of the student conduct system. (2) Willful falsification, distortion, or misrepresentation of information before a university conduct proceeding. (3) Disruption or interference with the orderly conduct of a university conduct board proceeding. (4) Filing fraudulent charges or initiating a university conduct proceeding in bad faith. (5) Attempting to discourage an individual's proper participation in, or use of, the student conduct system. (6) Attempting to influence the impartiality of a member of the university conduct system prior to, and/or during the course of, any university conduct board proceeding. (7) Harassment (verbal, written, or physical) and/or intimidation of a member of a university conduct board, any individual involved in the conduct process, or any conduct officer before, during, and/or after any university conduct proceeding. (8) Failure to comply with or failure to complete any term or condition of any disciplinary sanction(s) imposed under the standards of conduct for students. (9) Influencing or attempting to influence another person to commit an abuse of the university conduct system. (10) Violation of probation or any probationary conditions.
> WAC 504-26-219 - Abuse of the student conduct system. Abuse of the student conduct system including, but not limited to: (1) Failure to obey any notice from a university conduct board or other university official to appear for a meeting or hearing as part of the student conduct system. (2) Willful falsification, distortion, or misrepresentation of information before a university conduct proceeding. (3) Disruption or interference with the orderly conduct of a university conduct board proceeding. (4) Filing fraudulent charges or initiating a university conduct proceeding in bad faith. (5) Attempting to discourage an

PO Box 641012, Pullman, WA 99164-1012
509-335-4532 | Fax: 509-335-4814
community.standards@wsu.edu | communitystandards.wsu.edu

AGENCY RECORD
173

individual's proper participation in, or use of, the student conduct system. (6) Attempting to influence the impartiality of a member of the university conduct system prior to, and/or during the course of, any university conduct board proceeding. (7) Harassment (verbal, written, or physical) and/or intimidation of a member of a university conduct board, any individual involved in the conduct process, or any conduct officer before, during, and/or after any university conduct proceeding. (8) Failure to comply with or failure to complete any term or condition of any disciplinary sanction(s) imposed under the standards of conduct for students. (9) Influencing or attempting to influence another person to commit an abuse of the university conduct system. (10) Violation of probation or any probationary conditions.

**Hearing Date: Monday, October 21, 2019**
**Time: 9:00 a.m.**
**Meeting with: Karen Metzner**
**Location: French 130**

**Your next steps in the community standards process are:**

**1. Attend an information session.**
This will help you understand our community standards and your rights and responsibilities in the process. More information and a current schedule can be found here.

**2. Use your resources and seek support.**
This is a good time to reach out for support from friends, family, or campus resources. We also have specially trained advisors who volunteer to guide you throughout the process. Your community standards advisor is different from your academic or career advisor. Language Interpreters are also available upon request.

**3. Preparing for your hearing.** Your hearing is a one on one meeting between you and your conduct officer. You can provide a written statement, submit additional documentation (such as text messages, emails, phone logs, videos etc.), provide witnesses, and/or ask witnesses to contact your conduct officer. You may also request to review your file and all materials and documents related to this incident.

**4. Attend your hearing.** It is your opportunity to share your experience related to the reported incident and make certain your voice is heard. If the scheduled time will not work for you, please call us at 509-335-4532 during business hours to reschedule, preferably no later than 24 hours before the hearing. If you do not reschedule or attend your hearing, it will be held in your absence with the available information I have about the reported incident.

As your WSU Conduct Officer, I am here to inform and engage you in a fair process.  If you would like to have a different conduct officer assigned to you, you may request a change and provide a reason for this request here.

More information can be found at https://handbook.wsu.edu. Please feel free to email us at 509-335-4532, call us at 509-335-4532, or visit https://communitystandards.wsu.edu if you have any questions or concerns.

Sincerely,

Karen Metzner
Director, Center for Community Standards

# YOUR QUICK GUIDE TO OUR
# COMMUNITY STANDARDS PROCESS

Go to HANDBOOK.WSU.EDU for more complete information about your rights and responsibilities, timelines, available resources, and possible sanctions.

**1** **AN INCIDENT HAS BEEN REPORTED AND YOU ARE LISTED AS POTENTIALLY VIOLATING OUR COMMUNITY STANDARDS.**

We will send an email (to your WSU address) with the next steps, including your information session. Remember that until a decision is made at your hearing, you are assumed **not responsible** for the reported incident.

**2** **YOUR COMMUNITY STANDARDS PROCESS BEGINS.**

These next steps may help you throughout the process:
- ❑ Attend an information session.
- ❑ Review your rights and responsibilities.
- ❑ Select an advisor. (*This is different from your academic or career advisor*)
- ❑ Request disability or medically related accommodations.
- ❑ Request a language interpreter.

**3** **PREPARING FOR AND ATTENDING YOUR HEARING.**

You will get another email with your hearing date, time, and location.
Your hearing will be with a **Conduct Officer** or the **Conduct Board.**

**BEFORE YOUR HEARING**
- ❑ Provide, gather, and review all of the information relevant to the reported incident.
- ❑ Request any changes that need to be submitted prior to your hearing. For example:
  - Requesting a new hearing date and time.
  - Requesting a different Conduct Officer or Conduct Board Member.
  - Challenging the jurisdiction of off-campus behavior.
- ❑ Invite your advisor to attend your hearing.

**4** **A DECISION IS MADE.**

You will be notified of the decision at the end of the hearing or by email, within 10 calendar days of your hearing.

**5** **YOUR OPTION TO APPEAL.**

You have 21 calendar days after receiving the decision to submit an appeal.

SC19-003 Jan

## LET US HELP.

Find Community Standards support on your campus at communitystandards.wsu.edu



Center for
Community Standards
WASHINGTON STATE UNIVERSITY

AGENCY RECORD
175

# Your rights and responsibilities in the community standards process.

## SHARING YOUR EXPERIENCE

**You are assumed not responsible**
You are assumed not responsible for any reported incident unless it is determined that you were "more likely than not" responsible within the Conduct Officer hearing or Conduct Board hearing.    WAC 504-26-040

**You do not have to self-incriminate**
You get to choose what information you want to share. You do not have to share any information which may incriminate you. You will not be viewed negatively if you choose not to share specific information.    WAC 504-26-045

**You have access to your information**
At any point throughout the process, even before you meet with your Conduct Officer, you can request to view your file with details and information related to the incident.

**You can provide documentation**
Sharing your information ensures that your experience is part of the conversation and is added to your file. You can provide a written statement, submit additional documentation (such as text messages, emails, phone logs, etc.), provide witnesses, and/or ask witnesses to contact your conduct officer.

**You have a responsibility to participate**
You will benefit by actively engaging in the process and we want you to be involved. If you choose not to show up or participate, the community standards process will continue in your absence.

## YOUR AVAILABLE RESOURCES

**Information sessions**
Information sessions are led by WSU students who are trained to clarify the community standards process from a student perspective and answer any questions you may have. These sessions help you understand your rights and responsibilities and what you can expect moving forward.    WAC 504-26-401

**Trained advisors**
You may choose to have an advisor during all stages of the conduct process. Advisors are volunteers, serving for the benefit of students.    WAC 504-26-020

**Disability or medically related accommodations**
You can request accommodations to assist you throughout the community standards process.

**Language interpreters**
You may request a language interpreter at no cost, at any time.

## YOUR RIGHT TO A FAIR AND EQUITABLE PROCESS

**Understand when community standards apply**
Community standards apply to individuals from the time of application until awarding of a degree. The standards apply on university premises, during university sponsored activities (including transit), to online behavior, and to off-campus behavior when it negatively affects the university community.    WAC 504-26-015

**Confidentiality**
Conduct meetings and hearings are closed to public observation. If there is a concern for your personal safety, wellbeing, or fears of confrontation, accommodations for participation can be made.    WAC 504-26-025

**Legal representation**
A licensed attorney or a legally licensed intern may act and speak on your behalf during Conduct Board hearings. During a Conduct Officer hearing, they can only serve as an advisor. If you choose to have legal representation, it is at your own expense.    WAC 504-26-020

**Request individuals to be removed from the process**
If you believe your assigned Conduct Officer or a Board Member may have a conflict of interest, you may request to have them removed (recused) from your conduct review.    WAC 504-26-125

**Appeal decisions**
You can make an appeal if you believe a hearing was conducted unfairly, if you think the information was insufficient for the outcome, if you think the assigned sanction was inappropriate, or if new and sufficient information becomes available.    WAC 504-26-420

**Your conduct file and record**
WSU is not permitted to share your information without your written consent, except:
- when a student under the age of 21 violates alcohol or drug standards, their parents/guardian will be notified, and
- when required by law. The community standards process is unique from the legal system and WSU generally does not share information with law enforcement unless required to do so,
- or when authorized by the Family Educational Rights and Privacy Act of 1974 (FERPA).

You may also request to remove a single alcohol, drug or marijuana-related incident from your conduct record.    WAC 504-26-530

Find more information about the community standards process at handbook.wsu.edu



Center for
## Community Standards
WASHINGTON STATE UNIVERSITY

SC19-003 Jan



Center for
Community Standards

October 18, 2019

Patrick Fleetwood
Sent electronically to patrick.fleetwood@wsu.edu

**PERSONAL AND CONFIDENTIAL**

Regarding Case Number: 2018371301

Dear Patrick,

Thanks for contacting me about your appointment. I understand that you have concerns about your ability to review the information in your community standards record prior to your conduct officer hearing. You have the following options through the community standards process:

1. **Review your file in our office.** You can review all of the information that I will utilize to make my determination of your responsibility in our office in French Administration Room 130. The only information redacted from this record is safety related information such as phone numbers and addresses. We had previously arranged for you to come to the office on Monday, October 14, 2019 to review your record, but you were unable to come to the office at that time. Your record is ready for you to review anytime during regular business hours; you do not need an appointment to do so. When you review the record in our office, you can take notes of the documents, but cannot take pictures of them.
2. **Request a copy of your record.** You can request a redacted copy of your record to take with you from our office. All identifiable student information will be removed. Given the size of the record, it may take us up to three business days to be able to release the record to you. If you would like to request a copy of your file, please fill out the attached sheet and email it to community.standards@wsu.edu. When your record is ready, we can either provide it to you electronically or in paper form if you would like to pick it up from our office.

To allow you additional time to access your documents, I have rescheduled your meeting. Your meeting has been rescheduled to:

New Meeting Date: Tuesday, October 29, 2019
Time: 1:00pm
Meeting with: Karen Metzner
Location: French 130

**Your next steps in the community standards process are:**

1. **Attend an information session.**
   This will help you understand our community standards and your rights and responsibilities in the process. More information and a current schedule can be found here.
2. **Use your resources and seek support.**
   This is a good time to reach out for support from friends, family, or campus resources. We also have specially trained advisors who volunteer to guide you throughout the process. Your community standards advisor is different from your academic or career advisor. Language Interpreters are also available upon request.
3. **Preparing for your hearing.** Your hearing is a one on one meeting between you and your conduct officer. You can provide a written statement, submit additional documentation (such as text messages, emails, phone logs, videos etc.), provide witnesses, and/or ask witnesses to contact your conduct officer. You may also request to review your file and all materials and documents related to this incident.

PO Box 641012, Pullman, WA 99164-1012
509-335-4532 | Fax: 509-335-4814
community.standards@wsu.edu | communitystandards.wsu.edu

AGENCY RECORD
177

4. **Attend your hearing.** It is your opportunity to share your experience related to the reported incident and make certain your voice is heard. If the scheduled time will not work for you, please call us at 509-335-4532 during business hours to reschedule, preferably no later than 24 hours before the hearing. If you do not reschedule or attend your hearing, it will be held in your absence with the available information I have about the reported incident.

More information can be found at https://handbook.wsu.edu. Please feel free to email us at community.standards@wsu.edu, call us at 509-335-4532, or visit https://communitystandards.wsu.edu. if you have any questions or concerns.

Best,

Karen Metzner
Director, Center for Community Standards

# WASHINGTON STATE UNIVERSITY

## Center for Community Standards

## Authorization for Release of Student Records

**STUDENT INFORMATION**

Name: _____

WSU ID: _____

Email: _____

Phone: _____

**TO WHOM INFORMATION IS TO BE RELEASED**

_____*Self* _____*Advisor* _____*Attorney*

*Other* _____

Name: _____

Email: _____

Phone: _____

**PURPOSE FOR WHICH INFORMATION IS TO BE RELEASED**

_____

_____

I consent to the release my disciplinary/conduct records to the individual(s) noted above.

I hereby authorize the Washington State University Center for Community Standards to release the records indicated above from my Washington State University conduct file and/or participate as an advisor in a conduct proceeding. I understand that the information will be used for purposes listed above (indicate by marking above)

This release will be valid for <u>one</u> academic year, and I understand that I may revoke it at any time by written notice to the Center for Community Standards.

_____          _____

**Student Signature:**                                              **Date:**

_____          _____

**Witness:**                                                               **Date:**

*Updated: 1/29/2019*

**From:**     "Metzner, Karen" <kmetzner@wsu.edu>
**Sent:**     Friday, October 18, 2019 2:28 PM
**To:**        Michael Fleetwood <michael.a.fleetwood1@gmail.com>
**Subject:**  RE: Case # 2018371301


Dear Colonel Fleetwood,

Thank you for your email. Due to the Family Educational Rights and Privacy Act, I am unable to share any specific student information with you.

If Patrick would like, he can sign a waiver with my office to allow me to speak directly with you in more detail. Please let me know if you have any additional questions or concerns.
Karen


--
**Karen Metzner [she/her/hers]**
*Director, Center for Community Standards*
Washington State University | French Administration 130
Main: 509-335-4532 | Direct: 509-335-2295
https://www.handbook.wsu.edu/
https://communitystandards.wsu.edu/
kmetzner@wsu.edu

**From:** Michael Fleetwood <michael.a.fleetwood1@gmail.com>
**Sent:** Friday, October 18, 2019 1:47 PM
**To:** Metzner, Karen <kmetzner@wsu.edu>
**Subject:** Case # 2018371301

Dear Ms. Metzner,
I'm writing on behalf of my son, Patrick Fleetwood, concerning the scheduling of his hearing (Case # 2018371301).  Prior to being notified of this hearing, a formal request for all records and files concerning the WSU Office for Equal Opportunity Investigative Report of Complaint # 2019-021 was made with the University pursuant to the Washington State Public Records Act.  We have been informed that the University is hoping to fulfill the request by November 20, 2019 (Request #19-520).

As we have already identified significant problems with the conduct of this investigation, it is imperative that Patrick be allowed full access to all the information, complete and unredacted, concerning the entire case prior to any Community Standards Hearing.  This is critical to ensuring that he receive the required due process for a fair hearing.

I was informed today that you have only granted Patrick a delay until October 29th.  This will not allow sufficient time for the University to conduct the required records review, notification and provide him the requested information prior to this hearing.  We are asking that this hearing be delayed until after Patrick receives and is able to review all the information requested.

Sincerely,

Michael (Mick) Fleetwood
Colonel, U.S. Army Retired

AGENCY RECORD
180

michael.a.fleetwood1@gmail.com
(253) 720-7529

# WASHINGTON STATE UNIVERSITY

## Center for Community Standards

## Authorization for Release of Student Records

**STUDENT INFORMATION**

Name: _Patrick Fleetwood_

WSU ID: _11464891_

Email: _patrick.fleetwood@wsu.edu_

Phone: _509-432-8032_

**TO WHOM INFORMATION IS TO BE RELEASED**

_____ *Self*  _____ *Advisor*  _____ *Attorney*

*Other* _Father (Parent)_

Name: _Michael Fleetwood_

Email: _Michael.a.fleetwood1@gmail.com_

Phone: _253-720-7529_

**PURPOSE FOR WHICH INFORMATION IS TO BE RELEASED**

_Any and all information related to case #2019-021_

I consent to the release my disciplinary/conduct records to the individual(s) noted above.

I hereby authorize the Washington State University Center for Community Standards to release the records indicated above from my Washington State University conduct file and/or participate as an advisor in a conduct proceeding. I understand that the information will be used for purposes listed above (indicate by marking above)

This release will be valid for <u>one</u> academic year, and I understand that I may revoke it at any time by written notice to the Center for Community Standards.

_____
**Student Signature:**

_October 21, 2019_
**Date:**

_____
**Witness:**

_10/21/19_
**Date:**

*Updated: 1/30/2019*

AGENCY RECORD
182

**From:**       "Metzner, Karen" <kmetzner@wsu.edu>
**Sent:**       Tuesday, October 22, 2019 10:05 AM
**To:**         Michael Fleetwood <michael.a.fleetwood1@gmail.com>
**Subject:**    RE: Case # 2018371301


Dear Colonel Fleetwood,
Thank you for your email. Patrick has signed a FERPA release that allows me to speak with you about his matter. Patrick and I are scheduled to meet next week for a conduct officer hearing to come to a resolution regarding this matter. Patrick has the ability to both view his file in our office and request a redacted copy, which provided him due process to respond to the allegations. I am happy to answer any additional questions that you have about this process.


Regards,
Karen


--
**Karen Metzner [she/her/hers]**
*Director, Center for Community Standards*
Washington State University | French Administration 130
Main: 509-335-4532 | Direct: 509-335-2295
https://www.handbook.wsu.edu/
https://communitystandards.wsu.edu/
kmetzner@wsu.edu


**From:** Michael Fleetwood <michael.a.fleetwood1@gmail.com>
**Sent:** Tuesday, October 22, 2019 9:03 AM
**To:** Metzner, Karen <kmetzner@wsu.edu>
**Subject:** Re: Case # 2018371301


Karen,
I believe that Patrick signed the required documentation yesterday allowing you to discuss his case with me. As stated in my original email on Friday, we are requesting that his hearing be postponed until the University has provided all of the unredacted records we've requested regarding this matter and we've had time to review.  This is critically important to ensuring that my son is provided proper due process.


Thank you,
Mick


Michael (Mick) Fleetwood
Colonel, U.S. Army Retired
michael.a.fleetwood1@gmail.com
(253) 720-7529


On Fri, Oct 18, 2019 at 2:49 PM Michael Fleetwood <michael.a.fleetwood1@gmail.com> wrote:

> Karen,
> I appreciate the prompt response and I completely understand.  Patrick will contact you to sign the waiver.
> Thank you,

AGENCY RECORD
183

Mick

Michael (Mick) Fleetwood
Colonel, U.S. Army Retired
michael.a.fleetwood1@gmail.com
(253) 720-7529


On Fri, Oct 18, 2019 at 2:28 PM Metzner, Karen <kmetzner@wsu.edu> wrote:

> Dear Colonel Fleetwood,
>
> Thank you for your email. Due to the Family Educational Rights and Privacy Act, I am unable to share any specific student information with you.
>
> If Patrick would like, he can sign a waiver with my office to allow me to speak directly with you in more detail. Please let me know if you have any additional questions or concerns.
> Karen
>
>
>
> --
> **Karen Metzner [she/her/hers]**
> *Director, Center for Community Standards*
> Washington State University | French Administration 130
> Main: 509-335-4532 | Direct: 509-335-2295
> https://www.handbook.wsu.edu/
> https://communitystandards.wsu.edu/
> kmetzner@wsu.edu
>
> **From:** Michael Fleetwood <michael.a.fleetwood1@gmail.com>
> **Sent:** Friday, October 18, 2019 1:47 PM
> **To:** Metzner, Karen <kmetzner@wsu.edu>
> **Subject:** Case # 2018371301
>
> Dear Ms. Metzner,
> I'm writing on behalf of my son, Patrick Fleetwood, concerning the scheduling of his hearing (Case # 2018371301).  Prior to being notified of this hearing, a formal request for all records and files concerning the WSU Office for Equal Opportunity Investigative Report of Complaint # 2019-021 was made with the University pursuant to the Washington State Public Records Act.  We have been informed that the University is hoping to fulfill the request by November 20, 2019 (Request #19-520).
>
> As we have already identified significant problems with the conduct of this investigation, it is imperative that Patrick be allowed full access to all the information, complete and unredacted, concerning the entire case prior to any Community Standards Hearing.  This is critical to ensuring that he receive the required due process for a fair hearing.
>
> I was informed today that you have only granted Patrick a delay until October 29th.  This will not allow sufficient time for the University to conduct the required records review, notification and provide him the requested information prior to this hearing.  We are asking that this hearing be delayed until after Patrick receives and is able to review all the information requested.

AGENCY RECORD
184

Sincerely,

Michael (Mick) Fleetwood
Colonel, U.S. Army Retired
michael.a.fleetwood1@gmail.com
(253) 720-7529

We were unable to preserve the rich-text formatting of this email chain. A plaintext version has been furnished.

| | |
|---|---|
| **From:** | "Metzner, Karen" <kmetzner@wsu.edu> |
| **Sent:** | Thursday, October 24, 2019 2:21 PM |
| **To:** | "2018371301+wsu@efc.maxient.com" |
| | <2018371301+wsu@efc.maxient.com> |
| **Subject:** | FW: Message from "RNP002673317C3B" |
| **Attachment(s):** | 20191023151908960.pdf  *749994 bytes* |

--
Karen Metzner [she/her/hers]
Director, Center for Community Standards
Washington State University | French Administration 130
Main: 509-335-4532 | Direct: 509-335-2295
https://www.handbook.wsu.edu/
https://communitystandards.wsu.edu/
kmetzner@wsu.edu

-----Original Message-----
From: CCS
Sent: Wednesday, October 23, 2019 3:19 PM
To: Metzner, Karen
Subject: Message from "RNP002673317C3B"

This E-mail was sent from "RNP002673317C3B" (Aficio MP C2551).

Scan Date: 10.23.2019 15:19:08 (-0700)
Queries to: apoirier@wsu.edu

## File/ Hearing Review Sign In

These records are protected by the Family Educational Rights and Privacy Act (FERPA) (20 U.S. C. §
1232g: 34 CFR Part 99) and University Policy.

You are prohibited from engaging in any form of retaliation against the complainant or any person
participating in, or that may participate in, the community standards process. Any retaliatory acts or
attempts to influence the conduct process will be considered an additional violation of the Standards of
Conduct. You should regard the interests of anyone who is involved in this matter as broadly defined,
including their personal and professional information.

In addition, you may not take any pictures or recordings of this information in its unredacted form. A
redacted copy of your conduct file can be requested by contacting Center for Community Standards.

| Name | Review Date | Signature | Staff initials |
|---|---|---|---|
| Patrick Fleetwood | Oct 23, 2019 | | KM |
| | | | |
| | | | |
| | | | |
| | | | |

*Updated: 1/29/2019*

## WASHINGTON STATE UNIVERSITY

### Center for Community Standards

### Authorization for Release of Student Records

**STUDENT INFORMATION**

Name: Patrick Fleetwood

WSU ID: 11464891

Email: Patrick.fleetwood@wsu.edu

Phone: 509-432-8032

**TO WHOM INFORMATION IS TO BE RELEASED**

✓ Self _____ Advisor _____ Attorney

Other _____

Name: Patrick Fleetwood

Email: Patrick.fleetwood@wsu.edu

Phone: 509-432-8032

**PURPOSE FOR WHICH INFORMATION IS TO BE RELEASED**

To view all documents for case 2019-021

I consent to the release my disciplinary/conduct records to the individual(s) noted above.

I hereby authorize the Washington State University Center for Community Standards to release the records indicated above from my Washington State University conduct file and/or participate as an advisor in a conduct proceeding. I understand that the information will be used for purposes listed above (indicate by marking above)

This release will be valid for <u>one</u> academic year, and I understand that I may revoke it at any time by written notice to the Center for Community Standards.

**Student Signature:**

**Date:** October 23, 2019

**Witness:**

**Date:** 10-23-19

*Updated: 1/30/2019*

AGENCY RECORD
188

**From:**        "Metzner, Karen" <kmetzner@wsu.edu>
**Sent:**        Thursday, October 24, 2019 3:05 PM
**To:**          Michael Fleetwood <michael.a.fleetwood1@gmail.com>
**Subject:**     RE: Case # 2018371301


Colonel Fleetwood,

I have copied Patrick on this email so that he can be aware of the conversation that we are having regarding his matter.

1. I extended my meeting time with Patrick by one week to allow him more time to come to our office to view his unredacted file. He has the opportunity to view his unredacted file in our office and request a redacted file to take with him, allowing him his due process right to respond to the allegations.
2. Our office has determined that this matter will be resolved by a conduct officer hearing and will not be referred to the University Conduct Board. As a conduct officer, I do not have the authority to suspend or expel students. If a student is found responsible for violating our community expectations, our office provides educational tools and resources to help students in their time at WSU and connect them to support within our community. For more information about commonly assigned sanctions, please visit https://handbook.wsu.edu/violations-and-possible-sanctions/sanction-descriptions/.
3. The only redactions that are present in the file that Patrick has the opportunity to view in my office are safety related redactions such as student addresses and phone numbers. Names are not redacted from the file. Patrick can take notes while he is reviewing, but cannot take photos of the record. The record contains all of the information that I have available to me to determine if Patrick is responsible for violating the Standards of Conduct for students, including the submissions and interview notes from the Office for Civil Rights Compliance and Investigation.

Please let me know if you have any additional questions.
Karen


--
**Karen Metzner [she/her/hers]**
*Director, Center for Community Standards*
Washington State University | French Administration 130
Main: 509-335-4532 | Direct: 509-335-2295
https://www.handbook.wsu.edu/
https://communitystandards.wsu.edu/
kmetzner@wsu.edu

**From:** Michael Fleetwood <michael.a.fleetwood1@gmail.com>
**Sent:** Tuesday, October 22, 2019 2:58 PM
**To:** Metzner, Karen <kmetzner@wsu.edu>
**Subject:** Re: Case # 2018371301

Karen,
As we decide how to proceed, I would appreciate your response to the following:

1) The reason for the denial of our request for a postponement of his hearing until the University provides the records we've formally requested?

2)  What are the possible consequences that Patrick could face from this hearing?

3)  You state that Patrick can review the file in your office.  Is this the complete and unredacted file, including all communication between your office and the Office of Civil Rights Compliance (formerly the Office for equal Opportunity)?  And is he allowed to take and retain notes?

We take this issue extremely seriously as it has long-term professional and financial implications far beyond Washington State University.  The highly irregular issues I discovered when reviewing the redacted investigative report, coupled with the constant verbal harassment Patrick has had to endure during the last nine months, are indicators that the University has not taken a fair and impartial stance.  This is why we must be allowed to review the entire unredacted file.  As recent congressional testimony has born-out, it is extremely difficult to defend oneself against accusations in a one-on-one situation and this is made all the more difficult when the accused is prevented from even knowing who is making the accusations.


Sincerely,
Mick

Michael (Mick) Fleetwood
Colonel, U.S. Army Retired
michael.a.fleetwood1@gmail.com
(253) 720-7529


On Tue, Oct 22, 2019 at 10:05 AM Metzner, Karen <kmetzner@wsu.edu> wrote:

Dear Colonel Fleetwood,
Thank you for your email. Patrick has signed a FERPA release that allows me to speak with you about his matter. Patrick and I are scheduled to meet next week for a conduct officer hearing to come to a resolution regarding this matter. Patrick has the ability to both view his file in our office and request a redacted copy, which provided him due process to respond to the allegations. I am happy to answer any additional questions that you have about this process.

Regards,
Karen


--
**Karen Metzner [she/her/hers]**
*Director, Center for Community Standards*
Washington State University | French Administration 130
Main: 509-335-4532 | Direct: 509-335-2295
https://www.handbook.wsu.edu/
https://communitystandards.wsu.edu/
kmetzner@wsu.edu

**From:** Michael Fleetwood <michael.a.fleetwood1@gmail.com>
**Sent:** Tuesday, October 22, 2019 9:03 AM
**To:** Metzner, Karen <kmetzner@wsu.edu>
**Subject:** Re: Case # 2018371301

Karen,
I believe that Patrick signed the required documentation yesterday allowing you to discuss his case with me. As stated in my original email on Friday, we are requesting that his hearing be postponed until the University has provided all of the unredacted records we've requested regarding this matter and we've had time to review.  This is critically important to ensuring that my son is provided proper due process.

Thank you,
Mick

Michael (Mick) Fleetwood
Colonel, U.S. Army Retired
michael.a.fleetwood1@gmail.com
(253) 720-7529


On Fri, Oct 18, 2019 at 2:49 PM Michael Fleetwood <michael.a.fleetwood1@gmail.com> wrote:

Karen,
I appreciate the prompt response and I completely understand.  Patrick will contact you to sign the waiver.
Thank you,
Mick

Michael (Mick) Fleetwood
Colonel, U.S. Army Retired
michael.a.fleetwood1@gmail.com
(253) 720-7529


On Fri, Oct 18, 2019 at 2:28 PM Metzner, Karen <kmetzner@wsu.edu> wrote:

Dear Colonel Fleetwood,

Thank you for your email. Due to the Family Educational Rights and Privacy Act, I am unable to share any specific student information with you.

If Patrick would like, he can sign a waiver with my office to allow me to speak directly with you in more detail. Please let me know if you have any additional questions or concerns.
Karen


--
**Karen Metzner [she/her/hers]**
*Director, Center for Community Standards*
Washington State University | French Administration 130
Main: 509-335-4532 | Direct: 509-335-2295
https://www.handbook.wsu.edu/
https://communitystandards.wsu.edu/
kmetzner@wsu.edu

**From:** Michael Fleetwood <michael.a.fleetwood1@gmail.com>
**Sent:** Friday, October 18, 2019 1:47 PM
**To:** Metzner, Karen <kmetzner@wsu.edu>
**Subject:** Case # 2018371301

Dear Ms. Metzner,
I'm writing on behalf of my son, Patrick Fleetwood, concerning the scheduling of his hearing (Case # 2018371301).  Prior to being notified of this hearing, a formal request for all records and files concerning the WSU Office for Equal Opportunity Investigative Report of Complaint # 2019-021 was

made with the University pursuant to the Washington State Public Records Act.  We have been informed that the University is hoping to fulfill the request by November 20, 2019 (Request #19-520).

As we have already identified significant problems with the conduct of this investigation, it is imperative that Patrick be allowed full access to all the information, complete and unredacted, concerning the entire case prior to any Community Standards Hearing.  This is critical to ensuring that he receive the required due process for a fair hearing.

I was informed today that you have only granted Patrick a delay until October 29th.  This will not allow sufficient time for the University to conduct the required records review, notification and provide him the requested information prior to this hearing.  We are asking that this hearing be delayed until after Patrick receives and is able to review all the information requested.

Sincerely,

Michael (Mick) Fleetwood
Colonel, U.S. Army Retired
michael.a.fleetwood1@gmail.com
(253) 720-7529

**From:**     "Metzner, Karen" <kmetzner@wsu.edu>
**Sent:**     Friday, October 25, 2019 6:33 PM
**To:**     "2018371301+wsu@efc.maxient.com" <2018371301+wsu@efc.maxient.com>
**Subject:**     FW: Case # 2018371301

--
**Karen Metzner [she/her/hers]**
*Director, Center for Community Standards*
Washington State University | French Administration 130
Main: 509-335-4532 | Direct: 509-335-2295
https://www.handbook.wsu.edu/
https://communitystandards.wsu.edu/
kmetzner@wsu.edu

**From:** Michael Fleetwood <michael.a.fleetwood1@gmail.com>
**Sent:** Friday, October 25, 2019 12:37 PM
**To:** Metzner, Karen <kmetzner@wsu.edu>
**Subject:** Re: Case # 2018371301

Karen,
Thank you for answering my questions.  Patrick was able to review the case file on Wednesday and is preparing to meet with you on Tuesday for his hearing.  Again, thank you for providing us with the information necessary to assist Patrick in this important matter.

Sincerely,
Mick

Michael (Mick) Fleetwood
Colonel, U.S. Army Retired
michael.a.fleetwood1@gmail.com
(253) 720-7529

On Thu, Oct 24, 2019 at 3:05 PM Metzner, Karen <kmetzner@wsu.edu> wrote:

> Colonel Fleetwood,
>
> I have copied Patrick on this email so that he can be aware of the conversation that we are having regarding his matter.
>
> 1. I extended my meeting time with Patrick by one week to allow him more time to come to our office to view his unredacted file. He has the opportunity to view his unredacted file in our office and request a redacted file to take with him, allowing him his due process right to respond to the allegations.
> 2. Our office has determined that this matter will be resolved by a conduct officer hearing and will not be referred to the University Conduct Board. As a conduct officer, I do not have the authority to suspend or expel students. If a student is found responsible for violating our community expectations, our office provides educational tools and resources to help students in their time at WSU and connect them to

support within our community. For more information about commonly assigned sanctions, please visit https://handbook.wsu.edu/violations-and-possible-sanctions/sanction-descriptions/.

3. The only redactions that are present in the file that Patrick has the opportunity to view in my office are safety related redactions such as student addresses and phone numbers. Names are not redacted from the file. Patrick can take notes while he is reviewing, but cannot take photos of the record. The record contains all of the information that I have available to me to determine if Patrick is responsible for violating the Standards of Conduct for students, including the submissions and interview notes from the Office for Civil Rights Compliance and Investigation.

Please let me know if you have any additional questions.
Karen


--
**Karen Metzner [she/her/hers]**
*Director, Center for Community Standards*
Washington State University | French Administration 130
Main: 509-335-4532 | Direct: 509-335-2295
https://www.handbook.wsu.edu/
https://communitystandards.wsu.edu/
kmetzner@wsu.edu

**From:** Michael Fleetwood <michael.a.fleetwood1@gmail.com>
**Sent:** Tuesday, October 22, 2019 2:58 PM
**To:** Metzner, Karen <kmetzner@wsu.edu>
**Subject:** Re: Case # 2018371301

Karen,
As we decide how to proceed, I would appreciate your response to the following:

1) The reason for the denial of our request for a postponement of his hearing until the University provides the records we've formally requested?

2) What are the possible consequences that Patrick could face from this hearing?

3) You state that Patrick can review the file in your office. Is this the complete and unredacted file, including all communication between your office and the Office of Civil Rights Compliance (formerly the Office for equal Opportunity)? And is he allowed to take and retain notes?

We take this issue extremely seriously as it has long-term professional and financial implications far beyond Washington State University. The highly irregular issues I discovered when reviewing the redacted investigative report, coupled with the constant verbal harassment Patrick has had to endure during the last nine months, are indicators that the University has not taken a fair and impartial stance. This is why we must be allowed to review the entire unredacted file. As recent congressional testimony has born-out, it is extremely difficult to defend oneself against accusations in a one-on-one situation and this is made all the more difficult when the accused is prevented from even knowing who is making the accusations.

Sincerely,
Mick

Michael (Mick) Fleetwood
Colonel, U.S. Army Retired

michael.a.fleetwood1@gmail.com
(253) 720-7529

On Tue, Oct 22, 2019 at 10:05 AM Metzner, Karen <kmetzner@wsu.edu> wrote:

Dear Colonel Fleetwood,
Thank you for your email. Patrick has signed a FERPA release that allows me to speak with you about his matter. Patrick and I are scheduled to meet next week for a conduct officer hearing to come to a resolution regarding this matter. Patrick has the ability to both view his file in our office and request a redacted copy, which provided him due process to respond to the allegations. I am happy to answer any additional questions that you have about this process.

Regards,
Karen


--
**Karen Metzner [she/her/hers]**
*Director, Center for Community Standards*
Washington State University | French Administration 130
Main: 509-335-4532 | Direct: 509-335-2295
https://www.handbook.wsu.edu/
https://communitystandards.wsu.edu/
kmetzner@wsu.edu

**From:** Michael Fleetwood <michael.a.fleetwood1@gmail.com>
**Sent:** Tuesday, October 22, 2019 9:03 AM
**To:** Metzner, Karen <kmetzner@wsu.edu>
**Subject:** Re: Case # 2018371301

Karen,
I believe that Patrick signed the required documentation yesterday allowing you to discuss his case with me.  As stated in my original email on Friday, we are requesting that his hearing be postponed until the University has provided all of the unredacted records we've requested regarding this matter and we've had time to review.  This is critically important to ensuring that my son is provided proper due process.

Thank you,
Mick

Michael (Mick) Fleetwood
Colonel, U.S. Army Retired
michael.a.fleetwood1@gmail.com
(253) 720-7529


On Fri, Oct 18, 2019 at 2:49 PM Michael Fleetwood <michael.a.fleetwood1@gmail.com> wrote:

Karen,
I appreciate the prompt response and I completely understand.  Patrick will contact you to sign the waiver.
Thank you,

Mick

Michael (Mick) Fleetwood
Colonel, U.S. Army Retired
michael.a.fleetwood1@gmail.com
(253) 720-7529


On Fri, Oct 18, 2019 at 2:28 PM Metzner, Karen <kmetzner@wsu.edu> wrote:

Dear Colonel Fleetwood,

Thank you for your email. Due to the Family Educational Rights and Privacy Act, I am unable to share any specific student information with you.

If Patrick would like, he can sign a waiver with my office to allow me to speak directly with you in more detail. Please let me know if you have any additional questions or concerns.
Karen



--
**Karen Metzner [she/her/hers]**
*Director, Center for Community Standards*
Washington State University | French Administration 130
Main: 509-335-4532 | Direct: 509-335-2295
https://www.handbook.wsu.edu/
https://communitystandards.wsu.edu/
kmetzner@wsu.edu

**From:** Michael Fleetwood <michael.a.fleetwood1@gmail.com>
**Sent:** Friday, October 18, 2019 1:47 PM
**To:** Metzner, Karen <kmetzner@wsu.edu>
**Subject:** Case # 2018371301

Dear Ms. Metzner,
I'm writing on behalf of my son, Patrick Fleetwood, concerning the scheduling of his hearing (Case # 2018371301).  Prior to being notified of this hearing, a formal request for all records and files concerning the WSU Office for Equal Opportunity Investigative Report of Complaint # 2019-021 was made with the University pursuant to the Washington State Public Records Act.  We have been informed that the University is hoping to fulfill the request by November 20, 2019 (Request #19-520).

As we have already identified significant problems with the conduct of this investigation, it is imperative that Patrick be allowed full access to all the information, complete and unredacted, concerning the entire case prior to any Community Standards Hearing.  This is critical to ensuring that he receive the required due process for a fair hearing.

I was informed today that you have only granted Patrick a delay until October 29th.  This will not allow sufficient time for the University to conduct the required records review, notification and provide him the requested information prior to this hearing.  We are asking that this hearing be delayed until after Patrick receives and is able to review all the information requested.

Sincerely,

Michael (Mick) Fleetwood
Colonel, U.S. Army Retired
michael.a.fleetwood1@gmail.com
(253) 720-7529

**Washington State University**
**Register Your Conduct Advisor**

*Submitted on October 23, 2019 at 5:40:48 pm PDT*

| | |
|---|---|
| Nature: | **Conduct Advisor Registration** |
| Urgency: | **Conduct Advisor Registration** |
| Incident Date and Time: | **2019-10-23** |
| Incident Location: | **Conduct Advisor Registration** |

Reported by

| | |
|---|---|
| Name: | **Patrick Fleetwood** |
| Title: | **11464891** |
| Email: | |
| Phone: | **2019-021** |
| Address: | |
| | **[UNAUTHENTICATED]** |

Conduct Advisor Information

Who is your conduct advisor?
**Chris Johnson**

The Center for Community Standards may disclose information regarding my conduct matter to the this person to help advise me in the community standards process.
**Yes**

*Pending IR #00018896*

*Submitted from 99.203.45.90 and routed to B. David Harrison (Program Support Supervisor). No routing rule matched. Routed to default recipient.*

Patrick Fleetwood

10/29/19

\* ███████ : two people invited to KBM lunch

███ - current GF

███ - former co-worker
— friend in program (currently @ eastern)

#21 venmo transaction - she paid me back for lunch

#22 thought it was random that she contacted me, felt like she was trying to cue up conversation - blocked her - things had made me more

\* don't talk about these things in closed areas w/ my friends, private setting

\* never in an ROTC setting/ training discuss women in private settings "not proud of that, but I will admit that I did that

\* w/ fellow ROTC people - Ian

\* "what's him name? -

\* used to be close w/ ███ - not anymore, you'd get this

#23 Student D - history class - 347 - US history course - ███████████ a Student D said that they were eskimo bros, just went allong w/ it "just tossed everything on to me since I was being investigated"

+ had this conversation in class, super hard to have

* Student talked about being eskimos bros w/ a number of other cadets

#27 * videos: do admit to sending videos - occurred more than 2 years ago

* it was on my 21st birthday (@ 9/7/2017)

* girl took me to her place send this to other ROTC guys so they can meet me

- deeply regret sending them

- wish I hadn't sent them, left it @ that, didn't say not to send them again - 't assume they were uncomfortable

* that video was consentual - she asked me to do that - don't know her name

#28 * Student E: prep for ranger challenge - October time frame, set it to everyone, sent to men + women

- great physical shape - really proud

- ellete soilder - no sexual intent

#29 Student F: people joke about how I am the playboy of the ROTC community - don't appreciate it, but never tell people to stop

* People would come to me w/ romantic advice and now matters have changed

#30 * if people told me they didn't want me to send, I would block

- lots of people blocked on my snapchat

* how was I supposed to know that that is what they are relaying to investigators

31 *

34 * 1/15/19 — called complainant
  - not trying to intimidate anyone
  - trying to be very professional
  - I was upset, accused 3rd hand that I was being accused of rape
  - "didn't want that to be around the ROTC community"
  - prevent gossip
  - didn't take her gossip + lies lightly
  - wasn't going to let myself be wrongly accused

35. call to Student C
  - wanted to know what/why he was talking to the complainant about
  - I could care less if he was going to help her
  - confronted him for gossiping about me behind my back — "unbrotherly"
  * student A endorsed student C to be free mason
  * wanted to stop gossip @ source
  * wrecking my reputation

36. FB message
- I gave these messages to investigator
- just wanted to talk face to face
- he was gossiping behind my back
- he has reported stuff before - looking for stuff
- not incorrectly reported, but he should focus elsewhere

37. didn't try to influence
biased interpretation
trying to ask him to be a character
witness
- wanted people who like me to be my character
witness
- friend / aquaintence
- feels misterpreted
- if I wanted him to lie I would have
just asked him - and I would have done
it in person

39. Student A has been through similar
process - seeking counsel - thought out
- he was taking info + giving it to complaining

Snapchat SHARP - pamphlet - "I can ruin your life"
weaponizing the process

Snapchat was @ Student A's house

other

* Student A + Complainant spent lots of
  time together — Student A had alternative
  motive
- Student A's roommate:
  ████████████
- didn't tell investigators because I have no evidence
- ████ saw Student A encourage sending it
- I did not take it as a joke
- found it very curious that investigators
  didn't include it in the report
- doesn't feel the report is accurate and
  felt investigator was biased
- prevented from discussing the investigation,
  but complainant was looking/contacting
  people from my past
- she was talking to everyone about it

  Cadre were gossipping about my case w/
  others — cadets and non cadets

- mutter rapist to me workouts
- repeated harassment gave me a lot of
  stress, talked to father about it
- gossip — ████████████ — watch out
  for Patrick
  └→ referred to CRCI

will email me copy

[ 7th - 14th - before
  Tue/Th    classes ]

Lieutenant Colonel Stafford,

My name is ███████████ and I am currently a Cadet at Washington State University's Army ROTC program. I have known Cadet Patrick Fleetwood since we both joined the program in Fall of 2015. Through the program, we have been able to conduct labs together, complete assignments together, and get through the hardships of ROTC together. Not only is he my classmate both in and outside of ROTC, he is my friend and although I have been in Spokane for nursing school the past year and half, we have maintained our friendship.

Since I've known Cadet Fleetwood, he has always been talking about his dreams as a future Army officer. He displays a huge amount of professionalism both in and out of uniform. He speaks to Cadre with respect and always shows military customs and courtesies. One of the biggest things I noticed is how Cadet Fleetwood takes the initiative to teach inexperienced Cadets on tactical skills. He treats them with respect and helps them better themselves as a future Army officer. When I met him, I knew he was a natural born leader.

I am aware and understand Washington State University's investigation into the allegations made against Cadet Patrick Fleetwood. When I received a call from him about this situation, I was able to tell how much this experience has hurt him just by hearing his voice. I've seen how much he has grown and matured since we've been in the program. These allegations do not align with the personality that he displays. I hope to serve with Cadet Patrick Fleetwood in the near future as an Army officer.

Very Respectfully,

████████████
CDT
Washington State University Army ROTC
███████████████████████
█████████████████

To Whom It May Concern:


My name is Cindy Angel, I work as an actor and scenic designer in Portland, Oregon.  I got to know Patrick when we were both students at Washington State University.  Aside from being students, Patrick and I were coworkers at Cougar Ridge Apartments.  Throughout my time working alongside Patrick, I got to see how hard he worked and how dedicated he was to succeeding in ROTC and at Washington State University.  No matter how busy he was however, he always managed to show up to work with a smile on his face and a let's get things done kind of attitude.  During our busy summer move in season, there were many days where Patrick had to be up at 4 a.m. for training and he'd still stay as late as he was needed at Cougar Ridge to ensure that students could get their new apartments in time.

When I spoke to Patrick about what he is being accused of I was very surprised.  Patrick has always been very polite and respectful.  At work and outside of it, he was very genuine and easy to get along with. He was also always willing to help, even if it was out of his way or a big job.  One summer he took time out of his schedule to help my roommates and I move and get everything hung in our apartment.  I'm happy to have a person like him as a friend and hope to see him continue to do what he is passionate about.


Sincerely,


Cindy Angel

███████████

█████████████████

To whom it regards,

I am writing on behalf of Patrick Fleetwood as a reference to his character. I have known Patrick for about nine months, five of which I have been in a relationship with him. During this time I have gotten to know Patrick very well, and can confidently attest to his disposition. While attending WSU and being in proximity with so many students and peers, one notices how rare it is to meet someone with such a distinct path for their future and the goals they hope to achieve. Patrick has always been very clear about his plan to join the military after his time at school and he has shaped his entire life and conduct around this ambition. He should pride himself on his ability to take extra steps to do the right thing, even when it is not readily convenient or in others' eyes always necessary. I have seen numerous occasions where Patrick is unwilling to compromise his integrity and his morals despite what others around him are doing which is a defining trait as a leader.

He is very driven to accomplish his goals and has been able to work to earn money for school while still being an active member of ROTC over the years and maintaining a social life. Outside of academics and work, Patrick sees the importance of building and maintaining relationships with his peers. While he does not shy away from making his views heard which can lead to friction with some, he is very loyal to those in his network of friends. After growing up with five sisters Patrick is comfortable being around women and the majority of his friendships are with females. He has even maintained to stay friendly with many of his past girlfriends, which I believe can be seen as a testament of how he interacts and conducts himself with the opposite sex. I have never felt any pressure from Patrick to do anything I don't want to, and in conversations about experiences that have happened to our peers it is clear that Patrick cares deeply about how women should be treated and have their decisions be respected.

Another notable thing that I have had the opportunity to witness about Patrick is his selflessness to help others. The entire time I have known him I have come to realize this is an inherent trait he possesses and exercises with almost everyone in his life. He took time out of his own life to help multiple people move in and out of housing during the summer for no gain of his own. I have also watched him give away belongings spanning from furniture and kitchen supplies to his own clothing, not because he no longer had use for the items or couldn't sell them but rather because he saw that the need for the item was greater in the other person. While visiting my parents house for my graduation party, he made a point to wake himself up early in the morning so that he could take part in doing yard work and house work to help my parents which was a task he had no obligation to do and that I myself didn't partake in. He does not think twice about doing things to help others and it seems as though it is second nature for him.

From everything I have seen of Patrick he is a person who is confident, takes pride in his actions, and treats others in a respectful way. In regards to the investigation I hope that this can shed some light on Patrick's conduct, character, and my account of who he is as an individual.

Best regards,

███████████

Becca Mischke
October 2019

Hello,

My name is Becca Mischke. I am a former student at Washington State University in Pullman. I am writing this letter in support of my best friend, Patrick Fleetwood. I have known Patrick for over 4 years. We met in 2015, freshman year in our dorm. I was lucky enough to be assigned the room directly across the hall from him. Our friendship developed quickly as we were living in such close quarters.

At first, he was just our "ROTC neighbor." I remember him being the first one awake every morning to go to PT. He was also often the last one to go to sleep in order to finish his homework and study. As I got to know him better, he told me about his aspiration to have a long career in the military and his goal to become a pilot. He was so sure of his path, while most freshmen (myself included) had no idea what we wanted to do in life. He has so much passion for the Army.

The next three years of college (and beyond) our friendship grew. I have known him through his relationships. He always treats his significant other with the utmost respect and compassion. I have never known him to disrespect a woman, or person for that matter. He has also known me through my relationships. He always looks out for me as if I were his sister. It comes naturally to him, he has four.

Patrick is one of the most hard-working and strong people I know. He puts extra hours into the things that are important to him. This includes work, exercise and school. His kindness and selflessness towards his family, friends, and coworkers is admirable. He is a one of a kind person that I feel grateful to have in my life.

I come from a military family. I see a lot of the same attributes in Patrick that I see in my family members who have served or are currently serving. They are the most hardworking, loyal, and mentally strong people that I know and probably ever will know. Patrick has amazed me since the day I met him with his dedication to the ROTC program and US Army. He is exactly the person I would want protecting this country.

Please feel free to contact me for any further information. I cannot attend the hearing on 10/11/2019 because I have a full-time job in Seattle. You can reach me at ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮. I would be happy to speak with you if required.

Sincerely,
Becca Mischke

October 4th, 2019

To whom it may concern,

My name is Evan Pederslie and I am a business student graduate of Washington State University. I am writing this letter on behalf of one of my best friends that I made in college; Patrick Fleetwood. I have known Patrick for almost 4 years now and I have learned a lot from him whether it was cooking or getting proper exercise. The most important of which being the willingness to help others out even if they are not close to you.

I first met Patrick in the dorms my freshman year and he was the first on the floor to introduce himself and invite me to hang out. If it weren't for Patrick I wouldn't have had as great of a time as I did my first year at WSU. He was always so welcoming and invited me to lots of fun activities. Because of Patrick I have made many long lasting friends my freshman year that I still have today. Over the past 4 years we have had many memorable adventures from camping to late night hiking. Since then he has been one of my most loyal friends that I can always count on to bend over backwards to help me out.

Through my time of knowing Patrick I have always known he was passionate about the army. He always took it very seriously and took pride in being top of his group, a good leader, and role model. He has always told me his stories of the training in ROTC and to me I won't ever fully understand the mindset needed to push yourself that hard physically and mentally. His completion of The Bataan Death March he participated in last spring down in New Mexico was a true example of this. His dad and his grandfather served their country in the military and I know Patrick wants to do the same. It's easy to tell that he is extremely passionate and motivated about his career in the military and his visions to become a helicopter pilot.

I know Patrick is currently working two jobs alongside school and works through the weekends to fuel his hobbies and expenses. He is a hard worker with the attitude to push him through any task. In the end, Patrick is a friend most would love to have or work alongside. He is a gentleman and a friend that I look up to and take advice from as he strives to become the best man he can be.

If you have any questions for me I will gladly help. Feel free to contact me at

Best,

Evan Pederslie



Center for
Community Standards

November 15, 2019

Patrick Fleetwood
Sent electronically to patrick.fleetwood@wsu.edu

**PERSONAL AND CONFIDENTIAL**

Regarding Case Number: 2018371301

Dear Patrick,

Thanks for meeting with me on October 29, 2019 regarding your pending community standards matter. As we discussed during our meeting, your conduct officer hearing has been continued. We are schedule to reconnect on:

Continued Meeting Date: Thursday, December 5, 2019
Time: 8:30am
Meeting with: Karen Metzner
Location: French 130

If this time will not work for you, please call our office at 509-335-4532 during business hours to reschedule, no later than 24-hours before the meeting. If you are not present for the scheduled meeting, a community standards hearing may be held in your absence, and sanctions may be assigned.

More information can be found at https://handbook.wsu.edu. Please feel free to email us at community.standards@wsu.edu, call us at 509-335-4532, or visit https://communitystandards.wsu.edu. if you have any questions or concerns.

Best,

Karen Metzner
Director, Center for Community Standards

AGENCY RECORD
210

**From:**            "Metzner, Karen" <kmetzner@wsu.edu>
**Sent:**            Thursday, November 21, 2019 3:36 PM
**To:**              "Fleetwood, Patrick Michael" <patrick.fleetwood@wsu.edu>
**Subject:**         RE: Follow up
**Attachment(s):**   RescheduleConf.pdf   *77063 bytes*

Hi Patrick,
We are scheduled to meet on December 5th at 8:30am. I have attached my communication to you from last week for your reference.
Karen

--
**Karen Metzner [she/her/hers]**
*Director, Center for Community Standards*
Washington State University | French Administration 130
Main: 509-335-4532 | Direct: 509-335-2295
https://www.handbook.wsu.edu/
https://communitystandards.wsu.edu/
kmetzner@wsu.edu

---

**From:** Fleetwood, Patrick Michael
**Sent:** Tuesday, November 19, 2019 11:00 AM
**To:** Metzner, Karen <kmetzner@wsu.edu>
**Subject:** Follow up

Good morning,

    I have been back in Pullman now for a few days and wanted to follow up on when I would be coming back in? I received an email with a link to a resource page, however I think the link is not working properly.

Very respectfully,

Patrick Fleetwood
Washington State University
Army ROTC
(509)432-8032

AGENCY RECORD
211



Center for
Community Standards

November 15, 2019

Patrick Fleetwood
Sent electronically to patrick.fleetwood@wsu.edu

**PERSONAL AND CONFIDENTIAL**

Regarding Case Number: 2018371301

Dear Patrick,

Thanks for meeting with me on October 29, 2019 regarding your pending community standards matter. As we discussed during our meeting, your conduct officer hearing has been continued. We are schedule to reconnect on:

> Continued Meeting Date: Thursday, December 5, 2019
> Time: 8:30am
> Meeting with: Karen Metzner
> Location: French 130

If this time will not work for you, please call our office at 509-335-4532 during business hours to reschedule, no later than 24-hours before the meeting. If you are not present for the scheduled meeting, a community standards hearing may be held in your absence, and sanctions may be assigned.

More information can be found at https://handbook.wsu.edu. Please feel free to email us at community.standards@wsu.edu, call us at 509-335-4532, or visit https://communitystandards.wsu.edu. if you have any questions or concerns.

Best,

Karen Metzner
Director, Center for Community Standards

PO Box 641012, Pullman, WA 99164-1012
509-335-4532 | Fax: 509-335-4814
community.standards@wsu.edu | communitystandards.wsu.edu



WASHINGTON STATE UNIVERSITY

*Center for*
Community Standards

December 6, 2019

Patrick Fleetwood
Sent electronically to patrick.fleetwood@wsu.edu

**PERSONAL AND CONFIDENTIAL**

Regarding Case Number: 2018371301

Dear Patrick,

Our records indicate that you have unresolved matters with the Center for Community Standards and that you have applied to graduate.

Due to this pending matter, you are not considered to be in good standing and a hold has been placed on your account. You are not eligible to be awarded your degree at this time. For more information about good standing, please visit https://apps.leg.wa.gov/WAC/default.aspx?cite=504-26-525.

This hold may restrict the release of your transcripts, degree, diplomas, or allow you to register for classes. If you disagree with the application of the community standards hold, you can challenge the hold here: https://cm.maxient.com/reportingform.php?WashingtonStateUniv&layout_id=19.

**After resolving this matter, the hold will be removed.** More information can be found at https://handbook.wsu.edu. Please feel free to email us at community.standards@wsu.edu, call us at 509-335-4532, or visit https://communitystandards.wsu.edu. if you have any questions or concerns.

Sincerely,

Karen Metzner
Director, Center for Community Standards

PO Box 641012, Pullman, WA 99164-1012
509-335-4532 | Fax: 509-335-4814
community.standards@wsu.edu | communitystandards.wsu.edu

# Case Resolution Form

## 2018371301

Name

Patrick Michael Fleetwood

SID

011464891

DOB

1996-09-07

Role

Respondent

---

# I. Resolution Information

Resolution Type

Administrative Hearing: Decision Letter

Resolution Date

2019-12-16

Administrator(s)

OSC - Director (Karen Metzner)

Parental/Guardian Notification

No

Clery Reportability

Clery Rationale

# II. Charges/Issues and Findings (if applicable)

1. WAC 504-26-227: Sexual harassment
Responsible
2. WAC 504-26-209: Violation of Executive Policy 15
Responsible
3. WAC 504-26-219: Attempting to discourage one's...participation in, or use of, the conduct system
Responsible

# III. Sanctions / Actions

- Action Plan. You must create an Action Plan that outlines a minimum of specific steps you will take to success after graduation and how to move forward from this sitution Each action step shoud include: The specific action that you will take The resources that you need or will access to complete that task The intended outcome or goal of that task. The Action Plan can be submitted electronically here: https://cm.maxient.com/reportingform.php? WashingtonStateUniv&layout_id=15. It is due by THIS FIELD IS EMPTY and each proposed action item must be completed on or before THIS FIELD IS EMPTY. We can work together to finalize the timeline for each proposed action item. Once we agree on the final Action Plan, you will be responsible for completing the steps outlined in the plan.

- **No Contact.** You must not have any contact with the complainants or other parties involved in the CRCI or Community Standards process directly or indirectly, through third parties or through physical, verbal, written, or electronic means. This no contact sanction will run from the date of this letter until December 16, 2021. If you happen to inadvertently

come into contact with the complainants or other parties involved in the CRCI or Community Standards process, you are required to remove yourself from that situation immediately.

- You are to write an essay on #metoo movement and community repair of at least pages to be turned into this office by THIS FIELD IS EMPTY. This essay must be in the following format: a) 12 point Times New Roman font, b) One inch margins, c) double-spaced, d) include a cover page with your name, WSU ID number, date, and the title of the paper (your cover page does not count as a page of your essay). Please keep in mind that only college level work will be accepted as a satisfactory completion of this sanction. In additional to content, proper grammar, correct spelling, sentence structure, and cohesive organization of thought will be taken into accounts. Be advised that this essay may not serve to justify your actions or evaluate the actions of others and should use appropriate language. Submit your completed sanction electronically here: https://cm.maxient.com/reportingform.php?WashingtonStateUniv&layout_id=15/.

- You are on disciplinary probation until THIS FIELD IS EMPTY. If you are alleged to be responsible for any further violation of the University's Standards of Conduct for Students, you may be suspended or expelled from the University. As per WAC 504-26-405(b), probation is defined as a designated period of time during which any future violations of University policies or failure to follow any conditions of probation may result in suspension or expulsion. A student on probation is not eligible to run for or hold an office in any student group or organization; she or he is not eligible for certain jobs on campus, including but not limited to resident advisor or orientation counselor, and she or he is not eligible to serve on the university conduct board.

## IV. Additional Sanctions/Stipulations

## V. Rationale

more likely than not that the student's behavior meets the definition of sexual harassment and impacted the educational environment of another student. Also, student admitted to contacting people about the process

## CC List

**Submitted by Karen Metzner (kmetzner) on December 16, 2019 at 2:35:34 pm PST**



Center for
Community Standards

December 16, 2019

Patrick Fleetwood
Sent electronically to patrick.fleetwood@wsu.edu

**PERSONAL AND CONFIDENTIAL**

Regarding Case Number: 2018371301

Dear Patrick,

On December 5, 2019, we participated in a community standards hearing regarding your alleged involvement in incidents that were reported to the Office for Civil Rights Compliance and Investigation on January 18, 2019. The Office for Civil Rights Compliance and Investigation investigated the reported incidents and released their report on June 13, 2019. Based on the information provided to the Center for Community Standards, you allegedly violated the following community standards:

> WAC 504-26-227 - Sexual harassment. Sexual harassment includes behavior defined in Washington State University's Executive Policy 15, which prohibits discrimination, sexual harassment, and sexual misconduct.
> WAC 504-26-209 - Violation of university policy, rule, or regulation. Violation of any university policy, rule, or regulation published electronically on the university web site or in hard copy including, but not limited to Executive policy 15 (policy prohibiting discrimination, sexual harassment and sexual misconduct).
> WAC 504-26-219 - Abuse of the student conduct system. Abuse of the student conduct system including, but not limited to: (5) Attempting to discourage an individual's proper participation in, or use of, the student conduct system.

After our discussion and after reviewing all of the information available to me, I have determined the following more likely than not occurred:

1. You and the Complainant had a consensual sexual relationship which ended in December 2018. After the relationship ended, you made sexual comments about your relationship and the Complainant to fellow students in the program. While you identified these people as your friends, they were also in some cases your subordinates within the program and also friends/acquaintances of the Complainant.
2. You sent a photo to students in the program of you shirtless and in a towel via "ShapChat". You sent the photo because you were proud of your physique and the training program that you were currently completing in preparation for the Ranger Challenge.
3. You sent sexually inappropriate videos to several ROTC members. You sent these videos years ago, on your 21st birthday, and alcohol played a factor in the situation.
4. The students who received these photos/videos did not ask you to send them photos/videos and the photos/videos were unwanted.
5. You called the Complainant after you heard that she intended to file a report about her experiences.
6. You contacted another student via Facebook Messenger to discuss the reporting process with them.
7. You contacted another student via text message about providing evidence to "help you out" with the investigation.

Based on that, I make the following findings:

> WAC 504-26-227: Sexual harassment -- Responsible
> WAC 504-26-209: Violation of Executive Policy 15 -- Responsible

PO Box 641012, Pullman, WA 99164-1012
509-335-4532 | Fax: 509-335-4814
community.standards@wsu.edu | communitystandards.wsu.edu

AGENCY RECORD
216

WAC 504-26-219: Attempting to discourage one's...participation in, or use of, the conduct system -- Responsible

The totality of your conduct created a hostile and offensive educational environment for your fellow ROTC members (WAC 504-26-227, WAC 504-26-209). Your contact with participants in the process, both the Complainant and witnesses, attempted to discourage an individual's participation in the student conduct system (WAC 504-26-219). Based on our conversation, you did not intend to create a hostile environment for the students around you, however, that does not change the impact of your actions.

Based on the information in this letter, and in consideration of your lack of previous interactions(s) with us, I am assigning the following educational sanctions to assist your personal development and success as a WSU student.

**Action Plan.** You must create an Action Plan that outlines a minimum of five specific steps you will take to support your success after graduation and how you will move forward from this situation. You can consider including, but are not required to, action steps that you identify in the course of writing your reflection paper.

Each action step should include:

- The specific action that you will take
- The resources that you need or will access to complete that task
- The intended outcome or goal of that task

The Action Plan can be submitted electronically here: https://cm.maxient.com/reportingform.php?WashingtonStateUniv&layout_id=15.

**No Contact.** You must not have any contact with the Complainant or other parties involved in the Office for Civil Rights Compliance and Investigation or the Center for Community Standards process directly or indirectly, through third parties or through physical, verbal, written, or electronic means. This no contact sanction will run from the date of this letter until December 16, 2021. If you happen to inadvertently come into contact with the Complainant or other parties involved in the Office for Civil Rights Compliance and Investigation or the Center for Community Standards process, you are required to remove yourself from that situation immediately.

**Reflection Paper.** You are to write a research/reflection paper on #metoo movement and how to repair the harm caused to the community. See attached instructions for writing your paper. Submit your completed sanction electronically here: https://cm.maxient.com/reportingform.php?WashingtonStateUniv&layout_id=15/.

**Probation.** You are on disciplinary probation for the remainder of your undergraduate career. If you are alleged to be responsible for any further violation of the University's Standards of Conduct for Students, you may be suspended or expelled from the University. As per WAC 504-26-405(b), probation is defined as a designated period of time during which any future violations of University policies or failure to follow any conditions of probation may result in suspension or expulsion. A student on probation is not eligible to run for or hold an office in any student group or organization; she or he is not eligible for certain jobs on campus, including but not limited to resident advisor or orientation counselor, and she or he is not eligible to serve on the university conduct board.

**Alcohol and Drug Information School.** You must complete a state-approved Alcohol & Drug Information School (ADIS) program. For an ADIS location near you, search the internet for "Alcohol and Drug Information School." An online program is also acceptable.

**Enrollment Hold.** A hold has been placed on your account that may restrict the release of your transcripts, degree, diplomas, or access to registration until satisfactory completion of these sanctions. Upon proof of satisfactory completion of the conditions or sanctions, the hold can be released.

**Your next steps in the community standards process are:**

**1. Complete your sanctions.** If you accept this decision and the sanctions, you can complete them. If you do not complete your assigned sanctions by the due date(s), you may get additional sanctions (for example, a hold on your WSU account preventing your registration and release of your transcript and degree until the sanctions are completed). Please note that if you wish to appeal, you do not need to complete your sanctions while the appeal is pending.

**2. Appeal.** You have the right to appeal the decision in this matter. If you choose to appeal, you must do so in writing within 21 calendar days from the date of this letter. Your deadline to appeal is 11:59pm Pacific Standard Time on January 6, 2020. While your appeal is being reviewed, you do not need to complete your sanction(s). You can find the appeal form here. If you do not submit an appeal by the appeal deadline, this decision becomes final.

**3. Seek support.** If you have any questions about this decision, we have specially trained advisors, who volunteer to guide you throughout the process. These advisors are not your academic advisors. You can also contact me directly for help.

Please let me know if you have any questions or concerns or if I can support you in any way. You can reach me at kmetzner@wsu.edu or at 509-335-4532.

Sincerely,

Karen Metzner
Director, Center for Community Standards

**Reflection/Research Paper**

You must write a three-part paper. Your paper must be typed, double-spaced, with one-inch margins, and 12-point font.

**Chapter #1:  Reflection**

Goal: The goal for this chapter is for you to reflect on your involvement violating the Standards of Conduct for Students (Standards) and explain your responsibility for your actions and the corresponding consequences.

Summarize the incident and answer these questions:

A.  How are you responsible for being involved in this incident?
B.  Who was harmed/impacted by the situation?
C.  What decisions led to the incident?
D.  What did you not know or misunderstand when you made those decisions?

Chapter #1 should reflect your own thoughts and be at least 500 words long.

**Chapter #2:  Research**

Goal: The goal for this chapter is for you to collect information about your topic and how that topic relates to your violation of the Standards.

A.  Identify communities that you identify with, such as social, occupational, organizational, or cultural membership. You must read at least two articles about the #metoo movement and how it is linked to the communities in which you identify.
B.  Read at least two articles that discuss recommended steps to take to support reports of sexual harassment and to create safe and inclusive space for everyone.

It must include proper citations and be at least 500 words long.

**Chapter #3:  Persuasion**

Goal: The goal for this chapter is for you to understand and contextualize how and why your actions have consequences for you and your communities.

A.  How would you explain your research to your friends?
B.  How might you mentor members of your communities to understand the impact of their decision, regardless of their intention?
C.  How might you use what you learned in this paper to regain the trust of your communities?
D.  What specific actions can you as an individual take to support the communities you identified in Chapter 2, bullet point A?

Chapter #3 must be at least 500 words long.

You can submit your finished paper electronically here:
https://cm.maxient.com/reportingform.php?WashingtonStateUniv&layout_id=15

AGENCY RECORD
219

## Washington State University
## Appeal a Conduct Officer Decision

*Submitted on January 5, 2020 at 11:07:26 am PST*

| | |
|---|---|
| Nature: | **Appeal** |
| Urgency: | **Conduct Officer** |
| Incident Date and Time: | **2019-12-16** |
| Incident Location: | **Name 2018371301** |

Reported by

| | |
|---|---|
| Name: | **Patrick Fleetwood** |
| Title: | **11464891** |
| Email: | |
| Phone: | |
| Address: | |
| | **[UNAUTHENTICATED]** |

Questions

Did a procedural error occur that significantly impacted your situation?  If so, please explain.
**I'm appealing both the findings and the sanctions imposed upon me by the Director, Center for Community Standards in her letter, dated December 16, 2019.  In Ms. Metzner's letter, it is apparent that no effort was put into examining the deeply flawed nature of the original Investigation Report nor the following issues within WSU's system that I highlighted in my two meetings with her:**

**a. WSU's Executive Policy #15 is overly broad and arbitrary, as evidenced by the fact that a single incident of otherwise normal behavior can be construed as a violation if an individual claims not to want it, even if they never express this to the originator.  Additionally, any violation of this policy is then considered a violation of WAC 504-26-209 and WAC 504-26-227.**

**b. Much of the investigation cites incidents that did not involve the complainant, were beyond the scope of her complaint, and are not normally considered prohibited actions.**

**c. The disclosure of the intimate video happened over two years ago, involved two consenting adults, and while distasteful and deeply embarrassing, was not illegal.  Equally important, the only two individuals who received it did not ever make a complaint.**

**d. In the report, the investigator cites that a witness was discovered to have given false testimony regarding a very inflammatory allegation but no effort was made to determine why or if this was part of a larger conspiracy (which subsequent evidence indicates it was).  Even when this witness was found to have lied, the investigator still used testimony from this individual. Furthermore, no action was taken by the University against this witness for providing false testimony, in direct violation of the University's Executive Policy #15.**

**e. My initial attempts to gain supporting character references were rebuffed in the Investigation Report as "…retaliatory and/or interfering behavior…".  It is extremely difficult to prove one's innocence when you are prohibited from seeking character witnesses or knowing specifically what you are being accused of.**

**f. Without access to the investigation records, it is unknown whether the investigator queried the complainant and each witness about previous collaboration.  Recently discovered evidence reveals that at least one of the witnesses colluded with the complainant in this conspiracy, with the goal of having me removed from the ROTC Program.**

**g. The report cites a message from the Complainant to me (which would normally  be considered sexual harassment under Executive Policy #15) yet does not comment about this and, more troubling, leaves out the evidence that I provided which indicates the complainant contemplating using the Army's Sexual**

Harassment/Assault Response and Prevention Program in order to seek personal revenge.

h. During the five-month-long investigation, I was repeatedly subjected to severe verbal harassment during university classroom instruction.

i. I was illegally harassed at my off-campus work place by a fellow employee, who also alleged to my employer that I was a rapist.  This was a direct result of a university official disclosing privileged information to unauthorized individuals.

j. My official requests for records of this case (#19-616 and #19-630), properly filed in accordance with WSU procedures, were denied.  Not only is this a denial of due process, but also appears to be a violation of RCW 42.56.

Do you feel that there was enough evidence to justify your conduct officer's decision?  If not, please explain.
I do not feel that there was enough evidence to justify Ms. Metzner's decision.  Again I will explain that:

a. Much of the investigation cites incidents that did not involve the complainant, were beyond the scope of her complaint, and are not normally considered prohibited actions. Some of these events that are being held against me happened over two years ago.

b. The disclosure of the intimate video happened over two years ago, involved two consenting adults, and while distasteful and deeply embarrassing, was not illegal.  Equally important, the only two individuals who received it did not ever make a complaint.

c. In the report, the investigator cites that a witness was discovered to have given false testimony regarding a very inflammatory allegation but no effort was made to determine why or if this was part of a larger conspiracy (which subsequent evidence indicates it was). Even when this witness was found to have lied, the investigator still used testimony from this individual. Furthermore, no action was taken by the University against this witness for providing false testimony, in direct violation of the University's Executive Policy #15 showing a bias enforcement of University Policy.

d. Never does a witness ever state they ever witnessed first hand the accusations the complainant made against me. In many cases the witnesses explain they came to any sort of knowledge through gossip.

Do you believe that your assigned sanction(s) were appropriate for the violation(s) in this case with respect to your prior violations (if applicable) with the Center for Community Standards?  If not, please explain?
The proposed sanctions are unreasonable and unfair.  I'm being asked to write a "research/reflection paper on #metoo movement and how to repair the harm caused to the community."  What specific harm have I caused?  I have taken no actions that harmed or threatened anyone.  Additionally, the two-year no contact directive "with the Complainant or other parties involved…in the process…"  is equally unreasonable given that some of the witnesses remain my friends and that I haven't been provided a list of who I'm prohibited from contacting.  The corresponding Enrollment Hold, which would withhold the diploma I earned last month for two-years, creates an undue personal hardship with far-reaching economic consequences.
 I have matured tremendously over the last two years, developing a much deeper sense of empathy and concern for others.  The investigation and subsequent University actions have improved my critical thinking and resulted in much greater appreciation for the rights afforded our citizens.  In the end, I ask that you consider this whole issue for what it was – a brazen attempt by a select group of student to weaponize a very ambiguous and highly subjective University policy in order to have me removed from the ROTC program based purely on personal animosity.  I implore you to consider that I am the only one that has suffered harm from this as I've spent the last year repeatedly being both harassed and that I may lose my Army Commission.  I have suffered far more than what is warranted for even the most egregious allegation.

Do you have new information that was not available at the time of the hearing?  If so, please provide that information and explain why was it not available at the original conduct officer hearing.  Why would the new information change the conduct officer's decision?
I will attach a copy of a letter that proves there was collusion between both the complainant and one of her witnesses. This was a letter that I submitted to Mr. Metzner, however to my knowledge she never followed

**up/contacted the witness I provided.**

By submitting this document, I hereby acknowledge that (1) the information provided in this form is complete and true to the best of my knowledge and, (2) I am aware of the policies and procedures concerning appeals as set forth in the Standards of Conduct for Students.
**Yes**

<u>Attachments</u>

█████ letter.docx

*Pending IR #00020607*
*Submitted from 50.52.123.105 and routed to B. David Harrison (Program Support Supervisor). Processed by routing rule #81.*
*Copies to: kcance@wsu.edu; kmetzner@wsu.edu*

To Whom It May Concern,

I would like to provide a memorandum to provide additional context behind the EO complaint against Patrick Fleetwood. Due to the complex and ambiguous nature of the situation, I do not want this memorandum to be taken as evidence for or against Patrick. Unfortunately, the nature of EO complaints are highly subjective, and are difficult to corroborate. Additionally, this memorandum will contain my assessment of the situation, and is only meant to provide additional context, not accusation.

From roughly May 2017 until May 2019, I was roommates with ██████████ and witnessed his behavior and interaction with the WSU ROTC cadets. Although I did not recognize it at the time, upon reflection and distance from the situation, I have realized the manipulative and coercive aspects of his character; to which I look back with great appall. I witnessed ████ interaction with ██████████████ and I would be remised if I did not bring to light that his behavior with her was coercive and implicative. I believe that he had intent to see that Patrick be dismissed from ROTC. I believe this because he has displayed character traits indicative of a spiteful power complex. He conveyed on numerous occasion to her, that he had just gone through an investigation into his own character, and that he knew the right courses of action to see to it that Patrick's involvement in ROTC would be ended. This was explicit collusion. Additionally, I observed him spreading his thoughts and opinions about Patrick in a subversive manner with other cadets. I realize that these points are not easily proven, as they are my subjective observation, and I am not writing to prove or disprove Patrick's guilt. I believe that Patrick is an extremely capable individual, and that he has learned from his immaturity. I can say that observing his character mature over the past year that he has learned from his past mistakes. Given the behavior of the ROTC Cadets I have seen, his dismissal would be a disproportionate response.

In conclusion, I only ask that the coercion that came from ██ to be taken deeply into account, as I have observed him spread rumor and inaccurate information in many other instances. ██ has a sense of theatrics and has displayed a strong vengeful attitude on many occasions. I hope this memo raises questions about the origination of the EO complaint, and would prefer to give my verbal account if necessary.

Respectfully,
- SGT Jon Crodle
19th Special Forces Group (Airborne)



University Appeals Board

January 8, 2020

Patrick Fleetwood
Sent electronically to patrick.fleetwood@wsu.edu

**PERSONAL AND CONFIDENTIAL**

Regarding Case Number: 2018371301

Dear Patrick,

The University Appeals Board received your appeal for the community standards case in which you are involved and has scheduled the matter for review. The University Appeals Board will review all the evidence in the Center for Community Standards case file, as well as the appeals materials submitted by the parties. You do not attend the University Appeals Board Hearing. The University Appeals Board can uphold the initial decision, reverse it, modify it, or send it back to the Center for Community Standards to review. The University Appeals Board will review the case on February 12, 2020. Your matter will be reviewed by the following University Appeals Board Members:

TJ Page (Chair)
Olivia Shoesmith
Riley Guttromson

Your next steps are:

    1. If you believe members of your assigned University Appeals Board may have a conflict of interest, you may request to have them removed (recused) from your conduct review. Please fill out the recuse request form if you would like to make this request. You need to make this request no later than five calendar days prior to the date of your appeals board meeting.
    2. You will receive your University Appeals Board decision letter (via email) once they make their decision. The Appeals Board must respond to your Conduct Officer hearing appeal within 20 calendar days or within 30 days if it was a Conduct Board hearing. **You are not responsible for completing any assigned sanctions while your appeal is pending.**

More information can be found at https://handbook.wsu.edu. Please feel free to email us at community.standards@wsu.edu, call us at 509-335-4532, or visit https://communitystandards.wsu.edu, if you have any questions or concerns.

Regards,

Kyle Cance
Student Hearing Boards Manager



**2018371301**                                                    Appeal Pending
Civil Rights Compliance and Investigations

# Patrick Michael Fleetwood (011464891)

## DEMOGRAPHICS

**DOB**
1996-09-07

**Athletics**
Not Athlete

**Visa Status/Country of Citizenship**
USA

**Gender**
Male

**Greek**
Not Greek

**Student Campus**
PULLM

**Ethnicity**

**Honors**
N/A

**WAVR21 Assessment**

**Classification**
Junior

**ROTC / Veteran**
N/A

**Major**
Social Sciences BA

**Academic Advisor**
Rocha Alma 509/432-1820

**GPA Last Term / GPA Cumulative**
3.130 / 2.880

## CONTACT INFORMATION

**Housing**
Off Campus

**Local**
13522 129th St E
Puyallup WA 98374
509/432-8032 (local)

**Permanent**
13522 129th St E
Puyallup WA 98374
253/268-2437

**Username**
patrick.fleetwood

**Email Address**
patrick.fleetwood@wsu.edu

**Emergency Contact**

## INCIDENT AND CASE INFORMATION

**Report Number**

**Role**
Respondent

**Incident Date**
2019-01-18

**Incident Time**

**Incident Location**
Campus Building

**Reported Date**
2019-01-18

**Referral Source**
Student

**Reported By**

**Case Created Date**
2019-04-08

**Assigned To**
Kyle Cance
(DOS - Care Officer (5))

**Home Office**
Center for Community Standards

**Access Restriction**
University Conduct Board

**Clery Reportability**

**Clery Rationale**

**Tags**

| **Next Deadline Date** | **Reason** |
|---|---|
| 2020-02-12 | UAB Hearing |

**Incident Summary**
The Complainant has alleged that after you and she had a consensual sexual relationship which ended in December 2018, you subjected her to unwelcome conduct on the basis of sex and/or gender on campus and within the WSU ROTC program. She also alleged that you engaged in harassment of a sexual nature towards her and others within the WSU ROTC program, and that you engaged in retaliation and interference.

**Incident Description**
The Complainant has alleged that after you and she had a consensual sexual relationship which ended in December 2018, you subjected her to unwelcome conduct on the basis of sex and/or gender on campus and within the WSU ROTC program. She also alleged that you engaged in harassment of a sexual nature towards her and others within the WSU ROTC program, and that you engaged in retaliation and interference.

## RESOLUTION INFORMATION

| **Charges/Issues** | **Findings (if applicable)** |
|---|---|
| 1) WAC 504-26-227: Sexual harassment | Responsible |
| 2) WAC 504-26-209: Violation of Executive Policy 15 | Responsible |
| 3) WAC 504-26-219: Attempting to discourage one's...participation in, or use of, the conduct system | Responsible |

| **Appt. Date** | **Appt. Time** | **Appt. Location** |
|---|---|---|
| 2020-02-12 | 2:00 p.m. | |

| **Hearing/Resolution Date** | **Hearing/Resolution Type** | **Hearing Officer(s)** |
|---|---|---|
| 2019-12-16 | Administrative Hearing: Decision Letter | OSC - Director (Karen Metzner) |

| **Parental Notification** | **Holds in Place** | **Appeal Status** |
|---|---|---|
| No | RDC | UAB Appeal Received |

**Rationale**
more likely than not that the student's behavior meets the definition of sexual harassment and impacted the educational environment of another student. Also, student admitted to contacting people about the process

**CC List**

## SANCTIONS / ACTIONS

✔ = completed, ✖ = incomplete, ➡ = referred to another case

✖ **Alcohol and Drug Information School**

**DUE:**

✖ **Action Plan**

**NUM ITEM:**
**LINKED TO:**    success after graduation and how to move forward from this sitution
**DUE:**

**COMPLETED BY:**

✖   **Enrollment Hold**

    **NOTES:**

✖   **No Contact**

    **WITH:**                       the complainants or other parties involved in the CRCI or Community Standards process

    **EFFECTIVE THRU:**    2021-12-16

✖   **Reflection Paper**

    **TOPIC:**                 #metoo movement and community repair

    **LENGTH:**

    **DUE:**

✖   **Probation**

    **EFFECTIVE TO:**

## NOTES

**Individual Notes**

**OEO**
*Karen Metzner*

THIRD PARTY COMMUNICATION
Monday April 8, 2019 at 10:36am

Yes, please. Im sorry not getting to you sooner.

Rachel M. Brooks
EEO Coordinator & Investigator
Office for Equal Opportunity
Washington State University
509-335-8288 / Rachel.M.Brooks@wsu.edu / oeo.wsu.edu

*This communication, including any attachment, is intended solely for the entity or individual(s) to whom it is addressed and may contain confidential information. If you have received this message in error, please notify me immediately and delete this message. Any disclosure, copying, distribution, or other use of the contents of this message is prohibited.

From: Metzner, Karen
Sent: Monday, April 8, 2019 9:57 AM
To: Brooks, Rachel M
Subject: RE: Student Conduct Hold

Hi Rachel,
I just retracted his letter because he hadn't opened it yet. Should I remove his hold and close the case that I created to apply the hold?
Karen

--
Karen Metzner [she/her/hers]
Interim Director, Center for Community Standards
Washington State University | French Administration 130
Main: 509-335-4532 | Direct: 509-335-2295
https://www.handbook.wsu.edu/
https://communitystandards.wsu.edu/
kmetzner@wsu.edu

From: Brooks, Rachel M
Sent: Monday, April 8, 2019 8:54 AM
To: Metzner, Karen
Subject: RE: Student Conduct Hold

Karen,
I was just about to email you and let you know that you would no longer need to put a hold on his account.

Rachel M. Brooks
EEO Coordinator & Investigator
Office for Equal Opportunity
Washington State University
509-335-8288 / Rachel.M.Brooks@wsu.edu / oeo.wsu.edu

*This communication, including any attachment, is intended solely for the entity or individual(s) to whom it is addressed and may contain confidential information. If you have received this message in error, please notify me immediately and delete this message. Any disclosure, copying, distribution, or other use of the contents of this message is prohibited.

From: Metzner, Karen
Sent: Monday, April 8, 2019 8:52 AM
To: Brooks, Rachel M
Subject: RE: Student Conduct Hold

Hi Rachel. I applied the hold. Attached is the letter I sent the student.
Karen

--
Karen Metzner [she/her/hers]
Interim Director, Center for Community Standards
Washington State University | French Administration 130
Main: 509-335-4532 | Direct: 509-335-2295
https://www.handbook.wsu.edu/
https://communitystandards.wsu.edu/
kmetzner@wsu.edu


From: Brooks, Rachel M
Sent: Tuesday, March 19, 2019 12:05 PM
To: Metzner, Karen
Subject: Student Conduct Hold

Hello Karen,
OEO is requesting that the student named at the bottom of this email have a conduct hold placed on his account. OEO has made several attempts in scheduling this student but have not been successful. This student has the potential to graduate in May, however, due to his involvement with our office we would like to meet with the student before that. If you need more information please just let me know. Thank you.

*students information
Patrick Fleetwood
011464891
Patrick.fleetwood@wsu.edu
The **student does have a cell phone, number listed in my.wsu is his home phone number**


Rachel M. Brooks
EEO Coordinator & Investigator
Office for Equal Opportunity
Washington State University
509-335-8288 / Rachel.M.Brooks@wsu.edu / oeo.wsu.edu

*This communication, including any attachment, is intended solely for the entity or individual(s) to whom it is addressed and may contain confidential information. If you have received this message in error, please notify me immediately and delete this message. Any disclosure, copying, distribution, or other use of the contents of this message is prohibited.

---

**cell phone**                                                    OTHER CASE UPDATE
*Holly Campbell*                                        Friday July 12, 2019 at 10:31am

the person who answered his permanent number gave me his cell phone number.

---

**Text messsage**                                                 OTHER CASE UPDATE
*Holly Campbell*                                        Friday July 12, 2019 at 10:36am

Sent text message to check his WSU email for letter.

---

**Phone Call**                                                        UNCATEGORIZED
*Nathan Deen*                                        Thursday August 29, 2019 at 2:19pm

Called ███████ LM

UNCATEGORIZED
Tuesday September 3, 2019 at 4:43pm

*Nathan Deen*

Spoke with ▮▮▮▮ about sending case to conduct officer. She was fine with that. Said she'd look for communication from CCS about process.

**Phone Call with** ▮▮▮▮
*Karen Metzner*

COMMUNICATION WITH STUDENT: PHONE CALL
Tuesday October 1, 2019 at 1:10pm
Last edited Tuesday October 1, 2019 at 1:11pm

Called and spoke to ▮▮▮▮ about participating in a conduct officer hearing as a witness or as a party. Explained that suspension was not an outcome we were considering at this time. Follow up email in the EFC. ▮▮▮▮ needed some time to consider her options and will let me know by Friday.

**Phone Call**
*Karen Metzner*

COMMUNICATION WITH STUDENT: PHONE CALL
Friday October 11, 2019 at 4:39pm

Patrick called in to request that we move his hearing so that he has more time to prepare and to get the files. We are still tentatively planning on meeting on 10/21 and will continue as necessary. He is coming by Monday to view the unredacted copy.

**Phone call**
*Karen Metzner*

COMMUNICATION WITH STUDENT: PHONE CALL
Thursday October 17, 2019 at 2:48pm

Submitted a public records request for his documents. Request 19-520 and the request is not due until 11/20. Requesting to postpone the hearing to December so that he can review the files he receives prior to meeting with me. I explained that his matter would be heard by a conduct officer and explained potential outcomes. I also clarified that he had the opportunity to review the file in our office and request a redacted copy of it if he wanted to, which he has not yet done. He had previously made arrangements to come review the file on 10/14, but did not come at that time. I explained that I had concern with postponing his hearing given that he has access to the information he is seeking. He is consulting with some other people and will send me a follow up email tomorrow with more information.

**Phone call**
*Karen Metzner*

COMMUNICATION WITH STUDENT: PHONE CALL
Friday October 18, 2019 at 11:49am
Last edited Friday October 18, 2019 at 11:50am

Called to explain that he would still like to request more time for the public request to be returned to him to allow him to prepare for his hearing. I explained again that I had the information that he was requesting in his Community Standards record and that he was welcome to come to our office to review it. I let him know that I would reschedule his hearing to 10/29 to allow him some additional time to come to the office to review his record. He indicated that he may be out of town on a family hunting trip for an extended period of time. I explained that he could choose to attend via phone or submit additional documentation for me to review. I let Patrick know that I would follow up in writing and if he had any additional questions once he received my letter that he should feel free to give our office a call back.

**Public Records Request**
*Karen Metzner*

OTHER CASE UPDATE
Monday October 21, 2019 at 9:06am

File provided to Public Records for the public records request.

**Phone Call**
*Karen Metzner*

COMMUNICATION WITH STUDENT: PHONE CALL
Monday October 28, 2019 at 4:40pm

Patrick called to ask about witness statements, character statements, and interviewing witnesses. I talked to him about what to expect and let him know that he would have the opportunity to present his information tomorrow.

## TASKS

✔ = completed, ✘ = incomplete    ⚫⚫⚫ = task for entire case

| | TASK AND DESCRIPTION | CATEGORY | ASSIGNED TO | DUE DATE |
|---|---|---|---|---|
| ✔ | **Email Complainant to pass to Karen** | Administration | Nathan Deen | 2019-09-03 |

*Created by Karen Metzner on 2019-09-03*
*Completed by Karen Metzner on 2019-09-03*

| | TASK AND DESCRIPTION | CATEGORY | ASSIGNED TO | DUE DATE |
|---|---|---|---|---|
| ✔ | **Contact Complainant** | Administration | Karen Metzner | 2019-09-09 |

*Created by Karen Metzner on 2019-09-08*
*Completed by Karen Metzner on 2019-10-01*

## ELECTRONIC FILE CABINET

| Doc ID | Filename | Date Modified | File Size | Associated with |
|---|---|---|---|---|
| 00116311 | Case Creation Sheet | April 8, 2019 8:42 am | 9.30kb | This individual |
| 00116312 | Notice of Investigation Draft.pdf | April 8, 2019 8:42 am | 309.54kb | This individual |
| 00116314 | Notice_of_Hold(Email) | April 8, 2019 8:47 am | 76.83kb | This individual |
| 00120936 | NOIM_UCB(Email) | June 14, 2019 12:00 pm | 171.06kb | This individual |
| 00121294 | 2019-021 Investigation Report (002).pdf | June 24, 2019 1:27 pm | 698.16kb | All parties |
| 00121296 | WSU Office for Equal Opportunity Matter No. (2).pdf | June 24, 2019 1:30 pm | 688.58kb | All parties |
| 00121297 | WSU Office for Equal Opportunity Matter No. 2019-021 (3).pdf | June 24, 2019 1:30 pm | 743.72kb | All parties |
| 00121298 | WSU Office for Equal Opportunity Matter No. 2019-021.pdf | June 24, 2019 1:30 pm | 737.20kb | All parties |
| 00121455 | Submissions_Redacted_CCS.pdf | July 1, 2019 8:35 am | 3.70MB | All parties |
| 00121456 | Interview Notes_No Redactions_CCS.pdf | July 1, 2019 8:35 am | 5.72MB | All parties |
| 00121896 | UCB_NOIM_Respondant(Email) | July 12, 2019 10:33 am | 56.58kb | This individual |
| 00123546 | 2019-06-29email.pdf | August 21, 2019 1:20 pm | 647.57kb | This individual |
| 00130045 | Complainant Contact re: hearing participation | October 4, 2019 12:46 pm | 6.21kb | All parties |
| 00130674 | NoticeofMeeting(Email) | October 8, 2019 11:05 am | 175.36kb | This individual |
| 00132112 | RescheduleConfirmation(Email) | October 18, 2019 12:02 pm | 138.81kb | This individual |
| 00132147 | 10.18.2019 Parent Communication | October 18, 2019 2:28 pm | 5.45kb | This individual |
| 00132518 | FERPA Release Michael Fleetwood.pdf | October 22, 2019 8:46 am | 342.87kb | This individual |
| 00132529 | Email - Document #00132529 | October 22, 2019 10:05 am | 10.61kb | This individual |
| 00133122 | Email - Document #00133122 | October 24, 2019 2:21 pm | 7.58kb | This individual |
| 00133123 | 20191023151908960.pdf | October 24, 2019 2:21 pm | 732.42kb | This individual |
| 00133141 | Email - Document #00133141 | October 24, 2019 3:05 pm | 16.44kb | This individual |
| 00133351 | Email - Document #00133351 | October 25, 2019 6:33 pm | 20.34kb | This individual |
| 00133453 | Conduct Advisor Registration | October 28, 2019 10:02 am | 1.85kb | This individual |
| 00134718 | 10.29.2019 Fleetwood Meeting Notes.pdf | November 4, 2019 12:26 pm | 3.28MB | All parties |
| 00136763 | RescheduleConfirmation(Email) | November 15, 2019 12:39 pm | 75.26kb | This individual |
| 00138526 | Email - Document #00138526 | November 21, 2019 3:36 pm | 4.51kb | This individual |
| 00140270 | RescheduleConfirmation(Email).pdf | December 4, 2019 11:15 am | 75.26kb | This individual |
| 00140770 | Admin_HoldApplied(Email) | December 6, 2019 4:31 pm | 76.29kb | This individual |
| 00141859 | CRF | December 16, 2019 2:35 pm | 6.88kb | This individual |
| 00142062 | CO_DecisionLtr(Email) | December 16, 2019 5:49 pm | 472.05kb | This individual |
| 00143683 | Appeal | January 7, 2020 3:32 pm | 6.46kb | This individual |
| 00143684 | ███████etter.docx | January 7, 2020 3:32 pm | 7.15kb | This individual |
| 00143811 | UAB_Notice_of_Hearing_CO_Appeal(Email) | January 8, 2020 3:19 pm | 75.70kb | This individual |

AGENCY RECORD
231

**University Appeals Board Checklist for the Chair**

**Student/Group Name:** Patrick Fleetwood

**WSU ID#:** 11464891

**Student Email:** patrick.fleetwood@wsu.edu

**Case Number:** 2018371301

**Type of Decision:** Conduct Officer Decision

**Original Hearing Date:** 12/5/2019

**Date of Decision:** 12/16/2019

**Appeal Received:** 1/5/2019

**Decision Due: 2/21/20**

**Date of Appeals Hearing:** 2/12/2020 Wednesday

**Time of Appeals Hearing:** 2:00:00 PM

**Board Members:** ███████████████████████████

**Violations:** EP 15 Violation

**Grounds for Appeal:** ABC

  (A) Conduct Board hearing was not conducted fairly and in conformity with prescribed procedures
  (B) Decision was not based on substantial information
  (C) Sanctions were not appropriate for the violation
  (D) Appellant has new information or relevant fact unknown at the time of hearing

**University Conduct Board Appeals are a full review of the case not the criteria above and can be remanded back to the board for consideration.**

**Decision:** ☐ Uphold   ☐ Reverse   ☐ Modify: _____
                                                        _____

**Sanction:** ☐ Uphold   ☐ Reverse   ☐ Modify: _____

**Pre-Hearing:**

  • Review File on Sharepoint

**Hearing:**

  • Confirm board attendance
  • Review grounds for appeal (WAC 504-26-420)
  • Conduct Hearing by discussion of appeal contents, case notes, evidence, and appeal documents
  • Ensure confidential destruction of all hearing notes, can be sent to hearing board manager for destruction

**Post-Hearing:**

  • Consult with Attorney General (usually Adam Malcom) for any questions/legal issues

**University Appeals Board Checklist for the Chair**

- Conduct Board Decision Appeal:
  - Write letter and review with appeals team
  - Send to assigned Attorney General (usually Adam Malcom) for review and approval, cc Hearing Board Manager during review
  - Review with appeals team if needed
  - Send final letter to Hearing Board Manger
- All Appeals Decision Letters:  Send final letter to Hearing Board Manager to send parties

**From:**
**To:**        Deen, Nathan
**Subject:**    Re: Meeting Follow-up
**Date:**       Saturday, June 29, 2019 12:08:53 PM

Hi Nathan,

thank you for the information and it was nice to meet you too.

Best,

Get Outlook for iOS

**From:** Deen, Nathan
**Sent:** Wednesday, June 26, 2019 1:46:51 PM
**To:**
**Subject:** Meeting Follow-up

Hello

It was nice to meet you telephonically today.  Based on our conversation, I understand that from a University perspective, you are interested in the Respondent receiving educational sanctions and learning from his conduct.  You are also interested in maintaining a no contact directive.  Although directly out of the University's control, you are also concerned with him becoming an officer in the U.S. military.  You indicated you were fine with me contacting LTC Hobbs to discuss this case.

In terms of next steps, I will be speaking with University officials to come up with a preferred resolution from the University's standpoint and get your input on that resolution before approaching the Respondent about the possibility of an agreed resolution.  If an agreed resolution cannot be arranged, the University will schedule a conduct board hearing sometime during the Fall semester. If a hearing is necessary, you stated at this time you were interested in participating as a party.  As I stated on the phone, this handbook is a great resource for information on the conduct hearing process.  Also, Holly Campbell from the Center for Community Standards indicated she will be emailing you regarding an advisor to assist you in this process.

In the meantime, please feel free to reach out with any questions, concerns, or for an update.

Regards,



*Nathan E. Deen*, Assistant Attorney General
Office of the Attorney General | Washington State University
PO Box 641031 | Pullman, WA  99164-1031
Phone 509.335.2636 | Fax 509.335.1663
nathan_deen@wsu.edu | http://atg.wsu.edu

 University Appeals Board

February 21, 2020

Patrick Fleetwood
Sent electronically to patrick.fleetwood@wsu.edu

**PERSONAL AND CONFIDENTIAL**

Regarding Case Number: 2018371301

The University Appeals Board has made a decision regarding the enclosed community standards matter pertaining to Patrick Fleetwood.  Please see the attached document for additional information.

Now is a good time to reach out for support from friends, family, or campus resources.

Please contact our office at 509-335-4532 or community.standards@wsu.edu if you have any questions.

Regards,

Kyle Cance
Student Hearing Boards Manager

CC:    Karen Metzner, Director, Center for Community Standards



Washington State University | University Appeals Board

February 21, 2020                                 Sent via email (patrick.fleetwood@wsu.edu)

Dear Patrick,

On 2/12/2020, the University Appeals Board met to consider your appeal of the Conduct Officer's decision issued on 12/16/2019. The Conduct Officer found you responsible for violating Washington State University Standards of Conduct (*Standards*), including WAC 504-26-227: Sexual harassment; WAC 504-26-209: Violation of university policy, rule, or regulation; and WAC 504-26-219: Abuse of student conduct system.

The appeal is a review of the record and the decision; it is not a new hearing. As outlined in WAC 504-26-420(3), the Appeals Board considers:

(a) Whether the University Conduct Officer's hearing was conducted fairly in light of the charges and information presented, and in conformity with prescribed procedures. Deviations from designated procedures are not a basis for sustaining an appeal unless significant prejudice results.

(b) Whether the decision reached regarding the accused student was based on substantial information, that is, whether there were facts in the case that, if believed by the fact finder, were sufficient to establish that a violation of the standards of conduct for students occurred.

(c) Whether the sanction(s) imposed were appropriate for the violation of the Standards that the respondent student was found to have committed.

(d) New information, sufficient to alter a decision, or other relevant facts not brought out in the original hearing, because such information and/or facts were not known to the person appealing at the time of the original Conduct Officer hearing.

Your appeal was based on WAC 504-26-420(3)(a)(b)(c).

The Appeals Board carefully considered the information and rationale provided in your appeal. We find that there is substantial information to establish violations of the *Standards* and the sanctions assigned to you by the Conduct Officer are appropriate for the violations. Consequently, the Appeals Board affirms the Conduct Officer's decision and sanctions.

****************
This is the final order of the University. Judicial review of this final order may be available under RCW 34.05 by filing a petition for review with Whitman County Superior Court within thirty (30) days from the date that this order was placed in the mail. This order will be placed in the mail on the date listed above.

Sincerely,

Olivia Shoesmith
Chair, University Appeals Board

cc:
Karen Metzner, Director, Center for Community Standards
Kyle Cance, Student Hearing Board Manager

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16



FILED

JUL 3 1 2020

JILL E. WHELCHEL
WHITMAN COUNTY CLERK

**IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
IN AND FOR THE COUNTY OF WHITMAN**

PATRICK FLEETWOOD,

        Plaintiff,

    vs.

WASHINGTON STATE UNIVERSITY,

        Defendant.

Case No.  20-2-00053-38

**DECLARATION OF MATTHEW
CROTTY**

17    I, Matthew Crotty, declare:

18    1.    I am competent to testify and have personal knowledge of what is written in this

19 declaration.

20    2.    I represent Mr. Fleetwood in the above entitled action. I am an attorney licensed to

21 practice law in the State of Washington.

22

23    3.    Mr. Fleetwood filed and served his lawsuit on March 13, 2020 with Defendant

24 appearing, through its attorney, Nathan Deen, on March 19, 2020.

25

DECLARATION - 1

4.      On March 26, 2020, at 2:13 PM Mr. Deen emailed me informing me, in part, that:

Finally, the University is in the process of redacting the Office of Civil Rights Compliance and Investigation's file so that I can provide a copy of that to you.

5.      Between March 27, 2020 and April 2, 2020, Defendant produced the "Office of Civil Rights Compliance and Investigation's file" to me in five separate installments many of which contained redactions. None of those documents were bate numbered.

6.      Upon reviewing the Agency Record it became apparent that some of the documents Defendant produced to me per counsel's March 26, 2020 email were not included in the Agency Record whereas some of those documents were also produced in the Agency Record.

7.      True and correct copies of the documents that the Defendant provided me, but were not included in the Agency Record, but are cited in Mr. Fleetwood's opening brief are attached to this declaration as Exhibit A. I have, however, bate numbered those documents as "WSU Prod."

I declare under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct.

DATED this July 31, 2020.


By:    _____
       Matthew Crotty

DECLARATION - 2

**<u>CERTIFICATE OF SERVICE</u>**

Pursuant to RCW 9A.72.085 the undersigned hereby certifies under penalty of perjury under the laws of the State of Washington, that on the 31st day of July 2020, the foregoing was delivered to the following persons in the manner indicated:

| | |
|---|---|
| Nathan E. Deen<br>Attorney General of Washington<br>332 French Administration Building<br>Pullman, WA 99164 | VIA REGULAR MAIL ___<br>VIA FACSIMILE ___<br>HAND DELIVERED ___<br>VIA EMAIL ✓ |

CROTTY & SON LAW FIRM, PLLC

_____
Matthew Crotty

DECLARATION - 3

# EXHIBIT A

**Brooks, Rachel M**

| | |
|---|---|
| **From:** | ▬▬▬▬ 38 ▬▬▬▬ |
| **Sent:** | Friday, June 14, 2019 12:37 AM |
| **To:** | Brooks, Rachel M |
| **Cc:** | Metzner, Karen |
| **Subject:** | Re: WSU Office for Equal Opportunity Matter No. |

M. Brooks,

Thank you. I will keep alert to any further Center for Community Standards outreach.

Best,

▬▬▬ 38 ▬▬▬

Get Outlook for iOS

---

**From:** Brooks, Rachel M
**Sent:** Thursday, June 13, 2019 12:37:45 PM
**To:** ▬▬▬ 38 ▬▬▬
**Cc:** Metzner, Karen
**Subject:** WSU Office for Equal Opportunity Matter No.

Dear ▬ 38 ▬

Attached is a copy of this office's investigative report in the matter involving you. All student names, including your own, were redacted to protect student privacy. The Respondent and the Center for Community Standards will also receive a copy of this memorandum. Participants are reminded of the policies prohibiting retaliation, which apply to all individuals involved in this process. The Respondent will be reminded that you do not wish for any future contact from him/her/them.

The Center for Community Standards may reach out to you for additional proceedings. Please know, should this matter proceed to a formal administrative hearing, your participation is important to that process. Lack of participation may have an impact on the outcome. If you have any questions about those hearings, please contact the Center for Community Standards at 509-335-4532. I have also copied the Director of the Center for Community Standards, Karen Metzner, on this email.

Please also find the attached list of resources that may be available to you. Please feel free to contact me if you have any questions.

Regards,


Rachel M. Brooks
EEO Coordinator & Investigator
Office for Equal Opportunity
Washington State University
509-335-8288 / Rachel.M.Brooks@wsu.edu / oeo.wsu.edu

*This communication, including any attachment, is intended solely for the entity or individual(s) to whom it is addressed and may contain confidential information. If you have received this message in error, please notify me immediately and delete this message. Any disclosure, copying, distribution, or other use of the contents of this message is prohibited.

**WSU Prod 297**

**Brooks, Rachel M**

| | |
|---|---|
| **From:** | [45] |
| **Sent:** | Wednesday, May 8, 2019 6:05 PM |
| **To:** | Brooks, Rachel M |
| **Subject:** | Re: Investigation Status |

Rachel,
Thank you.

[45]

Sent from my iPhone

On May 8, 2019, at 4:23 PM, Brooks, Rachel M <rachel.m.brooks@wsu.edu> wrote:

> Hello [45]
> It is currently being reviewed by our senior investigator. I apologize for the delay again things are just moving very slow right now, but it is next in line to be reviewed by the AG's office
> <image001.png>Rachel M. Brooks
> EEO Coordinator & Investigator
> Office for Equal Opportunity
> Washington State University
> 509-335-8288 / Rachel.M.Brooks@wsu.edu / oeo.wsu.edu
> *This communication, including any attachment, is intended solely for the entity or individual(s) to whom it is addressed and may contain confidential information. If you have received this message in error, please notify me immediately and delete this message. Any disclosure, copying, distribution, or other use of the contents of this message is prohibited.
>
> **From:** [45]
> **Sent:** Wednesday, May 8, 2019 3:34 PM
> **To:** Brooks, Rachel M <rachel.m.brooks@wsu.edu>
> **Subject:** Investigation Status
> Rachel,
> I was hoping you had some insight on the status of Patrick Fleetwood's Title IX investigation with regards to status or outcome.
> Respectfully,
> [45]



**38**

**WSU Prod 311**

**Brooks, Rachel M**

| | |
|---|---|
| **From:** | Brooks, Rachel M |
| **Sent:** | Wednesday, May 8, 2019 4:23 PM |
| **To:** | ▮▮▮ 45 ▮▮▮ |
| **Subject:** | RE: Investigation Status |

Hello ▮ 45 ▮
It is currently being reviewed by our senior investigator. I apologize for the delay again things are just moving very slow right now, but it is next in line to be reviewed by the AG's office

🐾 Rachel M. Brooks
EEO Coordinator & Investigator
Office for Equal Opportunity
Washington State University
509-335-8288 / Rachel.M.Brooks@wsu.edu / oeo.wsu.edu

*This communication, including any attachment, is intended solely for the entity or individual(s) to whom it is addressed and may contain confidential information.  If you have received this message in error, please notify me immediately and delete this message.  Any disclosure, copying, distribution, or other use of the contents of this message is prohibited.

**From:** ▮▮▮▮ 45 ▮▮▮▮
**Sent:** Wednesday, May 8, 2019 3:34 PM
**To:** Brooks, Rachel M <rachel.m.brooks@wsu.edu>
**Subject:** Investigation Status

Rachel,
   I was hoping you had some insight on the status of Patrick Fleetwood's Title IX investigation with regards to status or outcome.

Respectfully,



**WSU Prod 312**

**Brooks, Rachel M**

| | |
|---|---|
| **From:** | Brooks, Rachel M |
| **Sent:** | Monday, April 15, 2019 10:08 AM |
| **To:** | Alina, Kristopher S |
| **Subject:** | student witness follow up |

Hi Kris,
Do you mind rescheduling this student witness for a follow-up interview



38
48
38

Rachel M. Brooks
EEO Coordinator & Investigator
Office for Equal Opportunity
Washington State University
509-335-8288 / Rachel.M.Brooks@wsu.edu / oeo.wsu.edu

*This communication, including any attachment, is intended solely for the entity or individual(s) to whom it is addressed and may contain confidential information.  If you have received this message in error, please notify me immediately and delete this message.  Any disclosure, copying, distribution, or other use of the contents of this message is prohibited.

**WSU Prod 313**

**Brooks, Rachel M**

| | |
|---|---|
| **From:** | Brooks, Rachel M |
| **Sent:** | Monday, April 15, 2019 10:11 AM |
| **To:** | Alina, Kristopher S |
| **Subject:** | RE: student witness follow up |

Oh sorry,
**38** -Fleetwood 2019-021

 Rachel M. Brooks
EEO Coordinator & Investigator
Office for Equal Opportunity
Washington State University
509-335-8288 / Rachel.M.Brooks@wsu.edu / oeo.wsu.edu

*This communication, including any attachment, is intended solely for the entity or individual(s) to whom it is addressed and may contain confidential information. If you have received this message in error, please notify me immediately and delete this message. Any disclosure, copying, distribution, or other use of the contents of this message is prohibited.

**From:** Alina, Kristopher S <kristopher.alina@wsu.edu>
**Sent:** Monday, April 15, 2019 10:10 AM
**To:** Brooks, Rachel M <rachel.m.brooks@wsu.edu>
**Subject:** RE: student witness follow up

Not a problem, what case is this again?

**Kristopher Alina**
Office Assistant | Office for Equal Opportunity
Washington State University
French Administration Building, Room 225 | Pullman, WA 99164-1022
509-335-8288 | Fax: 509-335-5483 | oeo.wsu.edu

**From:** Brooks, Rachel M <rachel.m.brooks@wsu.edu>
**Sent:** Monday, April 15, 2019 10:08 AM
**To:** Alina, Kristopher S <kristopher.alina@wsu.edu>
**Subject:** student witness follow up

Hi Kris,
Do you mind rescheduling this student witness for a follow-up interview




 Rachel M. Brooks

94

**WSU Prod 314**

EEO Coordinator & Investigator
Office for Equal Opportunity
Washington State University
509-335-8288 / Rachel.M.Brooks@wsu.edu / oeo.wsu.edu

*This communication, including any attachment, is intended solely for the entity or individual(s) to whom it is addressed and may contain confidential information.  If you have received this message in error, please notify me immediately and delete this message.  Any disclosure, copying, distribution, or other use of the contents of this message is prohibited.

**WSU Prod 315**

**Brooks, Rachel M**

| | |
|---|---|
| **From:** | Alina, Kristopher S |
| **Sent:** | Monday, April 15, 2019 10:12 AM |
| **To:** | Brooks, Rachel M |
| **Subject:** | RE: student witness follow up |

Thanks!

**Kristopher Alina**
Office Assistant | Office for Equal Opportunity
Washington State University
French Administration Building, Room 225 | Pullman, WA 99164-1022
509-335-8288 | Fax: 509-335-5483 | oeo.wsu.edu

**From:** Brooks, Rachel M <rachel.m.brooks@wsu.edu>
**Sent:** Monday, April 15, 2019 10:11 AM
**To:** Alina, Kristopher S <kristopher.alina@wsu.edu>
**Subject:** RE: student witness follow up

Oh sorry,

■ 38 Fleetwood 2019 021

Rachel M. Brooks
EEO Coordinator & Investigator
Office for Equal Opportunity
Washington State University
509-335-8288 / Rachel.M.Brooks@wsu.edu / oeo.wsu.edu

*This communication, including any attachment, is intended solely for the entity or individual(s) to whom it is addressed and may contain confidential information. If you have received this message in error, please notify me immediately and delete this message. Any disclosure, copying, distribution, or other use of the contents of this message is prohibited.

**From:** Alina, Kristopher S <kristopher.alina@wsu.edu>
**Sent:** Monday, April 15, 2019 10:10 AM
**To:** Brooks, Rachel M <rachel.m.brooks@wsu.edu>
**Subject:** RE: student witness follow up

Not a problem, what case is this again?

**Kristopher Alina**
Office Assistant | Office for Equal Opportunity
Washington State University
French Administration Building, Room 225 | Pullman, WA 99164-1022
509-335-8288 | Fax: 509-335-5483 | oeo.wsu.edu

**From:** Brooks, Rachel M <rachel.m.brooks@wsu.edu>
**Sent:** Monday, April 15, 2019 10:08 AM

96

**WSU Prod 316**

**To:** Alina, Kristopher S <kristopher.alina@wsu.edu>
**Subject:** student witness follow up

Hi Kris,
Do you mind rescheduling this student witness for a follow-up interview

38
48
38


Rachel M. Brooks
EEO Coordinator & Investigator
Office for Equal Opportunity
Washington State University
509-335 8288 / Rachel.M.Brooks@wsu.edu / oeo.wsu.edu

*This communication, including any attachment, is intended solely for the entity or individual(s) to whom it is addressed and may contain confidential information. If you have received this message in error, please notify me immediately and delete this message. Any disclosure, copying, distribution, or other use of the contents of this message is prohibited.

**WSU Prod 317**

**Brooks, Rachel M**

| | |
|---|---|
| **From:** | Brooks, Rachel M |
| **Sent:** | Monday, April 22, 2019 9:35 AM |
| **To:** | ███ 45 ███ |
| **Subject:** | WSU OEO |

Hello ██ 45 ██
Do you have a SID for a ███ 38 ███ I know she isn't a student anymore but I was trying to find her in my wsu.

Rachel M. Brooks
EEO Coordinator & Investigator
Office for Equal Opportunity
Washington State University
509-335-8288 / Rachel.M.Brooks@wsu.edu / oeo.wsu.edu

*This communication, including any attachment, is intended solely for the entity or individual(s) to whom it is addressed and may contain confidential information. If you have received this message in error, please notify me immediately and delete this message. Any disclosure, copying, distribution, or other use of the contents of this message is prohibited.

**WSU Prod 318**

**Brooks, Rachel M**

| | |
|---|---|
| **From:** | Ashkannejhad, Holly C |
| **Sent:** | Thursday, April 11, 2019 11:51 AM |
| **To:** | Brooks, Rachel M |
| **Subject:** | FW: WSU FAIS File Sharing Link |
| **Attachments:** | 19 W1468 Harassment.pdf |

See attached re: ▇ 38 ▇  ▇ 38 ▇

Holly Ashkannejhad, J.D.
Assistant Director | Office for Equal Opportunity Washington State University French Administration Building, Room 225 | Pullman, WA 99164 1022
509 335 8288 | Fax: 509 335 5483 | oeo.wsu.edu

This communication, including any attachment, is intended solely for the entity or individual(s) to whom it is addressed and may contain confidential information. If you have received this message in error, please notify me immediately and delete this message. Any disclosure, copying, distribution, or other use of the contents of this message is prohibited.


    Original Message
From: shannon.normandin <shannon.normandin@wsu.edu>
Sent: Thursday, April 11, 2019 11:38 AM
To: Anderson, Kimberly <anderson34@wsu.edu>; Ashkannejhad, Holly C <holly.ashkannejhad@wsu.edu>
Subject: WSU FAIS File Sharing Link

You have received access to a Serv U File Share from shannon.normandin. The link to transfer your file(s) will expire on Thursday, April 18, 2019 12:00 AM.

https://securefiles.fais.wsu.edu/?ShareToken=17569B2D0978B7FD796A7C1D05BB9DB7DB3B2C68

Attached is a police report for your referral:

19 W1661: Citizen Assist
19 W1620: Violate Order
19 W1468: Harassment

Need help? See some troubleshooting tips at https://urldefense.proofpoint.com/v2/url?u=http 3A__www.Serv 2DU.com_sharefiles&d=DwIDaQ&c=C3yme8gMkxg_ihJNXS06ZyWk4EJm8LdrrvxQb Je7sw&r=b5A_U5YBTM0aPrdy_6q3bk5WJeGtMS3u0Yk_LixrUNo&m=KZOM45BKSlZ5PQhveG3iLGJnByQQ9 ckShreh_z ViM&s=7MCVt8Fb3Izh1xLEd7OOvd3czTi02tHHmplthLaFJdc&e=.

**WSU Prod 319**

**Brooks, Rachel M**

| | |
|---|---|
| **From:** | Metzner, Karen |
| **Sent:** | Monday, April 8, 2019 8:52 AM |
| **To:** | Brooks, Rachel M |
| **Subject:** | RE: Student Conduct Hold |
| **Attachments:** | Notice of Hold(Email).pdf |

Hi Rachel. I applied the hold. Attached is the letter I sent the student.
Karen

--
**Karen Metzner [she/her/hers]**
*Interim Director, Center for Community Standards*
Washington State University | French Administration 130
Main: 509-335 4532 | Direct: 509 335 2295
https://www.handbook.wsu.edu/
https://communitystandards.wsu.edu/
kmetzner@wsu.edu

**From:** Brooks, Rachel M <rachel.m.brooks@wsu.edu>
**Sent:** Tuesday, March 19, 2019 12:05 PM
**To:** Metzner, Karen <kmetzner@wsu.edu>
**Subject:** Student Conduct Hold

Hello Karen,
OEO is requesting that the student named at the bottom of this email have a conduct hold placed on his account. OEO has made several attempts in scheduling this student but have not been successful. This student has the potential to graduate in May, however, due to his involvement with our office we would like to meet with the student before that. If you need more information please just let me know. Thank you.

*students information
Patrick Fleetwood
011464891
Patrick.fleetwood@wsu.edu
The **student does have a cell phone, number listed in my.wsu is his home phone number**

Rachel M. Brooks
EEO Coordinator & Investigator
Office for Equal Opportunity
Washington State University
509-335-8288 / Rachel.M.Brooks@wsu.edu / oeo.wsu.edu

*This communication, including any attachment, is intended solely for the entity or individual(s) to whom it is addressed and may contain confidential information. If you have received this message in error, please notify me immediately and delete this message. Any disclosure, copying, distribution, or other use of the contents of this message is prohibited.

**WSU Prod 320**

**Brooks, Rachel M**

| | |
|---|---|
| **From:** | Brooks, Rachel M |
| **Sent:** | Monday, April 8, 2019 8:54 AM |
| **To:** | Metzner, Karen |
| **Subject:** | RE: Student Conduct Hold |

Karen,
I was just about to email you and let you know that you would no longer need to put a hold on his account.

Rachel M. Brooks
EEO Coordinator & Investigator
Office for Equal Opportunity
Washington State University
509-335-8288 / Rachel.M.Brooks@wsu.edu / oeo.wsu.edu

*This communication, including any attachment, is intended solely for the entity or individual(s) to whom it is addressed and may contain confidential information. If you have received this message in error, please notify me immediately and delete this message. Any disclosure, copying, distribution, or other use of the contents of this message is prohibited.

**From:** Metzner, Karen <kmetzner@wsu.edu>
**Sent:** Monday, April 8, 2019 8:52 AM
**To:** Brooks, Rachel M <rachel.m.brooks@wsu.edu>
**Subject:** RE: Student Conduct Hold

Hi Rachel. I applied the hold. Attached is the letter I sent the student.
Karen

--
Karen Metzner [she/her/hers]
*Interim Director, Center for Community Standards*
Washington State University | French Administration 130
Main: 509-335-4532 | Direct: 509-335-2295
https://www.handbook.wsu.edu/
https://communitystandards.wsu.edu/
kmetzner@wsu.edu

**From:** Brooks, Rachel M <rachel.m.brooks@wsu.edu>
**Sent:** Tuesday, March 19, 2019 12:05 PM
**To:** Metzner, Karen <kmetzner@wsu.edu>
**Subject:** Student Conduct Hold

Hello Karen,
OEO is requesting that the student named at the bottom of this email have a conduct hold placed on his account. OEO has made several attempts in scheduling this student but have not been successful. This student has the potential to graduate in May, however, due to his involvement with our office we would like to meet with the student before that. If you need more information please just let me know. Thank you.

**WSU Prod 321**

*students information
Patrick Fleetwood
011464891
Patrick.fleetwood@wsu.edu
The **student does have a cell phone, number listed in my.wsu is his home phone number**

Rachel M. Brooks
EEO Coordinator & Investigator
Office for Equal Opportunity
Washington State University
509-335-8288 / Rachel.M.Brooks@wsu.edu / oeo.wsu.edu

*This communication, including any attachment, is intended solely for the entity or individual(s) to whom it is addressed and may contain confidential information. If you have received this message in error, please notify me immediately and delete this message. Any disclosure, copying, distribution, or other use of the contents of this message is prohibited.

**WSU Prod 322**

**Brooks, Rachel M**

| | |
|---|---|
| **From:** | Metzner, Karen |
| **Sent:** | Monday, April 8, 2019 9:57 AM |
| **To:** | Brooks, Rachel M |
| **Subject:** | RE: Student Conduct Hold |

Hi Rachel,
I just retracted his letter because he hadn't opened it yet. Should I remove his hold and close the case that I created to apply the hold?
Karen


--
**Karen Metzner [she/her/hers]**
*Interim Director, Center for Community Standards*
Washington State University | French Administration 130
Main: 509-335-4532 | Direct: 509-335-2295
https://www.handbook.wsu.edu/
https://communitystandards.wsu.edu/
kmetzner@wsu.edu


**From:** Brooks, Rachel M <rachel.m.brooks@wsu.edu>
**Sent:** Monday, April 8, 2019 8:54 AM
**To:** Metzner, Karen <kmetzner@wsu.edu>
**Subject:** RE: Student Conduct Hold

Karen,
I was just about to email you and let you know that you would no longer need to put a hold on his account.

Rachel M. Brooks
EEO Coordinator & Investigator
Office for Equal Opportunity
Washington State University
509-335-8288 / Rachel.M.Brooks@wsu.edu / oeo.wsu.edu

*This communication, including any attachment, is intended solely for the entity or individual(s) to whom it is addressed and may contain confidential information. If you have received this message in error, please notify me immediately and delete this message. Any disclosure, copying, distribution, or other use of the contents of this message is prohibited.


**From:** Metzner, Karen <kmetzner@wsu.edu>
**Sent:** Monday, April 8, 2019 8:52 AM
**To:** Brooks, Rachel M <rachel.m.brooks@wsu.edu>
**Subject:** RE: Student Conduct Hold

Hi Rachel. I applied the hold. Attached is the letter I sent the student.
Karen

**WSU Prod 323**

--

**Karen Metzner [she/her/hers]**
*Interim Director, Center for Community Standards*
Washington State University | French Administration 130
Main: 509-335-4532 | Direct: 509-335-2295
https://www.handbook.wsu.edu/
https://communitystandards.wsu.edu/
kmetzner@wsu.edu

**From:** Brooks, Rachel M <rachel.m.brooks@wsu.edu>
**Sent:** Tuesday, March 19, 2019 12:05 PM
**To:** Metzner, Karen <kmetzner@wsu.edu>
**Subject:** Student Conduct Hold

Hello Karen,
OEO is requesting that the student named at the bottom of this email have a conduct hold placed on his account. OEO has made several attempts in scheduling this student but have not been successful. This student has the potential to graduate in May, however, due to his involvement with our office we would like to meet with the student before that. If you need more information please just let me know. Thank you.

*students information
Patrick Fleetwood
011464891
Patrick.fleetwood@wsu.edu
The **student does have a cell phone, number listed in my.wsu is his home phone number**

Rachel M. Brooks
EEO Coordinator & Investigator
Office for Equal Opportunity
Washington State University
509-335-8288 / Rachel.M.Brooks@wsu.edu / oeo.wsu.edu

*This communication, including any attachment, is intended solely for the entity or individual(s) to whom it is addressed and may contain confidential information. If you have received this message in error, please notify me immediately and delete this message. Any disclosure, copying, distribution, or other use of the contents of this message is prohibited.

**WSU Prod 324**

**Brooks, Rachel M**

| | |
|---|---|
| **From:** | Brooks, Rachel M |
| **Sent:** | Monday, April 8, 2019 9:58 AM |
| **To:** | Metzner, Karen |
| **Subject:** | RE: Student Conduct Hold |

Yes, please. Im sorry not getting to you sooner.

Rachel M. Brooks
EEO Coordinator & Investigator
Office for Equal Opportunity
Washington State University
509-335-8288 / Rachel.M.Brooks@wsu.edu / oeo.wsu.edu

*This communication, including any attachment, is intended solely for the entity or individual(s) to whom it is addressed and may contain confidential information. If you have received this message in error, please notify me immediately and delete this message. Any disclosure, copying, distribution, or other use of the contents of this message is prohibited.

**From:** Metzner, Karen <kmetzner@wsu.edu>
**Sent:** Monday, April 8, 2019 9:57 AM
**To:** Brooks, Rachel M <rachel.m.brooks@wsu.edu>
**Subject:** RE: Student Conduct Hold

Hi Rachel,
I just retracted his letter because he hadn't opened it yet. Should I remove his hold and close the case that I created to apply the hold?
Karen

--
**Karen Metzner [she/her/hers]**
*Interim Director, Center for Community Standards*
Washington State University | French Administration 130
Main: 509-335-4532 | Direct: 509-335-2295
https://www.handbook.wsu.edu/
https://communitystandards.wsu.edu/
kmetzner@wsu.edu

**From:** Brooks, Rachel M <rachel.m.brooks@wsu.edu>
**Sent:** Monday, April 8, 2019 8:54 AM
**To:** Metzner, Karen <kmetzner@wsu.edu>
**Subject:** RE: Student Conduct Hold

Karen,
I was just about to email you and let you know that you would no longer need to put a hold on his account.

**WSU Prod 325**



Rachel M. Brooks
EEO Coordinator & Investigator
Office for Equal Opportunity
Washington State University
509-335-8288 / Rachel.M.Brooks@wsu.edu / oeo.wsu.edu

*This communication, including any attachment, is intended solely for the entity or individual(s) to whom it is addressed and may contain confidential information. If you have received this message in error, please notify me immediately and delete this message. Any disclosure, copying, distribution, or other use of the contents of this message is prohibited.

**From:** Metzner, Karen <kmetzner@wsu.edu>
**Sent:** Monday, April 8, 2019 8:52 AM
**To:** Brooks, Rachel M <rachel.m.brooks@wsu.edu>
**Subject:** RE: Student Conduct Hold

Hi Rachel. I applied the hold. Attached is the letter I sent the student.
Karen

--
**Karen Metzner [she/her/hers]**
*Interim Director, Center for Community Standards*
Washington State University | French Administration 130
Main: 509-335-4532 | Direct: 509-335-2295
https://www.handbook.wsu.edu/
https://communitystandards.wsu.edu/
kmetzner@wsu.edu

**From:** Brooks, Rachel M <rachel.m.brooks@wsu.edu>
**Sent:** Tuesday, March 19, 2019 12:05 PM
**To:** Metzner, Karen <kmetzner@wsu.edu>
**Subject:** Student Conduct Hold

Hello Karen,
OEO is requesting that the student named at the bottom of this email have a conduct hold placed on his account. OEO has made several attempts in scheduling this student but have not been successful. This student has the potential to graduate in May, however, due to his involvement with our office we would like to meet with the student before that. If you need more information please just let me know. Thank you.

*students information
Patrick Fleetwood
011464891
Patrick.fleetwood@wsu.edu
The **student does have a cell phone, number listed in my.wsu is his home phone number**

Rachel M. Brooks
EEO Coordinator & Investigator

77

**WSU Prod 326**

Office for Equal Opportunity
Washington State University
509-335-8288 / Rachel.M.Brooks@wsu.edu / oeo.wsu.edu

*This communication, including any attachment, is intended solely for the entity or individual(s) to whom it is addressed and may contain confidential information. If you have received this message in error, please notify me immediately and delete this message. Any disclosure, copying, distribution, or other use of the contents of this message is prohibited.

WSU Prod 327

**Brooks, Rachel M**

| | |
|---|---|
| **From:** | Metzner, Karen |
| **Sent:** | Monday, April 8, 2019 10:40 AM |
| **To:** | Brooks, Rachel M |
| **Subject:** | RE: Student Conduct Hold |

Got it!
Karen

--
**Karen Metzner [she/her/hers]**
*Interim Director, Center for Community Standards*
Washington State University | French Administration 130
Main: 509-335-4532 | Direct: 509-335-2295
https://www.handbook.wsu.edu/
https://communitystandards.wsu.edu/
kmetzner@wsu.edu

**From:** Brooks, Rachel M <rachel.m.brooks@wsu.edu>
**Sent:** Monday, April 8, 2019 9:58 AM
**To:** Metzner, Karen <kmetzner@wsu.edu>
**Subject:** RE: Student Conduct Hold

Yes, please. Im sorry not getting to you sooner.

Rachel M. Brooks
EEO Coordinator & Investigator
Office for Equal Opportunity
Washington State University
509-335-8288 / Rachel.M.Brooks@wsu.edu/ oeo.wsu.edu

*This communication, including any attachment, is intended solely for the entity or individual(s) to whom it is addressed and may contain confidential information. If you have received this message in error, please notify me immediately and delete this message. Any disclosure, copying, distribution, or other use of the contents of this message is prohibited.

**From:** Metzner, Karen <kmetzner@wsu.edu>
**Sent:** Monday, April 8, 2019 9:57 AM
**To:** Brooks, Rachel M <rachel.m.brooks@wsu.edu>
**Subject:** RE: Student Conduct Hold

Hi Rachel,
I just retracted his letter because he hadn't opened it yet. Should I remove his hold and close the case that I created to apply the hold?
Karen

**WSU Prod 328**

--
**Karen Metzner [she/her/hers]**
*Interim Director, Center for Community Standards*
Washington State University | French Administration 130
Main: 509-335-4532 | Direct: 509-335-2295
https://www.handbook.wsu.edu/
https://communitystandards.wsu.edu/
kmetzner@wsu.edu

**From:** Brooks, Rachel M <rachel.m.brooks@wsu.edu>
**Sent:** Monday, April 8, 2019 8:54 AM
**To:** Metzner, Karen <kmetzner@wsu.edu>
**Subject:** RE: Student Conduct Hold

Karen,
I was just about to email you and let you know that you would no longer need to put a hold on his account.

Rachel M. Brooks
EEO Coordinator & Investigator
Office for Equal Opportunity
Washington State University
509-335-8288 / Rachel.M.Brooks@wsu.edu / oeo.wsu.edu

*This communication, including any attachment, is intended solely for the entity or individual(s) to whom it is addressed and may contain confidential information. If you have received this message in error, please notify me immediately and delete this message. Any disclosure, copying, distribution, or other use of the contents of this message is prohibited.

**From:** Metzner, Karen <kmetzner@wsu.edu>
**Sent:** Monday, April 8, 2019 8:52 AM
**To:** Brooks, Rachel M <rachel.m.brooks@wsu.edu>
**Subject:** RE: Student Conduct Hold

Hi Rachel. I applied the hold. Attached is the letter I sent the student.
Karen

--
**Karen Metzner [she/her/hers]**
*Interim Director, Center for Community Standards*
Washington State University | French Administration 130
Main: 509-335-4532 | Direct: 509-335-2295
https://www.handbook.wsu.edu/
https://communitystandards.wsu.edu/
kmetzner@wsu.edu

**From:** Brooks, Rachel M <rachel.m.brooks@wsu.edu>
**Sent:** Tuesday, March 19, 2019 12:05 PM
**To:** Metzner, Karen <kmetzner@wsu.edu>
**Subject:** Student Conduct Hold

**WSU Prod 329**

Hello Karen,

OEO is requesting that the student named at the bottom of this email have a conduct hold placed on his account. OEO has made several attempts in scheduling this student but have not been successful. This student has the potential to graduate in May, however, due to his involvement with our office we would like to meet with the student before that. If you need more information please just let me know. Thank you.

*students information
Patrick Fleetwood
011464891
Patrick.fleetwood@wsu.edu
The **student does have a cell phone, number listed in my.wsu is his home phone number**

Rachel M. Brooks
EEO Coordinator & Investigator
Office for Equal Opportunity
Washington State University
509-335-8288 / Rachel.M.Brooks@wsu.edu / oeo.wsu.edu

*This communication, including any attachment, is intended solely for the entity or individual(s) to whom it is addressed and may contain confidential information. If you have received this message in error, please notify me immediately and delete this message. Any disclosure, copying, distribution, or other use of the contents of this message is prohibited.

**WSU Prod 330**

**Brooks, Rachel M**

| | |
|---|---|
| **From:** | Alina, Kristopher S |
| **Sent:** | Monday, April 8, 2019 8:21 AM |
| **To:** | Brooks, Rachel M |
| **Subject:** | RE: student witness |

Sounds good!

**Kristopher Alina**
Office Assistant | Office for Equal Opportunity
Washington State University
French Administration Building, Room 225 | Pullman, WA 99164-1022
509-335-8288 | Fax: 509-335-5483 | oeo.wsu.edu

**From:** Brooks, Rachel M <rachel.m.brooks@wsu.edu>
**Sent:** Friday, April 05, 2019 10:24 AM
**To:** Alina, Kristopher S <kristopher.alina@wsu.edu>
**Subject:** student witness

Hi Kris,
Can you contact this student witness for an interview

█ 38 █
█ 48 █
█ **38** █

█ 38 █ -Fleetwood


Rachel M. Brooks
EEO Coordinator & Investigator
Office for Equal Opportunity
Washington State University
509-335-8288 / Rachel.M.Brooks@wsu.edu / oeo.wsu.edu

*This communication, including any attachment, is intended solely for the entity or individual(s) to whom it is addressed and may contain confidential information. If you have received this message in error, please notify me immediately and delete this message. Any disclosure, copying, distribution, or other use of the contents of this message is prohibited.

**WSU Prod 331**

**Brooks, Rachel M**

| | |
|---|---|
| **From:** | Alina, Kristopher S |
| **Sent:** | Monday, April 8, 2019 8:14 AM |
| **To:** | Brooks, Rachel M |
| **Subject:** | RE: student witness |

Got it.

**Kristopher Alina**
Office Assistant | Office for Equal Opportunity
Washington State University
French Administration Building, Room 225 | Pullman, WA 99164-1022
509-335-8288 | Fax: 509-335-5483 | oeo.wsu.edu

**From:** Brooks, Rachel M <rachel.m.brooks@wsu.edu>
**Sent:** Thursday, April 04, 2019 6:16 PM
**To:** Alina, Kristopher S <kristopher.alina@wsu.edu>
**Subject:** RE: student witness

And this student witness as well,



38 -fleetwood

Rachel M. Brooks
EEO Coordinator & Investigator
Office for Equal Opportunity
Washington State University
509-335-8288 / Rachel.M.Brooks@wsu.edu / oeo.wsu.edu

*This communication, including any attachment, is intended solely for the entity or individual(s) to whom it is addressed and may contain confidential information. If you have received this message in error, please notify me immediately and delete this message. Any disclosure, copying, distribution, or other use of the contents of this message is prohibited.

**From:** Alina, Kristopher S <kristopher.alina@wsu.edu>
**Sent:** Thursday, April 4, 2019 2:50 PM
**To:** Brooks, Rachel M <rachel.m.brooks@wsu.edu>
**Subject:** RE: student witness

No worries, thanks!

**Kristopher Alina**
Office Assistant | Office for Equal Opportunity
Washington State University

65

**WSU Prod 332**

French Administration Building, Room 225 | Pullman, WA 99164-1022
509-335-8288 | Fax: 509-335-5483 | oeo.wsu.edu

**From:** Brooks, Rachel M <rachel.m.brooks@wsu.edu>
**Sent:** Thursday, April 04, 2019 2:49 PM
**To:** Alina, Kristopher S <kristopher.alina@wsu.edu>
**Subject:** RE: student witness

Oh sorry,
███ 38 ███-Fleetwood 2019-021

Rachel M. Brooks
EEO Coordinator & Investigator
Office for Equal Opportunity
Washington State University
509-335-8288 / Rachel.M.Brooks@wsu.edu / oeo.wsu.edu

*This communication, including any attachment, is intended solely for the entity or individual(s) to whom it is addressed and may contain confidential information. If you have received this message in error, please notify me immediately and delete this message. Any disclosure, copying, distribution, or other use of the contents of this message is prohibited.

**From:** Alina, Kristopher S <kristopher.alina@wsu.edu>
**Sent:** Thursday, April 4, 2019 2:49 PM
**To:** Brooks, Rachel M <rachel.m.brooks@wsu.edu>
**Subject:** RE: student witness

Sure, do you know which case this is associated with so can start a contact log?

Thanks!

**Kristopher Alina**
Office Assistant | Office for Equal Opportunity
Washington State University
French Administration Building, Room 225 | Pullman, WA 99164-1022
509-335-8288 | Fax: 509-335-5483 | oeo.wsu.edu

**From:** Brooks, Rachel M <rachel.m.brooks@wsu.edu>
**Sent:** Thursday, April 04, 2019 2:47 PM
**To:** Alina, Kristopher S <kristopher.alina@wsu.edu>
**Subject:** student witness

Hi Kris,
Can you get this student witness scheduled;
███ 38 ███
███ 48 ███
███████ 38 ███████
███ 38 ███ (cell. mywsu)

Rachel M. Brooks
EEO Coordinator & Investigator
Office for Equal Opportunity

**WSU Prod 333**

Washington State University
509-335-8288 / Rachel.M.Brooks@wsu.edu / oeo.wsu.edu

*This communication, including any attachment, is intended solely for the entity or individual(s) to whom it is addressed and may contain confidential information. If you have received this message in error, please notify me immediately and delete this message. Any disclosure, copying, distribution, or other use of the contents of this message is prohibited.

**WSU Prod 334**

**Brooks, Rachel M**

| | |
|---|---|
| **From:** | Brooks, Rachel M |
| **Sent:** | Friday, April 5, 2019 10:24 AM |
| **To:** | Alina, Kristopher S |
| **Subject:** | student witness |

Hi Kris,
Can you contact this student witness for an interview



38 -Fleetwood

Rachel M. Brooks
EEO Coordinator & Investigator
Office for Equal Opportunity
Washington State University
509-335-8288 / Rachel.M.Brooks@wsu.edu / oeo.wsu.edu

*This communication, including any attachment, is intended solely for the entity or individual(s) to whom it is addressed and may contain confidential information. If you have received this message in error, please notify me immediately and delete this message. Any disclosure, copying, distribution, or other use of the contents of this message is prohibited.

**WSU Prod 335**

**Brooks, Rachel M**

| | |
|---|---|
| **From:** | Brooks, Rachel M |
| **Sent:** | Thursday, April 4, 2019 6:16 PM |
| **To:** | Alina, Kristopher S |
| **Subject:** | RE: student witness |

And this student witness as well,



█ 38 █ -fleetwood

Rachel M. Brooks
EEO Coordinator & Investigator
Office for Equal Opportunity
Washington State University
509-335-8288 / Rachel.M.Brooks@wsu.edu / oeo.wsu.edu

*This communication, including any attachment, is intended solely for the entity or individual(s) to whom it is addressed and may contain confidential information. If you have received this message in error, please notify me immediately and delete this message. Any disclosure, copying, distribution, or other use of the contents of this message is prohibited.

**From:** Alina, Kristopher S <kristopher.alina@wsu.edu>
**Sent:** Thursday, April 4, 2019 2:50 PM
**To:** Brooks, Rachel M <rachel.m.brooks@wsu.edu>
**Subject:** RE: student witness

No worries, thanks!

**Kristopher Alina**
Office Assistant | Office for Equal Opportunity
Washington State University
French Administration Building, Room 225 | Pullman, WA 99164-1022
509-335-8288 | Fax: 509-335-5483 | oeo.wsu.edu

**From:** Brooks, Rachel M <rachel.m.brooks@wsu.edu>
**Sent:** Thursday, April 04, 2019 2:49 PM
**To:** Alina, Kristopher S <kristopher.alina@wsu.edu>
**Subject:** RE: student witness

Oh sorry,
█ 38 █ -Fleetwood 2019 021


Rachel M. Brooks

**WSU Prod 336**

EEO Coordinator & Investigator
Office for Equal Opportunity
Washington State University
509-335-8288 / Rachel.M.Brooks@wsu.edu / oeo.wsu.edu

*This communication, including any attachment, is intended solely for the entity or individual(s) to whom it is addressed and may contain confidential information. If you have received this message in error, please notify me immediately and delete this message. Any disclosure, copying, distribution, or other use of the contents of this message is prohibited.

**From:** Alina, Kristopher S <kristopher.alina@wsu.edu>
**Sent:** Thursday, April 4, 2019 2:49 PM
**To:** Brooks, Rachel M <rachel.m.brooks@wsu.edu>
**Subject:** RE: student witness

Sure, do you know which case this is associated with so can start a contact log?

Thanks!

**Kristopher Alina**
Office Assistant | Office for Equal Opportunity
Washington State University
French Administration Building, Room 225 | Pullman, WA 99164-1022
509-335-8288 | Fax: 509-335-5483 | oeo.wsu.edu

**From:** Brooks, Rachel M <rachel.m.brooks@wsu.edu>
**Sent:** Thursday, April 04, 2019 2:47 PM
**To:** Alina, Kristopher S <kristopher.alina@wsu.edu>
**Subject:** student witness

Hi Kris,
Can you get this student witness scheduled;

████ 38 ████
████ 48 ████
████████ 38 ████████
████ 38 ████ (cell. mywsu)

 Rachel M. Brooks
EEO Coordinator & Investigator
Office for Equal Opportunity
Washington State University
509-335-8288 / Rachel.M.Brooks@wsu.edu / oeo.wsu.edu

*This communication, including any attachment, is intended solely for the entity or individual(s) to whom it is addressed and may contain confidential information. If you have received this message in error, please notify me immediately and delete this message. Any disclosure, copying, distribution, or other use of the contents of this message is prohibited.

**WSU Prod 337**

**Brooks, Rachel M**

| | |
|---|---|
| **From:** | Brooks, Rachel M |
| **Sent:** | Thursday, April 4, 2019 4:37 PM |
| **To:** | 45 |
| **Subject:** | WSU OEO |

Hi,

When you have time can you give me a call, I know you all our headed out of town so if you are back on Monday can you give me a call, thank you.

Rachel M. Brooks
EEO Coordinator & Investigator
Office for Equal Opportunity
Washington State University
509-335-8288 / Rachel.M.Brooks@wsu.edu / oeo.wsu.edu

*This communication, including any attachment, is intended solely for the entity or individual(s) to whom it is addressed and may contain confidential information.  If you have received this message in error, please notify me immediately and delete this message.  Any disclosure, copying, distribution, or other use of the contents of this message is prohibited.

**WSU Prod 338**

**Brooks, Rachel M**

| | |
|---|---|
| **From:** | [45] |
| **Sent:** | Thursday, April 4, 2019 5:01 PM |
| **To:** | Brooks, Rachel M |
| **Subject:** | Re: WSU OEO |

Rachel,
I'll call you tomorrow morning. We will have phone service for most of the day.

[45]

Sent from my iPhone

On Apr 4, 2019, at 4:37 PM, Brooks, Rachel M <rachel.m.brooks@wsu.edu> wrote:

> Hi,
> When you have time can you give me a call, I know you all our headed out of town so if you are back on
> Monday can you give me a call, thank you.
> <image001.png>Rachel M. Brooks
> EEO Coordinator & Investigator
> Office for Equal Opportunity
> Washington State University
> 509-335-8288 / Rachel.M.Brooks@wsu.edu / oeo.wsu.edu
> *This communication, including any attachment, is intended solely for the entity or individual(s) to whom it is
> addressed and may contain confidential information. If you have received this message in error, please notify me
> immediately and delete this message. Any disclosure, copying, distribution, or other use of the contents of this
> message is prohibited.

**WSU Prod 339**

**Brooks, Rachel M**

| | |
|---|---|
| **From:** | Brooks, Rachel M |
| **Sent:** | Thursday, April 4, 2019 5:02 PM |
| **To:** | ▇▇▇ 45 ▇▇▇ |
| **Subject:** | RE: WSU OEO |

Ok thank you.

Rachel M. Brooks
EEO Coordinator & Investigator
Office for Equal Opportunity
Washington State University
509-335-8288 / Rachel.M.Brooks@wsu.edu / oeo.wsu.edu

*This communication, including any attachment, is intended solely for the entity or individual(s) to whom it is addressed and may contain confidential information.  If you have received this message in error, please notify me immediately and delete this message.  Any disclosure, copying, distribution, or other use of the contents of this message is prohibited.

**From:** ▇▇▇ 45 ▇▇▇
**Sent:** Thursday, April 4, 2019 5:01 PM
**To:** Brooks, Rachel M <rachel.m.brooks@wsu.edu>
**Subject:** Re: WSU OEO

Rachel,
     I'll call you tomorrow morning.  We will have phone service for most of the day.

▇▇▇ 45 ▇▇▇

Sent from my iPhone

On Apr 4, 2019, at 4:37 PM, Brooks, Rachel M <rachel.m.brooks@wsu.edu> wrote:

> Hi,
> When you have time can you give me a call, I know you all our headed out of town so if you are back on Monday can you give me a call, thank you.
>
> <image001.png>Rachel M. Brooks
> EEO Coordinator & Investigator
> Office for Equal Opportunity
> Washington State University
> 509-335-8288 / Rachel.M.Brooks@wsu.edu / oeo.wsu.edu
>
> *This communication, including any attachment, is intended solely for the entity or individual(s) to whom it is addressed and may contain confidential information.  If you have received this message in error, please notify me immediately and delete this message.  Any disclosure, copying, distribution, or other use of the contents of this message is prohibited.

**WSU Prod 340**

**Brooks, Rachel M**

| | |
|---|---|
| **From:** | ████████ 45 ████████ |
| **Sent:** | Thursday, April 4, 2019 5:04 PM |
| **To:** | Brooks, Rachel M |
| **Subject:** | Re: WSU OEO |

I just tried calling but was forwarded to voicemail. If you still available I'm available to talk. My number is ████ 14 ████

███ 45 ███

Sent from my iPhone

On Apr 4, 2019, at 5:01 PM, Brooks, Rachel M <rachel.m.brooks@wsu.edu> wrote:

> Ok thank you.
> <image001.png>Rachel M. Brooks
> EEO Coordinator & Investigator
> Office for Equal Opportunity
> Washington State University
> 509-335-8288 / Rachel.M.Brooks@wsu.edu / oeo.wsu.edu
> *This communication, including any attachment, is intended solely for the entity or individual(s) to whom it is addressed and may contain confidential information. If you have received this message in error, please notify me immediately and delete this message. Any disclosure, copying, distribution, or other use of the contents of this message is prohibited.
>
> **From:** ███████ 45 ███████
> **Sent:** Thursday, April 4, 2019 5:01 PM
> **To:** Brooks, Rachel M <rachel.m.brooks@wsu.edu>
> **Subject:** Re: WSU OEO
> Rachel,
> I'll call you tomorrow morning. We will have phone service for most of the day.
> ██████ 45 ██████
>
> Sent from my iPhone
>
> On Apr 4, 2019, at 4:37 PM, Brooks, Rachel M <rachel.m.brooks@wsu.edu> wrote:
>
>> Hi,
>> When you have time can you give me a call, I know you all our headed out of town so if you are back on Monday can you give me a call, thank you.
>> <image001.png>Rachel M. Brooks
>> EEO Coordinator & Investigator
>> Office for Equal Opportunity
>> Washington State University
>> 509-335-8288 / Rachel.M.Brooks@wsu.edu / oeo.wsu.edu
>> *This communication, including any attachment, is intended solely for the entity or individual(s) to whom it is addressed and may contain confidential information. If you have received this message in error, please notify me immediately and delete this message. Any disclosure, copying, distribution, or other use of the contents of this message is prohibited.

**WSU Prod 341**

**Brooks, Rachel M**

| | |
|---|---|
| **From:** | Brooks, Rachel M |
| **Sent:** | Thursday, April 4, 2019 5:05 PM |
| **To:** | [45] |
| **Subject:** | RE: WSU OEO |

Are you in your office
I saw I just missed your call im still in the office

Rachel M. Brooks
EEO Coordinator & Investigator
Office for Equal Opportunity
Washington State University
509-335-8288 / Rachel.M.Brooks@wsu.edu / oeo.wsu.edu

*This communication, including any attachment, is intended solely for the entity or individual(s) to whom it is addressed and may contain confidential information. If you have received this message in error, please notify me immediately and delete this message. Any disclosure, copying, distribution, or other use of the contents of this message is prohibited.

**From:** [45]
**Sent:** Thursday, April 4, 2019 5:04 PM
**To:** Brooks, Rachel M <rachel.m.brooks@wsu.edu>
**Subject:** Re: WSU OEO

I just tried calling but was forwarded to voicemail. If you still available I'm available to talk. My number is [14] [45]

Sent from my iPhone

On Apr 4, 2019, at 5:01 PM, Brooks, Rachel M <rachel.m.brooks@wsu.edu> wrote:

> Ok thank you.
>
> <image001.png>Rachel M. Brooks
> EEO Coordinator & Investigator
> Office for Equal Opportunity
> Washington State University
> 509-335-8288 / Rachel.M.Brooks@wsu.edu / oeo.wsu.edu
>
> *This communication, including any attachment, is intended solely for the entity or individual(s) to whom it is addressed and may contain confidential information. If you have received this message in error, please notify me immediately and delete this message. Any disclosure, copying, distribution, or other use of the contents of this message is prohibited.
>
> **From:** [45]
> **Sent:** Thursday, April 4, 2019 5:01 PM

55

**WSU Prod 342**

**To:** Brooks, Rachel M <rachel.m.brooks@wsu.edu>
**Subject:** Re: WSU OEO

Rachel,

I'll call you tomorrow morning.  We will have phone service for most of the day.

█████ 45 █████

Sent from my iPhone

On Apr 4, 2019, at 4:37 PM, Brooks, Rachel M <rachel.m.brooks@wsu.edu> wrote:

Hi,

When you have time can you give me a call, I know you all our headed out of town so if you are back on Monday can you give me a call, thank you.

<image001.png>Rachel M. Brooks
EEO Coordinator & Investigator
Office for Equal Opportunity
Washington State University
509-335-8288 / Rachel.M.Brooks@wsu.edu / oeo.wsu.edu

*This communication, including any attachment, is intended solely for the entity or individual(s) to whom it is addressed and may contain confidential information.  If you have received this message in error, please notify me immediately and delete this message.  Any disclosure, copying, distribution, or other use of the contents of this message is prohibited.

**WSU Prod 343**

**Brooks, Rachel M**

| | |
|---|---|
| From: | ▮▮45▮▮ |
| Sent: | Thursday, April 4, 2019 5:19 PM |
| To: | Brooks, Rachel M; ▮▮▮▮38▮▮▮▮; ▮▮▮38▮▮▮ |
| Subject: | Re: WSU OEO |

▮▮38▮▮ and ▮▮38▮▮

Please make email or phone contact with Rachel Brooks from WSU OEO. She is working an EO investigation and needs your cooperation to close out here report. Her contact info is in the email below.

VR,

▮▮45▮▮

Sent from my iPhone

On Apr 4, 2019, at 5:05 PM, Brooks, Rachel M <rachel.m.brooks@wsu.edu> wrote:

> Are you in your office
> I saw I just missed your call im still in the office
> <image001.png>Rachel M. Brooks
> EEO Coordinator & Investigator
> Office for Equal Opportunity
> Washington State University
> 509-335-8288 / Rachel.M.Brooks@wsu.edu / oeo.wsu.edu
> *This communication, including any attachment, is intended solely for the entity or individual(s) to whom it is addressed and may contain confidential information. If you have received this message in error, please notify me immediately and delete this message. Any disclosure, copying, distribution, or other use of the contents of this message is prohibited.
>
> From: ▮▮▮▮45▮▮▮▮
> Sent: Thursday, April 4, 2019 5:04 PM
> To: Brooks, Rachel M <rachel.m.brooks@wsu.edu>
> Subject: Re: WSU OEO
> I just tried calling but was forwarded to voicemail. If you still available I'm available to talk. My number is
> ▮▮14▮▮
> ▮45▮
>
> Sent from my iPhone
>
> On Apr 4, 2019, at 5:01 PM, Brooks, Rachel M <rachel.m.brooks@wsu.edu> wrote:
>
>> Ok thank you.
>> <image001.png>Rachel M. Brooks
>> EEO Coordinator & Investigator
>> Office for Equal Opportunity
>> Washington State University
>> 509-335-8288 / Rachel.M.Brooks@wsu.edu / oeo.wsu.edu
>> *This communication, including any attachment, is intended solely for the entity or individual(s) to whom it is addressed and may contain confidential information. If you have received this message in error, please notify me immediately and delete this message. Any disclosure, copying, distribution, or other use of the contents of this message is prohibited.

**WSU Prod 344**

**From:** ███████████████ 45 ███████████████
**Sent:** Thursday, April 4, 2019 5:01 PM
**To:** Brooks, Rachel M <rachel.m.brooks@wsu.edu>
**Subject:** Re: WSU OEO

Rachel,

I'll call you tomorrow morning. We will have phone service for most of the day.

████████ 45 ████████

Sent from my iPhone

On Apr 4, 2019, at 4:37 PM, Brooks, Rachel M <rachel.m.brooks@wsu.edu> wrote:

> Hi,
> When you have time can you give me a call, I know you all our headed
> out of town so if you are back on Monday can you give me a call, thank
> you.
> <image001.png>Rachel M. Brooks
> EEO Coordinator & Investigator
> Office for Equal Opportunity
> Washington State University
> 509-335-8288 / Rachel.M.Brooks@wsu.edu / oeo.wsu.edu
> *This communication, including any attachment, is intended solely for the entity
> or individual(s) to whom it is addressed and may contain confidential
> information. If you have received this message in error, please notify me
> immediately and delete this message. Any disclosure, copying, distribution, or
> other use of the contents of this message is prohibited.

58

**WSU Prod 345**

**Brooks, Rachel M**

| | |
|---|---|
| **From:** | Brooks, Rachel M |
| **Sent:** | Thursday, April 4, 2019 2:47 PM |
| **To:** | Alina, Kristopher S |
| **Subject:** | student witness |

Hi Kris,

Can you get this student witness scheduled;

▮▮ 38 ▮▮

▮▮ 48 ▮▮

▮▮ 38 ▮▮

▮▮ 38 ▮▮ (cell. mywsu)

 Rachel M. Brooks
EEO Coordinator & Investigator
Office for Equal Opportunity
Washington State University
509-335-8288 / Rachel.M.Brooks@wsu.edu / oeo.wsu.edu

*This communication, including any attachment, is intended solely for the entity or individual(s) to whom it is addressed and may contain confidential information. If you have received this message in error, please notify me immediately and delete this message. Any disclosure, copying, distribution, or other use of the contents of this message is prohibited.

**WSU Prod 346**

**Brooks, Rachel M**

| | |
|---|---|
| **From:** | Brooks, Rachel M |
| **Sent:** | Thursday, April 4, 2019 2:49 PM |
| **To:** | Alina, Kristopher S |
| **Subject:** | RE: student witness |

Oh sorry,

██ 38 ██ -Fleetwood 2019-021

 Rachel M. Brooks
EEO Coordinator & Investigator
Office for Equal Opportunity
Washington State University
509-335-8288 / Rachel.M.Brooks@wsu.edu / oeo.wsu.edu

*This communication, including any attachment, is intended solely for the entity or individual(s) to whom it is addressed and may contain confidential information.  If you have received this message in error, please notify me immediately and delete this message.  Any disclosure, copying, distribution, or other use of the contents of this message is prohibited.

**From:** Alina, Kristopher S <kristopher.alina@wsu.edu>
**Sent:** Thursday, April 4, 2019 2:49 PM
**To:** Brooks, Rachel M <rachel.m.brooks@wsu.edu>
**Subject:** RE: student witness

Sure, do you know which case this is associated with so can start a contact log?

Thanks!

**Kristopher Alina**
Office Assistant | Office for Equal Opportunity
Washington State University
French Administration Building, Room 225 | Pullman, WA 99164-1022
509-335-8288 | Fax: 509-335-5483 | oeo.wsu.edu

**From:** Brooks, Rachel M <rachel.m.brooks@wsu.edu>
**Sent:** Thursday, April 04, 2019 2:47 PM
**To:** Alina, Kristopher S <kristopher.alina@wsu.edu>
**Subject:** student witness

Hi Kris,
Can you get this student witness scheduled;
██ 38 ██
██ 48 ██
██ 38 ██
██ 38 ██ (cell. mywsu)

Rachel M. Brooks
EEO Coordinator & Investigator

47

**WSU Prod 347**

Office for Equal Opportunity
Washington State University
509-335-8288 / Rachel.M.Brooks@wsu.edu / oeo.wsu.edu

*This communication, including any attachment, is intended solely for the entity or individual(s) to whom it is addressed and may contain confidential information.  If you have received this message in error, please notify me immediately and delete this message.  Any disclosure, copying, distribution, or other use of the contents of this message is prohibited.

WSU Prod 348

**Brooks, Rachel M**

| | |
|---|---|
| **From:** | Alina, Kristopher S |
| **Sent:** | Thursday, April 4, 2019 2:50 PM |
| **To:** | Brooks, Rachel M |
| **Subject:** | RE: student witness |

No worries, thanks!

**Kristopher Alina**
Office Assistant | Office for Equal Opportunity
Washington State University
French Administration Building, Room 225 | Pullman, WA 99164-1022
509-335-8288 | Fax: 509-335-5483 | oeo.wsu.edu

**From:** Brooks, Rachel M <rachel.m.brooks@wsu.edu>
**Sent:** Thursday, April 04, 2019 2:49 PM
**To:** Alina, Kristopher S <kristopher.alina@wsu.edu>
**Subject:** RE: student witness

Oh sorry,
█ 38 █-Fleetwood 2019-021

Rachel M. Brooks
EEO Coordinator & Investigator
Office for Equal Opportunity
Washington State University
509-335-8288 / Rachel.M.Brooks@wsu.edu / oeo.wsu.edu

*This communication, including any attachment, is intended solely for the entity or individual(s) to whom it is addressed and may contain confidential information. If you have received this message in error, please notify me immediately and delete this message. Any disclosure, copying, distribution, or other use of the contents of this message is prohibited.

**From:** Alina, Kristopher S <kristopher.alina@wsu.edu>
**Sent:** Thursday, April 4, 2019 2:49 PM
**To:** Brooks, Rachel M <rachel.m.brooks@wsu.edu>
**Subject:** RE: student witness

Sure, do you know which case this is associated with so can start a contact log?

Thanks!

**Kristopher Alina**
Office Assistant | Office for Equal Opportunity
Washington State University
French Administration Building, Room 225 | Pullman, WA 99164-1022
509-335-8288 | Fax: 509-335-5483 | oeo.wsu.edu

**WSU Prod 349**

**From:** Brooks, Rachel M <rachel.m.brooks@wsu.edu>
**Sent:** Thursday, April 04, 2019 2:47 PM
**To:** Alina, Kristopher S <kristopher.alina@wsu.edu>
**Subject:** student witness

Hi Kris,
Can you get this student witness scheduled;

▮ 38
▮ 48
▮ 38
▮ 38  (cell. mywsu)


Rachel M. Brooks
EEO Coordinator & Investigator
Office for Equal Opportunity
Washington State University
509-335-8288 / Rachel.M.Brooks@wsu.edu / oeo.wsu.edu

*This communication, including any attachment, is intended solely for the entity or individual(s) to whom it is addressed and may contain confidential information. If you have received this message in error, please notify me immediately and delete this message. Any disclosure, copying, distribution, or other use of the contents of this message is prohibited.

**WSU Prod 350**

**Brooks, Rachel M**

| | |
|---|---|
| **From:** | 45 |
| **Sent:** | Wednesday, May 8, 2019 3:34 PM |
| **To:** | Brooks, Rachel M |
| **Subject:** | Investigation Status |

Rachel,
I was hoping you had some insight on the status of Patrick Fleetwood's Title IX investigation with regards to status or outcome.

Respectfully,



**WSU Prod 351**

**Brooks, Rachel M**

| | |
|---|---|
| **From:** | Brooks, Rachel M |
| **Sent:** | Thursday, April 4, 2019 12:07 PM |
| **To:** | ███ 45 ███ |
| **Subject:** | WSU OEO investigation |

Hi ██ 45 ██

I'm currently conducting an investigation involing two ████ 38 ████, there is a question I need to ask you. If you have time today can you give me call my x4878

Rachel M. Brooks
EEO Coordinator & Investigator
Office for Equal Opportunity
Washington State University
509-335-8288 / Rachel.M.Brooks@wsu.edu / oeo.wsu.edu

*This communication, including any attachment, is intended solely for the entity or individual(s) to whom it is addressed and may contain confidential information. If you have received this message in error, please notify me immediately and delete this message. Any disclosure, copying, distribution, or other use of the contents of this message is prohibited.

**WSU Prod 352**

**Brooks, Rachel M**

| | |
|---|---|
| **From:** | ▮▮45▮▮ |
| **Sent:** | Tuesday, March 19, 2019 10:15 AM |
| **To:** | Brooks, Rachel M |
| **Subject:** | Re: WSU OEO Follow up |

Rachel,
All ▮38▮ requirements are complete by 0930 on Fridays. However we have our semester ▮38▮ exercise April 5-7 in Spokane. He would not be available those days.

▮45▮

Sent from my iPhone

On Mar 19, 2019, at 12:28 PM, Brooks, Rachel M <rachel.m.brooks@wsu.edu> wrote:

> Hello ▮45▮
> I'm trying to schedule Patrick for a meeting with my office, after looking at his class schedule I was wondering does he have any ▮38▮ requirements Friday after his 9:10 am class?
> <image001.png>Rachel M. Brooks
> EEO Coordinator & Investigator
> Office for Equal Opportunity
> Washington State University
> 509-335-8288 / Rachel.M.Brooks@wsu.edu / oeo.wsu.edu
> *This communication, including any attachment, is intended solely for the entity or individual(s) to whom it is addressed and may contain confidential information. If you have received this message in error, please notify me immediately and delete this message. Any disclosure, copying, distribution, or other use of the contents of this message is prohibited.
>
> **From:** ▮▮45▮▮
> **Sent:** Tuesday, February 5, 2019 2:20 PM
> **To:** Brooks, Rachel M <rachel.m.brooks@wsu.edu>
> **Subject:** Re: WSU OEO Follow up
> Rachel,
> I have attached a PDF of the two sworn statements we have on file. After review of Patrick's statement it ids not signed an not in correct format. We will have him reformat and submit and I will get it to you at a later date.
> VR,



> email: ▮▮45▮▮
> ▮▮45▮▮

---

**From:** Brooks, Rachel M
**Sent:** Tuesday, February 5, 2019 10:26 AM
**To:** ▮▮45▮▮
**Subject:** WSU OEO Follow up

**WSU Prod 353**

Hi ███ 45 ███

I was wondering would you be able to get me those sworn statements from the three ███ 38 ███ you have spoken with.

<image001.png>Rachel M. Brooks

EEO Coordinator & Investigator

Office for Equal Opportunity

Washington State University

509-335-8288 / Rachel.M.Brooks@wsu.edu / oeo.wsu.edu

*This communication, including any attachment, is intended solely for the entity or individual(s) to whom it is addressed and may contain confidential information. If you have received this message in error, please notify me immediately and delete this message. Any disclosure, copying, distribution, or other use of the contents of this message is prohibited.

**WSU Prod 354**

RMB        4.3.19

██ 38 ██    - Fleetwood

Phone call

██ 45 ██        WSU  ██ 38 ██

-calling for update on timeline

. └ Patrick will not graduate till Next fall

**WSU Prod 355**

Curtis Whitman                    HLA                    3-29-19

telephone harassment / stalking
disturbing Interns images

Suspect - lives in Spokane. Not affiliated w/ WSU
no safety concerns.

will send names.

CP:                  ███ 38 ███

**WSU Prod 356**

**Brooks, Rachel M**

| | |
|---|---|
| **From:** | ████ 45 ████ |
| **Sent:** | Tuesday, February 12, 2019 9:02 AM |
| **To:** | Brooks, Rachel M |
| **Subject:** | Re: ██ 38 ██ Information |

████ 38 ████    ████ 48 ████

Sent from my iPhone

On Feb 12, 2019, at 8:13 AM, Brooks, Rachel M <rachel.m.brooks@wsu.edu> wrote:

> Hi ██ 45 ██
> I'm looking for ██ 38 ██ ID number; the student's name is ████ 38 ████ (not sure if ██ 38 ██ is the actual first
> name or if it is short for something else." I believe that she is a ██ 38 ██ year ██ 38 ██
>
> <image001.png>Rachel M. Brooks
> EEO Coordinator & Investigator
> Office for Equal Opportunity
> Washington State University
> 509-335-8288 / Rachel.M.Brooks@wsu.edu / oeo.wsu.edu
>
> *This communication, including any attachment, is intended solely for the entity or individual(s) to whom it is
> addressed and may contain confidential information.  If you have received this message in error, please notify me
> immediately and delete this message.  Any disclosure, copying, distribution, or other use of the contents of this
> message is prohibited.

**WSU Prod 357**

**From:** Finnestead, Nikki Ann <nfinnestead@wsu.edu>
**Sent:** Tuesday, January 29, 2019 12:44 PM
**To:** ████████ 45 ████████
**Cc:** Brooks, Rachel M <rachel.m.brooks@wsu.edu>
**Subject:** Re: Office for Equal Opportunity

███ 45 ███,

Rachel Brooks is the primary OEO investigator in this matter. I have copied Rachel on this email. Rachel, please see the message below.

Thank you,

**Nikki A. Finnestead**
EEO Coordinator & Investigator
Office for Equal Opportunity | Washington State University
509-335-8288 | nfinnestead@wsu.edu | oeo.wsu.edu

*This communication, including any attachment, is intended solely for the entity or individual(s) to whom it is addressed and may contain confidential information. If you have received this in error, please delete this message notify me immediately. Any disclosure, copying, distribution, or other use of the contents of this message is prohibited.*

On Jan 29, 2019, at 12:36 PM, ████████ 45 ████████ wrote:

> Nikki,
>      Could you pleases call me reference the Title IX inquiry we were discussion.
>
> Respectfully,
>
>
> ██████ 45 ██████
>
> **38**
>
> email: **45**

_____

**From:** Finnestead, Nikki Ann
**Sent:** Monday, January 28, 2019 8:36 AM

2

**WSU Prod 364**

**To:** ███ 45 ███
**Subject:** RE: Office for Equal Opportunity

███ 45 ███ ,

Thank you for sharing this information.

Have a great week,

**Nikki A. Finnestead**

EEO Coordinator & Investigator

Office for Equal Opportunity | Washington State University

509 335 8288 | nfinnestead@wsu.edu | oeo.wsu.edu

*This communication, including any attachment, is intended solely for the entity or individual(s) to whom it is addressed and may contain confidential information. If you have received this in error, please delete this message notify me immediately. Any disclosure, copying, distribution, or other use of the contents of this message is prohibited.*

---

**From:** ███ 45 ███
**Sent:** Friday, January 25, 2019 12:47 PM
**To:** Finnestead, Nikki Ann <nfinnestead@wsu.edu>
**Subject:** Re: Office for Equal Opportunity

Nikki,

Attached is the Annual ███ 38 ███ training package I used to teach out required block RE sexual harassment and assault.

Respectfully,

**WSU Prod 365**



email:

---

**From:** ████ 45 ████
**Sent:** Friday, January 25, 2019 8:10 AM
**To:** Finnestead, Nikki Ann
**Subject:** Re: Office for Equal Opportunity


Yes it is.

Sent from my iPhone


On Jan 25, 2019, at 7:24 AM, Finnestead, Nikki Ann <nfinnestead@wsu.edu> wrote:

> ████ 45 ████


> I will plan to speak with you at 9:45. Is the office line listed in the WSU directory the best way to reach you?


> Thank you,

> **Nikki A. Finnestead**

4

**WSU Prod 366**

EEO Coordinator & Investigator

Office for Equal Opportunity | Washington State University

509-335-8288 | nfinnestead@wsu.edu | oeo.wsu.edu

*This communication, including any attachment, is intended solely for the entity or individual(s) to whom it is addressed and may contain confidential information. If you have received this in error, please delete this message notify me immediately. Any disclosure, copying, distribution, or other use of the contents of this message is prohibited.*

On Jan 24, 2019, at 4:49 PM, ▮▮▮ 45 ▮▮▮
▮▮▮ 45 ▮▮▮ > wrote:

Nikki Ann,

I am available from 0930-1015 and then from 1200 until 3:00 PM. I am also eager to discuss the situation you are working on.

Best,

▮▮▮ 45 ▮▮▮

Sent from my iPhone

On Jan 24, 2019, at 4:28 PM, Finnestead, Nikki Ann <nfinnestead@wsu.edu> wrote:

▮▮▮ 45 ▮▮▮ ,

I would like to schedule a time to discuss a student matter that has been brought to my attention. It is my understanding that you are already aware of this matter. Do you have any time for a brief phone call tomorrow (Friday)? Thank you, and I look forward to your response.

5

**WSU Prod 367**

Regards,


**Nikki A. Finnestead**

EEO Coordinator & Investigator

Office for Equal Opportunity |
Washington State University

509-335 8288 |
nfinnestead@wsu.edu |
oeo.wsu.edu


*This communication, including any attachment, is intended solely for the entity or individual(s) to whom it is addressed and may contain confidential information. If you have received this in error, please delete this message notify me immediately. Any disclosure, copying, distribution, or other use of the contents of this message is prohibited.*

**WSU Prod 368**

**Finnestead, Nikki Ann**

---

| | |
|---|---|
| **From:** | Finnestead, Nikki Ann |
| **Sent:** | Monday, January 28, 2019 8:36 AM |
| **To:** | <span style="background:black;color:white">45</span> |
| **Subject:** | RE: Office for Equal Opportunity |

<span style="background:black;color:white">45</span> ,

Thank you for sharing this information.

Have a great week,

**Nikki A. Finnestead**
EEO Coordinator & Investigator
Office for Equal Opportunity | Washington State University
509-335-8288 | nfinnestead@wsu.edu | oeo.wsu.edu

*This communication, including any attachment, is intended solely for the entity or individual(s) to whom it is addressed and may contain confidential information. If you have received this in error, please delete this message notify me immediately. Any disclosure, copying, distribution, or other use of the contents of this message is prohibited.*

**From:** <span style="background:black;color:white">45</span>
**Sent:** Friday, January 25, 2019 12:47 PM
**To:** Finnestead, Nikki Ann <nfinnestead@wsu.edu>
**Subject:** Re: Office for Equal Opportunity

Nikki,
   Attached is the Annual <span style="background:black;color:white">38</span> training package I used to teach out required block RE sexual harassment and assault.

Respectfully,



email: <span style="background:black;color:white">45</span>

**From:** <span style="background:black;color:white">45</span>
**Sent:** Friday, January 25, 2019 8:10 AM
**To:** Finnestead, Nikki Ann
**Subject:** Re: Office for Equal Opportunity

1

**WSU Prod 369**

**Finnestead, Nikki Ann**

| | |
|---|---|
| **From:** | ▆▆▆ 45 ▆▆▆ |
| **Sent:** | Friday, January 25, 2019 12:47 PM |
| **To:** | Finnestead, Nikki Ann |
| **Subject:** | Re: Office for Equal Opportunity |
| **Attachments:** | ▆ 38 ▆ Annual Training Presentation   v11-1   as of 20180725.pptx |

Nikki,

   Attached is the Annual ▆ 38 ▆ training package I used to teach out required block RE sexual harassment and assault.

Respectfully,



email: ▆▆ 45 ▆▆

---

**From:** ▆▆ 45 ▆▆
**Sent:** Friday, January 25, 2019 8:10 AM
**To:** Finnestead, Nikki Ann
**Subject:** Re: Office for Equal Opportunity

Yes it is.

Sent from my iPhone

On Jan 25, 2019, at 7:24 AM, Finnestead, Nikki Ann <nfinnestead@wsu.edu> wrote:

> ▆ 45 ▆,
>
> I will plan to speak with you at 9:45. Is the office line listed in the WSU directory the best way to reach you?
>
> Thank you,
>
> **Nikki A. Finnestead**
> EEO Coordinator & Investigator
> Office for Equal Opportunity | Washington State University
> 509-335-8288 | nfinnestead@wsu.edu | oeo.wsu.edu

1

**WSU Prod 370**

**Brooks, Rachel M**

| | |
|---|---|
| **From:** | Brooks, Rachel M |
| **Sent:** | Thursday, June 13, 2019 12:38 PM |
| **To:** | ███████ 38 ███████ |
| **Cc:** | Metzner, Karen |
| **Subject:** | WSU Office for Equal Opportunity Matter No. |
| **Attachments:** | Investigation Report 2019-021.pdf |

Dear ██ 38 ██

Attached is a copy of this office's investigative report in the matter involving you. All student names, including your own, were redacted to protect student privacy. The Respondent and the Center for Community Standards will also receive a copy of this memorandum. Participants are reminded of the policies prohibiting retaliation, which apply to all individuals involved in this process. The Respondent will be reminded that you do not wish for any future contact from him/her/them.

The Center for Community Standards may reach out to you for additional proceedings. Please know, should this matter proceed to a formal administrative hearing, your participation is important to that process. Lack of participation may have an impact on the outcome. If you have any questions about those hearings, please contact the Center for Community Standards at 509-335-4532. I have also copied the Director of the Center for Community Standards, Karen Metzner, on this email.

Please also find the attached list of resources that may be available to you. Please feel free to contact me if you have any questions.

Regards,

Rachel M. Brooks
EEO Coordinator & Investigator
Office for Equal Opportunity
Washington State University
509-335-8288 / Rachel.M.Brooks@wsu.edu / oeo.wsu.edu

*This communication, including any attachment, is intended solely for the entity or individual(s) to whom it is addressed and may contain confidential information. If you have received this message in error, please notify me immediately and delete this message. Any disclosure, copying, distribution, or other use of the contents of this message is prohibited.

**WSU Prod 415**

6-13-19 . - Phone Call    - RmB

· Spoke  w / RP  via  Phone  Call

will issue  report  in  person  at  12:ish  tomorr

· In  addition  ███ 38 ███  will  also  be  present.

**WSU Prod 416**

**Brooks, Rachel M**

| | |
|---|---|
| **From:** | Brooks, Rachel M |
| **Sent:** | Wednesday, June 12, 2019 11:46 AM |
| **To:** | 38 |
| **Subject:** | RE: WSU investigation report |

I will be issuing that report tomorrow at noon.

Rachel M. Brooks
EEO Coordinator & Investigator
Office for Equal Opportunity
Washington State University
509-335-8288 / Rachel.M.Brooks@wsu.edu / oeo.wsu.edu

*This communication, including any attachment, is intended solely for the entity or individual(s) to whom it is addressed and may contain confidential information. If you have received this message in error, please notify me immediately and delete this message. Any disclosure, copying, distribution, or other use of the contents of this message is prohibited.

**From:** 38
**Sent:** Wednesday, June 12, 2019 11:44 AM
**To:** Brooks, Rachel M <rachel.m.brooks@wsu.edu>
**Subject:** Re: WSU investigation report

Hi Rachel,
I got your message on the phone too, I'll let you know if I have any questions, and thank you for all your work this semester.

Sincerely,

38

Get Outlook for iOS

**From:** Brooks, Rachel M <rachel.m.brooks@wsu.edu>
**Sent:** Tuesday, June 11, 2019 1:23 PM
**To:** 38
**Subject:** WSU investigation report

Hi 38
I wanted to let you that the investigation report is complete and I will issuing that report on Thursday.

Rachel M. Brooks
EEO Coordinator & Investigator
Office for Equal Opportunity
Washington State University
509-335-8288 / Rachel.M.Brooks@wsu.edu / oeo.wsu.edu

**WSU Prod 417**

*This communication, including any attachment, is intended solely for the entity or individual(s) to whom it is addressed and may contain confidential information. If you have received this message in error, please notify me immediately and delete this message. Any disclosure, copying, distribution, or other use of the contents of this message is prohibited.

**WSU Prod 418**

**Brooks, Rachel M**

| | |
|---|---|
| **From:** | 38 |
| **Sent:** | Wednesday, June 12, 2019 11:44 AM |
| **To:** | Brooks, Rachel M |
| **Subject:** | Re: WSU investigation report |

Hi Rachel,

I got your message on the phone too, I'll let you know if I have any questions, and thank you for all your work this semester.

Sincerely,

38

Get Outlook for iOS

---

**From:** Brooks, Rachel M <rachel.m.brooks@wsu.edu>
**Sent:** Tuesday, June 11, 2019 1:23 PM
**To:** 38
**Subject:** WSU investigation report

Hi 38

I wanted to let you that the investigation report is complete and I will issuing that report on Thursday.

Rachel M. Brooks
EEO Coordinator & Investigator
Office for Equal Opportunity
Washington State University
509 335-8288 / Rachel.M.Brooks@wsu.edu / oeo.wsu.edu
*This communication, including any attachment, is intended solely for the entity or individual(s) to whom it is addressed and may contain confidential information. If you have received this message in error, please notify me immediately and delete this message. Any disclosure, copying, distribution, or other use of the contents of this message is prohibited.

**WSU Prod 419**

**Brooks, Rachel M**

| | |
|---|---|
| **From:** | Brooks, Rachel M |
| **Sent:** | Tuesday, June 11, 2019 1:23 PM |
| **To:** | ███ 38 ███ |
| **Subject:** | WSU investigation report |

Hi ███ 38 ███

I wanted to let you that the investigation report is complete and I will issuing that report on Thursday.

Rachel M. Brooks
EEO Coordinator & Investigator
Office for Equal Opportunity
Washington State University
509-335-8288 / Rachel.M.Brooks@wsu.edu / oeo.wsu.edu

*This communication, including any attachment, is intended solely for the entity or individual(s) to whom it is addressed and may contain confidential information. If you have received this message in error, please notify me immediately and delete this message. Any disclosure, copying, distribution, or other use of the contents of this message is prohibited.

**WSU Prod 420**

**Brooks, Rachel M**

| | |
|---|---|
| **From:** | Brooks, Rachel M |
| **Sent:** | Tuesday, June 11, 2019 1:22 PM |
| **To:** | Fleetwood, Patrick Michael |
| **Subject:** | WSU Office for Equal Opportunity |

Hi Patrick,

The investigation report is complete and I would like to provide you a copy of that report in person on Thursday. Please let me know a time on Thursday between 9am-3:30pm. Myself, another OEO staff member, and ████ 38 ████ will also be attendance during the meeting.

Rachel M. Brooks
EEO Coordinator & Investigator
Office for Equal Opportunity
Washington State University
509-335-8288 / Rachel.M.Brooks@wsu.edu / oeo.wsu.edu

*This communication, including any attachment, is intended solely for the entity or individual(s) to whom it is addressed and may contain confidential information. If you have received this message in error, please notify me immediately and delete this message. Any disclosure, copying, distribution, or other use of the contents of this message is prohibited.

**WSU Prod 421**

**Brooks, Rachel M**

| | |
|---|---|
| **From:** | Brooks, Rachel M |
| **Sent:** | Tuesday, May 14, 2019 7:46 AM |
| **To:** | ███ 38 ███ |
| **Subject:** | RE: Investigation |

Hi ██ 38 ██

The investigation is still open, I have written the final report and it is currently under review. The report will be ready for issue soon.

Rachel M. Brooks
EEO Coordinator & Investigator
Office for Equal Opportunity
Washington State University
509-335-8288 / Rachel.M.Brooks@wsu.edu / oeo.wsu.edu

*This communication, including any attachment, is intended solely for the entity or individual(s) to whom it is addressed and may contain confidential information. If you have received this message in error, please notify me immediately and delete this message. Any disclosure, copying, distribution, or other use of the contents of this message is prohibited.

**From:** ███████ 38 ███████
**Sent:** Monday, May 13, 2019 9:47 PM
**To:** Brooks, Rachel M <rachel.m.brooks@wsu.edu>
**Subject:** Investigation

M. Brooks,

I never heard back about what happened with the investigation and was wondering about it.

Thanks,

██ 38 ██

**WSU Prod 422**

**Brooks, Rachel M**

| | |
|---|---|
| **From:** | 38 |
| **Sent:** | Monday, May 13, 2019 9:47 PM |
| **To:** | Brooks, Rachel M |
| **Subject:** | Investigation |

M. Brooks,

I never heard back about what happened with the investigation and was wondering about it.

Thanks,

38

**WSU Prod 423**

**Brooks, Rachel M**

| | |
|---|---|
| **From:** | Brooks, Rachel M |
| **Sent:** | Wednesday, April 10, 2019 1:04 PM |
| **To:** | ███████ 38 ███████ |
| **Subject:** | RE: WSU Office for Equal Opportunity |

Ok, thank you very much for getting back to me and sharing this information with me.

Rachel M. Brooks
EEO Coordinator & Investigator
Office for Equal Opportunity
Washington State University
509-335-8288 / Rachel.M.Brooks@wsu.edu / oeo.wsu.edu

*This communication, including any attachment, is intended solely for the entity or individual(s) to whom it is addressed and may contain confidential information. If you have received this message in error, please notify me immediately and delete this message. Any disclosure, copying, distribution, or other use of the contents of this message is prohibited.

**From:** ███████ 38 ███████
**Sent:** Wednesday, April 10, 2019 12:24 PM
**To:** Brooks, Rachel M <rachel.m.brooks@wsu.edu>
**Subject:** Re: WSU Office for Equal Opportunity

Good Afternoon,

I'm sorry for the delay in my response as I have a busy schedule. I have heard about the case you are looking into. However, I never felt apprehensive or felt that ██ 38 ██ was unapproachable. I discussed that the case did not pertain to me with ██ 38 ██. I was never called in to speak to ██ 38 ██, otherwise I would have. I do not think I have any information that would be helpful to this case or I would have went to speak to him myself.
The individual who reported the ██ 38 ██ in question thought I had been involved with this ██ 38 ██ as well; however, this is not the case. I believe she named me because she knew I had been friends with the ██ 38 ██ in question and that I am not anymore. While I am no longer friends with the ██ 38 ██ in question it has nothing to do with anything pertaining to this case or his conduct. I explained to ██ 38 ██ that me leaving the ██ 38 ██ program had nothing to do with the alleged ██ 38 ██
Also, I believe the individual that reported this ██ 38 ██ confused me with another female ██ 38 ██ my friend ██ 38 ██. She has given me permission to give you her email as she was more involved with the alleged ██ 38 ██ and might be able to help answer your questions about his conduct. Her email is ███████ 38 ███████

Have a good day,
██████ 38 ██████

Get Outlook for iOS

---

**From:** Brooks, Rachel M <rachel.m.brooks@wsu.edu>
**Sent:** Friday, April 5, 2019 11:10 AM
**To:** ███████ 38 ███████
**Subject:** RE: WSU Office for Equal Opportunity

**WSU Prod 424**

I'm looking into some alleged conduct of an ▮▮38▮▮. Its my understanding that you were apprehensive about speaking with ▮▮38▮▮, but our process and is different so I want to explain that to you so you can decide if you want to talk with us or not.

**Rachel M. Brooks**
EEO Coordinator & Investigator
Office for Equal Opportunity
Washington State University
509-335-8288 / Rachel.M.Brooks@wsu.edu / oeo.wsu.edu

*This communication, including any attachment, is intended solely for the entity or individual(s) to whom it is addressed and may contain confidential information. If you have received this message in error, please notify me immediately and delete this message. Any disclosure, copying, distribution, or other use of the contents of this message is prohibited.

**From:** ▮▮▮▮▮▮▮▮38▮▮▮▮▮▮▮▮
**Sent:** Friday, April 5, 2019 10:56 AM
**To:** Brooks, Rachel M <rachel.m.brooks@wsu.edu>
**Subject:** Re: WSU Office for Equal Opportunity

Good Afternoon Rachel,

I was just wondering if you could tell me what this case is in regards to?

Happy Friday,
▮▮38▮▮

Get Outlook for iOS

**From:** Brooks, Rachel M <rachel.m.brooks@wsu.edu>
**Sent:** Friday, April 5, 2019 10:22 AM
**To:** ▮▮▮▮▮38▮▮▮▮▮
**Subject:** WSU Office for Equal Opportunity

Hello ▮▮38▮▮

My name is Rachel, and I am an investigator here at WSU in the Office for Equal Opportunity. I'm contacting you today because I would like to speak in regards to a case I'm currently investigating. I just a few questions and I think you would be the best person to answer those questions. I would like to chat over the phone so that I can give you a bit more details, and you can decide if you want to share information with us or not. My office number is 509-335-4878

**Rachel M. Brooks**
EEO Coordinator & Investigator
Office for Equal Opportunity
Washington State University
509-335-8288 / Rachel.M.Brooks@wsu.edu / oeo.wsu.edu

*This communication, including any attachment, is intended solely for the entity or individual(s) to whom it is addressed and may contain confidential information. If you have received this message in error, please notify me immediately and delete this message. Any disclosure, copying, distribution, or other use of the contents of this message is prohibited.

**WSU Prod 425**

**WSU Prod 426**

**Brooks, Rachel M**

| | |
|---|---|
| **From:** | <span style="background:black">  38  </span> |
| **Sent:** | Wednesday, April 10, 2019 12:24 PM |
| **To:** | Brooks, Rachel M |
| **Subject:** | Re: WSU Office for Equal Opportunity |

Good Afternoon,

I'm sorry for the delay in my response as I have a busy schedule. I have heard about the case you are looking into. However, I never felt apprehensive or felt that ▇38▇ was unapproachable. I discussed that the case did not pertain to me with ▇38▇. I was never called in to speak to ▇38▇, otherwise I would have. I do not think I have any information that would be helpful to this case or I would have went to speak to him myself. The individual who reported the ▇38▇ in question thought I had been involved with this ▇38▇ as well; however, this is not the case. I believe she named me because she knew I had been friends with the ▇38▇ in question and that I am not anymore. While I am no longer friends with the ▇38▇ in question it has nothing to do with anything pertaining to this case or his conduct. I explained to ▇38▇ that me leaving the ▇38▇ program had nothing to do with the alleged ▇38▇

Also, I believe the individual that reported this ▇38▇ confused me with another female ▇38▇ my friend ▇38▇. She has given me permission to give you her email as she was more involved with the alleged ▇38▇ and might be able to help answer your questions about his conduct. Her email is ▇38▇

Have a good day,
▇38▇

Get Outlook for iOS

---

**From:** Brooks, Rachel M <rachel.m.brooks@wsu.edu>
**Sent:** Friday, April 5, 2019 11:10 AM
**To:** ▇38▇
**Subject:** RE: WSU Office for Equal Opportunity

I'm looking into some alleged conduct of an ▇38▇. Its my understanding that you were apprehensive about speaking with ▇38▇, but our process and is different so I want to explain that to you so you can decide if you want to talk with us or not.

Rachel M. Brooks
EEO Coordinator & Investigator
Office for Equal Opportunity
Washington State University
509-335-8288 / Rachel.M.Brooks@wsu.edu / oeo.wsu.edu
*This communication, including any attachment, is intended solely for the entity or individual(s) to whom it is addressed and may contain confidential information. If you have received this message in error, please notify me immediately and delete this message. Any disclosure, copying, distribution, or other use of the contents of this message is prohibited.

**From:** ▇38▇
**Sent:** Friday, April 5, 2019 10:56 AM
**To:** Brooks, Rachel M <rachel.m.brooks@wsu.edu>
**Subject:** Re: WSU Office for Equal Opportunity

Good Afternoon Rachel,

I was just wondering if you could tell me what this case is in regards to?
Happy Friday,
▇38▇

**WSU Prod 427**

Get Outlook for iOS

**From:** Brooks, Rachel M <rachel.m.brooks@wsu.edu>
**Sent:** Friday, April 5, 2019 10:22 AM
**To:** ████████ 38 ████████
**Subject:** WSU Office for Equal Opportunity

Hello ██ 38 ██

My name is Rachel, and I am an investigator here at WSU in the Office for Equal Opportunity. I'm contacting you today because I would like to speak in regards to a case I'm currently investigating. I just a few questions and I think you would be the best person to answer those questions. I would like to chat over the phone so that I can give you a bit more details, and you can decide if you want to share information with us or not. My office number is 509-335-4878

Rachel M. Brooks
EEO Coordinator & Investigator
Office for Equal Opportunity
Washington State University
509 335 8288 / Rachel.M.Brooks@wsu.edu / oeo.wsu.edu

*This communication, including any attachment, is intended solely for the entity or individual(s) to whom it is addressed and may contain confidential information. If you have received this message in error, please notify me immediately and delete this message. Any disclosure, copying, distribution, or other use of the contents of this message is prohibited.

**WSU Prod 428**

**Brooks, Rachel M**

| | |
|---|---|
| **From:** | Brooks, Rachel M |
| **Sent:** | Tuesday, April 9, 2019 9:22 AM |
| **To:** | Fleetwood, Patrick Michael |
| **Subject:** | RE: WSU OEO follow up |

Can we do Thursday again at 10 or 11

Rachel M. Brooks
EEO Coordinator & Investigator
Office for Equal Opportunity
Washington State University
509-335-8288 / Rachel.M.Brooks@wsu.edu / oeo.wsu.edu

*This communication, including any attachment, is intended solely for the entity or individual(s) to whom it is addressed and may contain confidential information. If you have received this message in error, please notify me immediately and delete this message. Any disclosure, copying, distribution, or other use of the contents of this message is prohibited.

**From:** Fleetwood, Patrick Michael <patrick.fleetwood@wsu.edu>
**Sent:** Monday, April 8, 2019 7:39 PM
**To:** Brooks, Rachel M <rachel.m.brooks@wsu.edu>
**Subject:** Re: WSU OEO follow up

I can come in Tuesday at 10:30, does that work?

Very respectfully,

Patrick Fleetwood
Washington State University
▮▮▮ 38 ▮▮▮
MS IV

**From:** Brooks, Rachel M <rachel.m.brooks@wsu.edu>
**Sent:** Monday, April 8, 2019 8:44 AM
**To:** Fleetwood, Patrick Michael
**Subject:** WSU OEO follow up

Hi Patrick,
I wanted to follow up and see if there was time on Tuesday or Wednesday were I could ask you some additional follow up questions.

Rachel M. Brooks
EEO Coordinator & Investigator
Office for Equal Opportunity

**WSU Prod 429**

Washington State University
509-335-8288 / Rachel.M.Brooks@wsu.edu / oeo.wsu.edu

*This communication, including any attachment, is intended solely for the entity or individual(s) to whom it is addressed and may contain confidential information.  If you have received this message in error, please notify me immediately and delete this message.  Any disclosure, copying, distribution, or other use of the contents of this message is prohibited.

**WSU Prod 430**

**Brooks, Rachel M**

| | |
|---|---|
| **From:** | Fleetwood, Patrick Michael |
| **Sent:** | Monday, April 8, 2019 7:39 PM |
| **To:** | Brooks, Rachel M |
| **Subject:** | Re: WSU OEO follow up |

I can come in Tuesday at 10:30, does that work?

Very respectfully,

Patrick Fleetwood
Washington State University
▉▉ 38 ▉▉
MS IV

**From:** Brooks, Rachel M <rachel.m.brooks@wsu.edu>
**Sent:** Monday, April 8, 2019 8:44 AM
**To:** Fleetwood, Patrick Michael
**Subject:** WSU OEO follow up
Hi Patrick,
I wanted to follow up and see if there was time on Tuesday or Wednesday were I could ask you some additional follow up questions.

Rachel M. Brooks
EEO Coordinator & Investigator
Office for Equal Opportunity
Washington State University
509-335-8288 / Rachel.M.Brooks@wsu.edu / oeo.wsu.edu
*This communication, including any attachment, is intended solely for the entity or individual(s) to whom it is addressed and may contain confidential information. If you have received this message in error, please notify me immediately and delete this message. Any disclosure, copying, distribution, or other use of the contents of this message is prohibited.

**WSU Prod 431**

**Brooks, Rachel M**

| | |
|---|---|
| **From:** | Fleetwood, Patrick Michael |
| **Sent:** | Tuesday, April 9, 2019 12:36 PM |
| **To:** | Brooks, Rachel M |
| **Subject:** | Re: WSU OEO follow up |

That works for me

Very respectfully,

Patrick Fleetwood
Washington State University
██38██
MS IV

---

**From:** Brooks, Rachel M <rachel.m.brooks@wsu.edu>
**Sent:** Tuesday, April 9, 2019 9:21 AM
**To:** Fleetwood, Patrick Michael
**Subject:** RE: WSU OEO follow up
Can we do Thursday again at 10 or 11

 Rachel M. Brooks
EEO Coordinator & Investigator
Office for Equal Opportunity
Washington State University
509-335-8288 / Rachel.M.Brooks@wsu.edu / oeo.wsu.edu
*This communication, including any attachment, is intended solely for the entity or individual(s) to whom it is addressed and may contain confidential information. If you have received this message in error, please notify me immediately and delete this message. Any disclosure, copying, distribution, or other use of the contents of this message is prohibited.

**From:** Fleetwood, Patrick Michael <patrick.fleetwood@wsu.edu>
**Sent:** Monday, April 8, 2019 7:39 PM
**To:** Brooks, Rachel M <rachel.m.brooks@wsu.edu>
**Subject:** Re: WSU OEO follow up
I can come in Tuesday at 10:30, does that work?
Very respectfully,
Patrick Fleetwood
Washington State University
██38██
MS IV

---

**From:** Brooks, Rachel M <rachel.m.brooks@wsu.edu>
**Sent:** Monday, April 8, 2019 8:44 AM
**To:** Fleetwood, Patrick Michael
**Subject:** WSU OEO follow up
Hi Patrick,
I wanted to follow up and see if there was time on Tuesday or Wednesday were I could ask you some additional follow up questions.

Rachel M. Brooks

**WSU Prod 432**

EEO Coordinator & Investigator
Office for Equal Opportunity
Washington State University
509-335-8288 / Rachel.M.Brooks@wsu.edu / oeo.wsu.edu

\*This communication, including any attachment, is intended solely for the entity or individual(s) to whom it is addressed and may contain confidential information. If you have received this message in error, please notify me immediately and delete this message. Any disclosure, copying, distribution, or other use of the contents of this message is prohibited.

**WSU Prod 433**

**Brooks, Rachel M**

| | |
|---|---|
| **From:** | Brooks, Rachel M |
| **Sent:** | Monday, April 8, 2019 8:44 AM |
| **To:** | Fleetwood, Patrick Michael |
| **Subject:** | WSU OEO follow up |
| | |
| **Importance:** | High |

Hi Patrick,
I wanted to follow up and see if there was time on Tuesday or Wednesday were I could ask you some additional follow up questions.

Rachel M. Brooks
EEO Coordinator & Investigator
Office for Equal Opportunity
Washington State University
509-335-8288 / Rachel.M.Brooks@wsu.edu / oeo.wsu.edu

*This communication, including any attachment, is intended solely for the entity or individual(s) to whom it is addressed and may contain confidential information. If you have received this message in error, please notify me immediately and delete this message. Any disclosure, copying, distribution, or other use of the contents of this message is prohibited.

**WSU Prod 434**

**Brooks, Rachel M**

| | |
|---|---|
| **From:** | Brooks, Rachel M |
| **Sent:** | Friday, April 5, 2019 11:10 AM |
| **To:** | ██████ 38 ██████ |
| **Subject:** | RE: WSU Office for Equal Opportunity |

I'm looking into some alleged conduct of an ████ 38 ████. Its my understanding that you were apprehensive about speaking with ████ 38 ████, but our process and is different so I want to explain that to you so you can decide if you want to talk with us or not.

Rachel M. Brooks
EEO Coordinator & Investigator
Office for Equal Opportunity
Washington State University
509-335-8288 / Rachel.M.Brooks@wsu.edu / oeo.wsu.edu

*This communication, including any attachment, is intended solely for the entity or individual(s) to whom it is addressed and may contain confidential information. If you have received this message in error, please notify me immediately and delete this message. Any disclosure, copying, distribution, or other use of the contents of this message is prohibited.

**From:** ██████████████ 38 ██████████████
**Sent:** Friday, April 5, 2019 10:56 AM
**To:** Brooks, Rachel M <rachel.m.brooks@wsu.edu>
**Subject:** Re: WSU Office for Equal Opportunity

Good Afternoon Rachel,

I was just wondering if you could tell me what this case is in regards to?

Happy Friday,
██ 38 ██

Get Outlook for iOS

**From:** Brooks, Rachel M <rachel.m.brooks@wsu.edu>
**Sent:** Friday, April 5, 2019 10:22 AM
**To:** ████████ 38 ████████
**Subject:** WSU Office for Equal Opportunity

Hello ██ 38 ██

My name is Rachel, and I am an investigator here at WSU in the Office for Equal Opportunity. I'm contacting you today because I would like to speak in regards to a case I'm currently investigating. I just a few questions and I think you would be the best person to answer those questions. I would like to chat over the phone so that I can give you a bit more details, and you can decide if you want to share information with us or not. My office number is 509-335-4878

**WSU Prod 435**

Rachel M. Brooks
EEO Coordinator & Investigator
Office for Equal Opportunity
Washington State University
509-335-8288 / Rachel.M.Brooks@wsu.edu / oeo.wsu.edu

*This communication, including any attachment, is intended solely for the entity or individual(s) to whom it is addressed and may contain confidential information.  If you have received this message in error, please notify me immediately and delete this message.  Any disclosure, copying, distribution, or other use of the contents of this message is prohibited.

**WSU Prod 436**

**Brooks, Rachel M**

| | |
|---|---|
| **From:** | Brooks, Rachel M |
| **Sent:** | Monday, March 25, 2019 12:14 PM |
| **To:** | Fleetwood, Patrick Michael |
| **Subject:** | RE: WSU OEO |

You appointment is for 11:00am Friday March 29, 2019

Rachel M. Brooks
EEO Coordinator & Investigator
Office for Equal Opportunity
Washington State University
509-335-8288 / Rachel.M.Brooks@wsu.edu / oeo.wsu.edu

*This communication, including any attachment, is intended solely for the entity or individual(s) to whom it is addressed and may contain confidential information. If you have received this message in error, please notify me immediately and delete this message. Any disclosure, copying, distribution, or other use of the contents of this message is prohibited.

**From:** Fleetwood, Patrick Michael <patrick.fleetwood@wsu.edu>
**Sent:** Monday, March 25, 2019 9:30 AM
**To:** Brooks, Rachel M <rachel.m.brooks@wsu.edu>
**Subject:** Re: WSU OEO

Rachel,

I am so sorry, I had tried to send you a message while I was at work but I don't think it went though. I was away in New Mexico with ▇38▇ participating in the ▇▇▇▇38▇▇▇▇ I will be free and will make this Friday's appointment.

Very respectfully,

Patrick Fleetwood
Washington State University
▇38▇
(509)-432-8032

Very respectfully,

Patrick Fleetwood
Washington State University
▇38▇
MS IV

**From:** Brooks, Rachel M <rachel.m.brooks@wsu.edu>
**Sent:** Monday, March 25, 2019 9:00 AM

1

**WSU Prod 484**

**To:** Fleetwood, Patrick Michael
**Subject:** RE: WSU OEO

Hi Patrick,
I wanted to follow up from my email sent last week. Since you missed your appointment Friday 3/22/2019 @ 11 am. I will start drafting my report. If you want you can still submit a statement in response to the allegations in your notice of investigation letter. Once I have finished my report, that will be your last chance to provide us information. Please let me know if you want to come in, provide a written statement, provide us, witnesses, you would like us to talk in regards to the allegations, or you can select to not speak with us. If you need assistance, please let me know.

Rachel M. Brooks
EEO Coordinator & Investigator
Office for Equal Opportunity
Washington State University
509-335-8288 / Rachel.M.Brooks@wsu.edu / oeo.wsu.edu

*This communication, including any attachment, is intended solely for the entity or individual(s) to whom it is addressed and may contain confidential information.  If you have received this message in error, please notify me immediately and delete this message.  Any disclosure, copying, distribution, or other use of the contents of this message is prohibited.

**From:** Brooks, Rachel M
**Sent:** Tuesday, March 19, 2019 12:05 PM
**To:** Fleetwood, Patrick Michael <patrick.fleetwood@wsu.edu>
**Subject:** RE: WSU OEO

Hello Patrick,
I wanted to follow up from our previous conversation about you scheduling a time to come in for your interview. After looking at your class schedule, I see you are free after 10:00 AM on Friday. Your appointment time with our office is 11:00 AM this Friday, March 22, 2019. If this time does not work for you, please let me know, so we can schedule a time for you to come in. I would like to this scheduled in the next two weeks. After that, I will start drafting my report. Also please know that if you don't want to come in, we can interview by phone, you can respond in person, you can provide a written statement, and have a support/advisor with you as well.

Also, if you want to provide us with witnesses that we would speak to in regards to the allegations in the letter.

Rachel M. Brooks
EEO Coordinator & Investigator
Office for Equal Opportunity
Washington State University
509-335-8288 / Rachel.M.Brooks@wsu.edu / oeo.wsu.edu

*This communication, including any attachment, is intended solely for the entity or individual(s) to whom it is addressed and may contain confidential information.  If you have received this message in error, please notify me immediately and delete this message.  Any disclosure, copying, distribution, or other use of the contents of this message is prohibited.

**From:** Brooks, Rachel M
**Sent:** Thursday, March 14, 2019 3:59 PM
**To:** Fleetwood, Patrick Michael <patrick.fleetwood@wsu.edu>
**Subject:** RE: WSU OEO

**WSU Prod 485**

Hi Patrick,

I wanted to see when you would like to come in and meet with us. Again just so you know, you can always come in, or we can do over the phone, or you can provide a written statement addressing the allegations in your notice. And if you do decided to come you can always bring a support person or advisor.

 Rachel M. Brooks
EEO Coordinator & Investigator
Office for Equal Opportunity
Washington State University
509-335-8288 / Rachel.M.Brooks@wsu.edu / oeo.wsu.edu

*This communication, including any attachment, is intended solely for the entity or individual(s) to whom it is addressed and may contain confidential information. If you have received this message in error, please notify me immediately and delete this message. Any disclosure, copying, distribution, or other use of the contents of this message is prohibited.

**From:** Brooks, Rachel M
**Sent:** Thursday, March 7, 2019 2:11 PM
**To:** Fleetwood, Patrick Michael <patrick.fleetwood@wsu.edu>
**Subject:** RE: WSU OEO

We can meet during that week. Is there a date and time that work best for you?

Rachel M. Brooks
EEO Coordinator & Investigator
Office for Equal Opportunity
Washington State University
509-335-8288 / Rachel.M.Brooks@wsu.edu / oeo.wsu.edu

*This communication, including any attachment, is intended solely for the entity or individual(s) to whom it is addressed and may contain confidential information. If you have received this message in error, please notify me immediately and delete this message. Any disclosure, copying, distribution, or other use of the contents of this message is prohibited.

**From:** Fleetwood, Patrick Michael <patrick.fleetwood@wsu.edu>
**Sent:** Thursday, March 7, 2019 2:10 PM
**To:** Brooks, Rachel M <rachel.m.brooks@wsu.edu>
**Subject:** Re: WSU OEO

Ma'am,

    Good afternoon, I will be in Pullman during spring break. If you would like we can meet during spring break. If that does not work for you I can definitely come in after break.

Very respectfully,

Patrick Fleetwood
<span style="background:black;color:white">38</span>
(509)-432 8032

**WSU Prod 486**

**From:** Brooks, Rachel M
**Sent:** Thursday, March 7, 2019 10:28 AM
**To:** Fleetwood, Patrick Michael
**Subject:** WSU OEO

Hi Patrick,
I wanted to follow up, from last week. Would you like to set up a time for you to come in after springbreak?

Rachel M. Brooks
EEO Coordinator & Investigator
Office for Equal Opportunity
Washington State University
509-335-8288 / Rachel.M.Brooks@wsu.edu / oeo.wsu.edu

*This communication, including any attachment, is intended solely for the entity or individual(s) to whom it is addressed and may contain confidential information. If you have received this message in error, please notify me immediately and delete this message. Any disclosure, copying, distribution, or other use of the contents of this message is prohibited.

**WSU Prod 487**

3.1.19   Phone to RP                RMB

Spoke w/ RP to see if he got my emails,

- RP did get emails, will call monday
to setup time to come in and speak w/ our
office.

- I will follow up Monday @ 3pm if I havent
heard from him.

Has a couple of Questions w/ disbers money
.

**WSU Prod 488**

**Brooks, Rachel M**

| | |
|---|---|
| **From:** | Brooks, Rachel M |
| **Sent:** | Friday, March 1, 2019 3:12 PM |
| **To:** | Fleetwood, Patrick Michael |
| **Subject:** | WSU OEO case |

Hi Patrick,

I wanted to follow from the email I sent Tuesday. I wanted to know if you still wanted to come in and speak with our office? If so please know, you are more than welcome to bring a support person or advisor with you to the meeting. If you have any questions or have changed your mind about coming in and speaking with us or you would like to provide a written a statement vs. coming in and speaking with us face to face, that's an option as well.

Rachel M. Brooks
EEO Coordinator & Investigator
Office for Equal Opportunity
Washington State University
509-335-8288 / Rachel.M.Brooks@wsu.edu / oeo.wsu.edu

*This communication, including any attachment, is intended solely for the entity or individual(s) to whom it is addressed and may contain confidential information.  If you have received this message in error, please notify me immediately and delete this message.  Any disclosure, copying, distribution, or other use of the contents of this message is prohibited.

**WSU Prod 489**

**Brooks, Rachel M**

| | |
|---|---|
| **From:** | Brooks, Rachel M |
| **Sent:** | Wednesday, January 30, 2019 8:41 AM |
| **To:** | ███████ 38 ███████ |
| **Subject:** | RE: Follow up |

Ok thank you

Rachel M. Brooks
EEO Coordinator & Investigator
Office for Equal Opportunity
Washington State University
509-335-8288 / Rachel.M.Brooks@wsu.edu / oeo.wsu.edu

*This communication, including any attachment, is intended solely for the entity or individual(s) to whom it is addressed and may contain confidential information. If you have received this message in error, please notify me immediately and delete this message. Any disclosure, copying, distribution, or other use of the contents of this message is prohibited.

**From:** ███████ 38 ███████
**Sent:** Wednesday, January 30, 2019 8:37 AM
**To:** Brooks, Rachel M <rachel.m.brooks@wsu.edu>
**Subject:** Re: Follow up

M. Brooks,

That's okay, you can go for it.

Thanks,
███ 38 ███

Get Outlook for iOS

**From:** Brooks, Rachel M <rachel.m.brooks@wsu.edu>
**Sent:** Wednesday, January 30, 2019 8:31 AM
**To:** ███████ 38 ███████
**Subject:** RE: Follow up

██ 38 ██
Here is the revised edits, if there look ok I will move forward in setting up a time tomorrow afternoon to meet with ██ 38 ██ Fleetwood and to give him official notice.

The Complainant has alleged that after you and she had a consensual sexual relationship which ended in December 2018, you subjected her to unwelcome conduct on the basis of sex and/or gender on campus and within the WSU ██ 38 ██ program. She also alleged that you engaged in harassment of a sexual nature towards her and others within the WSU ██ 38 ██ program:, and that you engaged in retaliation and interference. Specifically, the Complainant alleged that you:,
   1. Subjected her to harassment and bullying by explicitly talking about the sexual relationship to others or talking to her about the sexual relationship in the presence of others within the WSU ██ 38 ██ classroom setting or on

1

**WSU Prod 503**

campus, which harmed and/or had the potential to harm her reputation amongst classmates in the WSU **38** program. This included, but is not limited to, the following comments:

    a.   During the week of January 9, 2019, you spread rumors about her sexual activities to other members of WSU **38** such as telling others that she "squirted all over my sheets," and referring to another **38** as an "Eskimo Bro" with the understanding that Eskimo Bros is a reference to two people who have had sex with the same person at different times.

    b.   On or around January 10, 2019, when the Complainant walked into class, you pulled lip gloss from your pocket and stated that you had found the lip gloss by your bed, asking the Complainant if she left it there.

2. Subjected her and other students to sexual comments by openly and explicitly talking about your sexual activities with other women;

3. Persistently attempted to reinitiate a sexual and/or romantic relationship with the Complainant, which was unwanted.

4. Subjected her to negative and rude treatment and comments amongst other students, including those in the WSU **38** program, when the Complainant was not amenable to reinitiating a sexual and/or romantic relationship with you.

5. Engaged in retaliatory conduct against the Complainant to dissuade her from making a complaint or participating in an investigation under this policy which included, but is not limited to, on January 15, 2019, you told her she would have no respect in the **38** program if she brought this case forward, and that you have a lot of people backing you.

6. Engaged in interference when you contacted another **38** in the program asking that if they are contacted by investigators to help you out and to tell them that "Patrick wouldn't do that, type deal."

7. Engaged in retaliatory and/or interfering behavior when you sent a statement about the Complainant to multiple other individuals.

Rachel M. Brooks
EEO Coordinator & Investigator
Office for Equal Opportunity
Washington State University
509-335-8288 / Rachel.M.Brooks@wsu.edu / oeo.wsu.edu

*This communication, including any attachment, is intended solely for the entity or individual(s) to whom it is addressed and may contain confidential information. If you have received this message in error, please notify me immediately and delete this message. Any disclosure, copying, distribution, or other use of the contents of this message is prohibited.

**From:** Brooks, Rachel M
**Sent:** Monday, January 28, 2019 11:30 AM
**To:** ▇▇▇▇▇▇▇▇ 38 ▇▇▇▇▇▇▇▇
**Subject:** RE: Follow up

**38**

Once my senior investigators looks it over, I will address those quotes and resend.

Rachel M. Brooks
EEO Coordinator & Investigator
Office for Equal Opportunity
Washington State University
509-335-8288 / Rachel.M.Brooks@wsu.edu / oeo.wsu.edu

**WSU Prod 504**

*This communication, including any attachment, is intended solely for the entity or individual(s) to whom it is addressed and may contain confidential information. If you have received this message in error, please notify me immediately and delete this message. Any disclosure, copying, distribution, or other use of the contents of this message is prohibited.

**From:** ██████████ 38 ██████████
**Sent:** Monday, January 28, 2019 11:26 AM
**To:** Brooks, Rachel M <rachel.m.brooks@wsu.edu>
**Subject:** Re: Follow up

M. Brooks,

No, you can send it as soon as you see fit. But again, the less quoting you can say in the letter the best in my opinion. He should know why he's brought in but I feel like if he knows those intricate details of my complaint that he'll have time to formulate some rebuttal to saying them. If you want to use them however that's fine.

Thanks,
████ 38 ████

Get Outlook for iOS

---

**From:** Brooks, Rachel M <rachel.m.brooks@wsu.edu>
**Sent:** Monday, January 28, 2019 11:23 AM
**To:** ████ 38 ████
**Subject:** RE: Follow up

███ 38 ███
I will make the corrections and resend to you. Is there a preferred date or time of day that works for delivery?

Rachel M. Brooks
EEO Coordinator & Investigator
Office for Equal Opportunity
Washington State University
509-335-8288 / Rachel.M.Brooks@wsu.edu / oeo.wsu.edu

*This communication, including any attachment, is intended solely for the entity or individual(s) to whom it is addressed and may contain confidential information. If you have received this message in error, please notify me immediately and delete this message. Any disclosure, copying, distribution, or other use of the contents of this message is prohibited.

**From:** ██████████ 38 ██████████
**Sent:** Monday, January 28, 2019 11:21 AM
**To:** Brooks, Rachel M <rachel.m.brooks@wsu.edu>
**Subject:** Re: Follow up

M. Brooks,

Of course I am nervous about the investigation moving forward but know it's for the best. In regards to the letter I would appreciate it if the direct quotes weren't used, just because I stated them off memory and don't know if they were the exact phrasing he said to me-given, I know the general ideas were stated but I feel uncomfortable putting words into his mouth over a letter that may or may not be the exact way he phrased it. If you do however want to use

3

**WSU Prod 505**

the quotes, I ask that a small misinterpretation is changed. Over the phone he threatened he had a lot of people that would back him, not a list of people.

Thank you,

████ 38

Get Outlook for iOS

---

**From:** Brooks, Rachel M <rachel.m.brooks@wsu.edu>
**Sent:** Monday, January 28, 2019 11:09 AM
**To:** ████████ 38
**Subject:** Follow up

Hi ██ 38

I just wanted to follow up with you to let you know that moving forward I will be the primary investigator in your case, so moving forward if you need anything please let me know included in this email are my contact details if you need them. Also, I wanted to check and see when is a good date this week that we could send the respondent his notification letter. Also please review the following allegations that will go into the letter we send him, if there are parts you would like us to change, please do so and return them to me. Thank you, and again if you have any questions or new concerns, please do not hesitate to let me or my office know.

1.  On or around January 9, 2019, you subjected the Complainant to comments that were sexual explicit when you made comments such as " She squirted all over my sheets" and referring to another ██ 38 as an "Eskimo Bro" (Eskimo Bros is a reference to two people who have had sex with the same person at different times). In addition on or around January 10, 2019 the Complainant walked into class, when you pulled lip gloss from your pocket and stated that you had found the lip-gloss by your bed and asked the Complainant if she left it there. Via snapchat the Complainant asked you to stop joking about you and her around people, and that she did not appreciate it.

2.  Additionally, the Complainant alleges that you engaged in retaliatory conduct against the Complainant to dissuade her from making a complaint or participating in an investigation under this policy; thus, engaged in retaliation. Specifically, she alleges that you told her she would have "no respect" in the ██ 38 program if she brought "this case forward," and that you "have a list of people backing" you. Also the Complainant alleges you contacted another ██ 38 in the program asking that if they are contacted by investigators to help you out and to tell them that "Patrick wouldn't do that, type deal"

Rachel M. Brooks
EEO Coordinator & Investigator
Office for Equal Opportunity
Washington State University
509-335-8288 / Rachel.M.Brooks@wsu.edu / oeo.wsu.edu

*This communication, including any attachment, is intended solely for the entity or individual(s) to whom it is addressed and may contain confidential information.  If you have received this message in error, please notify me immediately and delete this message.  Any disclosure, copying, distribution, or other use of the contents of this message is prohibited.

**WSU Prod 506**

**Rose, Cheryl**

| | |
|---|---|
| **From:** | 38 |
| **Sent:** | Friday, January 18, 2019 1:11 PM |
| **To:** | Rose, Cheryl |
| **Subject:** | Re: WSU Office for Equal Opportunity |

M. Rose,

Thank you for reaching out to me, and I would like to meet and pursue further action as soon as possible. If there is a time today or next week that works for you I would like to make an appointment.

Many Thanks,

38

Get Outlook for iOS

---

**From:** Rose, Cheryl <cheryl.rose@wsu.edu>
**Sent:** Friday, January 18, 2019 12:50 PM
**To:** 38
**Subject:** WSU Office for Equal Opportunity

Dear 38

I recently learned of a concern you discussed with 38 , and I'd like you to know about some resources available to you on campus and in the community (please see resources below). I'd also like you to know about the WSU processes in place to respond to your concerns, which may implicate the WSU Policy Prohibiting Discrimination, Sexual Harassment, and Sexual Misconduct (Executive Policy 15).

If you would like, I can schedule a time for you to talk with me and an investigator in my office. Although you are not required to speak with me or respond to this email, please know that I am available to answer any questions you might have about reporting a concern or support options. If you do choose to speak with me, you can share as little or as much information with me, depending on your level of comfort. There is also no deadline to speak with me; if you do not feel comfortable speaking with me now, and later decide that it would be helpful, we are happy to meet with you at your convenience. If you would like to speak with me, please give my office a call at 509-335-8288, or simply respond to this email.

Please do not hesitate to contact me if you have any questions or concerns, or if I can assist you in accessing any resources.

Sincerely,

Cheryl Rose
Investigative Assistant | Office for Equal Opportunity
Washington State University
French Administration Building, Room 225 | Pullman, WA 99164-1022
509-335-8288 | Fax: 509-335-5483 | oeo.wsu.edu

1

**WSU Prod 510**

1
2
3
4
5
6
7
8
9
10
11

FILED

JUL 3 1 2020

JILL E WHELCHEL
WHITMAN COUNTY CLERK

**SUPERIOR COURT, STATE OF WASHINGTON, COUNTY OF WHITMAN**

12   PATRICK FLEETWOOD,

13                                   Plaintiff,          NO. 20-2-00053-38

14        vs.

15   WASHINGTON STATE UNIVERSITY,          **OPENING BRIEF**

16                                   Defendant.

17

18              **I.    INTRODUCTION & SUMMARY OF ARGUMENT**

19        Complainant joined WSU's Army Reserve Officers Training Corps (ROTC) program as a

20   Military Science – 1 (MS-1) Cadet in September 2018.  Within weeks it was public knowledge

21   that Complainant was involved in an intimate relationship with MS-IV Cadet P who was friends

22   with Patrick Fleetwood, also an MS-IV.  After Cadet P broke up with the Complainant, she reached

23   out to Fleetwood, looking for support and expressly seeking dirt about her ex to help confirm her

24   belief that *"Todos Chicos son Pendejos,"* or, "all men are assholes."  At the time Fleetwood was

25   not in a committed relationship and had a reputation as a "ladies' man," active on dating apps, and

26   comfortable with non-committal, non-monogamous sexual relationships described in places like

OPENING BRIEF - PAGE 1

Washington State University (WSU) Pullman as "hook-up culture." The Complainant knew this when she initiated a text flirtation with Fleetwood.  And the Complainant has never made any claim that her brief sexual encounter with Fleetwood was anything but consensual.  It was what allegedly happened afterwards that inspired this Complainant to seek retribution.

In early January 2019, Fleetwood and the Complainant went to lunch at an off-campus restaurant. Approximately one week after that lunch at that public off-campus eating establishment the Complainant, upon the urging and assistance of Cadet M (another ROTC Cadet with serious credibility issues) made a complaint to WSU ROTC accusing Fleetwood of "sexual harassment" when, in fact, *nothing of that sort happened.* Indeed, even the language of the Complainant's original sworn testimony make clear her vague concerns were speculative: she chose to formally, vindictively disapprove of rumors related to Fleetwood's promiscuity due to her concern about potential repercussions on other future unknown partners of Fleetwood and her own growing reputation as, *in Complainant's own words*, "the program slut." Complainant admitted as much in later telling WSU's investigator that in making the complaint "*[t]he spotlight gets off me and on his behavior in uniform…general character check on him*."

Nonetheless, after the January lunch, a story traveled through the college grapevine that Complainant claimed Fleetwood had asked to resume their prior consensual sexual relationship and then "bullied" her when she said "no." The Complainant did not describe in her original written complaint what that "bullying" was, nor did she ever describe details of the allegedly unwanted proposition. Instead by early-April she vacillated claiming in one full sentence recorded by two investigators that she *perceived* Fleetwood wanted to "hook up" again because he *hinted* as much. This was but one example of this Complainant's flagrant flip-floppery which WSU ignored when

it chose to pursue a "guilty if accused" approach to find Fleetwood responsible for "sexual harassment" even after all original allegations were effectively proven false.

And blatant issues with Complainant credibility weren't the only thing WSU ignored. WSU also ignored the concept of time, for it wasn't until the end of January 2019 that WSU made Fleetwood aware that the Complainant had initiated any claim against him through the "student conduct system" or any type of system. Nevertheless, seemingly bound and determined to sanction this student, WSU construed three brief conversations Fleetwood had – ***before he was on notice that any complaint of any sort had been lodged against him*** – to be formal interference with his friends' participation in the student conduct system while wholly ignoring the fact that Fleetwood had those conversations in the context of defending himself against meritless ROTC rumor mill allegations that he had "raped" or "assaulted" the Complainant. When investigators realized that the Complainant's accusations were based on rumor—not fact, this case should have been thrown out.

But instead WSU shifted the approach of its investigation to hunt down witnesses, muckrake Fleetwood's past, and draft entirely new findings based on evidence of cell phone transmissions entirely unrelated to the original complaint and/or the original Complainant. There is no physical evidence of allegedly inappropriate cell phone conduct between friends, which no one had complained about in the two-year interim.

Nonetheless, ignoring Complainant's self-professed anti-male bias WSU, first on December 16, 2019 and then on February 21, 2020, determined (collectively "Decision") that Fleetwood violated:

> WAC 504-26-227 - Sexual harassment. Sexual harassment includes behavior defined in Washington State University's Executive Policy 15, which prohibits discrimination, sexual harassment, and sexual misconduct.

OPENING BRIEF - PAGE 3

WAC 504-26-209 - Violation of university policy, rule, or regulation. Violation of any university policy, rule, or regulation published electronically on the university web site or in hard copy including, but not limited to Executive policy 15 (policy prohibiting discrimination, sexual harassment and sexual misconduct).

WAC 504-26-219 - Abuse of the student conduct system. Abuse of the student conduct system including, but not limited to: (5) Attempting to discourage an individual's proper participation in, or use of, the student conduct system.

The WSU Decision should be overturned because WSU (a) erroneously applied the law in finding that Fleetwood sexually harassed the Complainant and/or violated Executive Policy 15 and such findings are not supported by the evidence, (b) has no legitimate evidence that Fleetwood attempted to discourage use of or participation in the student conduct system, again misapplying the law, (c) arbitrarily and capriciously ignored context and serious witness credibility issues by turning an off-campus spat between two college-age exes into a fiasco which, as it stands, has destroyed Fleetwood's military career.

## II.    INCIDENT TIMELINE

**Part 1**: **Two College Kids "Hook Up" for Two Weeks: No Sexual Harassment Involved, Just Standard Youth Melodrama with Complainant Seeking Dirt on an Ex-Boyfriend and Expressing Hatred of Men—All Context WSU Ignores as Part of Its Decision.**

1.      Fleetwood and Complainant were cadets in WSU's ROTC program, with Fleetwood being a MSIV and Complainant a MSI. During the fall of 2018, Complainant became romantically and sexually involved with Cadet P, a different MS-IV (AR 160).

2.      Complainant's first known ROTC relationship ended sometime in mid-October 2018 but not before the romance was public knowledge in the program because, as the Complainant told WSU OEO investigators, "[i]n ROTC people know everything. I dated a guy

OPENING BRIEF - PAGE 4

[not Fleetwood] back in September thru November, and just by dating him people started asking how many cadets has [the Complainant] slept with" (AR 160).

3.    On or about November 20, 2018, suffering from her break-up with Cadet P, the Complainant *initiated* new intimacy with Fleetwood by texting him the request: "Tell me things about Cadet P that will make me hate him" (AR 033). Fleetwood asked Complainant, "Do you get offended or not like 'upsetting and dirty memes?'" to which Complainant replied, "Bring it on, kid" (AR 034). The text evidence reveals how Complainant  accused different male Cadets of the same insults she would later accuse Fleetwood himself to have made. **Complainant**: "Like [Cadet X] said I didn't deserve my scholarship. [Cadet Q] said I was a tiny heart. [Cadet Z] should have been on the team instead of me." **Fleetwood:** "Wait are you for real? To your face?"  (AR 036).

4.    Soon thereafter the Complainant  requested a second time that Fleetwood tell her bad things about her previous boyfriend (Cadet P) because she was **"sick of being treated like shit"** and **"loosing [sic] faith in men kind quick"**  (AR 038). Complainant texted she was "sick of empty promises" and shared the sentiment, "*Ayee todos chicos son pendejos*" which in Spanish translation she claimed to mean "All men are Assholes" (AR 043, 045). Texts also reveal Complainant was embarrassed to tell her family Cadet P had "gone behind [her] back" (AR 042).

5.    On or about December 1, 2018, Complainant sent Fleetwood a threatening Snapchat image of the Army's Sexual Harassment/Assault Response and Prevention (SHARP) pamphlet (AR 101).  When asked by investigators, the Complainant confirmed she sent the threatening text but meant it *jokingly*: "We were joking around.  We all knew Patrick had a reputation. Sent picture to him jokingly" (AR 101).

6.    Fleetwood and Complainant's short lived sexual relationship ended on/about December 7, 2018, because (a) Complainant "stopped having sex [with Fleetwood because he] is

kind of a fuck boy and u [sic] shouldn't be getting with him, and he needs to learn not to get with girls" (AR 160-161); and (b) Fleetwood did not feel comfortable with what he perceived to be jealous manipulative tendencies in the Complainant (AR 031, 069, 107).

7.      On December 31, 2018, the Complainant Snapchatted Fleetwood, "Should I dump your ass in 2018?" which was odd since Complainant later told investigators the relationship ended in early December (AR 101).

8.      On January 9, 2019, Fleetwood invited the Complainant along with several other peers to a "coupon deal" group lunch at Pullman's Red Bento sushi restaurant. Only the Complainant was available to dine, responding to Fleetwood's invite, "Hell yea; I love sushi" (AR 062). The pair walked together to the restaurant. Complainant paid Fleetwood for her share of the lunch (AR 062). The only controversy Fleetwood recalls was described as follows: "I took a Snapchat picture of her while she was eating sushi and jokingly said, 'it's going to [Cadet P]'. My intention was to patch-up our previously tense relationship with a little humor. However, the Complainant quickly responded, 'Oh my god why did you send that to him? Did you really send that to [Cadet P]. I [Fleetwood] didn't send it Cadet P, only to her while [they] were eating [their] sushi and she understood this" (AR 32). This account of the lunch was confirmed by Complainant (AR 100, 102).

9.      Nonetheless, something about the lunch felt unsatisfactory to the Complainant, who later gossiped to ROTC peer Cadet M and Cadet S that she perceived Fleetwood "had been 'bullying' her because she had refused to re-enter into a relationship/sleep with him again" (AR 67, AR 102).

10.      **Fleetwood has consistently denied attempting to re-initiate a sexual relationship** at the January 2019 Red Bento lunch or at any time after early December 2018, and

OPENING BRIEF - PAGE 6

when interviewed by WSU investigators ***Complainant corrected her written accusation to report she merely perceived Fleetwood "hinted" at renewed interested but never asked to re-initiate a sexual relationship*** (AR 101).

11.    Nonetheless, the ROTC rumor mill was effectively activated following the lunch, and on or about January 10, 2019, Cadet M approached Fleetwood to ask why he tried to retaliate against the Complainant because she would not engage in a sexual relationship (AR 032). When interrogated by WSU OEO, Cadet M would later describe the January 9, 2019, Red Bento lunch in ridiculously detailed terms as if he had been present (AR 089). "Some point he propositioned her to sleep with him.  Got more aggressive. She kept saying no he realized she wasn't going to say yes, he started being mean. Berating her … He wanted to know why she wouldn't sleep with him" (AR 089).  This testimony in no way aligns with either Fleetwood's or the Complainant's account, yet Cadet M's testimony would remain part of WSU's evidence even after WSU knew Cadet M's credibility was in question on a variety of other points (AR 016, 017, 223).

**Part 2: Complainant, Fearful of Being Deemed the "Program Slut", Accuses Fleetwood of Sexual Harassment, but in Doing So Identifies NO Conduct that Remotely Comes Close to Meeting the Legal Definition of Sexual Harassment.**

12.    On January 10, 2019, WSU ROTC hosted a Sexual Harassment/Assault Response and Prevention Program (SHARP) training lab, and shortly afterwards the Complainant sent a Snapchat telling Fleetwood to stop joking about them to other people. Fleetwood's alleged "joking about them" was another of Cadet M's rumors, never corroborated (AR 063). **This was also the first and only time that the Complainant directly requested Fleetwood to cease behaviors she found offensive.**

13. On January 10, 2019, Fleetwood responded to Complainant's text with an "OK" emoji and proceeded to block the Complainant because he did not know what jokes she was referring to, and he "didn't want to have any more drama" (AR 032, 063).

14. Fleetwood's immediate response (blocking Complainant's messaging) apparently offended the Complainant because Cadet M would soon confront Fleetwood asking why he had blocked the Complainant (AR 032).

15. Regarding Cadet M's role in the origin of Complainant's complaint, Fleetwood provided written testimony from Sergeant Jon Crodle (a third party witness) who was Cadet M's roommate before and after the complaint and witnessed, "the manipulative and coercive aspects of his character with great appall." Sgt Crodle witnessed Cadet M's interactions with the Complainant and believed Cadet M had intent to see Fleetwood be dismissed from ROTC. He witnessed Cadet M to possess character traits indicative of spiteful power complex. Crodle further described Cadet M's role as **explicit collusion.** He had also "observed him spread rumor and inaccurate information in many other instances ... he has a sense of theatrics and has displayed a strong vengeful attitude" (AR 223).

16. For the next few days the ROTC rumor mill churned wildly, and on January 15, 2019, Cadet R told Cadet D who, in turn, told Fleetwood he'd overheard the Complainant and Cadet S discussing a sexual assault/rape complaint (AR 033).

17. On January 15, 2019 Fleetwood called Cadet S to verify what he'd been told by Cadet R, but Cadet S did not pick up, so Fleetwood messaged him on Facebook (AR 063).

18. That same day, January 15, 2019, three days before any complaint would be filed, Fleetwood called the Complainant, and she returned his call for a sixty second conversation when

OPENING BRIEF - PAGE 8

he asked her to stop talking about their relationship as if it had not been consensual because he had

overwhelming evidence to show the relationship had been consensual (AR 032, 064).

19.     Fleetwood's own description of these January 15-16, 2019 interactions corroborate

the text evidence and actual timeline: in a phone call *which the Complainant initiated* on January

15 at 5:10 pm, Fleetwood relayed, "there's been some word out that you and whoever are trying

to say that I committed assault on you. I just want you to know that if you bring your argument up

[read: the rumored assault charge] that it will not last against the overwhelming evidence I have.

<u>Do what you want</u>, but I'm advising you that it won't turn out great for you..." (AR 032, 064).

20.     Fleetwood recalls the Complainant replied, "I'm not going to report you. I wouldn't

do that."  And Fleetwood interjected, "Well, you don't have anything to report on me" (AR 032;

corroborated by Cadet S at AR 063)

21.     Reflecting on this pre-complaint time period which WSU would later construe as

interference/retaliation, Fleetwood wrote to WSU on January 23, 2019, "I personally felt

threatened, as much of this information was being passed to me by others.  Nothing whatsoever

came from the accusers themselves.  So, I tried to deal with the issue at the lowest level.  I had the

conversations with Cadet S and the Complainant because I thought they were conspiring to create

a false accusation that I had assaulted [Complainant] or forced her do things that she didn't want

to do. This upset me because I have and would never push anyone to do thing they don't want to.

**I want to be clear that I did not tell Complainant or Cadet S that I would retaliate in anyway"**

(AR 033).

22.     January 15, 2019, **three days before any complaint was filed**—and the same day

a key witness texted, "Relax … she's over it;" the same day the Complainant herself told

OPENING BRIEF - PAGE 9

Fleetwood words to the effect of "don't worry, there's not going to be a complaint"—**was the last time Fleetwood spoke to the Complainant** (AR 032, 063).

23.     Within the same hour, January 15, 2019, **before any complaint had been filed, at a time he believed he was being falsely accused of sexual assault,** Fleetwood also exchanged texts with his friend Cadet P, the Complainant 's ex-boyfriend, and Cadet S (see AR 021-22, 033, 064, 070).  On January 15, 2019, **Cadet S approached Fleetwood** explaining he wanted to discuss rumors he had heard through the Complainant after PT (Physical Training) (AR 032, 066).

24.     The next day **Cadet S again approached Fleetwood** about the rumors to which Fleetwood told Cadet S, "You don't know anything. Stay out of it." The encounter was somewhat heated, but all accounts agree Fleetwood did not threaten Cadet S in any way (AR 022, 032, 067).

25.     On January 18, 2019, despite earlier claims there would be no complaint, Complainant (escorted by Cadet S) filed her "harassment" complaint against Fleetwood (AR 066-071). Complainant filed her "sworn statement" with ROTC instructor Sergeant First Class Streigle (AR 106).[1] The Complainant (a) expressed "character concerns" about Fleetwood, (b) confirmed Complainant's November-December sexual relations with Fleetwood were consensual, (c) claimed Fleetwood had sexual relations with thirty women[2] that semester which (d) led to the *speculative concern* about Fleetwood's character and ability to serve a la "his professionalism as a [future] officer and whether or not he will know his limmits [sic] and potentially prey on some private right out of basic training whose [sic] new to the program, have sex with her, leave her,

---

[1]  As an aside,  Cadet M alleged Fleetwood maligned Streigle's wife, Fleetwood denied that allegation, WSU's investigator contacted Streigle who did not confirm Cadet M's allegation, yet WSU did not report this potentially exonerating evidence in its June 13 investigation report. (AR 17, 106, 109)

[2]  Fleetwood provided third party corroboration of Cadet M's role in conspiring with the Complainant to file the complaint against Fleetwood. (AR 223)

OPENING BRIEF - PAGE 10

then ruin her reputation," and that Fleetwood's behavior may at some point cause some unknown future person to maybe commit suicide (AR 069-70).

26.     Complainant's additional  motivation for filing is best explained by female witness Cadet HFT (recruited by the Complainant):

> *Question*: Did [Complainant] ever say anything about being afraid of retaliation?
> *Answer*: I think reputation.  Hard to have rep already established like when you've slept around in program, to have rep that freshman girl who slept around. Didn't want to be girl who made rape case and people think that.  Don't think she was scared of Patrick, think he has fragile ego but not aggressive. **Thinks she was more afraid of reputation, don't want to be girl that made false rape case** (AR 145).

27.     WSU's  June  13  Investigation  Report  confirms  this:  "The  Complainant  … **expressed  worry  about  gossip  and  rumors  in  the  Program  and  being  labeled  a '[Program]slut'**" (AR 022).

28.     Cadet S also filed a sworn statement describing his January 15-16, 2019 encounters with  Fleetwood  (AR  066-067).   The  testimony  does  not  support  allegations  that  Fleetwood attempted  to  retaliate  or  interfere.   Cadet  S  further  reported  the  later  discredited  rumor  that Complainant "brought up [that] CDT Fleetwood had asked her out and she had said no" (AR 066) and that Complainant "did not want to be thought of as 'the unit slut' or 'the girl who kept someone from commissioning'" (AR 067).

**Part 3: WSU OEO Investigation Disregards Complainant's Inconsistent Accounts of the Event  Giving  Rise  to  Her  Complaint,  Disregards  Exculpatory  Evidence  Favorable  to Fleetwood, and Focuses on Consensual Activities from Years Earlier that Do Not involve Complainant.**

29.     Within  the  hour  of  receiving  Complainant's  sworn  testimony  WSU ROTC contacted WSU OEO whereupon WSU OEO Investigative Assistant Cheryl Rose reached

OPENING BRIEF - PAGE 11

1    out to the Complainant about filing a Title IX complaint thru the Office of Community Standards

2    (WSU Prod 510) [3].

3        30.    On January 24, 2019, the Complainant met with OEO Investigator Nikki

4    Finnestead in her office. Finnestead emailed at 11:31am requesting the Complainant's permission

5    to contact ROTC to gather information about their "reporting and response processes" (WSU Prod

6    509). That same day Complainant returned Ms. Finnestead's email: "I know we talked about a lot

7    both times we met, so if there's anything you need me to say or do, please let me know" (WSU

8    Prod 508).  Close reading of Finnestead's intake notes from January 24, 2019, reveals various

9    evidence related to Complainant/witness credibility/motivation never addressed in the

10   Investigation Report (AR 160-167). The notes affirm, again, that her main concern with Fleetwood

11   was his promiscuity—and its impact on her reputation.

- "The reason I stopped having sex with is CFW is kind of a fuck boy and u shouldn't be getting them and ***he needs to learn to not get with girls***.  He told his friends group from break, I'm going to be loyal to this one girl he was talking to not me.  …  He isn't a very loyal person" (AR 161).
- "***The spotlight gets off me and on his behavior in uniform…general character check on him"*** (AR 162)
- "They [Cadet S, Cadet M, and Cadet HFT] wanted to meet me in the library. They said we should bring this case forward. At first, I was like I don't know" (AR 164).
- "People telling [me I'm an] ROTC slut.  Not to my face" (AR 164).
- "Cadet M said Patrick's not really a great guy.  I said, I'm not trying to date him."(AR 165).
- "It's really weird because most college students, drama is contained outside of classroom setting.  You're with a ton of strangers in class. But for me a lot of what I do revolves around ROTC. Around it all the time. With the people who ***potentially think bad things about me***" (AR 164).

---

[3] The Agency Record omitted documents WSU provided Fleetwood's counsel after Fleetwood filed this lawsuit. (Crotty Decl. Ex. A) Those additional documents are referenced and are filed to supplement the Agency Record. Those documents are labeled "WSU Prod."

OPENING BRIEF - PAGE 12

31.     On January 25, 2019, Ms. Finnestead and Ms. Brooks recorded notes from an interview with a name-redacted ROTC representative (presumably LTC Hobbs).  The included questions about his approach to sexual harassment training. **The notes and emails from these interactions were not included in the Agency Record (**WSU Prod 365-370**).**

32.     On January 28, 2019, the name-redacted ROTC rep emailed Ms. Finnestead "Could you call me reference [sic] the Title IX inquiry we were discussion [sic]"?  Ms. Finnestead replied that the newly hired Ms. Rachel Brooks had been made the primary investigator  (WSU Prod 364).

33.     On January 28, 2019, Rachel Brooks informed the Complainant  by email that she would now be the contact person and primary investigator for the case, indicating Ms. Finnestead, who did the "intake interviews" was removed (or removed herself) from the case.  **Several content-explicit emails would be exchanged in the upcoming days, none of which were included in the Agency Record** (WSU Prod 504-506).

34.     On January 28, 2019, at 11:09 am, Ms. Brooks emailed the Complainant with her interpretation of the "allegations" (WSU Prod 506, **Not Included in Agency Record**).  Neither the dates nor the details of allegations in this list of allegations bear notable resemblance to the alleged "facts" of the case presented in the January 18, 2019 sworn statements to ROTC, nor later, in the June 13, 2019 WSU Investigation Report produced by Investigator Brooks. Nevertheless, when explicitly asked by Brooks for corrections, emails from **the Complainant did not contest <u>any</u> version of the ever-changing allegations** except as noted below.

35.     On January 28, 2019 11:21am, the Complainant emailed Investigator Brooks a **"Don't quote me on that"** disclaimer*:* **"Of course I am nervous about the investigation moving forward** but know it's for the best. In regards to the letter I would appreciate it if the direct quotes weren't used, just because I stated them off memory and don't know if they were the exact phrasing

he said to me-given[4], I know the general ideas were stated but **I feel uncomfortable putting words into his mouth** over a letter that may or may not be the exact way he phrased it" (WSU Prod 505-506, **Not Included in Agency Record)**

36.    On January 28, 2019 11:23am, Ms. Brooks emailed the Complainant that she would make the correction requested above and resend it to her (WSU Prod 505, **Not Included in Agency Record).**

37.    On January 28, 2019 11:26am, the Complainant again revealed credibility concerns when she replied, "Send it as soon as you see fit. But again, **the less quoting you can say in the letter the best,** in my opinion. … If you want to use them however that's fine" (WSU Prod 505, **Not Included in Agency Record).**

38.    On January 30, 2019 8:31am, after consulting with a "senior investigator," Ms. Brooks emailed the Complainant who then approved a significantly altered collection of allegations as follows:

> **Brooks:** Here is the revised edits. If there [sic] look good I will move forward…
> "Specifically, the Complainant alleged that you
>
> 1. subjected her to harassment and bullying by explicitly talking about the sexual relationship to others or talking to her about the sexual relationship in the presence of others within the WSU classroom setting or on campus, which harmed and/or had the potential to harm her reputation amongst classmates in the WSU program. This included, but is not limited to, the following comments: a. During the week of January 9, 2019, you spread rumors about her sexual activities to other members of WSU such as telling others that she "squirted all over my sheets," and referring to another as an "Eskimo Bro" with the understanding that Eskimo Bros is a reference to two people who have had sex with the same person at different times.[5] b. On or

---

[4] Notably, several of the "I stated them off memory and don't know if they were the exact phrasing he said to me" quotes were reported to the Complainant, presumably by Cadet M.  In most cases, she could not have remembered exact phrasing because she was not present to witness the alleged statements, but that did not concern her, nor Investigator Brooks.

[5] Neither of these he said/he said "Eskimo Bro" accounts survived investigation, and both were removed entirely from WSU's December 16, 2019 Findings presumably due to Cadet P's quiet

around January 10, 2019, when the Complainant walked into class, you pulled lip gloss from your pocket and stated that you had found the lip gloss by your bed, asking the Complainant if she left it there.[6]

2. Subjected her and other students to sexual comments by openly and explicitly talking about your sexual activities with other women;

3. *Persistently* attempted to reinitiate a sexual and/or romantic relationship with the Complainant, which was unwanted.

4. Subjected her to negative and rude treatment and comments amongst other students, including those in the WSU program, when the Complainant was not amenable to reinitiating a sexual and/or romantic relationship with you.

5. Engaged in retaliatory conduct against the Complainant to dissuade her from making a complaint or participating in an investigation under this policy which included, but is not limited to, on January 15, 2019, you told her she would have no respect in the xxx program if she brought this case forward, and that you have a lot of people backing you.

6. Engaged in interference when you contacted another in the program asking that if they are contacted by investigators to help you out and to tell them that "Patrick wouldn't do that, type deal."

7. Engaged in interference when you contact another xxx in the program asking that if they are contacted by investigators to help you out and to tell them that "Patrick wouldn't do that, type deal."

8. Engaged in retaliatory and/or interfering behaviors when you sent a statement about the Complainant to multiple other individuals (WSU Prod 503-504, **Not Included in Agency Record**).

39.    The Complainant okayed the new version of events a few minutes later, on January 30, 2019 at 8:37am, "That's okay, you can go for it. Thanks" (WSU Prod 503, **Not Included in Agency Record**).

---

admission that he, not Fleetwood indeed, initiated the comment: "I found out he had sex with [Complainant from someone else], he said yeah bro we are Eskimo bros now.  We had a class together and **I asked him when he came in.** It wasn't in in a space where e a lot of people could hear" (AR 127).

[6]  As for the shifting hearsay that Fleetwood told someone that she (or was it he?) "squirted the sheets," *and* the odd "chap stick" incident; **both storylines entirely disappeared during investigation**; instead, the June 13 Investigation Report, line 17 shared discretely, that Cadet M's "remaining statements were given limited weight <u>as appropriate</u>." Which is to say, Brooks presumably determined the main allegations were lies, but nonetheless never fully dismissed Student A/Cadet M's credibility. Nor did she dismiss or seek alternative resolution in a case based on verifiable lies (AR 012-022).

40.     WSU took no issue with Complainant's willingness to accept either version as "truth," with emails to Brooks confirming she "okayed" both versions. The concern was never raised as an issue of witness credibility; instead, the June 13 Investigation report claimed, in general, "For witnesses interviewed, investigators assessed credibility.  Factors considered when assessing credibility include, but are not limited to, internal consistency of their statements, consist of their statements with those of other witnesses or documentary evidence, plausibility, motivation to make statements, demeanor during their interview, and witnesses' overall memory (AR 15). The report also included specific assessment of the Complainant credibility which ignored countless inconsistencies in her own written and oral testimony, "Her statements to investigators were generally consistent with the written statement[7] she provided" (AR 017, WSU Prod 503-504).

41.     On January 31, 2019, Brooks hand-delivered a letter to Fleetwood clarifying that he was under investigation for the allegations above and that he should cease contact with the Complainant (AR 003-005).

42.      From February 6, 2019 through April 19, 2019 Investigator Brooks conducted numerous witness interviews (AR 84-167, plus dozens of relevant emails in WSU Prod 311-357, 415-436, **none of which appear in Agency Record**).

43.     While Brooks did expedite numerous interviews with the Complainant and the Complainant's witnesses, beginning February 6, 2019 (AR 083-168), Ms. Brooks never invited Fleetwood to meet until February 26, 2019, and due to calendar conflicts with Spring Break and

---

[7] To be clear, the only written statement Complainant provided which was included in the Agency Record was the January 18, 2019 the Sworn Statement to ROTC, and the content of the investigation report is very different from that written statement (AR AR 17-21, 069-071)

OPENING BRIEF - PAGE 16

1  ROTC trainings (WSU Prod 484-489), she did not actually interview Fleetwood until March 29,

2  2019 (AR 113).

3      44.    Nor did Ms. Brooks inform Fleetwood when her approach to the investigation

4  shifted, as early as February 6, 2019 to include interviews related to all new allegations from an

5  entirely different time period involving instances that didn't even involve Complainant (AR 115-

6  162).

7      45.    Brooks took notes regarding the investigation which WSU filed in this Court as part

8  of the Agency Record (AR 084-167). However, WSU failed to include exculpatory evidence in

9  the Agency Record such as when on April 10, 2019, Brooks received an email from a former WSU

10  student named by the Complainant as a possible "victim" of Fleetwood's allegedly inappropriate

11  advances towards female MS-I Cadets:

I'm sorry for the delay in my response as I have a busy schedule. I have heard about the case you are looking into. However, I never felt apprehensive or felt that ██ 38 ██ was unapproachable. I discussed that the case did not pertain to me with ██ 38 ██, I was never called in to speak to ██ 38 ██, otherwise I would have. I do not think I have any information that would be helpful to this case or I would have went to speak to him myself.
The individual who reported the ██ 38 ██ in question thought I had been involved with this ██ 38 ██ as well; however, this is not the case. I believe she named me because she knew I had been friends with the ██ 38 ██ in question and that I am not anymore. While I am no longer friends with the ██ 38 ██ in question it has nothing to do with anything pertaining to this case or his conduct. I explained to ██ 38 ██ that me leaving the ██ 38 ██ program had nothing to do with the alleged ██ 38 ██
Also, I believe the individual that reported this ██ 38 ██ confused me with another female ██ 38 ██ my friend ██ 38 ██. She has given me permission to give you her email as she was more involved with the alleged ██ 38 ██ and might be able to help answer your questions about his conduct. Her email is ████ 38 ████

**Key quote:** "While I am no longer friends with the [Fleetwood] it has nothing to do with anything pertaining to this case or his conduct. I explained to [presumably Complainant] that **me leaving the [ROTC] program nothing to with the alleged [Cadet]**" (WSU Prod 427, **Not in Agency Record).**

      46.    This exonerating evidence (not provided by WSU as part of the Agency Record)

introduced additional credibility concerns about a key allegation—again founded in rumor—which

appeared in the Complainant's January 18, 2019 complaint: "Not only did I find out he had sex

with well over 30 women [sic] that semester, he was also involved with two other MS-I cadets:

Ms. XXXXX and Ms. XXXXX [one of whom presumably penned the email above]. I do not know

if they left the program because of him, but his predatorial [sic] behaviors of pursuing the newest/youngest freshmen in are [sic] program concerns me" (AR 069-071).

47.     Discussion highlighting how many allegations from the original complaint(s) were proven untrue is never included in the June 13 Investigation Report, and at least one exonerating witness who contacted Brooks is not even listed as a witness (AR 012-022, AR 069-071)[8].

48.     When original harassment allegations proved false, the WSU OEO chose to solicit new witness testimony to pursue a new line of questioning related to Fleetwood's much earlier transmission of a Snapchat video consensually created in September 2017. *The video, consensually created years earlier on his 21st birthday, played no role in the Complainant's original complaint* (AR 012-022, 110-129).

49.     During this phase, Investigator Brooks also led a female witness to claim she had been previously "grossed out" by a shirtless "Army Strong" photo Fleetwood transmitted by phone at time period when he was dating one of her friends (AR 125). *These photos and videos did not involve the Complainant.*

50.     On June 13, 2019, WSU delivered an Investigation Report, drafted by Ms. Brooks who also completed the bulk of the interviews for the investigation meaning that *Fleetwood's investigator was Fleetwood's original adjudicator.* The report found Fleetwood "Responsible" for Violating WSU Executive Policy 15 (AR 012-022).

---

[8] Determining who the actual witnesses were is an exasperating part of reading the Investigation Report, and the Agency Record, especially with redactions. Nonetheless, we do know it was Cadet S, not Fleetwood, who would best be accused of "pursuing the newest/youngest freshmen," including the Complainant herself. In addition, the very first interview notes in the Agency Record (AR 83-88) present a somewhat exonerating testimony from a Ms. XXXX who also is not listed as a witness (AR 14-15).  Then, there's the curious notation of a Student J, who *is* listed as a witness, but then two lines later receives the disclaimer, "Investigators did *not* interview (Student J)" (AR 15).  It's unclear whether this was a typo or if Ms. Brooks herself had trouble tracking who was who.

OPENING BRIEF - PAGE 18

51.     On June 13, 2019, Ms. Brooks emailed the Complainant informing Complainant that her failure to participate in a conduct hearing could have consequences, impact the outcome for the case (WSU Prod 297, **Not Included in Agency Record).**

52.     On October 4, 2019, the Complainant officially informed Ms. Metzner she did not want to be involved in the Center for Community Standards conduct hearing (AR 171).

53.     On October 8, 2019, Ms. Metzner (a) after having an off the record call with Brooks about Fleetwood on June 13, 2019, (b) after having an off the record call with Complainant sometime in late-September/early-October 2019, and (c) knowing (from the June 13th email exchange) that Complainant had been warned of the consequences of not participating in the hearing process, emailed Mr. Fleetwood that she (Metzner) was Fleetwood's "designated Conduct Officer" and that Fleetwood was "assumed not responsible for the reported incident" until a decision was made at his hearing (AR 173-175)

54.     On October 29, 2019, Fleetwood met with Ms. Metzner. Ms. Metzner's notes from the hearing show that Fleetwood (still unrepresented by a lawyer) had numerous concerns with the investigation including concrete inaccuracies with remaining allegations, Cadet M's manipulation/collusion as witnessed by Sgt Crodle (see AR 233), the double standard wherein Complainant freely discussed and recruited witnesses from his past whereas Fleetwood had been instructed not to discuss the confidential case, Brooks' failure to address the Complainant's December 2018 threats to weaponize sexual harassment policies process, and other concerns with an ROTC rumor mill which was still, nearly a year later, "muttering rapist" accusations against him (AR 199-204).  Fleetwood also provided Ms. Metzner with numerous character statements to challenge the Complainant's rumor-based attack related to "the way he treats women" (AR 205-209).

55.     On December 5, 2019, Fleetwood met with Ms. Metzner in her office.  Nobody else was present.  This would later be described as his "conduct hearing" by WSU.  At the "hearing," Fleetwood also provided Metzner with the signed letter from Sgt Crodle verifying the issues with Cadet M's witness credibility (AR 223). According to Fleetwood, Ms. Metzner gave the letter a brief glance.  The meeting was short. Fleetwood was not provided with the redacted file that Ms. Metzner promised and had no opportunity to cross examine witnesses (AR 214).

56.     On December 16, 2019 WSU, by and through Ms. Metzner, found Fleetwood "Responsible" for the violating the following community standards and subjected him to various sanctions (AR 214-219).

57.     On January 5, 2020, Fleetwood appealed the December 16, 2019, finding to WSU's University Appeals Board (AR 220-221). Key points in his appeal letter included:

- Metzner not addressing "flawed nature of the original investigation report"
- Some allegations did not involve Complainant and are not usually prohibited
- Investigator's reliance on statements from witnesses with easily verifiable credibility issues
- WSU failure to provide Fleetwood full access to investigation records
- Failure to note the Complainant's conduct could be sexual harassment
- The Snapchat video did not involve Complainant and was from years earlier
- Failure to provide evidence that Fleetwood "gossiped" about Complainant
- Cadet M's role with his blatant bias against Fleetwood (AR 220-221).

58.     On January 8, 2020, Kyle Cance wrote Fleetwood that his Appeals Board Chair would be Hearing Boards Manager TJ Page, with Olivia Shoesmith and Riley Guttromson[9] as Board members.  Fleetwood was invited to investigate members of his Appeals Board for conflicts of interest (AR 224).

---

[9] Appeals Board Chair Olivia Shoesmith was a student intern with the Alumni Association pursuing a Bachelor's Degree in Accounting. *See* https://www.linkedin.com/in/olivia-shoesmith (*last visited* July 31, 2020). Member Riley Guttromson is/was "double majoring in witchcraft and ecoterrorism." *See* https://www.instagram.com/rileyguttromson (*last visited* July 31, 2020).

OPENING BRIEF - PAGE 20

59.      On February 12, 2020, the WSU's Student Appeals Board allegedly convened to consider Fleetwood's appeal using a promised protocol to Review grounds for appeal, Conduct Hearing by discussion of appeal contents, case notes, evidence and appeal documents. No Notes from the Appeals Board Meeting, not even a list of his actual appeal board members, was provided (AR 232).

60.      Instead a letter dated February 21, 2020, signed by student Chair Olivia Shoesmith—***not Student Hearing Boards Manager TJ Page as promised***—upheld, without explanation, Metzner's December 16, 2019, finding (AR 237-238).  The letter from Ms. Shoesmith claimed the Appeals Board had adhered to WAC 504-26-420(3) to consider a) whether the conduct hearing was fair and followed procedure, b) whether "substantial information" to support the decision c) whether sanctions were appropriate; d) new information or relevant facts (eg: Sgt Crodle's letter) which might alter a decision (AR 237).

61.      As written, the Appeals Board (AR 237) letter ***defied*** EP #15's own Policy & Procedures to provide prescribed Decision Letter Contents including:

a.    A short summary of the procedural history and stated grounds for the appeal; ***Not provided***
b.    A list of the documents reviewed by the Committee and any interviews conducted by the Committee; ***Not provided***
c.    A summary of the Committee's findings; ***Not provided***
d.    A conclusion as to whether the appeal warrants remanding the CRCI Final Investigation Report for additional investigation by CRCI; ***Not provided***
See  https://crci.wsu.edu/crci-procedural-guidelines/ (*last visited* July 23, 2020)

## ARGUMENT

**A.      Standard of review.**

"The APA governs judicial review of agency orders in adjudicative proceedings." *Mills v. W. Washington Univ.*, 170 Wn.2d 903, 909 (2011).  A court will reverse an Agency's decision if,

OPENING BRIEF - PAGE 21

*inter alia,*   "(1) the administrative decision is based on an error of law, (2) the administrative decision is unsupported by substantial evidence, [or] (3) the administrative decision is arbitrary or capricious."  *Hung Dang v. Washington State Dep't of Health, Med. Quality Assurance Comm'n*, 450 P.3d 1189, 1197 (Wash. Ct. App. 2019).

An agency commits an "error of law" when the Agency's interpretation of the law conflicts with the statute. *Crosswhite v. Washington State Dep't of Soc. & Health Servs.*, 197 Wn. App. 539, 549 (2017).  An agency must support its decision with substantial evidence i.e. evidence of "a sufficient quantity of evidence to persuade a fair-minded person of the truth or correctness of the order." *Tassoni v. Dep't of Ret. Sys.*, 108 Wn. App. 77, 84 (2001). And an agency's actions are arbitrary and capricious when the agency commits a "willful and unreasoning action, taken without regard to or consideration of the facts and circumstances surrounding the action." *Linville v. Dep't of Ret. Sys.*, 452 P.3d 1269, 1275 (Wn. Ct. App. 2019)(internal quotations omitted).

With these rules in mind, it is clear that WSU's Decision was not in compliance with the law, not supported by substantial evidence, and arbitrary and capricious.

**B.      WSU's finding that Fleetwood sexually harassed Complainant     and/or violated EP 15 is both an error of law and is not supported by substantial evidence.**

WSU's Executive Policy 15 defines "sexual harassment" as "*[u]nwelcome* sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature or on the basis of sex and/or gender constitutes sexual harassment and is a violation of this policy when: (1) The conduct meets the definitions described in <u>Discriminatory Harassment</u>,[10] or (2) The

---

[10]   "Sexual harassment's" definition also includes "<u>quid pro quo</u>" harassment which can be summed up as "you have sex with me in exchange for educational/work favors," "<u>sexual misconduct</u>" as "and egregious form [of] sexual assault and other sexual violence," WAC 504-26-221(1),  <u>stalking</u>" as "engaging in a course of conduct directed at a specific person that would cause a reasonable person to: (a) Fear for his or her safety or the safety of others; (b) Fear for harm

conduct has the purpose or effect of ***unreasonably*** interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment."   EP 15 defines "<u>Discriminatory Harassment</u>" as "[u]nwelcome, intentional conduct, on the basis of membership in a protected class, which is ***so severe or pervasive, and objectively offensive, that it substantially and unreasonably (1) interferes with, or has the potential to interfere with, an individual's ability to participate in WSU employment, education, programs, or activities***" or (2) "[a]dversely alters the condition of an individual's WSU employment, education, or participation status" or (3) "[c]reates an objectively abusive employment, program, or educational environment; or (4) "[r]esults in a material or substantial disruption of WSU's operations or the rights of students, staff, faculty, visitors, or program participants."[11]

In assessing whether "substantial evidence" of sexual harassment exists case law interpreting the Washington Law Against Discrimination and Title VII of the Civil Rights Act, statutes that both use EP-15's "severe or pervasive" language in defining legally actionable sexual harassment make the following points:

***First,*** "conduct that is hostile and intimidating, without more, is not actionable as sexual harassment."  *Herried v. Pierce Cty. Pub. Transp. Ben. Auth. Corp.*, 90 Wn. App. 468, 473 (1998)(*citing Miller v. Aluminum Co. of Am.,* 679 F.Supp. 495, 502 (W.D.Pa.1988) ("Hostile behavior that does not bespeak an unlawful motive cannot support a hostile work environment

_____

to his or her property or the property of others; or (c) Suffer substantial emotional distress," WAC 504-26-223(1)(a)-(c), and "<u>intimate partner abuse</u>" as "conduct or threats which are targeted against a person with whom an individual is in or had been in a romantic, sexual, or dating relationship, where the conduct or threats are used to coerce, intimidate, or control the person. This may include physical, verbal, emotional, psychological, or financial assault and/or control." There is no allegation Fleetwood engaged in these types of "discriminatory harassment."

[11]    *See*    https://policies.wsu.edu/prf/index/manuals/executive-policy-manual-contents/ep15-discrimination-sexual-harassment-and-sexual-misconduct/ (*last visited* July 28, 2020).

OPENING BRIEF - PAGE 23

claim."). ***Second,*** (a) "[c]asual, isolated or trivial manifestations of a discriminatory environment do not affect the terms or conditions of employment to a sufficiently significant degree to violate the law" (b) "the harassment must be sufficiently pervasive so as to alter the conditions of employment ***and*** create an abusive working environment" and (c) "[w]hether the harassment…is sufficiently severe and persistent to seriously affect the emotional or psychological wellbeing…is a question to be determined with regard to the totality of circumstances." *Payne v. Children's Home Soc. of Washington, Inc.*, 77 Wn. App. 507, 515 (1995). ***Third,*** gossip is not harassment. *Clemmons v. Academy for Educ. Dev.,* 107 F.Supp.3d 100, 121 (D. D.C. 2015) (holding that plaintiff's "allegations of workplace criticisms, gossip, rudeness, and subjective changes in perception are simply insufficient to establish an objectively hostile work environment."); *Davis v. NYS Dept. of Corr.,* 46 F.Supp.3d 226, 236 (W.D. N.Y. 2014)("Whispering, gossiping, and making negative comments about an employee also do not rise to the level of an adverse employment action because they do not materially change the terms and conditions of employment."). ***Fourth,*** the fact that Fleetwood directed his supposed request that he and Complainant reignite their prior (consensual) sexual relationship in and of itself is not harassment as WSU needed to show "that the conduct was (a) directed at women ***and*** (b) ***motivated by animus against them as women***." *Adams v. Able Bldg. Supply, Inc.*, 114 Wn. App. 291, 297 (2002).

For the reasons stated below none of the facts giving rise to WSU's Decision established that Fleetwood "sexually harassed" Complainant. ***First,*** the sexual relations were fully consensual (AR 069) ***Second,*** there was never a quid-pro-quo relationship in place. Indeed, when asked if Fleetwood "ever used his position, standing in program to manipulate cadets for dates" a female witness answered, "Don't think so. He doesn't really have position. He's not in a position of authority that could do that. I haven't seen it" (AR 141). ***Third,*** Complainant's January 18, 2019

OPENING BRIEF - PAGE 24

complaint expresses her **speculative** "concerns about his **professionalism**," that Fleetwood may "**potentially** prey on some private right out of basic training", that Fleetwood "decided to share explicit content [underline]none of which is described[/underline] some true and some not true" after being "denied sexual favors"; in short, her complaint was that Fleetwood may harm some unknown person at some unknown date, which is not, in fact, a complaint and certainly not a qualifying act of sexual harassment (AR 069-71). **Fourth,** Complainant flipflopped on April 8, 2019, as to whether Fleetwood told her he did not want to have sex with Complainant anymore after December:

> RMB: Did Patrick ever tell you he did not want to engage in sexual relations with you anymore?
>
> No. Not really. I mean, yeah. We stopped seeing each other, but don't remember him saying I don't want to have sex with you. I could be mistaken, but I don't remember him saying no more sex.

(AR 101). **Fifth,** Complainant confirmed that despite her original sworn statement to ROTC, **Fleetwood never asked to re-engage in sexual relationship after December**; hence, the overriding premise that he retaliated because she withheld "sexual favors" is unsubstantiated (AR 101). **Sixth,** the "Eskimo brothers" comment was **not** initiated by Fleetwood but rather by Cadet P, one of the Complainant's other MS-IV sex partners (AR 127). Cadet P's testimony confirms Fleetwood's own memory that **Cadet P asked him about his sexual relationship with the Complainant,** indicating that someone else had spread the gossip. Fleetwood's part was merely to discretely confirm that they had both slept with the same Cadet by repeating the ROTC code "Eskimo brothers" (AR 108-109). **Seventh,** the entire premise that "who-hooked-up-with-who gossip" (or making "sexual comments" to friends) is somehow legally off limits on a college campus or within an ROTC program is ridiculous. Gossip is not illegal sexual harassment. Courts, in analogous employment cases assessing anti-discrimination statutes that use the same "severe and pervasive" standard as EP-15 say as much. *See supra.* People talk about their relationships. The Complainant clearly talked about her relationships. Her ex-boyfriend talked about his relationship. Cadet M

OPENING BRIEF - PAGE 25

couldn't keep his mouth shut about everyone else's relationships.  But only Fleetwood, who was decidedly discrete when it came to talking about his relationships, ended up in the WSU student conduct system where no amount of witness credibility issues could change the finding "guilty if accused."  **Eighth,**  when the original harassment allegations proved false, WSU OEO chose instead to solicit all new witness testimony, pursuing an entirely different allegation related to Fleetwood's much earlier transmission of a Snapchat video consensually created in September 2017. The video played no role in the Complainant's original complaint to ROTC or WSU OEO. Nor did Fleetwood posing "shirtless in a towel" - - - something that is not remotely illegal. Indeed, the video had absolutely NO impact on the Complainant and should never have been investigated in relation to a sexual harassment against the Complainant.  **Ninth,** Complainant's admission that she was taking action not to end harassment but as a "***general character check on him.***"  (AR 162) **Tenth,** and most damning WSU failed to show that any of Fleetwood's comments were "***motivated by animus against…women***" *Adams,* 114 Wn. App. at 297.  This is an important legal criterion because without it *any* request by *any* ex-boyfriend to "hook back up" with *any* ex-girlfriend (before said ex-girlfriend warns ex-boyfriend that solicitation is not welcome) would constitute sexual harassment.

There is **zero evidence** that Fleetwood ever engaged in unwelcome "verbal or physical conduct of *a sexual nature*" towards the Complainant following the dissolution of their relationship in 2018. There is **zero evidence** that Fleetwood's behavior was ***sufficiently severe, persistent, or pervasive***[12] to interfere with another's work or, in this context, educational

---

[12] OCR Guidelines are established in V.1, clarifying that "OCR considers the conduct from both a subjective and objective perspective. In evaluating the severity and pervasiveness of the conduct, OCR considers all relevant circumstances, i.e. 'The constellation of surrounding circumstances, expectations, and relationships' … To draw commonsense distinctions between

environment.  Instead, Complainant's January 18, 2019, complaint states she "never had [negative] thoughts herself" but rather acted upon a rumor-fueled speculative concern for future female Army cadets who might feel mistreated by Fleetwood should he become an officer.  (AR 069-71) Indeed, when WSU OEO asked Complainant "[h]as this impacted your status in the program", the Complainant responded, "They've been clear this has no affect. … It makes it a little awkward for me but I feel like I'm in good things [sic]" (AR 167).

**C.    WSU's finding that Fleetwood discouraged or interfered with students using/accessing the student conduct system is not supported by the law or the facts.**

In order to establish that Fleetwood violated WAC 504-26-219(5) in "abuse of the student conduct system" WSU needed to establish via substantial evidence that Fleetwood was "[a]ttempting to discourage an individual's proper participation in, or use of, the student conduct system."  For the reasons stated below, WSU failed to establish that Fleetwood tried to discourage others to participate in or use the student conduct system.

***First,*** Fleetwood was first informed of Complaint's complaint on January 31, 2019, but the alleged retaliatory actions by Fleetwood ended on January 15, 2019. This is key because common sense dictates that a party cannot be found to have discouraged someone from using the student conduct system when the party didn't know the student conduct system was in play in the first place. By analogy, courts routinely dismiss retaliation complaints in employment discrimination cases when it is found that the alleged bad actor (here Fleetwood) did not know of the protected activity. Indeed "[b]ecause retaliation is an intentional act, an employer cannot retaliate against an employee for an action of which the employer is unaware." *Cornwell v. Microsoft Corp.*, 192 Wn.2d 403, 414 (2018).

---

conduct that constitutes sexual harassment and conduct that does not rise to that level." https://www2.ed.gov/about/offices/list/ocr/docs/ocrcpm.pdf.

***Second,*** the three brief communications which took place within a 24-hour period ***before*** any complaint had been filed, happened because Fleetwood understood he was being falsely accused of sexual assault and confirm Complainant was not fearful of retaliation at all.   Indeed, even a witness peripheral to the case confirmed the rape rumor:

**WSU RMB:** "Did she say anything about being afraid of retaliation"

**Cadet HFT**: "I think reputation. Hard to have rep already established like when you've slept around in program, to have rep that's freshman girl who slept around.  Didn't want to be girl who made rape case and have people think that.  Don't think she was scared of Patrick, think he has a fragile ego, but not aggressive.  Think she was more afraid of reputation, **don't want to be that girl that made false rape case" (AR 145)**

***Third,*** one of the communications involved Fleetwood responding to communication initiated by Complainant a la "there's been some word out that you and whoever are trying to say that I committed assault on you. I just want you to know that if you bring your argument up [the rumored assault charge] that it will not last against the overwhelming evidence I have. <u>Do what you want</u>, but I'm advising you that it won't turn out great for you..." (AR 032).   Telling someone "do what you want" is not discouraging use of the student conduct system and claiming (truthfully) that no sexual assault happened is not retaliatory either.

***Fourth,*** in keeping with EP #15 Procedural guidelines to consider circumstances and relationships, Fleetwood calling his longstanding colleagues in order to clear up misunderstandings surrounding an utterly false accusation seems to be a sensible response.

***Fifth,*** once Fleetwood ***was*** aware that a complaint had indeed been filed, he made no attempt to interfere with the investigation and indeed limited his recruitment of viable witnesses because he feared his behavior could be construed as interference.

    **D.**       **WSU's Decision was arbitrary and capricious.**

The WSU Decision should also be reversed because it was a willful and unreasoning action which ignored the facts and circumstances surrounding the action for which there is no room to form two opinions. *See Linville*, 452 P.3d at 1275.

As stated above, there is no room to form two opinions as to whether Fleetwood engaged in illegal sexual harassment or retaliation. And the other facts and circumstances WSU ignored in finding Fleetwood at fault for sexual harassment and retaliation are as follows.

**First,** WSU ignored the fact that Complainant's story changed multiple times between her January 18, 2019 complaint and her follow up correspondence with Brooks that occurred days later. Tellingly, WSU did not disclose Complainant's "new" story with Brooks as part of the Agency Record. Instead Brooks concluded, "[The Complainant 's] statements to investigator were generally consistent internally and consistent with the written statements she provided" when that clearly wasn't the case (AR 17).

**Second,** WSU wrongly concluded Complainant's "statements were generally consistent with the statements of witnesses OEO found to be credible including Student A [Cadet M who served as her chief conspirator]" (AR 017), but nevertheless assessed Fleetwood's credibility as poor because he told investigators he had "concerns about the impact this investigation may have on his future career prospects, his continued participation in the Program, and with his family. Investigators considered this as a potential motivation to be untruthful and weighted the assessment of the Respondent's credibility appropriately" (AR 017). While concluding Fleetwood had a motive to be untruthful, WSU fully disregarded that Complainant not only had a motive to be untruthful but expressed, in writing, motives to do so first by professing an anti-male bias and second by professing concern for not wanting to be seen as the ROTC "program slut" (AR 022, 067).

OPENING BRIEF - PAGE 29

**Third,** there is no evidence that Fleetwood's case ever went thru EP Policy #15 Conflict Review which checks for a conflict of interest defined as a "personal interest, financial, familial, professional, or otherwise, that might impair or reasonably appear to an objective outside observer to impair an investigator independent, unbiased judgment " documentation of the Review has not been provided.  *See* https://crci.wsu.edu/crci-procedural-guidelines/ (*last visited* July 23, 2020)

**Fourth,** in this case the preferential treatment/pro-female bias provided to the female Complainant was evident as follows:

- The Complainant was never reprimanded for her own witness coaching and refusal to respect confidentiality during the Investigation. (i.e: Fleetwood was gagged; the C.P. was not (AR 199-204, AR 220-221).
- Complainant was never reprimanded in any way for her equal and often more extreme incidences of "discussing prior sexual relationships" within the program (No evidence in Agency Record).
- The Complainant was never reprimanded for her own explicitly sexual depiction of other members of the ROTC program. (No evidence in Agency Record).
- The Complainant did not honor the no contact order (AR 199-204)
- The underlying basis of this claim—speculative concern about the reputation consequences of sexual promiscuity within the ROTC program—was never applied to the Complainant's other sexualized behavior within the program. (No evidence in Agency Record).
- Complainant was never reprimanded for wrongly and without basis concluding that Fleetwood slept with 30 women in a semester.

**Fifth,** additional evidence of a biased investigation includes:

- a verifiably inaccurate list of witnesses (AR 016-017).
- a lack of genuine effort to assess witness credibility, including most blatantly Cadet M's who promoted the false allegations which mysteriously disappeared, but also Cadet S (who was a freemason brother to Cadet M), and Cadet P, the Complainant's ex-boyfriend who had further motive to mislead as means to avoid self-incrimination (AR 017, 127)
- a failure to examine the Complainant's motivation (AR 012-022)
- a failure to summarize exculpatory evidence (AR 018-022)
- a repeated reliance on hearsay as fact (AR 017-018)
- factual timeline issues, confusing chronology (AR 021)
- failure to explain how/why initial allegations disappeared and instead, were replaced by unrelated allegations surrounding alleged cell phone misconduct from an entirely different standpoint (AR 022-023)
- failure to inform Respondent that allegations had changed. (AR 012-022).

OPENING BRIEF - PAGE 30

***Sixth,*** WSU ignored context. And "Agency action is 'arbitrary or capricious' if there is no support in the record for the action which is therefore 'willful and unreasoning action, in disregard of facts and circumstances.'" *Hayes v. Yount*, 87 Wn.2d 280, 286 (1976). Such is the case here. As a whole the November texts, available at AR 033-061 and in WSU's possession early in its prolonged investigation, provide compelling context evidence that WSU disregarded in its investigation.

- The sexual relationship between Fleetwood and the Complainant was <u>fully consensual</u>; if anything the Complainant pursued Fleetwood
- Fleetwood never indicated he would be monogamous
- The Complainant confessed a pre-existing belief that all men were malicious
- The Complainant demonstrated a pre-existing potential for seeking "dirt" about men she felt rejected by
- The Complainant herself used sexually explicit and otherwise offensive language to describe ROTC peers. Indeed, the Complainant 's own clearly documented hostile language is notably more hostile and explicit than Fleetwood's <u>only</u> corroborated incident of alleged verbal harassment wherein he agreed, in a private setting—after being asked by Cadet P—that he and the Complainant 's former sex partner were now "Eskimo brothers" (AR 012, 127).
- The Complainant  herself discussed her sexual relationships with ROTC peers, which is to say, evidence suggests the Complainant 's own sexualized behavior along with the Complainant 's willingness to gossip widely about her sexualized behavior, presented biggest threat to her "reputation" within the program (AR 043-045).

Taken alone or together these points show WSU Decision arbitrarily disregarded any pro Fleetwood evidence while ignoring Cadet M's malicious collusion, the Complainant's own vindictive nature and anti-male bias.

***Seventh,*** not only did WSU ignore context, it also ignored its own policies. Its Appeal Letter did not contain the information required of EP 15. WSU told Fleetwood that certain members would be on the board, so as to allow Fleetwood to conduct a conflict check, but then changed the board's composition which deprived Fleetwood to conduct a conflict check on the board member who determined Fleetwood's fate.

OPENING BRIEF - PAGE 31

**Eighth,** WSU did not produce the entire Agency Record which, in turn, is proof positive of "a willful and unreasoning action made without consideration and without regard to the facts and circumstances" which, in this instance are (a) how Complainant's allegations against Fleetwood changed from January 18, 2019 to January 28, 2019 (e.g. no mention of "Eskimo Bros" in the 1/18/19 complaint but it magically appears ten days later) and how (b) Complainant twice told Ms. Brooks words to the effect of "don't quote me on that." *Lang v. Washington State Dep't of Health*, 138 Wn. App. 235, 255 (2007). Additional evidence of WSU ignoring the facts and circumstances (and its own policy) is the fact that the triggering event that gave rise to Complainant's complaint (the January 9th lunch) took place off campus as EP 15 only applies to off campus behavior if it negatively effects "the university community" and there is no evidence of such a negative community-wide effect (AR 011).

As shown above, WSU ignored the circumstances giving rise to the complaint while also ignoring the Complainant's verifiable inconsistencies—inconsistencies that she twice highlighted through her "don't quote me on that" emails.  WSU also ignored that Fleetwood's mid-January attempts to combat the false complaint that he was a rapist could "reasonably be considered protected speech."

### III.    CONCLUSION

WSU's Decision should be reversed.  As written, the findings in this case threaten the legitimate purposes of WSU EP #15 and Title IX legislation at large.

//

//

//

//

OPENING BRIEF - PAGE 32

DATED this 31st day of July 2020.

**CROTTY & SON LAW FIRM, PLLC**

By: _____
MATTHEW Z. CROTTY, WSBA #39284

905 W. Riverside Ave. Ste. 404
Spokane, WA 99201
(509) 850 7011
matt@crottyandson.com

Attorneys for Plaintiff

OPENING BRIEF - PAGE 33

1

## <u>CERTIFICATE OF SERVICE</u>

2

3

      Pursuant to RCW 9A.72.085 the undersigned hereby certifies under penalty of perjury under the laws of the State of Washington, that on the 31st day of July 2020, the foregoing was delivered to the following persons in the manner indicated:

4

| Nathan E. Deen | VIA REGULAR MAIL | __ |
| Attorney General of Washington | VIA FACSIMILE | __ |
| 332 French Administration Building | HAND DELIVERED | __ |
| Pullman, WA 99164 | VIA EMAIL | ✓ |

5

6

7

8

9

10

11

          CROTTY & SON LAW FIRM, PLLC

12

13

          Matthew Crotty

14

15

16

17

18

19

20

21

22

23

24

25

26

OPENING BRIEF - PAGE 34

**Who's Who?**

Cadet P was the first MS-IV boyfriend of the Complainant and a problematic witness in the case because his truthful exoneration of Fleetwood would require self-incrimination. Hence, he had motive to misrepresent facts surrounding who said what, when. Also remarkable is the way Cadet P somehow avoided the primary accusation of "ruining the Complainant 's reputation" since their ROTC relationship was "public knowledge" and the text record indicates the Complainant was originally frustrated with his spurning of her affection. In his own words, Cadet P said, "I don't know what happened between you two. Like she's my Ex and I hold no hard feelings. Like I'm friends to both of you." Indeed, many of the antics which took place with Fleetwood appear to have been the Complainant 's efforts to make Cadet P jealous.

Cadet M was "just a friend" of the Complainant who seemingly had romantic interests and became her chief conspirator/advisor in the case against Fleetwood (a friend prior to the case). The Complainant described multiple times how Cadet M was the one informing her of things such as the alleged sexual comments that Fleetwood was making about her. *She later told the ROTC board, that Cadet M. "did encourage her to make a complaint and helped her with it."*

Cadet S is a free mason brother to Cadet M. Part of their brotherly pledge includes loyalty; hence, Cadet S felt obligated to support Cadet M. And certainly Cadet S was influenced by Cadet M to file against Fleetwood with ROTC.

Sergeant C, a Washington Army National Guardsman, was Cadet M's roommate during the time of the complaint. He shared in a letter provided to WSU OEO (AR 223) how he witnessed the Complainant 's interactions with Cadet M. who Sergeant C.: "I witnessed Cadet M.'s interaction … and I would be remised if I did not bring to light that his behavior wither was coercive and complicative. I believe that he had intent to see that Patrick be dismissed from ROTC. I believe this because he has displayed character traits indicative of a spiteful power complex. He conveyed on numerous occasions to [the Complainant] that he had just gone through and investigation into his own character and that he knew the right courses of action to see to it that Fleetwood's involvement in ROTC would be ended. This was explicit collusion." Sergeant C also described how he "had observed [Cadet M.] spread rumor and inaccurate information in many other instances. Cadet M. has a sense of theatrics and has displayed a strong vengeful attitude on many occasions" (AR 223).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

FILED

AUG 19 2020

JILL E. ISHER, Cr
WHITMAN COUNTY

**SUPERIOR COURT, STATE OF WASHINGTON, COUNTY OF WHITMAN**

PATRICK FLEETWOOD,

                      Plaintiff,

    vs.

WASHINGTON STATE UNIVERSITY,

                      Defendant.

NO. 20-2-00053-38

**MOTION AND MEMORANDUM TO AMEND COMPLAINT**

## I.     INTRODUCTION & SUMMARY OF ARGUMENT

Patrick Fleetwood seeks to amend his Complaint. A copy of Mr. Fleetwood's proposed amended complaint is attached to this briefing as Exhibit A. Mr. Fleetwood's motion should be granted because:

1.     The motion is timely.  No discovery has issued. No depositions have been taken. No trial date is set. There is no prejudice.

.2     Washington's Civil Rules and case law mandate that motions to amend complaints be freely granted.

MOTION   AND   MEMORANDUM   RE &rule
AMEND COMPLAINT - PAGE 1

3.        Mr. Fleetwood pleads viable gender discrimination, tortious interference, First Amendment, Fourteenth Amendment, and Title IX claims.

4.        Michael Fleetwood pleads a timely and proper public record act claim.

## II. ARGUMENT

**A.        Motions to Amend are regularly granted.**

Washington courts constantly hold that "[l]eave to amend should be freely given unless it would result in prejudice to the nonmoving party [and] [i]n determining whether prejudice would result, a court can consider potential delay, unfair surprise, or the introduction of remote issues." *Kirkham v. Smith*, 106 Wn. App. 177, 181 (2001)(citations omitted).

The Defendant will not be prejudiced by this amendment. No trial has been set. No discovery has been conducted.

**B.        Mr. Fleetwood pleads viable gender discrimination, tortious interference, First Amendment, Fourteenth Amendment, and Title IX claims.**

The Washington Law Against Discrimination (WLAD) bars **gender discrimination** in public education. RCW 49.60.400. Mr. Fleetwood pleads a WLAD gender discrimination claim by alleging, *inter alia,* that WSU discriminated against Fleetwood on account of Fleetwood's gender by (a) ignoring C.P.'s documented anti-male bias including, *without limitation*, C.P.'s statements that "all men are assholes," (b) assigning investigators to investigate C.P.'s complaint who were biased against men, (c) refusing to consider Fleetwood's new evidence during the December 5, 2019, hearing, (d) disregarding C.P.'s stated motive for bringing her complaint against Fleetwood, i.e. not a compliant for sexual harassment but "character check on him," (e) ignoring C.P.'s repeated "don't quote me on that" explanations about what happened, (f) ignoring C.P.'s unsubstantiated (but under oath) submission that Fleetwood had slept with 30 women in the past semester, and (g) ignoring exculpatory evidence. (PAC ¶117 – 144, 218) Fleetwood pleads a

MOTION    AND    MEMORANDUM    RE
AMEND COMPLAINT - PAGE 2

gender discrimination claim. Accordingly, his motion to amend should be granted as to that claim.

In order to prove a ***tortious interference*** claim the plaintiff must show "(1) the existence of a valid contractual relationship or business expectancy; (2) that defendants had knowledge of that relationship; (3) an intentional interference inducing or causing a breach or termination of the relationship or expectancy; (4) that defendants interfered for an improper purpose or used <u>improper means</u>; and (5) resultant damage." *Leingang v. Pierce Cty. Med. Bureau, Inc.*, 131 Wn.2d 133, 157 (1997). Mr. Fleetwood properly pleads the existence of a contractual expectancy, Defendant knowledge of the same, interference via improper means, and damages. (PAC ¶222-226). Accordingly, Fleetwood's motion to amend his complaint for this claim should be granted.

In order to bring ***First Amendment Constitutional void for vagueness/overbreadth*** claims a party seeking to challenge a regulation must show punishing people for behavior that they could not have known was illegal and/or that the government regulation may deter protected speech. *Italian Colors Rest. v. Harris*, 99 F. Supp. 3d 1199, 1210 (E.D. Cal. 2015); *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*, 447 U.S. 557, 566 (1980). Here Mr. Fleetwood pleads that EP 15's definition of sexual harassment is both vague and overbroad as it does not put students on notice that discussing sexual relationships with other students (which is something that happens on college campuses in America numerous times each day) or posing shirtless places them in violation of EP 15's prohibition against sexual harassment. (PAC ¶231-232) Nor, for that matter, does EP 15 put students on notice that temporary SnapChat videos of consensual sexual activity that are transmitted to others with the consent of both parties is illegal. *Id.* Additionally, Fleetwood pleads that WSU policy, memorialized in WAC 504-26-219, is vague and overbroad because it has a chilling effect on the accused which, in this instance, was Fleetwood. (PAC ¶232) Before

MOTION    AND    MEMORANDUM    RE
AMEND COMPLAINT - PAGE 3

Fleetwood was told that any complaint of any type had been filed against him, he heard that he had been accused of rape. Wanting to defend himself from such criminal allegations, Fleetwood contacted both the C.P. and other students to both inquire into the bases of the claim and defend his reputation. At no time did WSU put Fleetwood on notice that any communication he had with any potential witness in the case would result in a violation of WSU regulations. Accordingly, Fleetwood pleads First Amendment claims and his motion to amend his complaint to that end should be granted.

Regarding Fleetwood's proposed ***due process*** claim, State actors that adjudicate important rights are constitutionally required to protect parties' due process rights. *Goldberg v. Kelley*, 397 U.S. 254, 262 (1970). These due process protections apply to students at public educational institutions. *Goss v. Lopez*, 419 U.S. 565 (1975). Neither the Supreme Court nor the Ninth Circuit have defined the precise process due to accused students. *See Wynar v. Douglas County Sch. Dist.*, 728 F.3d 1062, 1073 (9th Cir. 2013); *see also Lucy v. Nevada ex rel. Board of Regents of the Nevada System of Higher Education*, 380 F. App'x 608, 610 (9th Cir. 2010) (unpublished opinion applying the Goss framework to higher education disciplinary process). The factors considered in determining whether a person has received sufficient due process protections are (1) the private rights affected by the official action, (2) the risk of an erroneous depravation of the private right because of procedural flaws, (3) any probable value of additional or substitute procedural safeguards, and (4) any governmental interests that would be affected by additional safeguards, such as fiscal and administrative burdens. *Matthews v. Eldridge*, 424 U.S. 319, 335 (1976).

Fleetwood pleads that he was not allowed to cross-examine C.P. as part of WSU's adjudication. (PAC ¶237) Without that cross-examination WSU found Fleetwood in violation of EP 15. *Id.* Conversely, the ROTC Board hearing process allowed Mr. Fleetwood opportunity to

MOTION    AND    MEMORANDUM    RE
AMEND COMPLAINT - PAGE 4

1   cross examine C.P. and this ability to cross examine C.P. led to the ROTC board finding in

2   Fleetwood's favor on all EP-15 related allegations except the allegation regarding the consensual

3   transmission of the video images that did not involve C.P. and occurred years earlier. *Id.*

4   Fleetwood further pleads that WSU utilized the single investigator model that allowed WSU

5   (through Rachel Brooks, its lead investigator) to not only investigate C.P.'s claims against

6   Fleetwood but to then determine, as Brooks did in the June 2019 investigation report, deem

7   Fleetwood liable for violating, *inter alia,* EP 15. (PAC ¶238) Fleetwood plead that this single

8   investigator model allowed Brooks (and others) to eviscerate any due process afforded Fleetwood

9   as shown by the above examples of WSU disregarding C.P.'s written anti-male bias, disregarding

10  C.P.'s ulterior motive that had nothing to do with sexual harassment but everything to do with

11  protecting her own reputation, and disregarding any exculpatory evidence brought in Fleetwood's

12  favor. *Id.*  Fleetwood also pleads that WSU failed to put Fleetwood on notice that its investigation

13  had expanded to consensual events that took place years before Fleetwood began his consensual

14  relationship with C.P. (PAC ¶239) Accordingly, Fleetwood pleads a due process claim and his

15

16  motion to amend his complaint to include such a claim should be granted.

17

18          Regarding Fleetwood's ***Title IX claim***, a plaintiff can bring such a claim via the

19  "erroneous outcome" and/or "selective enforcement" theories.  *Schwake v. Arizona Bd. of Regents*,

20  No. 18-15725, 2020 WL 4343730, at *4 (9th Cir. July 29, 2020). Under the "erroneous outcome"

21  test, the plaintiff "must allege particular facts sufficient to cast some articulable doubt on the

22  accuracy of the outcome of the disciplinary proceeding." *Id.* In a "selective enforcement" claim, a

23  plaintiff must allege that "regardless of the student's guilt or innocence, the severity of the penalty

24  and/or the decision to initiate the proceeding was affected by the student's gender." *Id.*

25

26

Fleetwood alleges facts sufficient to proceed under both theories. (*See e.g.* PAC ¶39, 42-47, 50, 52-58, 61, 70, 76, 111-144, 151, 168) Accordingly, Fleetwood's motion to amend his complaint to include a Title IX claim should be granted.

**C.    Michael Fleetwood should be added as a named plaintiff because he pleads a proper public record act claim.**

Michael Fleetwood made his public record act requests on October 2, 2019 and October 18, 2019. (PAC ¶202) WSU informed M. Fleetwood that it would not be producing any records on November 21, 2019. (PAC ¶203) M. Fleetwood brings this claim within one year of wrongfully being denied said records. Accordingly, the claim is timely under the statute of limitations.

### III.    CONCLUSION

Plaintiff's Motion to Amend should be granted.

DATED this 19th day of August 2020.

**CROTTY & SON LAW FIRM, PLLC**

By: _____
MATTHEW Z. CROTTY, WSBA #39284

905 W. Riverside Ave. Ste. 404
Spokane, WA 99201
(509) 850 7011
matt@crottyandson.com

Attorneys for Plaintiff

MOTION    AND    MEMORANDUM    RE _____
AMEND COMPLAINT - PAGE 6

1

## <u>CERTIFICATE OF SERVICE</u>

2

3

Pursuant to RCW 9A.72.085 the undersigned hereby certifies under penalty of perjury under the laws of the State of Washington, that on the 19th day of August 2020, the foregoing was delivered to the following persons in the manner indicated:

4

5

6

7

| Nathan E. Deen | VIA REGULAR MAIL | __ |
| Attorney General of Washington | VIA FACSIMILE | __ |
| 332 French Administration Building | HAND DELIVERED | __ |
| Pullman, WA 99164 | VIA EMAIL | ✓ |

8

9

10

11

CROTTY & SON LAW FIRM, PLLC

12

13

Matthew Crotty

14

15

16

17

18

19

20

21

22

23

24

25

26

MOTION   AND   MEMORANDUM   RE
AMEND COMPLAINT - PAGE 7

# EXHIBIT A

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
IN AND FOR THE COUNTY OF WHITMAN

PATRICK FLEETWOOD and MICHAEL
FLEETWOOD,

           Plaintiffs,

     vs.

WASHINGTON STATE UNIVERSITY,

         Defendant.

Case No.  20-2-00053-38

**[PROPOSED] AMENDED
COMPLAINT**

The Plaintiffs, PATRICK FLEETWOOD and MICHAEL FLEETWOOD, by and through

MATTHEW Z. CROTTY, of CROTTY & SON LAW FIRM, PLLC complain of Defendant and

alleges as follows:

### I.  PARTIES, JURISDICTION, & VENUE

1.     Patrick Fleetwood was a student of Defendant Washington State University during

the time-frame relevant to this lawsuit.  Mr. Fleetwood has standing because he has been aggrieved

by the below-referenced Agency action as (a) that Agency action has prejudiced Mr. Fleetwood's

[PROPOSED] AMENDED COMPLAINT - 1

ability to complete his college education in a timely manner and his desire to serve as an officer in the U.S. Army (b) the Agency failed to consider Mr. Fleetwood's interests (described in more detail below), and (c) a judgment in Mr. Fleetwood's favor would substantially eliminate the prejudice to Mr. Fleetwood caused by the Agency's actions. Per RCW 34.05.546 Mr. Fleetwood's mailing address is 880 NE Providence Court, Apt P102 Pullman, WA 99163. For the purpose of this complaint Mr. Fleetwood is referred to as "Fleetwood."

2.    Michael Fleetwood is Patrick Fleetwood's father. M. Fleetwood made a public record request to Defendant to which Defendant did not respond as provided by law. Unless otherwise noted, Michael Fleetwood will be referred to as "M. Fleetwood" in the Amended Complaint.

3.    Defendant Washington State University ("WSU") is a state agency with a place of business in Pullman, Washington.  Defendant is either referred to as "WSU" or "the Agency" in this complaint.

4.    The Whitman County Superior Court has jurisdiction over this case.

5.    Venue is proper in Whitman County pursuant to RCW 34.05.514(2).

6.    The administrative pre-requisites to bringing this lawsuit are satisfied. Mr. Fleetwood timely appealed WSU's December 16, 2019, sanctions decision, to the WSU Appeals Board. On February 21, 2020 the WSU Appeals Board upheld WSU's December 16, 2019, decision. Mr. Fleetwood filed this instant action within 30 days of February 21, 2020.

7.    The administrative pre-requisites to bringing the gender discrimination, tortious interference, First Amendment, Fourteenth Amendment, and Title IX claims have been satisfied. Mr. Fleetwood served Defendant with a Notice of Tort claim on May 19, 2020. Defendant received

[PROPOSED] AMENDED COMPLAINT - 2

said Tort Claim on May 22, 2020 and acknowledged receipt of said Tort Claim on May 28, 2020. Over sixty days have elapsed since May 22, 2020.

## II. FACTS

8.    Mr. Fleetwood incorporates the above allegations as if pled verbatim herein.

### Part 1: Timeline

9.    During late November and early December of 2018, Patrick Fleetwood, an ROTC MS-IV[1] at WSU, had a short-lived consensual sexual relationship with the C.P.[2], an ROTC MS-I. At least initially, there was no expectation for monogamy and no real "dating." This was a *hook-up*, no strings attached; and Fleetwood understood the C.P. understood that arrangement.

10.    Fleetwood recalls the pair hooked-up four times before he stopped initiating contacts in part due to cellular messages indicating the C.P.'s potential for jealous manipulation and indiscretion.

11.    The C.P. would later explain to the ROTC board (that was subsequently convened for the purpose of removing Fleetwood from ROTC) that she "broke it off in early to mid-December because she learned [Fleetwood] was sleeping with other women."

12.    Despite having allegedly "broken it off" in early December, on New Year's Eve, December 31, 2018 the C.P. texted Fleetwood, "Should I dump your ass in 2018?"

13.    On January 3, 2019, Fleetwood received a text from a friend in Anacortes sharing a profile photo of the C.P. (who appears to be partially naked behind a poster) promoting her dating

---

[1] MS IV means "Military Science" IV, a fourth year ROTC cadet. A MS I is a first year ROTC cadet. A MS II is a second year ROTC Cadet. A MS III is a third year ROTC cadet.
[2] C.P. = Complaining Party

[PROPOSED] AMENDED COMPLAINT - 3

availability on Tinder: The profile reads, "back on Tinder cause it's break and I'm bored as hell."



14.     On January 9, 2019, WSU was back in session, and Fleetwood invited the C.P. along with two other students to a "coupon deal" group lunch at Pullman's Red Bento sushi restaurant. Inviting fellow Cadets/students to "coupon lunch deals" was something Fleetwood did regularly. As it turned out, that day just the C.P. was available to attend, and something about the pair's interaction at the lunch did not sit well with the C.P., who later gossiped to ROTC peer Cadet M. that Fleetwood had "become hostile towards her due to her refusal to provide ongoing sexual favors."

15.     Fleetwood has consistently denied attempting to re-initiate a sexual relationship at the January 2019 Red Bento lunch or at any time after early December 2018.

16.     When asked under oath at Fleetwood's ROTC Disenrollment Hearing, the C.P. *changed her earlier account* of the lunch: "He did not directly ask to resume a sexual relationship," but rather she perceived he "was flirty with her." Notes recorded at the ROTC Disenrollment Hearing read as follows:

[PROPOSED] AMENDED COMPLAINT - 4

1

2

3

4

5

> LTC Stafford then asked _____ why she went to the Red Bento sushi restaurant with Fleetwood on 09 JAN 2019. She said that she thought it was going to be a lunch in a group setting and that Cadet _____ would be there. However, when she got there it was just the two of them present. LTC Stafford then asked l_____ if Fleetwood made any direct comments to resume a sexual relationship with her. She said that he did not directly ask to resume a sexual relationship, but was flirty with her during the lunch. She said she told Fleetwood during the lunch that she was not interested in continuing their prior sexual relationship.

6

7        17.    Nonetheless, by January 10, 2019, the ROTC rumor mill had been activated. And

8    sometime after the Red Bento lunch, Cadet M. approached Fleetwood to ask why he had tried to

     "force the C.P. into a quid pro quo sexual relationship."

9        18.    Cadet M. was "just a friend" who had romantic interests in the C.P. and became her

10   chief conspirator/advisor in the case against Fleetwood in the months to follow. The C.P. told the

11   ROTC board, "Cadet M was the one informing her of things such as sexual comments that Fleetwood

12   was saying about her." She added that, Cadet M. "did encourage her to make a complaint and helped

13   her with it."

14

15       19.    Former Cadet C, who now serves as a Sergeant in 19th Special Forces Group, was

16   Cadet M.'s roommate during the time of the complaint. He shared how C.P. began visiting their

17   apartment to drink alcohol during Fall 2018 (Cadet M. was legal aged; C.P. was not). She visited up

18   to twice per week in January 2019 when the complaint was filed. In early 2019, Cadet M told Cadet

19   C about his complaint against Fleetwood, and Cadet C "did not believe the narrative put out to him.

20   He believed they were conspiring against Fleetwood." After overhearing conversations in a small

21   apartment, he concluded as summarized under oath to ROTC, "Cadet M was actively helping C.P.

22   with how to respond to questions. He said that Cadet M had been subject to a prior disenrollment

23   board and knew that may have made him jealous of Fleetwood."

24

25   [PROPOSED] AMENDED COMPLAINT - 5

20.    On January 10, 2019, WSU ROTC hosted a Sexual Harassment/Assault Response and Prevention Program training lab, and afterwards the C.P. sent a Snapchat telling Fleetwood to stop joking about them to other people. This was the first time that C.P. told Fleetwood to stop joking or otherwise discussing their relationship or her in general. Fleetwood responded with an OK emoji and proceeded to block her on Snapchat.  Later, when asked by ROTC why he blocked her, Fleetwood said, "he was irritated by the fact that C.P. told Cadet M. that Fleetwood had asked to start a sexual relationship again when it was not true."  He added that, "He did not want to play games with C.P. anymore." Blue is C.P.  Red is Fleetwood:



21.    On January 15, 2019, Cadet D told Fleetwood that he had heard from Cadet R that the C.P. and Cadet S were planning to file a Sexual Harassment/Assault Response and Prevention Program (SHARP) complaint against him.  Fleetwood called Cadet S to verify what he'd been told by Cadet D, but he did not pick up, so Fleetwood messaged him on Facebook. Finally, Fleetwood called the C.P. for a 60 second call, requesting her to stop talking about their relationship as if it had not been consensual because he had overwhelming evidence to show the relationship had been

[PROPOSED] AMENDED COMPLAINT - 6

consensual.  That was the last time Fleetwood spoke to the C.P.

22.    ROTC December 2019 Disenrollment hearing notes confirm, "Fleetwood was adamant that he was not trying to intimidate C.P. but was upset because he felt he was being falsely accused of sexual assault based on gossip he was told by other Cadets."

23.    That same day, January 15, 2019, Fleetwood also exchanged texts with his friend Cadet P. (ex-boyfriend of the C.P. who she had claimed via text message to be so angry with a few weeks earlier).

> Fleetwood: I don't need an investigation on my name is what I'm saying dude. I'm asking that if I need evidence or back up... if you'd be the guy to help me out.
> Cadet P: What evidence? Like I was not involved in what occurred between you guys.  Me and her dated and things ended like relationships do.
> Fleetwood: No, I mean, "Patrick wouldn't do that" type deal.
> Cadet P:  If you want to call me as a character witness then I'll answer whatever they ask me.  But I don't know what happened between you to. Like she's my Ex and I hold no hard feelings.  Like I'm friends to both of you."

24.    To be clear, *no investigation existed* at the point when Fleetwood texted Cadet P. Instead, there was an active rumor mill that the C.P. planned to accuse Fleetwood of sexual assault. Fleetwood heard the word "rapist" used by several other Cadets and a Cadre to describe him. Nevertheless, the WSU-OEO December 16, 2019 Finding #7 concluded, "You contacted another student via text message about providing evidence to 'help you out' with the  investigation," which then became evidence for a WAC 504-26-219 sanction of "attempting to discourage one's … participation in, or use of the conduct system."

[PROPOSED] AMENDED COMPLAINT - 7

25.     On January 15, 2019, Cadet S. *approached Fleetwood*[3] explaining he wanted to discuss rumors he had heard through the C.P. after PT (Physical Training).

26.     On January 16, 2019, Cadet S. and Fleetwood had a short, soon-to-be documented discussion about the rumors of sexual assault. This short discussion with a long time ROTC peer would later be used as a second "finding" to support Fleetwood's alleged interference with another's "Use of the student conduct system," and hence the early direct witness account is provided in full:

> harassment. I then advised CDT ____ , that she should go to cadre and report CDT Fleetwood's actions. She stated that she did not want to be thought of as "The unit slut" or "The girl who kept someone from commissioning" (along those lines). I told CDT Fleetwood that I wanted to talk to him in person "tomorrow" which was 16 Jan 2019. After PT on 16 Jan 2019 I went up to CDT Fleetwood wanting to hear what he had to say. When I tried to talk to him he acted verbally aggressive towards me saying "you dont know anything"/stay out of it" after that he said "You have a history of reporting this stuff to cadre." in reference to an incident last year when my now fiancé CDT reported a nude photo that was posted on ROTC Social media. I became angry and said "Stop talking" he said a few words which I cant remember and then said "now I'm mad" and left the building (to my knowledge) I I had messaged CDT ____ about needing to talk to him

27.     On January 18, 2019, after ostensibly conspiring with Cadet M, the C.P. went with

---

[3] Again, timeline in this period is important because once allegations of sexual harassment were effectively disproven, WSU instead promoted an "interference retaliation" finding, relying on evidence and full disclosure of Fleetwood's three very brief attempts to clear his name of rape allegations, communications which all took place during this January 15-16, 2019 *before* any claims had been filed with ROTC or WSU-OEO.

[PROPOSED] AMENDED COMPLAINT - 8

Cadet S to file a complaint with WSU ROTC which proceeded to take a sworn statement dated 18 January 2019 11:29 am.

28.    Because it is revealing to read the early version of a report intended to end a man's military career; an excerpt from the C.P.'s sworn written statement record on January 18, 2019 at 11:29 am appears here:



29.    To summarize, the C.P. swore under oath that her November-December sexual relations with Fleetwood had been fully consensual, but described how she later heard *false rumors*

[PROPOSED] AMENDED COMPLAINT - 9

that Fleetwood had sexual relations with thirty women that semester.[4]  These rumors (perpetuated by Cadet M, a dubious witness with his own romantic interests in the C.P.) prompted the C.P. to express her *speculative concern* about Fleetwood's character and ability to serve as an officer in the Army due to "the way he treats women."[5]

30.    The sworn statement continued, explaining how rumors of Fleetwood's sexual promiscuity concerned her because it made her "realize why someone would take their own life due to another person destroying their reputation." To be clear, none of this "Fleetwood-destroyed-her-reputation" allegation was revealed to have basis in fact—not by the WSU OEO investigation, and not by the Army's own investigation; nonetheless, the early sworn statements do establish the C.P.'s motivations.

31.    Lest accusing Fleetwood of causing an entirely fictionalized future suicide might seem extreme, the C.P. did clarify to the ROTC: "I never personally had these thoughts, but to realize the severity of his gossip could potentially lead someone to do that was a crazy thought for me and for the people [i.e. unknown fictionalized future people] he could potentially effect."

---

[4] Fleetwood did <u>not</u> have anything close to thirty sexual interactions that semester.

[5] With regards to the C.P.'s motivation for filing, she was asked under oath at the ROTC disenrollment hearing why she chose not to testify against Fleetwood at the WSU Community Standards hearing, and she replied, "she did not want to prevent Fleetwood from receiving his degree from WSU.  She just does not want him to be an officer in the US Army because how he treats females."

[PROPOSED] AMENDED COMPLAINT - 10

me deeply because it made me realize why someone would take their own life due to another person destroying their reputation. I never personally had these thoughts, but to realize the severity of his gossip could potentially lead someone to do that was a scary thought for me and for the people he could potentially effect. Furthermore, on January 9th, 2019,

32.     WSU ROTC then forwarded C.P.'s *speculative concern* to WSU OEO, and later that same day, on January 18, 2019, at 12:51pm, WSU OEO Investigative Assistant Cheryl Rose reached out to the C.P. about filing a Title IX complaint thru the Office of Community Standards.

33.     On Friday January 18, 2019, at 1:11pm, the C.P. replied to Ms. Rose, "Thank you for reaching out to me, and I would like to meet to pursue further action as soon as possible."

34.     ***On January 22, 2019, ROTC LTC Brendan Hobbs counseled Cadet Fleetwood telling him for the first time to cease contact with the C.P. and alerting him he had requested a Title IX inquiry into his behavior between December 2018 and 18 January 2019.*** Allegations presented to Fleetwood were, "statements contributing to a hostile environment and threat of professional retribution for reporting harassment to Cadre." The Summary of Counseling Key Points of Discussion reads, verbatim: "CDT Fleetwood -I have received a formal complaint against you from fellow cadets in reference to the Army SHARP program and the WSU Title IX Policy. I have directed a Commander Inquiry and requested a formal Title IX investigation from the Title IV coordinator on campus with regards to incidents between December 2019 and 18 January 2019.  2. You are to cease all verbal, digital and telephonic communication with [C.P.] effective immediately. 3. You are to cease discussing the incident or incidences relate to this complaint with any cadets or outside immediately. 4. You are welcome to provide a sworn statement on your own behalf 5. You

[PROPOSED] AMENDED COMPLAINT - 11

are to conduct yourself as a professional and a leader at all times."

35.    That same hour, January 22, 2019, LTC Hobbs told Fleetwood words to the effect that he had not wanted to open an Army SHARP investigation, and rather forwarded the complaint to the Office of Community Standards because, quite frankly, he did not think anything would come of it.  He also advised Fleetwood not to worry because he did not believe ROTC had any intention to kick him out.

36.    On January 23, 2019, Fleetwood submitted a personal written statement responding, to the best of his ability, to the broad allegations shared by LTC Hobbs in the January 22 Counseling. The statement clarified that he had not threatened retaliation; he had not harassed, taunted, nor threatened to blackmail the C.P. Instead he was concerned about false allegations of sexual assault; and that he felt personally threatened by the false allegations: "I expect to see individuals who knowingly make false allegations be held accountable for their actions."

37.    On January 24, 2019, the C.P. met with OEO Investigator Nikki Finnestead in her office. Finnestead emailed at 11:31 am requesting the C.P.'s permission to contact ROTC to gather information about their "reporting and response processes."

38.    On January 24, 2019, the C.P. returned Ms. Finnestead's email: "I know we talked about a lot both times we met, so if there's anything you need me to say or do, please let me know."

39.    A meeting between C.P. and Finnestead took place on January 24, 2019. Intake notes from that meeting (written by Finnestead) reveal that C.P. stated:

- "The reason I stopped having sex with is CFW is kind of a fuck boy and u shouldn't be getting them and *he needs to learn to not get with girls*.  He told his friends group from break, I'm going to be loyal to this one girl he was talking to not me.  …  He isn't a very loyal person"

[PROPOSED] AMENDED COMPLAINT - 12

- "*The spotlight gets off me and on his behavior in uniform...general character check on him*"
- "They [Cadet S, Cadet M, and Cadet HFT] wanted to meet me in the library. They said we should bring this case forward. At first, I was like I don't know"
- "People telling [me I'm an] ROTC slut.  Not to my face"
- "Cadet M said Patrick's not really a great guy.  I said, I'm not trying to date him."
- "It's really weird because most college students, drama is contained outside of classroom setting.  You're with a ton of strangers in class. But for me a lot of what I do revolves around ROTC. Around it all the time. With the people who *potentially think bad things about me*".

40.    On July 25, 2019, Ms. Finnestead and Ms. Brooks recorded notes from an interview with a unknown ROTC representative.

41.    On January 28, 2019, Rachel Brooks informed the C.P. by email that she would now be the contact person and primary investigator for the case, indicating Ms. Finnestead, who did the "intake interviews" was removed or removed herself from the case.

42.    On January 28, 2019, at 11:09 am, the newly assigned investigator Rachel Brooks emailed the C.P. with her interpretation of the "allegations" (presumably compiled by Ms. Finnestead).

43.    Because the allegations evolved, the initial text of C.P.'s "allegations" will be provided in full:

Brooks:  "I just wanted to follow up with you to let you know that moving forward I will be the primary investigator in your case ... please review the following allegations that will go into the letter we send him, if there are parts you would like us to change, please do so and return them to me.
- On or around January 9, 2019, you subjected the C.P. to comments that were sexual explicit [sic] when you made comments such as "She squirted all over my sheets" and referring to another as an "Eskimo Bro" (Eskimo Bros is a reference to two people who have had sex with the same person at different

[PROPOSED] AMENDED COMPLAINT - 13

times). In addition on or around January 10, 2019 the C.P. walked into class, when you pulled lip gloss from your pocket and stated that you had found the lip-gloss by your bed and asked the C.P. if she left it there. Via snapchat the C.P. asked you to stop joking about you and her around people, and that she did not appreciate it.

• Additionally, the C.P. alleges that you engaged in retaliatory conduct against the C.P. to dissuade her from making a complaint or participating [sic] in an investigation under this policy; thus, engaged in retaliation. Specifically, she alleges that you told her she would have "no respect" in the program if she brought "this case forward," and that you "have a list of people backing" you.

• Also the C.P. alleges you contacted another in the program asking that if they are contacted by investigators to help you out and to tell them that "Patrick wouldn't do that, type deal."

44.     To be clear, neither the dates nor the details of allegations in this first communication bear notable resemblance to the alleged "facts" of the case presented in the January 18, 2019 sworn statements to ROTC, nor later, in the June 13, 2019 WSU Investigation Report produced by Investigator Brooks. Nevertheless, when explicitly asked by Brooks for corrections, emails from the C.P. did not contest <u>any</u> version of the ever changing allegations except as noted below.

45.     On January 28, 2019 11:21 am, the C.P. emailed Investigator Brooks a "Don't quote me on that" disclaimer: "Of course I am nervous about the investigation moving forward but know it's for the best. In regards to the letter I would appreciate it if the direct quotes weren't used, just because I stated them off memory and don't know if they were the exact phrasing he said to me-given, I know the general ideas were stated but I feel uncomfortable putting words into his mouth over a letter that may or may not be the exact way he phrased it."

46.     On January 28, 2019 11:23 am, Ms. Brooks emailed the C.P. she would make the correction requested above and resend it to her.

47.     On January 28, 2019 11:26 am, the C.P. replied, "Send it as soon as you see fit. But

[PROPOSED] AMENDED COMPLAINT - 14

again, the less quoting you can say in the letter the best, in my opinion." ... "If you want to use [the direct quotes] however that is fine."

48.    On January 30, 2019 8:31 am, after consulting with a "senior investigator," Ms. Brooks emailed the C.P. who then approved a significantly altered collection of allegations as follows:

**Brooks:** "Specifically, the C.P. alleged that you subjected her to harassment and bullying by explicitly talking about the sexual relationship to others or talking to her about the sexual relationship in the presence of others within the WSU classroom setting or on campus, which harmed and/or had the potential to harm her reputation amongst classmates in the WSU program. This included, but is not limited to, the following comments:

a. During the week of January 9, 2019, you spread rumors about her sexual activities to other members of WSU such as telling others that she "squirted all over my sheets," and referring to another as an "Eskimo Bro" with the understanding that Eskimo Bros is a reference to two people who have had sex with the same person at different times.[6]

b. On or around January 10, 2019, when the C.P. walked into class, you pulled lip gloss from your pocket and stated that you had found the lip gloss by your bed, asking the C.P. if she left there.

c. Subjected her and other students to sexual comments by openly and explicitly talking about your sexual activities with other women;

d. Persistently attempted to reinitiate a sexual and/or romantic relationship with the C.P., which was unwanted.

e. Subjected her to negative and rude treatment and comments amongst other students, including those in the WSU program, when the C.P. was not amenable to reinitiating a sexual and/or romantic relationship with you.

f. Engaged in retaliatory conduct against the C.P. to dissuade her from making a complaint or participating in an investigation under this policy which included, but is not limited to, on January 15, 2019, you told her she would have

[PROPOSED] AMENDED COMPLAINT - 15

no respect in the program if she brought this case forward, and that you have a lot of people backing you.

g. Engaged in interference when you contacted another in the program asking that if they are contacted by investigators to help you out and to tell them that "Patrick wouldn't do that, type deal."

49.    The C.P. replied a few minutes later that she was good with the new version of events and encouraged Ms. Brooks to begin the case.

50.    Neither of these he said/he said "Eskimo Bros" accounts survived investigation, and both were removed entirely from WSU's December 16, 2019 Findings. Nonetheless, WSU took no issue with C.P.'s willingness to accept either version as "truth," with emails to Brooks confirming she "okayed" both versions.

51.    As for the shifting hearsay that Fleetwood told someone that someone (Fleetwood/C.P./someone else?) "squirted the sheets," **and** the odd "chap stick" incident; both storylines also entirely disappeared during investigation; instead, the June 13 Investigation Report, line 17 shares that,  "Investigators learned that Student A [Cadet M.] had provided information that was later determined to be, more likely than not, untrue. … Investigators followed up with Student A about this inconsistency, he did not have a response for the inconsistency.  This inconsistency did affect Student A's credibility … his remaining statement were given limited weight as appropriate." In other words, Brooks figured out the main allegations were lies, but never fully dismissed Student A (Cadet M's) credibility. Nor did she dismiss a case based on verifiable lies.

52.    On January 31, 2019, Brooks hand-delivered a letter to Fleetwood clarifying that he was under investigation for the allegations above and that he should cease contact with the C.P.

[PROPOSED] AMENDED COMPLAINT - 16

53.     On February 5, 2019, Ms. Brooks had an email exchange (presumably with ROTC) indicating she ***just then***, and not before received the sworn written testimony from the original January 18, 2019 written complaints to ROTC.

54.     On Sunday, February 10, 2019, Fleetwood emailed Ms. Brooks the written response to allegations he had provided ROTC in January and requested to meet with her in person as soon as the following day.

55.     From February thru May 2019, Investigator Brooks led a decidedly non-prompt investigation with her first interview of Fleetwood not taking place until March 29, 2019.

56.     Notes from the investigation are seemingly incomplete in many places; however, close reading reveals Brooks' (RMB's) bias against Fleetwood as compared to other note-takers present in the room during the same interviews.

57.     The spring interview also reveal that Brooks failed to pursue lines of questioning to elicit exculpatory evidence which could have proven Fleetwood's innocence and revealed the C.P.'s ulterior motivations.

58.     For example, on April 10, 2019, Brooks received exculpatory evidence via email from a former WSU student named by the C.P. as a possible "victim" of Fleetwood's allegedly inappropriate advances towards female MS-I Cadets:

[PROPOSED] AMENDED COMPLAINT - 17

I'm sorry for the delay in my response as I have a busy schedule. I have heard about the case you are looking into. However, I never felt apprehensive or felt that ▮38▮ was unapproachable. I discussed that the case did not pertain to me with ▮38▮. I was never called in to speak to ▮38▮, otherwise I would have. I do not think I have any information that would be helpful to this case or I would have went to speak to him myself.

The individual who reported the ▮38▮ in question thought I had been involved with this ▮38▮ as well; however, this is not the case. I believe she named me because she knew I had been friends with the ▮38▮ in question and that I am not anymore. While I am no longer friends with the ▮38▮ in question it has nothing to do with anything pertaining to this case or his conduct. I explained to ▮38▮ that me leaving the ▮38▮ program had nothing to do with the alleged ▮38▮.

Also, I believe the individual that reported this ▮38▮ confused me with another female ▮38▮ my friend ▮38▮. She has been given me permission to give you her email as she was more involved with the alleged ▮38▮ and might be able to help answer your questions about his conduct. Her email is ▮38▮.

**Key quote:** "While I am no longer friends with the [Fleetwood] it has nothing to do with anything pertaining to this case or his conduct.  I explained to [presumably C.P.] that **me leaving the [ROTC] program nothing to with the alleged [Cadet].**"

59.     This witness testimony relates to the C.P.'s initial written based on Cadet M.'s rumors:  "Not only did I find out he had sex with well over 30 women that semester, he was also involved with two other MS I cadets: Ms. KS and Ms. GD. I do not know if they left the program because of him, but his [sic] predatorial behaviors of pursuing the newest/youngest freshmen in are [sic] program concerns me."  Ms. Brooks' realization that this basis for complaint had been proven untrue, is not mentioned in the report.  Indeed, the witness above is not listed as a witness.

60.     During the prolonged investigation, the January 31 allegations of sexual harassment retaliation/interference proved un-true, introducing major credibility concerns with both the C.P. and her key witness Cadet M.

61.     When original harassment allegations proved false, the WSU OEO chose to solicit new witness testimony to pursue a new line of questioning related to Fleetwood's much earlier transmission of a Snapchat video consensually created in September 2017. The video played no role in the C.P.'s original complaint to ROTC or WSU OEO.

[PROPOSED] AMENDED COMPLAINT - 18

62.    During this phase, Brooks also led a witness to claim she had been previously "grossed out" by a shirtless "Army Strong" photo Fleetwood transmitted by phone at time period when he was dating one of her friends.

63.    These photos and videos did not involve the C.P.; and in fact, no individual had ever reported (or complained about) their existence prior to the investigation.

64.    No physical evidence of the photos nor video exists; nevertheless, Fleetwood answered truthfully under oath to confirm he did regret sending the consensually created Snapchat video in 2017.  He clarified that woman encouraged him to send the video because she apparently wanted to promote her reputation with other ROTC men. The video lasted 12 seconds and disappeared from his friends' phones immediately upon receipt.

65.    On June 13, 2019 WSU delivered an Investigation Report, drafted by Ms. Brooks who also completed the bulk of the interviews for the investigation [Read: Fleetwood's investigator was also his adjudicator].  The report found Fleetwood "Responsible" for Violating WSU Executive Policy 15 Prohibiting Discrimination, Sexual Harassment, and Sexual Misconduct based upon the seven Initial Allegations from the C.P. (none of which included mention of photos or videos).

66.    Ms. Brooks transmitted the June 13, 2019, report to Karen Metzner (more on her below) via email at 12:40 PM.

67.    At 3:04 PM on June 13, 2019, Ms. Brooks emailed Ms. Metzner in part "give me a call. I want to share some information with you that I learned from a meeting I had to day [sic] with the Respondent and [redacted]."

[PROPOSED] AMENDED COMPLAINT - 19

68. No written record of what Ms. Metzner and Ms. Brooks discussed exists.

69. On June 13, 2019, Ms. Brooks (cc'ing Ms. Metzner) emailed C.P. informing C.P. that her failure to participate in a conduct hearing could have consequences for the case.

70. Issues with Ms. Brooks' June 13 Investigation Report are substantial and described more fully in Part III of this document; however; evidence of a biased investigation include:

- a verifiably inaccurate list of witnesses,
- a lack of effort to assess witness credibility,
- a failure to examine the C.P.'s motivation,
- a failure to summarize exculpatory evidence,
- a repeated reliance on hearsay as fact
- factual timeline issues, confusing chronology,
- failure to explain how/why initial allegations disappeared and instead, were replaced by unrelated allegations surrounding alleged cell phone misconduct from an entirely different standpoint.

71. On June 14, 2019, and July 12, 2019, WSU Conduct Officer 1 "Holly Campbell" emailed Fleetwood, that WSU's Community Standards office received a complaint and the allegations against Fleetwood might be referred to a University Conduct Board. Both letters began, in part:

> As your WSU Center for Community Standards, we are here to protect the opportunities and success of all students. You are receiving this letter because we received a report you and subjected another student to unwelcome conduct on the basis of sex and/or gender on campus and within the WSU ▮38▮ program. The report also alleges that you engaged in harassment of a sexual nature towards her and others within the WSU ▮38▮ program, and that you engaged in retaliation and attempted to interfere with the investigative process. This may be violation(s) of:

72. Ms. Campbell's letters invited Mr. Fleetwood to attend informational session later that summer; however, Mr. Fleetwood attend said informational session until October 24, 2019.

[PROPOSED] AMENDED COMPLAINT - 20

73.     On October 1, 2019, Karen Metzner (the person Brook's emailed on June 13th regarding Fleetwood) contacted C.P., referenced a prior phone call she (Metzner) had with C.P., and asked if C.P. would like to be involved in the Conduct Board formal hearing.

74.     On October 2, 2019, M. Fleetwood made an online public record request for "the complete investigative file concerning the Office of Equal Opportunity Complaint No. 2019-021 including all statement and records."

75.     On October 4, 2019, C.P. informed Ms. Metzner that she did not want to be involved in the Conduct Board formal hearing.

76.     On October 8, 2019, Ms. Meztner (a) *after* having an off the record call with Brooks about Fleetwood on June 13, 2019, (b) *after* having an off the record call with C.P. sometime in late-September/early-October 2019, and (c) *knowing* (from the June 13th email exchange) that C.P. had been warned of the consequences of not participating in the hearing process, emailed Mr. Fleetwood that she (Metzner) was Fleetwood's "designated Conduct Officer" and that Fleetwood was "assumed not responsible for the reported incident:"

> I am your designated Conduct Officer from the WSU Center for Community Standards. It is my role to help you throughout this process, evaluate all available information, and determine appropriate outcomes. Until a decision is made at your hearing, you are assumed not responsible for the reported incident.

77.     At or near this time Fleetwood also learned that ROTC had scheduled a proceeding called a Disenrollment Board to determine whether he should remain in ROTC. Fleetwood immediately requested a delay in his disenrollment hearing so he could obtain a copy of the June 13, 2019 investigation and related documents through a public record request.

[PROPOSED] AMENDED COMPLAINT - 21

78.     On October 18, 2019, M. Fleetwood made a second public record request for "[t]he complete file and all records concerning WSU Center for Community Standards Case No. 2018371301, including all emails and records of communications with the Office of Civil Rights Compliance and Investigation (formerly Office for Equal Opportunity) concerning this case and/or OEO Case No. 2019-021."

79.     On October 21, 2019, Fleetwood made an official record request for "any and all information" related to the OEO case.

80.     On October 23, 2019, Ms. Metzner let Fleetwood review some documents relating to the case but would not allow Fleetwood to copy or photograph said documents. Fleetwood was only able to review the documents for approximately 30 minutes. When Fleetwood got up to depart the office Ms. Metzner asked if he would like a copy of the redacted file, Fleetwood said "yes" and Metzner promised Fleetwood that he would get the file before Fleetwood's ROTC Disenrollment Board hearing.

81.     To that end, on October 23, 2019, Fleetwood made another record request for "all documents" relating to the case.

82.     On November 21, 2019, WSU informed M. Fleetwood that his October 2, 2019, and October 18, 2019, public record requests were denied because of the Family Educational Rights and Privacy Act (FERPA).

83.     On December 5, 2019, Fleetwood met with Ms. Metzner in her office.  Nobody else was present.  It would appear this would later be described as his "conduct hearing" by WSU. At the "hearing," Fleetwood provided Metzner with additional evidence he had compiled, but she

[PROPOSED] AMENDED COMPLAINT - 22

seemed to him to be impatient. It seemed clear to him she had already made her decision. The meeting was short. Fleetwood was not provided with the redacted file that Ms. Metzner promised and had no opportunity to cross examine witnesses.

84.    On December 9, 2019 an Army Disenrollment Board convened a 10+ hour hearing to review evidence, make credibility determination, question witnesses, and allow for cross-examination of witnesses including the C.P., Fleetwood, Cadet P, Cadet.S.  Cadet/Sergeant C and others.

85.    In addition, to the aforementioned testimony from the C.P. confirming that the noncredible witness Cadet M. had been her chief source of false information about Fleetwood, *and* that Fleetwood had never directly asked her to re-engage in a sexual relationship.  Other key elements of exculpatory evidence collected during the ROTC hearing included testimony from Cadet P., the C.P.'s ex-boyfriend, who claimed under oath that:

- It was not unusual for MS-IV and MS-I cadets to date.
- He'd heard rumors from Cadet M that Fleetwood "treats woman like crap" but with regards to actual negative comments about the C.P. the worst he ever heard Fleetwood say was that she was "annoying."
- He said Fleetwood had never bragged about his sexual exploits in uniform

86.  ROTC also interviewed Cadet L who confirmed:

- The C.P. had dated three MS-IV cadets before or during the investigations.
- When asked if it was normal to discuss sexual activities among Cadets, he said it was normal to talk about women they were hooking up with in private settings but not in the ROTC setting.  When asked if he ever heard Fleetwood bully or make inappropriate comments or spread rumors about the C.P.; he had not.
- Cadet L. claimed he had received one inappropriate Snapchat video from Fleetwood, but could not recall the time period.

87.  ROTC also interviewed Cadet S. further who clarified:

[PROPOSED] AMENDED COMPLAINT - 23

- he had not heard Fleetwood say anything inappropriate about the C.P.,
- he never heard Fleetwood use the term Eskimo Bros.
- Multiple times he heard Cadet M slandering Fleetwood.
- Before going forward to ROTC on January 18, he only heard thru the C.P. that Fleetwood was trying to "ruin her reputation."
- He also confirmed that he and Cadet M. were fellow freemasons, and that Cadet M. had sponsored him.

88.    On December 16, 2019 WSU, by and through, Ms. Metzner found Fleetwood "Responsible" for the violating the following community standards:

> **WAC 504-26-227 - Sexual harassment.** Sexual harassment includes behavior defined in Washington State University's Executive Policy 15, which prohibits discrimination, sexual harassment, and sexual misconduct.
> **WAC 504-26-209 - Violation of university policy, rule, or regulation.** Violation of any university policy, rule, or regulation published electronically on the university web site or in hard copy including, but not limited to Executive policy 15 (policy prohibiting discrimination, sexual harassment and sexual misconduct).
> **WAC 504-26-219 - Abuse of the student conduct system**. Abuse of the student conduct system including, but not limited to: (5) Attempting to discourage an individual's proper participation in, or use of, the student conduct system.

> Metzner's letter claimed, "After our discussion and reviewing all the information available to me, I have determined the following more likely than not occurred:
> 1.You and the C.P. had a consensual sexual relationship which ended in December 2018. After the relationship ended, you made sexual comments about your relationship and the C.P. to fellow students in the program. While you identified these people as your friends, they were also in some cases your subordinates within the program and also friends/acquaintances of the C.P..
> 2. You sent a photo to students in the program of you shirtless and in a towel via "ShapChat". You sent the photo because you were proud of your physique and the training program that you were currently completing in preparation for the Ranger Challenge.
> 3. You sent sexually inappropriate videos to several ROTC members. You sent these videos years ago, on your 21st birthday, and alcohol played a factor in the situation.
> 4. The students who received these photos/videos did not ask you to send them photos/videos and the photos/videos were unwanted.
> 5. You called the C.P. after you heard that she intended to file a report about her experiences.

[PROPOSED] AMENDED COMPLAINT - 24

6. You contacted another student via Facebook Messenger to discuss the reporting process with them.
7. You contacted another student via text message about providing evidence to "help you out" with the investigation."

89.      Ms. Metzner's December 16, 2019, finding (a) forbade Fleetwood from having "any contact with the C.P. or other parties involved [in the process] until December 16, 2021" (b) required Fleetwood to draft an action plan (c) required Fleetwood to write a reflection paper, (d) required Fleetwood to complete a state-approved alcohol and drug information program, and (e) placed Fleetwood on disciplinary probation. The December 16, 2019, finding also placed Fleetwood on "enrollment hold" pending completion of the above-referenced tasks.

90.      On December 19, 2019, WSU Army ROTC, obligated to honor the Community Standards sanction, informed Fleetwood that he had breached the terms of his ROTC contract due to his undesirable character demonstrated through his violation of WSU Executive Policy #15. And on August 13, 2020 the Army in fact disenrolled Fleetwood from ROTC and required he repay his $32,617.63 in debt from scholarships and based the disenrollment decision on Fleetwood's violation of EP 15.

91.      The Army's *only* listed reason for their recommendation for disenrollment was the broadly referenced WSU OEO sanction citing his violation of EP#15 and the following specific concern underlined to the initial complaint: "The sending out of explicit video and showing other Cadets naked and inappropriate photos of women is not something a Cadet of Character would do and is not in compliance with the Army Values."

92.      By listing the much earlier, unrelated incidents of video/photo transmission as *its only* corroborated evidence, the Army's Disenrollment Investigation **effectively discredited all**

[PROPOSED] AMENDED COMPLAINT - 25

**other allegations of sexual harassment and retaliation** nefariously propagated by the C.P.'s January 18, 2019 SHARP complaint which prompted the WSU Community Standards investigation.

93.     On January 5, 2020, Fleetwood appealed the December 16, 2019, finding to WSU's University Appeals Board.

94.     Fleetwood's January 5, 2020 appeal contained a signed statement from an admittedly disinterested third party witness that made clear that C.P. and CDT M conspired on *CDT M's* desire to get Fleetwood thrown out of ROTC.

95.     On February 21, 2020, WSU's Student Appeals Board via Olivia Shoesmith upheld, without explanation, Metzner's December 16, 2019, finding.

### Part II: Complainant Credibility: A "Don't Quote Me On That" Story Of Jealousy, Double Standards, and Malicious Intent

96.     Begin again, a bit earlier in the timeline.  September 2018 marked a new school year for WSU ROTC. Throughout September and October, Fleetwood and C.P. remained acquaintances; meanwhile, the C.P. became sexually involved with Cadet P, a different MS-IV in the program.  The sexual relationship between Cadet P and C.P. was effectively public knowledge within the program.

97.     Within two months, C.P.'s relationship with Cadet P ended. Later under oath before the Army Disenrollment board, Cadet P confirmed he had a "sexual relationship with the

1

2

C.P. between October and mid-November 2018. He said he ended things and that the C.P. was

upset about it."[7]

3

4

98.      On or about November 20, 2018, the C.P. initiated new intimacy with Fleetwood

by Snapchatting a meme comparing Father Christmas to Stalin.  Before engaging, **Fleetwood**

5

6

**asked,** "Do you get offended or not like "upsetting and dirty memes?"" **C.P. replied,** "Bring it

on, kid."  Blue is C.P. Red is Fleetwood.  C.P. initiated the dialogue.

7

8

9

10

11

12



13

14

15

16

17

18

99.      The light-hearted flirty, dialogue quickly transitioned to the C.P. accusing

different male Cadets of spreading the same perceived insults she later accused Fleetwood. C.P.

19

20

texted: "Like [Cadet X] said I didn't deserve my scholarship." …  Cadet Q said I have a tiny heart.

…  Cadet Z should have been on the team instead of me." Fleetwood responded supportively,

21

22

23

24

---

[7] The C.P. claimed under oath at the Disenrollment Board hearing that "she broke up the relationship" with CDT P, which contradicts her own earlier texts and CDT P's account, one of numerous documented issues with her inconsistency and credibility under oath.

25

[PROPOSED] AMENDED COMPLAINT - 27

"What are you for real? To your face?"  Again below, Blue is C.P.  Red is Fleetwood. Pay attention to which gender uses sexually graphic or otherwise derogatory, inflammatory language.

 

100.    Next, the C.P. asked Fleetwood to tell her bad things about her earlier ROTC boyfriend (Cadet P) because, already, before anything happened with Fleetwood, she was "sick of being treated like shit."  and "loosing [sic] faith in men kind quick"

101.    The text flirtation continued with Fleetwood suggesting that perhaps the C.P. and her ex-ROTC boyfriend should have stayed FWB = Friends with Benefits.



102.    C.P. shared the sentiment, "Ayee todos chicos son pendejos" which in Spanish translation equals "All men are Assholes."   Or possibly "All men are bitches," either way indicating a powerfully anti-male bias.

103.    There is no evidence that Ms. Brooks (or any WSU investigator/adjudicator) took C.P.'s professed anti-male bias into account in determining C.P.'s motives.

104.    The text dialogue further revealed the C.P. was embarrassed to tell her family that the former ROTC ex-boyfriend CDT P had "gone behind [her] back."



105.    As a whole the November texts (all of which were in the possession of WSU during the course of its investigation of Fleetwood) provide compelling evidence to challenge the C.P.'s credibility and motivation due to her:

- Pre-existing concern about her growing reputation as the "ROTC slut"
- Confessed belief that all men were malicious

106.    Prior to engaging in a sexual relationship with Fleetwood, the C.P. also demonstrated her potential for:

- Seeking "dirt/revenge" against the men she felt rejected by
- Using sexually explicit language to describe ROTC peers
- Discussing her sexual relationships with ROTC peers, which is to say, the C.P.'s own tendency to gossip about her sex life appears to be a primary threat to her "reputation" within the program.

107.    The texting also led to Fleetwood and the C.P.'s own short-lived consensual sexual relationship, which fizzled out before the winter holiday.

[PROPOSED] AMENDED COMPLAINT - 30

108.    But first, on or about December 1, during a jealous moment in their non-monogamous sexual relationship, the C.P. demonstrated her potential for malicious prosecution by sending Fleetwood a threatening text along with a Snapchat image of the Army's Sexual Harassment/Assault Response and Prevention (SHARP) pamphlet. When questioned under oath in the December 9, 2019 ROTC Disenrollment Board Hearing, C.P. confirmed, "She did send [a picture of the SHARP pamphlet] over Snapchat *as a joke* because she was frustrated with Fleetwood sleeping with multiple women" (Disenrollment Proceedings (DP) 14:11).

109.    Here again, corroborated evidence suggests the C.P.'s main motive for filing a complaint against Fleetwood was his refusal to be monogamous with her, and she would soon describe in writing her concern about developing a reputation as the ROTC "program slut" due to her own non-monogamous sexual relationships.

110.    Then, on December 31, 2018, the C.P. texted Fleetwood the aggressive, "Should I dump your ass in 2018?" This was fine with Fleetwood who was never seeking a serious relationship. Nonetheless, the tone is aggressive, and the timing of the text is odd since C.P. later claimed they were done in early December.

### Part III: WSU OEO's Fails to Follow Policy & Procedure to Provide
### A Timely, Impartial Investigation Into a Nefarious, Complaint
### Which Itself Warranted Investigation as Fraud

111.    The Department of Education's Office of Civil Rights September 22, 2017 *Dear Colleague letter* and accompanying Q&A on Campus Sexual Misconduct, clarifies WSU's legal obligation to provide an "equitable" process for **adequate, reliable and impartial investigation** of Title IX complaints.   These guidelines call for an investigator who is  "free of actual or

[PROPOSED] AMENDED COMPLAINT - 31

reasonably perceived conflicts of interest and biases for or against any party" objectively **evaluates the credibility of parties and witnesses**, and synthesizes all available evidence—including both inculpatory and exculpatory evidence—and **takes into account the unique and complex circumstances of each case.**

112.    In 2017-18, WSU's own issues with equitable investigations led to a sizable Student Conduct Task Force, including several high-level administrators who were directed to "recommend any changes that will improve the quality, fairness, and educational values of the [student conduct adjudication] process." As part of that process, WSU conduced a major survey soliciting input from students, faculty and former or active conduct board members.  The survey released in 2018 revealed widespread concern surrounding bias and due process within the Office of Community Standards. To wit:

**Table 1: Description of Themes**

| Theme | Description |
| --- | --- |
| Composition of Conduct Board | • Diversity<br>• Question maturity of student members<br>• Members have too much power |
| Bias | • Race, Ethnic, Gender, and Class Bias<br>• Bias against certain student groups (e.g., Athletes and Greek Life)<br>• Bias against students with different cultures or where English is a second language<br>• Organizational Bias and Conflicts of Interest |
| Negative Experiences with Conduct Board | • Respondent was wrongfully accused, or personally knew someone who was<br>• Respondent was or personally knew someone who had a bad experience with the conduct board<br>• Students were punished for reporting crimes if they themselves committed crimes (e.g., getting a drink spiked while underage drinking)<br>• Respondent had a negative experience serving on the conduct board |
| Conduct Board Procedures | • Assumes guilt, rather than "innocent until proven guilty"<br>• Burden of proof for serious accusations is low<br>• Board acts as the "judge, jury, and executioner"<br>• Does not allow representation, even for serious accusations<br>• No Due Process<br>• Claims process is "educational," but is really out to punish<br>• Process is too confusing |

[PROPOSED] AMENDED COMPLAINT - 32

113.    Quotes from the documented survey which resonate with Fleetwood's own experience of implicit anti-male bias with the office include:

> "I recall the process very confusing, multi-layered, and lacking clarity-- And I was on the Board. I could only imagine what it was like for students who came before the board and our proceedings." (Student and Former Conduct Board Member)

> "Student conduct is broken, and eliminating the 'always guilty' presumption would help avoid attention like WSU is receiving currently." (Alumni)

> "I represented a few students in my former capacity as an attorney, in student conduct proceedings. I cannot comment on ethnic bias. I can say that in all occasions, it appeared that the outcome was pre-ordained. The sanctions were virtually identical, with little or no individualization." (Community Member)

> "I am concerned that the student conduct process at WSU may lack independence or the appearance of independence due to the fact that the Director of the Office of Student Conduct and the head of the Office for Equal Opportunity (who is also the Executive Director for Compliance Title IX Coordinator and ADA Coordinator) are long-term cohabiting romantic partners." (Unknown Respondent)

114.    In addition to the documented concerns about ambiguity, bias, and internal conflicts of interest; during Fleetwood's Investigation, the Office of Community Standards was experiencing a period of personnel turnover and leadership upheaval after former Director Adam Jussell (who had been a romantic partner with the Title IX Coordinator) resigned on February 4, 2019.[8]

---

[8] https://dailyevergreen.com/47399/news/director-of-the-center-for-community-standards-resigns-after-six-years/

[PROPOSED] AMENDED COMPLAINT - 33



**Director of the Center for Community Standards resigns after six years**

*Jussel to act as new dean of students at University of Wisconsin-Milwaukee*

PAIGE CAMPBELL | DAILY EVERGREEN FILE
Adam Jussel, former director of the Center for Community Standards, discusses new changes to the student conduct process Friday in the French Administration building.

115.   On February 4, 2019, Mary Jo Gonzales, Vice President of Student Affairs, announced that Karen Metzner would serve as Interim Director of Community Standards until WSU could complete a national search to find a permanent Director.



[PROPOSED] AMENDED COMPLAINT - 34

116.      Prior to her career boost to Interim Director, Karen Metzner, BFA Fine Art, MA Higher Ed Administration, served as Assistant Director of Community Standards; and prior to that she worked as an Assistant Director of Resident Life (overseeing dormitories and conduct issues within the Greek system). One of her professional accomplishments was developing a Community Standards Volunteer Advisor program. The WSU website quoted her in December 2018: **"The community standards process can be overwhelming for students.** … Having [a volunteer] to talk with about the process gives a student an opportunity to be informed about how they play an active role in their community standards experience." As she promoted the program to the public, she claimed volunteers would not need previous experience in student conduct, but would be required to participate in online and in person training.

117.      Evidence of Ms. Metzner's bias and impartiality of includes, but is not limited to, **(a)** her notable impatience and refusal to seriously consider Fleetwood's new evidence during the December 5, 2019, hearing; **(b)** her oddly disjunct language in the December 16 letter (where sanctions do not match findings); **(c)** her proposed Action Plan for Fleetwood which included the unusual directive to "Read at least two articles about the #metoo movement and how it is linked to the communities in which you identify;" and **(d)** her apparent disregard for C.P.'s documented anti-male sentiments.

118.      The anti-male bias is not just limited to Ms. Metzner.

119.      WSU utilized Nikki Finnestead, to conduct C.P.'s intake interview on or about January 24, 2019. Ms. Finnestead hosted **_FEMpowerment_** luncheons on campus and previously

[PROPOSED] AMENDED COMPLAINT - 35

served as the trainer for the progressive Green Dot violence prevention program, which offered WSU a new perspective to power-violence prevention by focusing on bystander intervention.



*Spread the green dots. Nikki Finnestead, WSU's violence prevention coordinator. (Photo by Linda Weiford, WSU News)*

120.    In a *Daily Evergreen* campus news article "Fighting the Violence," Finnestead publicly expressed her disappointment, "that students entering college accept violence in our society as a norm. … We just expect [gender-based] violence is going to happen."  She continued, describing how, "relationship abuse is not necessarily physical in nature; emotional, verbal and sexual abuse are more difficult for outsiders to recognize. 'I think we should be turning the focus away from 'Why doesn't she just leave?' to 'Why is this person doing that to their partner?'"[9]

121.    In a separate article Finnestead, expressly applauded the Obama era passage of the Campus Sexual Violence Elimination Act as an important win for students at WSU and college

---

[9] https://dailyevergreen.com/1081/news/wsu-pullman-campus/fighting-the-violence/.

campuses nationwide. "By providing prevention and awareness education to students, we're teaching the meaning of sexual consent and what constitutes dating violence and stalking. **We're also empowering students by showing them how to intervene as bystanders,**" said Finnestead, referring to a campus violence prevention program called Green Dot that capitalizes on **the power of peer influence and intervention.**" [10]

122.    This "intervene as a bystander" approach aligns with the C.P.'s original allegations against Fleetwood which were speculative in nature. I.e. that C.P. wanted to use the power of her peer influence to "intervene" in a nonexistent harassment scenario due to her "concerns for the females in his future platoon and the sexist culture he would create."

123.    After drafting allegations and convening with LTC Hobbs on January 28, 2019, Ms. Finnestead handed off Fleetwood's case to WSU's brand-new Investigator Rachel M. Brooks



------

[10] https://news.wsu.edu/2013/03/13/major-law-expands-protections-at-college-campuses/

[PROPOSED] AMENDED COMPLAINT - 37

124.      The newly hired Brooks' anti-male bias is shown in investigation interview notes collected from February thru April 2019.  Examples of her bias and/or incompetence appear below:

125.      **Issue 1:**  Brooks repeatedly failed to report the C.P.'s own credibility issues:

- The C.P.'s explicitly expressed potential for malicious prosecution provided by Fleetwood in December 2018 Snapchat messages was never mentioned in the June 13 Investigation Report
- The C.P.s "don't quote me on that" email along with her documented willingness to quickly endorse differing written accounts of allegations was similarly un-noted.
- To the contrary, Brooks' June 13 report instead claimed, pg.7 Par.14, "Her statements to investigators were generally consistent internally and consistent with the written statement she provided.  In addition, her statements were generally consistent with the statement of witnesses OEO found to be credible **including Student A (Cadet M)**" But close reading of the evidence reveals this is untrue; the content of her written statement to ROTC bears little resemblance to the content of the interviews.  Her accounting of what happened is not consistent presumably in part because she relied so heavily on hearsay from the highly non-reliable Student A/Cadet M. Furthermore, interview notes reveal little effort to test the internal consistency of her accounts by asking for the sorts of supporting details the ROTC asked for (and the C.P. was unable to provide).
- The C.P.'s willingness to rely upon and propagate "gossip as evidence" were not corrected nor effectively noted in the report.
- The C.P.'s written testimony to ROTC which presented her **speculative** concern about Fleetwood based on false statements about promiscuity (the 30 women in one semester lie) was never addressed. Brooks did nothing to test C.P.'s assertion that Fleetwood was a male slut; instead Brooks appeared to take that assertion at face value.
- No effort to measure an educational impact that Fleetwood's supposed "harassment" had on C.P. was included (which makes sense, since there was no real impact).  Instead, Brooks concludes, Pg. 14 Par. 40, "The Complainant told investigators that she has been impacted on a social and emotional level.  She expressed worry about gossip and rumors in the Program and being labeled a "Program slut." The Complainant told investigators she feels uncomfortable in the Program with everyone hearing these rumors from the Respondent about their sexual activities." This was

[PROPOSED] AMENDED COMPLAINT - 38

written on June 13; Brooks had access to texts which proved the C.P. was worried about her reputation *well before Fleetwood*. Brooks also knew there was no factual evidence to support the C.P.'s conclusion that people were "hearing these rumors from the Respondent" and disregarded the fact that any reputational ruin alleged by C.P. could have been C.P.'s own doing.

126.    **Issue 2:** Brooks' June 13 report failed to directly address blatant credibility issues surrounding Student A's/Cadet M.'s testimony which formed the foundation for the case from the beginning. An impartial investigator would likely have dismissed the case upon realizing how readily the C.P.'s conspirator could and did lie. But not Brooks.  Instead:

- The June 13 report at ¶16 concluded, **"The statements of Student A [Cadet M], Student B, and Student C were relied on as witnesses** to the interactions between the Complainant and Respondent after the relationship…"
- At this late date, on June 13, Cadet M's testimony was "relied on" even though at ¶17, we read, "During the investigation, **investigators learned that Student A [Cadet M.] had provided information that was later determined to be, more likely than not, untrue."** That one line, which conflicts with other credibility analysis within the report, is the only notation of Cadet M's verifiable lies, which effectively initiated the entire complaint, and should have been detailed, in full.  Instead, allegation after allegation ("he said she squirted the sheets", the chap stick incident, Fleetwood initiating the Eskimo Bros) disappear from the report without any correspondent condemnation of the cases' overall credibility.
- When confronted with additional proof about CDT M (student A's) motivation in the December 2019 – January 2020 timeframe Metzner still disregarded that information germane to disproving that any type of sexual harassment occurred.

- On this note a direct excerpt from one of Cadet M.'s interviews is worth reading:

> ▓▓38▓▓                                    RMB/KRH                    4/17/19
> OEO – In Person
>
> RMB: Did ▓38▓ ever tell you how lunch at Red Bento went?
>
> She did. Think I mentioned in first interview. It was some sushi place in Pullman. Patrick had coupon. She agreed to go as friends, talk. Some point, he propositioned her to sleep with him. Got more aggressive. She kept saying no. he realized she wasn't going to say yes, he started being mean. Berating her.
>
> He knew me and were friends. He asked what does ▓38▓ have that I don't. She said he's got a degree and published author. We're not together that way at all though.
>
> HE wanted to know why she wouldn't sleep with him. That conversation went negatively. He began immediately insulting her about her intelligence, aspirations in ▓38▓ college. At some point, she left and walked home by herself.
>
> RMB: Did she tell you after?
>
> Almost immediately after, she called and asked to talk. Went to my apartment and talked. I was floored a friend of mine would act this way. Talked about maybe it's time for you to go forward and talk about this to somebody.

- Cadet M. shamelessly describes conversations <u>he was not present to witness</u>: this included details which by that point Brooks *knew* (or should have recalled) did not align with the C.P.'s own account. (See below). Fleetwood <u>did not proposition the C.P. to sleep</u> with her at Red Bento. The C.P.'s second interview on the topic effectively denied it happened. And C.P. would later deny any such proposition occurred to ROTC. And Nonetheless, Cadet M. speaks as if he witnessed not just one, but multiple aggressive propositions:  As Cadet M. relayed to Brooks: "She kept saying no, he realized she wasn't going to say yes, he started being mean. Berating her."

- This testimony was a bald-faced, easily verifiable **lie** which Brooks should have prosecuted as Prohibited Discriminatory Conduct under Executive Policy #15 Appendix 1 Paragraphs 9, 10

> **OFFICE OF PROCEDURES, RECORDS, AND FORMS**
> **Executive Policy Manual**
>
> 9. **Interference** may include:
>
>    - Asking a witness, reporting party, or responding party to provide false information to an investigator or disciplinary body;
>    - Unreasonably delaying participation in an investigation; or
>    - Sharing false information to a witness, reporting party, or responding party in order to disrupt an investigation.
>
> 10. **Knowingly false allegations** may include:
>
>    - Falsely filing a complaint of discrimination against another individual whom the reporting party dislikes or disagrees with;
>    - Falsely filing a complaint of stalking against an individual in an attempt to improperly remove them from campus; or
>    - Falsely filing a complaint of sexual harassment against an individual to harm their reputation.

- Nevertheless, there's no indication that Brooks stopped Cadet M to clarify how he knew what he claimed to know. Nor does the Investigation Report ever fully discredit Cadet M or consider the consequences of his malicious jealousy which compromised the entire complaint.

127.    **Issue 3:**    Brooks' investigation report failed to acknowledge significant exculpatory evidence which arose during interviews, thereby ignoring opportunities to establish Fleetwood's innocence vise-vi multiple false allegations.

128.    **Blatant examples:** Brooks failed to highlight testimony from Cadet P. indicating that he, not Fleetwood, initiated the allegedly controversial "Eskimo Bros" comment. Indeed, it's clear here, that *someone besides Fleetwood had told Cadet P about the C.P.'s sexual activity*, and Cadet P. was asking Fleetwood to confirm the rumor:

> RMB: Ever heard Patrick refer to you and him as eskimo bros? Context?
>
> Yeah. In context I found out he had sex in ▮38▮ I asked him about he, is it true? He said yeah, we're eskimo bros now.
>
> RMB: Where did that happen?
>
> Had a class last semester. I asked him when I came in.
>
> RMB: Know if anyone else heard?
>
> No. We sat down, I asked like what's going on with you and ▮38▮ That type of context.

129.    Cadet P's account here corroborates Fleetwood's consistent testimony that Cadet P "asked him" [asked Fleetwood] about his sexual encounter with the C.P. Nevertheless, Brooks' June report along with Metzner's December sanctions both fail to acknowledge the way the original allegation was inaccurately presented.

130.    Contrary to Cadet M's maliciously exaggerated account, this one-time conversation initiated by Cadet P happened one-on-one. The notes above, like many of RMB/Brooks' notes, include ambiguity: Did he not *know* if anybody else heard? Or did he

[PROPOSED] AMENDED COMPLAINT - 41

answer, **No,** nobody else heard. It would be nice to know for sure, but presumably Cadet P answered **"No."** Nobody else overheard.

131.    Finally, it's noteworthy but never noted that <u>this seemingly benign interaction involved a student who already possessed carnal knowledge of the C.P.'s sexuality within the program</u>; nevertheless, the conversation was construed as Fleetwood somehow "ruining her reputation" in the program.  Again, the double standard is ridiculous. The C.P. can and does talk about her own sexual relationships. The C.P.'s ex-boyfriend can and does ask questions about the C.P.'s later sexual relationships. Cadet M. can and clearly did talk about the C.P.'s sexual relationships, seemingly non-stop. Still, only Fleetwood, who did not talk, was accused of misconduct related to "talk of the C.P.'s sexual relationships" within the program.

132.    And, on December 16, 2019, when the Eskimo Bros conversation initiated by CDT P remained as the *only* evidence of such talk, Metzner concluded, "After the relationship ended, you made sexual comments about your relationship and the C.P. to fellow students in the program. While you identified these people as your friends, they were also in some cases your subordinates within the program and also friends/acquaintances of the C.P."

133.    **Issue 4:** In this situation, and throughout the investigation, Brooks and later Metzner, **failed to effectively distinguish behavior which was "severe and persistent" enough to qualify "sexual harassment."**  Which is to say, even *if* Fleetwood had initiated or repeated the "Eskimo bros" descriptor, the comment, while arguably in poor taste, **does not rise to the level of sexual harassment** as described by WSU's own definition. To be clear:

[PROPOSED] AMENDED COMPLAINT - 42

- Brooks and later Metzner, **failed to consider context**, situation wherein discussing prior sexual relationships is standard practice within shared housing scenarios of college campuses or within military programs.
- WSU's own EP #15's opening section expressly clarifies the policy's intent to eliminate legitimate sexual harassment without impeding freedom of expression.[11]
- Tangible evidence exists to show the C.P. herself readily and consistently described, to Fleetwood and others, details of her past sexual relationships within ROTC, but nobody policed her language; nobody accused her of sexual harassment. **On this point, the double standard/anti-male bias is overwhelmingly evident**.
- Nevertheless—regardless of gender—the conclusion that "who-hooked-up-with-who" gossip on a college campus is punishable as sexual harassment is absurd and compromises the legitimate purposes of Title IX legislation.

134.    **Issue 5:** Brooks' **investigation notes are a chaos of conflicting, incomplete documentation** which nonetheless reveal her consistent failure to follow thru on obvious lines of questioning to challenge witness credibility See, for example, the notes below describing C.P.'s recollection of the January 9, 2019 Red Bento lunch and alleged retaliation:

---

[11]    See    WSU    Executive    Policy    #15    *available    at* https://policies.wsu.edu/prf/index/manuals/executive-policy-manual-contents/ep15-discrimination-sexual-harassment-and-sexual-misconduct/

[PROPOSED] AMENDED COMPLAINT - 43

38 - Phone Call . 4·8·19

1. Invited other people: I don't know if he asked anyone else. I don't remember if it was over snapchat or the phone. I don't know if we had a group chat, but if so it was 38

2. No, I think he did. Oh yeah he, did. He had taken a picture. I said what are you doing, and he said im sending it to 38 I checked his phone and he didn't send it.

3. Did you share that information with one. I told 38 and said Patrick wants to get back together with me, I don't know how I feel about that. That's when I started being concerned.

4. First sharing information about PF. 38 said be careful he is kind of a womanizer. Just the fact that I was talking to him, and after I hooked up with him. I wish you would have told me sooner, like  a be careful sort of thing.

5. Other people: when I first started getting with him, told me he had just said he was going to loyal to this one girl, and started hooking up with me. He just promised them that Im going to be loyal. OK lets see how long that last, and that was the first time we started hooking up. Heavily hitting that you wanted to get back with him. He does have a girlfriend. He thought she was cheating and so that's why I want to hook up. That was the birthday party, we were wrestling, accidently got chocked out, later that night. We were all hanging, I think we were still seeing each other and the likely hook of something happening, I was stilling him at the time.

135.     Reading the incomplete documentation, #3 shows RMB failed to ask C.P., as the ROTC Board asked, if Fleetwood *actually requested* C.P. to resume a sexual relationship. (She later said under oath he did not!).  See also, #4 & #5 which introduce issues of C.P. motivation *and* witness credibility.  CDT M told me, "Be careful, he is kind of a womanizer."  And again, the double-standard and the hearsay. Cadet M. is maliciously gossiping about Fleetwood's past sexual relationships in a way that damages his own reputation in the program.  However, since CDT M has aligned himself with the female accuser his (CDT M's) gossiping about Fleetwood's sex life is overlooked.

136.     Another example of Brooks' failure to track details is shown on pg. 4-5 of the June 13 Report, a section called "Summary of Investigation" which reads, "As part of the investigation, investigators interviewed the following people:"

[PROPOSED] AMENDED COMPLAINT - 44

11.                    , (Student J) a former female WSU undergraduate student, and former member of the Program."
But less than three lines later, the report continues:

"Investigators did not interview                    (Student J) … at the request of the Respondent."

137.    **Issue 6:** Additional evidence of Brooks' anti-male bias appears in the interview notes.  For example, while Ms. A above apparently did not make the list of witnesses, she did speak with Brooks, in an interview that included witness leading, narrative leaps, and problematic omissions present in the RMB (Brooks) typed notes as compared to a second notetaker present at the same interview.

The bystander's notes reveal Brooks questioning the witness about Fleetwood's general demeanor:



138.    Ms Brooks' own notes meanwhile reduce the more nuanced exchange above as follows:

Its not what he says its more about how he says it, his tone of voice lets you know he doesn't care. then there are times he chooses to be disrespectful. Kind of how you go about, hurting someones. He did

[PROPOSED] AMENDED COMPLAINT - 45

139.    Ms. A established in the opening lines of the interview that she and Fleetwood had not engaged in sexual intercourse: "We never slept together, we just did stuff together."  Still, Ms. Brooks probed:



140.    Brooks' own notes **reduced the exchange by leaving out** the important segue, "No, Mr. RP never made me feel uncomfortable."

141.    Instead Brooks typed-up an encounter that could be construed as sexual assault, "He did vaginal penetrate, but I did not stop him. I made that clear that I wasn't wanting to have sex with him.  I did not consider that to be intercourse."

142.    This inconsistent transcription where Brooks (Lead Investigator **and** Adjudicator) depicts Fleetwood in the worst possible light, while never challenging Cadet M nor

[PROPOSED] AMENDED COMPLAINT - 46

the C.P. on their own inconsistencies recurs throughout the notes.  For example, Brooks again failed to follow up and/or record exculpatory evidence disproving the Retaliation/Interference claim against Fleetwood when interviewing female Cadet HFT who previously reported a different male Cadet for sexualized behavior but nonetheless refused to condemn Fleetwood.

> **RMB:** When did tell you?"
> **Cadet HFT:** In January? Something like that. <u>That's when she talked to me about going forward</u>. She was afraid of retaliation. Think she wanted another female to have her back."
> **RMB:** Did she say anything about being afraid of retaliation?
> **Cadet HFT:** I think reputation. Hard to have rep already established like when you've slept around in program, to have rep that's girl who slept around. <u>Didn't want to be girl who made rape case and have people think that. Don't think she was scared of Patrick, think he has fragile ego, but not aggressive. Think she was more afraid of reputation, don't want to be girl that made false rape case.</u>"[12]

143.    **And then the interview notes end abruptly.**  There is no evidence that Brooks asked whether a) C.P. <u>had indeed</u> coached the witness "when she talked to [her] about going forward?" or b) the witness had information to share about the C.P.'s real motivation for filing against Fleetwood. Instead, Brooks either ended the interview when it became clear the witness was not sympathetic to the C.P. or failed to type additional comments.

144.    Finally, **Issue 7,** Brooks herself, and later Metzner, failed to acknowledge the point at which the C.P. herself seemingly questioned the validity of her initial complaint when she refused to participate in the WSU conduct hearing.

---

[12] A C.P. with a "fear of being the girl who cried rape" motivation is not intuitively obvious; however, it stands up to various testimonies including Fleetwood's own.  During the January 14-19, 2019, time period, the ROTC rumor mill was admittedly on fire; and the main message was, "C.P. accused Fleetwood of rape."

[PROPOSED] AMENDED COMPLAINT - 47

**Part IV: Additional Issues Addressed by the US Department of Education Office for Civil Rights 2017 Guidelines for Sexual Misconduct Cases Appear Below**[13]

145.    "Restricting the ability of either party to discuss the investigation (e.g., through "gag orders") is likely to deprive the parties of the ability to obtain and present evidence or otherwise to defend their interests and therefore is likely inequitable." ***Beginning January 22, 2019, Fleetwood was effectively and thoroughly gagged by WSU and then WSU used Fleetwood's discussion of the allegation (before he knew an investigation had started) as evidence of Fleetwood's "retaliation/interference."***

146.    "Once it decides to open an investigation that may lead to disciplinary action against the responding party, a school should provide written notice to the responding including sufficient details, and the precise conduct allegedly constituting the potential violation, and the date and location of the alleged incident." ***Fleetwood never received notice of the emerging allegations during the Investigation phase.  Nor was he ever provided clear dates, locations, or details surrounding the various allegations which proved to be lies perpetrated by Cadet M.***

147.    "Any rights or opportunities that a school makes available to one party during the investigation should be made available to the other party on equal terms." ***The C.P. certainly participated in multiple early interviews with the Office of Community Standards whereas Fleetwood's first in-person interview did not take place until March 29, 2019.***

---

[13]    Full    text    of    September    2017    Q&A    on    Campus    Sexual    Misconduct    available    at: https://www2.ed.gov/about/offices/list/ocr/docs/qa-title-ix-201709.pdf

[PROPOSED] AMENDED COMPLAINT - 48

148.    WSU's website also describes the following expectation regarding Investigation Timeline and the Respondent's rights to a prompt investigation: "CRCI seeks to balance the need to promptly complete investigations after receipt of a complaint with the need to conduct a thorough investigation. Generally, CRCI will **complete the information gathering portion of an investigation within 60 days, and will issue relevant reports to the parties involved in an investigation within 30 days of completing the information gathering portion**. The length of an individual investigation varies depending on, but not limited to, the number of witnesses to be interviewed, the extent of documentation to be reviewed, the type of alleged conduct, and length of time over which the alleged conduct has occurred."

149.    In Fleetwood's case, the severity/risk factor of alleged conduct [verbal incidents] and length of time over which the conduct occurred [at most several weeks] provided no rationale for extending this investigation.    Nevertheless, Fleetwood's complaint was processed by Finnestead on January 19, 2019, and interviews continued through April, with the first in-person interview of Fleetwood delayed until March 29, 2019 (70 days after filing).  The final interviews took place in mid-April, but the initial Investigation Report was not released until June 13, 2019 (140 days after filing), and the conduct hearing did not take place until December 5, 2019 (315 days after filing), at which point the Respondent, Fleetwood, had still not been issued full information related to the allegations against him.

150.    On the topic of timeline, WSU OEO's official cover sheet noted a January 19, 2019 incident "on campus" when Fleetwood allegedly "Intimidated, Threatened and made Comments about the C.P."  This Cover Sheet has no basis in cell phone-based evidence nor the

[PROPOSED] AMENDED COMPLAINT - 49

C.P.'s own timeline of alleged concern. January 19, 2019 was a Saturday.  No witnesses ever suggested anything out of the ordinary happened on that Saturday. This cover sheet also chose to elevate the Incident as "Clery" indicating Clery Act level criminal behavior was involved, again calling the basic effectiveness of the investigation/investigators into question.



151.    In short, Fleetwood was never presumed innocent. Instead, it appears WSU's biased Office of Community Standards was bound and determined to charge Fleetwood guilty because he had been accused, even if that required ignoring issues of witness credibility, failing to address exculpatory testimony, and rather calling new witnesses to explore entirely unrelated evidence, thereby broadening the scope of investigation to include a much earlier consensual sex video Fleetwood created and  shared with two male acquaintances using a private Snapchat setting at the woman's request. Which is to say, once it became clear in spring of 2019, that Fleetwood was ***not guilty as charged*** by the C.P., WSU instead felt inclined to pursue new charges to justify

continuing an investigation rather than pursuing their viable options to seek "Alternative Resolution."[14]

152.    Brooks and Metzner chose not to pursue restorative justice within a system that encourages EP 15 Procedural Guidelines Part J Alternative Resolution Process: "At anytime after receipt of a complaint, and when appropriate, CRCI may assess whether an alternative resolution is appropriate. … Generally, alternative resolution may be appropriate in the following situations: i. *The alleged conduct is not sufficiently severe, persistent, or pervasive to constitute a violation*… ii. The Reporting Part and/or the Respondent prefer an alternative resolution process; or iii. There is *limited nexus between the alleged conduct and EP15.*

153.    Instead, WSU continued with a broadened scope of the video related harassment charge even after the C.P. had effectively distanced herself from the investigation, declining to appear at the WSU conduct hearing because, as she stated under oath to ROTC, "She did not want to prevent Fleetwood from receiving his degree at WSU.  She just does not want him to be an officer in the U.S. Army because of how he treats females."

154.    With regards to the broadened charges of cell phone misconduct, there is no physical evidence that the video Fleetwood created while intoxicated on his 21st birthday currently exists. In addition, there is no evidence that any of the video's recipients objected to Fleetwood's transmission or indicated that the video was in fact "unwanted" until years later and then only after being prompted by WSU's investigators.

[PROPOSED] AMENDED COMPLAINT - 51

155.     Indeed, the Finding related to the video exists largely because Fleetwood incriminated himself, confirming he had transmitting the video **only after** being confronted with the previously undisclosed allegation during an interview.  It was not until mid-way through the interview—an interview that WSU represented to Fleetwood pertained only to the C.P.'s January 31, 2019 allegations as opposed to non-Complainant related issues from year earlier—that the investigator confronted Fleetwood with the video allegation.

156.     At the time Fleetwood confessed to sending the video, he was not represented by an attorney and believed he was responding to an entirely different allegation.

157.     While in poor taste, creating the much earlier video was behavior protected under Fleetwood's First Amendment freedom of expression rights.

158.     Furthermore, while the transmission of a sexualized video may seem reprehensible to an older generation, an examination of context and circumstance is warranted. And Pew Research Center[15] reports 48% of all users—and 57% of women aged 18-34—report it is very common for online daters to be sent a sexually explicit message they didn't ask for.

159.     Which is to say, the advent of Snapchat, an app whose principal feature "is that pictures and messages are usually only available for a short time before they become inaccessible to their recipients" contributed to widespread changes in community standards of privacy related to cell phone transmissions.[16] And Fleetwood's use of the app which "allows users to keep photos

---

[15]     https://www.pewresearch.org/fact-tank/2020/02/06/10-facts-about-americans-and-online-dating/

[16]     https://en.wikipedia.org/wiki/Snapchat

[PROPOSED] AMENDED COMPLAINT - 52

in the 'my eyes only' … password-protected space" took place in September 2017, when the cultural impacts of cell phone privacy standards were just beginning to be examined.

160.    Nonetheless, on December 16, 2019, Karen Metzner issued her Findings, including the video.

161.    Fleetwood exercised his right to appeal, and on February 12, 2020, the WSU Appeals Board, chaired by Olivia Shoesmith, an incoming undergraduate transfer student from Cascadia College with no legal background, convened to consider if justice was truly served to Fleetwood.



162.    On February 21, 2020, Mr. Fleetwood received a letter signed by Ms. Shoesmith upholding the December 16, 2019 sanctions and claiming the Appeals Board had "carefully considered the information and rationale" as stated below:

(a) Whether the University Conduct Officer's hearing was conducted fairly in light of the charges and information presented, and in conformity with prescribed procedures. Deviations from designated procedures are not a basis for sustaining an appeal unless significant prejudice results.

(b) Whether the decision reached regarding the accused student was based on substantial information, that is, whether there were facts in the case that, if believed by the fact finder, were sufficient to establish that a violation of the standards of conduct for students occurred.

(c) Whether the sanction(s) imposed were appropriate for the violation of the Standards that the respondent student was found to have committed.

(d) New information, sufficient to alter a decision, or other relevant facts not brought out in the original hearing, because such information and/or facts were not known to the person appealing at the time of the original Conduct Officer hearing.

163.    The Appeals Board process wherein students with zero legal experience determine the financial, professional fate of their peers as an act of resume-building student governance is described on WSU's website as follows:

About the Appeals Board:

- Your Appeals Board will consist of three members, with the majority of members being your WSU student peers. One member will be appointed as the Chair who takes on responsibility for ensuring you receive a fair and impartial process and is also a voting member. WAC 504-26-115
- Your Appeals Board members have been through a selection process and trained on topics such as due process, burden of proof, cultural competency and implicit bias. WAC 504-26-120
- Prior to your Appeals Board review, your board member names will be provided to you.
- You can also request to have a board member removed with good cause.
- Appeals Board reviews are not held in person.
- The Appeals Board must respond to your Conduct Officer hearing appeal within 20 calendar days or within 30 days if it was a Conduct Board hearing.
- The Appeals Board can uphold the initial decision, reverse it, modify it, or send it back to the Conduct Officer or Conduct Board for additional review. WAC 504-26-420

### Part V: WSU EP #15's Definition of Actionable Sexual Harassment Which "creates a hostile environment" is Overbroad or Vague Under the 1st Amendment of the US Constitution.

164.    To pass muster, a regulation must "allow persons of 'ordinary intelligence a reasonable opportunity to know what is prohibited.'" Instead Fleetwood's freedom of expression was unduly limited with innocent verbal interactions illegally construed first as sexual harassment and secondly as interference/witness intimidation. WSU's definition of sexual harassment states:

[PROPOSED] AMENDED COMPLAINT - 54

"Sexual harassment encompasses unwelcome verbal or physical conduct *of a sexual nature*. … Sexual harassment creates a hostile environment when behavior *is sufficiently severe, persistent, or pervasive to interfere with an individual's work* or educational performance or creates an intimidating, hostile, or offensive work or educational environment."

165.    There is **zero evidence** that Fleetwood ever engaged in unwelcome "verbal or physical conduct of *a sexual nature*" towards the C.P.

166.    There is **zero evidence** that Fleetwood's behavior was *sufficiently severe, persistent, or pervasive*[17] to interfere with another's work.  Instead, the C.P. herself from Day one indicated that "she never had [negative] thoughts herself" but rather acted upon a rumor-fueled speculative concern for future female Army cadets who might feel mistreated by Fleetwood should he become an officer.   Moreover, this Investigation failed to assess "the effect of" alleged harassment which was never established as fact.  Or, to quote again, an anonymous critic surveyed by the Task Force charged to address bias in the WSU student conduct system: ***"I can say that in all occasions, it appeared the outcome was pre-ordained."***

167.    There is no evidence that Fleetwood's case ever went thru EP Policy #15 E Conflict Review which checks for a conflict of interest defined as a "personal interest, financial, familial, professional, or otherwise, that might impair or reasonably appear to an objective outside observer

---

[17] OCR Guidelines are established in V.1, clarifying that "OCR considers the conduct from both a subjective and objective perspective. In evaluating the severity and pervasiveness of the conduct, OCR considers all relevant circumstances, ie: 'The constellation of surrounding circumstances, expectations, and relationships' … To draw commonsense distinctions between conduct that constitutes sexual harassment and conduct that does not rise to that level."

to impair an investigator independent, unbiased judgment " documentation of the Review has not been provided.  https://studentaffairs.wsu.edu/media/256672/conduct-board-survey-report.pdf

168.    And here, in this case the preferential treatment/pro-female bias provided to the female C.P. was evident as follows:

- The C.P. was never reprimanded for her equal and often more extreme incidences of "discussing prior sexual relationships" within the program.
- The C.P. was never reprimanded for her own explicitly sexual depiction of other members of the ROTC program.
- The C.P. was never reprimanded for her own witness coaching and refusal to respect confidentiality during the Investigation. (i.e: Fleetwood was gagged; the C.P. was not)
- The C.P. did not honor the no contact order
- The underlying basis of this claim—speculative concern about the reputation consequences of sexual promiscuity within the ROTC program—was never applied to the Complainant's other sexualized behavior within the program

169.    Mr. Fleetwood timely appealed the December 16, 2019, finding to WSU's University Appeals Board who, on February 21, 2020, upheld Ms. Metzner's December 16, 2019, decision.

### III. CAUSE OF ACTION

170.    Mr. Fleetwood incorporates the above paragraphs as if pled verbatim herein.

### (Count One – Violation of the Washington Administrative Procedure Act)

171.    A final agency decision, such as the February 21, 2020, Appeals Board decision and the December 16, 2019, are properly appealable when (a) the Agency erroneously interprets or applies the law (b) issues an order not supported by the evidence or (c) issues an order that is arbitrary or capricious. RCW 34.05.570(3)(d)(e)&(i).

172.    For the following reasons, the Agency's determination that Mr. Fleetwood's actions violated WAC 504-26-227 & WAC 504-26-209 (i.e. sexually harassed complainant in violation of

WSU Executive Policy 15) constitutes a misapplication of the law and is not supported by substantial evidence.

173.    WSU Executive Policy 15 defines "sexual harassment" as "a form of discrimination based on sex and/or gender and is prohibited by this policy. Sexual harassment encompasses *unwelcome* verbal or physical conduct *of a sexual nature*."  (Emphasis added)

174.    As it relates to *finding number 1,* the "joke" centers around a "Eskimo bro" comment that Mr. Fleetwood vehemently disputes even making, and that rather, Cadet D[18], another MS-IV[19] who previously dated the Complainant, used the term.  Nevertheless, assuming Mr. Fleetwood did initiate or repeat that comment, the comment in and of itself, while arguably in poor taste, does not rise to the level of harassment. Here context (and freedom of speech) matter as discussing prior sexual relationships, including frustrations with prior sexual relationships, is standard on within the shared housing scenarios of college campuses and within military programs. Indeed, the Complainant herself described, to Mr. Fleetwood, her frustrations about her past sexual relationship with Cadet D.  Both testimonies confirm that is how their more intimate relationship began.

175.    As it relates to *finding number 3 and 4* of Ms. Metzler's December 16, 2019, letter: there is no evidence that the recipients of those videos objected to the receipt of those videos at (or near) the time they were transmitted. Accordingly, Mr. Fleetwood was not on notice that the transmission of those videos was unwanted. Further, Mr. Fleetwood testified that he had permission

---

[18] The Agency's June 13, 2019, report 2019-021 references Students A through J. In this complaint Students A through J are referred to as Cadets to the extent they were part of WSU Army ROTC. And it was WSU's June 13, 2019, report from which the Agency utilized in issuing the orders at issue in this complaint.

[19] MS IV means "Military Science" IV, a fourth year ROTC cadet. A MS I is a first year ROTC cadet. A MS II is a second year ROTC Cadet. A MS III is a third year ROTC cadet.

[PROPOSED] AMENDED COMPLAINT - 57

from the person in the video to transmit those videos.

176.     As it relates to *finding number 2* of Ms. Metzler's December 16, 2019 letter and *finding 28* of the June 13, 2019, WSU Investigative Report, both cite Student E's report of feeling "grossed out" after receiving a photo Mr. Fleetwood sent of himself shirtless in a towel after a Ranger Challenge workout.  In addressing this issue Mr. Fleetwood stated, in a proceeding that WSU Army ROTC initiated against Mr. Fleetwood, that, "Many of his guy friends also received this message. No rule states that I cannot be shirtless. I was purely showing how proud I was of my physical achievements and that I was proud to have become Army Strong.  I send these to guys and gals with no sexual intent." Indeed, the conclusion that exposure to an image of a shirtless male could somehow qualify as harassment and create hostile environment is highly problematic. Consider the *Men's Health* magazine cover below. One can easily imagine encountering it in a doctor's office. Is that doctor guilty of sexual harassment?  Consider the college boys pictured below, or countless other photos found during a simple Google image search of the terms "towels" "college" "muscles"? Are these "shirtless male hunks" creating a hostile environment on Ebay?  Most would conclude not. Indeed, EP 15 itself states that it is "committed to the principles of free inquiry and free expression"[20] and sending a shirtless photo to some friends falls squarely into that category.

---

[20] *See infra* n. 20.

[PROPOSED] AMENDED COMPLAINT - 58

177.    As it relates to *findings number 2, 3, and 4*, WSU's own Purposes section, the opening section of Executive Policy #15, expressly clarifies the policy's intent to eliminate legitimate sexual harassment *without* impeding freedom of expression.[21] Mr. Fleetwood's sharing of consensually created videos should be protected under his first amendment freedom of expression rights.

178.    The Agency also misapplied the law and had no factual basis for its determination that Mr. Fleetwood violated WAC 504-26-219 (abuse of the student conduct system) because the Agency did not establish that any of Mr. Fleetwood's conduct was directed at any of the potential

---

[21] "WSU is committed to the principles of free inquiry and *free expression;* vigorous discussion and debate are fundamental to the University. This policy is not intended to stifle teaching methods or *freedom of expression*. Discrimination, as prohibited in this policy, is conduct that is neither *legally protected as an expression of free speech*, nor the proper exercise of academic freedom.; vigorous discussion and debate are fundamental to the University." *See* EP 15 *available at* https://policies.wsu.edu/prf/index/manuals/executive-policy-manual-contents/ep15-discrimination-sexual-harassment-sexual-misconduct/ (*last visited* March 10, 2020).

[PROPOSED] AMENDED COMPLAINT - 59

witnesses *before* Mr. Fleetwood was told that he could not have contact with any witnesses.

179.    As it relates to *finding numbers 5, 6, and 7* of Ms. Metzler's December 16, 2019, letter: there is no evidence that any of Mr. Fleetwood's contact with the individuals identified in findings 5, 6, or 7 happened *after* Mr. Fleetwood was told not to have contact with potential witnesses. But more to the point, there is no evidence that Mr. Fleetwood's communications with any of the potential witnesses (or Complainant) rose to the level of "attempting to discourage an individual's proper participation in, or use of, the student conduct system."

180.    As it relates to *finding numbers 5, 6, and 7* of Ms. Metzler's December 16, 2019 letter: the only evidence of contact with other Cadets related to the case occurred during the time period when Mr. Fleetwood misunderstood—through an active ROTC rumor mill quite probably perpetrated by the Complainant's conspirators—that he had been accused of rape.  And while keeping EP's protection of "speech" in mind, it logically follows that a person falsely accused of rape would naturally reach out to colleagues of his to defend his reputation or at least tell his side of the story.

181.    The Agency's December 16, 2019, order and February 21, 2020, Appeals Board decision (all of which stem from the June 13, 2019, investigation) is also arbitrary and capricious as the Agency credited the testimony of witnesses who were found to have misled the investigator and credited the testimony of Complainant while ignoring false (and sexually motivated) written statements made by Complainant regarding Mr. Fleetwood, specifically a statement that Complainant made (under oath) that she found out that  "[Mr. Fleetwood] had slept with well over 30 women during that semester" when that statement was false.

[PROPOSED] AMENDED COMPLAINT - 60

182.    Establishing the arbitrary and capricious nature of the Agency's investigation and subsequent determination requires comparing WSU's conclusions vis-à-vis Mr. Fleetwood with the seemingly more thorough and transparently documented findings of the Army ROTC disciplinary board which also investigated Complainant's allegations against Mr. Fleetwood but reached a different conclusion.

183.    By way of example, WSU's June 13, 2019 report ¶ 24 states *in finding 24*, "Student A, Student C, Student F, and Student I stated "the Respondent had made inappropriate sexual comments while in uniform," but the Army investigation's reached a conflicting conclusion after interviewing the same witnesses on the same topic.    To be clear, the notes from the Army Disenrollment Board on December 9, 2019 at (20:15) state: "CDT Doe [Student F] was first reminded that he still was under oath… CDT Doe [Student F] was then asked if Fleetwood ever made sexual comments to him in uniform." He said that Fleetwood *never* made sexual comments to him in uniform." Either the witness was not credible in front of the WSU OEO. Or the investigation was not credible, and if the first is true, then the second must hold true as well.

184.    Equally problematic is unusual disappearance of WSU's initial evidence[22] that Mr. Fleetwood had been "telling others that "[the Complainant] 'squirted all over my sheets'" from the Army ROTC Disenrollment Board findings. Why did the Army reject that evidence but not WSU? What happened to this evidence? Who reported it initially?  Why was it not discussed in the report? Were there issues with the consistency of the report? Was that witness deemed "not credible"; if so, why did the report not state so much transparently?

---

[22] *See* WSU Investigation Report, 1.a, authored, June 13, 2019,

185.    Continuing with credibility issues, the WSU Investigative Report *finding 20* mentions one aggressive, and sexually explicit "should I leave your ass in 2018" message the Complainant sent on December 31, 2018, but fails to address corroborated evidence of a more troubling interaction which impacts the Complainant's credibility.  Specifically, in late November or early December while still dating Mr. Fleetwood, the Complainant effectively confessed her potential for both jealousy and malicious prosecution by sending Mr. Fleetwood a threatening text along with a Snapchat image of the Army's Sexual Harassment/Assault Response and Prevention (SHARP) pamphlet.  The December 9, 2019 Disenrollment Board Officially notes the Complainant's response: "She did send it over Snapchat as a joke because she was frustrated with Fleetwood sleeping with multiple women" (Disenroll Proceedings (DP) 14:11[23]). This corroborated evidence suggests that the Complainant's earliest motive for filing against Mr. Fleetwood was his refusal to be monogamous, which, sad as it might be, does not qualify as sexual harassment.[24]

186.    Equally concerning is the Complainant's refusal to testify during the WSU OEO hearing, but later to testify in the Army disciplinary hearing.  When the Complainant declined to testify, WSU should have discounted her complaint or certainly questioned her credibility.  Instead, *finding 14* of the June 13, 2019, report confidently concluded "the Complainant's statement to be credible."   And to be clear, there is no evidence that Complainant's refusal to testify as part of the

---

[23]  The Army Disenrollment Board hearing was partially transcribed. The 14:11 entry refers to the time stamp on an Army document titled "Cadet Fleetwood Disenrollment Board Sequence of Events."

[24] The Complainant's presumed motive (jealousy and/or concern about Mr. Fleetwood's alleged promiscuity) is reasserted in her false testimony in the complaint later in the December 9, 2019 Disenrollment Proceedings when sometime after 15:50 she explains why she did not in the end testify during the university harassment hearing on his case: "[Complainant] just does not want him to be an officer in the US Army because of how he treats females."

[PROPOSED] AMENDED COMPLAINT - 62

WSU OEO investigation was in related to fear that her testimony might exacerbate PTSD or impact her own reputation because she, in fact, testified twice before the Army disciplinary hearing. When asked at the Army disciplinary hearing why Complainant did not testify as part of the WSU OEO investigation Complainant stated, as recorded: "She did not want to prevent Fleetwood from receiving his degree at WSU. She just does not want him to be an officer in the U.S. Army because of how he treats females." *See supra.*

187.    WSU OEO Investigative Report *finding 40* states that "the Complainant told investigators she has been impacted on a social and emotional level.   She expressed worry about gossip and rumors in the Program and being labeled a '[Program] slut'" is evidence of motive that the Agency disregarded in arbitrarily determining that Mr. Fleetwood violated the above-referenced regulations. Worry and rumors are another phrase for "speculation" and the Agency arbitrarily and capriciously credited Complainant's speculative fear about rumors and gossip while rejecting the unrebutted evidence that when it came to Mr. Fleetwood, this Complainant never experienced anything akin to sexual assault. Indeed, during the ROTC Disenrollment Proceeding Complaint provided no evidence of Mr. Fleetwood doing or saying anything of a harassing nature. The only comment Complainant could recall was Mr. Fleetwood stating something to the effect that Complainant "won't be able to get in a sorority." (15:50) That is not harassment and there is no evidence that the WSU OEO investigation considered any other comment than the one Complainant made during the Disenrollment Proceeding.

188.    Instead, the Agency arbitrarily bases its hostile environment finding on rumor/reality-based stigmatization experienced by the Complainant, but not caused by Mr. Fleetwood, or certainly

not solely by Mr. Fleetwood.  Specifically, the Complainant admits to multiple short-term sexual romances with MS-IVs during her first year as a Cadet: at least one before, and a different one during the months after her brief interlude with Mr. Fleetwood (a romance which began, as text evidence reveals, in part because Mr. Fleetwood was consoling the Complainant about her outrage surrounding the first MS-IV Cadet's treatment).

189.    Complainant's own words (presumably words Complainant also told WSU's OEO investigators) make clear Complainant had real reason to fear her ROTC environment could become awkward/hostile due to her growing reputation as a "[Program] slut" however, WSU's arbitrary blaming of just Mr. Fleetwood for the actions of Complainant and the actions of various Cadets involved in this consensual situation is an abuse of the intention of Title IX.  To be clear, during the investigation, Mr. Fleetwood faced repeated false accusations of "being a rapist"; however, at no time does the Complainant suggest her sexual relations with Fleetwood were anything but consensual.

190.    Further, the Army's Disenrollment Proceeding makes clear that Complainant was not harmed, at all, by any of Mr. Fleetwood's alleged statements; in fact, she could not recall much that Mr. Fleetwood said to her after his last in private encounter with her (a group invitation *she accepted* to attend a public lunch spot in broad daylight). Indeed, the US Army intake paperwork (dated January 18, 2019) associated with Complainant's allegations against Mr. Fleetwood included specific opportunity for Complainant to report on her disposition. In response to that query: "N/A" was reported.  Hence, contrary to WSU OEO's reporting, the Army intake paperwork concluded the Complainant was not visibly impacted by the accusations at the time she first filed the complaint.

[PROPOSED] AMENDED COMPLAINT - 64

191.    Although the WSU OEO investigation report claims the investigators "assessed credibility" of witnesses, including, but not limited to "internal consistency of statements... consistency of their statements with those of other witnesses or documentary evidence, plausibility, and motivation," the conclusions rely heavily upon Student A, who provided information that was later determined to be, more likely than not, untrue.  This is especially concerning since Student A had pre-existing credibility issues due to a) his own earlier ROTC disenrollment proceedings related to a racism charge and b) his noted romantic interest in the Complainant.

192.    The one piece of evidence that WSU OEO and the Army generally agree upon relates to a video Mr. Fleetwood sent to two friends and with the consent/encouragement of a woman he was having sex with after his twenty-first birthday party. This event took place two years prior to Complainant's allegations, did not involve the Complainant, and was only corroborated fact because Mr. Fleetwood confessed, due to his own honest nature, to making the video and distributing it to a pair of presumably willing male recipients.

193.    There is no physical evidence that the video currently exists. There is no evidence that any of the video's recipients objected to Mr. Fleetwood's transmission of that video or indicated that the video was in fact "unwanted" until years later, and then only after being contacted by WSU's investigators.

194.    Mr. Fleetwood confirmed transmitting the videos only after being confronted with that allegation by the WSU investigator during an interview. It was not until mid-way through the interview—an interview that WSU represented to Mr. Fleetwood pertained *only* to Complainant's allegations as opposed to non-Complainant related issues that happened years earlier—that the

[PROPOSED] AMENDED COMPLAINT - 65

investigator confronted Mr. Fleetwood with the video allegations.

195.    At the time Mr. Fleetwood confessed to sending the videos Mr. Fleetwood was not represented by an attorney

196.    In short, Mr. Fleetwood ended his military career and accrued considerable financial debt, by his own conscientious admission to a behavior he clearly regretted/regrets.  And he did this in a proceeding where he had no legal counsel and believed he was responding to an entirely different allegation. Before he walked into that room he had no idea he would be asked that question. Mr. Fleetwood condemned himself in a "trial by ambush" aided and abetted by the Agency's refusal to provide required documentation throughout the investigation process.

197.    Furthermore, while the transmission of the Snapchat video may seem reprehensible to an older generation, the behavior has become seemingly normal within Mr. Fleetwood's age group. Current statistics related to online dating are relevant in assessing whether Mr. Fleetwood's short-lived Snapchat behavior was aberrant enough to justify such harsh persecution. For example, 60% of female users ages 18 to 34 say someone on a dating site or app continued to contact them after they said they were not interested, while a similar share--57% of women aged 18 to 34--and 48% of all users, report being sent a sexually explicit message or image they didn't ask for.[25]  And this is during an age when 48% of Americans aged 18-29 report using dating sites or online apps. In short, if Mr. Fleetwood's bad night truly violated community standards, it did so in a way which has become "standard" for the subset of our population who engage with Snapchat: an app whose

---

[25]    *See* Pew Research Center Report *available at* https://www.pewresearch.org/internet/2020/02/06/the-virtues-and-downsides-of-online-dating/ (*last visited* March 11, 2020)

[PROPOSED] AMENDED COMPLAINT - 66

principal feature "is that pictures and messages are usually only available for a short time before they become inaccessible to their recipients."[26]

198.    The bullet points provided in Ms Karen Metzger, Director of the Office of Community Standards' 16 December 2019 letter suggest the Agency itself discredited the bulk of the Complainant's harassment accusations, concluding in its own for Mr. Fleetwood's essential innocence: "Based on our conversations, you did not intend to create a hostile environment for the students around you, however, that does not change the impact of your actions."  The understated language of the final findings versus the original accusations warrants a second read:

After our discussion and after reviewing all of the information available to me, I have determined the following more likely than not occurred:

1. You and the Complainant had a consensual sexual relationship which ended in December 2018. After the relationship ended, you made sexual comments about your relationship and the Complainant to fellow students in the program. While you identified these people as your friends, they were also in some cases your subordinates within the program and also friends/acquaintances of the Complainant.
2. You sent a photo to students in the program of you shirtless and in a towel via "ShapChat". You sent the photo because you were proud of your physique and the training program that you were currently completing in preparation for the Ranger Challenge.
3. You sent sexually inappropriate videos to several ROTC members. You sent these videos years ago, on your 21st birthday, and alcohol played a factor in the situation.
4. The students who received these photos/videos did not ask you to send them photos/videos and the photos/videos were unwanted.
5. You called the Complainant after you heard that she intended to file a report about her experiences.
6. You contacted another student via Facebook Messenger to discuss the reporting process with them.
7. You contacted another student via text message about providing evidence to "help you out" with the investigation.

199.    Mr. Fleetwood has requested (but has not been given – more on that below) copies of the documents/interview notes the Agency considered in reaching its decision/investigating Complainant's allegations.

200.    Accordingly, Mr. Fleetwood reserves the right to amend his complaint once he

---

[26] *See* Wikipedia "Snapchat" *available at* https://en.wikipedia.org/wiki/Snapchat (*last visited* March 11, 2020)

receives the underlying documents that the Agency used in reaching its investigatory conclusions and administrative findings.

**(Counts Two and Three – Violation of the Washington Public Record Act – P. Fleetwood & M. Fleetwood)**

201.    Plaintiffs incorporate the above facts as if pled verbatim herein.

202.    Washington's Public Record Act (PRA) "provides a cause of action for two types of violations: (1) when an agency wrongfully denies an opportunity to inspect or copy a public record, or (2) when an agency has not made a reasonable estimate of the time required to respond to the request." *Andrews v. Washington State Patrol*, 183 Wn. App. 644, 651 (2014).

203.    On October 2, 2019 and October 18, 2019, M. Fleetwood made two public record requests to WSU as set out above. Those record requests were numbered 19-520 (October 2, 2019 request) and 19-549 (October 18, 2019 request).

204.    On November 21, 2019, WSU denied both of M. Fleetwood's public record requests.

205.    On November 23, 2019, Fleetwood made a public record request to WSU seeking:

#1: The complete investigative file concerning the Office of Equal Opportunity Complaint No. 2019-021, Including all statements, emails and records.
#2: The complete file and all records concerning WSU Center for Community Standards Case No. 2018371301, including emails and records of communication with the Office of Civil Rights Compliance and Investigation (formerly Office for Equal Opportunity) concerning this case and/or OEO Case No. 2019-021.

206.    WSU designated Fleetwood's November 23, 2019, request as Request No. 19-616.

207.    WSU closed the request on November 27, 2019 claiming that "Community Standards case number 2018371301 is still an active investigation."

208.    WSU made no such objection to Mr. Fleetwood's request for the "complete investigative file concerning the Office of Equal Opportunity Complaint No. 2019-021, Including

[PROPOSED] AMENDED COMPLAINT - 68

all statements, emails and records" as that investigation, undisputedly completed on June 13, 2019.

209.   Accordingly, WSU's failure to provide Fleetwood documents responsive to item number one of Request No. 19-616 violated Washington's Public Record Act as did WSU's failure to provide M. Fleetwood documents responsive to Request Nos. 19-520 and 19-549.

210.   Furthermore, WSU's failure to provide Fleetwood and M. Fleetwood those documents materially prejudiced Fleetwood by depriving him of the information he needed to both defend himself from the above-referenced Agency procedures as well as a concurrently occurring administrative procedure by WSU's Army Reserve Officer Training Corps (ROTC) arising out of Complainant's allegations.

211.   On November 28, 2019, Fleetwood made a public record request to the Agency seeking "The complete investigative file concerning the Office of Equal Opportunity Complaint No. 2019-021, Including all statements, emails and records."

212.   WSU labeled this November 28, 2019, request as Request No. 19-630.

213.   WSU closed the request on December 2, 2019, claiming that Fleetwood could access the information through WSU's Civil Rights & Compliance Investigation office.

214.   Fleetwood then requested the documents from Civil Rights & Compliance Investigation; however, the Civil Rights & Compliance Investigation did not provide Fleetwood any responsive documents other than the redacted investigation report that Fleetwood received months earlier.

215.   Additionally, at least twice, Ms. Metzler promised to Fleetwood that he (Fleetwood) would receive copies of all the above-referenced documents; however, as of the date of this lawsuit

[PROPOSED] AMENDED COMPLAINT - 69

WSU has not produced any documents in response to Request No. 19-630.

216.    The Agency's violation of the Public Record Act has caused Mr. Fleetwood damage in an amount to be proven at trial.

### (Count 4 – Gender Discrimination – RCW 49.60.400 – P.  Fleetwood)

217.    Plaintiffs incorporate the above facts as if pled verbatim herein.

218.    The Washington Law Against Discrimination defines "any place of public resort" to include "any public library or educational institution." RCW 49.60.040(2). The Washington State Supreme Court supports this extended protection: "[u]nlike our state law against discrimination, Title VII does not contain a broad statement of the right to be free of discrimination in other areas. Our state law does [and] [w]hile Title VII of the Civil Rights Act of 1964 is similar to RCW 49.60.180, the provision delineating unfair practices in employment, there is no provision in the federal law which sets forth the equivalent of the broad language of RCW 49.60.030(1) and there is no statutory provision requiring liberal construction in order to accomplish the purposes of the act." *Marquis v. City of Spokane*, 130 Wn.2d 97, 110–11 (1996). What this means is that the WLAD's anti-gender discrimination provisions apply in the educational context.

219.    Indeed, the WLAD also makes clear:

> The state shall not discriminate against, or grant preferential treatment to, **any individual** or group on the basis of race, **sex**, color, ethnicity, or national origin in the operation of public employment, **public education**, or public contracting. RCW 49.60.400(1)(emphasis added).

220.    Here WSU discriminated against Fleetwood on account of Fleetwood's gender by (a) ignoring C.P.'s documented anti-male bias including, *without limitation*, C.P.'s statements that "all men are assholes," (b) assigning investigators to investigate C.P.'s complaint who were biased

[PROPOSED] AMENDED COMPLAINT - 70

against men, (c) refusing to consider Fleetwood's new evidence during the December 5, 2019, hearing, (d) disregarding C.P.'s stated motive for bringing her complaint against Fleetwood, i.e. not a compliant for sexual harassment but "character check on him," (e) ignoring C.P.'s repeated "don't quote me on that" explanations about what happened, (f) ignoring C.P.'s unsubstantiated (but under oath) submission that Fleetwood had slept with 30 women in the past semester, and (g) ignoring exculpatory evidence.

221.    WSU's violation of the WLAD has caused Fleetwood damages in an amount to be proven at trial.

**(Count 5 – Tortious Interference With Contractual Expectancy – P.  Fleetwood)**

222.    Plaintiff incorporates the above facts as if pled verbatim herein.

223.    In order to prove a tortious interference claim the plaintiff must show "(1) the existence of a valid contractual relationship or business expectancy; (2) that defendants had knowledge of that relationship; (3) an intentional interference inducing or causing a breach or termination of the relationship or expectancy; (4) that defendants interfered for an improper purpose or used underline improper means; and (5) resultant damage." *Leingang v. Pierce Cty. Med. Bureau, Inc.*, 131 Wn.2d 133, 157 (1997).

224.    "Improper means" includes a government entity's arbitrary and capricious actions as evidence of improper means and a "court need not find that a defendant acted with ill will, spite, defamation, fraud, force, or coercion in order to find improper purpose or means." *Greensun Grp., LLC v. City of Bellevue*, 436 P.3d 397, 408 (Wash. Ct. App. 2019).

225.    Fleetwood had a Reserve Officer Training Corps (ROTC) contractual relationship

[PROPOSED] AMENDED COMPLAINT - 71

with the U.S. Army.

226.    WSU knew of Fleetwood's contract with the U.S. Army.

227.    WSU intentionally interfered with Fleetwood's contract with the U.S. Army by, *inter alia,* without notice to Fleetwood, broadening the scope of its investigation to encompass consensual activity that occurred between Fleetwood and others years before and did not involve C.P.

228.    WSU's interference with the contractual relationship was by improper means because, *without limitation,* it was arbitrary and capricious (as alleged above), biased in favor of the female accuser, ignored exculpatory evidence from Fleetwood, ignored C.P.'s own contradictory statements about Fleetwood's alleged harassment, ignored C.P.'s professed reason for bringing the complaint, i.e. her speculative belief that Fleetwood might prey on unsuspecting female Soldiers should Fleetwood become an officer, and broadened the scope of its investigation to include consensual videotaped (but no longer existing) encounters Fleetwood had with female partners years earlier.

229.    WSU's actions caused Fleetwood harm. ROTC ended its contract with Fleetwood and required Fleetwood to re-pay ROTC in excess of $32,000.00. More importantly, this action has destroyed any change of Fleetwood embarking on a military career thus causing him substantial damages. The sole reason ROTC gave for ending its contract was the consensual videotapes Fleetwood made years earlier. And had WSU not impermissibly extended the scope of its investigation to encompass the consensual videos ROTC would not have been able to use that event to justify the ending of Fleetwood's military career.

**(Count 6 & 7 - Violation of 1st and 14th Amendments of the U.S. Constitution – P.  Fleetwood)**

[PROPOSED] AMENDED COMPLAINT - 72

230.    Plaintiff incorporates the above facts as if pled verbatim herein.

231.    The First Amendment of the U.S. Constitution forbids regulations that are overbroad and/or vague.

232.    "Statutes that are insufficiently clear are void for three reasons:                    (1) to avoid punishing people for behavior that they could not have known was illegal;                    (2) to avoid subjective enforcement of   the laws based on   'arbitrary and discriminatory enforcement' by government officers; and (3)                                        to avoid any chilling effect on the exercise of First Amendment freedoms ... when First Amendment freedoms are at stake, an even greater degree of specificity and clarity of laws is required." *Italian Colors Rest. v. Harris*, 99 F. Supp. 3d 1199, 1210 (E.D. Cal. 2015).

233.    Conversely,   "[t]he overbreadth doctrine derives    from    the    recognition    that unconstitutional restriction of expression may deter protected speech by parties not before the court and thereby escape judicial review." *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*, 447 U.S. 557, 566 (1980).

234.    WSU found Fleetwood violated EP 15, specifically that Fleetwood's conduct met EP 15's definition of "sexual harassment."  As examples of this sexual harassment WSU found that (a) Fleetwood "made sexual comments about your relationship and the C.P. to fellow student," and (b) posed shirtless in a towel.

235.    EP 15's definition of sexual harassment is both vague and overbroad as it does not put students on notice that discussing sexual relationships with other students (which is something that happens on college campuses in America numerous times each day) or posing shirtless places

[PROPOSED] AMENDED COMPLAINT - 73

them in violation of EP 15's prohibition against sexual harassment. Nor, for that matter, does EP 15 put students on notice that temporary SnapChat videos of consensual sexual activity that are transmitted to others with the consent of both parties is illegal.

236.    Additionally, WSU policy, which is memorialized in WAC 504-26-219, is vague and overbroad because it has a chilling effect on the accused which, in this instance, was Fleetwood. Before Fleetwood was told that any complaint of any type had been filed against him, he heard that he had been accused of rape. Wanting to defend himself from such criminal allegations, Fleetwood contacted both the C.P. and other students to both inquire into the bases of the claim and defend his reputation. At no time did WSU put Fleetwood on notice that any communication he had with any potential witness in the case would result in a violation of WSU regulations.

237.    WSU's policies and regulations are void and overbroad and this Court should exercise its powers to declare the same.

238.    State actors that adjudicate important rights are constitutionally required to protect parties' due process rights. *Goldberg v. Kelley*, 397 U.S. 254, 262 (1970). These due process protections apply to students at public educational institutions. *Goss v. Lopez*, 419 U.S. 565 (1975). Neither the Supreme Court nor the Ninth Circuit have defined the precise process due to accused students. *See Wynar v. Douglas County Sch. Dist.*, 728 F.3d 1062, 1073 (9th Cir. 2013); *see also Lucy v. Nevada ex rel. Board of Regents of the Nevada System of Higher Education*, 380 F. App'x 608, 610 (9th Cir. 2010) (unpublished opinion applying the Goss framework to higher education disciplinary process).

239.    The factors considered in determining whether a person has received sufficient due

[PROPOSED] AMENDED COMPLAINT - 74

process protections are (1) the private rights affected by the official action, (2) the risk of an erroneous depravation of the private right because of procedural flaws, (3) any probable value of additional or substitute procedural safeguards, and (4) any governmental interests that would be affected by additional safeguards, such as fiscal and administrative burdens. *Matthews v. Eldridge*, 424 U.S. 319, 335 (1976).

240.    The process by which WSU used in finding Fleetwood at fault for violating EP 15 fails for lack of Constitutionally required due process.

241.    Fleetwood was not allowed to cross-examine C.P. as part of WSU's adjudication. Without that cross-examination WSU found Fleetwood in violation of EP 15. Conversely, the ROTC Board hearing process (described more fully above) allowed Mr. Fleetwood opportunity to cross examine C.P. and this ability to cross examine C.P. led to the ROTC board finding in Fleetwood's favor on all EP-15 related allegations except the allegation regarding the consensual transmission of the video images that did not involve C.P. and occurred years earlier.

242.    Additionally, WSU utilized the single investigator model that allowed Brooks to not only investigate C.P.'s claims against Fleetwood but to then determine, as Brooks did in the June 2019 investigation report, deem Fleetwood liable for violating, *inter alia,* EP 15. This single investigator model allowed Brooks (and others) to eviscerate any due process afforded Fleetwood as shown by the above examples of WSU disregarding C.P.'s written anti-male bias, disregarding C.P.'s ulterior motive that had nothing to do with sexual harassment but everything to do with protecting her own reputation, and disregarding any exculpatory evidence brought in Fleetwood's favor.

[PROPOSED] AMENDED COMPLAINT - 75

243.    Additionally, WSU failed to put Fleetwood on notice that its investigation had expanded to consensual events that took place years before Fleetwood began his consensual relationship with C.P.

244.    WSU's unconstitutional polices and failure to provide Fleetwood due process have caused Fleetwood harm.

### (Count 8 – Violation of Title IX – 20 U.S.C. §1681 - P.  Fleetwood)

245.    Plaintiff incorporates the above facts as if pled verbatim herein.

246.    WSU is a recipient of federal funds and, as such, is subject to Title IX.

247.    Title IX bars gender discrimination and further bars gender discrimination in the context of a university disciplining a student based on improper assumptions about gender roles.

248.    A plaintiff can bring a Title IX claim by showing an erroneous outcome where the plaintiff is innocent and was wrongly found to have committed an offense. *Yusuf v. Vassar College*, 35 F.3d 709, 715 (2d Cir. 1994).  A Title IX plaintiff can also proceed under a selective enforcement theory. Fleetwood proceeds under both theories.

249.    Here WSU brought actions against Fleetwood in the context of WSU's process for handling harassment complaints being called into question as stated above. With that background, WSU treated C.P. and Fleetwood differently by, *inter alia,* ignoring C.P.'s stated anti-male bias and her defamatory statements about Fleetwood (that he had sex with 30 women in a semester) but taking C.P.'s word for it that Fleetwood harassed her at the Red Bento lunch when C.P. herself repeatedly said to WSU's investigators "don't quote me on that" and then later reversed course and admitted that Fleetwood did not engage in any sexual harassment whatsoever at the lunch or anytime after

their consensual relationship ended.

250.    WSU's anti-male bias is further set out in the above paragraphs of the complaint.

251.    Due to his gender Fleetwood was subject to numerous sanctions by WSU (set out above) and his ROTC contract cancelled.

## IV. PRAYER FOR RELIEF

Plaintiffs respectfully seek:

A.  An order pursuant to RCW 34.05.574 setting aside all agency action.

B.  An order compelling WSU to produce the above-requested documents per the Public Record Act.

C.  Attorneys' fees, costs, and expenses as allowed under the Public Record Act.

D.  All damages allowed under the law including injunctive relief, equitable relief, as well as general and economic damages as allowed under the WLAD and/or Title IX.

E.  All other relief that is just and equitable.

DATED this _____, 2020.


CROTTY & SON LAW FIRM, PLLC


By:    _____
       Matthew Z. Crotty, WSBA No. 39284
       905 West Riverside Ave. Ste. 404
       Spokane, Washington 99201
       Telephone No. 509.850.7011

       Attorneys for Plaintiff

[PROPOSED] AMENDED COMPLAINT - 77

1

2

3

4

5

6

7

8

9

10

FILED

AUG 19 2020

JILL E. ISHIDA
WHITMAN COUNTY

**SUPERIOR COURT, STATE OF WASHINGTON, COUNTY OF WHITMAN**

| | |
|---|---|
| PATRICK FLEETWOOD, | |
| Plaintiff, | NO. 20-2-00053-38 |
| vs. | **NOTE FOR HEARING** |
| WASHINGTON STATE UNIVERSITY, | **(Clerk's Action Requested)** |
| Defendant. | |

TO: CLERK OF THE COURT

TO: WSU c/o Nathan Deen, its attorney.

The clerk is requested to place the following motion on the docket for the day indicated:

MOTION:        Fleetwood's motion to amend complaint.

HEARING DATE;        September 2, 2020 at 10:00 AM

NOTE FOR HEARING - PAGE 1

DATED this 19th day of August 2020.

**CROTTY & SON LAW FIRM, PLLC**

By: _____
MATTHEW Z. CROTTY, WSBA #39284

905 W. Riverside Ave. Ste. 404
Spokane, WA 99201
(509) 850 7011
matt@crottyandson.com

Attorneys for Plaintiff

NOTE FOR HEARING - PAGE 2

1

2
     Pursuant to RCW 9A.72.085 the undersigned hereby certifies under penalty of perjury under the laws of the State of Washington, that on the 19th day of August 2020, the foregoing was delivered to the following persons in the manner indicated:

3

4

| | |
|---|---|
| Nathan E. Deen | VIA REGULAR MAIL ___ |
| Attorney General of Washington | VIA FACSIMILE ___ |
| 332 French Administration Building | HAND DELIVERED ___ |
| Pullman, WA 99164 | VIA EMAIL ✓ |

5

6

7

8

9

10

11

CROTTY & SON LAW FIRM, PLLC

12

_____
Matthew Crotty

13

14

15

16

17

18

19

20

21

22

23

24

25

26

NOTE FOR HEARING - PAGE 3

FILED

AUG 26 2020

JILL B WHELCHEL
WHITMAN COUNTY CLERK

## STATE OF WASHINGTON
## WHITMAN COUNTY SUPERIOR COURT

PATRICK FLEETWOOD,

                    Plaintiff,

    v.

WASHINGTON STATE
UNIVERSITY,

                    Defendant.

NO. 20-2-00053-38

DEFENDANT WASHINGTON
STATE UNIVERSITY'S
RESPONSE TO PLAINTIFF'S
MOTION TO AMEND
COMPLAINT

Defendant Washington State University (WSU) does not object to Plaintiff's Motion to Amend Complaint.  However, WSU retains all substantive and procedural objections and defenses to any claims and/or factual assertions therein.

DATED this 26th day of August, 2020.

ROBERT W. FERGUSON
Attorney General

NATHAN E. DEEN, WSBA #39673
Assistant Attorney General

1

1

**PROOF OF SERVICE**

2    I certify that I served a copy of this document on all parties or their counsel

3    of record on the date below as follows:

4
    **To Plaintiff:**
5    ☑    Matthew Z. Crotty, attorney for Plaintiff
6        via email to:  matt@crottyandson.com; matthew.z.crotty@msn.com

7    I certify under penalty of perjury under the laws of the state of Washington

8    that the foregoing is true and correct.

9    DATED this 26th day of August, 2020, at Pullman, Washington.

10

11    _____

12    Rita Haas
    Assistant Director of Legal Services

13

14

15

16

17

18

19

20

21

22

23

24

25

2

ATTORNEY GENERAL OF WASHINGTON
332 French Administration Building
PO Box 641031
Pullman, WA 99164-1031
(509) 335-2636



20 – 2 – 00053 – 38
OR          33
Order
8792513

FILED

AUG 31 2020

JILL E. WHELCHEL
WHITMAN COUNTY CLERK

**STATE OF WASHINGTON**
**WHITMAN COUNTY SUPERIOR COURT**

| | |
|---|---|
| PATRICK FLEETWOOD, | NO. 20-2-00053-38 |
| Petitioner, | STIPULATION AND ORDER FOR EXTENSION OF TIME FOR RESPONDENT TO RESPOND TO PETITIONER'S OPENING BRIEF |
| v. | |
| WASHINGTON STATE UNIVERSITY, | |
| Respondent. | |

The parties, through their respective attorneys, Nathan E. Deen, attorney for Respondent Washington State University, and Matthew Z. Crotty, attorney for Petitioner Patrick Fleetwood, stipulate that the time for Respondent to respond to Petitioner's Opening Brief may be enlarged for a period of 8 days, from August 31 to September 8, 2020, and Petitioner's reply brief, if any, from September 30 to October 8, 2020.

DATED this 31st day of August, 2020.

ROBERT W. FERGUSON
Attorney General

NATHAN E. DEEN, WSBA #39673
Assistant Attorney General

STIPULATION AND ORDER FOR
EXTENSION OF TIME FOR
RESPONDENT TO RESPOND TO
PETITIONER'S OPENING BRIEF

1

ATTORNEY GENERAL OF WASHINGTON
332 French Administration Building
PO Box 641031
Pullman, WA 99164-1031
(509) 335-2636

## II.  ORDER

Based upon the above Stipulation of the Petitioner and Respondent, It Is Ordered:

    1.    The time for Respondent to respond to Petitioner's Opening Brief shall be enlarged by 8 days.

    2.    Respondent shall file a response to Petitioner's Opening Brief by no later than September 8, 2020.

    3.    The time for Petitioner to file a reply brief, if any, shall be enlarged by 8 days.

    4.    Petitioner shall file a reply to Respondent's response brief by no later than October 8, 2020.

_____

Superior Court Judge Libey

Presented by:

_____

Nathan E. Deen, WSBA #39673
Assistant Attorney General
Attorney for Respondent
Date:  8/31/2020 _____

Agreed by attorney for Petitioner
and notice of presentation waived by:

[approved via email]
_____

Matthew Z. Crotty, WSBA #39284
Attorney for Petitioner
Date:  8/18/2020 _____

STIPULATION AND ORDER FOR
EXTENSION OF TIME FOR
RESPONDENT TO RESPOND TO
PETITIONER'S OPENING BRIEF

2

1

**PROOF OF SERVICE**

2      I certify that I served a copy of this document on all parties or their counsel of record on

3 the date below as follows:

4      **To Petitioner:**

5      ☑    Matthew Z. Crotty, attorney for Petitioner
            via email to:  matt@crottyandson.com; matthew.z.crotty@msn.com

6

7      I certify under penalty of perjury under the laws of the state of Washington that the

8 foregoing is true and correct.

9      DATED this 31st day of August, 2020, at Pullman, Washington.

10

11

12      Rita Haas
        Assistant Director of Legal Services

13

14

15

16

17

18

19

20

21

22

23

24

25

STIPULATION AND ORDER FOR                3         ATTORNEY GENERAL OF WASHINGTON
EXTENSION OF TIME FOR                                    332 French Administration Building
RESPONDENT TO RESPOND TO                                        PO Box 641031
PETITIONER'S OPENING BRIEF                                   Pullman, WA 99164-1031
                                                              (509) 335-2636

WHITMAN SUPERIOR COURT
Clerk's Minutes
Judicial Officer: Libey, Gary
Court Reporter: FTR Gold Recorder
Clerk: LORENA LYNCH

Date:  09/02/2020
Start:  11:45 AM      End:  11:49 AM

20-2-00053-38
PATRICK FLEETWOOD
VS
WASHINGTON STATE UNIVERSITY

Matter set for: Motion to Amend

Case Parties Present/Not Present:

PATRICK FLEETWOOD, Petitioner, not present

MATTHEW CROTTY, Attorney, present

WASHINGTON STATE UNIVERSITY, Respondent, not present

Nathan E Deen, Assistant Attorney General, present

Comments:
ORDERS TO BE PRESENTED

Events:

- Motion Hearing

Hearings Scheduled:

```
20-2-00053-38
ORGMT       34
Order Granting Motion Petition
8809975
```

FILED

SEP 0 2 2020

WHITMAN COUNTY CLERK

1
2
3
4
5
6
7
8
9
10

## SUPERIOR COURT, STATE OF WASHINGTON, COUNTY OF WHITMAN

11

PATRICK FLEETWOOD,

12
                                            Plaintiff,          NO. 20-2-00053-38

13

14        vs.                                          **ORDER GRANTING MOTION TO**
                                                       **AMEND PLAINTIFF'S COMPLAINT**
15        WASHINGTON STATE UNIVERSITY,

16                                         Defendant.

17
          Plaintiff Patrick Fleetwood moves for an order amending his complaint. The Court
18
     heard oral argument of Matt Crotty, attorney for Plaintiff, and Nathan Deen, attorney for
19
     Defendant, and considered:
20

21        1.       Plaintiff's Motion to Amend.

22        2.       Plaintiff's Proposed Amended Complaint.

23        3.       WSU's Response to Plaintiff's Motion to Amend.

24        THEREFORE, after hearing the arguments of counsel and having reviewed the
25
     above-referenced documents IT IS HEREBY ORDERED THAT:
26
          Plaintiff's Motion to Amend is GRANTED

ORDER - PAGE 1

1    Dated this September 2, 2020.

2

3                                                        Honorable Gary Libey

4

Presented by:

5

CROTTY & SON LAW FIRM, PLLC

6

By: _____
7    Matthew Crotty, WSBA 39284
Attorney for Plaintiff

8

Copy Received; Approved as to Form;
9    Notice of Presentation Waived:

10
Robert Ferguson, Washington State Attorney General

11

By: *Electronically approved*
12    Nathan Deen, WSBA 39673
Attorney for Defendant

13

14

15

16

17

18

19

20

21

22

23

24

25

26

ORDER - PAGE 2

20-2-00053-38
OR          36
Order
8830247



SEP 08 2020

1
2
3
4
5
6
7
8
9

**STATE OF WASHINGTON**
**WHITMAN COUNTY SUPERIOR COURT**

10  PATRICK FLEETWOOD and MICHAEL
    FLEETWOOD,

11

12              Petitioner/Plaintiffs,

13      v.

14  WASHINGTON STATE UNIVERSITY,

15              Respondent/Defendant.

16

| | |
|---|---|
| | NO. 20-2-00053-38 |
| | STIPULATION AND ORDER FOR EXTENSION OF TIME FOR RESPONDENT TO RESPOND TO PETITIONER'S OPENING BRIEF AND AMENDED COMPLAINT |

17

18      The parties, through their respective attorneys, Nathan E. Deen, attorney for

19  Respondent/Defendant Washington State University, and Matthew Z. Crotty, attorney for

20  Petitioner Patrick Fleetwood and Plaintiffs Patrick and Michael Fleetwood, stipulate that the

21  time for Respondent to respond to Petitioner's Opening Brief is changed from September 8 to

22  September 21, 2020, and Petitioner's reply brief, if any, from October 8 to October 15, 2020.

23      The parties further stipulate that the time for Defendant to file an answer to Plaintiffs'

24  Amended Complaint is extended to October 2, 2020.

25

STIPULATION AND ORDER FOR
EXTENSION OF TIME FOR
RESPONDENT TO RESPOND TO
PETITIONER'S OPENING BRIEF AND
AMENDED COMPLAINT

1

ATTORNEY GENERAL OF WASHINGTON
332 French Administration Building
PO Box 641031
Pullman, WA 99164-1031
(509) 335-2636

DATED this 4th day of September, 2020.

ROBERT W. FERGUSON
Attorney General

NATHAN E. DEEN, WSBA #39673
Assistant Attorney General

## II. ORDER

Based upon the above Stipulation of the parties, It Is Ordered:

1. The time for Respondent to respond to Petitioner's Opening Brief shall be extended; Respondent shall file a response to Petitioner's Opening Brief by no later than September 21, 2020.

2. The time for Petitioner to file a reply brief, if any, shall be extended; Petitioner shall file a reply to Respondent's response brief by no later than October 15, 2020.

3. The time for Defendant to answer Plaintiffs' Amended Complaint shall be extended; Defendant shall file an answer to Plaintiffs' Amended Complaint by no later than October 2, 2020.

Superior Court Judge Libey

STIPULATION AND ORDER FOR
EXTENSION OF TIME FOR
RESPONDENT TO RESPOND TO
PETITIONER'S OPENING BRIEF AND
AMENDED COMPLAINT

2

ATTORNEY GENERAL OF WASHINGTON
332 French Administration Building
PO Box 641031
Pullman, WA 99164-1031
(509) 335-2636

1   Presented by:

2

3   _____

    Nathan E. Deen, WSBA #39673
4   Assistant Attorney General
    Attorney for Respondent
5   Date:  9/4/2020

6

7

    Agreed by attorney for Petitioner
8   and notice of presentation waived by:

9   [electronically approved]

10  _____

    Matthew Z. Crotty, WSBA #39284
11  Attorney for Petitioner
    Date:  9/4/2020
12

13

14

15

16

17

18

19

20

21

22

23

24

25

STIPULATION AND ORDER FOR              3          ATTORNEY GENERAL OF WASHINGTON
EXTENSION OF TIME FOR                                 332 French Administration Building
RESPONDENT TO RESPOND TO                                      PO Box 641031
PETITIONER'S OPENING BRIEF AND                            Pullman, WA 99164-1031
AMENDED COMPLAINT                                            (509) 335-2636

1

## PROOF OF SERVICE

2      I certify that I served a copy of this document on all parties or their counsel of record on

3 the date below as follows:

4      **To Petitioner:**

5      ☑      Matthew Z. Crotty, attorney for Petitioner

6              via email to:  matt@crottyandson.com; matthew.z.crotty@msn.com

7      I certify under penalty of perjury under the laws of the state of Washington that the

8 foregoing is true and correct.

9      DATED this 4th day of September, 2020, at Pullman, Washington.

10

11

12      Rita Haas
        Assistant Director of Legal Services

13

14

15

16

17

18

19

20

21

22

23

24

25

STIPULATION AND ORDER FOR
EXTENSION OF TIME FOR
RESPONDENT TO RESPOND TO
PETITIONER'S OPENING BRIEF AND
AMENDED COMPLAINT

4

1
2
3
4
5
6
7
8

FILED

SEP 2 1 2020

WHITMAN COUNTY CLERK

**STATE OF WASHINGTON**
**WHITMAN COUNTY SUPERIOR COURT**

9

PATRICK FLEETWOOD,

NO. 20-2-00053-38

10

                    Petitioner,

11

                                                    RESPONDENT'S MOTION TO
                                                    STRIKE DECLARTION OF
                                                    MATTHEW CROTTY

12

    v.

13

WASHINGTON STATE UNIVERSITY,

14

                    Respondent.

15

**I.  INTRODUCTION**

16

        On July 31, 2020, Petitioner Patrick Fleetwood filed the Declaration of Matthew Crotty

17

complete with an attached exhibit (Declaration) in the above-captioned matter.  Mr. Fleetwood

18

filed his opening brief pertaining to the portion of this case dedicated to his judicial review on

19

the same day.  Due to the unique procedural posture of this case, on the Declaration's face it is

20

not particularly clear what the purposes of the Declaration is (e.g., the parties are captioned

21

"Plaintiff" and "Defendant" suggesting the declaration was filed in regards to the lawsuit portion

22

of this cause number).  However, when one reads Petitioner's opening brief, it becomes clear

23

that the intent of the Declaration is to supplement the Washington State University (WSU or

24

University) agency record in the judicial review.  Because Mr. Fleetwood failed to seek the

25

Court's permission to supplement the agency record and cannot meet the burden of doing so, the

26

Court should strike the Declaration of Matthew Crotty with regard to its judicial review of

RESPONDENT'S MOTION TO STRIKE
DECLARATION OF MATTHEW
CROTTY

1

ATTORNEY GENERAL OF WASHINGTON
332 French Administration Building
PO Box 641031
Pullman, WA 99164-1031
(509) 335-2636

1  WSU's action and should not rely on any information contained therein in rendering its decision

2  on judicial review.

3  ## II.  ARGUMENT

4  As a state agency, WSU is subject to the Washington Administrative Procedure Act

5  (APA).   RCW 34.05.010(2).   Thus, the University treats student conduct adjudications as

6  administrative adjudications subject to the APA.  WAC 504-04.  For student conduct cases where

7  suspension or expulsion is not a possibility, the University elected to adopt the APA's brief

8  adjudicative proceeding requirements (RCW 34.05.482-491) for its student conduct hearings.

9  WAC 504-04-010(1).  Because the University treats student conduct hearings as adjudicative

10  proceedings under the APA, a respondent student aggrieved by a final order of the University in

11  a student conduct case may seek judicial review of the University's decision, which

12  Mr. Fleetwood has done here.  RCW 34.05.570; WAC 504-26-420(6)(b).

13  Judicial review is the exclusive means for reviewing an agency action unless the sole

14  issue is a claim for money damages, it is an ancillary procedural matter before the reviewing

15  court, or *de novo* review or jury trial review of the agency action is expressly authorized by

16  provision of law.  RCW 34.05.510.  The Court conducts its review in its appellate capacity and

17  confines its review to the agency record unless a party supplements the agency record in

18  accordance with the APA.  RCW 34.05.558.  The APA defines the contents of the agency record;

19  in brief adjudicative proceedings the agency record is limited to "any documents regarding the

20  matter that were considered or prepared by the presiding officer for the brief adjudicative

21  proceeding or by the reviewing officer for any review."  RCW 34.05.494(1).

22  Petitioner may supplement the agency record only with the Court's explicit permission.

23  *Washington Independent Tele. Ass'n. v. Wash. Utilities and Trans. Comm'n*, 110 Wn. App. 498,

24  518 (2002).  RCW 34.05.562 controls supplementation of the agency record in judicial reviews

25  and provides as follows:

26

(1) The court may receive evidence in addition to that contained in the agency record for judicial review, only if it relates to the validity of the agency action at the time it was taken and is needed to decide disputed issues regarding:

(a) Improper constitution as a decision-making body or grounds for disqualification of those taking the agency action;

(b) Unlawfulness of procedure or of decision-making process; or

(c) Material facts in rule making, brief adjudications, or other proceedings not required to be determined on the agency record.

Mr. Fleetwood did not seek the Court's permission to supplement the agency record with the Declaration; thus, the Court cannot considered it in its review of the University's action. Furthermore, even if Mr. Fleetwood had properly requested the Court to supplement the agency record, the Court would have been required to reject his request. This is so because Mr. Fleetwood cannot establish any of the three prerequisites to supplementing the agency record. Mr. Fleetwood does not contest the constitution of the University's decision-making body or grounds for their disqualification; therefore, RCW 3405.562(1)(a) does not apply. Nor does RCW 34.05.562(1)(b), as Mr. Fleetwood makes no claim that the University's procedure or decision-making process is unlawful. While Mr. Fleetwood does argue that the University erred in its fact finding in his brief adjudicative proceeding, the University, as it was required, made all of those contested findings on the agency record. There is no "material fact" that is in dispute that was "not required to be determined on the agency record." Therefore RCW 34.05.562(1)(c) is likewise inapplicable here. Because Mr. Fleetwood cannot establish the requisite conditions to supplement the agency record under RCW 34.05.562, the Court cannot consider the Declaration and attached exhibits in this judicial review.

## III. CONCLUSION

Mr. Fleetwood did not seek the Court's permission to supplement the agency record nor can he meet the requirements to do so. Therefore, the Court should strike, or at least not consider, the Declaration for purposes of this judicial review.

RESPONDENT'S MOTION TO STRIKE DECLARATION OF MATTHEW CROTTY

3

ATTORNEY GENERAL OF WASHINGTON
332 French Administration Building
PO Box 641031
Pullman, WA 99164-1031
(509) 335-2636

1    DATED this 21st day of September, 2020.

2

3                    ROBERT W. FERGUSON
                    Attorney General

4

5                    _____
                    NATHAN E. DEEN, WSBA #39673

6                    Assistant Attorney General

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

RESPONDENT'S MOTION TO STRIKE          4          ATTORNEY GENERAL OF WASHINGTON
DECLARATION OF MATTHEW                            332 French Administration Building
CROTTY                                                    PO Box 641031
                                                    Pullman, WA 99164-1031
                                                      (509) 335-2636

1

**PROOF OF SERVICE**

2
3

I certify that I served a copy of this document on all parties or their counsel of record on the date below as follows:

4
5
6

**To Plaintiff:**
☑    Matthew Z. Crotty, attorney for Plaintiff
       via email to:  matt@crottyandson.com; matthew.z.crotty@msn.com

7
8

I certify under penalty of perjury under the laws of the state of Washington that the foregoing is true and correct.

9

DATED this 21st day of September, 2020, at Pullman, Washington.

10
11
12

Rita Haas
Assistant Director of Legal Services

13
14
15
16
17
18
19
20
21
22
23
24
25
26

RESPONDENT'S MOTION TO STRIKE
DECLARATION OF MATTHEW
CROTTY

5

ATTORNEY GENERAL OF WASHINGTON
332 French Administration Building
PO Box 641031
Pullman, WA 99164-1031
(509) 335-2636



*Patrick Fleetwood v.*

*Washington State University*

State of Washington

Whitman County Superior Court No. 20-2-00053-38

**Certification of Corrected Agency Record,**
**Index of Agency Record – Corrected,**
**and**
**Agency Record, additional 16 pages**

**REDACTED COPY**

THIS DOCUMENT IS **NOT UNDER SEAL**.

IT IS AVAILABLE TO THE PUBLIC.

1
2
3
4
5
6
7

**STATE OF WASHINGTON**
**WHITMAN COUNTY SUPERIOR COURT**

8

PATRICK FLEETWOOD,

9
                            Petitioner,          NO. 20-2-00053-38

10
    v.                                           CERTIFICATION OF CORRECTED
                                                 AGENCY RECORD
11

WASHINGTON STATE UNIVERSITY,

12
                            Respondent.

13

14
STATE OF WASHINGTON  )
                     ) ss.
15
County of Whitman    )

16
        I, Karen Metzner, state that:

17
        1.      I am the Director of the Center for Community Standards at Washington State

18
University (WSU).  I have held this position since May 2019.  I also serve as one of WSU's

19
University Conduct Officers.

20
        2.      My duties include collecting documents and maintaining the agency record of

21
student conduct matters.  As Director of the Center for Community Standards, I can certify the

22
content of the agency record.

23
        3.      On June 30, 2020, I certified a version of the agency record herein that

24
inadvertently omitted sixteen pages of the agency record.

25

26

CERTIFICATION OF
CORRECTED AGENCY
RECORD

1

1          4.      A true and correct copy of the sixteen inadvertently omitted pages in the student

2     conduct proceedings involving Patrick Fleetwood is attached hereto and shall be added to the

3     end of the agency record originally filed on June 30, 2020.

4          I certify under penalty of perjury under the laws of the state of Washington that the

5     foregoing is true and correct.

6          DATED this 21st day of September, 2020, at Pullman, Washington.

7

8     _____

9     Karen Metzner

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

CERTIFICATION OF                          2                  ATTORNEY GENERAL OF WASHINGTON
CORRECTED AGENCY                                                 332 French Administration Building
RECORD                                                                      PO Box 641031
                                                                    Pullman, WA  99164-1031
                                                                         (509) 335-2636

1

**PROOF OF SERVICE**

2    I certify that I served a copy of this document on all parties or their counsel of record on

3    the date below as follows:

4    **To Plaintiff:**

5    ☑    Matthew Z. Crotty, attorney for Plaintiff
         via email to:  matt@crottyandson.com

6         via email to:  matthew.z.crotty@msn.com

7    I certify under penalty of perjury under the laws of the state of Washington that the

8    foregoing is true and correct.

9    DATED this 21st day of September, 2020, at Pullman, Washington.

10

11    _____
      Rita Haas

12    Assistant Director of Legal Services

13

14

15

16

17

18

19

20

21

22

23

24

25

26

CERTIFICATION OF
CORRECTED AGENCY
RECORD

3

1
2
3
4
5
6
7

**STATE OF WASHINGTON**
**WHITMAN COUNTY SUPERIOR COURT**

8

PATRICK FLEETWOOD,

9                    Petitioner,

10    v.

11    WASHINGTON STATE UNIVERSITY,

12                    Respondent.

13

NO. 20-2-00053-38

INDEX OF AGENCY RECORD –
CORRECTED

14        Washington State University (WSU) transmits the following documents as the Certified

15    Agency Record in the above-captioned matter, with page numbers stamped in the lower-right

16    corner of the document (AGENCY RECORD ###).

17

18

| Page Numbers | Date | Description of Document(s) |
|---|---|---|
| 001-002 | undated | Cover sheet of Petitioner's student conduct file |
| 003-006 | 1/31/2019 | Notice of Office for Equal Opportunity (OEO) investigation |
| 007 | 4/8/2019 | Notice of hold on Petitioner's account |
| 008-011 | 6/14/2019 | Notice of informational meeting |
| 012-024 | 6/13/2019 | OEO Investigation Report |
| 025-168 | various | OEO investigation file |
| 169-170 | 7/12/2019 | Notice of informational meeting |
| 171-172 | 10/4/2019 | Emails between the Center for Community Standards (CCS) and Complainant |
| 173-176 | 10/8/2019 | Notice of Conduct Officer hearing |
| 177-179 | 10/18/2019 | Notice of rescheduled Conduct Officer hearing |
| 180-197 | 10/2019 | Emails between CCS, Petitioner, and Petitioner's father |
| 198 | 10/23/2019 | Conduct Advisor Registration |

19
20
21
22
23
24
25
26

INDEX OF AGENCY RECORD –
CORRECTED

1

| Page Numbers | Date | Description of Document(s) |
|---|---|---|
| 199-204 | 10/29/2019 | Notes from Conduct Officer hearing |
| 205-209 | various | Letters of support for Petitioner |
| 210 | 11/15/2019 | Notice of continuation of Conduct Officer hearing |
| 211-213 | 11/21/2019 | Email from CCS to Petitioner |
| 214-215 | undated | CCS Case Resolution Form |
| 216-219 | 12/16/2019 | Conduct Officer decision letter (Initial Order) |
| 220-223 | 1/5/2020 | Petitioner's appeal of Conduct Officer decision |
| 224 | 1/8/2020 | Letter from University Appeals Board to Petitioner |
| 225-231 | undated | CCS conduct file notes |
| 232-233 | undated | University Appeals Board Checklist |
| 234-235 | 6/29/2019 | Email from Complainant to WSU's attorney |
| 236-238 | 2/21/2020 | University Appeals Board decision letter (Final Order) |
| *239-240* | *12/5/2019* | *Notes from Conduct Officer hearing* |
| *241-244* | *various* | *Additional letters of support for Petitioner* |
| *245-254* | *12/18/14* | *WSU Executive Policy #15* |

DATED this 21st day of September, 2020.

ROBERT W. FERGUSON
Attorney General

NATHAN E. DEEN, WSBA #39673
Assistant Attorney General

INDEX OF AGENCY RECORD –
CORRECTED

2

1

**PROOF OF SERVICE**

2

I certify that I served a copy of this document on all parties or their counsel of record on

3

the date below as follows:

4

**To Plaintiff:**

5

☑    Matthew Z. Crotty, attorney for Plaintiff
via email to:  matt@crottyandson.com

6

via email to:  matthew.z.crotty@msn.com

7

I certify under penalty of perjury under the laws of the state of Washington that the

8

foregoing is true and correct.

9

DATED this 21st day of September, 2020, at Pullman, Washington.

10

11

Rita Haas

12

Assistant Director of Legal Services

13

14

15

16

17

18

19

20

21

22

23

24

25

26

INDEX OF AGENCY RECORD –
CORRECTED

3

Fleetwood                                    12/5/19

Sexual Harassment - PR
EP 15
Abuse of Conduct System

S.H.  - get lunch, no sexual harassment, concerns w/
        ▮▮▮ testimony
      - videos - don't know that they were offended
      - role model, don't think they were hurt
      - lying - previous sexual partners - 1 (@ time)
      - trying to be honest - didn't realize she would
        count
      - adversarial relationship - didn't go out of my way
        to ~~keep her~~ great her/ engage but didn't
        exclude her - didn't know how to engage
        with her, didn't associate w/ her
      - thought distancing would be helpful, but
        I think it made

      - Abuse of conduct system - ~~did~~ didn't
        ask for lying - just asking for
        character witness for me - should have
        worded different

Lessons Learned -

* limited social media, quit drinking
- do more things about hobbies, spend time
  w/ GF
* don't talk about personal life w/ friends -
  thought ███ was friend
* videos - of course
* not the person that I am -
* false description of my character
* if there is an issue - gotta talk about it
→ graduating in Dec.

investigation massive lesson learned

☐ redacted file

- additional document by Monday

To Whom It May Concern:
October 8th, 2019


My name is ▆▆▆▆ and I have known cadet Patrick Fleetwood since the Fall of 2017. We met when I was a senior D1 rower at Washington State University studying Political Science and History and was part of Honors College as well. Currently, I am completing my Master's degree in International Relations at the University of Tartu, Estonia.

Patrick and I dated for a few months and broke up since I was not going to return to the US after my graduation. Even though we broke up, we continued being very close friends sharing common interests as athletics and security and hung out as friends until I graduated from WSU. During our relationship, Patrick was always very supportive and respected my wishes and privacy. I cannot recall any moments where he was being pushy and did whatever was in his power to make me feel comfortable, welcomed, and loved. I am aware of the situation Patrick is currently facing. During the relationship, Patrick rarely initiated sexual intercourse, and even then, he made sure that I was okay with it. I also saw how he was treating his other friends and family (especially sisters), and I always admired how loving, protective, and caring he was towards them. I do not imagine Patrick ever disrespecting any women and doing something against their will.

After our break-up, he continued being supportive with a friendly interest in my life, and I have always felt very free talking about everything on my mind. He has been very determined of his career and serving his country, still trying his best to excel. I would characterize Patrick as a very hard-working, honest, precise, discreet, and loving man.

I know how deeply those accusations influence him, and it breaks my heart to see how Patrick is suffering. Again, taking into account our history and how he has been treating his family and friends, I am confident stating that Patrick would never do anything against anyone's will and treats everyone with respect.

If you have any further questions, please do not hesitate to contact me via email
▆▆▆▆▆▆ or cell ▆▆▆▆▆▆


Yours faithfully

▆▆▆▆

(ex girlfriend)

AGENCY RECORD
241

October 9, 2019
To whom it may concern,

My name is ████████ and I am currently completing my senior year at Washington State University. I first met Patrick my Junior year of high school at Emerald Ridge High School, we had a few classes and were on the track team together. Patrick and I became friends and then dated for about a year. He has always been a leader and willing to help anyone that asks for it. I have known Patrick for about 6 years now, although he and I ended our relationship about 3 years ago we remain friends and chat occasionally about how we are doing. Having been in a relationship with Patrick, I know that he is a great man that exemplifies leadership, hard work, and never walks away from anything until it has been completed to its highest standards. Throughout our relationship, Patrick always treated me with the utmost respect. My parents think very highly of him as a person, as do I. My parents and I were impressed with his dedication to the ROTC program. I was in this program with him during my freshman year at Washington State University and he always modeled great leadership skills and was always willing to help anyone who needed it. Patrick is dedicated to becoming one of the best soldiers the Army has ever seen, and I know that he will be when he is given the opportunity. He has been a great role model for the other cadets in the program, from being in shape for what the Army requires, to leading groups to success, to give a helping hand to those who need it. His father and grandfather have also served in the Army, I think this is where Patrick got his motivation and determination to be the best soldier there is. I know that Patrick would never do anything to get in the way of his dream to serve in the United States Army. He was raised to treat everyone respectfully and to work hard to accomplish his goals.

If you have any questions or concerns for me, I will gladly answer them. You can contact me at ████████ or call me at ████████

Best,
████████

(ex girl friend)

September 29, 2019

To whom it may concern,

My name is ▮▮▮▮▮▮ I am a student in Pullman, WA. I am writing this character witness letter in support of Patrick Fleetwood. I have known Patrick for almost two years and during that time we have both dated and been friends. I have known him to be kind, honest, respectful and responsible. I have watched him grow, and mature, and work extremely hard.

When I first met Patrick and throughout the time I have known him, his commitment to the army has been very clear. He has told me about his goals to be a pilot and to serve this country. I have watched him work hard on schoolwork so that he maintains good grades. I have also watched him work hard on his workouts outside of ROTC so that he is both mentally and physically equipped to succeed. I know him to be very responsible and to always put his obligations and commitments before his own interests.

Patrick has always been respectful of my feelings, beliefs and personal boundaries. Although we do not agree on everything, Patrick has an open mind and often sought out opportunities to get my opinion and hear what I had to say. I have never felt pressure from him to change the way I see the world, to go anywhere I didn't want to or to do anything I didn't feel like doing. I never had an experience of feeling guilty for saying no to anything. As a couple we made decisions together and now as friends I know that I have his support in my life and my decisions.

Just after I met Patrick he enrolled in a women's studies course at the University. Feminism is something that is important to me and Patrick strove to understand as much as he could about my viewpoint. I was able to watch him learn, mature and grow while taking the course. I believe that Patrick has always had respect for women, he was raised primarily by his stepmother, alongside his four sisters. Some of his best friends are women he has met while attending WSU. However, during and after the women's studies class I saw a change in the way he interacted with other men. He began to notice and call out his friends for saying and doing disrespectful things. I took comfort knowing that he was being a positive influence on his male peers and that he was creating a better environment for his female peers.

I spent 10 months last year living abroad. Although he had schoolwork, ROTC and work, he still reached out to my parents to see how they could help them around the house while I was gone. He took our dog for walks to help my mom out. He also spent several hours with my father planting, watering and weeding he's garlic garden. My father has a passion for gardening but he is 78 and has trouble bending down and working on his hands and knees. Patrick's help meant so much to him as it meant he was able to have a garlic crop this year. While I was gone my best friend was going through a phase of depression, so Patrick reached out to her as well and invited her to work out with him to help raise her spirits, which doing so definitely did. He went out of his way to be helpful and kind. It was so thoughtful and meant so much to me that he maintained those relationships while I was gone and unable to be there.

I feel grateful to have Patrick in my life. He is a great example to me of kindness and hard work. Unfortunately, due to family commitments I will be traveling on October 11ᵗʰ when Patrick's hearing is to take place. I would be happy to answer any questions you may have. I can be reached at ▮▮▮▮▮▮ and I will be back in Pullman on Monday, October 14ᵗʰ.

Thank you for considering my letter,

▮▮▮▮▮▮


(ex girlfriend)

To Whom It May Concern,

I would like to provide a memorandum to provide additional context behind the EO complaint against Patrick Fleetwood. Due to the complex and ambiguous nature of the situation, I do not want this memorandum to be taken as evidence for or against Patrick. Unfortunately, the nature of EO complaints are highly subjective, and are difficult to corroborate. Additionally, this memorandum will contain my assessment of the situation, and is only meant to provide additional context, not accusation.

From roughly May 2017 until May 2019, I was roommates with                    and witnessed his behavior and interaction with the WSU ROTC cadets. Although I did not recognize it at the time, upon reflection and distance from the situation, I have realized the manipulative and coercive aspects of his character; to which I look back with great appall. I witnessed       interaction with                    and I would be remised if I did not bring to light that his behavior with her was coercive and implicative. I believe that he had intent to see that Patrick be dismissed from ROTC. I believe this because he has displayed character traits indicative of a spiteful power complex. He conveyed on numerous occasion to her, that he had just gone through an investigation into his own character, and that he knew the right courses of action to see to it that Patrick's involvement in ROTC would be ended. This was explicit collusion. Additionally, I observed him spreading his thoughts and opinions about Patrick in a subversive manner with other cadets. I realize that these points are not easily proven, as they are my subjective observation, and I am not writing to prove or disprove Patrick's guilt. I believe that Patrick is an extremely capable individual, and that he has learned from his immaturity. I can say that observing his character mature over the past year that he has learned from his past mistakes. Given the behavior of the ROTC Cadets I have seen, his dismissal would be a disproportionate response.

In conclusion, I only ask that the coercion that came from       to be taken deeply into account, as I have observed him spread rumor and inaccurate information in many other instances. has a sense of theatrics and has displayed a strong vengeful attitude on many occasions. I hope this memo raises questions about the origination of the EO complaint, and would prefer to give my verbal account if necessary.

Respectfully,
- SGT Jon Crodle
19th Special Forces Group (Airborne)

**WASHINGTON STATE UNIVERSITY**
**EXECUTIVE POLICY MANUAL**
Executive Policy #15
Revision Approved December 18, 2014

# Policy Prohibiting Discrimination, Sexual Harassment, and Sexual Misconduct

## POLICY

### Purpose

Discrimination in all its forms, including discriminatory harassment, sexual harassment, and sexual misconduct (including sexual assault and other sexual violence), destroys mutual respect and a trusting environment, can bring substantial personal harm to individuals, and violates individual rights. Such behaviors are prohibited and are not tolerated at Washington State University (WSU or the University). This policy expresses WSU's commitment to maintain an environment free of all forms of discrimination.

This policy applies to all students, faculty, staff, and others having an association with the University including, but not limited to, such individuals at all campuses and WSU employment sites. This policy applies whether conduct occurs on campus or off campus, if the continuing effects of the conduct have the potential to unreasonably interfere with or limit an individual's work, academic performance, living environment, personal security, or participation in any WSU activity. WSU's Office for Equal Opportunity (OEO) is the University's central intake office for matters involving discrimination, sexual harassment, and sexual misconduct. All WSU employees and units must coordinate with OEO on matters that implicate this policy.

Definitions of terms follow below. In some cases, certain definitions from the WSU Standards of Conduct for Students are incorporated into this policy and apply to *all* persons subject to this policy, not just students.

WSU is committed to the principles of free inquiry and free expression; vigorous discussion and debate are fundamental to the University. This policy is not intended to stifle teaching methods or freedom of expression. Discrimination, as prohibited in this policy, is conduct that is neither legally protected as an expression of free speech, nor the proper exercise of academic freedom. Discrimination compromises the integrity of the University, its tradition of intellectual freedom, the trust and respect expected in the University community, and the rights of individuals.

### Discrimination Prohibited

This policy prohibits discrimination on the basis of the following protected classes and/or characteristics:

- Race;
- Sex/gender;
- Sexual orientation;
- Gender identity/expression;
- Religion;
- Age;
- Color;
- Creed;

AGENCY RECORD
245

**WASHINGTON STATE UNIVERSITY**
**EXECUTIVE POLICY MANUAL**
Executive Policy #15
Revision Approved December 18, 2014

# Policy Prohibiting Discrimination, Sexual Harassment, and Sexual Misconduct

Protected classes (cont.):

- National or ethnic origin;
- Physical, mental or sensory disability, including disability requiring the use of a trained service animal;
- Marital status;
- Genetic information and/or;
- Status as an honorably discharged veteran or member of the military.

Discriminatory harassment, a form of discrimination, is also prohibited (see also "Sexual Harassment Prohibited" below). Discriminatory harassment is improper conduct toward a particular individual, individuals, or groups on the basis of one or more of the protected classes indicated above, that is sufficiently severe, persistent, or pervasive that it has the purpose or effect of:

- Creating an intimidating, hostile, or offensive environment; or

- Unreasonably interfering with work, academic performance, living environment, personal security, or participation in any WSU activity.

Examples of behaviors that may constitute discrimination include, but are not limited to:

- Denying someone an employment or educational opportunity or benefit because of their gender, race, or disability;

- Treating individuals differently because of their national origin or age (for example, giving them less advantageous working conditions);

- Following a practice or policy that disproportionately impacts women or members of another protected class; or

- Severe, persistent, or pervasive name calling, jokes, or other verbal or physical behavior towards a person based on their sexual orientation or perceived sexual orientation.

**Sexual Harassment Prohibited**

Sexual harassment is a form of discrimination based on sex and/or gender and is prohibited by this policy. Sexual harassment encompasses unwelcome verbal or physical conduct of a sexual nature.

**Quid pro quo** sexual harassment occurs when:

- Submission to unwelcome verbal or physical conduct of a sexual nature is made either explicitly or implicitly a term or condition of any individual's employment or education; or

- Submission to or rejection of unwelcome verbal or physical conduct of a sexual nature by an individual is used as the basis for employment or educational decisions affecting the individual.

AGENCY RECORD
246

WASHINGTON STATE UNIVERSITY
EXECUTIVE POLICY MANUAL
Executive Policy #15
Revision Approved December 18, 2014

# Policy Prohibiting Discrimination, Sexual Harassment, and Sexual Misconduct

**Sexual misconduct**, which includes sexual assault and other sexual violence, is a form of sexual harassment and is also prohibited by this policy (see below).

Sexual harassment also encompasses "**gender-based harassment**," which means harassment of a non-sexual nature that occurs because of a person's sex and/or gender. It includes harassment based on a person's nonconformity with sex and/or gender stereotypes.

Sexual harassment creates a **hostile environment** when behavior is sufficiently severe, persistent, or pervasive to interfere with an individual's work or educational performance, or creates an intimidating, hostile, or offensive work or educational environment. Examples include, but are not limited to, the following:

- Physical assault;

- Direct or implied threats that submission to sexual advances will be a condition of employment, work status, promotion, grades, work references, or letters of recommendation;

- Sexual behavior that is unwelcome. Such behavior may include, but is not limited to, the following:

  - Comments of a sexual nature;

  - Sexually explicit statements, questions, jokes, or anecdotes;

  - Unnecessary or undesirable physical contact;

  - Unwanted, offensive, and/or uninvited comments about another's physical appearance;

  - Display of pictures with sexual content;

  - Persistent, unwanted attempts to change a professional relationship to an amorous relationship;

  - Subtle propositions for sexual activity or direct propositions of a sexual nature;

  - Uninvited letters, e-mails, telephone calls, or other correspondence referring to or depicting sexual activities; and/or

  - Any of the above carried out via the Internet or social media ("cyber harassment").

Other offenses that may constitute sexual harassment when based on sex and/or gender include, but are not limited to:

- Threatening or causing physical harm, extreme verbal abuse, or other conduct that threatens or endangers the health or safety of any person.

- Intimidation, which is defined as implied threats or acts that cause a reasonable fear of harm in another.

AGENCY RECORD
247

WASHINGTON STATE UNIVERSITY
**EXECUTIVE POLICY MANUAL**
Executive Policy #15
Revision Approved December 18, 2014

# Policy Prohibiting Discrimination, Sexual Harassment, and Sexual Misconduct

Other offenses (cont.)

- Hazing, as defined in *WAC* 504-26-206.

- Bullying or workplace violence, as defined in *BPPM* 50.30 and 50.31.

- Intimate partner violence, which includes violence or abusive behavior within an intimate partner relationship. Intimate partner violence may also be referred to as domestic violence or dating violence. It can be physical, sexual, emotional, verbal, economic, or psychological in nature and can include actions or threats of actions that influence or harm an intimate partner.

- Stalking, as defined in *WAC* 504-26-223.

**Sexual Misconduct Prohibited**

Sexual misconduct is a form of sexual harassment and is prohibited by this policy. The definition of sexual misconduct in *WAC* 504-26-221 is used for purposes of this policy. Sexual misconduct includes sexual assault and other sexual violence.

**To File a Complaint**

Anyone who has experienced conduct implicated by this policy, or any third party who witnesses or becomes aware of conduct implicated by this policy, should contact OEO or a Title IX Co-Coordinator. For incidents on regional campuses, Global Campus, or Extension facilities, the incident may be reported to the designated Title IX Liaison for that area, who reports the incident to OEO. The list of Title IX Co-Coordinators and Title IX Liaisons is available on the OEO website at:

   http://oeo.wsu.edu

Individuals who file a complaint with OEO can expect to receive information regarding resources available at WSU and in the community that provide counseling and support. OEO also provides information regarding the investigation process and interim measures that may be available while the investigation is pending (see "Investigation Procedures—Interim Measures" below).

After an incident is reported to OEO, WSU takes appropriate steps to stop the discriminatory behavior, prevent its recurrence, and remedy its effects. These steps typically include a prompt, effective, and impartial investigation (see "Investigation Procedures" below).

Generally within one working day of receiving a complaint, OEO provides written materials to the complainant regarding WSU's policies, procedures, and available resources. These materials include the name of a contact person for questions or comments regarding this policy and OEO's complaint procedures.

AGENCY RECORD
248

**WASHINGTON STATE UNIVERSITY**
**EXECUTIVE POLICY MANUAL**
Executive Policy #15
Revision Approved December 18, 2014

# Policy Prohibiting Discrimination, Sexual Harassment, and Sexual Misconduct

Reporting Criminal Behavior to Police

Anyone who has experienced sexual misconduct, sexual assault, stalking, domestic violence, or another crime may choose to report the incident to the police. WSU's process under this policy is separate from the criminal process and can be pursued simultaneously (see "Investigation Procedures" below). In most cases, OEO defers to the complainant's wishes regarding whether to contact police and/or file a criminal complaint; however, there are situations in which the safety of the WSU community or other considerations may require OEO to report an incident to police. OEO attempts to inform the complainant of its decision when this occurs.

Confidential Consulting Protected by Law

Anyone who has experienced conduct implicated by this policy may choose to consult with a licensed mental health care provider or health care provider (see "Resources" below). By law, such professionals are able to assist victims confidentially and are exempt from legal obligations to report incidents for investigation, with some exceptions (for example, child abuse, elder abuse, certain threats of harm) (see "WSU Employee Reporting Responsibilities" for a list of other offices that are able to provide a level of confidentiality).

**WSU Employee Reporting Responsibilities**

Incidents Involving Sexual Harassment or Sexual Misconduct

WSU employees who have information regarding an incident or situation involving sexual harassment or sexual misconduct are required to promptly report the information to OEO or to one of the designated Title IX Co-Coordinators or Title IX Liaisons. The list of area Title IX Co-Coordinators and Title IX Liaisons is available on the OEO website at:

http://www.oeo.wsu.edu/title-ix/

There are limited exceptions to this requirement. The exceptions are:

- Employees who are statutorily barred from reporting (for example, health care providers and mental health care providers acting in their capacities as health care and mental health care providers);

- Employees, interns, professional trainees, and other similar individuals who are not statutorily barred from reporting but who provide services to students in WSU's Counseling and Testing Services or are otherwise designated by WSU to provide mental health services, or who provide services to students in WSU's Health and Wellness Services;

- Employees participating in a preventative education program for students regarding sex and gender-based violence or a related program, during which a student discloses having experienced sexual harassment or sexual misconduct; and

- Employees who have no authority to take action to redress sexual harassment or sexual misconduct and who could not reasonably be viewed by students as having such authority (for example, certain nonsupervisory custodial or dining services staff); such employees are nonetheless strongly encouraged to report all instances of sexual harassment and sexual misconduct to OEO.

AGENCY RECORD
249

**WASHINGTON STATE UNIVERSITY**
**EXECUTIVE POLICY MANUAL**
Executive Policy #15
Revision Approved December 18, 2014

# Policy Prohibiting Discrimination, Sexual Harassment, and Sexual Misconduct

Other Incidents of Discrimination

WSU employees with supervisory responsibility must report all incidents of discrimination and discriminatory harassment to OEO, including incidents that do not involve sexual harassment or sexual misconduct. All other WSU employees are strongly encouraged to report such incidents.

Interim Measures

In some cases, WSU employees with supervisory responsibility must take immediate action to end offending conduct and protect the well-being of the complainant. Supervisors must take such interim measures in consultation with OEO, HRS, and the WSU Division of the Attorney General's Office (see also "Investigation Procedures—Interim Measures" below).

Other Reporting

Under state law (*RCW* 26.44.030(1)(f)), all administrative, academic, and athletic department employees, including student employees, are required to report suspected child abuse or neglect to law enforcement or to the Washington State Department of Social and Health Services. All other higher education employees are required to report suspected child abuse or neglect to their supervisor within 48 hours and also should report these incidents to law enforcement (*RCW* 28B.10.846).

Discrimination, Sexual Harassment, and Sexual Misconduct Awareness, Prevention, and Response Training

WSU employees are required to complete Discrimination, Sexual Harassment, and Sexual Misconduct Awareness, Prevention, and Response Training. To learn more about this training requirement, see:

http://hrs.wsu.edu/dshp

Individual units may require employees to complete additional training and may submit requests to OEO for specific training needs.

**Retaliation and Interference Prohibited**

This policy prohibits retaliation. Retaliation includes any act that would dissuade a reasonable person from making or supporting a complaint, or participating in an investigation, under this policy.
It includes action or threat of action that could negatively affect another's employment, education, reputation, or other interest. **Retaliation is a separate and distinct violation of this policy.**
Retaliatory acts should be reported immediately to OEO and are handled promptly, effectively, and equitably.

Interference with the complaint or investigation process is also prohibited and constitutes a violation of this policy. Interference includes, but is not limited to, actions that dissuade or attempt to dissuade complainants or witnesses from reporting or participating in an investigation, or actions that delay or disrupt, or attempt to delay or disrupt, an investigation.

AGENCY RECORD
250

**WASHINGTON STATE UNIVERSITY**
**EXECUTIVE POLICY MANUAL**
Executive Policy #15
Revision Approved December 18, 2014

# Policy Prohibiting Discrimination, Sexual Harassment, and Sexual Misconduct

## Investigation Procedures

OEO conducts prompt, fair, effective, and impartial investigations of incidents of alleged discrimination, sexual harassment, and sexual misconduct. For complete information regarding investigative procedures, consult OEO's Procedural Guidelines for Responding to Allegations of Violation of the WSU Policy Prohibiting Discrimination, Sexual Harassment, and Sexual Misconduct:

http://oeo.wsu.edu/oeo-procedural-guidelines-2/

Investigations under this policy are subject to the following:

- **Confidentiality**. WSU takes confidentiality seriously. Investigative information is shared with others on a need-to-know basis only, including with investigators, witnesses, the accused individual, and relevant WSU officials, or as required or permitted by law. In some cases, the investigation file may be subject to requests for public records; WSU redacts identifying or other information when legally permissible.

  When a complainant requests confidentiality or that WSU not proceed with an investigation, WSU respects that request to the extent possible. WSU's legal obligation to provide a safe and nondiscriminatory environment may require that OEO proceed with an investigation, which may require investigators to share limited identifying information about a complainant. OEO informs a complainant if this occurs. In all cases, OEO works with the complainant to provide resources and support.

- **Conflict of Interest.** An investigator does not participate in an investigation in which he or she has a conflict of interest. A conflict of interest means the existence of an interest that could reasonably affect or appear to affect the impartiality of the investigator.

- **Criminal Complaints.** Under this policy, a complainant has the option to file a criminal complaint with the police. The criminal process can be pursued simultaneously. WSU does not wait for the conclusion of a criminal case to investigate possible violations of this policy. In some cases, a temporary suspension of WSU's investigation may be necessary when requested by law enforcement. However, WSU's investigation resumes promptly once WSU is notified by law enforcement that it may proceed. An outcome reached in a criminal process does not necessarily determine the outcome of WSU's process.

- **Interim Measures.** WSU takes appropriate interim steps before a final resolution to support and protect the complainant, as needed. Such steps may be taken regardless of whether complainant wishes to pursue the complaint. WSU may impose a "no-contact" order, which typically includes a directive that the parties refrain from having contact with one another. Other interim measures include, but are not limited to, altering the academic, WSU housing, and/or WSU employment arrangements of the parties. When taking such steps, WSU seeks to minimize unnecessary or unreasonable burdens on either party; however, every reasonable effort is made to allow the complainant to continue in his or her academic, WSU housing, and/or WSU employment arrangements. Violations of such protective measures may lead to disciplinary action.

AGENCY RECORD
251

# Policy Prohibiting Discrimination, Sexual Harassment, and Sexual Misconduct

- **Participation of Parties.** When appropriate, WSU seeks the consent of the complainant to proceed with an investigation but informs each complainant that alleged violations of this policy may be investigated regardless of consent. If any party or witness declines to participate in an investigation, WSU continues the investigation to the extent possible. WSU, as an employer, expects all employees to participate and cooperate with all investigations.

- **Investigation Process.** The complainant and the respondent are given the opportunity to provide information and evidence to the investigator, including names of witnesses. The parties are also given the opportunity to provide oral and written statements. Except in extraordinary circumstances, both parties are given written notice of the outcome of the investigation, an opportunity to respond, and an opportunity to appeal.

- **Appeals.** For cases in which the respondent is a student, the opportunity to appeal is provided through the student conduct process. For other cases, the opportunity to appeal is provided through OEO's procedural guidelines:

    http://oeo.wsu.edu/oeo-procedural-guidelines-2/

    See also "Enforcement and Disciplinary Sanctions" below.

- **Standard of Proof.** WSU uses a "preponderance of the evidence" legal standard to evaluate allegations of violations of this policy, which means it is "more likely than not" that the behavior or incident in the complaint occurred.

- **Timeframes.** OEO seeks to complete all investigations promptly after receipt of a complaint. An investigation of sexual assault, sexual misconduct, or domestic violence is typically completed within 60 calendar days unless there is good cause to extend that time frame.

## Enforcement and Disciplinary Sanctions

**The University vigorously enforces this policy**. Persons determined to have violated this policy are subject to sanctions imposed using the procedures set forth in applicable University policies and handbooks (e.g., the *WSU Faculty Manual*, the *Administrative Professional Handbook*, *WAC* 357-40 (civil service employees), applicable collective bargaining agreements, or the *WSU Standards of Conduct for Students*, *WAC* 504-26), including any appeal procedures therein. The chosen sanction is to be adequately and appropriately severe to prevent future offenses. The sanctions that are imposed, or other actions taken, must be reported to OEO by the administrator or supervisor who imposes the sanctions.

In addition, inappropriate and unprofessional behavior by WSU personnel that does not rise to the level of a policy violation (e.g., unwelcome sexual comments that are not sufficiently severe, persistent, or pervasive to constitute sexual harassment), may nonetheless be subject to corrective or disciplinary action in some cases.

AGENCY RECORD
252

WASHINGTON STATE UNIVERSITY
EXECUTIVE POLICY MANUAL
Executive Policy #15
Revision Approved December 18, 2014

# Policy Prohibiting Discrimination, Sexual Harassment, and Sexual Misconduct

## Malicious or Frivolous Allegations Prohibited

The University disciplines members of the University community who knowingly make false or frivolous allegations of discrimination, sexual harassment, or sexual misconduct. No complaint is considered malicious or frivolous solely because it cannot be corroborated.

**Office for Equal Opportunity**
French Administration, Room 225
Pullman, WA 99164-1022
509-335-8288
http://oeo.wsu.edu

## RESOURCES

The resources listed below represent only a selection of the resources available. For additional resources, including resources specific to each campus location, as well as state and federal compliance offices, visit:

http://oeo.wsu.edu/resources/

## WSU Title IX Coordinator, Co-Coordinators, and Liaisons:

**WSU Title IX Coordinator:**
**Kimberly Anderson**
Director,  Office for Equal Opportunity
French Ad 225
anderson34@wsu.edu
509-335-8288

**WSU Title IX Co-Coordinators and Liaisons:**
For the list of current Title IX Co-Coordinators and campus Liaisons, see the OEO website:
http://oeo.wsu.edu

## Confidential Resources

In most instances, service providers from the following resources can speak with individuals confidentially about their concerns:

**WSU Pullman Confidential Resources:**

**Counseling and Testing Services**
509-335-4511
http://counsel.wsu.edu/

**WSU Health and Wellness Services**
509-335-3575
http://hws.wsu.edu/

**Alternatives to Violence of the Palouse**
24-hour crisis line:
**1-877-334-2887 or 509-332-HELP**

**WSU Employee Assistance Program**
509-335-1744
http://www.eap.wsu.edu/

AGENCY RECORD
253

**WASHINGTON STATE UNIVERSITY**
**EXECUTIVE POLICY MANUAL**
Executive Policy #15
Revision Approved December 18, 2014

# Policy Prohibiting Discrimination, Sexual Harassment, and Sexual Misconduct

**Regional Campuses Confidential Resources:**

**WSU Spokane—Counseling Services**
Academic Center 145C
Spokane, WA 99210-1495
509-358-7740
severing@wsu.edu

**WSU Tri-Cities—Counseling Services**
Tri-Cities West Building 269 E
Richland, WA 99354
509-372-7153
http://www.tricity.wsu.edu/counseling/

**WSU Vancouver—Counseling Services**
Student Services Center, rooms 111 & 113
Vancouver, WA, USA  98686-9600
360-546-9238
http //studentaffairs.vancouver.wsu.edu/counseling-services

**Health and Wellness Services**
(For students at all WSU locations)
24 Hour Consulting Nurse:  509- 335-3575

**Confidential Resources for Employees at all WSU Locations:**

**Washington Department of Personnel**
**Employee Assistance Program**
(For employees at all WSU locations):
1-877-313-4455 (toll free)
http://www.dop.wa.gov/EAP/

## Additional Resources

For information about additional resources, including resources specific to each campus location and state and federal compliance offices, visit:

http://oeo.wsu.edu/resources/

**Human Resource Services**
French Administration, Room 139
Pullman, WA  99164-1014
509-335-4521
http://hrs.wsu.edu/

**Regional Human Resource Services**
Spokane:   509-358-7566
Tri-Cities:  509-372-7302
Vancouver:  360-546-9587

**WSU Police**
Public Safety Building
Pullman, WA  99164-7300
509-335-8548
**For Emergencies: Dial 911**

**University Ombudsman**
Wilson-Short Hall, Room 2
Pullman, WA  99164-4002
509-335-1195
http://ombudsman.wsu.edu
(Serving all campuses)

AGENCY RECORD
254



*Patrick Fleetwood v.*

*Washington State University*

State of Washington

Whitman County Superior Court No. 20-2-00053-38

**Brief of Respondent Washington State University**

**REDACTED COPY**

THIS DOCUMENT IS **NOT UNDER SEAL**.

IT IS AVAILABLE TO THE PUBLIC.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

**STATE OF WASHINGTON**
**WHITMAN COUNTY SUPERIOR COURT**

PATRICK FLEETWOOD,

                Petitioner,

  v.

WASHINGTON STATE UNIVERSITY,

                Respondent.

NO. 20-2-00053-38

BRIEF OF RESPONDENT
WASHINGTON STATE
UNIVERSITY

## I.  INTRODUCTION

After upperclassmen Patrick Fleetwood and freshman Ms. Doe ended a short-lived sexual relationship, Mr. Fleetwood began spreading rumor and gossip regarding Ms. Doe and their sexual relationship through the Washington State University (WSU or University) Army Reserve Officers Training Corps (ROTC) program.   After Ms. Doe turned down Mr. Fleetwood's persistent advances to re-kindle their sexual relationship, Mr. Fleetwood's treatment of Ms. Doe soured even more, and he began insulting her in front of others.  When Ms. Doe asked Mr. Fleetwood to cease the sexually charged jokes he was telling other ROTC members regarding Ms. Doe, Mr. Fleetwood blocked Ms. Doe on all social media and soon thereafter made a comment in class to Ms. Doe insinuating that she had slept with him.  Fed up with Mr. Fleetwood's treatment of her and concerned for the integrity of the ROTC program, Ms. Doe openly discussed filing a sexual harassment complaint with other members of the

**ATTORNEY GENERAL OF WASHINGTON**
332 French Administration Building
PO Box 641031
Pullman, WA  99164-1031
(509) 335-2636

1  ROTC program.  Mr. Fleetwood was informed of this possibility and threatened to ruin Ms.

2  Doe's career and reputation if she dared file a complaint.  His threat proved unsuccessful; Ms.

3  Doe filed a complaint leading to a University investigation and adjudication under WSU's

4  student conduct code, the Standards of Conduct for Students (Standards).

5      The University provided Mr. Fleetwood with multiple and ample opportunities

6  throughout the investigation and hearing process to confront the allegations, which

7  Mr. Fleetwood took advantage of.  However, at the end of the process, the University disagreed

8  with Mr. Fleetwood's interpretation of the facts and University policy, found him responsible

9  for several violations of the Standards, and assigned him several educational sanctions.

10  Although Mr. Fleetwood vigorously objects to the University's outcome in his student conduct

11  case and argues that the University should have decided some contested events in his favor, the

12  University's decision was a reasonable interpretation of its own Standards and based on

13  substantial evidence in the record.  Thus, the Court must deny Mr. Fleetwood's petition.

14                                   **II.  ISSUES PRESENTED FOR REVIEW**

15  **1.  Is there substantial evidence in the record to support a reasonable conclusion that Mr. Fleetwood violated the University Standard sexual harassment?**

16

17  **2.  Is there substantial evidence in the record to support a reasonable conclusion that Mr. Fleetwood violated the University Standard violation of university policy, rule, or regulation?**

18

19  **3.  Is there substantial evidence in the record to support a reasonable conclusion that Mr. Fleetwood violated the University Standard abuse of the conduct system?**

20

21                                        **III.  STATEMENT OF THE CASE**

22  **A.    Mr. Fleetwood's creation of a hostile educational environment and interference of an investigation**

23      By November of 2018, Mr. Fleetwood had cemented his reputation as a misogynistic

24  womanizer in WSU's ROTC program, disposed to objectifying women and purveying sexually

25  explicit content.  *See, e.g.*, AR 127 (student T.P., a self-described friend of Mr. Fleetwood,

26  stating that Mr. Fleetwood "treats women like shit . . . .  It is pretty well known about his behavior

towards women within the program."); AR 104 (student N.T. describing Mr. Fleetwood as a womanizer); AR 134 (student J.S. reporting that Mr. Fleetwood says "very sexist things"). Throughout the previous several years, Mr. Fleetwood exposed numerous members of the ROTC program to his untoward character.  For instance, just a month earlier, Mr. Fleetwood simultaneously attempted to engage in sexual relations with two separate freshman cadets. AR 84-86.  His pension for sexual or sexist jokes was well known.  *See, e.g.*, AR 68 (student D.B. stated that he had heard Mr. Fleetwood express sexist remarks over a long period of time); AR 104 (N.T. discussing Mr. Fleetwood sharing sexual jokes); AR 94 (student W.R. discussing Mr. Fleetwood making inappropriate sexual comments and jokes during ROTC programing). As well as his habit of showing sexually explicit images.  *See, e.g.*, AR 94 (student W.R. stating Mr. Fleetwood had shared an unsolicited video of himself having sex and stating a lot of people in the ROTC program had received the videos); AR 90 (student I.M. discussing incidents where Mr. Fleetwood showed others sexually explicit texts and photos they did not want to see).  The most egregious of these incidents was Mr. Fleetwood sending a video of himself engaged in sexual intercourse with an unknown female to student R.P.  AR 114.  Although R.P. told Mr. Fleetwood that he did not want to receive the video or another like it, Mr. Fleetwood sent R.P. another video a few months later.  AR 114.

It is against this backdrop that Ms. Doe met Mr. Fleetwood through the University's ROTC program during her freshman year in the fall of 2018. AR 16, 69-71.  Mr. Fleetwood was an upperclassman and occupied a leadership role in ROTC.  *Id.*  Shortly after undergoing a breakup with her boyfriend T.P., Ms. Doe and Mr. Fleetwood engaged in a short-lived sexual relationship in late November and early December.  AR 31.  As was his nature, Mr. Fleetwood soon thereafter began spreading rumors and gossip about Ms. Doe and their sexual relationship within the program.  For instance, he discussed having sexual relations with Ms. Doe with Ms. Doe's ex-boyfriend T.P, referring to himself and T.P. as "Eskimo Bros.," slang for two men sleeping with the same woman.  AR 130.  Mr. Fleetwood also began sharing explicit details of

3

his past sexual relationship with Ms. Doe to other cadets in the program and began joking about Ms. Doe to other senior cadets.  AR 70.  On one occasion, he told others "she squirted all over my shit."  AR 160.

Upon returning to school for the spring semester, Mr. Fleetwood invited Ms. Doe to lunch at Red Bento in Pullman.  *Id.*  During lunch, Mr. Fleetwood persistently propositioned Ms. Doe for sex; she declined several times until it "sunk in" that she was not interested.  AR 70. Following their lunch, Ms. Doe requested that Mr. Fleetwood stop joking about their past relationship.  AR 75.  Mr. Fleetwood did not deny he was doing so and agreed to cease; he then blocked Ms. Doe from his social media.  AR 70, 75.  Mr. Fleetwood did not stop however.  He began verbally bullying Ms. Doe in front of other cadets, saying that ROTC leadership was lying to her about her scholarship and career opportunities, calling her self-centered and stupid, and telling her she would not get into a sorority.  AR 70-71.  Mr. Fleetwood's treatment of Ms. Doe became so pervasive, that even others in the program noticed and asked her about his negative treatment.  AR 71.

The ROTC program is a community all its own within the broader WSU community. Training to possibly become officers in the United States armed forces, cadets work closely with each other to learn teambuilding skills.  Cadets take required coursework together, conduct training exercises together, and often socialize together.  AR 25-168.  Older members of ROTC help to mentor younger members, and often take leadership roles in the training of younger cadets.  AR 161.  Therefore, the malicious spreading of sexual details or negative treatment of a cadet within the program can have increased impact in a setting that the object of the treatment cannot avoid if one wants to remain a ROTC member.  AR 162.  Mr. Fleetwood's actions had just this effect on Ms. Doe, damaging her mental health and making it difficult for her to continue to participate in ROTC as well as University classes she shared with Mr. Fleetwood and other ROTC cadets.  AR 160-62.

4

1    Because of her concerns regarding Mr. Fleetwood's treatment of her as well as his future

2    treatment of others and his character as an officer in the Army, Ms. Doe contemplated reporting

3    Mr. Fleetwood's actions to the ROTC.  *E.g.*, AR 66, 71, 141, 160.  Ms. Doe appreciated the

4    gravity of such allegations and sought counsel from fellow ROTC cadets on what to do.  *Id*.  The

5    consensus of the group:  Mr. Fleetwood possessed character traits unbecoming of an army officer

6    (see above) and Ms. Doe should report his treatment of her to their superiors.  *Id*.

7    Before Ms. Doe had made a final decision regarding whether to report Mr. Fleetwood,

8    Mr. Fleetwood got wind of her potential report and quickly responded to forcefully persuade her

9    otherwise.  In a January 15 phone call to Ms. Doe, Mr. Fleetwood threatened Ms. Doe that if she

10   filed a complaint, he would ruin her career and reputation and that she would regret it.  AR 66,

11   71, 163.  Not satisfied that his intimidation of Ms. Doe had sufficiently neutralized the threat her

12   complaint posed, Mr. Fleetwood set about influencing and intimidating other potential witnesses.

13   For instance, upon learning that J.S. was offering support to Ms. Doe, Mr. Fleetwood desperately

14   set out to confront him.  AR 66-67.  In addition to calling Ms. Doe on January 15, Mr. Fleetwood

15   called and electronically messaged J.S.  *Id*.  J.S. sent a message back to Mr. Fleetwood telling

16   him that he would speak with Mr. Fleetwood the next day.  *Id*.  On January 16, J.S. attempted to

17   engage Mr. Fleetwood in conversation to hear Mr. Fleetwood's version of events; instead,

18   Mr. Fleetwood angrily confronted J.S., telling him not be involved in any report or investigation.

19   AR 67.

20   Mr. Fleetwood's interference and intimidation did not stop with Ms. Doe and J.S.  Over

21   text message, Mr. Fleetwood had the following exchange with student T.P., a potential (and turns

22   out future) witness:

23   //

24   //

25   //

26   //



AR 73.

Mr. Fleetwood's attempt to taint the witness pool did not stop with J.S. and T.P.; through the University's future investigation, witness after witness discussed concerning interactions with Mr. Fleetwood prior to their interview with investigators. *E.g.*, AR 94 (W.R. discussing Mr. Fleetwood providing evidence to W.R.); AR 141 (student H.F. stating she got a phone call from Mr. Fleetwood regarding the investigation).

Despite Mr. Fleetwood's attempts to thwart Ms. Doe from filing a complaint with WSU's ROTC, both Ms. Doe and J.S. provided sworn statements in support of a complaint against Mr. Fleetwood.  AR 66-71.  Upon receiving the complaint that included allegations that could implicate the University's Policy Prohibiting Discrimination, Sexual Harassment, and Sexual

1   Misconduct, Executive Policy #15 (EP 15)[1], ROTC notified the University of Ms. Doe's

2   concerns.

3   **B.      Investigations of Discrimination at the University**

4         EP 15, the University's overarching policy prohibiting discrimination, including sexual

5   harassment, "applies to all students, faculty, staff, and others having an association with the

6   University." AR 245.  EP 15 "applies whether conduct occurs on campus or off campus, if the

7   continuing effects of the conduct have the potential to unreasonably interfere with or limit an

8   individual's work, academic performance, living environment, personal security, or participation

9   in any WSU activity." *Id*.  The University's Office for Equal Opportunity[2] "is the University's

10  central intake office for matters involving discrimination, sexual harassment, and sexual

11  misconduct." *Id*.  WSU employees having information regarding allegations of sexual

12  harassment are to report these concerns to the Office for Equal Opportunity.  AR 249.  When a

13  community member raises discrimination concerns, including sexual harassment concerns, the

14  Office for Equal Opportunity is also the office that the University tasks with investigating the

15  allegations.  AR 248; 250-51.  During an investigation, the Office for Equal Opportunity puts

16  both complainants and respondents on notice of the allegations and gives each party an

17  opportunity to respond, including providing evidence and potential witnesses for the Office for

18  Equal Opportunity to interview.  AR 252.  Once the Office for Equal Opportunity completes an

19  investigation regarding a student respondent, it provides a copy of the report to both the

20  complainant and the respondent.  *Id*.  In addition, in the event of a finding, the Office for Equal

21

22  ―――――――――――――

23        [1] The version of EP 15 Mr. Fleetwood quotes in his brief was not in effect at the time of the
    University's discrimination investigation or student conduct adjudication, thus it is not applicable to this
    judicial review.  The version of EP 15 in effect at all times relevant to this matter is included in the
24  corrected agency record.  AR 245-254.

25        [2] The Office for Equal Opportunity changed its name since Mr. Fleetwood's investigation.  The
    office's current name is Compliance and Civil Rights.  Because the agency record refers to the name of
    the office at the time of Mr. Fleetwood's investigation, the University will use the former name, Office
26  for Equal Opportunity, throughout its briefing.

1  Opportunity forwards the report to WSU's Center for Community Standards for *de novo* review

2  and adjudication under the University's Standards, WAC 504-26.  *Id.*

3  **C.      The University's student conduct process**

4  The Standards outline student conduct expectations and the process the University

5  utilizes to adjudicate student conduct complaints.   WAC 504-26.   The process is primarily

6  educational and designed to be non-adversarial.    WAC 504-26-001.    Therefore, where

7  suspension or expulsion are not possible outcomes, student conduct cases are resolved through

8  a non-adversarial one-on-one meeting or hearing with a conduct officer.[3]   The University

9  identifies such hearings as conduct officer hearings, which it conducts as brief adjudicative

10  proceedings under Washington's Administrative Procedure Act (APA), RCW 34.05.482-.494.

11  WAC 504-04-010(1); WAC 504-26-402.

12  Under the APA, a brief adjudicative proceeding requires only that the University give a

13  respondent student "an opportunity to be informed" of the allegation and an opportunity "to

14  explain the [student's] view of the matter"; no live hearing is required.  RCW 34.05.485(2).

15  After providing a respondent student the opportunity to explain the student's position, the APA

16  merely requires the University to issue "a brief statement of the reasons for the decision" and a

17  chance to appeal, but nothing else.  RCW 34.05.485.  At WSU, the University provides student

18  respondents much more.

19  Prior to conducting a conduct officer hearing, the University provides students

20  participating in the process an informational meeting where students have the opportunity to

21  learn more about the adjudication process even prior to receiving notice of a conduct officer

22  hearing.  WAC 504-26-401(3)-(4).  After the University provides students with an opportunity

23  to fully inform themselves of the University's student conduct process through an informational

24  _____

25  [3] In cases where suspension or expulsion is a possibility, the University conducts a more formalized and adversarial hearing in front of a conduct board that complies with the APA's full adjudication requirements, RCW 34.05.413-.476.  WAC 504-04-010(1); WAC 504-26-403.

26

meeting,[4] the University sends notice to students of the conduct officer hearing.  WAC 504-26-402(2).   Through its conduct officer hearings, WSU provides student respondents with procedural rights well in excess of those the APA requires.  In addition to notice of the allegations and an opportunity to respond, WSU provides the following rights to respondent students:

- the right to challenge the University's application of the Standards to the respondent's actions, WAC 504-26-015, -402;

- a right to notice of the identity of the conduct officer ten days prior to the hearing and the right to request recusal of the conduct officer, WAC 504-26-125, -402;

- the right to request a continuance of the hearing, WAC 504-26-402;

- the right to review all information the conduct officer will consider in making a decision and the opportunity to respond to it in a live hearing, *id.*;

- the right to have an advisor, which may be an attorney, present at the hearing and allow for the respondent student to consult the advisor during the hearing; upon request, an advisor will be provided to a respondent student, *id.*, WAC 504-26-020.

At the conclusion of a conduct officer hearing, the conduct officer issues a written decision constituting the University's initial order.  WAC 504-26-402(4).  A respondent student has twenty-one days to file an administrative appeal to the University Appeals Board.  WAC 504-26-420(1).  The University Appeals Board reviews the conduct officer decision to determine if the conduct officer conducted the hearing fairly; if the decision was based on substantial evidence; whether the sanctions, if any, were appropriate; and to consider new information.  WAC 504-26-420(3).  After reviewing an appeal, the University Appeals Board issues the University's final decision on the matter.  WAC 504-26-420(6)(c).

---

[4] In addition to informational sessions, the University provides students with access to a student handbook explaining the student conduct process.  https://handbook.wsu.edu/handbook-home/

**ATTORNEY GENERAL OF WASHINGTON**
332 French Administration Building
PO Box 641031
Pullman, WA  99164-1031
(509) 335-2636

**D.     Mr. Fleetwood's disciplinary proceedings**

Upon receiving Ms. Doe and J.S.'s report, WSU's ROTC informed the Office for Equal Opportunity of the complaint as required by EP 15.  The Office for Equal Opportunity in turn reached out to Ms. Doe to gather more information.  After speaking with Ms. Doe and clarifying her allegations,[5] the Office for Equal Opportunity issued notice to Mr. Fleetwood and conducted an investigation.  AR 3-6.  Over the next several months, the Office for Equal Opportunity interviewed over a dozen witnesses—including both Ms. Doe and Mr. Fleetwood multiple times each—and reviewed scores of documents and photos the parties submitted.  AR 12-16.  At the conclusion of the investigation, the Office for Equal Opportunity issued an investigative report opining that Mr. Fleetwood violated EP 15.  *Id.* at AR 23-24.  In accordance with EP 15 and University policy, the Office for Equal Opportunity forwarded its report, its witness interviews, and the documentary evidence collected in its investigative file to the Center for Community Standards for review and adjudication.  *Id.*

Upon receipt of the Office for Equal Opportunity's investigation, the Center for Community Standards began the adjudicative process.  In compliance with WSU's Standards, the Center for Community Standards offered Mr. Fleetwood an informational meeting to learn more about the community standards process and his hearing rights.  AR 8-11; 169-170.  After providing Mr. Fleetwood with an opportunity to attend an information meeting, on October 8, 2019, the Center for Community Standards sent Mr. Fleetwood notice of his conduct officer hearing scheduled for October 21.  AR 173-176.  Despite the University having informed Mr. Fleetwood of the student conduct proceedings since at least July, Mr. Fleetwood had not yet taken advantage of his right to review his student conduct file, which included the Office for

---

[5] Mr. Fleetwood improperly points to evidence outside the agency record to suggest that Ms. Doe was inconsistent in her recollection of the events.  *See* Resp't Mot. to Strike Decl. of Matthew Crotty (arguing why consideration of evidence in this judicial review is improper).  Even if the Court were to consider Mr. Fleetwood's proffered evidence, all it establishes is that the Office for Equal Opportunity was conducting its due diligence to ensure it understood Ms. Doe's allegations and that Ms. Doe was engaged in a conversation with the Office for Equal Opportunity to clarify them.

1  Equal Opportunity's report, interview notes, and documentary evidence.  AR 25-168.  On

2  October 11, Mr. Fleetwood requested a continuance of the hearing in order to review his file and

3  prepare.  AR 230.  The Center for Community Standards arranged for Mr. Fleetwood to review

4  his file on October 14, but Mr. Fleetwood neglected to take advantage of the offer and instead

5  filed a public records request seeking the documents the Center for Community Standards was

6  providing him access to.  *Id*.  On October 17, Mr. Fleetwood again called the Center for

7  Community Standards seeking a continuance in order to review documentation and prepare for

8  his hearing.  *Id*.  The Center for Community Standards again informed Mr. Fleetwood that he

9  could review the material in their office; Mr. Fleetwood did not accept the offer and told the

10  Center for Community Standards that he would consult with others and contact them the next

11  day.  *Id*.  On October 18, Mr. Fleetwood again asked to continue his hearing to allow time for

12  the University to respond to his public records request.  *Id*.  Although Mr. Fleetwood had the

13  opportunity to review the records he was requesting for over three months and had declined

14  numerous offers by the Center for Community Standards to review his file, the Center for

15  Community Standards granted Mr. Fleetwood's request and again offered for Mr. Fleetwood to

16  come to the office to review his file.  *Id*.; AR 177-179.  On October 24, Mr. Fleetwood finally

17  came to the Center for Community Standards to review his file—he did not request to review

18  the file again.  AR 187, 193.

19        On October 29, Mr. Fleetwood attended his conduct officer hearing with the Center for

20  Community Standards Director Karen Metzner.  AR 199-204.  Despite having registered for an

21  advisor (and having the right to have an attorney present) AR 198, Mr. Fleetwood elected to

22  attend the hearing alone.  At the hearing, Mr. Fleetwood presented a rigorous and detailed

23  defense, including presenting testimony and argument rebutting specific findings of the Office

24  for Equal Opportunity report.  AR 199-204 (numbers in notes indicating responses to numbered

25  findings in the Office for Equal Opportunity report).  In addition, Mr. Fleetwood submitted

26  several character references.  AR 205-209.  In order to properly review and consider

1    Mr. Fleetwood's defense, Ms. Metzner continued Mr. Fleetwood's conduct officer hearing to

2    December 5.  AR 210.

3         On December 5, Ms. Metzner and Mr. Fleetwood met to complete Mr. Fleetwood's

4    conduct officer hearing.  AR 239-240.  At the meeting, Ms. Metzner asked some clarifying

5    questions of Mr. Fleetwood and again gave Mr. Fleetwood the opportunity to present a defense.

6    Mr. Fleetwood also provided Ms. Metzner with additional character reference.  AR 241-244.

7    Eleven days after the conclusion of Mr. Fleetwood's conduct officer hearing, Ms. Metzner issued

8    her written decision and the University's initial order.  AR 216-219.  After considering all the

9    evidence contained in Mr. Fleetwood's conduct file and the information Mr. Fleetwood

10   provided, Ms. Metzner found Mr. Fleetwood responsible for sexual harassment in violation of

11   WAC 504-26-227; violation of university policy, rule, or regulation for violating EP 15,

12   WAC 504-26-209; and abuse of the student conduct system in violation of WAC 504-26-219.

13   *Id*.  As educational outcomes for his violations, Ms. Metzner sanctioned Mr. Fleetwood with an

14   action plan, a reflection paper, probation, alcohol and drug information school, a hold on degree

15   conferral until all sanctions were complete, and a no contact directive.  *Id*.

16        Mr. Fleetwood exercised his right of administrative review and appealed Ms. Metzner's

17   decision to the University Appeals Board.  AR 220-23.  The University Appeals Board reviewed

18   the material available to Ms. Metzner and Mr. Fleetwood's appeal and upheld Ms. Metzner's

19   decision.[6]  AR 236-239.  Mr. Fleetwood then filed this judicial review, challenging the

20   University Appeals Board's decision.

21

22        [6] Mr. Fleetwood claims that the University Appeals Board's decision "defied EP #15's own
     Policy and Procedures" by not including certain contents in the decision.  Pet'r Br. at 21.  This is one of

23   many examples where Mr. Fleetwood conflates the Office for Equal Opportunity's investigative process
     and the University student conduct process.  The procedural guidelines that Mr. Fleetwood quotes (aside

24   from being a completely different version of the guidelines than were in place at the time of
     Mr. Fleetwood's case) refer to what the Office for Equal Opportunity requires in its own investigative

25   report, not to what is required in a University Appeals Board decision.  For appeals of conduct officer
     hearings, the University Appeals Board decision need only include "the outcome, any sanction, and a

26   brief statement of the reasons for the decision," as well as information on seeking judicial review.

    **ATTORNEY GENERAL OF WASHINGTON**
332 French Administration Building
PO Box 641031
Pullman, WA  99164-1031
(509) 335-2636

# IV.  ARGUMENT

## A.    Standard of review

RCW 34.05.570(3) sets forth nine basis under which a court may grant relief from an agency order in an adjudicative proceeding.  Mr. Fleetwood asserts three:

> (d)  The agency has erroneously interpreted or applied the law;
> (e)  The order is not supported by evidence that is substantial when viewed in light of the whole record before the court, which includes the agency record for judicial review, supplemented by any additional evidence received by the court under this chapter;
> [and]
> (i)  The order is arbitrary or capricious.

RCW 34.05.570(3).  *See* Petitioner's Brief at 22 (asserting basis for reversing the University's order).  Under the "error of law" standard contained in RCW 34.05.570(3)(d), the court engages in de novo review of the agency's legal conclusions.  *Franklin Cnty. Sheriff's Office v. Sellers*, 97 Wn.2d 317, 325, 646 P.2d 113 (1982), *cert. denied*, 459 U.S. 1106 (1983).  However, in reviewing an agency action, the court gives substantial weight to an agency's interpretation of its own rules.  *Seatoma Convalescent Ctr. v. Dep't of Soc. & Health Servs.*, 82 Wn. App. 495, 518 (1996).

In regard to the substantial evidence standard in RCW 34.05.570(3)(e), it is "highly deferential" to the agency fact finder.  *ARCO Prods. Co. v. Wash. Utils. & Transp. Comm'n*, 125 Wn.2d 805 (1995).  Substantial evidence is "evidence in sufficient quantum to persuade a fair minded person of the truth or correctness of the order."  *Cornelius v. Dep't of Ecology*, 182 Wn.2d 574, 607 (2015).  The Court must view the evidence in the light most favorable to the prevailing party.  *City of Univ. Place v. McGuire*, 144 Wn.2d 604, 652 (2001).  The Court must accept the fact finder's determinations of credibility and the weight given to reasonable but competing inferences.  *McGuire*, 144 Wn.2d at 652.  If there are sufficient facts in the record

---

WAC 504-26-420(6)(b).  This is in accordance with the APA, the only requirement for a decision on review of a brief adjudicative proceeding is that it "must be in writing [and] must include a brief statement of the reasons for the decision."  RCW 34.05.491(4).  The contents of the University Appeals Board's decision complied with all applicable statutes, regulations, and University policies.

13

1  from which a reasonable person could make the same finding as the agency, the Court must

2  uphold the finding, even if the Court would make a different finding based on its reading of the

3  record.  *Callecod v. Wash. State Patrol*, 84 Wn. App. 663, 676 n.9 (1997).

4      Arbitrary and capricious action is defined as "willful and unreasoning action, without

5  consideration and in disregard of facts or circumstances.  Where there is room for two opinions,

6  action is not arbitrary or capricious when exercised honestly and upon due consideration, even

7  though it may be believed that an erroneous conclusion has been reached."  *Smith v. Hollenbeck*,

8  48 Wn.2d 461, 464, 294 P.2d 921, 923 (1956).

9      "The burden of demonstrating the invalidity of agency action is on the party asserting

10  invalidity." RCW 34.05.570(1)(a).  Not only does a party seeking relief from agency action bear

11  the burden of demonstrating invalid action, it also bears the burden of demonstrating that it was

12  "substantially prejudiced" from any such action.  RCW 34.05.570(1)(a), (d).  This is the

13  prejudice necessary to obtain relief, as opposed to the standing requirement in RCW 34.05.530.

14  The final order of the agency is the order reviewed in a petition for judicial review.

15  RCW 34.05.542; *see Valentine v. Dep't of Licensing*, 77 Wn. App. 838, 844 (1995) (review of

16  director's findings, not those of administrative law judge).

17      Here, as explained below, Mr. Fleetwood cannot meet his burden of showing error nor

18  substantial prejudice.  Therefore, the Court must affirm the University's final order.

19  **B.    Substantial evidence supports the University's conclusion that Mr. Fleetwood**
20  **violated the Standard sexual harassment**

21      WSU's Standards refer to EP 15's definition of the term sexual harassment.  WAC 504-

22  26-227.  The version of EP 15 in effect at the time of Mr. Fleetwood's actions and adjudication

23  defined sexual harassment as behavior "sufficiently severe, persistent, or pervasive [as] to

24  interfere with an individual's work or educational performance, or create[] an intimidating,

25  hostile, or offensive work or educational environment."  EP 15 at 247.  The University's

26  definition originated from Title IX guidance issued by United States Department of Education's

Office for Civil Rights (OCR) in 1997. 62 Fed. Reg. 12034, 12038. If the Court is to look anywhere outside of the University to help it determine whether Mr. Fleetwood's actions constitute sexual harassment under the University's policy (which it is not required to do as the Court must give deference to the agency's interpretation of its own regulation, *Seatoma Convalescent Ctr.*, 82 Wn. App. at 518), the Court should look to OCR's interpretation of this definition.

In 2010, OCR issued guidance providing context to when the "sufficiently severe, persistent, or pervasive" standard would be met. Its first example of sexual harassment meeting this standard is eerily similar to the actions Mr. Fleetwood engaged in here:

> Shortly after enrolling at a new high school, a female student had a brief romance with another student. After the couple broke up, other male and female students began routinely calling the new student sexually charged names, spreading rumors about her sexual behavior, and sending her threatening text messages and e-mails.

OCR "Dear Colleague" Letter at 6 (October 26, 2010). *See also Mercer Island Sch. Dist. v. Office of the Superintendent of Pub. Instruction,* 186 Wn. App. 939, 981 (2015) (name calling sufficiently severe under same test for Title VI purposes); See *Krebs v. New Kensington-Arnold Sch. Dist. No. 16-610*, 2016 WL 6820402, at *3-4 (W.D. Pa. Nov. 17, 2016) (course of harassment by group of peers which included calling plaintiff fat and ugly, being told to kill herself, and being targeted by ex-boyfriend with terms like "whore" and "slut" constituted sexual harassment for purposes of Title IX claim).

Here, Mr. Fleetwood's actions mirror the example provided by OCR and met the definition of "severe, persistent, or pervasive" as the University defines those terms. After their brief sexual relationship ended, Mr. Fleetwood began spreading rumors and gossip about their sexual relationship. For instance, that semester he told T.P. that they were now "Eskimo bros." in a reference to having slept with Ms. Doe. AR 131. Mr. Fleetwood also began sharing explicit details of his past sexual relationship with Ms. Doe to other cadets in the program and began

1    joking about Ms. Doe to other senior cadets.  AR 70.  On one occasion, he told others "she

2    squirted all over my shit."  AR 160.

3            On January 9, Ms. Doe agreed to meet Mr. Fleetwood for lunch at a local restaurant.  *Id*.

4    Once there, Mr. Fleetwood began persistently asking Ms. Doe to re-engage in a sexual

5    relationship.  *Id*.  Ms. Doe had to decline his propositions several times until it "sunk in" that she

6    was not interested.  AR 70.  The following day, tired of Mr. Fleetwood's malicious gossiping,

7    Ms. Doe requested that Mr. Fleetwood cease his ill-intended joking.  AR 75.  Mr. Fleetwood,

8    cognizant of what Ms. Doe was referencing, feigned agreement to cease his muckraking and

9    blocked Ms. Doe from his social media.  AR 70, 75.  Instead of ceasing his harassing behavior,

10   Mr. Fleetwood doubled down.  He began verbally bullying Ms. Doe in front of other cadets,

11   saying that ROTC leadership was lying to her about her scholarship and career opportunities,

12   calling her self-centered and stupid, and telling her she would not get into a sorority.  AR 70-71.

13   Mr. Fleetwood's treatment of Ms. Doe became so pervasive, that even others in the program

14   noticed and asked her about his negative treatment.  *Id*., AR 160.

15           Not only did Mr. Fleetwood's negative treatment of Ms. Doe increase, he did not cease

16   spreading sexual rumor and innuendo.  In a class Mr. Fleetwood shared with Ms. Doe,

17   Mr. Fleetwood presented Ms. Doe with a tube of ChapStick or lip gloss and commented that he

18   had found it in his bed, insinuating that the two had recently slept together.  AR 161.  The above

19   behavior, when considered *in tutom*, was severe, persistent, or pervasive enough to disrupt

20   Ms. Doe's educational experience and create a hostile educational environment.  *See* AR 160

21   (Ms. Doe discussing the toll of Mr. Fleetwood's action on her mental health and being

22   uncomfortable in school and in the ROTC program because of his actions).

23           Much of Mr. Fleetwood's brief is dedicated to discrediting Ms. Doe and the Office for

24   Equal Opportunity's report.  In essence, Mr. Fleetwood attempts to turn this judicial review into

25   a contested trial with review *de novo*.  This is no more evident than by the fact that Mr. Fleetwood

26   continuously cites to "evidence" outside the record.  *E.g.*, Petitioner's Br. at 12-19

1   (Mr. Fleetwood citing to documents produced pursuant to a public records request).[7]   The

2   Court's review is limited to the agency record, however.  RCW 34.05.558.  Mr. Fleetwood is not

3   free to insert whatever he chooses into the agency record without the Court's permission.

4   RCW 34.05.562.  The APA confines the agency record in a brief adjudication to "any documents

5   regarding the matter that were considered or prepared by the presiding officer for the brief

6   adjudicative proceeding or by the reviewing officer for any review."  RCW 34.05.494(1).  The

7   additional material cited by Mr. Fleetwood was not considered by the presiding officer (Ms.

8   Metzner) or by the reviewing officer (the University Appeals Board), therefore it is outside the

9   agency record and cannot be considered by the Court.  *See* Resp't Mot. to Strike Decl. of

10   Matthew Crotty (arguing why consideration of Mr. Fleetwood's proffered evidence is improper).

11          Mr. Fleetwood's apparent obsession with the Office for Equal Opportunity's report is

12   also misplaced.  Although it was part of the agency record and was reviewed by the presiding

13   officer (Ms. Metzner) and the reviewing officer (the University Appeals Board), Ms. Metzner

14   and the University Appeals Board also reviewed scores of other pages of evidence and

15   considered oral testimony and additional evidence submitted by Mr. Fleetwood.[8]   The Court is

16

17          [7] Through information not relied upon by the University's decision makers, Mr. Fleetwood
    attempts to show that Ms. Doe was somehow inconsistent with the Office for Equal Opportunity when

18   she initially reported her concerns.  *See* n.5 *infra* (discussing how this is not the case).  In addition,
    Mr. Fleetwood claims that the University improperly excluded "exonerating evidence" from the agency

19   record.  Pet'r Br. at 17.  The University did not improperly exclude the quoted email from the agency
    record or from the material provided to the Center for Community Standards, nor was it exonerating.  The

20   quoted information had nothing to do with the allegations against Mr. Fleetwood in the student conduct
    proceeding.  Furthermore, it is not in reference to one of the "two other MS-I cases" that Ms. Doe

21   mentions in her written statement.  This is yet again another example of Mr. Fleetwood confusing what
    exactly the Court is tasked with reviewing in this judicial review.  Again, it is the outcome of the student

22   conduct proceeding the Court is reviewing, not the Office for Equal Opportunity's investigation or
    procedure.

23          [8] Page 30 of Mr. Fleetwood's brief provides a compelling example of his misplaced assignment
    of error.  That page (among many others) is completely dedicated to attacking the Office for Equal

24   Opportunity's investigation and claiming it was biased.  Aside from largely being factually incorrect or
    misleading (for instance, the Office for Equal Opportunity did speak to the complainant about contacting

25   Mr. Fleetwood's ex-girlfriends, Exhibit A, and no compliant was ever brought against Ms. Doe so there
    was no opportunity for her to be "reprimanded"), it is also not relevant to the instant judicial review.  The

26

   **ATTORNEY GENERAL OF WASHINGTON**
332 French Administration Building
PO Box 641031
Pullman, WA  99164-1031
(509) 335-2636

1    not reviewing the Office for Equal Opportunity report.  Rather, the Court is reviewing the final

2    decision of the University, which is the University Appeals Board decision.  While the

3    University's decision makers did consider the Office for Equal Opportunity's report, they also

4    had access to scores of pages of additional evidence and Mr. Fleetwood's input in making their

5    decision.  Based on that evidence, the Court cannot hold that the University's conclusions were

6    unreasonable or not supported by the available evidence.

7            Understandably, Mr. Fleetwood would like the Court to re-litigate the disputed factual

8    findings that the University did not make in his favor.  However, that is not the Court's role on

9    judicial review.  The question is not what decision would the Court make based on the facts in

10   the record, but rather it is whether the University's decision was reasonable based on the record.

11   As the *Callecod* Court succinctly put it:

12           [I]t does not matter that a reviewing court would likely have ruled differently had
             it been the trier of fact.  The question, instead, is whether any fair-minded person
13           could have ruled as the [agency] did after considering all of the evidence. . . .
             That we, like the trial court, likely would have decided this case in [Petitioner's]
14           favor had we been the triers of fact is irrelevant, because the standard of review
             does not permit us to substitute our judgment for that of the [agency] on the
15           credibility of witnesses or the weight to be given to conflicting evidence.

16   *Callecod*, 84 Wn. App. at 676 n.9.  While there are facts in the record to support Mr. Fleetwood's

17   version of events, the same can be said for Ms. Doe's.  Because there is evidence in the record

18   of the facts as described above, the Court cannot now undo them, even if the Court itself would

19   come to a different decision.  Based on the evidence noted above, it was reasonable for the

20   University to conclude that Mr. Fleetwood's conduct was sufficiently severe, persistent, or

21   pervasive as to constitute sexual harassment under its student conduct code.  Furthermore, this

22   being the University's interpretation of its own student conduct rules and not the interpretation

23   of some statute or legislative mandate, the Court is bound to give deference to the University's

24

25   Office for Equal Opportunity's decision is not under review by this Court and most of the evidence
     Mr. Fleetwood cites to in making his arguments regarding the Office for Equal Opportunity's report was
26   before the decision makers in the student conduct process.

1    conclusion. *Seatoma Convalescent Ctr.*, 82 Wn. App. at 518 ("Substantial weight and deference

2    should be given to an agency's interpretation of the statutes and regulations it administers.").

3    　　　Mr. Fleetwood also argues that there was no evidence that any of Mr. Fleetwood's actions

4    or comments were on the basis of sex.  Pet'r Br. at 26.  This argument misses the mark.

5    "Harassment by a former paramour is considered sexual harassment even when some of the

6    harassing conduct appears gender neutral."  *Doe v. Pennridge Sch. Dist.*, 413 F. Supp. 3d 393,

7    403 (E.D. Pa. 2019) (citing *Krebs v. New Kensington-Arnold Sch. Dist.,* No. 16-610, 2016 WL

8    6820402, at *3-4 (W.D. Pa. Nov. 17, 2016)).  In other words, when an ex-sexual partner harasses

9    the other ex-sexual partner, the nature of the past relationship is enough for a fact finder to

10    permissibly infer that the harassment is on the basis of sex.

11    **D.    Substantial evidence supports the University's conclusion that Mr. Fleetwood**
**      violated the Standard violation of university policy, rule, or regulation**

12    　　　WAC  504-26-209  defines  violation  of  university  policy,  rule,  or  regulation  as  a

13    "[v]iolation of any university policy, rule, or regulation . . . including . . . executive policy 15."

14    WAC 504-26-209.  EP 15 prohibits sexual harassment and, thus, if Mr. Fleetwood committed

15    sexual harassment as defined by EP 15 as established above, he also violated the Standard

16    violation of university policy, rule, or regulation.  Even if the Court were to find against the

17    University on that point, however, there is substantial evidence in the record that Mr. Fleetwood

18    violated EP 15 in an alternative way by committing interference as defined by that policy.[9]  EP 15

19    defines interference as "actions that dissuade or attempt to dissuade complainants or witnesses

20    from reporting or participating in an investigation, or actions that delay or disrupt, or attempt to

21    delay or disrupt, an investigation."  EP 15 at 6.  Here, Mr. Fleetwood engaged is numerous

22    

23    

24    _____

25    　　　[9] Mr. Fleetwood cites to an employment case regarding retaliation in an attempt to argue that WSU's decision was not supported by law.  Pet'r Br. at 27.  Although EP 15 does include a retaliation

26    definition, the University never accused Mr. Fleetwood of committing retaliation; therefore, any discussion of case law considering retaliation in employment or any other context is inapposite.

**ATTORNEY GENERAL OF WASHINGTON**
                                                    332 French Administration Building
                                                    PO Box 641031
                                                    Pullman, WA  99164-1031
                                                    (509) 335-2636

1  actions in an attempt to dissuade others from reporting allegations or participating in an

2  investigation and to delay or disrupt, or attempt to delay or disrupt, an investigation.

3  Initially, when Mr. Fleetwood got wind of a potential complaint, he immediately began

4  reaching out to Ms. Doe and J.S. in an attempt to cut short any investigation.  First, he attempted

5  to call J.S. while he and Ms. Doe were in color guard practice.  AR 32, 63.  When J.S. did not

6  pick up, he then called Ms. Doe.  AR 64, 82.  Ms. Doe did not immediately answer, but shortly

7  thereafter left practice to call Mr. Fleetwood.  AR 64, 66, 82.  When Mr. Fleetwood answered,

8  he threatened Ms. Doe and told her that if she pursued an investigation, he would ruin her career

9  and reputation.[10]  AR 66, 71, 134.

10  When J.S. did not answer his phone, Mr. Fleetwood attempted to contact him over

11  Facebook.  AR 63.  When he did, the following exchange occurred:

12  Mr. Fleetwood: "Call me when you get this"

13  J.S.: "I got class until 9. Have time to talk [i]n person tomorrow?"

14  Mr. Fleetwood: "**I need to talk to you <u>today.  Hea[r]d some stuff and <u>need to address this issue before anything irrational is done</u>**." (emphasis added)

15  J.S.: Relax its [sic] not my decision and she's over it. I'm just a little surprised[.] But if you still want to talk I can call you back after my lab.

16
17  Mr. Fleetwood: Call me regardless, it's very unbrotherly to take one persons [sic] word over another before even fully getting the whole scope of said issue.

18  AR 63.

19

20  _____

21  [10] Mr. Fleetwood claims that he did not threaten Ms. Doe, but instead merely informed her: "if you bring your argument up that it will not last against the overwhelming evidence I have.  Do what you want, but I'm advising you that it won't turn out great for you and I will come out on top."  AR 32.  Even

22  if the Court were to believe Mr. Fleetwood's version of events—which it cannot because the University found otherwise and there is substantial evidence in the record to support this decision—Mr. Fleetwood's

23  version of the communication still suffices to meet EP 15's definition of interference.  Given the context, a reasonable person in Ms. Doe's position would have interpreted that communication as a threat, or at

24  least an attempt to dissuade Ms. Doe from filing a complaint.  Mr. Fleetwood's communication was after Ms. Doe turned him down at lunch, after he was already saying inappropriate things about her, and after

25  she had requested him to stop and yet he continued.  Under these circumstances, it would be reasonable for a person in Ms. Doe's position to assume Mr. Fleetwood was extremely angry with her and would

26  take action against her—perhaps even physically—if she complained.

**ATTORNEY GENERAL OF WASHINGTON**
332 French Administration Building
PO Box 641031
Pullman, WA  99164-1031
(509) 335-2636

1    The next day, Mr. Fleetwood confronted J.S. after physical training. AR 32, 67. Mr. Fleetwood

2    menacingly accused J.S. of bringing frivolous complaints in the past and told J.S. to "stay out of

3    it." AR 67, 133.

4              Mr. Fleetwood's attempted interference did not stop with Ms. Doe and J.S.,

5    however. While trying to cut the investigation off at its head, he was also attempting to poison

6    the witness well. In addition to threatening Ms. Doe and J.S., Mr. Fleetwood actively engaged

7    potential witnesses in attempt to curry favor and influence their testimony. One such witness

8    was Ms. Doe's ex-boyfriend, T.P., whom Mr. Fleetwood texted asking, "if I need evidence or

9    back up . . . if you'd be the guy to help me out" and requesting that T.P. tell investigators that

10   "'Patrick wouldn't do that.'" AR 73. Another was W.R., whom Mr. Fleetwood provided

11   information to in attempt to sway his opinion. AR 94-98. *See also* AR 141 (H.F. stating she got

12   a phone call from Mr. Fleetwood regarding the investigation).

13             Based on the above evidence, the majority of which is uncontested, it was not

14   unreasonable for the University to conclude that Mr. Fleetwood committed interference as

15   defined by EP 15 and thus violated WAC 504-26-209. The University found Ms. Doe's sworn

16   statement that Mr. Fleetwood threatened her reputation and career (in addition to telling her she

17   would lose any investigation) credible. This determination was not arbitrary and capricious

18   given Ms. Doe's statement provided under oath, the sworn statement of J.S. (confirming that

19   Ms. Doe told him Mr. Fleetwood threatened her immediately following her conversation with

20   Mr. Fleetwood), and evidence of Mr. Fleetwood's conduct towards other witnesses. Although

21   Mr. Fleetwood wants the Court to reevaluate this evidence and come to a different finding, the

22   Court is not free to do so here, where the evidence supports the University's findings. *See*

23   *McGuire*, 144 Wn.2d at 652 (reviewing court must view evidence in light most favorable to party

24   prevailing on agency's final order).

25             In addition to threatening Ms. Doe, Mr. Fleetwood also attempted to contact J.S. with the

26   stated purpose of addressing the complaint "before anything irrational is done." This statement,

1   in Mr. Fleetwood's own words, identifies Mr. Fleetwood's motives for contacting Ms. Doe and

2   J.S.—he was attempting to dissuade them from making a complaint.

3          Mr. Fleetwood stakes his defense on the fact that at the time of these actions, the

4   University was not conducting an investigation.  This is of no consequence.  The policy violation

5   for interference under EP 15 is not dependent on an investigation being underway.  By its terms,

6   interference under EP 15 includes "actions that dissuade or attempt to dissuade complainants or

7   witnesses from <u>reporting</u>."  AR 250 (emphasis added).  This makes logical sense; in creating a

8   culture of compliance, free from harassment, the University wants to ensure that individuals

9   report harassment.  If the University refused to sanction interference with the reporting of a

10  concern, respondents could easily avoid the consequences of the University's discrimination

11  policy through intimidation and bullying—reporting would be effectively suppressed.

12         Nor do the subjective beliefs of Mr. Fleetwood matter regarding to whom a report would

13  be made.  Based on University policy, any report to ROTC, which is run by University adjunct

14  professors, would result in a report to the Office for Equal Opportunity.  Thus, by attempting to

15  prevent Ms. Doe and/or J.S. from reporting to ROTC, Mr. Fleetwood was also attempting to

16  interfere with a report to the University (i.e., the Office for Equal Opportunity).

17  **D.    Substantial evidence supports the University's conclusion that Mr. Fleetwood
18         violated the Standard abuse of the conduct system**

19         As applicable here, WAC 504-26-219 defines the Standard abuse of the conduct system

20  as "[a]ttempting to discourage an individual's proper participation in, or use of, the student

21  conduct system."  WAC 504-26-219(5).  The evidence used to establish interference under EP 15

22  also provides substantial evidence that Mr. Fleetwood violated Abuse of the Conduct System.

23  Again, given the evidence in the record (mostly undisputed), it is reasonable to conclude that

24  Mr. Fleetwood attempted to discourage Ms. Doe and J.S. from reporting their concern.  As with

25  interference under EP 15, it is not relevant that an ongoing student conduct case was not yet

26  underway.  EP 15 requires that the Center for Community Standards (or any other WSU office

BRIEF OF RESPONDENT WSU                22                **ATTORNEY GENERAL OF WASHINGTON**
                                                         332 French Administration Building
                                                         PO Box 641031
                                                         Pullman, WA  99164-1031
                                                         (509) 335-2636

1  for that matter) route any discrimination complaint it receives to the Office for Equal

2  Opportunity for investigation before the Office for Equal Opportunity forwards the concern to

3  the Center for Community Standards for review and adjudication.  Therefore, attempting to

4  discourage an individual from reporting a discrimination concern regarding a student respondent

5  at the University is discouraging the reporter from participation in the student conduct system.

6  This being the University's interpretation of its own rules for its own students, the Court is

7  required to give substantial weight to its interpretation.  *Seatoma Convalescent Ctr.*, 82 Wn. App.

8  at 518.

9                                      **V.  CONCLUSION**

10        There is substantial evidence in the record to support a reasonable conclusion that

11  Mr. Fleetwood violated the University's Standards as found by the University Conduct Board.

12  The Court is not free to come to a different conclusion—even if it would have had it been the

13  original fact finder—where, as here, substantial evidence exists in the record for the University's

14  decision.  Therefore, the Court should deny Mr. Fleetwood's petition and affirm the University's

15  final order.

16        Respectfully submitted this 21st day of September, 2020.

17                                ROBERT W. FERGUSON
18                                Attorney General

19

20                                _____
                                 NATHAN E. DEEN, WSBA NO. 39673
21                                Assistant Attorney General
                                 Attorneys for Washington State University

22

23

24

25

26

1

**PROOF OF SERVICE**

2      I certify that I served a copy of this document on all parties or their counsel of record on

3    the date below as follows:

4      **To Plaintiff:**

5      ☑    Matthew Z. Crotty, attorney for Plaintiff
            via email to:  matt@crottyandson.com

6            via email to:  matthew.z.crotty@msn.com

7      I certify under penalty of perjury under the laws of the state of Washington that the

8    foregoing is true and correct.

9      DATED this 21st day of September, 2020, at Pullman, Washington.

10

11                                      _____
                                        Rita Haas

12                                      Assistant Director of Legal Services

13

14

15

16

17

18

19

20

21

22

23

24

25

26

EXHIBIT

A

RMB                                                          4/1/2019

████████████████ (Phone Call)

- RP raised concerns of contact between yourself
and his former girlfriends.

- Purpose of contact if known?
  - Attempt to learn if expense w/ RP
  was same as mine.

- Limit contact to those that may not have
knowledge of incidents between yourself and RP.

- Understood, will no longer do that.

- Any Questions?
  - No.

   UK - EOC

FILED

OCT 0 5 2020

WHITMAN COUNTY CLERK

**STATE OF WASHINGTON**
**WHITMAN COUNTY SUPERIOR COURT**

PATRICK FLEETWOOD and MICHAEL FLEETWOOD,

Plaintiffs,

v.

WASHINGTON STATE UNIVERSITY,

Defendant.

NO. 20-2-00053-38

DEFENDANT WASHINGTON STATE UNIVERSITY'S ANSWER TO PLAINTIFFS' AMENDED COMPLAINT

Defendant, Washington State University (WSU), in answer to Plaintiffs' amended complaint, admits, denies and alleges as follows:

## I.    PARTIES, JURISDICTION, & VENUE

1.    WSU admits Plaintiff Patrick Fleetwood ("Plaintiff") was a student of WSU during the time-frame relevant to this lawsuit.  WSU is without knowledge or information sufficient to form a belief as to the truth of the allegation regarding Plaintiff's mailing address and, therefore, denies the same.  WSU denies all other allegations contained in paragraph 1.

2.    Michael Fleetwood made a public record request to WSU. WSU is without knowledge or information sufficient to form a belief as to the truth of the allegation regarding if Michael Fleetwood is Plaintiff's father and, therefore, denies the same. WSU denies all other allegations contained in paragraph 2.

DEFENDANT WASHINGTON STATE
UNIVERSITY'S ANSWER TO PLAINTIFFS'
AMENDED COMPLAINT

1

ATTORNEY GENERAL OF WASHINGTON
Torts Division
7141 Cleanwater Drive SW
PO Box 40126
Olympia, WA 98504-0126
(360) 586-6300

3.      WSU admits the allegations contained in paragraph 3.

4.      The allegations contained in paragraph 4 constitute legal conclusions to which no answer is required.  To the extent an answer is required, WSU denies the same.

5.      The allegations contained in paragraph 5 constitute legal conclusions to which no answer is required.  To the extent an answer is required, WSU denies the same.

6.      WSU admits that it received a tort claim from Plaintiff on or around May 22, 2020. The remaining allegations contained in paragraph 6 constitute legal conclusions to which no answer is required.  To the extent an answer is required, WSU denies the same.

7.      Washington State Department of Enterprise Systems received a tort claim from Plaintiff on or around May 22, 2020, acknowledged receipt of the tort claim on or about May 28, 2020, and more than 60 days have elapsed since May 22, 2020. The allegations contained in paragraph 7 constitute legal conclusions to which no answer is required.  To the extent an answer is required, WSU denies the same.

## II.    FACTS

8.      WSU reasserts and incorporates by reference each and every answer set forth in paragraphs 1-7 with the same force and effect as though fully set forth herein, and applies those answers to its response to the facts.

### Part 1: Timeline

9.      Plaintiff was at WSU in ROTC as an MS-IV and C.P. was in ROTC as an MS-1. WSU is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in paragraph 9 and, therefore, denies the same.

10.     WSU is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 10 and, therefore, denies the same.

11.     WSU is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 11 and, therefore, denies the same.

DEFENDANT WASHINGTON STATE
UNIVERSITY'S ANSWER TO PLAINTIFFS'
AMENDED COMPLAINT

2

ATTORNEY GENERAL OF WASHINGTON
Torts Division
7141 Cleanwater Drive SW
PO Box 40126
Olympia, WA 98504-0126
(360) 586-6300

12.     WSU admits the allegations contained in paragraph 12.

13.     WSU is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 13 and, therefore, denies the same.

14.     On January 9, 2019, WSU classes started. WSU is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in paragraph 14 and, therefore, denies the same.

15.     WSU is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 15 and, therefore, denies the same.

16.     WSU is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 16 and, therefore, denies the same.

17.     WSU is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 17 and, therefore, denies the same.

18.     WSU is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 18 and, therefore, denies the same.

19.     WSU is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 19 and, therefore, denies the same.

20.     WSU is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 20 and, therefore, denies the same.

21.     WSU is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 21 and, therefore, denies the same.

22.     WSU is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 22 and, therefore, denies the same.

23.     WSU is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 23 and, therefore, denies the same.

DEFENDANT WASHINGTON STATE UNIVERSITY'S ANSWER TO PLAINTIFFS' AMENDED COMPLAINT

3

ATTORNEY GENERAL OF WASHINGTON
Torts Division
7141 Cleanwater Drive SW
PO Box 40126
Olympia, WA 98504-0126
(360) 586-6300

24.     WSU's Office for Civil Rights Compliance and Investigation found that Plaintiff "contacted another student via text message about providing evidence to 'help you out' with the investigation." WSU's Office for Civil Rights Compliance and Investigation also found that based on all the statements set forth in the December 16, 2019, determination, Plaintiff violated WAC 504-26-219 by "attempting to discourage one's …participation in, or use of the conduct system." The remainder of the allegations contained in paragraph 24 and any inference from the allegations not specifically admitted are denied.

25.     WSU is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 25 and, therefore, denies the same.

26.     WSU is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 26 and, therefore, denies the same.

27.     WSU admits that on January 18, 2019, Senior Military Instructor MSG Jeremy Keller contacted WSU's Office of Civil Rights Compliance and Investigation (CRCI) regarding possible sexual harassment by Plaintiff. WSU further admits that on that day, CRCI contacted a potential target of Plaintiff's harassment, who agreed to meet with CRCI to discuss her knowledge at a future date. The remainder of the allegations and any inference from the allegations not specifically admitted are denied.

28.     WSU received a copy of C.P's sworn statement from a member of WSU ROTC, LTC Brendan Hobbs. WSU is without knowledge or information sufficient to form a belief if Plaintiff's own acts ended his military career and, therefore, denies the same. To the extent an answer is required, the allegation is denied. The remainder of the allegations in this paragraph and any inference from the allegations not specifically admitted are denied.

29.     WSU admits that it received a copy of C.P's sworn statement from a member of WSU ROTC, LTC Brendan Hobbs. WSU is without knowledge or information sufficient to form

DEFENDANT WASHINGTON STATE
UNIVERSITY'S ANSWER TO PLAINTIFFS'
AMENDED COMPLAINT

4

ATTORNEY GENERAL OF WASHINGTON
Torts Division
7141 Cleanwater Drive SW
PO Box 40126
Olympia, WA 98504-0126
(360) 586-6300

a belief as to the truth of the remaining allegations contained in paragraph 29 and, therefore, denies the same.

30.    WSU received a copy of C.P's sworn statement from a member of WSU ROTC, LTC Brendan Hobbs. WSU is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in paragraph 30 and, therefore, denies the same.

31.    WSU received a copy of C.P's sworn statement from a member of WSU ROTC, LTC Brendan Hobbs. WSU is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in paragraph 31 and, therefore, denies the same.

32.    On or about January 18, 2019, WSU ROTC informed the WSU Office of Equal Opportunity (OEO) of events which occurred to C.P. involving the Plaintiff.  On January 18, 2019, Cheryl Rose, Investigative Assistant for OEO, emailed C.P. with information related to campus and community resources related to C.P.'s concerns. The remainder of the allegations contained in paragraph 32 and any inference from the allegations not specifically admitted are denied.

33.    WSU admits the allegations contained in paragraph 33.

34.    WSU is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 34 and, therefore, denies the same.

35.    WSU is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 35 and, therefore, denies the same.

36.    Plaintiff created a written statement dated January 23, 2019, which was a part of WSU OEO's June 13, 2019, Investigative Report finding that "Plaintiff's conduct toward C.P. violated WSU's Policy Prohibiting Discrimination, Sexual Harassment, and Sexual Misconduct." WSU admits that the last sentence of the paragraph was in Plaintiff's written statement and that in that statement, Plaintiff argues what he didn't do. WSU is without knowledge or information sufficient to form a belief as to the truth of Plaintiff's ability when he drafted the written statement, what the statement clarified, and what Plaintiff personally felt and

DEFENDANT WASHINGTON STATE
UNIVERSITY'S ANSWER TO PLAINTIFFS'
AMENDED COMPLAINT

5

ATTORNEY GENERAL OF WASHINGTON
Torts Division
7141 Cleanwater Drive SW
PO Box 40126
Olympia, WA 98504-0126
(360) 586-6300

therefore, denies the same. The remainder of the allegations contained in paragraph 36 and any inference from the allegations not specifically admitted are denied.

37.     WSU admits the allegations contained in paragraph 37.

38.     WSU admits the allegations contained in paragraph 38.

39.     WSU admits the allegations contained in paragraph 39.

40.     WSU is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 40 and, therefore, denies the same.

41.     On or about January 28, 2019, EEO Coordinate and Investigator Rachel Brooks for the WSU OEO, informed C.P. by email that she is the primary investigator on the case going forward. The remainder of the allegations contained in paragraph 41 and any inference from the allegations not specifically admitted are denied.

42.     On January 28, 2019, investigator Rachel Brooks emailed C.P. In this email, Rachel Brooks emailed C.P. the statements C.P. provided to Ms. Brooks about what happened with Plaintiff. The remainder of the allegations contained in paragraph 42 and any inference from the allegations not specifically admitted are denied.

43.     On January 28, 2019, investigator Rachel Brooks emailed C.P. her statements laid out by C.P. against Plaintiff. The remainder of the allegations contained in paragraph 43 and any inference from the allegations not specifically admitted are denied.

44.     C.P. requested changes to Rachel Brook's email. The remainder of the allegations contained in paragraph 44 and any inference from the allegations not specifically admitted are denied.

45.     WSU admits the allegations contained in paragraph 45.

46.     WSU admits the allegations contained in paragraph 46.

47.     WSU admits the allegations contained in paragraph 47.

DEFENDANT WASHINGTON STATE
UNIVERSITY'S ANSWER TO PLAINTIFFS'
AMENDED COMPLAINT

6

ATTORNEY GENERAL OF WASHINGTON
Torts Division
7141 Cleanwater Drive SW
PO Box 40126
Olympia, WA 98504-0126
(360) 586-6300

48.     On January 30, 2019, investigator Rachel Brooks sent C.P. a revised version of the statements, which are set forth by Plaintiff in this paragraph. The remainder of the allegations contained in paragraph 48 and any inference from the allegations not specifically admitted are denied.

49.     On January 30, 2020, C.P. emailed investigator Rachel Brooks to go forward with the case. The remainder of the allegations contained in paragraph 49 and any inference from the allegations not specifically admitted are denied.

50.     WSU denies the allegations contained in paragraph 50.

51.     WSU's OEO June 13, 2019, Investigation Report sets forth that the OEO found "that the Respondent's conduct toward the Complainant did violate the WSU Policy Prohibiting Discrimination, Sexual Harassment, and Sexual Misconduct."  This report contained line 17 which is quoted in this paragraph. WSU is without knowledge or information sufficient to form a belief as to the truth as to Plaintiff's hearsay and therefore, denies the same. The remainder of the allegations contained in paragraph 51 and any inference from the allegations not specifically admitted are denied.

52.     WSU hand-delivered and emailed a letter dated January 31, 2019, to Plaintiff detailing the complaint and investigation of his actions. In the letter, Rachel Brooks stated that he is prohibited from engaging in any form of retaliation against the complainant and he is prohibited from contacting the complainant. The remainder of the allegations contained in paragraph 52 and any inference from the allegations not specifically admitted are denied.

53.     WSU is without knowledge or information sufficient to form a belief as to the truth of the allegations concerning an "email exchange" and "written complaints to ROTC" and therefore, denies these allegations. The remainder of the allegations contained in paragraph 53 and any inference from the allegations not specifically admitted are denied.

54.     WSU admits the allegations contains in paragraph 54.

DEFENDANT WASHINGTON STATE
UNIVERSITY'S ANSWER TO PLAINTIFFS'
AMENDED COMPLAINT

7

ATTORNEY GENERAL OF WASHINGTON
Torts Division
7141 Cleanwater Drive SW
PO Box 40126
Olympia, WA 98504-0126
(360) 586-6300

55.    WSU denies the allegations contained in paragraph 55.

56.    WSU denies the allegations contained in paragraph 56.

57.    WSU is without knowledge or information sufficient to form a belief as to the truth a "spring interview" and therefore, denies the allegations pertaining to this interview. WSU denies the remainder of the allegations contained in paragraph 57 and any inference from the allegations not specifically admitted are denied.

58.    On April 10, 2019, investigator Rachel Brooks received an email from a former ROTC cadet who was friends with Plaintiff. WSU is without knowledge as to the remaining allegations in paragraph 58 and, therefore, denies these allegations

59.    WSU is without knowledge or information sufficient to form a belief as to the truth of whether the witness testimony in paragraph 59 relates to Cadet M's rumors and what Plaintiff refers to when he alleges that the witness "is not listed as a witness" and, therefore, denies these allegations.  The remainder of the allegations contained in paragraph 59 and any inference from the allegations not specifically admitted are denied.

60.    WSU denies the allegations contained in paragraph 60.

61.    WSU denies the allegations contained in paragraph 61.

62.    WSU denies the allegations contained in paragraph 62.

63.    WSU is without knowledge or information sufficient to form a belief as to the truth of the allegations that no individual reported or complained about the existence of the photos and videos and, therefore, denies the same. The remainder of the allegations contained in paragraph 63 and any inference from the allegations not specifically admitted are denied.

64.    WSU is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 64 and, therefore, denies the same.

65.    On June 23, 2019, WSU delivered an investigation report authored by Rachel Brooks that concluded Plaintiff had violated WSU Executive Policy 15 Prohibiting Discrimination,

DEFENDANT WASHINGTON STATE
UNIVERSITY'S ANSWER TO PLAINTIFFS'
AMENDED COMPLAINT

8

ATTORNEY GENERAL OF WASHINGTON
Torts Division
7141 Cleanwater Drive SW
PO Box 40126
Olympia, WA 98504-0126
(360) 586-6300

Sexual Harassment, and Sexual Misconduct. The remainder of the allegations contained in paragraph 65 and any inference from the allegations not specifically admitted are denied.

66.    WSU admits the allegations contained in paragraph 66.

67.    WSU admits the allegations contained in paragraph 67.

68.    WSU is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 68 and, therefore, denies the same.

69.    WSU admits the allegations contained in paragraph 69.

70.    WSU denies the allegations contained in paragraph 70.

71.    WSU admits the allegations contained in paragraph 71.

72.    WSU invited Plaintiff for a meeting in the summer of 2019. WSU admits that Plaintiff met with the Center for Community Standards on October 29, 2019.

73.    WSU admits the allegations contained in paragraph 73.

74.    WSU admits the allegations contained in paragraph 74.

75.    On October 4, 2019, C.P. emailed Karen Metzner that she "decided not to be involved in the hearing." The remainder of the allegations contained in paragraph 75 and any inference from the allegations not specifically admitted are denied.

76.    By letter dated October 8, 2019, Karen Metzner informed Plaintiff that she was his designated conduct officer from the WSU Center for Community Standards and that until a decision is made at his hearing, he is not responsible for the reported incident. The letter also outlined allegations of sexual harassment and unwelcome conduct on the basis of sex/gender and information on the hearing date and process. The remainder of the allegations contained in paragraph 76 and any inference from the allegations not specifically admitted are denied.

77.    WSU is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 77 and, therefore, denies the same.

78.    WSU admits the allegations contained in paragraph 78.

DEFENDANT WASHINGTON STATE
UNIVERSITY'S ANSWER TO PLAINTIFFS'
AMENDED COMPLAINT

9

ATTORNEY GENERAL OF WASHINGTON
Torts Division
7141 Cleanwater Drive SW
PO Box 40126
Olympia, WA 98504-0126
(360) 586-6300

79.     Plaintiff requested information related to the OEO case in November 2019. The remainder of the allegations contained in paragraph 79 and any inference from the allegations not specifically admitted are denied.

80.     On October 23, 2019, Plaintiff reviewed an unredacted copy of the OEO file and Plaintiff requested a redacted copy of the file. The remainder of the allegations contained in paragraph 80 and any inference from the allegations not specifically admitted are denied.

81.     WSU admits that on October 23, 2019 plaintiff requested to view all documents related to OEO case 2019-021. The remainder of the allegations contained in paragraph 80 and any inference from the allegations not specifically admitted are denied.

82.     In October 2018, in response to Michael Fleetwood's request for the hearing to be postponed, WSU informed Michael Fleetwood that WSU cannot share student specific information with him due to the Family Educational Rights and Privacy Act, unless Plaintiff signs a waiver. The remainder of the allegations contained in paragraph 82 and any inference from the allegations not specifically admitted are denied.

83.     On December 5, 2019, Plaintiff participated in a hearing with the Center for Community Standards. The remainder of the allegations contained in paragraph 83 and any inference from the allegations not specifically admitted are denied.

84.     WSU is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 84 and, therefore, denies the same.

85.     WSU is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 85 and, therefore, denies the same.

86.     WSU is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 86 and, therefore, denies the same.

87.     WSU is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 87 and, therefore, denies the same.

DEFENDANT WASHINGTON STATE
UNIVERSITY'S ANSWER TO PLAINTIFFS'
AMENDED COMPLAINT

10

ATTORNEY GENERAL OF WASHINGTON
Torts Division
7141 Cleanwater Drive SW
PO Box 40126
Olympia, WA 98504-0126
(360) 586-6300

88.    WSU admits the allegations contained in paragraph 88.

89.    WSU admits that the Director of the Center for Community Standards Karen Metzner's December 16, 2019, initial order (a) forbade Plaintiff from having "any contact with the Complainant or other parties involved [in the process] until December 16, 2021;" (b) required Plaintiff to draft an action plan; (c) required Plaintiff to write a reflection paper; (d) required Plaintiff to complete a state-approved alcohol and drug information program; and (e) placed Plaintiff on disciplinary probation.  WSU further admits that it placed a hold on Plaintiff's account precluding graduation until Plaintiff completes the sanctions outlined in (b), (c), and (d) of this paragraph.  The remainder of the allegations contained in paragraph 89 and any inference from the allegations not specifically admitted are denied.

90.    Plaintiff was discharged from the ROTC program based on Plaintiff's "undesirable character as demonstrated by a violation of the Washington State University Policy prohibiting discrimination, sexual harassment, and sexual misconduct." WSU is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in paragraph 90 and, therefore, denies the same.

91.    WSU is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 91 and, therefore, denies the same.

92.    WSU is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 92 and, therefore, denies the same.

93.    WSU admits the allegations contained in paragraph 93.

94.    Plaintiff submitted a letter with his appeal on January 5, 2020.  The remainder of the allegations contained in paragraph 94 and any inference from the allegations not specifically admitted are denied.

95.    On February 21, 2020, WSU's Student Appeals Board upheld the December 16, 2019, finding "carefully considering the information and rationale provided" in Plaintiff's appeal.

DEFENDANT WASHINGTON STATE UNIVERSITY'S ANSWER TO PLAINTIFFS' AMENDED COMPLAINT

11

ATTORNEY GENERAL OF WASHINGTON
Torts Division
7141 Cleanwater Drive SW
PO Box 40126
Olympia, WA 98504-0126
(360) 586-6300

The remainder of the allegations contained in paragraph 95 and any inference from the allegations not specifically admitted are denied.

### Part II: Complainant Credibility: A "Don't Quote Me On That" Story Of Jealousy, Double Standards, and Malicious Intent

96.    WSU is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 96 and, therefore, denies the same.

97.    WSU is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 97 and, therefore, denies the same.

98.    WSU is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 98 and, therefore, denies the same.

99.    WSU is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 99 and, therefore, denies the same.

100.    WSU is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 100 and, therefore, denies the same.

101.    WSU is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 101 and, therefore, denies the same.

102.    WSU is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 102 and, therefore, denies the same.

103.    WSU is without knowledge or information sufficient to form a belief as to truth of the allegation of "C.P.'s preferred anti-male bias" and, therefore, denies the same.  The remainder of the allegations contained in paragraph 103 and any inference from the allegations not specifically admitted are denied.

104.    WSU is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 104 and, therefore, denies the same.

105.    WSU is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 105 and, therefore, denies the same.

DEFENDANT WASHINGTON STATE
UNIVERSITY'S ANSWER TO PLAINTIFFS'
AMENDED COMPLAINT

12

ATTORNEY GENERAL OF WASHINGTON
Torts Division
7141 Cleanwater Drive SW
PO Box 40126
Olympia, WA 98504-0126
(360) 586-6300

106.    WSU is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 106 and, therefore, denies the same.

107.    WSU is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 107 and, therefore, denies the same.

108.    WSU is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 108 and, therefore, denies the same.

109.    WSU is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 109 and, therefore, denies the same.

110.    WSU is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 110 and, therefore, denies the same.

## Part III:  WSU OEO's Fails to Follow Policy & Procedure to Provide A Timely, Impartial Investigation Into a Nefarious, Complaint Which Itself Warranted Investigation as Fraud

111.    WSU is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 111 and, therefore, denies the same.

112.    In 2016, the President of WSU appointed a Student Conduct Task Force to "complete a comprehensive review of the student conduct process." This task force included university administrators. As part of the task force process, an online survey was created to "solicit comments from students, faculty, alumni, and the general public." The results of the survey were issued in a "Conduct Board Survey Report."  The report described that "[a]ll responses were read multiple times to construct variables based on themes. Most of the themes fall into two categories: concerns and advice." Table 1 in paragraph 112 lists these themes. The remainder of the allegations contained in paragraph 112 and any inference from the allegations not specifically admitted are denied.

113.    The Conduct Board Survey Report included the quotes listed in paragraph 113. WSU denies Plaintiffs' inference from the quotes that any anti-male bias existed. The remainder of

DEFENDANT WASHINGTON STATE
UNIVERSITY'S ANSWER TO PLAINTIFFS'
AMENDED COMPLAINT

13

ATTORNEY GENERAL OF WASHINGTON
Torts Division
7141 Cleanwater Drive SW
PO Box 40126
Olympia, WA 98504-0126
(360) 586-6300

the allegations contained in paragraph 113 and any inference from the allegations not specifically admitted are denied.

114.    Adam Jussel was a Director of the Office of Community Standards. Mr. Jusel left this position to take a new position as the Dean of Students at another institution.  The former Title IX coordinator, who is currently married to Mr. Jussel, did not oversee Title IX investigations and left prior to the completion of Plaintiff's investigation.  WSU is without knowledge or information sufficient to form a belief as to the date of Ms. Jussel's resignation and therefore, denies the same. The remainder of the allegations contained in paragraph 114 and any inference from the allegations not specifically admitted are denied.

115.    Karen Metzner served as Interim Director of the Office of Community Standards and WSU planned to conduct a national search to find a permanent director.  This information was published in a February 4, 2019, article in *The Daily Evergreen.* WSU is without knowledge or information sufficient to form a belief as the remainder of the allegations contained in this paragraph and, therefore, denies the same.

116.    Karen Metzner has a BFA in Fine Art, an MA in Higher Ed Administration, served as an Assistant Director of Community Standards, and was as an Assistant Director of Resident Life. WSU denies that Ms. Metzner oversaw conduct issues within the Greek system when she was an Assistant Director of Resident Life. WSU admits that Ms. Metzner began the process of developing advisors for the student conduct process and that the statement quoted in this paragraph was published on a WSU website. The remainder of the allegations contained in paragraph 116 and any inference from the allegations not specifically admitted are denied.

117.    WSU denies the allegations contained in paragraph 117.

118.    WSU denies the allegations contained in paragraph 118.

119.    Nikki Finnestead conducted C.P's intake interview on our around January 24, 2019. At that time, Nikki Finnestead was an EEO Coordinator and Investigator for the OEO. During her

DEFENDANT WASHINGTON STATE
UNIVERSITY'S ANSWER TO PLAINTIFFS'
AMENDED COMPLAINT

14

ATTORNEY GENERAL OF WASHINGTON
Torts Division
7141 Cleanwater Drive SW
PO Box 40126
Olympia, WA 98504-0126
(360) 586-6300

previous position at WSU, Ms. Finnestead attended Women's Center luncheons hosted on campus entitled "FEMPowerment." During the time Ms. Finnestead was WSU's violence prevention coordinator, she was also a coordinator of the Green Dot violence prevention program. The remainder of the allegations contained in paragraph 119 and any inference from the allegations not specifically admitted are denied.

120.    WSU admits that the *Daily Evergreen* published an article on October 9, 2013, entitled "Fighting the Violence." In this article, Nikki Finnestead, who was WSU's violence prevention coordinator at the time, made the statements set forth in the paragraph.  Ms. Finnestead also stated in that article that "[r]elationship violence includes dating violence, stalking and sexual assault, and can be directed at women and men in heterosexual or same-sex relationships." The remainder of the allegations contained in paragraph 120 and any inference from the allegations not specifically admitted are denied.

121.    The *WSU Insider* published an article on October 13, 2013, entitled "Major Law Expands Protections at College Campuses."  Nikki Finnestead, as WSU's violence prevention coordinator at the time, made the statements set forth in the paragraph; WSU denies that these statements were bolded or emphasized in any way. The remainder of the allegations contained in paragraph 121 and any inference from the allegations not specifically admitted are denied

122.    WSU is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 122 and, therefore, denies the same.

123.    After the initial intake interviews, the investigation was transferred to investigator Rachel Brooks. The remainder of the allegations contained in paragraph 123 and any inference from the allegations not specifically admitted are denied.

124.    WSU denies the allegations contained in paragraph 124.

125.    WSU denies that investigator Rachel Brooks was biased and/or incompetent and denies any reference or inference from any allegation in paragraph 125 that she was. The remainder

DEFENDANT WASHINGTON STATE
UNIVERSITY'S ANSWER TO PLAINTIFFS'
AMENDED COMPLAINT

15

ATTORNEY GENERAL OF WASHINGTON
Torts Division
7141 Cleanwater Drive SW
PO Box 40126
Olympia, WA 98504-0126
(360) 586-6300

of the allegations contained in paragraph 125 and any inference from the allegations not specifically admitted are denied. WSU denies the remaining allegations contained in paragraph 125.

126.    WSU denies the allegations contained in paragraph 126

127.    WSU denies the allegations contained in paragraph 127.

128.    WSU denies the allegations contained in paragraph 128.

129.    WSU denies the allegations contained in paragraph 129.

130.    WSU is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 130 and, therefore, denies the same.

131.    WSU is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 131 and, therefore, denies the same.

132.    The allegations contained in paragraph 132 do not contain facts to which an answer is required. To the extent an answer is required, WSU denies the same.

133.    WSU denies the allegations contained in paragraph 133.

134.    WSU denies the allegations contained in paragraph 134.

135.    WSU is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 135 and, therefore, denies the same.

136.    WSU denies the allegations contained in paragraph 136.

137.    WSU denies that investigator Rachel Brooks was biased and/or incompetent and denies any reference or inference from any allegation in paragraph 137 that she was. WSU denies the remaining allegations contained in paragraph 137.

138.    WSU is without knowledge or information sufficient to form a belief to what notes are referred to paragraph 138 and, therefore, denies the same. WSU denies the remaining allegations contained in this paragraph.

139.    WSU denies the allegations contained in paragraph 139.

140.    WSU denies the allegations contained in paragraph 140.

DEFENDANT WASHINGTON STATE
UNIVERSITY'S ANSWER TO PLAINTIFFS'
AMENDED COMPLAINT

16

ATTORNEY GENERAL OF WASHINGTON
Torts Division
7141 Cleanwater Drive SW
PO Box 40126
Olympia, WA 98504-0126
(360) 586-6300

1

2    141.    WSU denies the allegations contained in paragraph 141.

3    142.    WSU denies the allegations contained in paragraph 142.

4    143.    WSU denies the allegations contained in paragraph 143.

5    144.    WSU is without knowledge or information sufficient to form a belief as to the truth

of the allegations contained in paragraph 144 and, therefore, denies the same.

6

7    **Part IV:  Additional Issues Addressed by the US Department of Education Office for Civil
Rights 2017 Guidelines for Sexual Misconduct Cases Appear Below**

8    145.    The allegations contained in paragraph 145 constitute legal conclusions to which no

9    answer is required. To the extent an answer is required, WSU denies the same.

10    146.    The allegations contained in paragraph 146 constitute legal conclusions to which no

11    answer is required. To the extent an answer is required, WSU denies the same.

12    147.    Plaintiff's first meeting with WSU OEO was in March 2019. The remaining

13    allegations contained in paragraph 147 constitute legal conclusions to which no answer is required.

14    To the extent an answer is required, WSU denies the same.

15    148.    The quote in this paragraph is from OEO's procedural guidelines. The last sentence

16    of this quoted section is: "As needed, OEO will provide written notice to parties when the timeline

17    for an investigation is changed." The remainder of the allegations contained in paragraph 148 and

18    any inference from the allegations not specifically admitted are denied.

19    149.    The complaint was received in January 2019 and an investigation report was issued

20    in December 2019. The remainder of the allegations contained in paragraph 149 and any inference

21    from the allegations not specifically admitted are denied.

22    150.    WSU OEO uses a coversheet when the office intakes a new report. This report

23    reflects information that OEO receives at that time, prior to its investigation and is not a

24    determination or elevation of the case at that time.  WSU is without knowledge or information

25    sufficient to form a belief as to the truth of the allegations as to what the handwritten notation refers

26

DEFENDANT WASHINGTON STATE
UNIVERSITY'S ANSWER TO PLAINTIFFS'
AMENDED COMPLAINT

17

ATTORNEY GENERAL OF WASHINGTON
Torts Division
7141 Cleanwater Drive SW
PO Box 40126
Olympia, WA 98504-0126
(360) 586-6300

to and, therefore, denies the same. The remainder of the allegations contained in paragraph 150 and any inference from the allegations not specifically admitted are denied.

151. WSU denies the allegations contained in paragraph 151.

152. WSU denies the allegations contained in paragraph 152.

153. WSU is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 153 and, therefore, denies the same.

154. WSU is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 154 and, therefore, denies the same.

155. WSU denies the allegations contained in paragraph 155.

156. WSU admits that at the time Plaintiff was not represented by an attorney. WSU is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in paragraph 156 and, therefore, denies the same.

157. WSU is without knowledge or information sufficient to form a belief as to the truth of the allegations whether it was "in poor taste" for Plaintiff not to send the video and, therefore, denies the same. The remaining allegations contained in paragraph 157 constitute legal conclusions to which no answer is required. To the extent an answer is required, WSU denies the same.

158. WSU is without knowledge or information sufficient to form a belief as to the truth of the allegations whether "the transmission of a sexualized video may seem reprehensible to an older generation" and if the transmission of a sexualized video "is warranted" and, therefore, denies the same. WSU is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in paragraph 158 and, therefore, denies the same.

159. WSU is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 159 and, therefore, denies the same.

160. On December 16, 2019, Karen Metzner, Director of the WSU Office of Community Standards issued the Office's findings that Plaintiff's conduct "created a hostile an offensive

DEFENDANT WASHINGTON STATE
UNIVERSITY'S ANSWER TO PLAINTIFFS'
AMENDED COMPLAINT

18

ATTORNEY GENERAL OF WASHINGTON
Torts Division
7141 Cleanwater Drive SW
PO Box 40126
Olympia, WA 98504-0126
(360) 586-6300

educational environment for your fellow ROTC members (WAC 504-26-227, WAC 504-26-209)." WSU denies the remaining allegations in this paragraph.

161.    Plaintiff appealed the December 16, 2019, investigation to the appeals board, which was chaired by Olivia Shoesmith. WSU is without knowledge or information sufficient to form a belief as to the truth of the allegations as to Ms. Shoesmith's background and, therefore, denies the same. WSU denies the remaining allegations in this paragraph.

162.    On February 21, 2020, WSU's Student Appeals Board upheld the December 16, 2019, finding "carefully considering the information and rationale provided" in Plaintiff's appeal, which included the provisions set forth in the paragraph. The remainder of the allegations contained in paragraph 162 and any inference from the allegations not specifically admitted are denied.

163.    WAC 504-26-115 sets forth the composition of the WSU Appeals Board: "The appeals board must consist of three members. A quorum of three is needed to review a matter. A majority of appeals board members hearing a matter must be enrolled WSU students (undergraduate, graduate, or professional) and may be full-time or part-time. The remaining members may be students, or full-time or part-time faculty or staff of any rank or classification." WSU is without knowledge or information sufficient to form a belief as to the truth of the allegations as to the students' experience or if what they do is "as an act of resume—building" and, therefore, denies the same. The remainder of the allegations contained in paragraph 163 and any inference from the allegations not specifically admitted are denied.

**Part V:  WSU EP #15's Definition of Actionable Sexual Harassment Which "creates a hostile environment" is Overbroad or Vague Under the 1st Amendment of the US Constitution.**

164.    The allegations contained in paragraph 164 constitute legal conclusions to which no answer is required. To the extent an answer is required, WSU denies the same.

165.    The allegations contained in paragraph 165 constitute legal conclusions to which no answer is required. To the extent an answer is required, WSU denies the same.

DEFENDANT WASHINGTON STATE
UNIVERSITY'S ANSWER TO PLAINTIFFS'
AMENDED COMPLAINT

19

ATTORNEY GENERAL OF WASHINGTON
Torts Division
7141 Cleanwater Drive SW
PO Box 40126
Olympia, WA 98504-0126
(360) 586-6300

166.    The allegations contained in paragraph 166 constitute legal conclusions to which no answer is required. To the extent an answer is required, WSU denies the same.

167.    WSU is without knowledge or information sufficient to form a belief as to the truth of the allegations regarding an "EP Policy #15 E" and, therefore, denies the same. WSU denies the remaining allegations in this paragraph.

168.    WSU denies the allegations contained in paragraph 168.

169.    WSU admits the allegations contained in paragraph 169.

### III.    CAUSE OF ACTION

170.    WSU reasserts and incorporates by reference each and every answer set forth in paragraphs 1-169 with the same force and effect as though fully set forth herein, and applies those answers to its response to each cause of action.

### (Count One – Violation of the Washington Administrative Procedure Act)

171.    The allegations contained in paragraph 171 constitute legal conclusions to which no answer is required. To the extent an answer is required, WSU denies the same.

172.    WSU denies the allegations contained in paragraph 172.

173.    WSU admits that its Executive Policy 15 (EP 15) defines "sexual harassment" in part as "a form of discrimination based on sex and/or gender and is prohibited by this policy. Sexual harassment encompasses unwelcome verbal or physical conduct of a sexual nature." However, EP 15 contains additional, alternative means for committing sexual harassment and, therefore, an inference from the allegation that the quoted definition is EP 15's sole definition for sexual harassment is denied.

174.    WSU is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 174 and, therefore, denies the same.

175.    WSU is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 175 and, therefore, denies the same.

DEFENDANT WASHINGTON STATE UNIVERSITY'S ANSWER TO PLAINTIFFS' AMENDED COMPLAINT

20

ATTORNEY GENERAL OF WASHINGTON
Torts Division
7141 Cleanwater Drive SW
PO Box 40126
Olympia, WA 98504-0126
(360) 586-6300

176.    WSU is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 176 and, therefore, denies the same.

177.    WSU is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 177 and, therefore, denies the same.

178.    WSU is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 178 and, therefore, denies the same.

179.    WSU admits that at this time it is not aware of any evidence that Plaintiff contacted the individuals identified in findings 5, 6, and 7 of Ms. Metzner's initial order after he was notified of CRCI's investigation; the remainder of the allegation contained in paragraph 179 and any inference from the allegation not specifically admitted is denied.

180.    WSU is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 180 and, therefore, denies the same.

181.    The allegations contained in paragraph 181 are not a short and plain statement of the claim showing that the pleader is entitled to relief, therefore no answer is required.  To the extent an answer is required, WSU denies the same.

182.    WSU denies the allegations contained in paragraph 182.

183.    The allegations contained in paragraph 183 are not a short and plain statement of the claim showing that the pleader is entitled to relief, therefore no answer is required.  To the extent an answer is required, WSU denies the same.

184.    WSU is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 184 and, therefore, denies the same.

185.    WSU is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 185 and, therefore, denies the same.

186.    WSU is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 186 and, therefore, denies the same.

DEFENDANT WASHINGTON STATE
UNIVERSITY'S ANSWER TO PLAINTIFFS'
AMENDED COMPLAINT

21

ATTORNEY GENERAL OF WASHINGTON
Torts Division
7141 Cleanwater Drive SW
PO Box 40126
Olympia, WA 98504-0126
(360) 586-6300

187.    WSU denies the allegations contained in paragraph 187.

188.    WSU denies the allegations contained in paragraph 188.

189.    WSU admits that at no time did the Complainant suggest her sexual relations with Plaintiff were anything but consensual and denies all other allegations contained in paragraph 189.

190.    WSU is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 190 and, therefore, denies the same.

191.    The allegations contained in paragraph 191 are not a short and plain statement of the claim showing that the pleader is entitled to relief, therefore no answer is required.  To the extent an answer is required, WSU denies the same.

192.    WSU is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 192 and, therefore, denies the same.

193.    WSU is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 193 and, therefore, denies the same.

194.    WSU admits that Plaintiff admitted to a CRCI investigator that he sent a video of himself having sex with a female to other ROTC members; the remainder of the allegation contained in paragraph 194 and any inference from the allegation not specifically admitted is denied.

195.    WSU admits the allegations contained in paragraph 195.

196.    WSU is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 196 and, therefore, denies the same.

197.    WSU is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 197 and, therefore, denies the same.

198.    WSU denies the allegations contained in paragraph 198.

199.    WSU is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 199 and, therefore, denies the same.

DEFENDANT WASHINGTON STATE
UNIVERSITY'S ANSWER TO PLAINTIFFS'
AMENDED COMPLAINT

22

ATTORNEY GENERAL OF WASHINGTON
Torts Division
7141 Cleanwater Drive SW
PO Box 40126
Olympia, WA 98504-0126
(360) 586-6300

200.    Paragraph 200 contains a reservation of rights; therefore no answer is required.

**(Counts Two and Three – Violation of the Washington Public Record Act – P. Fleetwood & M. Fleetwood)**

201.    WSU reasserts and incorporates by reference each and every answer set forth in paragraphs 1-200 with the same force and effect as though fully set forth herein, and applies those answers to its response to each cause of action.

202.    The allegations contained in paragraph 202 constitute legal conclusions to which no answer is required. To the extent an answer is required, WSU denies the same.

203.    WSU admits the allegations contained in paragraph 203.

204.    WSU admits the allegations contained in paragraph 204.

205.    WSU admits the allegations contained in paragraph 205.

206.    WSU admits the allegations contained in paragraph 206.

207.    WSU admits the allegations contained in paragraph 207.

208.    WSU admits the allegations contained in paragraph 208.

209.    WSU denies the allegations contained in paragraph 209.

210.    WSU denies the allegations contained in paragraph 210.

211.    WSU admits the allegations contained in paragraph 211.

212.    WSU admits the allegations contained in paragraph 212.

213.    WSU admits the allegations contained in paragraph 213.

214.    WSU denies the allegations contained in paragraph 214.

215.    WSU denies the allegations contained in paragraph 215.

216.    WSU denies the allegations contained in paragraph 216.

**(Count 4 – Gender Discrimination – RCW 49.60.400 – P. Fleetwood)**

217.    WSU reasserts and incorporates by reference each and every answer set forth in paragraphs 1-217 with the same force and effect as though fully set forth herein, and applies those answers to its response to each cause of action.

DEFENDANT WASHINGTON STATE
UNIVERSITY'S ANSWER TO PLAINTIFFS'
AMENDED COMPLAINT

23

ATTORNEY GENERAL OF WASHINGTON
Torts Division
7141 Cleanwater Drive SW
PO Box 40126
Olympia, WA 98504-0126
(360) 586-6300

218.    The allegations contained in paragraph 218 constitute legal conclusions to which no answer is required. To the extent an answer is required, WSU denies the same.

219.    The allegations contained in paragraph 219 constitute legal conclusions to which no answer is required. To the extent an answer is required, WSU denies the same.

220.    WSU denies it discriminated against Plaintiff or that its actions were in any way discriminatory. Further, WSU denies that Plaintiff is entitled to any relief from WSU. To the extent the allegations in these paragraphs suggest otherwise, they are denied. WSU denies the remaining allegations in paragraph 220.

221.    WSU denies it discriminated against Plaintiff or that its actions were in any way discriminatory. Further, WSU denies that Plaintiff is entitled to any relief from WSU. To the extent the allegations in these paragraphs suggest otherwise, they are denied. WSU denies the remaining allegations in paragraph 221.

**(Count 5 – Tortious Interference With Contractual Expectancy – P. Fleetwood)**

222.    WSU reasserts and incorporates by reference each and every answer set forth in paragraphs 1-221 with the same force and effect as though fully set forth herein, and applies those answers to its response to each cause of action.

223.    The allegations contained in paragraph 223 constitute legal conclusions to which no answer is required. To the extent an answer is required, WSU denies the same.

224.    The allegations contained in paragraph 224 constitute legal conclusions to which no answer is required. To the extent an answer is required, WSU denies the same.

225.    WSU is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 225 and, therefore, denies the same.

226.    WSU is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 226 and, therefore, denies the same.

DEFENDANT WASHINGTON STATE UNIVERSITY'S ANSWER TO PLAINTIFFS' AMENDED COMPLAINT

24

ATTORNEY GENERAL OF WASHINGTON
Torts Division
7141 Cleanwater Drive SW
PO Box 40126
Olympia, WA 98504-0126
(360) 586-6300

227.    WSU denies it intentionally interfered with Plaintiff's contract with the U.S. Army or that its actions were in any way tortious. Further WSU denies that Plaintiff is entitled to any relief from WSU. To the extent the allegations in these paragraphs suggest otherwise, they are denied. WSU denies the remaining allegations contained in paragraph 227.

228.    WSU denies it intentionally interfered with Plaintiff's contract with the U.S. Army or that its actions were in any way tortious. Further, WSU denies that Plaintiff is entitled to any relief from WSU. To the extent the allegations in these paragraphs suggest otherwise, they are denied. WSU denies the remaining allegations contained in paragraph 228.

229.    WSU denies it intentionally interfered with Plaintiff's contract with the U.S. Army or that its actions were in any way tortious. Further, the State denies that Plaintiff is entitled to any relief from WSU. To the extent the allegations in these paragraphs suggest otherwise, they are denied. WSU is without knowledge or information sufficient to form a belief as to the truth of the allegations concerning Plaintiff's military career and ROTC's reason for ending its contract with Plaintiff and, therefore, denies the same. WSU denies the remaining allegations contained in paragraph 229.

**(Count 6 & 7 – Violation of 1st and 14th Amendments of the U.S. Constitution – P. Fleetwood)**

230.    WSU reasserts and incorporates by reference each and every answer set forth in paragraphs 1-229 with the same force and effect as though fully set forth herein, and applies those answers to its response to each cause of action.

231.    The allegations contained in paragraph 231 constitute legal conclusions to which no answer is required. To the extent an answer is required, WSU denies the same.

232.    The allegations contained in paragraph 232 constitute legal conclusions to which no answer is required. To the extent an answer is required, WSU denies the same.

233.    The allegations contained in paragraph 233 constitute legal conclusions to which no answer is required. To the extent an answer is required, WSU denies the same.

DEFENDANT WASHINGTON STATE
UNIVERSITY'S ANSWER TO PLAINTIFFS'
AMENDED COMPLAINT

25

ATTORNEY GENERAL OF WASHINGTON
Torts Division
7141 Cleanwater Drive SW
PO Box 40126
Olympia, WA 98504-0126
(360) 586-6300

234. WSU admits the allegations contained in paragraph 234.

235. WSU denies that EP 15's definition of sexual harassment is vague and overbroad. Further, the State denies that Plaintiff is entitled to any relief from WSU. To the extent the allegations in these paragraphs suggest otherwise, they are denied. WSU denies the remaining allegations contained in paragraph 235.

236. WSU denies that WSU policy and WAC 504-26-219 are vague and overbroad. Further, WSU denies that Plaintiff is entitled to any relief from WSU. To the extent the allegations in these paragraphs suggest otherwise, they are denied. WSU is without knowledge or information sufficient to form a belief as to the truth of the allegations concerning what Plaintiff wanted to do and what he heard and, therefore, denies the same. WSU denies the remaining allegations contained in paragraph 236.

237. WSU denies that its policies and regulations are vague and overbroad. Further, the WSU denies that Plaintiff is entitled to any relief from WSU. To the extent the allegations in these paragraphs suggest otherwise, they are denied. WSU denies the remaining allegations contained in paragraph 237.

238. The allegations contained in paragraph 238 constitute legal conclusions to which no answer is required. To the extent an answer is required, WSU denies the same.

239. The allegations contained in paragraph 239 constitute legal conclusions to which no answer is required. To the extent an answer is required, WSU denies the same.

240. WSU denies that WSU's process which found that Plaintiff violated WSU policy is unconstitutional. WSU denies that WSU's process which found Plaintiff violated WSU policy violates students' due process rights. Further, WSU denies that Plaintiff is entitled to any relief from WSU. To the extent the allegations in these paragraphs suggest otherwise, they are denied. WSU denies the remaining allegations contained in paragraph 240.

241. WSU denies the allegations contained in paragraph 241.

DEFENDANT WASHINGTON STATE
UNIVERSITY'S ANSWER TO PLAINTIFFS'
AMENDED COMPLAINT

26

ATTORNEY GENERAL OF WASHINGTON
Torts Division
7141 Cleanwater Drive SW
PO Box 40126
Olympia, WA 98504-0126
(360) 586-6300

242.    WSU denies the allegations contained in paragraph 242.

243.    WSU denies the allegations contained in paragraph 243.

244.    WSU denies that WSU's process which found that Plaintiff violated WSU policy is unconstitutional. WSU denies that WSU's process which found Plaintiff violated WSU policy violated Plaintiff's due process rights. Further, WSU denies that Plaintiff is entitled to any relief from WSU. To the extent the allegations in these paragraphs suggest otherwise, they are denied. WSU denies the remaining allegations contained in paragraph 244.

**(Count 8 – Violation of Title IX – 20 U.S.C. §1681 – P. Fleetwood)**

245.    WSU reasserts and incorporates by reference each and every answer set forth in paragraphs 1-244 with the same force and effect as though fully set forth herein, and applies those answers to its response to each cause of action.

246.    WSU admits the allegations contained in paragraph 246.

247.    The allegations contained in paragraph 247 constitute legal conclusions to which no answer is required. To the extent an answer is required, WSU denies the same.

248.    The allegations contained in paragraph 248 constitute legal conclusions to which no answer is required. To the extent an answer is required, WSU denies the same.

249.    WSU denies the allegations contained in paragraph 249.

250.    WSU denies the allegations contained in paragraph 250.

251.    WSU denies the allegations contained in paragraph 251.

## IV.    PRAYER FOR RELIEF

WSU denies Plaintiffs' prayer for relief and denies all damages alleged in the Amended Complaint.

## V.    ALLEGATIONS NOT EXPRESSLY ADMITTED ARE DENIED

Multiple allegations were imbedded in most of the paragraphs of Plaintiffs' Amended Complaint, and, indeed, in many of the individual sentences in the paragraphs of that document.

DEFENDANT WASHINGTON STATE
UNIVERSITY'S ANSWER TO PLAINTIFFS'
AMENDED COMPLAINT

27

ATTORNEY GENERAL OF WASHINGTON
Torts Division
7141 Cleanwater Drive SW
PO Box 40126
Olympia, WA 98504-0126
(360) 586-6300

While the State has made every effort to address each allegation, the State is aware it may be possible to interpret that a particular allegation was neither admitted nor denied in this Answer. Accordingly, in addition to the admissions and denials stated herein, the State denies any allegation in Plaintiffs' Complaint that has not been expressly admitted or denied.

## VI.    AFFIRMATIVE DEFENSES

1.    By Way of FURTHER ANSWER and FIRST AFFIRMATIVE DEFENSE, WSU alleges that the court lacks jurisdiction over the subject matter of Count One.

2.    By Way of FURTHER ANSWER and SECOND AFFIRMATIVE DEFENSE, WSU alleges that Plaintiffs have failed to exhaust administrative remedies or Plaintiffs' remedy is administrative rather than judicial and therefore the action will not lie.

3.    By Way of FURTHER ANSWER and THIRD AFFIRMATIVE DEFENSE, WSU alleges that the injuries and damages, if any, claimed by the Plaintiffs were proximately caused or contributed to by the fault of Plaintiffs as defined by RCW 4.22.015.

4.    By Way of FURTHER ANSWER and FOURTH AFFIRMATIVE DEFENSE, WSU alleges that the Plaintiffs have failed to state a claim upon which relief may be granted.

5.    By Way of FURTHER ANSWER and FIFTH AFFIRMATIVE DEFENSE, WSU alleges that WSU at all times acted in good faith in the performance of its duties and is therefore immune from suit for the matters charged in Plaintiffs' complaint.

6.    By Way of FURTHER ANSWER and SIXTH AFFIRMATIVE DEFENSE, WSU alleges that the claims against WSU are barred by the doctrine of absolute quasi-judicial and/or quasi-prosecutorial immunity.

7.    By Way of FURTHER ANSWER and SEVENTH AFFIRMATIVE DEFENSE, WSU alleges that the damages and/or injuries, if any, were caused by the fault of a nonparty for purposes of RCW 4.22.070(1).  The identity of the nonparty is the United States Army Cadet Command.

DEFENDANT WASHINGTON STATE
UNIVERSITY'S ANSWER TO PLAINTIFFS'
AMENDED COMPLAINT

28

ATTORNEY GENERAL OF WASHINGTON
Torts Division
7141 Cleanwater Drive SW
PO Box 40126
Olympia, WA 98504-0126
(360) 586-6300

8.      By Way of FURTHER ANSWER and EIGHTH AFFIRMATIVE DEFENSE, WSU alleges that Plaintiffs have failed to join an indispensable party.

9.      By Way of FURTHER ANSWER and NINTH AFFIRMATIVE DEFENSE, WSU alleges that the claims against WSU are barred by the doctrine of prosecutorial discretion.

## RESERVATION OF RIGHTS

WSU reserves the right to amend this Answer by adding affirmative defenses, counterclaims, cross-claims, or by initiating third party actions as information is gained through investigation and discovery.

WHEREFORE, WSU prays that Plaintiffs' complaint be dismissed with prejudice, that Plaintiffs take nothing by their complaint, and that WSU be allowed its costs and reasonable attorney fees herein.

DATED this 2nd day of October, 2020.

ROBERT W. FERGUSON
Attorney General

*s/ Debra Lefing*

DEBRA LEFING, WSBA No. 53344
BRIAN J. BAKER, WSBA No. 54491
OID #91023
Assistant Attorneys General
Torts Division
7141 Cleanwater Drive SW
PO Box 40126
Olympia, WA 98504-0126
Debra.Lefing@atg.wa.gov
brian.baker@atg.wa.gov
(360) 586-6300

DEFENDANT WASHINGTON STATE
UNIVERSITY'S ANSWER TO PLAINTIFFS'
AMENDED COMPLAINT

29

ATTORNEY GENERAL OF WASHINGTON
Torts Division
7141 Cleanwater Drive SW
PO Box 40126
Olympia, WA 98504-0126
(360) 586-6300

### DECLARATION OF SERVICE

I declare that I caused to have served a copy of this document on all parties or their counsel of record on the date below as follows:

| **Party** | **Method of Service** | |
|---|---|---|
| Matthew Z. Crotty<br>905 West Riverside Avenue, Suite 404<br>Spokane, WA 99201<br>matt@crottyandson.com | ✓ US Mail Postage Prepaid<br><br>o Certified Mail Postage Prepaid<br><br>o State Campus Mail<br><br>o ABC/Legal Messenger | o UPS Next Day Air<br><br>o By Fax<br><br>o By Email<br><br>o Hand delivered by: |

I declare under penalty of perjury under the laws of the state of Washington that the foregoing is true and correct.

DATED this 2nd day of October, 2020, at Tumwater, Washington.

*s/ Debra Lefing*

_____

DEBRA LEFING, WSBA No. 53344

DEFENDANT WASHINGTON STATE
UNIVERSITY'S ANSWER TO PLAINTIFFS'
AMENDED COMPLAINT

30



20 – 2 – 00053 – 38
NT                43
Notice
9014869

**FILED**

**OCT 06 2020**

JILL E. WHELCHEL
WHITMAN COUNTY CLERK

**STATE OF WASHINGTON
WHITMAN COUNTY SUPERIOR COURT**

PATRICK FLEETWOOD and MICHAEL FLEETWOOD,

                    Plaintiffs,

    v.

WASHINGTON STATE UNIVERSITY,

                    Defendant.

NO. 20-2-00053-38

NOTICE TO WHITMAN COUNTY SUPERIOR COURT OF REMOVAL TO FEDERAL COURT

**(Clerk's Action Required)**

       Please take notice that on October 2, 2020, the undersigned attorney for defendant, WASHINGTON STATE UNIVERSITY, filed a Notice of Removal in the above-entitled case, in the United States District Court, Eastern District of Washington, Spokane Division.

       DATED this 2nd day of October, 2020.

                            ROBERT W. FERGUSON
                            Attorney General

                            *s/ Brian J. Baker*

                            BRIAN J. BAKER, WSBA No. 54491
                            OID #91023
                            Assistant Attorney General

NOTICE TO WHITMAN COUNTY
SUPERIOR COURT OF REMOVAL TO
FEDERAL COURT

1

ATTORNEY GENERAL OF WASHINGTON
Torts Division
7141 Cleanwater Drive SW
PO Box 40126
Olympia, WA 98504-0126
(360) 586-6300

**CERTIFICATE OF SERVICE**

I certify that I served a copy of this document on all parties or their counsel of record on the date below as follows:

☒ US Mail Postage Prepaid via Consolidated Mail Service

Matthew Z. Crotty
Crotty & Son Law Firm, PLLC
905 West Riverside Avenue, Suite 404
Spokane, WA  99201
matt@crottyandson.com

☐ ABC/Legal Messenger

☐ State Campus Delivery

☐ Hand delivered by

I certify under penalty of perjury under the laws of the state of Washington that the foregoing is true and correct.

DATED this 2nd day of October, 2020, at Tumwater, Washington.

*s/ Brian J. Baker*

_____
BRIAN J. BAKER, WSBA No. 54491

NOTICE TO WHITMAN COUNTY
SUPERIOR COURT OF REMOVAL TO
FEDERAL COURT

2

ATTORNEY GENERAL OF WASHINGTON
Torts Division
7141 Cleanwater Drive SW
PO Box 40126
Olympia, WA 98504-0126
(360) 586-6300

1
2
3
4
5
6
7
8
9
10

**SUPERIOR COURT, STATE OF WASHINGTON, COUNTY OF WHITMAN**

11

PATRICK FLEETWOOD,

12

                        Plaintiff,

NO. 20-2-00053-38

13
14

    vs.

15

WASHINGTON STATE UNIVERSITY,

**PLAINTIFF'S MOTION TO STRIKE RESPONSE BRIEF**

16

                     Defendant.

17
18

      The Court should deny WSU's attempt to strike evidence that is not to its liking from the

19

Agency Record.

20

      By way of a brief background, Fleetwood timely appealed WSU's finding that he violated

21
22

EP 15. (Dkt. 1, Complaint) Shortly thereafter WSU produced, to Fleetwood's counsel, "the Office

23

of Civil Rights Compliance[1] and *Investigation file*," and did so beginning March 27, 2020 and

24
25
26

[1] WSU admits that "The Office for Equal Opportunity changed its name since Mr. Fleetwood's investigation. The office's current name is Compliance and Civil Rights." (WSU Response Br. P. 7, n.2)

MOTION TO STRIKE RESPONSE BRIEF -
PAGE 1

1  ending April 2, 2020. (7/31/2020 Crotty Decl. ¶4)(emphasis added) On July 21, 2020, WSU filed

2  the "Index of Agency Record" and, as part of WSU's "Index of Agency Record" listed "OEO

3  *investigative file*" as part of the Agency Record. (Index of Agency Record, p. 1)(emphasis added)

4  WSU does not dispute this. On July 31, 2020, Fleetwood timely filed his opening brief and, as part

5  of the opening brief included 87 pages from the "investigative file" WSU produced to Fleetwood

6  during the March 27 – April 2 timeframe. (7/31/2020 Crotty Decl. Ex. A) Those "investigative

7  file" documents include, but are not limited to, investigatory emails between WSU investigator

8  Brooks and Complainant wherein Complainant tells Ms. Brooks "I would appreciate it if the direct

9  quotes weren't used" as it relates to Complainant's allegation that Fleetwood sexually harassed

10  her. (7/31/2020 Crotty Decl. Ex A *citing* WSU Prod 505)

11

12        Now recognizing the damning nature of the "investigative file" documents it omitted, WSU

13  seeks to engage on another round of form overs substance legal maneuvering in an attempt to

14  distract the Court from the real issue at hand: WSU's lawyer represented that it produced the

15  "investigative file" to Fleetwood but did not convey key (and exonerating) parts of the

16  "investigation file" to the Court. For the above and following reasons, WSU's motion should be

17  denied.

18

19        **First,** WSU does not deny that the documents contained in the Crotty declaration are part

20  of the Agency Record. For it submits no declaration (in support of its Motion to Strike) from any

21  WSU employee or agent attesting to the contrary.

22

23        **Second,** Fleetwood is not seeking to "supplement the agency record" because the

24  documents contained in the Crotty declaration are already part of the Agency Record. This is

25  because WSU represented that the documents contained in the Crotty declaration were part of the

26  "investigative file" and represented, in its July 21, 2020, court filing of the Index, that the Agency

MOTION TO STRIKE RESPONSE BRIEF - _____
PAGE 2

Record contained the "OEO investigation file." WSU cites no authority for the proposition that, under such facts, it can pick and choose what it wants to call the Agency Record.

**Third,** WSU argues that Fleetwood needed the Court's "explicit permission" before supplementing the Agency Record (AR). (Motion to Strike p. 2) WSU cites *Washington Indep. Tel. Ass'n v. Washington Utilities & Transp. Comm'n*, 110 Wn. App. 498, 518 (2002) in support. That case in inapposite: it involved a trial court exercising its discretion in refusing to allow additional discovery which, in that case, involved issuance of a subpoena. Here Fleetwood is not asking the Court that a subpoena be issued or that discovery commence on the APA matter.

WSU's motion to strike should be denied.

DATED this 7th day of October 2020.

**CROTTY & SON LAW FIRM, PLLC**

By: _____

MATTHEW Z. CROTTY, WSBA #39284

Attorneys for Plaintiff

MOTION TO STRIKE RESPONSE BRIEF -
PAGE 3

1

## <u>CERTIFICATE OF SERVICE</u>

2

3

Pursuant to RCW 9A.72.085 the undersigned hereby certifies under penalty of perjury under the laws of the State of Washington, that on the 7th day of October 2020, the foregoing was delivered to the following persons in the manner indicated:

4

5

6

7

| Nathan E. Deen | VIA REGULAR MAIL | __ |
| Attorney General of Washington | VIA FACSIMILE | __ |
| 332 French Administration Building | HAND DELIVERED | __ |
| Pullman, WA 99164 | VIA EMAIL | ✓ |

8

9

10

11

CROTTY & SON LAW FIRM, PLLC

12

13

Matthew Crotty

14

15

16

17

18

19

20

21

22

23

24

25

26

MOTION TO STRIKE RESPONSE BRIEF -
PAGE 4

1
2
3
4
5
6
7
8
9

FILED

OCT 0 7 2020

WHITMAN COUNTY CLERK

10

## SUPERIOR COURT, STATE OF WASHINGTON, COUNTY OF WHITMAN

11

PATRICK FLEETWOOD,

12

                Plaintiff,

13

vs.

14

WASHINGTON STATE UNIVERSITY,

15

                Defendant.

16

NO. 20-2-00053-38

**PETITIONER REPLY BRIEF**

17

18

### I.    INTRODUCTION & SUMMARY OF ARGUMENT

19

      Rather than responding to the facts of this case in a meaningful fashion, Defendant

20

essentially claims that its decision vis-à-vis Fleetwood is unassailable because it is a government

21

agency, and since it made a decision, that decision is beyond reproach.  That is not the law. The

22

Agency must support its decision by ***substantial evidence***, i.e. "evidence

23

sufficient to persuade a fair-minded rational person of the truth of the declared premise" which, in

24

this case, is whether Fleetwood sexually harassed the Complainant and/or interfered with the

25

student conduct system. *In re Welfare of A.B.*, 181 Wn. App. 45, 59 (2014).

26

REPLY BRIEF - PAGE 1

In this case there is simply **_no_** evidence that Fleetwood sexually harassed Complainant. Instead, the Complainant's words show her motivation for filing a complaint was at best speculation (AR 069-071) about Fleetwood's potential to harass some woman in his future—and even that speculation was based on rumor, not evidence, much less evidence of the "substantial" sort. Complainant filed a complaint against her former sexual partner because she disapproved of malicious, hugely exaggerated, and utterly false rumors she heard about Fleetwood's alleged promiscuity (AR 069-071). Complainant describes her complaint as a "character concern" about Fleetwood's **_future "_**professionalism as an officer and whether or not he will know his limmits [sic] and **_potentially_** prey on some private right out of basic training … have sex with here, leave her, then ruin her reputation" (AR 069). Complainant told investigators how her reputation was ruined well before she met Fleetwood: "People talk. Another thing that makes community hostile. I dated a guy back in Sept-Nov. *Just by me dating that one person, people asking, how many people has [Complainant] slept with now.* It's really bad" (AR 163).   While this is unfortunate for Complainant, it is not Fleetwood's fault.

The substantial evidence, as shown by Complainant's own words, was Complainant's concern for her growing reputation as "the program slut." Complainant admitted as much when telling WSU's investigator her purpose for making the complaint: "**_[t]he spotlight gets off me and on his behavior in uniform…general character check on him_**" (AR 167). WSU echoed this concern in its June 2018 Investigation Report: "[Complainant] expressed worry about gossip and rumors in the Program and being labeled a '[Program] slut.' (AR 22). The Complainant told investigators she feels uncomfortable in the Program with everyone [allegedly] hearing these rumors from the Respondent about their sexual activities" (AR 22, OEO Investigation Report ¶40).  WSU legitimized Complainant's refusal to take accountability for her own actions despite

REPLY BRIEF - PAGE 2

a factual record proving that others—including the Complainant herself—actively discussed the Complainant's sexual activity, but never provided a single factual instance when Fleetwood himself initiated such gossip (AR 036-46).

The Complainant's various testimony reveals remarkable internal inconsistency surrounding the limited situations she chose to construe as verbal harassment, including the now infamous January 9, 2019 Red Bento coupon lunch, which she attended willingly because "hell yea" she loves sushi (AR 062).

- First, she told ROTC, in sworn written statement: "I noticed that he was acting way more nice than usual and ***then he asked*** if I wanted to resume our sexual behavior. When I denied him he was persistent" (AR 070).
- But later she would tell investigators how she told Cadet M immediately after the lunch, "Like ***I think*** Patrick wants to get back to me, don't know how I feel" (AR 100).
- Later her story becomes "he was ***heavily hinting he wanted to get back*** with me" (AR101).
- Nonetheless to ROTC, this Complainant wrote, "after Cadet Fleetwood was denied sexual favors from me, he decided to share explicit content to other cadets in the program about what conspired between us" (AR 068).
- Then, in Cadet M's wild imagination of an interaction he did not witness, the tall tale develops further: "It was some sushi place in Pullman. Patrick had coupon. … Some point, he propositioned her to sleep with him. Got more aggressive. She kept saying no. He realized she wasn't going to say yes, he started being mean. He wanted to know why she wouldn't sleep with him. … He began insulting her about her intelligence... [and afterward ***he, Cadet M,*** suggested] "it's time for you to go forward and talk about this to somebody"[1] (AR 089).

---

[1] Lest the different Cadet-alphabets become confusing, the fair-minded will want to recall testimony of SGT Jon Crodle, so important to understanding the  real story of this case: Crodle was Cadet M's roommate who witnessed Cadet M's interactions with the Complainant eventually recognizing  "the manipulative and coercive aspects of his character... with great appall." Crodle questioned the origination of the OEO complaint because he believed Cadet M, "had intent to see that Patrick be dismissed from ROTC... and that he "displayed character traits indicative of a spiteful power complex." Moreover, Crodle noted, how he observed Cadet M to "spread rumor and inaccurate information in many other instances" (AR 223).

REPLY BRIEF - PAGE 3

Outside Cadet M's imagination, truth does matter. In addition to never denying Fleetwood sexual favors, this Complainant never produced explicit evidence of Fleetwood sharing "explicit content" beyond the one time he confirmed (quietly, when asked) his "eskimo bros[2]" status with Cadet P—a former boyfriend who ***already knew the news*** from others, presumably the Complainant herself (AR 127).

In place of evidence, this case exists due to Complainant's willingness to forward broadly stroked lies from Cadet M. In fact, with time, members of WSU's OEO investigation team recognized the credibility concerns with Cadet M's allegations central to the case (AR 17 at OEO Investigation Report pg. 6 ¶40). By removing findings related to original allegation***, WSU OEO itself effectively concluded there was no evidence of sexual harassment related to the Complainant.*** However, instead of sensibly dismissing the case, WSU investigators shifted focus, recruiting witnesses to complain about reports of photo transmissions between male friends—photo transmissions which happened in a much earlier time period and were entirely unrelated to the Complainant, except insofar as she dredged he ex's past for dirt just as she'd previously asked Fleetwood to "Tell me things about Cadet P that will make me hate him" (AR 046).

Text evidence from the Complainant further clarifies she was never sexually harassed but rather acted on pre-existing vindictive motivations related to her resentment that Fleetwood, along

---

[2] A fair-minded rational person would conclude that a single instance of quietly using the code "Eskimo brothers" to reply in the affirmative to a peer's query about the Complainant's sexual activity does **NOT** qualify as a sexual harassment. As OCR affirms (see below), context matters! This was a college campus. These guys were army buddies. And army or no army, fair-minded, rational people talk about who hooked up with who. Indeed, Fleetwood, for his part, was decidedly discrete.

with her previous boyfriend, had not remained monogamous (AR 36-46). Again, the Complainant's temperament is established clearly—in her own words. She was "sick of empty promises" and shared the sentiment, "*Ayee todos chicos son pendejos*" which in Spanish translation she claimed to mean "All men are Assholes" (AR 043, 045). Indeed, upon discovering he had connected with another woman, this Complainant explicitly *threatened* to file a SHARP complaint against him back in December 2018—and a full month before any incident of alleged harassment took place, but later claimed the threat was a joke (Opening Brief 5 ¶5). As Fleetwood can attest, unfounded complaints are ***not*** a joke: he has now been kicked out of ROTC, forced to pay back over $32,000 to the government, and is barred from pursuing the military career he has envisioned since boyhood (Amended Complaint, ¶229).

Underscoring the weakness of WSU's defense for the utter failure of this investigation, is the latest response brief's continued reliance on "evidence" (e.g. Fleetwood's alleged "Eskimo bros" and "she squirted my sheets[3]") which WSU OEO's Investigation Report (despite all its flaws) effectively discarded. Which is to say, these were ***rumors*** the investigation failed to corroborate, underline{not} "substantial evidence."

For example, in the first lines of its Statement of Case, WSU's Response misconstrues interview testimony to support ongoing vague attacks against Fleetwood's character—***all based on rumor***. See, for example, Resp Brief, pg.3 line 25-26 where WSU falsely claims, "student T.P, a self-described friend of Mr. Fleetwood, stat[ed] that Mr. Fleetwood 'treats women like shit.'" Counsel cites AR 127, but misquotes the investigation record. In actuality, Cadet P was asked by investigators, "Ever ***heard anyone talk about Patrick's behavior*** towards women? *What heard?*"

---

[3] It bears repeating, on January 31, 2019, WSU accused Fleetwood of telling others Complainant "squirted all over my sheets" (AR 004) but WSU's June 13, 2019 "Investigation Report" does not substantiate the "squirted all over my sheets" allegation (AR 016 – 022).

At which point Cadet P answered **he had heard** Fleetwood **"treats women like shit"** (AR 127). When probed later in the same interview, "Who said Patrick treats women like shit," Cadet P clarified, "I know his best friend [the non-credible conspirator Cadet M] talked about it..." (AR 130). When asked if females were saying things Cadet P clarified, "Only talked to Complainant" (AR 130). And even then when asked by investigators, "Did she say what problems she was having? Cadet P: "Just him being a dick head." RMB: "Did she give example?" Cadet P: "None I recall" (AR 130).

This Response Brief also draws attention to the most frequently misquoted, misdated, and unsubstantiated allegation of this entire case: the notorious "who squirted whose what" rumor. (See Response Brief, pg. 4, lines 2-3) The record shows Complainant **told investigators** Fleetwood allegedly said something about squirting on some date (perhaps November 9th, when they were sexually active) but then again maybe it was January 9th (long after they were broken up, which makes little sense) but then WSU does not substantiate that allegation in its June 2019 report. *See supra* n.3. The "sheet squirting" comment plays out as follows:

- **January 18, 2019**: ROTC Complaint. No mention of any "squirting" commentary whatsoever (AR 069-071).
- **January 24, 2019:** OEO *Interview notes Version 1* "We talked after we had sex we continued to communicate. **November 9th** started saying things about our sex life. He was saying things like "she squirted all over my shit, Ekimio bro (If two people had had sex with the same person) he is saying this in our professional area. Saying a lot things that aren't true, he is ruining my rep." (AR 160)
- **January 24, 2019**: *OEO Interview notes Version 2*: "**Jan 9** that whole week spreading rumors details about sex life in and out of uniform to whole battalion. Telling people, she squirted on my sheets. Telling people, friend I date in program, Eskimo Bro—two people who have sex with same person. In our professional settings." (AR 163)
- **January 28, 2019, 11:09 a.m.:** WSU OEO Rachel Brooks emailed Complainant allegations: "On or around January 9, 2019, you subjected the Complainant to comments that were sexual explicit when you made comments such as 'She squirted all over my sheets.'" (7/31/2020 Crotty Decl Ex. A *citing* WSU Prod 506)
- **January 28, 2019, 11:21 a.m.:** Complainant writes back "I would appreciate it if the direct quotes weren't used." (*Id.* WSU Prod 505)

REPLY BRIEF - PAGE 6

- **January 28, 2020 11:23 a.m.:** Brooks emails Complainant: "I will make the corrections and resend to you." *Id.*
- **January 28, 2019 11:26 a.m.:** Complainant emails Brooks, "No you can send it as soon as you see fit.  But again the less quoting you can in the letter the best in my opinion." *Id.*
- **January 28, 2019 11:30 a.m.:** OEO Brooks emails Complainant, "Once my senior investigators looks [sic] it over, I will address those quotes and resend" (WSU Prod 504).
- **January 30, 2019 8:31 a.m.:** OEO Brooks emails Complainant, "Here is the revised edits, if there look [sic] ok I will move forward...During **the week of January 9, 2019**, [he] spread rumors…such as telling others that she 'Squirted all over my sheets...'" (WSU Prod 503-504).
- That version of the allegation carried over to the **January 31, 2019** letter received by Fleetwood, was repeated in the allegations of the **June 13, 2019** Investigation Report, but mysteriously disappeared from the *Findings* in the **June 13, 2019** OEO Investigation Report, presumably because nobody corroborated the details nor the date of the originally problematic hearsay. *See supra.* n.3.

Yet despite all of this WSU still argues, "On one occasion, ***he told others***, 'she squirted all over my shit' (AR 160)" (Response Brief, pg. 4, lines 2-3)  That is not substantial evidence.

Meanwhile, physical, corroborated, exculpatory evidence debunking allegations that Fleetwood attempted to interfere or intimidate students ***does exist*** in the factual record; however, it requires a level of attention to factual chronology which seemingly did not exist in this investigation.  Recall, how on or about January 14-15, 2019, Fleetwood learned through the overactive rumor mill that Complainant accused him of rape/sexual assault (See Opening Brief pg. 16-21). As a fair-minded, rational person who is appalled by rape, Fleetwood proceeded to defend his reputation from false and defamatory allegations.  He did that in three brief communications with friends which took place within 24 hours on January 15-16 and well before the Complainant had invoked the student conduct system for the reasons reported to ROTC, and later revised to WSU OEO. Again, ***the Complainant's own words debunk the allegations*** WSU forwarded on her behalf.  See for example, AR 166, January 24 interview comments from Complainant which establish that Fleetwood had learned about the OEO complaint, ***two days previously on Tuesday,***

REPLY BRIEF - PAGE 7

*January 22,* "I didn't know he'd find out so quickly."  But more to the point, Complainant admits that she "don't know how he would react", AR 166, meaning that WSU has no substantial evidence to accuse Fleetwood of engaging in retaliatory conduct on January 15, 2019, when Complainant, on January 24, 2019, still "don't know" how Fleetwood will react to a harassment complaint Fleetwood (in Complainant's words) first learned about on January 22, 2019, (*compare* AR 13, ¶5 *with* AR 166 bottom of page).

After receiving formal notice first from ROTC (January 19, 2019) and then from WSU OEO (January 31, 2019) that an actual student conduct harassment complaint (not the rumored rape sexual assault complaint) ***had*** indeed been filed, Fleetwood entirely ceased communication fully adhering to the no-contact directive. Indeed, the last time he spoke to the Complainant was January 15, 2019, ***three days before*** she approached WSU ROTC with her initial sworn statement (AR 064, AR 069).

Lastly, there is ample evidence that WSU's actions were arbitrary and capricious because it failed to act upon available evidence surrounding witness credibility—especially Cadet M's malicious motives, while also disregarding Complainant's anti-male bias, Complainant's real stated motives, and the extenuating constellations of circumstance:  College kids have sex, and college kids talk about who they have sex with.  That does not qualify as sexual harassment.

## II.    ARGUMENT

### A.    There is no substantial evidence, that Fleetwood sexually harassed Complainant.

WSU's response instructs the Court to "look to OCR's interpretation" of sexual harassment which is "sufficiently severe, persistent, pervasive" to warrant sanctions (Resp Brief pg. 15 lines 1-6). Fleetwood agrees that the Court should look to the OCR's interpretation of "sexual

harassment" because applying OCR interpretation to this case shows that there is no substantial evidence of sexual harassment (OCR 62 FR 12034-01).

*First,* OCR advises investigators to consider the "***totality of the circumstances***" including first and foremost, "***evidence about the relative credibility of the allegedly harassed student and the alleged harasser. For example, the level of detail and consistency of each person's account should be compared in an attempt to determine who is telling the truth***" (OCR 62 FR at 12041). WSU to this day attacks Fleetwood's credibility ad nauseum, using broad strokes of "he's sexist," yet ignores recurrent inconsistencies in Complainant's story, her outright threats to the Fleetwood, her vocal anti-male bias, along with her blatant disregard for the details of truth established in her early email dialogue with WSU OEO intake (See Opening Brief §II – Incident Timeline - ¶3-4, 10, 11, 22, 25, 26, 30-40). WSU's Response Brief would have us believe these emails (referenced in §II, ¶31-37 of the Opening Brief) between Complainant and WSU-OEO are somehow irrelevant to the case[4], thereby justifying their non-inclusion in the Agency Record yet these emails demonstrate Complainant's credibility concerns and the credibility of WSU's investigation.

*Second,* OCR continues, advising investigators to consider, "***other contemporaneous evidence. For example, did the student claiming harassment write about the conduct, and his or her reaction to it, soon after it occurred (e.g., in a diary or letter)?*** "(OCR 62 FR at 12041) Here Complaint's first documentation occurred on January 18, 2019, ***nine days after the alleged harassment,*** when Complainant wrote about her experiences in her sworn statement to ROTC, that sworn statement makes no mention of "squirting on sheets" or "Eskimo bros" or "Chapstick"

---

[4] It would appear WSU wants to "fancy dance" around blatant omissions to the Agency Record by drawing some arbitrary, non-existent boundary between WSU OEO and WSU Office of Community Standards (located just a few doors down the same Pullman Administrative Hall). But common sense and the facts dictate you can't have one (OEO first investigating) without the other (OCS) making decisions off of the "facts" OEO found.

REPLY BRIEF - PAGE 9

but those allegations show up in WSU's January 31, 2019, OEO complaint against Fleetwood (*compare* AR 069-071 *with* AR 3-6).

*Third,* OCR guidance includes the obvious point, "***another way to assess credibility is to see if corroborative evidence is lacking where it should logically exist***" (OCR 62 FR at 12041). Here the only corroboration of Complainant's original (and conflicting)[5] allegations of sexual harassment was CDT M (who wasn't at the lunch where the harassment allegedly occurred) who was later deemed to have been untruthful during the investigation (*compare* AR 16 (identifying Student A as CDT M) *with* AR 17, ¶17 (identifying Student A as providing untrue information) *and* AR 89 CDT M's interview).

*Fourth*, OCR recommends an examination of past history: "***Evidence that the alleged harasser has been found to have harassed others may support the credibility of the student claiming the harassment; conversely, the student's claim will be weakened if he or she has been found to have made false allegations against other individuals***" **(**OCR 62 FR at 12041) Here Complaint's first documentation occurred on January 18, 2019, ***nine days after the alleged harassment,*** when Complainant wrote about her experiences in her sworn statement to ROTC, that sworn statement makes no mention of "squirting on sheets" or "Eskimo bros" or "Chapstick" but those allegations show up in WSU's January 31, 2019, OEO complaint against Fleetwood (*compare* AR 069-071 *with* AR 3-6).

*Third,* OCR guidance includes the obvious point, "***another way to assess credibility is to see if corroborative evidence is lacking where it should logically exist***" (OCR 62 FR at 12041).

---

[5] *Compare* AR 70 "I noticed that he was acting way more nice than usual and ***then he asked*** if I wanted to resume our sexual behavior. When I denied him he was persistent" *with* AR 100 "Like ***I think*** Patrick wants to get back to me, don't know how I feel."

REPLY BRIEF - PAGE 10

To read interview notes, WSU looked long (four months) and far (across the state) to find another woman willing to further denigrate Fleetwood's reputation—and had no success. *See infra*. Meanwhile, several witnesses recruited to support Complainant's allegations plain simply refuted the malicious characterization presented by the original Complaint.    See, for example, a conveniently ignored email (not in the Agency Record) from a former female Cadet WSU pursued after Complainant claimed she the program because of Fleetwood:



(7/31/2020 Crotty Decl at Ex. A *citing* WSU Prod 427).

Similarly, Witness L.A, who did meet with investigators, also failed to corroborate allegations of former sexual harassment.  Instead, this former Cadet, despite significant leading by Investigators, claimed, "RP never made me feel uncomfortable" (AR 087). When asked, again, about any potential verbal offenses, she clarified, "It's not what he say, its more about how he says it, his tone of voice lets you know he doesn't care" (AR 83-87 versus AR 069).  This "failure to corroborate" was clearly a pattern as Cadet HFT, another female recruited by Complainant, not only failed to agree with the Complainant's negative characterization, but also refuted details related to stated concerns founded in false rumor.

> **Cadet HFT:** "When this case is developing, people saying Patrick is rude to women. … I think his demeanor is neutral, I don't see it."
> **WSU:** Anyone ever come to you and said Patrick did this or that.
> **Cadet HFT:** Only [Complainant] …. "She only one that ever came with specific 'Patrick did this to me'" (AR 143-145).

Fleetwood also provided Ms. Metzner, and by extension the Appeals Board, with numerous character references from other female colleagues—none of whom experienced harassment by Mr. Fleetwood.

Indeed, witnesses called in to support the allegations against Fleetwood instead introduced evidence to further question the Complainant's motivation Complainant's additional motivation for filing is best explained by female witness Cadet HFT (recruited by the Complainant):

> **WSU RMB**: Did [Complainant] ever say anything about being afraid of retaliation?
> **Cadet HFT**: I think reputation.  Hard to have rep already established like when you've slept around in program, to have rep that freshman girl who slept around. Didn't want to be girl who made rape case and people think that.  Don't think she was scared of Patrick, think he has fragile ego but not aggressive.  **Thinks she was more afraid of reputation, don't want to be girl that made false rape case** (AR 145).

And the conflicts were not just with Complainants' reporting of other females' sentiments.  See also the testimony of Cadet P, Complainant's ex-boyfriend, which contradicts accusation that Fleetwood publicly gossiped about Complainant.

> **WSU RMB**: ever heard Patrick refer to you and him as eskimo bros? Context?
> **Cadet P**: Yeah in context I found out [not from Fleetwood] he had sex with Complainant. *I asked him about her*, is it true.  He said yeah, we're eskimo bros now.
> **WSU RMB:** Know if anyone else heard?
> **Cadet P**: We sat down, I asked like what going on... that type of context.  (AR 130)

Meanwhile, Complainant accused other men of treating her like shit (AR 038-39) or being promiscuous (AR 044), or being pendejos meaning, according to Complainant, "Dumbass, asshole, all of the above lol" (AR 45) because "lol" = laugh out loud.  Here, the Complainant's logic presents a ridiculous double standard: a woman slandering all men is laughable whereas she believed Fleetwood's military career should be ended due to *rumors* of less egregious verbal

behavior, which as it turned out was him making one quiet "eskimo bros" comment in a conversation he did not initiate with a man who previously possessed intimate knowledge of the Complainant's sexual promiscuity within the program (AR 130).

**Fourth,** the OCR writes, "[i]n order to be actionable as harassment, sexual conduct must be unwelcome.  Conduct is unwelcome if the student did not request or invite it **_and 'regarded the conduct as undesirable or offensive'_**" (OCR 62 FR at 12040). In this case Complainant accused Fleetwood of improperly discussing her relationships in the ROTC program but she also discussed her relationships with other ROTC program members did so using swear words (See, as example AR 040-046).  To use OCR verbiage, **_"...if a student actively participates in sexual banter and discussions and gives no indication that he or she objects, then the evidence generally will not support a conclusion that the conduct was unwelcome"_** *Id.* From day one, when **Complainant initiated new intimacy** with Fleetwood asked her outright, "Do you get offended or not like upsetting and dirty memes." And Complainant responded, "Bring it on kid" (AR 034).

**Fifth**, OCR provides useful, fair-minded, rational guidance to help investigators consider if **_"conduct of a sexual nature is sufficiently severe, persistent, or pervasive"_** to create a hostile environment. **_"In most cases, a hostile environment will exist if there is a pattern or practice of harassment or if the harassment is sustained and nontrivial"_** (OCR 62 FR at 12041). In this case it would seem clear, that one verifiable incident does not constitute a pattern. And even if one admits the unrelated photo transmissions which no one previously complained about, Fleetwood ceased that behavior as well—and long before it constituted a "sustained" pattern.

WSU also cites a 2010 Dear Colleague letter to highlight its allegedly "eerily similar"(?) example involving fictionalized high school kids. The fictional example in no way "mirrors" this case (Resp Brief pg. 15 lines 7-24). Instead, this seemingly desperate attempt to find a compelling

REPLY BRIEF - PAGE 13

comparator misconstrues the cited story wherein "One of the student's teachers and an athletic coach underlined{witnessed} the name calling" but ignored it (OCR Dear Colleague Letter at 6 (October 26, 2010)). That fictionalized school employee "also noticed the new student's anxiety and declining class participation" *Id.* In the Dear Colleague example, evidence of verbal harassment ***was*** corroborated by a reliable witness—which never happened in Fleetwood's saga. *Id.* Moreover, an educational impact on that fictionalized underaged victim ***was*** evident. *Id.* No such educational impact on this Complainant has been established. Indeed, when asked by WSU during intake about impacts, Complainant responded, "They've been clear this has no effect... it makes it a little awkward for me but I feel like I'm in good things" (AR 167)

Furthermore, OCR's purpose in citing this example was to illustrate how a fictionalized school did ***not*** comply with its Title IX obligations because it failed **to investigate** the situation (OCR Dear Colleague Letter at 7 (October 26, 2010)). WSU, on the other hand, dragged Fleetwood through an investigation for nearly a year—and long after initial allegations had been disproven. The remedies recommended by OCR also do not equate: "An effective response also might have included training students and employees on the school's policies related to harassment, instituting new procedures by which employees should report allegations of harassment, and more widely distributing the contact information for the district's Title IX coordinator..." *Id.* Nowhere does OCR guidance suggest the punitive, career-ending "remedy" levied against the innocent Fleetwood.

WSU cites *Mercer Island* for the proposition that name calling is, standing alone, actionable under Title VI. What *Mercer Island* actually held was "*That which occurred here went beyond simple teasing or name calling*" and that pronouncement was made in the following context:

Student A made it clear to B.W. not only that his skin color made him look physically different from his peers, but that it also was the basis for a lack of intelligence. 'Shut up, you stupid Black' leaves no doubt as to the perceived cause of a lack of intelligence.

In fact, during the second incident, Student B joined Student A in taunting B.W. It is not difficult to imagine the emotional toll that these instances of harassment could take on a seventh grade boy in an unfamiliar environment. Yet, there is no need to imagine: the emotional stress suffered by B.W. was evidenced by crying in front of his peers, submitting disturbing essays to his teacher who blamed him for the conflict with Student A, and receiving uncharacteristically low grades. *Mercer Island Sch. Dist. v. Office of the Superintendent of Pub. Instruction*, 186 Wash. App. 939, 981 (2015).

What happened at WSU is on a planet wholly different than that of *Mercer Island.*

There is no substantial evidence that Fleetwood harassed Complainant because of her gender.

**B.      There is no substantial evidence that Fleetwood dissuaded anyone from using the student conduct system.**

In order for the government to show "substantial evidence" that Fleetwood dissuaded someone from using the student conduct system the government must show that Fleetwood knew that the student conduct system was in play, meaning that someone was intending to use that system. This is important because knowledge of that intent constructively puts Fleetwood on notice that such interference would be improper. But that's not what happened here. Instead Fleetwood's only interaction with the future Complainant and witnesses took place when he heard was being labeled a criminal, a rapist, an assaulter. WSU arbitrarily and capriciously ignores these surrounding circumstances and argues Fleetwood's attempted to discourage Complainant and JS from using the student conduct system (Resp Br. pg. 22). This is simply not true. The actual evidence is:

- On January 15, 2019, Fleetwood learned through two friends that Complainant was claiming Fleetwood "committed assault" on her, i.e. a crime (AR 032-33).

REPLY BRIEF - PAGE 15

- On January 15, 2019 Fleetwood called Cadet S to verify what he'd been told by Cadet R, but Cadet S did not pick up, so Fleetwood messaged him on Facebook (AR 063). That same day, January 15, 2019, three days before any complaint would be filed, Fleetwood called the Complainant, and she returned his call for a sixty second conversation when he asked her to stop talking about their relationship as if it had not been consensual because he had overwhelming evidence to show the relationship had been consensual (AR 032-33, 064).

- Fleetwood's own description of these January 15-16, 2019 interactions corroborate the text evidence and actual timeline: in a phone call *which the Complainant initiated* on January 15 at 5:10 pm, Fleetwood relayed, "there's been some word out that you and whoever are trying to say that I committed assault on you. I just want you to know that if you bring your argument up [read: the rumored assault charge] that it will not last against the overwhelming evidence I have. *Do what you want*, but I'm advising you that it won't turn out great for you..." (AR 032, 064).

- On January 15, 2019, **three days before any complaint was filed**—and the same day a key witness texted Fleetwood, "Relax … she's over it;" the same day the Complainant herself told Fleetwood words to the effect of "don't worry, there's not going to be a complaint"**—was the last time Fleetwood spoke to the Complainant** (AR 032, 063).

- Within the same hour, January 15, 2019, **before any complaint had been filed, at a time he believed he was being falsely accused of sexual assault,** Fleetwood also exchanged texts with his friend Cadet P, the Complainant 's ex-boyfriend, and Cadet S (see AR 021-22, 033, 064, 070).  And, on January 15, 2019, **Cadet S approached Fleetwood** explaining he wanted to discuss rumors he had heard through the Complainant after PT (Physical Training) (AR 032, 066).  The next day **Cadet S again approached Fleetwood** about the rumors to which Fleetwood told Cadet S, "You don't know anything. Stay out of it." The encounter was somewhat heated, but all accounts agree Fleetwood did not threaten Cadet S in any way (AR 022, 032, 067).

- Complainant's additional motivation for filing is best explained by female witness Cadet HFT (recruited by the Complainant):

  > *Question*: Did [Complainant] ever say anything about being afraid of retaliation?
  > *Answer*: I think reputation.  Hard to have rep already established like when you've slept around in program, to have rep that freshman girl who slept around. Didn't want to be girl who made rape case and people think that.  Don't think she was scared of Patrick, think he has fragile ego but not aggressive. **Thinks she was more afraid of reputation,**

**don't want to be girl that made false rape case**[6] (AR 144-145).

WSU ignores all of this and erroneously concludes that a reasonable fair minded person would deem Fleetwood's brief efforts to defend himself to friends against the earlier rape rumors to be dissuading the use of a student conduct system Fleetwood did not know was in play. Moreover, WSU ignores context again in accusing Fleetwood of poisoning Cadet P, a long time ROTC colleague. When Fleetwood said, "if I need evidence or back up" in the form of "Patrick wouldn't do that," a fair-minded rational person would discern that one friend confiding in another to seek a character witness to defend against an assault charge "Patrick wouldn't rape a woman. Patrick wouldn't sexually assault a woman" does not constitute activity dissuading someone from using the student conduct system. Moreover, Fleetwood *knew* the Complainant had discussed the "consensual" nature of their interactions since that witness, Cadet P, a formal sexual partner of the Complainant, had approached him to ask about it, "In context I found out he had sex in [sic] Brianna. I asked him about he [sic], is it true" (AR 130)

Nonetheless WSU OEO presented the findings which the Office of Community Standards upheld: "investigators determined that the Respondent attempted to interfere[7] with the [not yet existent] investigation on three separate occasions [all three days before any complaint was filed]"

---

[6] Here again, we see corroborated in the record Fleetwood's version of events wherein he made three brief efforts to defend himself against the January 15-16 rape rumors which were unrelated to the sexual harassment report Complainant later filed. Indeed, this witness apparently believe the Complainant filed her actual January 18 complaint in part to challenge any rumors that she would be the "girl who made rape case."

[7] WSU Response Brief engages in polemics surrounding the word "retaliation" versus "intimidation" or "interference" claiming, at pg. 19, n. 9, "any discussion of case law considering retaliation in employment or any other context is inapposite." Nonetheless, "retaliation" *was* one word used by investigators to describe interference. See for example witness interview with Cadet HFT: "RMB: Did she say anything about being afraid of retaliation" (AR 144). And no, Cadet HFT did not think Complainant was afraid of retaliation about reporting. *See supra.*

REPLY BRIEF - PAGE 17

(AR 022 ¶43).  The irony occurs in the report writers' unnecessary repetition within the same paragraph: "OEO finds that the Respondent did interfere with the investigation and his interference could have had [sic] impacted the witnesses [sic] willingness to provide truthful information" *Id*. Which is to say, there's zero indication that any witnesses felt unwilling to provide information, but in Cadet M's case, the information they provided remained far from truthful.

C.    **Agency's action was arbitrary and capricious.**

An agency's actions are arbitrary and capricious when the agency commits a "willful and unreasoning action, taken without regard to or consideration of the facts and circumstances surrounding the action." *Linville v. Dep't of Ret. Sys.*, 452 P.3d 1269, 1275 (Wn. Ct. App. 2019)(internal quotations omitted).

As set out above, WSU did not consider the facts nor the relevant circumstances surrounding Complainant's motivations, Complainant's ever-changing story, and Complainant's documented anti-male bias.

D.    **Rebuttal to Agency's process arguments.**

In lengthy paragraphs, pages 7-12, WSU presents minimal relevant evidence, but rather filibusters through miscellaneous rules and statutes for EP15 investigations.  The semantics of who is who at WSU are irrelevant to Fleetwood's fate. Indeed, they only serve to obfuscate the recurring failure of justice which began with OEO, continued with the Center for Community Standards, and was ultimately upheld by the University Appeals Board (AR 216-227, 236-238).  WSU Counsel scolds Fleetwood for his reliance on the OEO Investigation which constitutes the bulk of the Agency Record provided, claiming dubiously that "Ms. Metzner and the University Appeals Board also reviewed scores of other pages of evidence considered oral testimony and additional evidence submitted by Fleetwood" (Response Brief pg. 17-18 lines 11-15, 1-6).  If there are "scores

REPLY BRIEF - PAGE 18

of pages of additional evidence" the Mr. Fleetwood, along with the court certainly deserve to see it.   Meanwhile, it would appear WSU wants readers to believe the Office for Equal Opportunity's existence a few doors down the hall from Center for Community Standards somehow indemnifies the second entity from responsibility for the first entity's investigative failures. This argument is a shameless haze designed to sidestep real issues of Complainant credibility, investigative fumbles, and now a deceptively inconsistent production of Agency Record wherein WSU would have us believe that OEO emails to the Complainant deserve no place in the Agency Record.

Pages 10 and 11 of WSU's response further blows smoke to blame-shift delays in what should have been a simple investigation onto Fleetwood. Once Fleetwood got notice of the opportunity to review the records he (and his father) attempted to do so by exercising his right to obtain them through a public record request—a  request that was not properly responded to and which forms the basis of the public record act claims Fleetwood and his father are currently bringing against WSU.

Moreover, after reviewing the record, Fleetwood did address first Ms. Metzner in his conduct hearing, and later then the University Appeals Board with his documented concern with Ms. Metzner's letter: "it is apparent that no effort was put into examining the deeply flawed nature of the original Investigation Report" (AR 220). He also provided new evidence including the credible letter from Sgt. Crodle about Cadet M's malicious collusion; however, to Fleetwood's knowledge "[Ms. Metzner] never followed up/contacted the witness [he provided]" (AR 221-222). Meanwhile, WSU has provided nil in the way of evidence supporting a conclusion that these latter phases of the WSU's adjudication relied on any new evidence, than presented in the OEO Investigation.

REPLY BRIEF - PAGE 19

**III.    CONCLUSION**

WSU's Decision should be reversed.

DATED this 7th day of October 2020.

**CROTTY & SON LAW FIRM, PLLC**

By:    _____
MATTHEW Z. CROTTY, WSBA #39284

Attorneys for Plaintiff

REPLY BRIEF - PAGE 20

**CERTIFICATE OF SERVICE**

Pursuant to RCW 9A.72.085 the undersigned hereby certifies under penalty of perjury under the laws of the State of Washington, that on the 7th day of October 2020, the foregoing was delivered to the following persons in the manner indicated:

| | |
|---|---|
| Nathan E. Deen<br>Attorney General of Washington<br>332 French Administration Building<br>Pullman, WA 99164 | VIA REGULAR MAIL ___<br>VIA FACSIMILE ___<br>HAND DELIVERED ___<br>VIA EMAIL ✓ |

CROTTY & SON LAW FIRM, PLLC

Matthew Crotty

REPLY BRIEF - PAGE 21

FILED

OCT 0 9 2020

WHITMAN COUNTY CLERK

**STATE OF WASHINGTON**
**WHITMAN COUNTY SUPERIOR COURT**

PATRICK FLEETWOOD and
MICHAEL FLEETWOOD,

                    Plaintiffs,

                vs.

WASHINGTON STATE
UNIVERSITY,

                   Defendant.

NO. 20-2-00053-38

NOTICE OF ASSOCIATION OF
COUNSEL

**(Clerk's Action Requested)**

TO:    PATRICK FLEETWOOD AND MICHAEL FLEETWOOD, Plaintiffs

TO:    MATTHEW CROTTY, Plaintiffs' Attorney

TO:    CLERK OF THE COURT

       PLEASE TAKE NOTICE that Assistant Attorneys General DEBRA LEFING and BRIAN

J. BAKER hereby associate with Assistant Attorney General NATHAN DEEN of the Attorney

General's Office on behalf of defendant WASHINGTON STATE UNIVERSITY, and request that

service of all papers and pleadings herein, except original process, also be made upon the

undersigned at the address stated below.

NOTICE OF ASSOCIATION           1

ATTORNEY GENERAL OF WASHINGTON
Torts Division
7141 Cleanwater Drive SW
PO Box 40126
Olympia, WA 98504-0126
(360) 586-6300

DATED this 29th day of September, 2020.

ROBERT W. FERGUSON
Attorney General

*s/ Debra Lefing*

DEBRA LEFING, WSBA No. 53344
BRIAN J. BAKER, WSBA No. 54491
OID #91023
Assistant Attorneys General
Torts Division
7141 Cleanwater Drive SW
PO Box 40126
Olympia, WA 98504-0126
Debra.Lefing@atg.wa.gov
brian.baker@atg.wa.gov
(360) 586-6300

NOTICE OF ASSOCIATION

2

ATTORNEY GENERAL OF WASHINGTON
Torts Division
7141 Cleanwater Drive SW
PO Box 40126
Olympia, WA 98504-0126
(360) 586-6300

**DECLARATION OF SERVICE**

I declare that I caused to have served a copy of this document on all parties or their counsel of record on the date below as follows:

| Party | Method of Service | |
|---|---|---|
| Matthew Z. Crotty<br>Crotty & Son Law Firm, PLLC<br>905 West Riverside Avenue, Suite 404<br>Spokane, WA 99201<br>matt@crottyandson.com | ✓ US Mail Postage Prepaid<br><br>o Certified Mail Postage Prepaid<br><br>o State Campus Mail<br><br>o ABC/Legal Messenger | o UPS Next Day Air<br><br>o By Fax<br><br>o By Email<br><br>o Hand delivered by: |

I declare under penalty of perjury under the laws of the state of Washington that the foregoing is true and correct.

DATED this 29th day of September, 2020, at Tumwater, Washington.

*s/ Debra Lefing*

_____

DEBRA LEFING, WSBA No. 53344

NOTICE OF ASSOCIATION                    3