# EXHIBIT A

```
 1                UNITED STATES DISTRICT COURT

 2             FOR THE EASTERN DISTRICT OF WASHINGTON

 3

 4      _____

 5
        PATRICK FLEETWOOD, et. al.
 6

 7

 8               Plaintiff,

 9                              Civil Action No. 2:20-cv-0355-SAB
10

11          vs.

12

13
        WASHINGTON STATE UNIVERSITY,
14

15

16               Defendant.

17      _____

18           AUDIO ZOOM DEPOSITION OF DAN PATTERSON

19                   MARCH 31, 2022

20      _____

21

22

23                 CERTIFIED COPY

24

25 Reported By: d'Anne Myers, CCR No. 2478
```



Central Court Reporting   800.442.3376

Fleetwood vs Washington State University                    Dan Patterson 03/31/2022

```
 1                THE COURT REPORTER:  On the record.  My name is
 2   d'Anne Meyers, Certified Court Reporter, Washington License
 3   No. 2478.  Do all Counsel stipulate to the taking of this
 4   audio Zoom deposition in this matter?
 5                MR. CROTTY:  Yes.
 6
 7
 8                        DAN PATTERSON,
 9                 called as a witness at the request
10                  of the Plaintiff herein, having
11                   been first duly sworn on oath,
12                    did testify as follows:
13                THE WITNESS:  To my knowledge,
14                    it will be the truth.
15
16                        EXAMINATION
17   BY MR. CROTTY:
18   Q   Sir, for the record, the record being this transcript
19   that's going to be created, can you please state your name.
20   A   My name is Dan, middle initial B, last name Patterson.
21   I am the Director of Operations for the 8th Brigade U.S.
22   Army Cadet Command located at Joint Base Lewis McChord.
23   Q   Have you ever had your deposition taken before?
24   A   Not that I remember.
25   Q   I'll briefly kind of explain the process.  We have the
```

Fleetwood vs Washington State University                    Dan Patterson 03/31/2022

```
 1   A   That's what it says, so correct.
 2   Q   And then you write on the third sentence of this e-mail:
 3   As I mentioned to you on the phone, the only reason my name
 4   is on those records is I had the ROTC Program at WSU send me
 5   the records as an intermediary ask them to provide to the
 6   State AG's office responding to their subpoena for records.
 7               And my question to you is what do you mean by
 8   records?
 9   A   Cadet files.  The transcript -- it would have included
10   the transcripts of -- cadet files normally include training
11   record, grades, all that stuff.  But I believe in this case
12   due to the record of his -- I don't remember what was in the
13   packet.  I never read the packet.  But more than likely it
14   included the results of his disenrollment action.
15               THE COURT REPORTER:  Mr. Patterson, you're going
16   to have to speak up louder and clearer.
17               THE WITNESS:  Can you hear me now better?
18               THE COURT REPORTER:  Please keep projecting your
19   voice, please.
20   A   I believe his disenrollment, the results of the
21   disenrollment action that was completed on Cadet Fleetwood
22   or he was disenrolled from ROTC for having been -- and I
23   don't remember the exact whatever term they used --
24   separated from Washington State University.
25               Now, whether that included -- I don't even
```



1  and then the cadet may or it may be assuming they were

2  disenrolled the cadet -- and they were scholarshipped and

3  the cadet -- and a bill would be prepared and they would

4  incur a debt to the government assuming it was a

5  disenrollment for some type of action that was adverse.  If

6  a cadet were injured and disenrolled for medical reasons,

7  they would not owe the money back.  Does that explain it?

8  Over.

9  Q    It does.  Thank you.  Then there's a reference, again,

10  I'm referring back to this March 25, 2022 e-mail, this

11  packet of material.  Do you see where that's highlighted?

12  A    Yes, I do.

13  Q    And can you tell us what you mean by this packet of

14  materials?

15  A    When we were subpoenaed for the records of this

16  Disenrollment Board, and three lines up where I said what

17  WSU sent me, I believe when I wrote that I found out the

18  next day that we have an automated system called ACA.  And

19  don't ask me what the abbreviation or the acronym stands

20  for.  I know, Automated Cadet Action.  That's what it stands

21  for.  And the records get passed, like from Washington State

22  if they were doing something they would put it in the system

23  and my clerks here at JBLM could see -- have copies.  So it

24  turns out, I believe, instead of having Washington State

25  send me records of the Disenrollment Board I went next door



Fleetwood vs Washington State University                    Dan Patterson 03/31/2022

 1   to my personnel shop, my Cadet Action shop, and they just

 2   downloaded the exact same thing that the Washington State

 3   had there, so they just printed it all out.  I put it into a

 4   folder and then I prepared it.  But then I realized --

 5   you'll notice if you go a couple lines down -- there is a

 6   line that says Tim and Ingrid.  Those are lawyers at Cadet

 7   Command.  And that was when I responded to you, Mr. Crotty,

 8   I realized I probably need to ask the Cadet Command and they

 9   said well as soon as we get the subpoena so I packaged

10   these.  I had my guy package it.  He gave me a package of

11   the records.  I set it on my coffee table in my office.

12   Never read it, didn't read it.  And contacted then the state

13   representative when I got permission from Cadet Command and

14   they came over and picked up the packet and took my name as

15   the custodian of the records because it was sitting on my

16   coffee table and that was how I became involved in this

17   case.  Over.

18   Q   I'm going to now move to Exhibit No. 2.

19                        (Exhibit No. 2 was marked.)

20   Q   (BY MR. CROTTY)  This will be the only other exhibit to

21   your deposition.  Can you tell us what we are looking at

22   here?

23   A   No.  I don't remember.  Can you scroll.  Okay (Reading).

24   That may have been the Declaration they had me sign about

25   giving them the records when they picked them up.  To be



Fleetwood vs Washington State University                    Dan Patterson 03/31/2022

 1   disenrolled from ROTC and explaining his rights.  It's a

 2   multi-page document and, again, it's -- you'll notice on

 3   Paragraph 1 it says:  As your Professor of Military Science

 4   or designee.  I would assume at the bottom this is probably

 5   signed by Matt Sheftic, Lieutenant Colonel Matt Sheftic, who

 6   is the -- oh no.  Brendan Hobbs.  Okay.  That was the former

 7   PMS at Arizona -- Washington State University, who has since

 8   departed and has been replaced by Lieutenant Colonel

 9   Sheftic.  So this is at least a couple years old.  I

10   remember the date.  Go back up.

11   Q   Do you know who specifically made the modifications to

12   the boilerplate that you describe for Exhibit 3?

13   A   I would assume the HRA.  That stands for Human Resource

14   and Assistant, the clerk that maintains records at

15   Washington State, they prepared this there I assume.  We're

16   talking three years ago almost.

17   Q   Just so I'm clear.  You don't know for a fact who made

18   the, I guess, on boilerplate to Exhibit 3 --

19   A   I do not know but I would assume it was done at the

20   University because Lieutenant Colonel Hobbs signed it, I

21   would assume, therefore, that it is the HRA.  Again, which

22   stands for Human Resource Assistant.  Over.

23   Q   I'm going to direct you to Paragraph 1 of Exhibit 3 and

24   there is a reference to Washington State University Policy

25   prohibiting discrimination, sexual harassment, and sexual



Central Court Reporting  800.442.3376

Fleetwood vs Washington State University                    Dan Patterson 03/31/2022

1    misconduct, Executive Policy 15, EP15.  Do you see that?

2    A    Yep.

3    Q    Do you have any idea what EP15 is?

4    A    Not the slightest.

5    Q    Do you know if Washington State University ROTC planned

6    on convening a Disenrollment Board before Washington State

7    University to determine whether Mr. Fleetwood violated EP15?

8    A    No, I do not.

9    Q    To your knowledge, was the fact the Washington State

10   University ultimately determined that Mr. Fleetwood violated

11   EP15 the reason WSU Army ROTC started the disenrollment

12   process?

13   A    I don't know if that was the reason they started it but

14   that was -- from what I remember or what I believe I think

15   and, again, I couldn't testify to this, that because the

16   University separated the individual that, therefore, he was

17   no longer a student and, therefore, he was automatically in

18   breach of his contract with us and, therefore, we had no

19   choice but to initiate disenrollment from the ROTC side of

20   the program because he was no longer a student and could not

21   complete ROTC.  Over.

22   Q    We're now going to move to Exhibit 4 of your

23   Declaration.  Can you tell us what Exhibit 4 is, if you

24   know?  A    Oh, yes.  That is the cover page, the first page

25   of the Disenrollment Board that lists who the members of the



Fleetwood vs Washington State University                    Dan Patterson 03/31/2022

1   Q   Do you see where there's different check marks on some

2   of these boxes?

3   A   Yes.

4   Q   Do you know who checked the boxes --

5   A   I would --

6           THE COURT REPORTER:  Mr. Patterson, hold on.  He

7   didn't finish.

8   Q   (BY MR. CROTTY)  Let me ask again so we have what we

9   lawyers call a clear record.  Do you know who checked the

10   Yes boxes and the No boxes and the NA boxes on the form

11   that's attached as Exhibit 4 to your Declaration?

12   A   No.  But a very valid assumption would be probably one

13   of the Board members, most likely Colonel Stafford or unless

14   he tasked one of the captains to prepare the form.  But I

15   believe if you go a couple pages down you'll find Stafford

16   is probably the one that signed it.  Yes.  All the Board

17   members signed it there.  There you go.  The upper three

18   signatures there.  Somebody on the Board.

19   Q   But you don't know who specifically?

20   A   No way to know from my level and I doubt they would

21   remember.  Over.

22   Q   Do you know if this unknown person who checked those

23   boxes was using any type of system to, I guess, inform

24   themselves on how they go about checking Yes or No or NA?

25   A   (Reading)  No, I don't know.  Any Board members are told



1    at any time they have questions during the proceedings they

2    can contact a lawyer at Cadet Command to ask for advice, but

3    something on this administrative portion, pretty pro forma,

4    I would assume.  No idea.

5    Q    I want to take you to Paragraph 2D where it says:  Are

6    copies, descriptions or depictions (open paren) if

7    substituted for real documentary evidence (close paren)

8    properly authenticated and is the location of the original

9    evidence indicated.

10                  Do you see where I just read?

11   A    Yes.

12   Q    Did you see how it's checked NA?

13   A    Yes.

14   Q    Do you have an understanding as to why --

15   A    No.

16   Q    -- NA is checked there?

17   A    No.  I would assume because they made no -- I have no

18   idea.

19   Q    I want to take you to Paragraph 9D which says:  Was the

20   Respondent provided a copy of all unclassified documents in

21   the case file.

22                  And my question to you is do you know what is

23   meant by case file?

24   A    When a disenrollment action is filled, for whatever

25   reason, any evidence we have, and this could have been



1    the Board President, was the PMS at Eastern at the time.

2    But this is his report to the Commander of the Brigade, at

3    the time Colonel Moye, Vanessa Moye, who has since, PCS

4    retired in the last few years, what the Board found as the

5    results.

6    Q    Do you have any knowledge of the system that was used by

7    Lieutenant Colonel Stafford to create Exhibit 5 to your

8    Declaration?

9    A    No.  I'm going to be smart and say the system they used

10   was Word I'm sure on the computer to create the document.

11   But no.  Are they provided a sample format?  I don't know on

12   that one.  But there are -- there's a Cadet Command

13   regulation on how to conduct it and then the documents,

14   before they come to us, to Colonel Moye, Colonel Stafford

15   would have sent the results of the Board to a Cadet

16   Commander to review for legal sufficiency to make sure that

17   the Board has followed the administrative processes

18   correctly.  So the Board prepares it, they send everything

19   first to the lawyers at Cadet Command.  Again, that's at

20   Fort Knox.  Then it comes back to the Board President, then

21   he signs it, finalizes it, and sends it to us.  And, again,

22   probably in that system I mentioned automated ACA, probably

23   not hard copy going back and forth.  Over.

24   Q    Have you ever had any conversation with Lieutenant

25   Colonel Stafford regarding the Exhibit 5 that we're looking



 1    at here?

 2    A    No.

 3    Q    Do you know then for a fact whether Lieutenant Colonel

 4    Stafford utilized the process you just described in

 5    preparing Exhibit 5?

 6    A    It is an educated assumption.

 7    Q    But you do not know for a fact; correct?

 8    A    I personally do not know.  It may be trackable in ACA as

 9    to what the steps were.

10    Q    Just so I'm clear.  You have not gone into ACA to

11    confirm or deny whether those steps have occurred?

12    A    That's correct.

13    Q    Do you know if the creator of Exhibit 5 was acting under

14    a duty of accuracy that the Army would rely upon in its

15    regular course and scope of the Army's business?

16    A    I'm not sure I understand precisely what you are asking.

17    Over.  He was appointed on orders.  He receives legal

18    guidance and counsel before the Board Presidents are told to

19    contact for advice on how to proceed.  There is a pretty pro

20    forma set of documents that are done so this is the system

21    that is set up.  It's very normal of the hundreds that are

22    done.  Over.

23    Q    Do you know one way or the other though whether

24    Lieutenant Colonel Stafford was acting under what's called a

25    duty of accuracy in preparing Exhibit 5?



1   States Army and, therefore, one would have to make the

2   assumption that he is acting in the true faith and depth of

3   the appointment of his orders and fulfillment of his duties.

4   Over.

5   Q   I'm going to take you to what begins at Page 3 of

6   Exhibit 5.  First off, can you tell us what we're looking at

7   here on Page 3 of Exhibit 5 to your Declaration?

8   A   It is rough -- very easy.  Please see the note

9   underneath the Cadet Fleetwood Disenrollment title.  This is

10  a rough transcript based upon notes from probably a captain

11  who is appointed as a Board recorder without a voice

12  recording, of the procedures in the Board during the conduct

13  of the Disenrollment Board.

14  Q   I'm going to take you to what's been -- and I'm

15  referring to the bottom right-hand to what we lawyers call

16  Bate numbers.  So it's Bate No. 04010071 of Exhibit 5.  Then

17  there is an entry that says Lieutenant Colonel Stafford and

18  then there's Exhibit 1 through 6.  Do you see that?

19  A   Yes, I do.

20  Q   Do you know if the creators of Exhibits 1, 2, 3 through

21  6 were acting under a duty of accuracy, as you just

22  described it, in preparing any of those exhibits?

23          MS. LEFING:  Objection.

24  Q   (BY MR. CROTTY)  Go ahead and answer.

25  A   I would assume so.  Those are the first two people,



 1   that's just a sworn statement from fellow cadets.  And then

 2   there is a counseling form from the PMS at the time

 3   Lieutenant Colonel Hobbs.  So I would assume that a cadet is

 4   making a sworn statement, that they are making a valid sworn

 5   statement that it's accurate to the best of their knowledge,

 6   unless the other ones they appear to be counseling forms.

 7   Over.

 8   Q   I want to reference or I want to direct you to where it

 9   says -- again, we're still on Page 04010071 of Exhibit 5,

10   which also references Exhibit 5, which says: Washington

11   State University Investigation Report, Office of Equal

12   Opportunity, Complaint No. 2019-21, June 13, 2019.  Do you

13   see where I just read?

14   A   Yes, I do.

15   Q   Do you know who created that document?

16   A   I would assume Washington State University, Office for

17   Equal Opportunity.

18   Q   Do you know for a fact whether the creator of this

19   document was acting under a duty to report that information

20   accurately?

21                MS. LEFING:  Objection --

22   A   I --

23                THE COURT REPORTER:  Hold on.  One at a time.

24   We have an objection.

25   A   I have absolutely no knowledge.  They are University



Fleetwood vs Washington State University                    Dan Patterson 03/31/2022

1   employees.

2   Q   (BY MR. CROTTY)  Do you know that Exhibit 1 and Exhibit

3   2, which are listed on Page 04010071, do you know that those

4   first two exhibits, the Kostecka sworn statement and the

5   Smithline sworn statement, do you know that they were used

6   by Washington State Office of Equal Opportunity, OEO, when

7   investigating Patrick Fleetwood?

8   A   No idea.  Not knowing the dates of when the Washington

9   State University OEO Office did whatever they did, I would

10  have to compare that and even then I wouldn't know whether

11  or not they were used.  I don't know if these were done to

12  prep the Board well after everything is done by the school

13  or before, so no idea.

14  Q   And then this Exhibit 3 on this Page 04010071, there's a

15  reference to a developmental counseling dated January 22,

16  2019, directing a commander's inquiry into the sexual

17  harassment allegation against Cadet Fleetwood.  And outside

18  of Washington State University's investigation into Mr.

19  Fleetwood, are you aware of a separate commander's inquiry?

20  A   I would assume the PMS made an inquiry.  But no, I'm not

21  -- I'm not familiar.  This case is three years old, I don't

22  remember.  Could I see that exhibit, maybe I can help?

23  Q   Sure.  We'll go to Exhibit 3 of Exhibit 5.  Just for the

24  record, we're now on Exhibit 3 of Exhibit 5 to your

25  Declaration, which is Page 04010096.  Do you see where is



1    written under Part 3, Summary of Counseling, it says:  Cadet

2    Fleetwood, I received a formal complaint against you from

3    fellow cadets in reference to the Army SHARP Program and the

4    WSU Title IX Policy and then Paragraph 1 says:  I have

5    directed a Commander's Inquiry and requested a formal Title

6    IV Investigation from the Title IV coordinator on campus

7    with regards to incidents between December 2018 and January

8    2019.

9              Do you see that?

10   A   Yes.

11   Q   Do you have an understanding as to what is that Title IV

12   Investigation conducted here by the coordinator on campus?

13   A   I believe it should say Title IX.  I've never heard of

14   that title.  It may have been a different title.

15   Q   I haven't either.

16   A   I believe it's a Title IV, a typo.  So I believe what --

17   I believe what occurred in this case -- and this is purely

18   speculation -- that the PMS got complaints from whoever,

19   from some cadet, and for this he had to probably turn it

20   over to the Title IX office because these are students.

21   First actions are always taken by the University's Title IX

22   office.

23   Q   To your knowledge, would the Title IX office in this

24   instance be the Washington State University OEO office?

25             MS. LEFING:  Objection.



 1   A   I am not sure of their structure.  It's a Washington

 2   State University office.  Who it is under at Washington

 3   State University I have no idea.  That's just an

 4   organizational structure.

 5   Q   (BY MR. CROTTY)  Setting aside that you don't know the

 6   organizational structure at Washington State University, can

 7   this, I guess Exhibit 3 to Exhibit 5, could that be

 8   interpreted that Washington State University ROTC was going

 9   to have some sort of office from Washington State University

10   conduct its investigation and then WSU ROTC would make its

11   next steps determinations off of that?

12              MS. LEFING:  Objection; totally speculation and

13   lack of knowledge.

14   Q   (BY MR. CROTTY)  Go ahead and answer.

15   A   That would be the normal procedure at any one of our

16   schools when a SHARP incident was brought.  The cadet brings

17   it up.  We normally turn it over to the school's Title IX

18   office and we'll wait their results in most cases.  Can I

19   say for a hundred percent that was done in this one?

20   I would say no, but that is the normal procedure for most.

21   Q   Again, the normal procedure being that there's a

22   complaint against a cadet, the University investigates, and

23   then ROTC takes action based on the investigation?

24   A   Or --

25              MS. LEFING:  Objection.



Fleetwood vs Washington State University                    Dan Patterson 03/31/2022

```
 1   A    -- in some cases, not this -- I don't know on this one
 2   at all.  Again, but in some cases we've gotten results and
 3   then we have conducted our own inquiry by appointing a 15-6
 4   Officer to look at some things.  I have no idea whether that
 5   was done in this case or not.
 6   Q    (BY MR. CROTTY)  That was going to be my next question.
 7   If there was a fifteen dash six Officer appointed regarding
 8   the allegations against Mr. Fleetwood, would that
 9   information be put in the Fleetwood file that you earlier
10   testified about?
11   A    If one was conducted, the cadet, when they are notified,
12   are given one hundred percent of every document.  Yes, it
13   would have been there.  So in the absence of one it was not
14   done.
15   Q    Have you ever seen any document relating to a 15-6
16   investigation that was done regarding any of the allegations
17   against Mr. Fleetwood?
18   A    Negative.  I don't even know what the allegations
19   against Mr. Fleetwood are.  I did not read the specifics.  I
20   can tell you from this document it's obviously a SHARP
21   incident of some type.
22   Q    Can you briefly tell us what a 15-6 investigation is?
23   A    15-6 investigations are an officer is appointed on
24   orders to look into the events of some kind of issue.  It
25   could be anything from an accident to an investigation or an
```



Central Court Reporting  800.442.3376

```
 1    allegation.  There's an Army regulation, Army Regulation
 2    15-6 that covers this.  They work with the lawyers.  They
 3    turn it in and it could be used as the basis for
 4    administrative action within the Army, but it's used for
 5    multiple things.  Over.
 6    Q   I want to take you back to Page 04010068, which at the
 7    top says Cadet Fleetwood Disenrollment Board Sequence of
 8    Events.  And then it says:  Note:  There was no voice
 9    recording; there is a rough transcription based off the use
10    of the proscribed script and notes taken.
11                   Do you see that?
12    A   Yes, I do.
13    Q   And what are these proscribed scripts, what do they look
14    like?
15    A   There is a boilerplate script, and I don't remember if
16    it's in the regulation.  I believe it is in a Cadet Command
17    Regulation on how to conduct a Board to provide you a basic
18    baseline and then a recorder is appointed and the recorder
19    with a non-voting member of the Board will take notes and
20    then they will draft up a rough transcript of the Board.
21    Q   Do you know --
22    A   Parts of it are actually pretty dictated when they read
23    them their rights.  They have a statement.  When you read
24    someone their rights it's exactly what's to say.
25    Q   Do you know who recorded the information that begins on
```



1    Page 04010068 and continues to Page 04010089, do you know

2    the name of the recorder?

3    A   I was trying to look.  I'm going to assume it is in

4    there somewhere.  I would have thought it was on that very

5    first page you showed me, not of the transcript, but where

6    we had the names of the Board members.  (Reading) Let's take

7    a look in here.

8    Q   For the record, we are now on Page 04010062 of your

9    Declaration.

10   A   If you can scroll down.  Scroll down to Page 4 of this

11   document.  (Reading)  No.  I don't know.  I would assume

12   it's somewhere in the record but I do not know who the

13   recorder was from this.  Over.

14   Q   Exhibit 5 to your Declaration, again it contains 133

15   pages, over 30 exhibits.  I understand that the first two

16   pages of Exhibit 5 are a memorandum signed by Colonel

17   Stafford.  My question is do you know who compiled all the

18   30 plus exhibits that are attached to this memorandum from

19   Colonel Stafford?

20   A   No.  The Board.  I don't know whether -- if I were the

21   colonel I would have just one of the two captains do it but

22   I do not know who put the packet together.  Possibly it's

23   HRA, but speculation.  Over.

24   Q   And since you're not sure, you probably don't know what

25   system this individual used to compile all the different



1    exhibits to the memorandum signed by Colonel Stafford?

2    A    That is correct.

3    Q    And then Exhibit 5, the Disenrollment Board that

4    referenced an Office of Equal Opportunity complaint dated

5    June 13, 2019; correct?

6    A    That's what that says, yes.

7    Q    And we're now looking at Page 040100 of Exhibit 5 which

8    has the first page of this Washington State University OEO

9    report; correct?

10   A    Yes.

11   Q    And then this OEO report contains what are called

12   findings of fact that begin on Page 04010105.  Do you see

13   that?

14   A    Yes.

15   Q    Can we agree that this OEO report was part of the

16   information the Washington State University considered as

17   part of its disenrollment process for Mr. Fleetwood?

18            MS. LEFING:   Objection.

19   A    I have no knowledge what they considered.  I will attest

20   that that appears to be a report from the Washington State

21   University office.  What they did with it, I have no idea.

22   I'm not privy to their administrative procedures at the

23   University.

24   Q    (BY MR. CROTTY)  So you don't know one way or the other

25   whether Washington State University ROTC or the



Fleetwood vs Washington State University                    Dan Patterson 03/31/2022

1   Disenrollment Board considered the OEO report dated June 13,

2   2019, you have no reason to know one way or the other?

3               MS. LEFING:  Objection.

4   A   That was not your original question.  Your original

5   question was Washington State University.  I will tell you

6   this is part of the Board packet, this document, so

7   therefore, it was the Disenrollment Board saw this

8   and knew this information.  You original question was did

9   the University and I have no knowledge of University

10  function.

11  Q   (BY MR. CROTTY)  Thank you for that clarification.

12  I appreciate that.  Just so we're clear, the Disenrollment

13  Board for Patrick Fleetwood considered as part of its

14  decision-making process this June 13, 2019, OEO report from

15  Washington State University?

16  A   It is --

17              MS. LEFING:  Objection.

18  A   It is a document that was presented to the Board.  How

19  much they considered it I have no idea.  It is a piece of

20  evidence that went to the Board.  The Board saw it.  Whether

21  they considered it, I do not know the mental -- what they

22  discussed, and I have no knowledge what was discussed by any

23  members of the Board or what they looked at or how much

24  weight they gave to any of the documents in this 100-plus

25  page thing you gave.



1   Q   (BY MR. CROTTY)  Can you think of anything other than

2   Finding 27 of the June 13, 2019, OEO report which is

3   reflected on Page 11 of 18 on the OEO report, also numbered

4   04010110, can you think of anything other than that

5   Paragraph 27 that is being referenced on Page 04010078 of

6   the report of the disenrollment proceedings?

7               MS. LEFING:  Same objection.

8   Q   (BY MR. CROTTY)  Go ahead and answer.

9   A   Having not read any of this document, and if I skimmed

10  it that was two and a half years ago, but I can tell you I

11  didn't read it.  If that is the only reference to videos, a

12  reasonable man might assume it was the same one.  But can I

13  testify precisely that it exactly is.  No.

14  Q   You're not aware of any other source of information

15  other than Paragraph 27 of this June 13, 2019, OEO report

16  where the issue of Mr. Fleetwood sending inappropriate

17  videos was brought to light before the Disenrollment Board?

18               MS. LEFING:  Objection.

19  A   As I said, having not read the 110-page plus, I don't

20  know if there are multiple references to videos besides that

21  document.  So if there were, there could be confusion.  So

22  if this is the only single one, one might assume they are

23  the same.

24  Q   (BY MR. CROTTY)  I am now going to take you to Exhibit

25  No. 9 of your Declaration.  Can you tell us what we're



Fleetwood vs Washington State University                Dan Patterson 03/31/2022

```
 1   A   Yes.

 2   Q   And then Mr. Fleetwood replies:  No.  They did not

 3   provide me any additional documents, which I know they have

 4   because I saw them when I visited their office.  I feel they

 5   are very unhelpful in helping me defend myself in

 6   participating in the bias investigation against me.

 7            Did I read that correctly?

 8   A   You read it correctly.  Yes.

 9            MR. CROTTY:  Let me take a couple minutes and

10   look through my notes and we should be done unless the State

11   Attorney has any questions for you.  Off the record.

12                         (A brief pause is taken.)

13                         (It is now 9:59 a.m.)

14            MR. CROTTY:  Back on the record.

15   Q   (BY MR. CROTTY)  Going back to Page 00010070, which is

16   the Exhibit 5 to your Declaration.  Mr. Fleetwood is telling

17   Colonel Stafford that he did not receive all the information

18   from Washington State University.  Is that a fair summary of

19   what Mr. Fleetwood is saying?

20   A   Yes.  Whether it's accurate or not, I don't know.

21   Q   Are you aware of, setting Mr. Fleetwood's contention

22   aside, are you aware of any other instance in your time with

23   the ROTC where a cadet accused of any misconduct requests

24   information from his or her university in preparation for a

25   Disenrollment Board and doesn't receive all of that
```

Central Court Reporting  800.442.3376

1  information, are you aware any other instance other than

2  what Mr. Fleetwood is alleging here?

3            MS. LEFING:  Objection.

4  A  I couldn't tell you.  I can't answer that.  Don't know.

5            MR. CROTTY:  I don't have any other questions at

6  this time.  Thank you, sir.

7                        EXAMINATION

8            MS. LEFING:  I have some questions.

9  BY MS. LEFING:.

10 Q  Good morning, Mr. Patterson.  For the record, my name is

11 Debra Lefing.  I am an Assistant Attorney General

12 representing Washington State University.

13            Can you please tell us what your current

14 position is in the Army?

15 A  I'm a Federal Employee GS14.  I am the Director of

16 Operations for the ROTC Brigade that is located at Joint

17 Base Lewis McChord, Washington.  We have the ROTC programs

18 from Montana to Guam at the college level.  Over.

19 Q  How many years have you been in this position?

20 A  Since I retired as a full Colonel with the ROTC since --

21 well, I have been a GS employed with ROTC since 2005 when

22 they reorganized the structure they changed the position, to

23 be honest, 2018 or 2019, I don't remember when exactly we

24 did the structure change and my title changed.

25 Q  You said you were in the Army; correct?



Fleetwood vs Washington State University    Dan Patterson 03/31/2022

1 A I had been for thirty years.

2 Q And your last position was that of a colonel?

3 A I was Chief of Staff of the western region ROTC here in

4 Fort Lewis as a full Colonel 06 in grade.

5 Q What were your job duties in that position?

6 A We oversaw -- as the Chief of Staff I oversaw the region

7 staff and at that time we oversaw the ROTC programs

8 everywhere from Pensacola, Florida, north to Michigan to

9 Guam.  We have 145 host universities and over 200 extensions

10 and we ran -- we supervise ROTC's from Pensacola, Florida,

11 to Guam.

12 Q Can we talk about your current position now.  What are

13 your job duties at Joint Fort Lewis McChord, am I saying

14 that correctly?

15 A Joint Base Lewis McChord.  Come on now, you're in

16 Olympia.

17 Q At JBLM.

18 A I'm not trying to be factitious at all.  I'm the No. 2

19 person in the brigade.  There's always a military person in

20 charge, a full colonel.  So when I retired my duties are

21 what I want to make them.  I visit the schools, I provide

22 advice and guidance.  I oversee their problem areas.  I help

23 them with civilian employment.  I help them with whatever

24 they need.  In reality I have a very, very nebulous job

25 description that being the No. 2 guy in the organization



Central Court Reporting   800.442.3376

1   kind of allows me to do what I want when I want.  Over.

2   Q   Well, can you explain then what your duties are with

3   regard to providing public records?

4   A   Oh.  I don't have any formal duties.  How this occurred

5   was when the request hit Washington State the PMS's defaults

6   to my experience to do a lot.  I believe I said give my

7   name.  Normally, I mean, I just had them print them off.

8   It's very easy.  To take the administrative burden off some

9   of my guys I said I'll hold them and sign them over.  The

10  reason I am listed on this is, again, they were in my office

11  and I'm the guy that gave them to you all in response to the

12  subpoena.  I kind of interface with some of the Cadet

13  Command, the lawyers there since I know who to call to make

14  sure I could do that and could release them.  I deal with a

15  lot of the legal actions with them.  So I contacted them.

16  They said yes, once you get a subpoena in writing.  And we

17  have no problem providing you with a copy of the

18  disenrollment packet.  It was just a matter I had to have

19  the written request, not just a verbal.

20  Q   So with regard to Fleetwood's records, who did you

21  receive those records from?

22  A   I believe my clerk next door, a guy named Steve

23  Remillard.  He just went into the system and just printed

24  them off for me.

25  Q   When you say system what are you referring to?



```
 1   A   I what?

 2   Q   You tell the truth?

 3   A   Yes.

 4   Q   And you would sign things with your signature that

 5   stated the truth; correct?

 6   A   Yes.

 7   Q   Mr. Patterson, were you on Mr. Fleetwood's Disenrollment

 8   Board?

 9   A   No.

10   Q   Did you have any role in Mr. Fleetwood's disenrollment?

11   A   I believe my only role was I had the authority to tell

12   the other three schools to provide a name to Washington

13   State University to serve on the Board.  Other than that,

14   that is the only role I had.  And I probably selected the

15   PMS Stafford to be the Board President of the three schools.

16   Q   Were you involved in any decision making with regard to

17   the disenrollment of Mr. Fleetwood?

18   A   Absolutely not.

19   Q   Did you draft any of the documents in your Declaration?

20   A   Negative.

21   Q   Were you involved in any part of Washington State

22   University's investigation of Mr. Fleetwood?

23   A   Not the University's not at all, nor the ROTC Department

24   anything they did, other than helping them to find people to

25   appointment to run the Board.
```



Fleetwood vs Washington State University                    Dan Patterson 03/31/2022

```
 1              MS. LEFING:  I'm looking over my notes for one
 2    second.  I have no further questions.  Thank you, Mr.
 3    Patterson.
 4                          EXAMINATION
 5              MR. CROTTY:  One follow-up really quick.
 6    BY MR. CROTTY:
 7    Q   Have you taken any steps to check the accuracy of any of
 8    the documents contained in your Declaration?
 9    A   No.  They were provided to me by my trusted guy who
10    downloaded them.
11    Q   Do you know if your trusted guy who has downloaded them
12    has taken any steps to independently confirm the accuracy of
13    any of the documents?
14    A   He can confirm that they are what is in ACA.
15              MR. CROTTY:  I don't have any other questions.
16    Thank you, sir.  I appreciate it.
17              THE COURT REPORTER:  Mr. Crotty, will you be
18    ordering up this transcript?
19              MR. CROTTY:  Yes.  And then how fast can you --
20    what's your usual turnaround time?
21                     (Discussion off the record.)
22              THE COURT REPORTER:  What are you looking at?
23              MR. CROTTY:  I just need it by April 25.
24              THE COURT REPORTER:  That's no problem.
25              MS. LEFING:  I'd like a copy too.
```

Fleetwood vs Washington State University                    Dan Patterson 03/31/2022

```
 1   STATE OF WASHINGTON )
                        :  ss:   REPORTER'S CERTIFICATE
 2   COUNTY OF SPOKANE  )

 3

 4                I, d'Anne Meyers, a notary public in and

 5   for the State of Washington, do hereby certify:

 6                That the foregoing deposition of DAN

 7   PATTERSON was taken on the date and at the time and place as

 8   shown on Page 1 hereto;

 9                That the witness was sworn upon his oath

10   to tell the truth, the whole truth and nothing but the truth

11   and did thereafter make answers as appear herein;

12                That the foregoing is a true and correct

13   transcription of my shorthand notes of the requested

14   deposition transcribed by me or under my direction;

15                That the witness' signature was waived.

16

17   My hand this 4th day of April 2022.

18

19                _____

20                D'ANNE MEYERS,
                  CCR No. WA 2478
21                The State of Washington

22

23

24

25
```

Central Court Reporting

1

Patterson 3-31-22

| From: | Matthew Crotty |
|---|---|
| To: | Patterson, Dan B CIV USARMY USACC (USA) |
| Cc: | Goblirsch, Timothy G (Tim) CIV USARMY USAG (USA); Babri, Ingrid J CPT USARMY USACC (USA) |
| Subject: | Following Up - Fleetwood v. WSU - Deposition |
| Date: | Tuesday, March 15, 2022 4:56:59 PM |

Dan,

Thanks for the note and for not being too harsh on my POG status. FWIW I'm not a matter lawyer either but that's a different discussion for a different day.

Let's shoot for 9 AM PST on March 31st. It should not take long. I'll send you a Zoom link for the deposition.

Tim/Ingrid – can you please let me know if you have any  issues with me emailing Mr. Patterson a deposition subpoena? If that won't work please let me know the name/address of the person who you want personally served with the subpoena.

RLTW!

Matt

Matthew Z. Crotty
Crotty & Son Law Firm, PLLC
905 W. Riverside Ave.
Ste. 404
Spokane, Washington 99201
+1.509.850.7011
https://www.crottyandson.com/

**From:** Patterson, Dan B CIV USARMY USACC (USA) <dan.b.patterson.civ@army.mil>
**Sent:** Tuesday, March 15, 2022 1:54 PM
**To:** Matthew Crotty <matt@crottyandson.com>
**Cc:** Goblirsch, Timothy G (Tim) CIV USARMY USAG (USA) <timothy.g.goblirsch.civ@army.mil>; Babri, Ingrid J CPT USARMY USACC (USA) <ingrid.j.babri.mil@army.mil>
**Subject:** Fleetwood v. WSU - Deposition

Mr. Crotty:

After looking at my calendar, any time on 29 or 31 March will work for me for the Deposition.   So send me a time that works for you.   As I mentioned to you on the phone, the only reason my name is on those records is I had the ROTC program at WSU send me the records as an intermediary to package them to provide to the State AG's office responding to their subpoena for records.     I have never met the Cadet, nor did I participate in any disenrollment board, and as of today I haven't even looked at the packet of material I provided the State AG's office, so my deposition is

going to be fairly boring.    You have my cell number and my email.

Tim/Ingrid:

Mr. Crotty is the attorney representing a former Cadet Fleetwood in a lawsuit against Washington State University (not ROTC, but the school itself), but the disenrollment of the Cadet is part of suit.    I acted as a "way-station" back in January obtaining the disenrollment packet from WSU ROTC to provide to the state AG's office which had subpoenaed them.    CPT Babri had sent me emails on this back on 17 November and you sent an email on 10 Nov.    Anyway, Mr. Crotty is going to have to subpoena me to testify and he wants to know if it should go thru ya'll or can he send it straight to me.    Again, I have no problem telling him all I did was collect a copy of the packet from the school and give it to the AG's office.    I thought I might have kept a copy on my computer but then remember I had them sent to me hard copy and I gave that to the state, so I really have no knowledge of this case.      Can he send me the subpoena directly or do you want him to send it to you to review it first?.      FYI – Mr. Crotty is a product of the Gonzaga Army ROTC program (Class of 97), even served in the Ranger Regt. so for a lawyer he's not all bad!    (and he liked my one lawyer joke!) ☺    - although he did go MI as a branch and not combat arms ☹

Dan B. Patterson
Director of Brigade Operations
8th Bde, USACC
JBLM, WA 98433
(o) 253-967-2340
(c) 253-376-6682
dan.b.patterson.civ@army.mil


**From:** Matthew Crotty <matt@crottyandson.com>
**Sent:** Tuesday, March 15, 2022 12:13 PM
**To:** Patterson, Dan B CIV USARMY USACC (USA) <dan.b.patterson.civ@army.mil>
**Cc:** Lefing, Debra (ATG) <debra.lefing@atg.wa.gov>
**Subject:** [URL Verdict: Neutral][Non-DoD Source] Fleetwood v. WSU - Deposition

All active links contained in this email were disabled. Please verify the identity of the sender, and confirm the authenticity of all links contained within the message prior to copying and pasting the address to a Web browser.

---

Hi Mr. Patterson,

My name is Matt Crotty and I'm the lawyer representing Patrick Fleetwood in a lawsuit against Washington State University. As you probably know WSU's attorney (Debra Lefing, cc'd) filed a declaration with the Court.

I would like to schedule your deposition for March 29, 30, or 31. It will be via Zoom. I anticipate it taking between two and three hours.

Can you please advise me as to your availability ASAP?

Thanks,

Matt

Matthew Z. Crotty
Crotty & Son Law Firm, PLLC
905 W. Riverside Ave.
Ste. 404
Spokane, Washington 99201
+1.509.850.7011
Caution-https://www.crottyandson.com/ < Caution-https://www.crottyandson.com/ >