FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

Jun 27, 2022

SEAN F. McAVOY, CLERK

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| PATRICK FLEETWOOD and MICHAEL FLEETWOOD, | No. 2:20-CV-00355-SAB |
| Plaintiffs, | |
| v. | **ORDER RE: DAN PATTERSON DECLARATION; GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT; DISMISSING CASE** |
| WASHINGTON STATE UNIVERSITY, | |
| Defendant. | |

Before the Court is Defendant's Motion for Summary Judgment, ECF No. 32, and the parties' supplemental briefing regarding Dan Patterson's Declaration, ECF Nos. 57, 59. The motion and briefing were considered without oral argument. Plaintiffs are represented by Matthew Crotty. Defendant is represented by Debra Lefing and Brian Baker.

Having considered the briefing and the applicable caselaw, the Court (1) determines that Dan Patterson is a qualified witness sufficient to satisfy Fed. R. Evid. 803(6); (2) grants Defendant's Motion for Summary Judgment; and (3) dismisses the case for lack of subject-matter jurisdiction.

//

//

//

**ORDER RE: DAN PATTERSON DECLARATION; GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT; DISMISSING CASE # 1**

**Factual Background**

The following facts are pulled from the parties' Statements of Fact, ECF Nos. 33, 38, 43, and are construed in the light most favorable to Plaintiffs, the non-moving party.

### I.   Mr. Fleetwood's Contract with ROTC

On January 1, 2016, Plaintiff Patrick Fleetwood ("Mr. Fleetwood") entered into a contract with the Department of the Army ("the Army") and the Reserve Officers' Training Corps ("ROTC") to participate in the ROTC program at Defendant Washington State University ("WSU"). As part of the contract, the Army agreed to pay Mr. Fleetwood three and a half years of financial assistance for his education, including tuition, school fees, monthly subsistence, and a flat fee for textbooks. In exchange, Mr. Fleetwood agreed to serve up to four years on active duty as a commissioned officer in the Army, if offered the position. In the contract, Mr. Fleetwood also agreed that if he became "disenrolled from the ROTC program for breach of contractual terms or any other disenrollment criteria established now or in the future by Army regulations," he would "reimburse the United States government through repayment of an amount of money, plus interest, equal to the entire amount of financial assistance . . . paid by the United States from the commencement of the contract to the date of his disenrollment." The Army states that it paid a total of $32,617.13 in financial assistance to Mr. Fleetwood from the commencement of the contract to the date of his disenrollment.

### II.   Initial Sexual Harassment Allegations against Mr. Fleetwood

During late November or early December 2018, Mr. Fleetwood, then a fourth-year ROTC cadet, began a sexual relationship with B.K., a first-year ROTC cadet. The relationship ended sometime in December 2018.

On January 18, 2019, two cadets submitted Sworn Statements to ROTC in support of a sexual harassment complaint against Mr. Fleetwood. The first Sworn

**ORDER RE: DAN PATTERSON DECLARATION; GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT; DISMISSING CASE # 2**

Statement was from B.K., who stated that she had "character concerns about Cadet Patrick Fleetwood, specifically regarding his sexist behavior towards women" and alleged that Mr. Fleetwood had improperly retaliated against her after she refused to resume a sexual relationship with him after their break-up. The second Sworn Statement was from Cadet J.S., who also alleged that Mr. Fleetwood had engaged in harassing behavior towards B.K. and stated that he had similar concerns about Mr. Fleetwood's sexist behavior.

These Sworn Statements were submitted to Lieutenant Colonel ("LTC") Brendan Hobbs, who initiated a counseling session with Mr. Fleetwood on January 22, 2019. During the counseling session, LTC Hobbs notified Mr. Fleetwood that he had contacted the campus Title IX coordinator to initiate an investigation into Mr. Fleetwood's conduct between December 2018 and January 18, 2019. Thus, WSU's Office of Equal Opportunity ("OEO") reached out to B.K. about filing a formal Title IX Complaint.

III.   OEO's Investigation of the Sexual Harassment Allegations against Mr. Fleetwood

The OEO is WSU's "neutral investigative office for potential violations of Executive Policy 15," which prohibits discrimination, sexual harassment, and sexual misconduct. At the time of Mr. Fleetwood's investigation, Executive Policy 15 defined sexual harassment as "a form of discrimination based on sex and/or gender." Specifically, Executive Policy 15 stated that "sexual harassment creates a hostile environment when behavior is sufficiently severe, persistent, or pervasive enough to interfere with an individual's work or educational performance, or creates an intimidating, hostile, or offensive work or educational environment."

Executive Policy 15 provided examples of conduct that could be found to create a hostile environment, one of which was "sexual conduct that is unwelcome," such as (1) comments of a sexual nature; (2) sexually explicit

**ORDER RE: DAN PATTERSON DECLARATION; GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT; DISMISSING CASE # 3**

statements, questions, jokes, or anecdotes; (3) unwanted, offensive, and/or uninvited comments about another's physical appearance; (4) display of pictures with sexual content; (5) persistent, unwanted attempts to change a professional relationship to an amorous relationship; (6) subtle propositions for sexual activity or directed propositions of a sexual nature; and/or (7) uninvited letters, e-mails, telephone calls, or other correspondence referring to or depicting sexual activities.

According to Daniel Records—who served as a senior coordinator in the OEO in 2019—when someone files a complaint of sexual harassment, the OEO will first perform an intake interview with the complaining party to determine whether an investigation into the complaint is warranted. If the OEO determines that an investigation *is* warranted, the OEO will then issue a formal letter of notice to the accused student, outlining the allegations against them. Mr. Records estimates that the OEO receives approximately 600-700 complaints each year, around 60-70% of which involve sexual harassment or sexual misconduct. Mr. Records also states that, of these 600-700 complaints, approximately 25-30% of the complainants do not want to respond or engage in the OEO process. Finally, Mr. Records states that the OEO probably averages around 60-70 investigations per year.

Here, OEO Investigators Nikki Finnestead and Rachel Brooks conducted the intake interview with B.K. on January 24, 2019. Because Ms. Brooks was new in the office at the time, Ms. Finnestead took the lead on the intake interview—however, Ms. Finnestead transferred B.K.'s case over to Ms. Brooks on January 28, 2019 because she was leaving the office. Plaintiffs note that Ms. Finnestead has a B.A. in multi-cultural and gender studies; has a background in working with victims of domestic violence and sexual assault; and has worked on the WSU's Presidential Commission on the Status of Women, as well as received awards such as the Washington State Women of the Year Award.

**ORDER RE: DAN PATTERSON DECLARATION; GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT; DISMISSING CASE # 4**

In her deposition, Ms. Brooks stated that both she and Ms. Finnestead made the decision to initiate an investigation into B.K.'s complaint. Ms. Brooks stated that the decision to investigate was based on (1) their determination that, if Mr. Fleetwood was found to have committed the alleged conduct, such conduct would rise to the level of a violation of Executive Policy 15; and (2) B.K.'s willingness and desire to proceed with an investigation. After several exchanges with B.K. regarding what details to include in the formal letter of notice to Mr. Fleetwood, Ms. Brooks hand-delivered the letter to Mr. Fleetwood on January 31, 2019, notifying him of the sexual harassment investigation.

From February 6, 2019 to April 19, 2019, Ms. Brooks conducted over a dozen witness interviews, including with B.K. and Mr. Fleetwood. As part of her investigation, Ms. Brooks interviewed numerous witnesses provided by B.K.— however, when Ms. Brooks asked Mr. Fleetwood if he would like to recommend witnesses to interview, he declined, stating it would be "hard to find an unbiased person in the program."

On June 13, 2019, Ms. Brooks issued her OEO Investigation Report, which recommended that WSU find Mr. Fleetwood responsible for violating Executive Policy 15.

Plaintiffs allege multiple improprieties regarding Ms. Brooks' investigation. Specifically, Plaintiffs argue that Ms. Brooks (1) interviewed witnesses about instances of Mr. Fleetwood's conduct outside the scope of B.K.'s initial complaint, specifically regarding a September 2017 Snapchat video Mr. Fleetwood sent to others which depicted himself having sex; (2) did not inform Mr. Fleetwood of this change in the focus of the investigation; (3) did not tell Mr. Fleetwood that he could refuse to answer any questions and that these refusals would not be held against him; (4) made inconsistent credibility determinations regarding key witnesses (*i.e.*, found that some of a witness's allegations were unsubstantiated, but

**ORDER RE: DAN PATTERSON DECLARATION; GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT; DISMISSING CASE # 5**

found the witness credible overall); (5) did not recall discussing whether any of Mr. Fleetwood's statements were protected by the First Amendment; (6) told Mr. Fleetwood not to delete any electronic communication or contact any other witnesses, but did not instruct B.K. to do the same; (7) asked Mr. Fleetwood about his prior sexual history, despite testifying that OEO does not take a student's consensual sexual history into consideration when determining responsibility; and (8) when sending the Investigation Report, told B.K. that "should this matter proceed to a formal administrative hearing, your participation is important to that process" and that her "[l]ack of participation may have an impact on the outcome."

Plaintiffs also argue that, of the nine cases Ms. Brooks investigated at OEO where a woman accused a man of engaging in sexual harassment, Ms. Brooks found in favor of the woman accuser every time except for one. Similarly, Plaintiffs note that, of the ten cases Ms. Finnestead investigated at OEO where a woman accused a man of engaging in sexual harassment, Ms. Finnestead found in favor of the woman every time except for one. Plaintiffs contrast this against Mr. Records' testimony that, on average, OEO finds no violation of a university policy 50-60% of the time in sexual harassment cases.

IV.    The Center for Community Standards' Finding that Mr. Fleetwood Violated Executive Policy 15

Pursuant to Executive Policy 15, after OEO issues its Investigative Report, it forwards its report, witness interviews, and documentary evidence to WSU's Center for Community Standards. The Center for Community Standards is responsible for reviewing the evidence and making the official determination regarding (1) whether a student has violated a university policy; and (2) if so, what sanctions should be imposed.

The Center for Community Standards can proceed through one of two adjudication processes. First, the Center for Community Standards can proceed

**ORDER RE: DAN PATTERSON DECLARATION; GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT; DISMISSING CASE # 6**

through a Conduct Officer hearing, which is generally a one-hour conversation between the student and a Conduct Officer from WSU. The student is permitted to invite an advisor to their Conduct Officer hearing and consult with them during breaks—however, the advisor is not permitted to speak for the student at the hearing. Attending the hearing is optional for the student. If the student attends, they and the Conduct Officer review the evidence in the record and discuss the reported incident and possible outcomes. If the student does not attend, the Conduct Officer simply makes the decision based on the submitted materials. After the hearing, the Conduct Officer can: (1) find the student not responsible; (2) dismiss the reported incident (*i.e.*, does not find the student responsible or not responsible, but instead allows review of the incident to continue and be re-opened at a later date); (3) determine that more investigation is necessary before a decision can be made; (4) refer the matter to the Conduct Board; or (5) find the student responsible and impose educational or disciplinary sanctions. A Conduct Officer *cannot* impose sanctions such as suspension, expulsion, and/or revocation of degrees or university recognition.

Alternatively, the Center for Community Standards can proceed through a Conduct Board hearing, which is a more formal adjudication process. The Conduct Board hearing includes at least five Conduct Board members and generally lasts several hours. The accused student can choose to have a legal representative speak on their behalf at the hearing and can also invite an advisor to consult with during breaks. An accused student at a Conduct Board hearing also has the right to cross examine witnesses. At the end of the hearing, the Conduct Board can: (1) find the student not responsible; (2) dismiss the reported incident; or (3) find the student responsible and impose educational and disciplinary sanctions. In order to find responsibility and impose sanctions, a majority of the Conduct Board must agree,

**ORDER RE: DAN PATTERSON DECLARATION; GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT; DISMISSING CASE # 7**

*unless* the sanction involves expulsion or revocation of degrees or university recognition, in which case it requires a supermajority.

Here, upon receiving and reviewing the OEO Investigation Report, the Center for Community Standards notified Mr. Fleetwood that he may have violated Executive Policy 15 and that it would schedule a Conduct Officer hearing (not a formal Conduct Board hearing) to address the allegations against him. Mr. Fleetwood's Conduct Officer hearing was originally scheduled for October 21, 2019, but was postponed to October 29, 2019 at his request. Mr. Fleetwood attended his Conduct Officer hearings on October 29, 2019, and December 5, 2019. Karen Metzner, the Director of the Center for Community Standards, served as Mr. Fleetwood's Conduct Officer.

On December 16, 2019, Ms. Metzner issued a letter notifying Mr. Fleetwood that, after considering all the evidence in Mr. Fleetwood's conduct file and the information he provided, she was finding him responsible for violating Executive Policy 15. Specifically, Ms. Metzner found that Mr. Fleetwood had engaged in sexual harassment by (1) sending unwanted pictures of himself in a towel to other ROTC cadets; (2) sending unwanted sexual videos to ROTC cadets via Snapchat; and (3) making sexual comments about B.K. to other cadets.

As a result of the finding, Mr. Fleetwood was tasked with the following sanctions: (1) creating an action plan; (2) writing a reflection paper on the #metoo movement and community repair; (3) being put on disciplinary probation; (4) enrolling in a state-approved alcohol and drug information school; (4) obeying a no contact directive; and (5) having an enrollment hold on his degree until he completed these other sanctions. At the end of the letter, the Center for Community Centers notified Mr. Fleetwood that he had twenty-one calendar days to appeal the decision to the University Appeals Board.

**ORDER RE: DAN PATTERSON DECLARATION; GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT; DISMISSING CASE # 8**

Plaintiffs also allege multiple improprieties regarding Ms. Metzner's decision. Specifically, Plaintiffs argue that Ms. Metzner (1) could not identify a time where she disagreed with OEO's recommended findings on either responsibility or sanctions; (2) did not give Mr. Fleetwood the opportunity to utilize the Conduct Board process, even though he told her that ROTC might remove him from the program based on the decision of the conduct process; (3) discussed Mr. Fleetwood's case with Ms. Brooks, even though this was outside the norm for a Conduct Officer to discuss ongoing investigations with OEO investigators; (4) had two off-the-record conversations—first with Ms. Brooks on June 13, 2019 (the day Ms. Brooks sent the OEO Investigation Report to the Center for Community Standards), and second with B.K. sometime in late September or early October 2019; and (5) did not investigate or seriously consider the evidence Mr. Fleetwood provided to support his own defense and did not address his concerns regarding the flaws in Ms. Brooks' investigation. Plaintiffs also argue that, of the four cases Ms. Metzner has adjudicated where a woman accused a man of engaging in sexual harassment, Ms. Metzner found in favor of the woman each time.

V.    The University Appeals Board's Agreement that Mr. Fleetwood Violated Executive Policy 15

On January 5, 2020, Mr. Fleetwood appealed the Center for Community Standards' December 16, 2019 finding to WSU's University Appeals Board. In his appeal letter, Mr. Fleetwood noted the many procedural flaws he perceived in his case, such as (1) Ms. Brooks' reliance on witnesses with easily verifiable credibility/bias issues; (2) Ms. Metzner's failure to address the flawed nature of Ms. Brooks' investigation; (3) WSU's failure to provide Mr. Fleetwood with full access to investigation records; (4) the lack of evidence substantiating B.K.'s

**ORDER RE: DAN PATTERSON DECLARATION; GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT; DISMISSING CASE # 9**

allegations; and (5) the addition of evidence, such as the 2017 Snapchat video, that was outside the scope of B.K.'s complaint.

On February 12, 2020, the University Appeals Board convened to consider Mr. Fleetwood's appeal. A University Appeals Board is made up of three members, one of which is designated as Chair and is tasked with ensuring the accused student receives a fair and impartial process. Here, Mr. Fleetwood was originally notified that TJ Page, Olivia Shoesmith, and Riley Guttromson would serve on his Appeals Board with TJ Page serving as Chair.

When considering an appeal, the University Appeals Board reviews all of the evidence in the Center for Community Standards case file, as well as any appeals materials submitted by the parties. However, the Appeals Board does not hear testimony and does not allow the parties to attend the meeting.

On February 21, 2020, the University Appeals Board sent Mr. Fleetwood a letter, notifying him that it was affirming the Center for Community Standards' decision. The University Appeals Board noted that it had considered (1) whether the Conduct Officer's hearing was conducted fairly and in conformity with prescribed procedures; (2) whether the decision was based on substantial information which was sufficient to support a violation of the university policy; (3) whether the sanctions were appropriate, given the violation; and (4) whether there existed any new information sufficient to alter the decision that was not known to the Conduct Officer at the time of the original hearing.

However, Plaintiffs once again point out what they perceive to be improprieties in the appeals process. These include (1) the University Appeals Board not providing any specific details or reasoning in their decision letter; (2) the Appeals Board changing the Chair from TJ Page to Olivia Shoesmith without explanation; (3) the Appeals Board not following WSU's Procedural Guidelines for Executive Policy 15 violations, specifically by not including the listed

**ORDER RE: DAN PATTERSON DECLARATION; GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT; DISMISSING CASE # 10**

rationales/documents with their decision letter; and (4) Ms. Metzner not forwarding Mr. Fleetwood's character witness letters to the Appeals Board.

## VI.   ROTC's Disenrollment Hearings for Mr. Fleetwood

On July 26, 2019, the Army notified Mr. Fleetwood that it was initiating his disenrollment from ROTC. The Army told Mr. Fleetwood that he was entitled to a hearing before an Army Disenrollment Board prior to the Army making a disenrollment decision—Mr. Fleetwood thus requested a disenrollment hearing.

Mr. Fleetwood's disenrollment hearing was originally scheduled for October 11, 2019. The Army told Mr. Fleetwood that the purpose of the hearing was to determine whether the evidence reasonably established, by a preponderance of the evidence, the following issues: (1) whether a valid ROTC contract existed between Mr. Fleetwood and the Army; (2) whether Mr. Fleetwood had breached any of the terms of the contract and, if so, how; (3) whether Mr. Fleetwood received advanced educational assistance from the U.S Government in the amount of $32,617.63 while enrolled in ROTC, which would constitute a valid debt to the United States; (4) whether there were grounds for his disenrollment in accordance with Army Regulation 145-1, paragraph 3-43a(14), *i.e.*, undesirable character as demonstrated by a violation of WSU Executive Policy 15; (5) whether the U.S. Government should recoup the amount of indebtedness or instead order repayment via enlisted active duty; and (6) if enlisted active duty was appropriate, whether Mr. Fleetwood should repay in whole or incur partial forgiveness for the resulting debt. The Army also told Mr. Fleetwood that he could submit written statements and witnesses for the hearing to aid the Disenrollment Board in making its decision.

Mr. Fleetwood requested that his disenrollment hearing be postponed so he could have more time to review documents and prepare his case. Thus, the Army moved Mr. Fleetwood's disenrollment hearing to December 9, 2019.

**ORDER RE: DAN PATTERSON DECLARATION; GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT; DISMISSING CASE #** 11

At the December 9, 2019 disenrollment hearing, the Army Disenrollment Board—which consisted of three appointed commissioned officers—heard testimony from ROTC cadets (including Mr. Fleetwood); reviewed exhibits and sworn statements from witnesses involved in the case; and reviewed other materials from Mr. Fleetwood's file (character letters submitted on his behalf, awards he had received, and peer evaluation reports from the ROTC). At the hearing, Mr. Fleetwood admitted that he had sent the Snapchat video of himself having sex, as well as a picture of himself shirtless and in a towel to male and female cadets.

On December 17, 2019, the Army Disenrollment Board recommended that Mr. Fleetwood be disenrolled from ROTC for breach of contract. Specifically, the Board stated that this decision was based on Mr. Fleetwood's undesirable conduct, specifically his sending of explicit photos/videos and showing other cadets naked and inappropriate photos of women.

On August 13, 2020, the Headquarters of the Army notified Mr. Fleetwood that it was disenrolling and discharging him from ROTC pursuant to Army Regulation 145-1. The Headquarters of the Army also notified Mr. Fleetwood that he would be responsible for repaying the $32,617.63 he had received in educational assistance and denied his request to contribute towards repayment through enlisted active duty.

**Procedural History**

Plaintiffs Patrick Fleetwood and Michael Fleetwood (Mr. Fleetwood's father) filed a complaint in the Whitman County Superior Court in March 2020. ECF No. 5 at 6. Plaintiffs alleged that WSU's Appeals Board decision—affirming the Center for Community Standards' December 16, 2019 determination that Mr. Fleetwood's actions violated WSU Executive Policy 15—was a misapplication of the law and was not supported by substantial evidence, thereby violating the

**ORDER RE: DAN PATTERSON DECLARATION; GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT; DISMISSING CASE # 12**

Washington Administrative Procedure Act ("state APA"). *Id.* at 10-21. Plaintiffs also alleged that WSU's denial of their public records requests and failure to provide Mr. Fleetwood access to his investigative file violated the Washington Public Record Act. *Id.* at 21-23. WSU filed both its Answer and a Motion to Dismiss Count One of Plaintiff's Complaint on April 2, 2020. *Id.* at 33, 42.

The state court denied WSU's Motion to Dismiss on May 7, 2020. *Id.* at 94-95. The state court then issued an Administrative Scheduling Order on May 12, 2020. *Id.* at 96-97. On June 30, 2020, Ms. Metzner filed the certified agency record with the state court. *Id.* at 111. On July 31, 2020, Plaintiffs filed their Opening Brief. *Id.* at 448. But on August 19, 2020, Plaintiffs filed a Motion to Amend their complaint to add additional claims, including First Amendment, Fourteenth Amendment, Title IX, Washington Law Against Discrimination ("WLAD") gender discrimination, and tortious interference with contract claims. *Id.* at 483-488. The state court granted the Motion to Amend on September 2, 2020. *Id.* at 577. WSU filed its Response Brief on September 21, 2020, and its Answer to Plaintiffs' Amended Complaint on October 5, 2020. *Id.* at 612-34, 637. Finally, on October 2, 2020, WSU filed a Notice of Removal of the case to this Court. *Id.* at 667; *see also* ECF No. 1.

On October 26, 2020, Plaintiffs filed a Motion to Remand, primarily on the grounds of *Younger* abstention. ECF No. 7. On January 21, 2021, the Court denied the motion to remand the case, stating that *Younger* abstention was not appropriate because there was no longer an ongoing state proceeding post-removal. ECF No. 11. Thus, on March 5, 2021, Plaintiffs filed a motion requesting that the Court rule on their pending state APA claim. ECF No. 23. However, on May 19, 2021, after reviewing the submitted materials, the Court declined to exercise supplemental jurisdiction and instead remanded the state APA claim back to state court. ECF No. 29.

**ORDER RE: DAN PATTERSON DECLARATION; GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT; DISMISSING CASE # 13**

On September 29, 2021, Judge Gary Libey of the Whitman County Superior Court held a hearing on Plaintiffs' state APA claim. After hearing argument from both parties, Judge Libey found that WSU had violated the Washington Administrative Procedure Act when it found that Mr. Fleetwood had violated Executive Policy 15. First, Judge Libey stated that the University Appeals Board's failure to consider the three character witness letters Mr. Fleetwood submitted to Ms. Metzner was sufficient in and of itself to make WSU's decision arbitrary and capricious. Second, Judge Libey stated that, while he was "not making separate findings of facts, conclusions of law . . . [or] particularly weighing the evidence," he believed that "Mr. Fleetwood present[ed] a very compelling argument . . . that he did not commit sexual harassment and that he did not commit retaliation, and that even the totality of the circumstances doesn't come up to the definition of sexual harassment under the new EP 15 definition as it is based in the code." Finally, Judge Libey concluded by stating that "although it's a close call," he found that the evidence in the record did not support WSU's decision that Mr. Fleetwood had violated Executive Policy 15.

On January 25, 2022, WSU filed the present Motion for Summary Judgment in this Court, seeking to dismiss Plaintiffs' First Amendment, Fourteenth Amendment, Title IX, WLAD gender discrimination, and tortious interference with contract claims. ECF No. 32. Plaintiffs filed their response on February 11, 2022, indicating that they were withdrawing their First Amendment and Fourteenth Amendment claims. ECF No. 37.

However, on February 11, 2022, Plaintiffs also filed a Motion to Exclude Dan Patterson, who submitted a declaration in support of WSU's Motion for Summary Judgment. ECF No. 41; *see also* ECF No. 36. Specifically, Plaintiffs argued that Mr. Patterson's declaration violated Fed. R. Civ. P. 26 because WSU had not disclosed Mr. Patterson as a witness in its initial disclosures. WSU in

**ORDER RE: DAN PATTERSON DECLARATION; GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT; DISMISSING CASE # 14**

response argued that Mr. Patterson was merely a records custodian and thus his nondisclosure was harmless, especially given that Mr. Fleetwood had been given all of the records included in Mr. Patterson's declaration.

On March 3, 2022, the Court issued an Order Denying Plaintiffs' Motion to Exclude Dan Patterson. ECF No. 49. However, after holding a hearing with both parties, the Court permitted Plaintiffs' counsel to depose Mr. Patterson prior the Court ruling on WSU's Motion for Summary Judgment. The Court also allowed Plaintiffs to submit any supplemental briefing associated with Mr. Patterson's declaration and deposition. ECF Nos. 50, 53.

The parties submitted their supplemental briefing regarding Mr. Patterson on April 25, 2022 and May 3, 2022. ECF Nos. 57, 59. Jury trial in this case is currently scheduled for March 20, 2023. ECF No. 56.

### Dan Patterson's Declaration

As a threshold matter, the Court must determine whether Dan Patterson's Declaration, ECF No. 36, can be considered when ruling on WSU's Motion for Summary Judgment.

In Mr. Patterson's declaration, he states that he has been the Director of Operations for the 8th ROTC Brigade (US Army Cadet Command) at Joint Base Lewis-McChord, Washington, for 10 years. ECF No. 36. Additionally, Mr. Patterson states that, in this position, he is "responsible for public records released from 8th Brigade, Cadet Command through the disclosure process, including in response to discovery in civil and criminal cases and in response to a subpoena duces tecum. While Cadet Records are maintained at the school location, when requests for official records are received, the school programs provide [him] the requested documents which [he] vet[s] with the Cadet Command Office of the Staff Judge Advocate (Fort Knox, KY), and upon their approval[,] release to the requestor."

**ORDER RE: DAN PATTERSON DECLARATION; GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT; DISMISSING CASE # 15**

Attached to Mr. Patterson's declaration are twelve records: (1) Mr. Fleetwood's ROTC Scholarship Cadet Contract dated January 21, 2016; (2) Mr. Fleetwood's U.S. Army Advanced Education Financial Assistance Record dated July 25, 2019; (3) a memorandum to Mr. Fleetwood from WSU ROTC regarding his Notification of Disenrollment dated July 26, 2019; (4) the Report of Mr. Fleetwood's Disenrollment Proceedings by Board of Officers dated December 9, 2019; (5)  the Formal Board Findings and Recommendations regarding Mr. Fleetwood's disenrollment dated December 17, 2019; (6) a memorandum to Mr. Fleetwood from the Army regarding his disenrollment from ROTC dated August 19, 2020; (7) the Addendum to Part 1 of Mr. Fleetwood's Scholarship Contractual Agreement dated August 19, 2020: (8) a memorandum to Mr. Fleetwood notifying him of the appointment of the Board of Officers for his disenrollment hearing dated September 17, 2019; (9) a letter from Mr. Fleetwood to LTC Stafford dated October 2, 2019; (10) emails between Mr. Fleetwood and LTC Stafford, the most recent of which is dated October 10, 2019; (11) the Addendum to Part II of Mr. Fleetwood's Cadet Contract dated August 15, 2019; and (12) a memorandum for Institutional Representative Donald Holbrook regarding Determination of University Representative – Determination of Suitability for Retention in the Army dated September 18, 2019.

Plaintiffs argue that Mr. Patterson is not a custodian of records or an otherwise qualified witness sufficient to satisfy Fed. R. Evid. 803(6) and therefore the records attached to his declaration are inadmissible pursuant to the business record exception to the hearsay rule. WSU in response argues that (1) Mr. Patterson is a qualified witness sufficient to satisfy FRE 803(6); and (2) the records attached to Mr. Patterson's declaration are admissible because they were produced in response to a subpoena.

//

**ORDER RE: DAN PATTERSON DECLARATION; GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT; DISMISSING CASE # 16**

1

<u>Legal Standard</u>

2    When ruling on a motion for summary judgment, a district court can only

3    consider admissible evidence. Fed. R. Civ. P. 56(c)(2); *Orr v. Bank of Am.*, 285

4    F.3d 764, 773 (9th Cir. 2002). Unauthenticated documents and hearsay evidence

5    that do not qualify for an exception are inadmissible and, consequently, may not be

6    considered on summary judgment. *Orr*, 285 F.3d at 773-74, 778.

7    FRE 803(6) is the business record exception to hearsay. It states that "a

8    record of an act, event, condition, opinion, or diagnosis" is admissible if:

9

10    (A)    The record was made at or near the time by—or from
             information transmitted by—someone with knowledge;

11    (B)    The record was kept in the course of a regularly conducted

12           activity of a business, organization, occupation, or calling,
             whether or not for profit;

13    (C)    Making the record was a regular practice of that activity;

14    (D)    All these conditions are shown by the testimony of the
             custodian or another qualified witness, or by a certification that

15           complies with Rule 902(11) or (12) or with a statute permitting
             certification; and

16

17    (E)    The opponent does not show that the source of information or
             the method or circumstances of preparation indicate a lack of

18           trustworthiness.

19

20    Here, Plaintiffs do not appear to be disputing that the records attached to Mr.

21    Patterson's declaration satisfy requirements (A) – (C) of 803(6). Instead, Plaintiffs

22    are disputing requirement (D), arguing that Mr. Patterson is not a qualified witness

23    regarding the submitted records.

24    The Ninth Circuit has stated the role of the FRE 803(6)(D) custodian or

25    qualified witness is to "testify to the methods of keeping the information." *N.L.R.B.*

26    *v. First Termite Control Co.*, 646 F.2d 424, 427 (9th Cir. 1981). More specifically,

27    the custodian or qualified witness must have sufficient knowledge of "the manner

28

**ORDER RE: DAN PATTERSON DECLARATION; GRANTING
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT; DISMISSING
CASE # 17**

in which the records are made and kept" such that they can "be subjected to meaningful cross-examination." *Id.* Otherwise, "[w]ithout cross-examination on the keeping of the records, the trier of fact would have no rational basis on which to evaluate the accuracy of the record, and therefore the trustworthiness of the evidence." *Id.*

However, the Ninth Circuit has also stated that the phrase "other qualified witness" has been "broadly interpreted to require only that the witness understand the record-keeping system," not necessarily that they be an employee of the business or someone with knowledge of how the records were made or maintained. *United States v. Ray*, 930 F.2d 1368, 1370 (9th Cir. 1990); *ABS Ent., Inc. v. CBS Corp.*, 908 F.3d 405, 426 (9th Cir. 2018). Additionally, "[i]t is unimportant under Fed. R. Evid. 803(6) that the custodian did not herself record the information or know who recorded the information." *United States v. Basey*, 613 F.2d 198, 202 n.1 (9th Cir. 1979).

Finally, the Ninth Circuit has insinuated that, if there are other indicia that the accuracy of the records is not contested (*i.e.*, the party challenging the admissibility of the records has relied on them outside of litigation), this may support the admissibility of the records, even if the qualified witness does not have perfect knowledge of every aspect of the record-keeping system. *See ABS Ent., Inc.*, 908 F.3d at 426 ("Here, CBS itself relied on the reports to establish its royalty payments to Sound Exchange in the ordinary course of business . . . . CBS has presented no evidence or argument showing that the Triton Reports were unreliable or inaccurate.").

## Discussion

Mr. Patterson is a qualified witness under FRE 803(6)(D) for the records submitted to his declaration.

//

**ORDER RE: DAN PATTERSON DECLARATION; GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT; DISMISSING CASE # 18**

First, Mr. Patterson's deposition testimony shows that he has an understanding of the record keeping system used by WSU ROTC and the Army to create and maintain the submitted records. Mr. Patterson testified that the submitted records came from "the ACA system. It's just a reposit . . . . It's some type of an Automated Cadet Action system where universities can input, scan them at their level." Patterson Dep., ECF No. 60 at 41:1-7. Additionally, when Mr. Patterson was asked "is it typical for university ROTC to submit documents through that system regarding their cadets?", Mr. Patterson replied "daily." *Id.* at 41:14-16.

Mr. Patterson's deposition testimony also demonstrates his knowledge regarding the manner in which the records are made and kept. For example, he testified that a cadet's file in the ACA system would consist of "training records, his academic records, the evaluation, counseling records . . . . Basically, it's a training file, academic file how you're tracking. Later on it would have their summer camp records and how well they performed at the ROTC summer camp, which is now held at Fort Knox, Kentucky, used to be from Fort Lewis. And then information about their choice, if they were going active duty is they would file what branch it served. Their personnel file." *Id.* at 12:3-14.

He also testified that this personnel file containing a cadet's records is created for "[e]very cadet once a contractor" and that—for cadets who were receiving scholarships from ROTC, such as Mr. Fleetwood—"there is a record created on every cadet when they contract because they have to take a physical, their medical records are in there, their contract is in there, their pay records is in there. Again, we are paying them to go to school and so then everything else, once you're done—once you're contracted a copy of your transcripts go in, counseling, those are a personnel file is created." *Id.* at 43:17, 43:22-25, 44:1-3.

**ORDER RE: DAN PATTERSON DECLARATION; GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT; DISMISSING CASE # 19**

Finally, Mr. Patterson testified that any records "being used for a cadet action," "request for scholarship, request for a leave of absence, a Disenrollment Board" would be put into a cadet's personnel file in the ACA system. *Id.* at 43:2-7. He estimated that he probably receives "five of these a week – maybe three or four a week" of requests for records from the ACA system for disenrollment actions. *Id.* at 12:17-25.

These portions of his deposition testimony demonstrate that Mr. Patterson has sufficient knowledge of the manner in which the submitted records were made and kept. Thus, the Court finds that Mr. Patterson is a qualified witness under FRE 803(6)(D) and therefore will consider Mr. Patterson's declaration in ruling on WSU's Motion for Summary Judgment.[1]

### WSU's Motion for Summary Judgment

WSU requests that the Court grant summary judgment in its favor on all of Plaintiffs' claims except for the Washington Public Record Act claim. Specifically, WSU seeks summary judgment dismissal on Plaintiffs' Title IX, WLAD gender discrimination, and tortious interference with contract claims.  WSU argues that there is no genuine dispute of material fact on these claims because there is a "total lack of evidence that anyone at the University had any gender discriminatory

---

[1] The Court concedes that there are portions of Mr. Patterson's deposition testimony which show his less-than-perfect understanding of all aspects of the record-keeping system. However, based on the Ninth Circuit's broad interpretation of who constitutes a qualified witness under FRE 803(6)(D), Mr. Patterson has demonstrated sufficient knowledge to cross the threshold. Moreover, Plaintiffs are not substantially challenging the accuracy of records submitted as part of Mr. Patterson's declaration.

**ORDER RE: DAN PATTERSON DECLARATION; GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT; DISMISSING CASE # 20**

animus against him and that the University did not interfere with Fleetwood's ROTC contract with the Army." ECF No. 32 at 2-3.

Plaintiffs in response argue that there are disputes of material fact, specifically regarding (1) whether WSU's decision to find Mr. Fleetwood responsible for violating Executive Policy 15 was an erroneous outcome; (2) whether this erroneous outcome was due to gender bias in WSU's student conduct process; (3) whether WSU engaged in disparate treatment based on gender bias; and (4) whether WSU's decision to initiate the student conduct process was based on gender bias. ECF No. 37.

<u>Legal Standard</u>

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). There is no genuine issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). The moving party has the initial burden of showing the absence of a genuine issue of fact for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the moving party meets its initial burden, the non-moving party must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248.

In addition to showing there are no questions of material fact, the moving party must also show it is entitled to judgment as a matter of law. *Smith v. Univ. of Wash. Law Sch.*, 233 F.3d 1188, 1193 (9th Cir. 2000). The moving party is entitled to judgment as a matter of law when the non-moving party fails to make a sufficient showing on an essential element of a claim on which the non-moving party has the burden of proof. *Celotex*, 477 U.S. at 323. The non-moving party

**ORDER RE: DAN PATTERSON DECLARATION; GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT; DISMISSING CASE # 21**

cannot rely on conclusory allegations alone to create an issue of material fact. *Hansen v. United States*, 7 F.3d 137, 138 (9th Cir. 1993).

When considering a motion for summary judgment, a court may neither weigh the evidence nor assess credibility; instead, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255.

<u>Discussion</u>

1. *Title IX claim*

WSU requests that the Court grant summary judgment in its favor and dismiss Plaintiffs' Title IX claim. Specifically, WSU argues that Plaintiffs have not created a genuine dispute of material fact regarding whether WSU discriminated against Mr. Fleetwood on the basis of his gender.

Plaintiffs in response that there is a genuine dispute of material fact regarding whether WSU discriminated against Mr. Fleetwood on the basis of his gender, specifically as evidenced by (1) the Whitman County Superior Court's order finding WSU's decision arbitrary and capricious; (2) the statistical evidence regarding the outcome of sexual harassment investigations conducted by Ms. Brooks and Ms. Finnestead; (3) the disparate treatment of B.K. and Mr. Fleetwood during the student conduct process; (4) Ms. Brooks ignoring B.K.'s "gender-biased" statements and unfounded allegations; and (5) other procedural irregularities and indications of gender bias on the part of Ms. Brooks and Ms. Finnestead.

To state a Title IX claim, a plaintiff must show that (1) the defendant educational institution receives federal funding; (2) they were excluded from participation in, denied the benefits of, or subjected to discrimination under any education program or activity; and (3) the exclusion/denial/discrimination occurred on the basis of gender. *Schwake v. Arizona Bd. of Regents*, 967 F.3d 940, 946 (9th

**ORDER RE: DAN PATTERSON DECLARATION; GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT; DISMISSING CASE # 22**

Cir. 2020). Title IX bars the imposition of university discipline where gender is a motivating factor in the decision to discipline. *Id.* (internal quotation and citation omitted).

Previously, the Ninth Circuit had acknowledged the existence of distinct doctrinal claims under Title IX, such as "erroneous outcome" or "selective enforcement" claims. However, in 2020, the Ninth Circuit clarified that all Title IX claims would be analyzed under the same standard: "whether the alleged facts, if true, raise a plausible inference that the university discriminated against the plaintiff on the basis of sex." *Id.* at 947 (internal quotation and citation omitted).

The Ninth Circuit also recently clarified that it "construe[s] Title IX's protections consistently with those of Title VII." *Doe v. Snyder*, 28 F.4th 103, 114 (9th Cir. 2022). Thus, the Court applies the same *McDonnell Douglas* standard to Plaintiffs' Title IX claim as it would to a motion for summary judgment for a Title VII claim.

Under the *McDonnell Douglas* standard, the plaintiff bears the initial burden of establishing a prima facie case of discrimination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Once the plaintiff has done so, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its actions. *Id.* If the employer articulates a legitimate reason, the plaintiff must raise a triable issue that the employer's proffered reason is pretext for unlawful discrimination. *Id.*; *see also Austin v. Univ. of Oregon*, 925 F.3d 1133, 1136 (9th Cir. 2019) ("The [*McDonnell Douglas*] framework is a tool to assist plaintiffs at the summary judgment stage so that they may reach trial.") (internal quotation and citation omitted).

The Court grants WSU's motion as to Plaintiffs' Title IX claim. Plaintiffs have not created a dispute of material fact regarding (1) whether any of the alleged procedural flaws in WSU's student conduct process were related to gender bias;

**ORDER RE: DAN PATTERSON DECLARATION; GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT; DISMISSING CASE # 23**

and/or (2) whether any of the actions taken by the individuals involved in Mr.
Fleetwood's student conduct process were motivated by gender bias.

Plaintiffs present several categories of evidence which they argue illustrate
WSU's gender bias against Mr. Fleetwood. First, Plaintiffs argue that there is
"statistical evidence of gender bias," specifically that Ms. Brooks, Ms. Finnestead,
and Ms. Metzner almost always find in favor of women in sexual harassment
cases. ECF No. 37 at 6. However, this fact, standing alone, is insufficient to
demonstrate gender bias. Additionally, Plaintiffs have provided no corresponding
statistics about whether Ms. Brooks, Ms. Finnestead, and Ms. Metzner have
refused to find in favor of a male accuser in sexual harassment cases. *See, e.g.*,
*Austin*, 925 F.3d at 1138 ("The student athletes . . . allege that, because the
University disciplines male students for sexual conduct but never female students,
it is biased against men. But this allegedly disparate impact, even assuming it is
true, claims too much. Significantly, the complaint does not claim that any female
University students have been accused of comparable misconduct, and thus fails to
allege that similarly situated students—those accused of sexual misconduct—are
disciplined unequally.").

Second, Plaintiffs argue that the disparate treatment of B.K. compared to Mr.
Fleetwood during the student conduct process is evidence of gender bias. ECF No.
37 at 6-11. Specifically, Plaintiffs state that Ms. Brooks (1) told Mr. Fleetwood not
to delete electronic communication or to contact/influence witnesses; and (2)
faulted Mr. Fleetwood for interfering with the student conduct process by reaching
out to witnesses—but conversely, Ms. Brooks did not advise B.K. of the same
things and did not admonish B.K. when she deleted electronic communication or
contacted witnesses. Additionally, Plaintiffs argue that Ms. Brooks (1) highlighted
Mr. Fleetwood's inconsistent answers over the course of the investigation, but
ignored B.K.'s inconsistent/inaccurate allegations; (2) ignored B.K.'s motivations

**ORDER RE: DAN PATTERSON DECLARATION; GRANTING**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT; DISMISSING**
**CASE # 24**

for making the complaint, as well as her gender-biased statements against men (*i.e.*, that Mr. Fleetwood was a "male whore who slept with 30 women in a semester"; that all men are "assholes," "fuck boys," "dickheads," "thirsty," or "flexing their testosterone"; and that she was "losing faith in men real quick"); (3) gave limited weight to statements in support of Mr. Fleetwood's character; and (4) allowed B.K. to modify her statements in the original complaint given to Mr. Fleetwood to be less specific and to contain less direct quotes.

Under the *McDonnell Douglas* analysis—and construing the facts in the light most favorable to Plaintiffs—this evidence of disparate treatment is sufficient to create a prima facie case of gender discrimination. However, the Court still grants WSU's motion because (1) WSU has offered a legitimate, nondiscriminatory reason for finding Mr. Fleetwood responsible for violating Executive Policy 15; (2) Plaintiffs have not presented any evidence that WSU's disciplinary actions were pretext for gender discrimination; and (3) Plaintiffs have not presented any evidence that any disparate treatment of B.K. compared to Mr. Fleetwood was motivated by gender bias and/or resulted in an erroneous outcome.

First, WSU offered a sufficiently legitimate and nondiscriminatory reason for its finding that Mr. Fleetwood violated Executive Policy 15—namely, that it had evidence that Mr. Fleetwood had sent sexual videos and photos to non-consenting recipients. Such conduct fits squarely into the examples of unwelcome sexual conduct sufficient to create a hostile environment in Executive Policy 15 (*e.g.*, display of pictures with sexual content; uninvited correspondence depicting sexual activities).

Additionally, Plaintiffs have not presented any evidence that any of the flaws in Ms. Brooks' investigative practices were motivated by gender bias or that WSU's decision to find Mr. Fleetwood responsible for violating Executive Policy 15—which only happened after *two more levels* of review by the Center for

**ORDER RE: DAN PATTERSON DECLARATION; GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT; DISMISSING CASE # 25**

Community Standards and the University Appeals Board—was pretext for gender discrimination. *See Austin*, 925 F.3d at 1138 ("[T]he student athletes do not articulate any basis to discern that the administration or outcomes of the disciplinary proceedings were flawed due to the student athletes' sex. Even if the outcome of the administrative conference procedure was erroneous, the complaint is missing any factual allegations that show that sex discrimination was the source of any error.") (internal citation omitted).

Finally, the U.S. Supreme Court has stated that, in the context of Title IX, "courts should refrain from second-guessing the disciplinary decisions made by school administrators." *Davis Next Friend LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 648 (1999). Thus, the Court concludes that Plaintiffs' provided examples of disparate treatment between B.K. and Mr. Fleetwood are insufficient to create a dispute of material fact regarding gender discrimination.

Third, Plaintiffs argue that the investigators on Mr. Fleetwood's student conduct case were gender biased. For example, Plaintiffs argue that Ms. Finnestead "has a history of working with female domestic violence victims, served on WSU's Vagina Monologues production team, served on WSU's commission on the status of women, hosted 'FEMPowerment' lunches at WSU" and "bears guilt for previously blaming a high school friend for being sexually assaulted." ECF No. 37 at 7. However, these do not constitute examples of gender bias. By making such an argument, Plaintiffs are essentially taking the position that a person who engages in advocacy on issues such as domestic violence, feminism/female empowerment, and sexual assault is inherently biased against men, which the Court staunchly rejects. Additionally, Plaintiffs' evidence of gender bias on the part of the investigators does not rise anywhere near the level of gender discrimination found in other cases. *See Dominguez-Curry v. Nevada Transp. Dep't*, 424 F.3d 1027, 1038 (9th Cir. 2005) (finding that a decisionmaker's sexist comments such as

**ORDER RE: DAN PATTERSON DECLARATION; GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT; DISMISSING CASE # 26**

"women have no business in construction," "women should only be in subservient positions," and "I'm going to hire a guy" were related to the hiring decision process and that "[w]here a decisionmaker makes a discriminatory remark against a member of the plaintiff's class, a reasonable factfinder may conclude that discriminatory animus played a role in the challenged decision.").

Thus, because Plaintiffs have not raised a "plausible inference that the university discriminated against him on the basis of gender," the Court grants WSU's motion as to Plaintiffs' Title IX claim. *Schwake*, 967 F.3d at 947.

2. *WLAD gender discrimination claim*

Washington courts have largely adopted the *McDonnell Douglas* standard when evaluating motions for summary judgment on state law discrimination claims where the plaintiff lacks direct evidence of discriminatory animus. *Hill v. BCTI Income Fund-I*, 144 Wash. 2d 172, 180 (2001) *abrogated on other grounds by Mikkelsen v. Pub. Util. Dist. No. 1 of Kittitas Cnty.*, 189 Wash. 2d 516 (2017). However, Washington courts are still "free to adopt" theories and rationales other than the *McDonnell Douglas* standard when they "best further the purposes and mandates of our state statute." *Id.* (internal quotation and citation omitted).

Here, because the Court has already found that Plaintiffs have not created a dispute of material fact regarding gender discrimination for Plaintiffs' Title IX claim, the Court similarly grants WSU's motion as to Plaintiffs' WLAD gender discrimination claim. Even if the Court deviates from the *McDonnell Douglas* analysis, the Court does not find that adopting any alternate theory or rationale would further the anti-discriminatory purpose of the WLAD in this case.

3. *Tortious interference with contract claim*

Lastly, WSU requests that the Court grant summary judgment in its favor on Plaintiffs' tortious interference with contract claim. WSU argues that there is no genuine dispute of material fact regarding whether WSU tortiously interfered with

**ORDER RE: DAN PATTERSON DECLARATION; GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT; DISMISSING CASE # 27**

Mr. Fleetwood's ROTC contract because the Army's decision to disenroll Mr. Fleetwood was based on its own independent fact-finding hearing, which took place *prior* to the Center for Community Standards' finding that Mr. Fleetwood had violated Executive Policy 15.

Plaintiffs in response argue that there is a dispute of material fact regarding tortious interference because Ms. Brooks, Ms. Finnestead, and Ms. Metzner knew of Mr. Fleetwood's ROTC contract and were aware that the WSU's student conduct process could have negative consequences for Mr. Fleetwood's involvement with ROTC. Plaintiffs also argue that, though the Army did hold a disenrollment hearing for Mr. Fleetwood, the disenrollment process would not have happened if not for WSU's investigation, which unearthed the evidence supporting the disenrollment decision (*i.e.*, the 2017 Snapchat video). Finally, Plaintiffs argue that the fact that the Whitman County Superior Court found that WSU's disciplinary actions against Mr. Fleetwood were arbitrary and capricious is sufficient to support that WSU had an improper purpose and/or used improper means in interfering with Mr. Fleetwood's ROTC contract.

In order to prove a claim of tortious interference with a contract, a plaintiff must show five elements: that (1) a valid contract existed; (2) the defendant had knowledge of that contract; (3) the defendant intentionally interfered, thereby inducing/causing a breach or termination of that contract; (4) the defendant interfered for an improper purpose or used improper means; and (5) the defendant's interference resulted in damage. *Leingang v. Pierce Cnty. Med. Bureau, Inc.*, 131 Wash. 2d 133, 157 (1997). Intentional interference requires an improper objective or the use of wrongful means that in fact cause injury to the person's contractual relationship. *Id*. Interference by improper means includes interference that is wrongful by reason of a statute or other regulation, or a recognized rule of common law, or an established standard of trade or profession.

**ORDER RE: DAN PATTERSON DECLARATION; GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT; DISMISSING CASE # 28**

*Pleas v. City of Seattle*, 112 Wash. 2d 794, 804 (1989). A party exercising its legal interests in good faith does not constitute improper interference. *Id.*

It appears that the parties are only disputing elements (3) and (4) of Plaintiffs' tortious interference claim. Thus, the Court will focus its analysis accordingly.

The Court grants WSU's motion as to Plaintiffs' tortious interference with contract claim. First, Plaintiffs have not created a dispute of material fact regarding whether WSU intentionally interfered and thereby induced/caused the termination of Mr. Fleetwood's ROTC contract. It is undisputed that WSU only initiated the student conduct process after ROTC reached out and requested that the campus Title IX coordinator investigate Mr. Fleetwood's conduct, which does not comport with a common-sense understanding of the word "interfere."

Additionally, Plaintiffs argue that WSU "induced" ROTC's decision to disenroll Mr. Fleetwood through the Center for Community Standards' decision to find Mr. Fleetwood responsible for violating Executive Policy 15. However, the Center for Community Standards issued its finding that Mr. Fleetwood was responsible for violating Executive Policy 15 on December 16, 2019. Meanwhile, the Army held its disenrollment hearing for Mr. Fleetwood on December 9, 2019. Thus, the Disenrollment Board could not have been "induced" to make its recommendation based on Ms. Metzner's finding because she had not yet issued it at the time of Mr. Fleetwood's disenrollment hearing.

Plaintiffs have also failed to create a dispute of material fact regarding whether WSU interfered with Mr. Fleetwood's ROTC contract for an improper purpose and/or used improper means. For one, OEO only initiated an investigation after independently reviewing B.K.'s allegations for sufficient plausibility. Moreover, though Plaintiffs argue that B.K. and/or J.S. had an improper objective in making a sexual harassment complaint against Mr. Fleetwood, Plaintiffs have

**ORDER RE: DAN PATTERSON DECLARATION; GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT; DISMISSING CASE # 29**

presented no evidence showing that WSU shared in that objective. In fact, Ms. Brooks testified that she investigated the theory (provided to her by Mr. Fleetwood) that B.K. only made the sexual harassment allegations as part of some "collaborative collusion" against him, but testified that she did not find much evidence to support this theory. ECF No. 40, Exhibit C, Brooks Dep. 118:8-24.

Finally, Mr. Fleetwood concedes that, at his Army disenrollment hearing, he testified and admitted to sending the 2017 Snapchat video as well as other explicit photos. Accordingly, in the Army's Formal Board Findings and Recommendations issued on December 17, 2019, after Mr. Fleetwood's disenrollment hearing, the Disenrollment Board stated that its reason for recommending Mr. Fleetwood's disenrollment was because of Mr. Fleetwood "sending out . . . explicit videos and showing other Cadets naked and inappropriate photos of women," which "is not something a Cadet of Character would do and is not in compliance with the Army Values." ECF No. 36, Exhibit 5. This is sufficient to show that the Army's disenrollment decision was independent of WSU's student conduct process.

Therefore, because the evidence in the record shows that WSU did not intentionally interfere with Mr. Fleetwood's ROTC contract and that ROTC engaged in its own independent disenrollment hearing before deciding to remove Mr. Fleetwood from the ROTC program the Court grants WSU's motion as to Plaintiffs' tortious interference claim.

### Lack of Federal Subject-Matter Jurisdiction

Now that the Court has granted summary judgment in favor of Defendant on Plaintiffs' Title IX, WLAD, and tortious interference with contract claims, the only remaining claim in the case is Plaintiffs' Washington Public Record Act claim.

However, Defendant removed this case to federal court based on (1) federal question jurisdiction pursuant to 28 U.S.C. § 1331; and (2) civil rights jurisdiction pursuant to 28 U.S.C. § 1343. ECF No. 1 at 2 ("This is a civil action of which this

**ORDER RE: DAN PATTERSON DECLARATION; GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT; DISMISSING CASE # 30**

court has original jurisdiction under 28 U.S.C. § 1331 and § 1343."). Now that the Court has resolved Plaintiffs' Title IX claim, the Court no longer has federal subject-matter jurisdiction under either basis. Thus, the Court dismisses the action for lack of subject-matter jurisdiction. Fed. R. Civ. P. 12(h)(3); *see also California Diversified Promotions, Inc. v. Musick*, 505 F.2d 278, 280 (9th Cir. 1974).

Accordingly, **IT IS HEREBY ORDERED**:

1.    Defendant's Motion for Summary Judgment, ECF No. 32, is **GRANTED**.

2.    The Clerk's Office is directed to enter judgment in favor of Defendant.

3.    The above-captioned case is **DISMISSED** without prejudice.

**IT IS SO ORDERED.** The District Court Clerk is directed to enter this Order, provide copies to counsel, and **close** the file.

**DATED** this 27th day of June 2022.



Stanley A. Bastian
Chief United States District Judge

**ORDER RE: DAN PATTERSON DECLARATION; GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT; DISMISSING CASE # 31**